# 2023-2177(L); -2178; -2179; -2180
## Volume I of III (Pages: Appx1–999)

In The

# United States Court Of Appeals
# For The Federal Circuit

## EPIC GAMES, INC.,

*Appellant,*

v.

## INGENIOSHARE, LLC,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD IN IPR2022-00202, IPR2022-00291,
IPR2022-00294, IPR2022-00295

———————

## JOINT APPENDIX

———————

Carolyn Chang
Ryan J. Marton
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94014
carolyn@martonribera.com
ryan@martonribera.com

*Counsel for Appellant*

Stephen R. Risley
KENT & RISLEY LLC
5755 N Point Parkway
Alpharetta, GA 30022
(770) 585-2101
steverisley@kentrisley.com

*Counsel for Appellee*

## <u>TABLE OF CONTENTS</u>
### Joint Appendix Volume I of III

| Paper/Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 29 | Final Written Decision (IPR2022-00202) | Appx00001-00062 |
| 30 | Final Written Decision (IPR2022-00291) | Appx00063-00128 |
| 30 | Final Written Decision (IPR2022-00294) | Appx00129-00190 |
| 27 | Final Written Decision (IPR2022-00295) | Appx00191-00254 |
| Exhibit 1001 (IPR2022-00202) | U.S. Patent No. 10,142,810 | Appx00255-00279 |
| Exhibit 1001 (IPR2022-00291) | U.S. Patent No. 10,708,727 | Appx00280-00304 |
| Exhibit 1001 (IPR2022-00294; IPR2022-00295) | U.S. Patent No. 10,492,038 | Appx00305-00334 |
| | Certified List IPR2022-00202 (without attachment) | Appx00335-00336 |
| | Certified List IPR2022-00291 (without attachment) | Appx00337-00338 |
| | Certified List IPR2022-00294 (without attachment) | Appx00339-00340 |
| | Certified List IPR2022-00295 (without attachment) | Appx00341-00342 |

| IPR2022-00202 | | |
|---|---|---|
| 2 | Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810 | Appx00343; Appx00356; Appx00376; Appx00384-00386; Appx00416-00417 |
| Exhibit 1003 | Declaration of Kevin Almeroth in Support of Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810 | Appx00847-00999 |

## <u>TABLE OF CONTENTS</u>
### Joint Appendix Volume II of III

| Paper/Exhibit No. | Description | Appendix Pages |
|---|---|---|
| Exhibit 1007 | U.S. Patent Application 2002/0016461 (Diacakis) | Appx01088-01107 |
| Exhibit 1008 | U.S. Patent Application 2004/0001480 (Tanigawa) | Appx01108-01143 |
| 6 | Patent Owner's Preliminary Response | Appx03126-03155 |
| Exhibit 2001 | Complaint IngenioShare v. Epic Games | Appx03156; Appx03173-03179 |
| Exhibit 3001 | Memorandum Opinion and Order Granting Defendant Epic Games, Inc.'s Motion to Dismiss for Improper Venue | Appx03290; Appx03298 |
| 8 | Petitioner's Reply to Patent Owner's Preliminary Response | Appx03306 |
| 9 | Institution Decision | Appx03311-03320; Appx03327-03329 |
| 13 | Patent Owner's Response | Appx03395; Appx03407-03411; Appx03413-03416 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx03483; Appx03496-03503 |
| Exhibit 2006 | Decision Denying Institution of IPR2022-00297 | Appx03552-03553 |
| Exhibit 2008 | Dr. Rouskas CV | Appx03586-03615 |
| 16 | Petitioner's Reply to Patent Owner's Response | Appx03621; Appx03628-03655 |

| Exhibit 1040 | What is a Web Portal | Appx03816-03820 |
| Exhibit 1041 | Gartner Glossary – Mobile Portal | Appx03821-03825 |
| Exhibit 1042 | Deposition of George Rouskas, Ph.D. | Appx03826-04070 |

## **TABLE OF CONTENTS**
**Joint Appendix Volume III of III**

| Paper/Exhibit No. | Description | Appendix Pages |
|---|---|---|
| Exhibit 1042 | Deposition of George Rouskas, Ph.D., Continued | Appx04071-04251 |
| 19 | Patent Owner's Sur-Reply | Appx04256-04261; Appx04263-04264 |
| 27 | Epic Games' Demonstratives | Appx04404; Appx04410-04424 |
| 28 | Hearing Transcript | Appx04475; Appx04478-04490; Appx04515-04518 |
| Exhibit 3003 | IEEE 100 The Authoritative Dictionary of IEEE Standards Terms | Appx04554-04556 |
| Exhibit 3004 | Microsoft Computer Dictionary (5th Edition) | Appx04557-04559 |
| Exhibit 3005 | Microsoft Internet & Networking Dictionary | Appx04560-04562 |
| **IPR2022-00291** | | |
| 1 | Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727 | Appx04563; Appx04577; Appx4596; Appx04606-4608; Appx04639-04640 |

| | | |
|---|---|---|
| Exhibit 1003 | Declaration of Dr. Kevin Almeroth in support of Inter Partes Review of U.S. Patent Nos. 10,708,727 and 10,492,038 | Appx04842;<br>Appx04869-04870;<br>Appx04882-04890;<br>Appx04905-04906;<br>Appx04993-04997;<br>Appx05066-05067 |
| 7 | Patent Owner's Preliminary Response | Appx05209-05210 |
| 10 | Decision Granting Institution of Inter Partes Review | Appx05264-05265;<br>Appx05273-05274 |
| 14 | Patent Owner's Response | Appx05323-05326;<br>Appx05329-05331 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx05412-05413 |
| 17 | Petitioner's Reply to Patent Owner's Response | Appx05480-05487 |
| 20 | Patent Owner's Sur-Reply | Appx05682-05683 |
| **IPR2022-00294** | | |
| 1 | Petition for Inter Partes Review for U.S. Patent No. 10,492,038 | Appx05699;<br>Appx05714;<br>Appx05734;<br>Appx05741-05743 |
| 10 | Patent Owner's Preliminary Response | Appx06563-06564 |
| 13 | Institution Grant | Appx06604-06605 |
| 17 | Patent Owner's Response | Appx06678-06682;<br>Appx06686-06688 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx06733-06734 |
| 19 | Petitioner's Reply to Patent Owner's Response | Appx06838-06845 |

| IPR2022-00295 | | |
|---|---|---|
| 1 | Petition for Inter Partes Review for U.S. Patent No. 10,492,038 | Appx06896; Appx06911; Appx06931; Appx06942-06944 |
| 8 | Patent Owner's Preliminary Response | Appx07011-07017 |
| 10 | Petitioner's Reply to Patent Owner's Preliminary Response | Appx07018-07027 |
| 11 | Institution Decision:  Grant | Appx07028-07101 |
| Exhibit 1039 | Supplemental Declaration of Dr. Kevin Almeroth | Appx07102-07108 |
| 15 | Patent Owner's Response | Appx07109-07112; Appx07129-07132; Appx07135-07137 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx07195-07196 |
| 17 | Petitioner's Reply to Patent Owner's Response | Appx07239-07246 |
| | CERTIFICATE OF FILING AND SERVICE | |

Trials@uspto.gov                                    Paper 29
571-272-7822                              Entered: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

———————

IPR2022-00202
Patent 10,142,810 B2

———————

Before THU A. DANG, PATRICK M. BOUCHER, and
STEVEN M. AMUNDSON, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* BOUCHER.

Opinion Dissenting filed by *Administrative Patent Judge* AMUNDSON.

BOUCHER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00202
Patent 10,142,810 B2

In response to a Petition (Paper 2, "Pet.") filed by Epic Games, Inc. ("Petitioner"), we instituted an *inter partes* review of claims 1–20 of U.S. Patent No. 10,142,810 B2 (Ex. 1001, "the '810 patent"). Paper 9 ("Dec."). During the trial, IngenioShare, LLC ("Patent Owner") filed a Response (Paper 13, "PO Resp."), to which Petitioner filed a Reply (Paper 16, "Reply") and Patent Owner filed a Sur-reply (Paper 19, "Sur-reply"). An oral hearing was held with the parties, and a copy of the transcript was entered into the record. Paper 28 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has not shown, by a preponderance of the evidence, that any of claims 1–20 is unpatentable.

## I. BACKGROUND

### A. The '810 Patent

The '810 patent relates to "automatically remov[ing] unwanted communications." Ex. 1001, 3:43–44. Figure 6 of the '810 patent is reproduced below.

IPR2022-00202
Patent 10,142,810 B2



FIG. 6

Figure 6 depicts communication system 100, which can support different communication devices, including mobile telephones 102, computers 104, and/or wireless personal digital assistants 106. *Id.* at 8:24–29. Users of such communication devices can communicate "with like or different communication devices," each of which offers one or both of audio or text communication capabilities. *Id.* at 8:29–32. Intercommunication of devices 102–106 can take place through network 108, which "can include one or more of voice networks and data networks." *Id.* at 8:32–35.

With the system, "[a] communication gateway or a portal is formed," thereby allowing a user "to receive communications from numerous sources through different modes." *Id.* at 4:13–15. "Based on the portal, the user can securely determine who can reach him at what conditions." *Id.* at 4:25–26.

IPR2022-00202
Patent 10,142,810 B2

Such conditions may include the status of the user, "access priorities" of the person trying to reach the user, and/or the urgency of the message from the person. *Id.* at 4:27–32.

The following table is reproduced from the '810 patent.

| Alice (Wife) | ContactClass1 |
| Peter (Close Friend) | ContactClass2 |
| Colina (Close Friend's wife) | ContactClass2 |

The table identifies different people and their relationships to a particular user, as well as "ContactClasses" to which such people are assigned and which reflect the various access priorities. *Id.* at 6:13–20. By way of example, if Peter wants to make a mobile phone call to the user, Peter calls the portal, which can be the user's internet service provider. *Id.* at 6:21–23. After verifying Peter's identity, the portal establishes contact by creating a virtual address for a communication session and determines that Peter belongs to "ContactClass2." *Id.* at 6:23–39. The portal implements various connectivity options depending on the status of the user, Peter's access priority according to his ContactClass, and Peter's urgency setting. *Id.* at 6:44–46. Connectivity options include allowing the user to receive Peter's call directly or asking Peter to leave a voicemail message, with the user notified of Peter's call by a short mobile message. *Id.* at 6:44–49. In some instances, communication requests can be classified into "different degrees of undesirability," thereby automatically blocking some requests from the user or automatically diverting them to be handled by another mechanism, "such as diverting a phone call to an email or voice mail." *Id.* at 4:47–52.

4

IPR2022-00202
Patent 10,142,810 B2

*B. Illustrative Claim*

The '810 patent includes three independent claims that respectively recite "[a] computer-implemented method for managing electronic communications using at least a network-based portal at least based on Internet protocol" (claim 1), "[a] computing apparatus for managing electronic communications using at least a network-based portal at least based on Internet protocol" (claim 11), and "[a] non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications using at least a network-based portal at least based on Internet protocol" (claim 19). Ex. 1001, 20:2–4, 21:28–30, 22:56–59. Independent claim 1 is illustrative of the challenged claims and is reproduced below.

> 1. A computer-implemented method for managing electronic communications using at least a network-based portal at least based on Internet protocol, the method comprising:
>
> providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user,
>
> wherein the plurality of communication options include text messaging and voice communication, and
>
> wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;
>
> receiving an indication regarding one of the plurality of communication options, via the network-based portal, from an electronic device associated with the first user, the indication

IPR2022-00202
Patent 10,142,810 B2

indicating the selected option of communication for the message from the plurality of communication options provided;

permitting the second user to block the first user from reaching the second user via the network-based portal; and

enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user,

wherein the method comprises determining availability of the second user,

wherein the method requires contact information associated with the second user to allow the second user to receive messages via the network-based portal,

wherein even when the message is received by the second user through the electronic device associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user, and

wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.

Ex. 1001, 20:2–58.

### C. Evidence

Petitioner relies on the following references:

| | | | |
|---|---|---|---|
| Diacakis | US 2002/0116461 A1 | Aug. 22, 2002 | Ex. 1007 |
| Tanigawa | US 2004/0001480 A1 | Jan. 1, 2004 | Ex. 1008 |
| Hullfish | US 7,428,580 B2 | Sept. 23, 2008 | Ex. 1009 |

6

IPR2022-00202
Patent 10,142,810 B2

In addition, Petitioner relies on Declarations by Kevin C. Almeroth, Ph.D. Exs. 1003, 1038. Patent Owner relies on a Declaration by George N. Rouskas, Ph.D. Ex. 2005. Dr. Rouskas was cross-examined by Petitioner, and a transcript of his deposition was entered into the record. Ex. 1042.

### D. Instituted Grounds of Unpatentability

We instituted review of claims 1–20 on the following grounds. Dec. 12, 73; Pet. 5.

| Claim(s) Challenged | 35 U.S.C. §[1] | References |
|---|---|---|
| 1–20 | 103(a) | Diacakis |
| 1–9, 11–17, 19, 20 | 103(a) | Tanigawa, Hullfish |

### E. Real Parties in Interest

The parties identify only themselves as real parties in interest. Paper 21, 1; Paper 4, 2.

### F. Related Matters

The parties identify *IngenioShare, LLC v. Epic Games, Inc.*, No 6:21-cv-00663 (W.D. Tex.) as a related matter. Paper 21, 1; Paper 4, 2.

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103 effective March 16, 2013. Petitioner asserts that, "[b]ased on the claimed priority date of the '810 Patent, Pre-AIA versions of §102(a) and §103 apply." Pet. 4 n.1. Patent Owner does not contest that the pre-AIA versions apply, and we apply those versions herein.

IPR2022-00202
Patent 10,142,810 B2

According to Petitioner, "[t]his case was dismissed by order of the court on March 18, 2022." Paper 21, 1.

Related patents are challenged by Petitioner in IPR2022-00291, IPR2022-00294, IPR2022-00295, and IPR2022-00297. Of these, *inter partes* review was instituted in IPR2022-00291, IPR2022-00294, and IPR2022-00295, but institution was denied in IPR2022-00297.

## II. ANALYSIS

### A. Legal Principles

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of nonobviousness, i.e., secondary considerations.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in

---

[2] The parties do not address objective indicia of nonobviousness, which accordingly do not form part of our analysis. *See* Pet. 91 ("Petitioner is unaware of any evidence of secondary considerations that would support a finding of non-obviousness.")

IPR2022-00202
Patent 10,142,810 B2

the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

### B. Direct Testimony by Dr. Rouskas

Petitioner contends that Dr. Rouskas's Declaration testimony is entitled to no weight because it "repeats the [Patent Owner Response] nearly verbatim," "appears to contain opinions he did not develop," and "is contradicted by Dr. Rouskas's own deposition testimony." Reply 4–5. Although Petitioner makes multiple allegations of deficiencies in Dr. Rouskas's direct testimony, none of these allegations is sufficiently developed with specific examples.

First, we disagree that mere verbatim duplication between an expert declaration and an attorney brief defines "a classic example of a cursory expert declaration the Board disregards." *See id.* at 4. The Board's concern is rather whether expert testimony "cite[s] to any additional supporting evidence or provide[s] any technical reasoning to support [its] statement[s]." *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential); *see also id.* at 16 ("Dr. Jones offers only a *verbatim* restatement of the assertion being supported, *without any supporting evidence or technical reasoning*" (emphasis added)). As Patent Owner asserts, "Petitioner fail[s] to provide a single example of how Dr. Rouskas's testimony is 'cursory or unsupported.'" Sur-reply 1.

IPR2022-00202
Patent 10,142,810 B2

Second, Petitioner provides only a single example to support its allegation that the direct testimony in Dr. Rouskas's Declaration "appears to contain opinions he did not develop." This example relates to an issue we discuss at length below, namely whether a "network-based portal" recited in the challenged claims must reside at a server side of a network or can reside on the client side as a user interface in a client device. Reply 4–5. Petitioner accurately states that, on cross-examination, "Dr. Rouskas admitted he was retained months after the [Preliminary Response] was filed and that he did not review the [Preliminary Response]," where Patent Owner argued that a "network-based portal" must reside at a server side. *Id.* at 5 (citing Ex. 1042, 25:2–26:2).

Dr. Rouskas's cross-examination also included the following exchange:

BY MR. SHI:

Q. The essence of your opinion is that Diacakis does not teach a network-based portal because that network-based portal must be in a server device and not a client device; correct?

MR. RISLEY: Object to form.

THE WITNESS: That is correct, yes.

BY MR. SHI:

Q. Did you come up with this argument, Dr. Rouskas?

A. I did, yes.

Ex. 1042, 53:22–54:7. Petitioner characterizes Dr. Rouskas's statement as "claim[ing] he ***conceived of*** [Patent Owner's] [network-based portal]

IPR2022-00202
Patent 10,142,810 B2

argument." Reply 5. According to Petitioner, such a claim is "not credible" because at least some form of the argument was presented during the preliminary phase of this proceeding, before Dr. Rouskas was retained. *Id.*

Petitioner did not explore Dr. Rouskas's answer on cross-examination in a manner that would have allowed the witness to expand on his brief statement that "[he] did, yes." But even if we were to agree with Petitioner's characterization, we see insufficient reason on that basis alone to discount *all* of Dr. Rouskas's direct testimony. As Patent Owner says, "Petitioner cross-examined (deposed) Dr. Rouskas for two days," and "Petitioner does not cite to *any* cross-examination question that Dr. Rouskas was *not* able to answer." Sur-reply 1. The totality of Dr. Rouskas's testimony is useful and his direct testimony was subject to extensive cross-examination that allows us to evaluate the weight to accord his testimony in individual contexts.

Third, Petitioner contends that, on cross-examination, "Dr. Rouskas contradicted his declaration and admitted the opinions therein rest on fundamental misunderstandings of the challenged claims and prior-art references." Reply 5. We evaluate Petitioner's specific arguments in our assessment of the weight to accord Dr. Rouskas's testimony below, and see no compelling basis to discount his direct testimony wholesale. *See* Sur-reply 2 (Patent Owner asserting that "the rule of completeness shows that Dr. Rouskas did not contradict his Declaration testimony" (citing Fed. R. Evid. 106)).

For these reasons, we decline Petitioner's request to give no weight to Dr. Rouskas's direct testimony in our analysis.

IPR2022-00202
Patent 10,142,810 B2

### C. Level of Ordinary Skill in the Art

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person of ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). "This legal construct is akin to the 'reasonable person' used as a reference in negligence determinations" and "also presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1992)).

Petitioner proposes that a person of ordinary skill in the art "would have had a Bachelor's degree in Computer Science, or an equivalent field, and three to five years of experience working with Internet communication systems." Pet. 24. According to Petitioner, "[a]dditional education might compensate for less experience, and vice-versa." *Id.* Dr. Almeroth supports this articulation. *See* Ex. 1003 ¶¶ 70–75. Patent Owner does not propose any different expression of the level of ordinary skill, and Dr. Rouskas testifies that he has "employed Dr. Almeroth's definition" in his Declaration. Ex. 2005 ¶ 21.

Because we find Petitioner's proposal reasonable, consistent with the level of skill reflected by the prior art, and supported by the testimony of Dr. Almeroth, we adopt it for purposes of this Decision. *See Okajima v.*

IPR2022-00202
Patent 10,142,810 B2

*Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art may reflect an appropriate level of skill in the art).

### D. Claim Construction

The Board uses "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2021); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). The specification may reveal a special definition given to a claim term by the patentee. *Phillips*, 415 F.3d at 1316. If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Although Petitioner asserts in its Petition that it "does not believe that any terms need to be construed to assess the arguments presented," we specifically "invite[d] the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '810 patent's claims." Pet. 25; Dec. 19. We address this term as follows, and we do not find it necessary to construe any other term for purposes of this Decision. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

The phrase "network-based portal" is recited numerous times in each of the independent claims of the '810 patent, and its construction is central to the parties' respective positions regarding application of Petitioner's asserted prior art to the challenged claims. *See generally* Ex. 1001, 20:2–58, 21:28–22:24, 22:56–24:26. In particular, Petitioner broadly describes a "network-based portal" as "a web page or interface that connects clients to a network." Pet. 34. Patent Owner argues that a "network-based portal" excludes a user terminal or client communication device. PO Resp. 10–11; *see also* Reply 6 (Petitioner asserting that Patent Owner's argument that "the [network-based portal] resides only 'at the server-side of a network' and excludes user interfaces of 'client communication devices[']" is "wrong").

The issue before us is therefore well-defined, namely whether a "network-based portal" as recited in the challenged claims is sufficiently broad to encompass residing at either a client or server side of a network, as Petitioner contends, or is limited to residing at the server side, as Patent Owner contends. On the preliminary record, we declined to adopt Patent Owner's exclusion of residing at a client side when extending our invitation to the parties to elaborate on their positions. Dec. 17–19. But we are mindful that "the Board is not bound by any findings made in its Institution Decision. At that point, the Board is considering the matter preliminarily without the benefit of a full record. The Board is free to change its view of the merits after further development of the record, and *should do so* if convinced its initial inclinations were wrong." *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016).

The full record developed at trial includes the Declaration of Dr. Rouskas (Patent Owner's expert), who directly opines on this issue.

IPR2022-00202
Patent 10,142,810 B2

Ex. 2005 ¶¶ 46–64. Although the record also includes a Declaration by
Petitioner's expert, Dr. Almeroth, that Declaration was filed with the
Petition and neither responds to Dr. Rouskas's opinions nor provides any
testimonial evidence to support Petitioner's positions beyond what was
available at the preliminary stage of the proceeding.[3] *See generally*
Ex. 1003. In evaluating the fully developed record, we necessarily accord
greater weight to Dr. Rouskas's testimony than to Petitioner's attorney
argument as advanced in Petitioner's Reply. *See, e.g.*, *Gemtron Corp. v.
Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("[U]nsworn
attorney argument . . . is not evidence and cannot rebut . . . other admitted
evidence . . . .").

        Our evaluation also necessarily remains cognizant that "[i]n an [*inter
partes* review], the petitioner has the burden from the onset to show with
particularity why the patent it challenges is unpatentable." *Harmonic Inc. v.
Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C.
§ 312(a)(3) (requiring *inter partes* review petitions to identify "with
particularity . . . the evidence that supports the grounds for the challenge to
each claim")). This burden never shifts to Patent Owner. *See Dynamic*

---

[3] Petitioner filed a second Declaration by Dr. Almeroth after institution
(such that it was not available on the preliminary record), but that
Declaration is provided primarily as supplemental evidence under 37 C.F.R.
§ 42.64(b)(2) to address objections by Patent Owner to the authenticity of
various other exhibits. Ex. 1038 ¶ 2. Dr. Almeroth's second Declaration
otherwise merely incorporates Dr. Almeroth's "technical opinions" by
reference to his first Declaration, without providing any further facts or
expressing any further opinions that bear on the merits, including claim
construction. *Id.* ¶ 1.

IPR2022-00202
Patent 10,142,810 B2

*Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Against this backdrop, we address the parties' arguments, ultimately concluding that Patent Owner articulates the more persuasive position that a "network-based portal" as recited in the claims is limited to residing at a server side of a network.

### 1. *Dictionary Definitions*

Patent Owner begins its argument by quoting dictionary definitions of "portal" offered by Dr. Rouskas in his Declaration: (1) "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources, and services," Ex. 2005 ¶ 49 (quoting https://www.techopedia.com/definition/13077/portal-internet); and (2) "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals," *id.* (quoting https://www.techtarget.com/whatis/definition/portal). Dr. Rouskas relies on these dictionary definitions to distinguish a "portal" from a client communication device, testifying specifically that "[w]ebsites are hosted on web servers, not on client communication devices." *Id.*

While we recognize that such dictionary definitions fall within the category of extrinsic evidence, as they do not form part of an integrated patent document, we find it useful to begin with such definitions because

IPR2022-00202
Patent 10,142,810 B2

they provide context for evaluation of the intrinsic evidence. In doing so, we recall that the Federal Circuit has advised that dictionary definitions are "worthy of special note": "Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

With its Reply, Petitioner counters Patent Owner's position by providing dictionary definitions of its own: (1) "A portal is a web-based platform that collects information from different sources into a single user interface and presents users with the most relevant information for their context," Ex. 1040; and (2) "A mobile portal is an Internet gateway that enables mobile devices to connect remotely with an enterprise intranet or extranet, typically via a Web browser interface," Ex. 1041. According to Petitioner, Dr. Rouskas "selectively disregarded" definitions like these that include the word "interface." Reply 7. But as Patent Owner points out, "that a definition includes the term 'interface' does not mean a 'portal' is an interface." Sur-reply 4. We find Patent Owner's explanation that "[t]he term 'interface' is used to indicate *how a user accesses the portal* (i.e., via a web browser interface), *not what a portal is*" to be consistent with Petitioner's preferred definitions. *See id.*

More generally, we discern no meaningful conflict between the definitions provided by Dr. Rouskas and those provided by Petitioner. For example, the second of Petitioner's preferred definitions expressly defines a "mobile portal" as an "Internet gateway" with certain features, thereby

differentiating it from a web browser interface that is used to connect a device to the portal. *See* Ex. 1041; Sur-reply 3. And that definition's expression of equivalence between a "mobile portal" and an "Internet gateway" is consistent with the '810 patent specification's use of the terms "portal" and "gateway," as we discuss in the next subsection.

### 2. *Specification*
#### a. *"portal or gateway"*

Both parties quote various portions of the specification of the '810 patent as supporting their respective positions, with much of their arguments focusing particularly on the specification's repeated use of the phrase "portal or gateway" (or similar variant). *See, e.g.*, Ex. 1001, 4:13, 4:53, 6:66–67, 7:3. According to Patent Owner, such phrasing amounts to a "definition" by the specification of a "portal" as a "communication gateway." PO Resp. 11. And in turn, Patent Owner says, "[t]he specification also defines a 'gateway' as a 'networked server'" by stating that "[t]he remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 electronic device, such as a mobile telephone." *Id.* at 11 (quoting Ex. 1001, 16:7–10).

We do not agree that such phrases are definitional because they lack the deliberateness and precision that characterize definitions. *See Renishaw*, 158 F.3d at 1249. But they nonetheless raise a relevant question as to whether the specification's phrase "portal or gateway" uses different words to describe the same thing or instead refers to distinct alternatives. *See* Reply 8 (Petitioner arguing that "the '810 Patent's recitation of 'portal or gateway' means the two are alternatives, not that one redefines the other").

IPR2022-00202
Patent 10,142,810 B2

As a matter of common English usage, we agree with Dr. Rouskas that both understandings are possible. *See* Ex. 1042, 90:10–20 (testifying on cross-examination that the word "or" can be a "disjunctive conjunction" or can be used "to refer to things that are synonymous to each other"). Mere use of the word "or" does not end the inquiry.

Patent Owner has the stronger position. First, Patent Owner correctly observes that "Dr. Rouskas's testimony that to a [person of ordinary skill in the art] the word 'or' in the specification means that 'portal' and 'gateway' are used synonymously is unrebutted." Sur-reply 4; *see also* Tr. 44:7–45:17 (discussing meaning of phrase to a person of ordinary skill in the art).

Second, Petitioner observes that the specification does not always use the phrase "portal or gateway," but sometimes uses one word or the other. *See, e.g.*, Ex. 1001, 4:39–53 (referring only to "portal"), 4:57–62 (referring only to "gateway"), 5:54–6:5 (referring only to "portal"). According to Petitioner, the specification is thus "using these phrases to describe different embodiments, indicating that portals and gateways are two alternative means to establish communication." Reply 8. But Petitioner does not meaningfully explain how such embodiments are, in fact, different. We have reviewed the passages Petitioner identifies and we instead agree with Dr. Rouskas's more prosaic explanation that the specification sometimes uses one of two equivalent terms to avoid repetition. *See* Ex. 1042, 91:10–15 ("So to a person skilled in the art, this implies that instead of just saying portal or gateway all the time and because the claims refer to portal, not gateway, these, you know -- you know, the two terms are used synonymously.").

Third, as we note above, one of Petitioner's own preferred dictionary definitions of "portal" expresses an equivalence between a "mobile portal"

IPR2022-00202
Patent 10,142,810 B2

and an "Internet gateway." Ex. 1041. This independent evidence adds
further support to Patent Owner's position, particularly in light of its overall
consistency with Dr. Rouskas's unrebutted testimony.

### b. Implementation of Portal Functionality

When instituting this proceeding, we acknowledged that Patent Owner
supported its contention that a "network-based" portal resides at a server
side with examples drawn from the specification of the '810 patent.
Dec. 17. Specifically, Patent Owner identified examples in which the
specification describes a "portal" as separate from a "mobile phone" or from
a person's "wireless device." Paper 6, 15–16 (citing Ex. 1001, 6:21–22,
6:41–42, 6:64–7:5, 16:8–10); *see* Dec. 17. But we *sua sponte* expressed a
concern that "[t]he '810 patent's specification discloses embodiments where
claimed functionality resides in a 'mobile phone,' i.e., a client-side device."
Dec. 17–18 (citing Ex. 1001, 3:20–27, 9:11–10:8, 10:24–13:35, 15:4–61,
Figs. 7–11). When extending our invitation for the parties to elaborate on
their positions for proper construction of "network-based portal," we
accordingly stated that "construing 'network-based portal' to exclude
'client-side functionality,' such as mobile-phone functionality, would
exclude preferred embodiments from claim scope." *Id.* at 18–19. The
parties have now had a full opportunity to develop their positions and, in
particular, to address the concern we raised when instituting the proceeding.
We have reconsidered our initial view in light of that fully developed record.

The parties' dispute on this point centers on Figures 7–11, and we
reproduce Figure 7 below, with highlighting provided by Petitioner. *See*
Reply 13.

20

IPR2022-00202
Patent 10,142,810 B2



FIG. 7

Figure 7 is "a flow diagram of a personal call response process according to one embodiment of the invention." Ex. 1001, 3:20–21. The patent uses similar language to describe Figures 8–11, which relate respectively to "an audio message response process," "a text message response process," "an automated call response process," and "a message presentation process." Ex. 1001, 3:22–29.

According to Patent Owner, "the embodiment[s] in Figs. 7-11 are not embodiments concerning use of a [network-based portal]," but instead "concern how a recipient user interacting with their client device can

IPR2022-00202
Patent 10,142,810 B2

respond to an incoming call or message." PO Resp. 17–18. This distinction is meaningful because each of the challenged claims is directed to "[a] computer-implemented method for managing electronic communications using at least a network-based portal at least based on Internet protocol," "[a] computing apparatus for managing electronic communications using at least a network-based portal at least based on Internet protocol," or "[a] non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications using at least a network-based portal at least based on Internet protocol." *See* Ex. 1001, 20:2–4 (independent claim 1), 21:28–30 (independent claim 11), 22:56–59 (independent claim 19). According to Patent Owner, the embodiments illustrated by Figures 7–11 are not directed to such management of electronic communications, but are instead "methods performed by the second user's device *upon receiving a message*." PO Resp. 18 (citing Ex. 1001, Figs. 7–11; Ex. 2005 ¶ 62). As such, Patent Owner argues, "a construction that has the [network-based portal] at a server distinct from the second user's communication device *does not exclude a preferred embodiment, if anything, it enables them*." *Id.* (citing Ex. 2005 ¶ 62). Patent Owner supports its argument with testimony by Dr. Rouskas, and we additionally note that Patent Owner's argument is consistent with the '810 patent specification's description of Figures 7–11 as illustrating "message *response* process[es]." Ex. 2005 ¶ 62; Ex. 1001, 3:20–29 (emphasis added).

 Petitioner notes that recitations of the independent claims "allow the second user to receive messages via the network-based portal." Reply 12; Ex. 1001, 20:47–48, 22:13–14, 24:4–5. The portions of Figure 7 that

IPR2022-00202
Patent 10,142,810 B2

Petitioner highlights  refer to "answer[ing] the incoming voice call" at step
206, "obtain[ing] and send[ing] audio message to caller" at step 214,
"obtain[ing] and send[ing] text message to caller" at step 218, and
"direct[ing] to voice mail" at step 222, which Petitioner contends are
examples where client devices "enable messages to be received."
Reply 12–13.  Petitioner appears to infer that these highlighted  steps must
correspond to the claim limitation  it identifies.  *See id.* at 12–14.  But even if
we agree that these are examples of client devices that "enable messages to
be received," Petitioner cites no evidence that links such functionality to be
"via" the recited "network-based portal" as the claim also requires.  *See*
Ex. 1001, 20:47–48, 22:13–14, 24:4–5.  In other words, the issue is not
merely whether the client  device is capable of implementing functionality in
some embodiments that is implemented by a server-resident network-based
portal in other embodiments (as appears to undergird the dissent's analysis);
the issue is instead whether that functionality is specifically  implemented at
the client with what Petitioner adequately shows to be "a network-based
portal."

Petitioner argues inferentially that "[a]ll of the '810 Patent's
independent claims recite a[] [network-based portal]—thus, because the
patent's figures are embodiments of the patent, they must include a[]
[network-based portal]."  Reply 13–14.  But Petitioner cites no legal
authority to support its implied  proposition that a patent's claims and
drawings must have such a correspondence.  *See* Sur-reply 9 ("Petitioner's
position that every issued claim must encompass every figure/embodiment
of a patent is wrong as a matter of law.").  Indeed, it is not particularly
uncommon that a patent describes unclaimed embodiments. *See, e.g., Eli*

IPR2022-00202
Patent 10,142,810 B2

*Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1334 (Fed. Cir. 2019) ("Under the disclosure-dedication rule, subject matter disclosed by a patentee, but not claimed, is considered dedicated to the public."). Although Petitioner asserts that "[Patent Owner] remains silent as to the purpose of these disclosures, if not related to the claims," Petitioner again cites no legal authority to support imposing such a requirement on a patent owner, and we are aware of none. *See* Reply 14.

In addition to failing to cite any authority that supports its legal position on this issue, Petitioner also cites no testimonial evidence that supports its factual interpretation of Figures 7–11. *See generally* Reply. We are accordingly left to discern how a person of ordinary skill in the art would understand these drawings and their related descriptions by weighing Petitioner's attorney argument against the expert testimony of Dr. Rouskas that Patent Owner cites. *See* Ex. 2005 ¶¶ 60–62. As we note above, we necessarily accord greater weight to Dr. Rouskas's testimonial evidence. We reiterate that Petitioner was notified of this issue in the Institution Decision, but declined during the trial to introduce additional expert testimonial evidence that might bear on the issue and that Patent Owner might have cross-examined. *See* Dec. 19 ("We invite the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '810 patent's claims."); 37 C.F.R. § 42.23(b) (authorizing reply that responds to arguments raised in a patent owner response or institution decision without limiting introduction of new evidence).

IPR2022-00202
Patent 10,142,810 B2

We accordingly determine that Petitioner does not persuasively support its contention that Patent Owner's proposed construction of "network-based portal" would exclude a preferred embodiment.

### 3. Prosecution History

Neither party cites the prosecution history of the '810 patent when addressing the meaning of "network-based portal." *See* Pet. 34, 65; PO Resp. 8–19, 47–52; Reply 6–14, 23; Sur-reply 3–9, 20. During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 109–118, 170–177, 210–217, 279–286, 320–327, 372–379. Instead, in an Examiner-initiated interview early during prosecution, the Examiner suggested that the Applicant submit a terminal disclaimer "to place the Application [in] condition [for] allowance." *Id.* at 117. The Applicant's filing of such a terminal disclaimer was followed by several Notices of Allowance as prosecution was repeatedly reopened to address Amendments and/or Information Disclosure Statements filed by the Applicant. *See id.* at 101–103, 109–118, 170–177, 210–217, 279–286, 320–327, 372–379. In each Notice of Allowance, the Examiner indicated that the claims were allowed based on the "history of rejection" or "previous record of rejection" of ancestor applications and patents. *Id.* at 114, 175, 215, 284, 325, 377.

We note that several of the Applicant's amendments, including a Preliminary Amendment, introduced language that refers to the "network-based portal," either to a then-pending claim or a newly introduced claim. *Id.* at 86–89, 154–163, 192–203, 244–255, 351–360. But the Applicant offered no explanation for those amendments other than that they "further

IPR2022-00202
Patent 10,142,810 B2

clarify the subject matter regarded as the invention." *Id.* at 163, 203, 255; *see id.* 89, 360 (noting amendment without explanation). And the Examiner similarly did not address that language. *See id.* at 109–118, 170–177, 210–217, 279–286, 320–327, 372–379.

While we have thus reviewed the prosecution history, we do not consider it helpful in construing "network-based portal," particularly in the absence of any arguments presented by either party.

### 4. Other Arguments

The parties address other points that we also do not find helpful in resolving the precise claim-construction issue before us, i.e. whether the recited "network-based portal" is broad enough to encompass residing at a client side of a network as well as residing at a server side. First, Patent Owner contends that the '810 patent specification supports concluding that a "network-based portal" has different functionality from a client communication device because the former "allows worldwide access to the user" and the latter is "associated with a user." PO Resp. 12–13. Petitioner discounts this as "a distinction without a difference." Reply 8–9.

While we agree that the record supports a meaningful functionality difference between a "network-based portal" and a client communication device, whether that difference lies in "worldwide access" does not bear on our analysis. When questioned about this point on cross-examination, Dr. Rouskas provided responses that we do not find illuminating because Dr. Rouskas agreed that a user's mobile phone allows that user worldwide access by allowing others to communicate with the user. *See* Ex. 1042,

IPR2022-00202
Patent 10,142,810 B2

110:20–24, 114:2–5 ("One is worldwide access to the user. A phone provides that. There's no question about that.").

Second, Patent Owner contends that a contradiction arises within independent claim 1 if the recited "network-based portal" is mapped to a user interface on the client communication device of the recited "first user." PO Resp. 13–14. Patent Owner's contention appears to be correct, such as it is. But the contention is clearly driven by one of Petitioner's arguments in applying the asserted prior art to the claim, rather than as a matter of claim construction itself. *See* Reply 9 (Petitioner disputing that it advances an argument that only the first user's device contains the network-based portal). That is, Patent Owner's scenario imposes an additional limit on the network-based portal (not merely residing on a client side, but residing on a specific client device). That scenario therefore does not address the broader claim-construction issue that confronts us, namely whether a "network-based portal" encompasses residing at a client side generally, rather than limited to a specific client communication device.

We accordingly give little weight to these additional arguments by Patent Owner in our evaluation of the claim-construction issue.

### 5. Summary

As we note above, we find certain of Patent Owner's arguments adequately rebutted by Petitioner, such that we do not consider them in our assessment. Nevertheless, Patent Owner retains compelling arguments for its proposed construction, supported by expert testimonial evidence, including dictionary definitions and the '810 patent specification's reference to a "portal or a gateway." We find such references more compellingly refer

to "portal" and "gateway" as synonyms rather than alternatives. In addition, Patent Owner provides convincing evidence and argument that rebuts the concern raised by the Board at institution whether Patent Owner's proposed construction would exclude preferred embodiments. Petitioner, who bears the overall burden, addresses that concern only with attorney argument, which we accord less weight.

In light of these considerations, we construe "network-based portal" as Patent Owner advocates, namely as residing on a server side of a network.

### E. Overview of the Prior Art

#### 1. Diacakis

Diacakis "relates generally to communications and, more particularly, to presence and availability management systems." Ex. 1007 ¶ 3. Figure 1 of Diacakis is reproduced below.



Fig. 1

IPR2022-00202
Patent 10,142,810 B2

Figure 1 is a diagram of "a presence and availability (P&A) management system." *Id.* ¶ 24. System 10 includes P&A management server 12 in communication with client terminal 22 via network 16. *Id.* P&A management server 12 includes presence detection engine 18, availability management engine 20, and profile database 24. *Id.* Functions of P&A management server 12 include determining whether a user is *present* on the network, determining whether the user is *available* on the network, and communicating such presence and availability information to others, depending on the user's preferences. *Id.* ¶¶ 24–27.

Figure 4 of Diacakis is reproduced below.



Figure 4 is a diagram illustrating details of P&A management server 12. *Id.* ¶¶ 15, 38. As illustrated, presence detection engine 18 may be in communication with various devices, such as landline desk phone 44, mobile phone 46, personal computer 48, personal digital assistant 50, and pager 52, to help determine presence information. *Id.* ¶¶ 43–44. Based on

the information from such devices, presence detection engine may determine an individual's status 54 on particular networks, the individual's physical location 56, and the individual's capabilities 58. *Id.* ¶ 45.

Presence information determined by presence detection engine 18 is communicated to availability management engine 20. *Id.* ¶ 46. Such presence information, in combination with the individual's situation 60 and the individual's rules and preferences 64, is used to determine the individual's availability. *Id.* ¶¶ 46–47. "Additionally, the individual may specify the observers 62 who receive the individual's contact information," with such observers 62 specified on a "group basis or an individual basis." *Id.* ¶ 47.

## 2. *Tanigawa*

Tanigawa "relates to a communication technology such as Instant Messaging (IM)," and endeavors "to achieve group chat using multimedia." Ex. 1008 ¶¶ 1, 8. Figure 1 of Tanigawa is reproduced below.

IPR2022-00202
Patent 10,142,810 B2

## FIG.1



Figure 1 is a schematic diagram of a voice-over-IP ("VoIP") communication system that includes a variety of communication devices, such as IP terminals 7, fixed telephone 11, and mobile telephone 9. *Id.* ¶¶ 34–35. IM server 4 "manages presence information of an IM client," AP server 5 "manages connection[s] for a voice chat using VoIP," MD server 6 "implements multi-party voice speech by mixing voice data," and VR server 10 "performs voice relay" with publicly switched telephone network 3 and radio communication network 2. *Id.* ¶ 35.

Figure 3 of Tanigawa is reproduced below.

IPR2022-00202
Patent 10,142,810 B2

## FIG.3



| ACCOUNT NAMES 431 | CLIENT ADDRESSES 432 | CLIENT NICKNAMES 433 | AUTHENTI-CATION KEYS 434 | PRESENCE 435 | USABLE MEDIA 436 | CONFERENCE ADDRESSES 437 | CONFERENCE NICKNAMES 438 | BUDDY LIST 439 |
|---|---|---|---|---|---|---|---|---|
| Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... |
| Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... |
| Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client G | ***.***.***.*** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |

PRESENCE INFORMATION MANAGEMENT TABLE 488

Figure 3 is an example of a "presence information management table" used by IM server 4 to manage presence information. *Id.* ¶ 49; *see id.* ¶¶ 40, 47. Chat participants are identified by nicknames 433, with the same nickname being used for a particular user across all devices. *Id.* ¶¶ 133, 194. This is illustrated in Figure 3, for example, for devices D and E, both of which belong to "hanako," and for devices F and G, both of which belong to "yoshi." *See id.* ¶ 50.

Figure 12 of Tanigawa is reproduced below.

IPR2022-00202
Patent 10,142,810 B2



Figure 12 shows an example of a user interface of an IM client, such as may be displayed on IP terminal 7. *Id.* ¶ 162. Display area 135 shows presence information of "chatting buddies." *Id.* ¶ 164. In addition, several chatting options are provided on main menu bar 130, which includes icon 131 "indicating an operation relating to presence information," icon 132 indicating one-to-one voice chatting, icon 133 indicating multiparty voice chatting, and icon 134 "indicating text chatting." *Id.* ¶ 163.

### 3. *Hullfish*

Hullfish "relates to electronic messaging systems in a computer environment." Ex. 1009, 1:6–9. Figure 5 of Hullfish is reproduced below.

IPR2022-00202
Patent 10,142,810 B2



**FIG. 5**

Figure 5 is a flow diagram depicting a method that incorporates a privacy feature into receiving short-message-service ("SMS") text messages. *Id.* at 8:59–61. The method is implemented when a first user ("User A") wants to stop receiving messages from a second user ("User B"). *Id.* at 8:62–64. To implement this, User A sends a text message containing User B's telephone number to a predetermined telephone number. *Id.* at 9:1–4. Thus, when an SMS server receives a text from User A at the predetermined telephone number at step 502, it is determined at step 504 whether the text contains a telephone number, i.e., User B's number. *Id.* at 9:5–9. If so, future messages from User B to User A are blocked at step 506. *Id.* at 9:9–18. Otherwise, future messages are forwarded "according to user preference" at step 508. *Id.* at 9:30–33.

IPR2022-00202
Patent 10,142,810 B2

### F. Grounds Based on Diacakis

Petitioner challenges claims 1–20 as unpatentable under 35 U.S.C.
§ 103(a) over Diacakis.  Pet. 33–60.  In addressing independent claim 1,
Petitioner draws a correspondence between Diacakis's P&A management
server and a computer that performs the recited "computer-implemented
method."  Pet. 33 (citing Ex. 1003 ¶ 88).  In doing so, Petitioner observes
that Diacakis's P&A management server is in communication with a client
terminal via a network that may be the Internet.  *Id.* at 33–34 (citing
Ex. 1007 ¶¶ 24–25).

Figure 9 of Diacakis, annotated by Petitioner, is reproduced below.
*See id*. at 34.



Figure 9 is a block diagram of client terminal 22, which includes indicator
module 110 in communication with user interface 112 (highlighted in yellow
by Petitioner).  *Id.*; Ex. 1007 ¶ 63.  User interface 112 "may include, for
example, a GUI (Graphical User Interface) or a CUI (Character-based user
interface)."  Ex. 1007 ¶ 63; *see* Ex. 1003 ¶ 92.  User interface 112 may
display information about a user's contacts, such as the contact's name,

work telephone number, work email address, home telephone number, home email address, and instant-messaging (IM) address. Ex. 1007 ¶¶ 56, 59, Fig. 8; *see* Ex. 1003 ¶¶ 89, 92. User interface 112 enables a user to communicate with a contact via network 16, e.g., the Internet. Ex. 1007 ¶¶ 24–25, 62–64, Fig. 9; *see* Ex. 1003 ¶ 107.

Both the preamble and the body of independent claim 1 recite "a network-based portal." Ex. 1001, 20:3, 20:11, 20:20, 20:23, 20:29, 20:31, 20:48, 20:54; *see* PO Resp. 19 (Patent Owner noting repeated recitation of "network-based portal" in independent claim 1). Contending that a "network-based portal" is "a web page or interface that connects clients to a network," Petitioner identifies client-resident user-interface 112 of Diacakis as meeting the claim's requirement for such a feature. Pet. 34. As explained above, after evaluating the record evidence developed during the trial, we do not adopt such a broad construction of "network-based portal." *Supra* § II.D. Instead, we construe "network-based portal" as Patent Owner advocates, namely as residing on a server side of a network. *Id.*

Because Petitioner does not show that Diacakis discloses a "network-based portal" as so construed, we conclude that Petitioner does not show, by a preponderance of the evidence, that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) over Diacakis. The same deficiency exists with respect to Petitioner's analysis of independent claims 11 and 19. *See* Pet. 55–57 (Petitioner's analysis of claim 11 relying substantially on analysis of claim 1), 59–60 (Petitioner's analysis of claim 19 relying substantially on analysis of claim 1). Because the deficiency in Petitioner's showing also applies to the dependent claims, which inherit the "network-based portal"

limitations, we conclude that Petitioner does not show that any of claims 1–20 is unpatentable under 35 U.S.C. § 103(a) over Diacakis.

### G. Grounds Based on Tanigawa and Hullfish

Petitioner challenges claims 1–9, 11–17, 19, and 20 as unpatentable under 35 U.S.C. § 103(a) over Tanigawa and Hullfish. Pet. 60–91.

In addressing independent claim 1, Petitioner identifies Tanigawa's communication system as performing most of the steps of the recited "computer-implemented method." Pet. 64–65. For the "network-based portal," Petitioner relies on the user interface illustrated in Figure 12, reproduced above: "Tanigawa's IP terminal contains a 'network-based portal,' which is a user interface that connects clients to a network." *Id.* at 65–66. That is, similar to its analysis of independent claim 1 for its Diacakis challenge, Petitioner relies on Tanigawa's disclosure of a client-resident user interface to meet the claim's recitations of a "network-based portal."

The only aspects of independent claim 1 for which Petitioner relies on a reference other than Tanigawa—specifically, Hullfish—are those that recite aspects that involve blocking users. In particular, Petitioner contends that the combination of Tanigawa and Hullfish renders obvious the following two recitations: (1) "permitting the second user to block the first user from reaching the second user via the network-based portal"; and (2) "enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the

IPR2022-00202
Patent 10,142,810 B2

first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user." *Id.* at 74–77; Ex. 1001, 20:28–43.

Under our adopted construction, Petitioner does not show that the combination of Tanigawa and Hullfish meets the claim requirements of a "network-based portal." We accordingly conclude that Petitioner does not show, by a preponderance of the evidence, that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa and Hullfish. The same deficiency exists with respect to Petitioner's analysis of independent claims 11 and 19. *See* Pet. 85–88 (Petitioner's analysis of claim 11 relying substantially on analysis of claim 1), 89–90 (Petitioner's analysis of claim 19 relying substantially on analysis of claim 1). Because the deficiency in Petitioner's showing also applies to the dependent claims, which inherit the "network-based portal" limitations, we conclude that Petitioner does not show, by a preponderance of the evidence that any of claims 1–9, 11–17, 19, or 20 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa and Hullfish.

## III.  CONCLUSION

The table below summarizes our conclusions as to the challenged claims.

IPR2022-00202
Patent 10,142,810 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–20 | 103(a) | Diacakis | | 1–20 |
| 1–9, 11–17, 19, 20 | 103(a) | Tanigawa, Hullfish | | 1–9, 11–17, 19, 20 |
| **Overall Outcome** | | | | 1–20 |

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–20 of U.S. Patent No. 10,142,810 B2 have not been shown, by a preponderance of the evidence, to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

39

Trials@uspto.gov                                          Paper 29
571-272-7822                                    Entered: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

—————————

IPR2022-00202
Patent 10,142,810 B2

—————————

AMUNDSON, *Administrative Patent Judge*, dissenting.

I respectfully dissent from the majority's determination that a
"network-based portal" does not encompass a user interface in a client
device that connects clients to a network and instead may reside only on a
server side of a network.  In my view, the majority gives too much weight to
the extrinsic evidence in making that determination.  The Federal Circuit has
"viewed extrinsic evidence in general as less reliable than the patent and its
prosecution history in determining how to read claim terms," e.g., because
expert testimony "is generated at the time of and for the purpose of litigation

IPR2022-00202
Patent 10,142,810 B2

and thus can suffer from bias that is not present in intrinsic evidence."
*Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).

Below, I discuss each party's claim-construction arguments and then explain my analysis of the intrinsic evidence and the extrinsic evidence and the bases for my disagreement with the majority's claim construction.

Based on my view that a "network-based portal" encompasses a user interface in a client device that connects clients to a network and my review of the evidence, I also respectfully dissent from the majority's determination that Petitioner fails to demonstrate by a preponderance of the evidence that the challenged claims are unpatentable.

## I.  BACKGROUND

The independent claims and certain dependent claims require a "network-based portal." Ex. 1001, 20:2–21:3 (claims 1–3), 21:28–22:36 (claims 11–13), 22:56–24:26 (claim 19). In their respective arguments, the parties dispute the meaning of "network-based portal." *See, e.g.*, Pet. 34, 65; Resp. 8–19, 47–52; Reply 6–14, 23; Sur-reply 3–4, 20.[4]

Petitioner contends that a "network-based portal" encompasses the following:

(1)  "a web page or interface that connects clients
      to a network";

(2)  "a user interface that connects clients to a network";

(3)  "a user interface in a client terminal"; and

---

[4] This decision uses the following abbreviations and words to identify documents filed with the Board: "Pet." for the Petition (Paper 2); "Resp." for Patent Owner's Response (Paper 13); "Reply" for Petitioner's Reply (Paper 16); "Sur-reply" for Patent Owner's Sur-reply (Paper 19); and "Tr." for the transcript of the February 17, 2023, oral hearing (Paper 28).

IPR2022-00202
Patent 10,142,810 B2

> (4)    an "interface that allows users to connect to"
>          a networked server.

Pet. 34, 65; Reply 6, 9, 23 (emphasis omitted); *see* Tr. 12:8–16.

Patent Owner equates a "portal" to a "networked server." *See* Resp.
11, 49; Sur-reply 3. In particular, Patent Owner contends that the
'810 patent's specification (1) defines a "portal" as a "gateway" and
(2) defines a "gateway" as a "networked server." Resp. 11, 49 (citing
Ex. 1001, 4:13, 4:53–54, 6:66–67, 7:3, 16:7–10; Ex. 2005 ¶¶ 50, 131);
Tr. 44:11–17; *see* Sur-reply 3.

## II. PATENT OWNER'S ARGUMENTS

Patent Owner asserts that the '810 patent's specification uses "portal"
and "gateway" synonymously. Sur-reply 3. As support, Patent Owner
quotes the following statements in the specification where the word "or"
appears between "portal" and "gateway": "A portal or gateway approach
could provide general Internet access to one or more embodiments of the
communication management systems . . . . The portal or gateway can then
facilitate download of a database or update thereto to a communication
device, such as a phone." Resp. 12, 16, 50 (quoting Ex. 1001, 6:66–7:5).
Patent Owner also asserts that Dr. Rouskas provides "unrebutted" testimony
that the specification uses "portal" and "gateway" synonymously because
the word "or" sometimes appears between "portal" and "gateway" in the
specification. Sur-reply 4 (citing Ex. 1042, 90:4–9, 91:10–15). According
to Patent Owner, a "portal" or "gateway" connects "distinct networks" in
contrast to a client device that does not do so. Resp. 16 (citing Ex. 2005
¶ 59).

IPR2022-00202
Patent 10,142,810 B2

To support its contention concerning the equivalence of a "gateway" and a "networked server," Patent Owner quotes the following statements in the specification: "The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 [sic] electronic device, such as a mobile telephone." Resp. 11, 49 (quoting Ex. 1001, 16:7–10).

Further, Patent Owner asserts that the specification "does not define" a "portal" or "network-based portal" as a client device. Resp. 11, 49 (citing Ex. 2005 ¶¶ 50, 131). Patent Owner asserts that a "portal" or "network-based portal" differs from a client device because a client device is "associated with a user," whereas a "portal" or "network-based portal" must allow "worldwide access" to a user and permit the user "to receive messages from multiple senders." *Id.* at 12–13, 15–16, 50–51 (emphasis omitted) (quoting Ex. 1001, 2:17–20, 4:43–44, 6:21–38, 6:66–7:2); *see id.* at 7; Sur-reply 4–5, 7. Patent Owner also asserts that a "portal" or "network-based portal" resides at a "server distinct from" a client device. Resp. 18; *see* Sur-reply 3.

Additionally, Patent Owner contends that the claim language distinguishes a "network-based portal" from a client device. *See* Resp. 13–14, 51. Patent Owner bases that contention on limitations [1.8] and [1.9] that read as follows:

> [1.8] wherein the method requires contact information associated with the second user to allow the second user to receive messages via the network-based portal; and

> [1.9] wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second

4

IPR2022-00202
Patent 10,142,810 B2

user is not provided via the network-based portal to the first
user through the electronic device associated with the first user.

*Id.* at 13, 51; *see* Ex. 1001, 20:46–55.

Specifically, Patent Owner asserts that if the first user's client device
"is the claimed network-based portal," then "claim 1 could not possibly be
carried out" because:

(1)   limitation [1.8] requires the recipient's (second user's)
      "contact information for messages to be received" via the
      network-based portal, i.e., via the sender's (first user's)
      client device; and

(2)   limitation [1.9] requires that the recipient's (second
      user's) "contact information not be provided to" the
      sender's (first user's) client device.

Resp. 13–14; *see id.* at 26–27. According to Patent Owner, Petitioner's
position "leads to a contradiction, making the method useless." *Id.* at 14; *see
id.* at 27.

To further support its position, Patent Owner quotes two undated
online definitions of "portal" that Dr. Rouskas found with a Google search.
Resp. 10–11, 48–49; *see* Ex. 1042, 61:17–63:10; Ex. 2005 ¶¶ 49, 130.
Patent Owner quotes the first online definition located at https://www.
techopedia.com/definition/13077/portal-internet as follows: "In the context
of the Internet, a portal refers to any commonly used website serving as an
entry point to the Internet, usually with many links to a wide variety of
information, data, resources and services." Resp. 10, 48; Ex. 2005
¶¶ 49, 130. Patent Owner asserts that websites are "hosted on web servers"
and not on client devices. Resp. 11, 49 (citing Ex. 2005 ¶¶ 49, 130). Patent
Owner quotes the second online definition located at https://www.techtarget.
com/whatis/definition/portal as follows: "Portal is a term, generally

IPR2022-00202
Patent 10,142,810 B2

synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site." Resp. 10–11, 48–49; Ex. 2005 ¶¶ 49, 130.

Patent Owner notes that the Institution Decision cited the embodiments in the '810 patent's Figures 7–11 when stating that the '810 patent "discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Resp. 16–17 (quoting Inst. Dec. 17–18). Patent Owner contends that "claim 1 concerns 'managing electronic communications using at least a network-based portal.'" *Id.* at 18. Patent Owner then contends that the embodiments in Figures 7–11 are "methods performed by the second user's device upon receiving a message" and "not embodiments for 'managing electronic communications using at least a network based portal' as are the claims of the '810 Patent." *Id.* (emphasis omitted); *see id.* at 18–19; Sur-reply 8–9.

### III. PETITIONER'S ARGUMENTS

Petitioner asserts that the '810 patent discloses the claimed functionality for a "network-based portal" residing in a client device, e.g., in a mobile phone. Reply 6. Petitioner asserts that independent claims 1, 11, and 19 require "the second user to receive messages." *Id.* at 12 (emphasis omitted). Petitioner then contends that the '810 patent discloses (1) the recipient functionality of "allowing users to specify who may contact them and see their contact information" taking place "all in the phone" and (2) the phone "automatically manag[ing] the communication." *Id.* (citing Ex. 1001, 7:13–22) (quoting Ex. 1001, 7:21–22, 7:24–25). Petitioner also contends that a "network-based portal" residing in a client device enables not only

IPR2022-00202
Patent 10,142,810 B2

message receipt but also message management. *Id.* (citing Ex. 1003 ¶¶ 107–108).

To support its contentions about message receipt and message management taking place "all in the phone," Petitioner provides the highlighted version of the '810 patent's Figure 7 reproduced below (Reply 13):



FIG. 7

IPR2022-00202
Patent 10,142,810 B2

Figure 7 "is a flow diagram of a personal call response process 200"
performed "by an electronic device, such as a mobile communication device
(e.g., mobile telephone)." Ex. 1001, 9:11–15, Fig. 7; *see id.* at 3:20–21.
This highlighted version of Figure 7 includes yellow highlighting over the
following steps in process 200:

- step 206 "answer the incoming voice call";
- step 214 "obtain and send audio message to caller";
- step 218 "obtain and send text message to caller"; and
- step 222 "direct to voicemail."

*See* Reply 13. Petitioner argues that "because the patent's figures are
embodiments of the patent, they must include" a "network-based portal."
*Id.* at 13–14.

Further, Petitioner asserts that the '810 patent's specification "treats
the phrase 'portal or gateway' differently from the singular 'portal,' using
these phrases to describe different embodiments, indicating that portals and
gateways are two alternative means to establish communication." Reply 8
(citing Ex. 1001, 4:53–54, 6:66–67, 7:3). Petitioner also asserts that the
specification's "recitation of 'portal or gateway' means the two are
alternatives, not that one redefines the other." *Id.* (citing *Thorner v. Sony
Comput. Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)).

Regarding Patent Owner's assertion that websites are "hosted on web
servers" and not on client devices, Petitioner argues that no claim requires
that a "network-based portal" be "hosted." Reply 7; *see* Resp. 11, 49.

Additionally, Petitioner contends that Patent Owner's assertion about
a "network-based portal" differing from a client device because a client
device is "associated with a user" lacks merit since a client device may

8

IPR2022-00202
Patent 10,142,810 B2

include a "network-based portal" that "connects a user to a network" even though the client device is "associated with a user." Reply 8; *see* Resp. 12–13, 49–51. Petitioner contends that Dr. Rouskas concedes that "a user's mobile phone allows worldwide access to that user by allowing others to communicate with the user." Reply 8–9 (citing Ex. 1042, 110:20–24, 114:2–5).

Petitioner criticizes the two online definitions of "portal" that Dr. Rouskas found as "cherry-picked from search results for 'portal' rather than from any nuanced inquiry or analysis." Reply 7 (citing Ex. 1042, 62:24–63:10); Tr. 74:5–16. According to Petitioner, Dr. Rouskas "selectively disregarded definitions that include the word 'interface.'" Reply 7. To undermine Dr. Rouskas's credibility, Petitioner introduces two online definitions of "portal" with 2022 copyright dates that include the word "interface." *Id.*; *see* Ex. 1040, 1, 5; Ex. 1041, 1, 5; Tr. 73:22–74:16, 75:8–76:7. Petitioner does not rely on those online definitions to establish the meaning of "network-based portal." Tr. 75:8–76:7.

Petitioner quotes the first online definition located at https://www. liferay.com/resources/l/web-portal as follows: "A portal is a web-based platform that collects information from different sources into a single user interface." Reply 7 (emphasis omitted) (quoting Ex. 1040, 1). Petitioner quotes the second online definition located at https://www.gartner.com/en/ information-technology/glossary/mobile-portal as follows: "A mobile portal is an Internet gateway that enables mobile devices to connect remotely . . . typically via a Web browser interface." *Id.* (alteration by Petitioner) (emphasis omitted) (quoting Ex. 1041, 1).

IPR2022-00202
Patent 10,142,810 B2

## IV.  ANALYSIS

After analyzing the intrinsic evidence and the extrinsic evidence, I agree with Petitioner that a "network-based portal" encompasses a user interface in a client device that connects clients to a network.  *See* Pet. 34, 65; Reply 6, 9, 23.  Below, I explain my analysis of the intrinsic evidence and the extrinsic evidence.

Independent claims 1, 11, and 19 recite "managing electronic communications using at least a network-based portal."  Ex. 1001, 20:2–3, 21:28–29, 22:58–59.  The '810 patent's specification discloses and depicts "managing electronic communications" using a "phone" or a "mobile telephone," i.e., a client device with a user interface.  *See id.* at 3:7–29, 4:39–41, 5:60–62, 7:6–25, 7:41–45, 8:7–10, 9:4–7, 9:11–13:35, 14:36–45, 14:54–59, 15:4–61, 17:60–62, 18:1–4, 18:12–20, Figs. 1–11.

For example, Figures 7–11 depict "managing" functionality as recited in claims 1, 11, and 19 performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)" as follows:

- providing a first user with a voice communication option and a text communication option, e.g., as recited in limitations [1.1], [1.2], [11.3], [11.4], [19.1], and [19.2];

- receiving an indication regarding the voice communication option or the text communication option, e.g., as recited in limitations [1.4], [11.6], and [19.4];

- enabling a second user to receive a voice message or a text message using the selected communication option in view of the second user not blocking the first user, e.g., as recited in limitations [1.6], [11.8], and [19.6]; and

- allowing the second user to receive messages through an electronic device associated with the second user, e.g., as

IPR2022-00202
Patent 10,142,810 B2

> recited in limitations [1.8], [1.9], [11.10], [11.11], [19.8], and [19.9].

Ex. 1001, 9:11–61, 10:24–14:49, 15:4–61, 20:2–58, 21:28–22:24, 22:56–24:26, Figs. 7–11; *see id.* at 3:20–29, 9:62–10:8.

Further, Figures 7–11 depict "managing" functionality as recited in certain dependent claims. Specifically, dependent claims 8, 9, and 16 recite actions that may occur depending on a "period of time," e.g., "not presenting the message to the second user depending on a period of time." Ex. 1001, 21:19–24 (claims 8–9), 22:44–47 (claim 16). The specification's disclosure of actions that may occur depending on a "period of time" appears in the discussion of Figure 7 depicting steps performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)." *Id.* at 9:11–15, 10:9–23, Fig. 7.

In particular, the specification explains that "an automated decision process to decide whether to answer a call," such as step 204 "answer?" in Figure 7, may be "based on time." Ex. 1001, 10:9–11, Fig. 7. The specification then provides the following example of not presenting a message to a user depending on a "period of time" or "time period": "[T]he called party can previously set a rule, such as that from midnight to 6 am, the party does not want to answer voice calls. Then, during this time period, the electronic device can automatically decide not to answer incoming calls." *Id.* at 10:11–16.

As discussed above, Petitioner argues that "because the patent's figures are embodiments of the patent, they must include" a "network-based portal." Reply 13–14; *see supra* § III. Petitioner's argument disregards the general principle that a patent may disclose unclaimed embodiments. *See*

IPR2022-00202
Patent 10,142,810 B2

*MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377 (Fed. Cir. 2007).
Nonetheless, as also discussed above, Figures 7–11 illustrate claimed
embodiments, i.e., by depicting "managing" functionality as recited in
various claims performed "by an electronic device, such as a mobile
communication device (e.g., mobile telephone)." *See* Ex. 1001, 9:11–61,
10:24–14:49, 15:4–61, 20:2–58, 21:19–24, 21:28–22:24, 22:44–47,
22:56–24:26, Figs. 7–11.

Additionally, the specification indicates that a "portal" may reside
in a "phone," i.e., a client device with a user interface. Ex. 1001, 4:39–41,
5:60–62, 7:13–22, 7:41–43, 14:54–57, 18:1–4, Figs. 1–5. In particular,
the specification explains that "a portal provides a number of intelligent
communication modes (ICM) for the user to select as shown in FIG. 1" and
"the intelligent communication modes shown in FIG. 1 for the user to select
are in the phone." *Id.* at 5:60–62, 7:13–14. The specification also explains
that "the portal can be used to control the selection and setting of different
intelligent communication modes" and "communication mode changes can
be performed at an electronic device to better suit the needs or condition
of the electronic device or user preferences." *Id.* at 4:39–41, 7:41–43,
14:54–57, 18:1–4. Because "the portal can be used to control the selection
and setting of different intelligent communication modes" and
"communication mode changes can be performed at an electronic device,"
e.g., at a "phone," the "portal" can reside in a "phone."

The specification discloses an example of "managing electronic
communications" using a "phone." *See* Ex. 1001, 7:15–25. In particular,
the specification explains that "the phone could automatically manage the

IPR2022-00202
Patent 10,142,810 B2

communication" from various individuals after a user configures the phone
as follows:

> define the contact classes, such as the ones shown in FIG. 2;
> set up the urgency classes, such as the ones shown in FIG. 3;
> define the statuses, such as the ones shown in FIG. 4; set up
> the Access Priority Database, such as the one shown in FIG. 5;
> and categorize a number of the user's contacts into the
> corresponding ContactClasses, all in the phone.

*Id.* at 7:15–22, Figs. 1–5; *see id.* at 18:12–20.

The specification discloses other techniques for "managing electronic
communications" using a "phone" as follows:

- "keep information in local databases, such as in such
  a phone";

- configure "user settings (e.g., preferences) to decline
  calls/messages matching certain criteria";

- "reduce user input at the mobile communication device
  by making use of stored data pertaining to its hardware
  components, configuration or preferences";

- "provide feedback to a caller without answering a voice
  call from the caller";

- "choose not to take the voice call from the calling party"
  and instead "provide the calling party with some limited
  information," e.g., "in an audio or textual format";

- "enable the called party to provide a brief audio or text
  message to the calling party";

- "automatically (i.e., without user input) respond to
  the calling party via an audio or text message"; and

- "communicate in different ways depending on device
  configuration, user preferences, prior history, time or
  other criteria."

13

Ex. 1001, 7:11–13, 7:43–45, 8:7–10, 9:4–7, 13:11–17, 14:36–45, 14:57–59, 17:60–62, 18:12–20; *see id.* at 13:36–47.

For these reasons, the '810 patent's specification discloses and depicts "managing electronic communications" using a "phone" or a "mobile telephone," i.e., a client device with a user interface. *See* Ex. 1001, 3:7–29, 4:39–41, 5:60–62, 7:6–25, 7:41–45, 8:7–10, 9:4–7, 9:11–13:35, 14:36–45, 14:54–59, 15:4–61, 17:60–62, 18:1–4, 18:12–20, Figs. 1–11. For example, the specification explains that "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can be performed at an electronic device," e.g., at a "phone" with the "portal." *Id.* at 4:39–41, 7:41–43, 14:54–57, 18:1–4. Hence, construing "network-based portal" to exclude a user interface in a client device that connects clients to a network would exclude preferred embodiments from claim scope. *See id.* at 3:7–29, 4:39–41, 5:60–62, 7:6–25, 7:41–45, 8:7–10, 9:4–7, 9:11–13:35, 14:36–45, 14:54–59, 15:4–61, 17:60–62, 18:1–4, 18:12–20, 20:2–58, 21:19–24, 21:28–22:24, 22:44–47, 22:56–24:26, Figs. 1–11. As discussed above, those preferred embodiments include mobile devices covered by the independent claims and certain dependent claims.

A construction excluding a preferred embodiment is "rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016). Those rare circumstances do not exist here.

Moreover, a patent's drawings "must show every feature of the invention specified in the claims." 37 C.F.R. § 1.83(a). The '810 patent's drawings do not show a "portal" or "network-based portal" residing at

IPR2022-00202
Patent 10,142,810 B2

a "server distinct from" a client device according to Patent Owner's arguments. *See* Ex. 1001, 3:18–19, 8:24–9:10, Fig. 6; Resp. 18; Sur-reply 3. The drawings do not even show a server. *See* Ex. 1001, 8:24–9:10, Fig. 6. Patent Owner does not contend otherwise. *See, e.g.*, Resp. 8–19, 47–54; Sur-reply 3–9, 20. But the drawings do show mobile telephones (items 102 in Figure 6) and steps performed by mobile telephones. Ex. 1001, 3:18–29, 8:24–29, 9:11–15, 10:24–28, 12:1–4, 13:9–17, 15:4–7, Figs. 6–11.

Consistent with the specification, the claim language does not preclude a "network-based portal" from encompassing a user interface in a client device that connects clients to a network. *See, e.g.*, Ex. 1001, 20:2–21:3 (claims 1–3), 21:28–22:36 (claims 11–13), 22:56–24:26 (claim 19). For instance, no claim recites a "server." *Id.* at 20:2–24:32. And no claim specifies a location for a "network-based portal." *Id.* If the patentee had wanted to limit the location for a "network-based portal," the patentee could have readily done so by reciting a "network-based portal at a server." As evidence of this, certain claims in related U.S. Patent No. 10,492,038 B2 expressly recite a "server." IPR2022-00294, Ex. 1001, 20:13–21:18 (claim 1), 21:22–49 (claims 3–6).

Patent Owner misinterprets claim 1 when asserting that if the first user's client device "is the claimed network-based portal," then "claim 1 could not possibly be carried out." *See* Resp. 13–14. Patent Owner's assertion rests on the erroneous premise that limitation [1.9] "requires that the [second user's] contact information not be provided to" the first user's client device. *See id.* at 14.

Limitation [1.9] specifies that "the contact information associated with the second user is not provided via the network-based portal to the first

IPR2022-00202
Patent 10,142,810 B2

user through the electronic device associated with the first user." Ex. 1001, 20:52–55. Limitation [1.9] does not exclude sending the second user's "contact information" to the first user's client device and then preventing the first user from viewing the second user's "contact information," e.g., by precluding the first user's client device from displaying the second user's "contact information." *See id.* at 20:49–55.

The '810 patent's specification supports this interpretation by explaining that (1) "the user can be aware of the identity of the caller even without being informed of the number of the caller" and (2) "the caller can reach the user without being aware of the number of the phone the user is using to receive the call." Ex. 1001, 5:22–27. Additionally, the specification discloses an example where a second user with a "cellular phone" talks to a first user and the first user "is not aware of the phone number of the cellular phone." *Id.* at 2:50–54.

Patent Owner's contention that the embodiments in Figures 7–11 are "not embodiments for 'managing electronic communications using at least a network based portal' as are the claims of the '810 Patent" lacks merit. *See* Resp. 18. The '810 patent's specification explains that the description and the drawings illustrate "by way of example the principles of the invention." Ex. 1001, 2:66–3:3. Further, as discussed above, Figures 7–11 depict "managing" functionality as recited in the independent claims and certain dependent claims performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)." *See, e.g.*, Ex. 1001, 9:11–61, 10:24–14:49, 15:4–61, 20:2–58, 21:19–24, 21:28–22:24, 22:44–47, 22:56–24:26, Figs. 7–11; *see also id.* at 3:20–29, 9:62–10:8.

IPR2022-00202
Patent 10,142,810 B2

Additionally, contrary to Patent Owner's contention, the '810 patent's specification does not (1) define a "portal" as a "gateway" or (2) define a "gateway" as a "networked server." *See* Resp. 11, 49; Sur-reply 3–4. An analysis of the specification shows that each part of Patent Owner's attempt to equate a "portal" to a "networked server" fails.

Regarding a "portal" and a "gateway," the specification explains that a "portal" and a "gateway" have functionality that overlaps but differs in different embodiments as follows:

> A number of embodiments depend on the different modes of communication converging onto the internet protocol platform. A communication gateway or a portal is formed allowing the user to receive communications from numerous sources through different modes. . . .

> One embodiment of the invention uses an open portal based on the web. Based on the portal, the user can securely determine who can reach him at what conditions. . . .

> Thus, in one embodiment, the portal can be used to control the selection and setting of different intelligent communication modes for the user. These intelligent communication modes allow priorities of various kinds of communication options to be set by the user. . . . The portal . . . can dynamically determine, for example, whether a call initiated at different time by different callers should be accepted by the user in real-time or handled by other mechanisms. . . .

> In one embodiment, the portal or gateway also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. . . .

> In one embodiment, the portal can dynamically change the access priorities of a caller trying to reach the user. . . .

Ex. 1001, 4:11–15, 4:24–26, 4:39–47, 4:53–55, 4:63–64.

17

IPR2022-00202
Patent 10,142,810 B2

The '810 patent's specification uses the phrase "portal or gateway" three times and the phrase "communication gateway or a portal" once. Ex. 1001, 4:13–15, 4:53–57, 6:66–7:5. The specification uses the word "portal" or "gateway" separately and unconnected by "or" more than twenty times. *See, e.g.*, *id.* at 4:11–7:5, code (57). The specification sometimes uses the phrase "portal or gateway" and sometimes uses the word "portal" or "gateway" separately to describe functionality that overlaps but differs in different embodiments, not to avoid repetition as Patent Owner contends. The specification's infrequent use of "or" between "portal" and "gateway" does not define "portal" to mean "gateway" or show that "portal" and "gateway" are used synonymously.

The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) defines "gateway" as follows:

(1)     "A functional unit that interconnects a local area network (LAN) with another network having different higher layer protocols";

(2)     "A dedicated computer that attaches to two or more networks and that routes packets from one to the other"; and

(3)     "In networking, a device that connects two systems that use different protocols."

IEEE 100 at 477 (Ex. 3003, 3). Additionally, the Microsoft Computer Dictionary (5th ed. 2002) defines "gateway" as follows: "A device that connects networks using different communications protocols so that information can be passed from one to the other. A gateway both transfers information and converts it to a form compatible with the protocols used by the receiving network." Microsoft Comput. Dictionary at 232 (Ex. 3004, 3). The Microsoft Internet & Networking Dictionary (2003) defines "gateway"

18

IPR2022-00202
Patent 10,142,810 B2

the same way as the Microsoft Computer Dictionary.  Microsoft Inter. & Networking Dictionary at 98 (Ex. 3005, 3).

Consistent with those definitions of "gateway," Patent Owner contends and Dr. Rouskas testifies that a "gateway connects distinct networks."  Resp. 16; Ex. 2005 ¶ 59.  Inconsistent with those definitions of "gateway," however, the '810 patent's specification describes a "portal" as performing other functions.  *See, e.g.*, Ex. 1001, 4:39–41, 4:63–64, 5:1–3, 5:19–20, 5:53–65, 6:21–43; Tr. 15:24–16:14.

As an example, the specification explains that "a portal provides a number of intelligent communication modes (ICM) for the user to select" and "the portal can be used to control the selection and setting of different intelligent communication modes for the user."  Ex. 1001, 4:39–41, 5:60–62, Fig. 1.  As another example, the specification explains that "a portal also holds the user's electronic calendar."  *Id.* at 5:53–54.  As yet another example, the specification explains that "the portal can dynamically change the access priorities of a caller trying to reach the user."  *Id.* at 4:63–64.  Patent Owner does not contend that a "gateway" performs these "portal" functions.  *See, e.g.*, Resp. 8–19, 47–54; Sur-reply 3–9, 20.

As noted above, Patent Owner asserts that Dr. Rouskas provides "unrebutted" testimony that the '810 patent's specification uses "portal" and "gateway" synonymously because the word "or" sometimes appears between "portal" and "gateway" in the specification.  Sur-reply 4 (citing Ex. 1042, 90:4–9, 91:10–15); *see supra* § II.  Although expert testimony "may be useful," e.g., to "provide background on the technology at issue" or "explain how an invention works," expert testimony "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the

19

IPR2022-00202
Patent 10,142,810 B2

context of the intrinsic evidence." *Phillips*, 415 F.3d at 1318–19. Here, in the context of the intrinsic evidence, e.g., the specification, Dr. Rouskas's testimony seeks to contradict the specification's infrequent use of "or" between "portal" and "gateway" compared to the many places where "portal" and "gateway" appear separately to describe functionality that overlaps but differs in different embodiments. *See* Ex. 1001, 4:11–7:5, code (57); Ex. 1042, 88:5–91:15.

Moreover, Dr. Almeroth's testimony refutes Dr. Rouskas's testimony. *See* Ex. 1003 ¶¶ 34, 39, 59–69, 89, 192. Specifically, Dr. Almeroth testifies that he considered the '810 patent's claims, specification, and prosecution history. *Id.* ¶¶ 34, 59–69. He understands that "claims in an IPR are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in view of the specification and prosecution history, unless those sources show an intent to depart from such meaning." *Id.* ¶ 39. He also testifies that a person of ordinary skill in the art would have understood that a "network-based portal" encompasses (1) "an interface that users employ to connect" to a server and (2) "a user interface . . . connecting clients devices to a network." *Id.* ¶¶ 89, 192.

Regarding a "gateway" and a "networked server," the '810 patent's specification describes a "gateway computer" as one type of "networked server" when discussing text-to-speech conversion as follows:

> While text-to-speech conversion, particularly if high quality is desired, requires substantial processing capabilities, mobile electronic devices, such as mobile communication devices, given their small form factor and price competition, tend to have limited processing capability. Accordingly, in one embodiment, text-to-speech conversion can be off-loaded from the mobile device. For example, a remote server computer can

20

IPR2022-00202
Patent 10,142,810 B2

> be provided the text message and produce the resulting audio
> message, and then supply the audio message to the mobile
> device. The remote server computer can be a networked server
> coupled to the network 108. One example of a networked
> server is a gateway computer for a wireless electronic device,
> such as a mobile telephone.

Ex. 1001, 15:64–16:10. Hence, contrary to Patent Owner's contention, the

specification does not define "gateway" to mean "networked server" or use

"gateway" and "networked server" as synonyms. See Resp. 11, 49.

The '810 patent's specification also explains that "[t]he portal allows

worldwide access to the user." Ex. 1001, 4:43–44. As discussed above,

Patent Owner asserts that a "portal" or "network-based portal" must allow

"worldwide access" to a user and permit the user "to receive messages from

multiple senders." Resp. 12–13, 15–16, 50–51 (emphasis omitted) (quoting

Ex. 1001, 4:43–44); see id. at 7; Sur-reply 4–5; supra § II. With that

assertion, however, Patent Owner wrongly seeks to read a limitation from

the specification into the claims. See Resp. 12–13, 15–16, 50–51; In re

Van Geuns, 988 F.2d 1181, 1184 (Fed. Cir. 1993). In any event, a user

interface in a client device that connects the client device to a network such

as the Internet allows "worldwide access" to a user and permits the user "to

receive messages from multiple senders." See Ex. 1042, 110:20–24,

114:2–5.

As for the undated or 2022 definitions of "portal" that the parties cite,

no party provides evidence that any of those definitions applied at the time

of the invention. See Resp. 10–11, 48–49; Reply 7; Ex. 1040, 1–5;

Ex. 1041, 1–5; Ex. 2005 ¶¶ 49, 130. The issue here involves determining

the meaning of "network-based portal" to "a person of ordinary skill in the

art at the time of the invention." See Power Integrations, 904 F.3d at 971.

IPR2022-00202
Patent 10,142,810 B2

Hence, the definitions of "portal" that the parties cite provide little, if any, help in resolving that issue.

As for the '810 patent's prosecution history, neither party cites the prosecution history when addressing the meaning of "network-based portal." *See* Pet. 34, 65; Resp. 8–19, 47–52; Reply 6–14, 23; Sur-reply 3–4, 20. I have reviewed the prosecution history and consider it unhelpful in determining the meaning of "network-based portal."

During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 109–18, 170–77, 210–17, 279–86, 320–27, 372–79. In an Examiner-initiated interview early during prosecution, the Examiner suggested that the applicant submit a terminal disclaimer "to place the Application [in] condition [for] allowance." *Id.* at 117. After the applicant submitted a terminal disclaimer, the Examiner allowed the claims based on the terminal disclaimer and the "history of rejection" of ancestor applications and patents. *Id.* at 114, 117, 175, 215, 284, 325, 377.

After analyzing the intrinsic evidence and the extrinsic evidence, and for the reasons discussed above, I agree with Petitioner that a "network-based portal" encompasses a user interface in a client device that connects clients to a network.

IPR2022-00202
Patent 10,142,810 B2

PETITIONER:

W. Todd Baker
Yimeng Dou
KIRKLAND & ELLIS LLP
todd.baker@kirkland.com
yimeng.dou@kirkland.com


PATENT OWNER:

Stephen R. Risley
Cortney S. Alexander
KENT & RISLEY LLC
steverisley@kentrisley.com
cortneyalexander@kentrisley.com

Trials@uspto.gov                                          Paper 30
571-272-7822                                    Entered: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

_____

IPR2022-00291
Patent 10,708,727 B2

_____

Before THU A. DANG, PATRICK M. BOUCHER, and
STEVEN M. AMUNDSON, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* BOUCHER.

Opinion Dissenting filed by *Administrative Patent Judge* AMUNDSON.

BOUCHER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00291
Patent 10,708,727 B2

In response to a Petition (Paper 1, "Pet.") filed by Epic Games, Inc. ("Petitioner"), we instituted an *inter partes* review of claims 1–9 and 15–17 of U.S. Patent No. 10,708,727 B2 (Ex. 1001, "the '727 patent"). Paper 10 ("Dec."). During the trial, IngenioShare, LLC ("Patent Owner") filed a Response (Paper 14, "PO Resp."), to which Petitioner filed a Reply (Paper 17, "Reply") and Patent Owner filed a Sur-reply (Paper 20, "Sur-reply"). An oral hearing was held with the parties, and a copy of the transcript was entered into the record. Paper 29 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has not shown, by a preponderance of the evidence, that any of claims 1–9 and 15–17 is unpatentable.

## I. BACKGROUND

### A. The '727 Patent

The '727 patent relates to "automatically remov[ing] unwanted communications." Ex. 1001, 3:33–34. Figure 6 of the '727 patent is reproduced below.

IPR2022-00291
Patent 10,708,727 B2



FIG. 6

Figure 6 depicts communication system 100, which can support different communication devices, including mobile telephones 102, computers 104, and/or wireless personal digital assistants 106.  *Id.* at 8:16–21.  Users of such communication devices can communicate "with like or different communication devices," each of which offers one or both of audio or text communication capabilities.  *Id.* at 8:21–24.  Intercommunication of devices 102–106 can take place through network 108, which "can include one or more of voice networks and data networks."  *Id.* at 8:24–27.

With the system, "[a] communication gateway or a portal is formed," thereby allowing a user "to receive communications from numerous sources through different modes."  *Id.* at 4:3–5.  "Based on the portal, the user can securely determine who can reach him at what conditions."  *Id.* at 4:15–16.

IPR2022-00291
Patent 10,708,727 B2

Such conditions may include the status of the user, "access priorities" of the person trying to reach the user, and/or the urgency of the message from the person. *Id.* at 4:17–22.

The following table is reproduced from the '727 patent.

| Alice (Wife) | ContactClass1 |
| Peter (Close Friend) | ContactClass2 |
| Colina (Close Friend's wife) | ContactClass2 |

The table identifies different people and their relationships to a particular user, as well as "ContactClasses" to which such people are assigned and which reflect the various access priorities. *Id.* at 6:4–10. By way of example, if Peter wants to make a mobile phone call to the user, Peter calls the portal, which can be the user's internet service provider. *Id.* at 6:12–14. After verifying Peter's identity, the portal establishes contact by creating a virtual address for a communication session and determines that Peter belongs to "ContactClass2." *Id.* at 6:14–30. The portal implements various connectivity options depending on the status of the user, Peter's access priority according to his ContactClass, and Peter's urgency setting. *Id.* at 6:35–37. Connectivity options include allowing the user to receive Peter's call directly or asking Peter to leave a voicemail message, with the user notified of Peter's call by a short mobile message. *Id.* at 6:35–40. In some instances, communication requests can be classified into "different degrees of undesirability," thereby automatically blocking some requests from the user or automatically diverting them to be handled by another mechanism, "such as diverting a phone call to an email or voice mail." *Id.* at 4:37–42.

IPR2022-00291
Patent 10,708,727 B2

*B.  Illustrative Claim*

Independent claim 1, the only independent claim of the '727 patent, is

illustrative of the challenged claims and is reproduced below.

1.  A computer-implemented method to facilitate electronic
communication of a plurality of users using at least a network-
based portal at least based on Internet protocol, the method
comprising:

providing a plurality of modes of communication to a
first user to allow the first user to use one of the plurality of
modes of communication as a selected mode of communication
for a first message to be sent from the first user to a second
user, based on an identifier associated with the first user
previously set by the first user via the network-based portal,

wherein the plurality of modes of communication
supported by the network-based portal include at least text
communication using a personal computer, voice
communication using a personal computer, and communication
with at least an image, and

wherein messages are eligible to be received by the
second user via the network-based portal, based on any of the
plurality of modes of communication, all depending on an
identifier associated with the second user previously set by the
second user via the network-based portal, which allows the
second user to efficiently maintain the second user's
communication using the plurality of modes of communication;

enabling the second user to block the first user from
using at least the selected mode of communication to
communicate with the second user via the network-based
portal, based on the identifier associated with the first user;

enabling the first message to be provided to the second
user, using the selected mode of communication, depending on
the identifier associated with the second user, in view of the
second user not blocking the first user from using the selected
mode of communication to communicate with the second user,
via the network-based portal; and

5

IPR2022-00291
Patent 10,708,727 B2

receiving a second message from the second user to the first user, to respond to the first message, after the second user has received the first message,

wherein one of the first message or the second message is voice and the other of the first message or the second message is text,

wherein even when the first message is received by the second user via the selected mode of communication, contact information associated with the second user and provided by the second user to the network-based portal is not provided via the network-based portal to the first user, and contact information associated with the first user and provided by the first user to the network-based portal is not provided via the network-based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user,

wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the contact information associated with the first user,

wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user, and

wherein the contact information associated with the first user includes at least one of a phone number or an email address of the first user.

Ex. 1001, 19:61–20:63.

## C. Evidence

Petitioner relies on the following references:

| Diacakis | US 2002/0116461 A1 | Aug. 22, 2002 | Ex. 1007 |
| Loveland | US 7,287,056 B2 | Oct. 23, 2007 | Ex. 1008 |

IPR2022-00291
Patent 10,708,727 B2

| | | | |
|---|---|---|---|
| Takahashi | US 2002/0183114 A1 | Dec. 5, 2002 | Ex. 1009 |
| Tanigawa | US 2004/0001480 A1 | Jan. 1, 2004 | Ex. 1010 |
| Hullfish | US 7,428,580 B2 | Sept. 23, 2008 | Ex. 1011 |

In addition, Petitioner relies on a Declarations by Kevin C. Almeroth, Ph.D.  Exs. 1003, 1039.  Patent Owner relies on a Declaration by George N. Rouskas, Ph.D.  Ex. 2005.  Dr. Rouskas was cross-examined by Petitioner, and a transcript of his deposition was entered into the record.  Ex. 1043.

### D.  Instituted Grounds of Unpatentability

We instituted review of claims 1–9 and 15–17 on the following grounds.  Dec. 35; Pet. 6.

| Claim(s) Challenged | 35 U.S.C. §[1] | References |
|---|---|---|
| 1–6, 15, 17 | 103(a) | Diacakis |
| 7–9 | 103(a) | Diacakis, Loveland |
| 16 | 103(a) | Diacakis, Takahashi |
| 1–3, 6, 15, 17 | 103(a) | Tanigawa, Hullfish |
| 7–9 | 103(a) | Tanigawa, Hullfish, Loveland |
| 16 | 103(a) | Tanigawa, Hullfish, Takahashi |

### E.  Real Parties in Interest

The parties identify only themselves as real parties in interest. Paper 22, 1; Paper 5, 2.

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103 effective March 16, 2013.  Petitioner asserts that, "[b]ased on the claimed priority date of the '727 patent, Pre-AIA versions of §102(a) and §103 apply."  Pet. 4 n.1. Patent Owner does not contest that the pre-AIA versions apply, and we apply those versions herein.

IPR2022-00291
Patent 10,708,727 B2

## F. Related Matters

The parties identify *IngenioShare, LLC v. Epic Games, Inc.*, No 6:21-cv-00663 (W.D. Tex.) ("the related litigation") as a related matter. Paper 22, 1; Paper 5, 2. According to Petitioner, "[t]his case was dismissed by order of the court on March 18, 2022." Paper 22, 1.

In addition, Patent Owner notes that related patents are challenged by Petitioner in IPR2022-00202, IPR2022-00294, IPR2022-00295, and IPR2022-00297. Paper 5, 2–3.

## II. ANALYSIS

### A. Legal Principles

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of nonobviousness, i.e., secondary considerations.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

---

[2] The parties do not address objective indicia of nonobviousness, which accordingly do not form part of our analysis. *See* Pet. 90 ("Petitioner is unaware of any evidence of secondary considerations that would support a finding of non-obviousness.")

IPR2022-00291
Patent 10,708,727 B2

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

### B. Direct Testimony by Dr. Rouskas

Petitioner contends that Dr. Rouskas's Declaration testimony is entitled to no weight because it "repeats the [Patent Owner Response] nearly verbatim," "appears to contain opinions he did not develop," and "is contradicted by Dr. Rouskas's own deposition testimony." Reply 4–6. Although Petitioner makes multiple allegations of deficiencies in Dr. Rouskas's direct testimony, none of these allegations is sufficiently developed with specific examples.

First, we disagree that mere verbatim duplication between an expert declaration and an attorney brief defines "a classic example of a cursory expert declaration the Board disregards." *See id.* at 4. The Board's concern is rather whether expert testimony "cite[s] to any additional supporting evidence or provide[s] any technical reasoning to support [its] statement[s]." *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential); *see also id.* at 16 ("Dr. Jones offers only a *verbatim* restatement of the assertion being supported, *without any supporting evidence or technical reasoning*" (emphasis added)). As Patent Owner

IPR2022-00291
Patent 10,708,727 B2

asserts, "Petitioner fail[s] to provide a single example of how Dr. Rouskas's testimony is 'cursory or unsupported.'" Sur-reply 1.

Second, Petitioner provides only a single example to support its allegation that the direct testimony in Dr. Rouskas's Declaration "appears to contain opinions he did not develop." This example relates to an issue we discuss at length below, namely whether a "network-based portal" recited in the challenged claims must reside at a server side of a network or can reside on a client side as a user interface in a client device. Reply 5. Petitioner accurately states that, on cross-examination, "Dr. Rouskas admitted he was retained months after the [Preliminary Response] was filed and that he did not review the [Preliminary Response]," where Patent Owner argued that a "network-based portal" must reside at a server side. *Id.* (citing Ex. 1043, 25:2–26:2).

Dr. Rouskas's cross-examination also included the following exchange:

BY MR. SHI:

Q. The essence of your opinion is that Diacakis does not teach a network-based portal because that network-based portal must be in a server device and not a client device; correct?

MR. RISLEY: Object to form.

THE WITNESS: That is correct, yes.

BY MR. SHI:

Q. Did you come up with this argument, Dr. Rouskas?

A. I did, yes.

IPR2022-00291
Patent 10,708,727 B2

Ex. 1043, 53:22–54:7.  Petitioner characterizes Dr. Rouskas's statement as "claim[ing] he ***conceived of*** [Patent Owner's] [network-based portal] argument."  Reply 5.  According to Petitioner, such a claim is "not credible" because at least some form of the argument was presented during the preliminary phase of this proceeding, before Dr. Rouskas was retained.  *Id.*

Petitioner did not explore Dr. Rouskas's answer on cross-examination in a manner that would have allowed the witness to expand on his brief statement that "[he] did, yes."  But even if we were to agree with Petitioner's characterization, we see insufficient reason on that basis alone to discount *all* of Dr. Rouskas's direct testimony.  As Patent Owner says, "Petitioner cross-examined (deposed) Dr. Rouskas for two days," and "Petitioner does not cite to *any* cross-examination question that Dr. Rouskas was *not* able to answer."  Sur-reply 1.  The totality of Dr. Rouskas's testimony is useful and his direct testimony was subject to extensive cross-examination that allows us to evaluate the weight to accord his testimony in individual contexts.

Third, Petitioner contends that, on cross-examination, "Dr. Rouskas contradicted his declaration and admitted the opinions therein rest on fundamental misunderstandings of the challenged claims and prior-art references."  Reply 5.  We evaluate Petitioner's specific arguments in our assessment of the weight to accord Dr. Rouskas's testimony below, and see no compelling basis to discount his direct testimony wholesale.  *See* Sur-reply 2 (Patent Owner asserting that "the rule of completeness shows that Dr. Rouskas did not contradict his Declaration testimony" (citing Fed. R. Evid. 106)).

For these reasons, we decline Petitioner's request to give no weight to Dr. Rouskas's direct testimony in our analysis.

IPR2022-00291
Patent 10,708,727 B2

### C. Level of Ordinary Skill in the Art

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person of ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). "This legal construct is akin to the 'reasonable person' used as a reference in negligence determinations" and "also presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1992)).

Petitioner proposes that a person of ordinary skill in the art "would have had a Bachelor's degree in Computer Science, or an equivalent field, and three to five years of experience working with Internet communication systems." Pet. 25. According to Petitioner, "[a]dditional education might compensate for less experience, and vice-versa." *Id.* Dr. Almeroth supports this articulation. *See* Ex. 1003 ¶¶ 92–97. Patent Owner does not propose any different expression of the level of ordinary skill, and Dr. Rouskas testifies that he has "employed Dr. Almeroth's definition" in his Declaration. Ex. 2005 ¶ 21.

Because we find Petitioner's proposal reasonable, consistent with the level of skill reflected by the prior art, and supported by the testimony of Dr. Almeroth, we adopt it for purposes of this Decision. *See Okajima v.*

IPR2022-00291
Patent 10,708,727 B2

*Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art may reflect an appropriate level of skill in the art).

### D. Claim Construction

The Board uses "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2021); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). The specification may reveal a special definition given to a claim term by the patentee. *Phillips*, 415 F.3d at 1316. If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Although Petitioner asserts in its Petition that it "does not believe that any terms need to be construed to assess the arguments presented," we specifically invited the parties "to elaborate on their positions for proper construction of 'network-based portal'" when we instituted this proceeding. Pet. 25; Dec. 11. We address this term as follows, and we do not find it necessary to construe any other term for purposes of this Decision. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

IPR2022-00291
Patent 10,708,727 B2

The phrase "network-based portal" is recited numerous times in the only independent claim of the '727 patent, and its construction is central to the parties' respective positions regarding application of Petitioner's asserted prior art to the challenged claims. *See generally* Ex. 1001, 19:61–20:63. In particular, Petitioner broadly describes a "network-based portal" as "a web page or interface that connects multiple users to a network." Pet. 36. Patent Owner argues that a "network-based portal" excludes a user terminal or client communication device. PO Resp. 11; *see also* Reply 6–7 (Petitioner asserting that Patent Owner's argument that "the [network-based portal] resides only at the server-side of a network and excludes user interfaces of 'client communication devices[']" is "wrong").

The issue before us is therefore well-defined, namely whether a "network-based portal" as recited in the challenged claims is sufficiently broad to encompass residing at either a client or server side of a network, as Petitioner contends, or is limited to residing at the server side, as Patent Owner contends. On the preliminary record, we declined to adopt Patent Owner's exclusion of residing at a client side when extending our invitation to the parties to elaborate on their positions. Dec. 11. But we are mindful that "the Board is not bound by any findings made in its Institution Decision. At that point, the Board is considering the matter preliminarily without the benefit of a full record. The Board is free to change its view of the merits after further development of the record, and *should do so* if convinced its initial inclinations were wrong." *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016).

The full record developed at trial includes the Declaration of Dr. Rouskas (Patent Owner's expert), who directly opines on this issue.

14

IPR2022-00291
Patent 10,708,727 B2

Ex. 2005 ¶¶ 46–64. Although the record also includes a Declaration by
Petitioner's expert, Dr. Almeroth, that Declaration was filed with the
Petition and neither responds to Dr. Rouskas's opinions nor provides any
testimonial evidence to support Petitioner's positions beyond what was
available at the preliminary stage of the proceeding.[3] *See generally*
Ex. 1003. In evaluating the fully developed record, we necessarily accord
greater weight to Dr. Rouskas's testimony than to Petitioner's attorney
argument as advanced in Petitioner's Reply. *See, e.g.*, *Gemtron Corp. v.
Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("[U]nsworn
attorney argument . . . is not evidence and cannot rebut . . . other admitted
evidence . . . .").

Our evaluation also necessarily remains cognizant that "[i]n an [*inter
partes* review], the petitioner has the burden from the onset to show with
particularity why the patent it challenges is unpatentable." *Harmonic Inc. v.
Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C.
§ 312(a)(3) (requiring *inter partes* review petitions to identify "with
particularity . . . the evidence that supports the grounds for the challenge to
each claim")). This burden never shifts to Patent Owner. *See Dynamic
Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir.

---

[3] Petitioner filed a second Declaration by Dr. Almeroth after institution
(such that it was not available on the preliminary record), but that
Declaration is provided primarily as supplemental evidence under 37 C.F.R.
§ 42.64(b)(2) to address objections by Patent Owner to the authenticity of
various other exhibits. Ex. 1039 ¶ 2. Dr. Almeroth's second Declaration
otherwise merely incorporates Dr. Almeroth's "technical opinions" by
reference to his first Declaration, without providing any further facts or
expressing any further opinions that bear on the merits, including claim
construction. *Id.* ¶ 1.

IPR2022-00291
Patent 10,708,727 B2

2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Against this backdrop, we address the parties' arguments, ultimately concluding that Patent Owner articulates the more persuasive position that a "network-based portal" as recited in the claims is limited to residing at a server side of a network.

### 1. Dictionary Definitions

Patent Owner begins its argument by quoting dictionary definitions of "portal" offered by Dr. Rouskas in his Declaration: (1) "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources, and services," Ex. 2005 ¶ 49 (quoting https://www.techopedia.com/definition/13077/portal-internet); and (2) "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals," *id.* (quoting https://www.techtarget.com/whatis/definition/portal). Dr. Rouskas relies on these dictionary definitions to distinguish a "portal" from a client communication device, testifying specifically that "[w]ebsites are hosted on web servers, not on client communication devices." *Id.*

While we recognize that such dictionary definitions fall within the category of extrinsic evidence, as they do not form part of an integrated patent document, we find it useful to begin with such definitions because they provide context for evaluation of the intrinsic evidence. In doing so, we

16

IPR2022-00291
Patent 10,708,727 B2

recall that the Federal Circuit has advised that dictionary definitions are "worthy of special note": "Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

With its Reply, Petitioner counters Patent Owner's position by providing dictionary definitions of its own: (1) "A portal is a web-based platform that collects information from different sources into a single user interface and presents users with the most relevant information for their context," Ex. 1041; and (2) "A mobile portal is an Internet gateway that enables mobile devices to connect remotely with an enterprise intranet or extranet, typically via a Web browser interface," Ex. 1042. According to Petitioner, Dr. Rouskas "selectively disregarded" definitions like these that include the word "interface." Reply 7. But as Patent Owner points out, "that a definition includes the term 'interface' does not mean a 'portal' is an interface." Sur-reply 4. We find Patent Owner's explanation that "[t]he term 'interface' is used to indicate *how a user accesses the portal* (i.e., via a web browser interface), *not what a portal is*" to be consistent with Petitioner's preferred definitions.

More generally, we discern no meaningful conflict between the definitions provided by Dr. Rouskas and those provided by Petitioner. For example, the second of Petitioner's preferred definitions expressly defines a "mobile portal" as an "Internet gateway" with certain features, thereby differentiating it from a web browser interface that is used to connect a

device to the portal. *See* Ex. 1042; Sur-reply 3. And that definition's expression of equivalence between a "mobile portal" and an "Internet gateway" is consistent with the '727 patent specification's use of the terms "portal" and "gateway," as we discuss in the next subsection.

### 2. *Specification*

#### a. *"portal or gateway"*

Both parties quote various portions of the specification of the '727 patent as supporting their respective positions, with much of their arguments focusing particularly on the specification's repeated use of the phrase "portal or gateway" (or similar variant). *See, e.g.*, Ex. 1001, 4:3, 4:43, 6:57–58, 6:61. According to Patent Owner, such phrasing amounts to a "definition" by the specification of a "portal" as a "communication gateway." PO Resp. 11. And in turn, Patent Owner says, "[t]he specification also defines a 'gateway' as a 'networked server'" by stating that "[t]he remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 electronic device, such as a mobile telephone." *Id.* at 12 (quoting Ex. 1001, 15:67–16:3).

We do not agree that such phrases are definitional because they lack the deliberateness and precision that characterize definitions. *See Renishaw*, 158 F.3d at 1249. But they nonetheless raise a relevant question as to whether the specification's phrase "portal or gateway" uses different words to describe the same thing or instead refers to distinct alternatives. *See* Reply 8 (Petitioner arguing that "the '727 Patent's recitation of 'portal or gateway' means the two are alternatives, not that one redefines the other").

IPR2022-00291
Patent 10,708,727 B2

As a matter of common English usage, we agree with Dr. Rouskas that both understandings are possible. *See* Ex. 1043, 90:10–20 (testifying on cross-examination that the word "or" can be a "disjunctive conjunction" or can be used "to refer to things that are synonymous to each other"). Mere use of the word "or" does not end the inquiry.

Patent Owner has the stronger position. First, Patent Owner correctly observes that "Dr. Rouskas's testimony that to a [person of ordinary skill in the art] the word 'or' in the specification means that 'portal' and 'gateway' are used synonymously is unrebutted." Sur-reply 4; *see also* Tr. 44:7–45:17 (discussing meaning of phrase to a person of ordinary skill in the art).

Second, Petitioner observes that the specification does not always use the phrase "portal or gateway," but sometimes uses one word or the other. *See, e.g.*, Ex. 1001, 4:29–43 (referring only to "portal"), 4:47–52 (referring only to "gateway"), 5:44–64 (referring only to "portal"). According to Petitioner, the specification is thus "using these phrases to describe different embodiments, indicating that portals and gateways are two alternative means to establish communication." Reply 8. But Petitioner does not meaningfully explain how such embodiments are, in fact, different. We have reviewed the passages Petitioner identifies and we instead agree with Dr. Rouskas's more prosaic explanation that the specification sometimes uses one of two equivalent terms to avoid repetition. *See* Ex. 1043, 91:10–15 ("So to a person skilled in the art, this implies that instead of just saying portal or gateway all the time and because the claims refer to portal, not gateway, these, you know -- you know, the two terms are used synonymously.").

Third, as we note above, one of Petitioner's own preferred dictionary definitions of "portal" expresses an equivalence between a "mobile portal"

19

IPR2022-00291
Patent 10,708,727 B2

and an "Internet gateway." Ex. 1042. This independent evidence adds
further support to Patent Owner's position, particularly in light of its overall
consistency with Dr. Rouskas's unrebutted testimony.

### b. Implementation of Portal Functionality

When instituting this proceeding, we acknowledged that Patent Owner
supported its contention that a "network-based" portal resides at a server
side with examples drawn from the specification of the '727 patent.
Dec. 10–11. Specifically, Patent Owner identified examples in which the
specification describes a "portal" as separate from a "mobile phone" or from
a person's "wireless device." Paper 7, 15–16 (citing Ex. 1001, 6:12–13,
6:32–33, 6:55–63, 16:1–3); *see* Dec. 10–11. But we *sua sponte* expressed a
concern that "the specification also includes numerous examples where the
portal functionality is implemented in a 'mobile phone,' i.e., a client-side
device." Dec. 11 (citing Ex. 1001, 3:10–19, 9:3–10:2, 10:17–13:27, 14:64–
15:54, Figs. 7–11). When extending our invitation for the parties to
elaborate on their positions for proper construction of "network-based
portal," we accordingly stated that "[t]o adopt Patent Owner's exclusion of
client-side functionality from the scope of the recited 'network-based portal'
would thus exclude preferred embodiments." *Id.* The parties have now had
a full opportunity to develop their positions and, in particular, to address the
concern we raised when instituting the proceeding. We have reconsidered
our initial view in light of that fully developed record.

The parties' dispute on this point centers on Figures 7–11, and we
reproduce Figure 7 below, with highlighting provided by Petitioner. *See*
Reply 13.

IPR2022-00291
Patent 10,708,727 B2



FIG. 7

Figure 7 is "a flow diagram of a personal call response process according to one embodiment of the invention." Ex. 1001, 3:10–11. The patent uses similar language to describe Figures 8–11, which relate respectively to "an audio message response process," "a text message response process," "an automated call response process," and "a message presentation process." Ex. 1001, 3:12–19.

According to Patent Owner, "the embodiment[s] in Figs. 7-11 are not embodiments concerning use of a [network-based portal]," but instead "concern how a recipient user interacting with their client device can

IPR2022-00291
Patent 10,708,727 B2

respond to an incoming call or message." PO Resp. 17–18. This distinction is meaningful because each of the challenged claims is directed to "[a] computer-implemented method to facilitate electronic communication of a plurality of users using at least a network-based portal at least based on Internet protocol." *See, e.g.*, Ex. 1001, 19:61–63. According to Patent Owner, the embodiments illustrated by Figures 7–11 are not directed to such a facilitation method, but are instead "methods performed by the second user's device *upon receiving a message*." PO Resp. 18 (citing Ex. 1001, Figs. 7–11; Ex. 2005 ¶ 62). As such, Patent Owner argues, "a construction that has the [network-based portal] at a server distinct from the second user's communication device *does not exclude a preferred embodiment, if anything, it enables them*." *Id.* (citing Ex. 2005 ¶ 62). Patent Owner supports its argument with testimony by Dr. Rouskas, and we additionally note that Patent Owner's argument is consistent with the '727 patent specification's description of Figures 7–11 as illustrating "message *response* process[es]." Ex. 2005 ¶ 62; Ex. 1001, 3:10–19 (emphasis added).

Petitioner notes that independent claim 1 recites that "messages are eligible to be received by the second user via the network-based portal." Reply 11; Ex. 1001, 20:10–11. The portions of Figure 7 that Petitioner highlights refer to "answer[ing] the incoming voice call" at step 206, "obtain[ing] and send[ing] audio message to caller" at step 214, "obtain[ing] and send[ing] text message to caller" at step 218, and "direct[ing] to voice mail" at step 222, which Petitioner contends are examples where client devices "enable messages to be received." Reply 12–13. Petitioner appears to infer that these highlighted steps must correspond to the claim limitation it identifies. *See id.* at 11–13. But even if we agree that these are examples of

22

IPR2022-00291
Patent 10,708,727 B2

client devices that "enable messages to be received," Petitioner cites no evidence that links such functionality to be "via" the recited "network-based portal" as the claim also requires. *See* Ex. 1001, 20:10–11. In other words, the issue is not merely whether the client device is capable of implementing functionality in some embodiments that is implemented by a server-resident network-based portal in other embodiments (as appears to undergird the dissent's analysis); the issue is instead whether that functionality is specifically implemented at the client with what Petitioner adequately shows to be "a network-based portal."

Petitioner argues inferentially that "[t]he '727 Patent's sole independent claim recites a[] [network-based portal]—thus, because the patent's figures are embodiments of the patent, they must include a[] [network-based portal]." Reply 14. But Patent Owner cites no legal authority to support its implied proposition that a patent's claims and drawings must have such a correspondence. *See* Sur-reply 8–9 ("Petitioner's position that every issued claim must encompass every figure/embodiment of a patent is wrong as a matter of law."). Indeed, it is not particularly uncommon that a patent describes unclaimed embodiments. *See, e.g.*, *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1334 (Fed. Cir. 2019) ("Under the disclosure-dedication rule, subject matter disclosed by a patentee, but not claimed, is considered dedicated to the public."). Although Petitioner asserts that "[Patent Owner] remains silent as to the purpose of these disclosures, if not related to the claims," Petitioner again cites no legal authority to support imposing such a requirement on a patent owner, and we are aware of none. *See* Reply 14.

IPR2022-00291
Patent 10,708,727 B2

In addition to failing to cite any authority that supports its legal position on this issue, Petitioner also cites no testimonial evidence that supports its factual interpretation of Figures 7–11. *See generally* Reply. We are accordingly left to discern how a person of ordinary skill in the art would understand these drawings and their related descriptions by weighing Petitioner's attorney argument against the expert testimony of Dr. Rouskas that Patent Owner cites. *See* Ex. 2005 ¶¶ 60–62. As we note above, we necessarily accord greater weight to Dr. Rouskas's testimonial evidence. We reiterate that Petitioner was notified of this issue in the Institution Decision, but declined during the trial to introduce additional expert testimonial evidence that might bear on the issue and that Patent Owner might have cross-examined. *See* Dec. 11 ("The parties will have an opportunity to elaborate on their positions for proper construction of 'network-based portal' during the trial."); 37 C.F.R. § 42.23(b) (authorizing reply that responds to arguments raised in a patent owner response or institution decision without limiting introduction of new evidence).

We accordingly determine that Petitioner does not persuasively support its contention that Patent Owner's proposed construction of "network-based portal" would exclude a preferred embodiment.

### 3. Prosecution History

Neither party cites the prosecution history of the '727 patent when addressing the meaning of "network-based portal." Pet. 36, 68; PO Resp. 8–19, 46–51; Reply 6–14, 24; Sur-reply 3–9, 19. During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 119–126. In an Examiner-initiated interview early during

24

IPR2022-00291
Patent 10,708,727 B2

prosecution, the Examiner suggested that the Applicant submit a terminal disclaimer "to place the Application [in] condition [for] allowance." *Id.* at 127. After the Applicant submitted a terminal disclaimer, the Examiner allowed the claims based on the terminal disclaimer and the "history rejection" of ancestor applications and patents. *Id.* at 124.

We note that the Applicant filed a Preliminary Amendment shortly after filing the application and introduced language that refers to the "network-based portal," either to a then-pending claim or a newly introduced claim. *Id.* 94–101. But the Applicant offered no explanation for those amendments. *Id.* 101 (Remarks identifying claims amended and added). And the Examiner similarly did not address that language. *See id.* at 119–126.

While we have thus reviewed the prosecution history, we do not consider it helpful in construing "network-based portal," particularly in the absence of any arguments presented by either party.

### 4. *Other Arguments*

The parties address other points that we also do not find helpful in resolving the precise claim-construction issue before us, i.e. whether the recited "network-based portal" is broad enough to encompass residing at a client side of a network as well as residing at a server side. First, Patent Owner contends that the '727 patent specification supports concluding that a "network-based portal" has different functionality from a client communication device because the former "allows worldwide access to the user" and the latter is "associated with a user." PO Resp. 12–13. Petitioner discounts this as "a distinction without a difference." Reply 8–9.

25

IPR2022-00291
Patent 10,708,727 B2

While there may be a meaningful functionality difference between a "network-based portal" and a client communication device, Patent Owner does not articulate that difference sufficiently clearly for it to bear on our analysis. Indeed, when questioned about this distinction on cross-examination, Dr. Rouskas provided responses that we do not find illuminating because Dr. Rouskas agreed that a user's mobile phone allows that user worldwide access by allowing others to communicate with the user. *See* Ex. 1043, 110:20–24, 114:2–5 ("One is worldwide access to the user. A phone provides that. There's no question about that.").

Second, Patent Owner contends that a contradiction arises within independent claim 1 if the recited "network-based portal" is mapped to a user interface on the client communication device of the recited "first user." PO Resp. 13–14. Patent Owner's contention appears to be correct, such as it is. But the contention is clearly driven by one of Petitioner's arguments in applying the asserted prior art to the claim, rather than as a matter of claim construction itself. *See* Reply 9 (Petitioner disputing that it advances an argument that only the first user's device contains the network-based portal). That is, Patent Owner's scenario imposes an additional limit on the network-based portal (not merely residing on a client side, but residing on a specific client device). That scenario therefore does not address the broader claim-construction issue that confronts us, namely whether a "network-based portal" encompasses residing at a client side generally, rather than limited to a specific client communication device.

We accordingly give little weight to these additional arguments by Patent Owner in our evaluation of the claim-construction issue.

IPR2022-00291
Patent 10,708,727 B2

### 5. Summary

As we note above, we find certain of Patent Owner's arguments adequately rebutted by Petitioner, such that we do not consider them in our assessment.  Nevertheless, Patent Owner retains compelling arguments for its proposed construction, supported by expert testimonial evidence, including dictionary definitions and the '727 patent specification's reference to a "portal or a gateway."  We find such references more compellingly refer to "portal" and "gateway" as synonyms rather than alternatives.  In addition, Patent Owner provides convincing evidence and argument that rebuts the concern raised by the Board at institution whether Patent Owner's proposed construction would exclude preferred embodiments.  Petitioner, who bears the overall burden, addresses that concern only with attorney argument, which we accord less weight.

In light of these considerations, we construe "network-based portal" as Patent Owner advocates, namely as residing on a server side of a network.

### E. Overview of the Prior Art

#### 1. Diacakis

Diacakis "relates generally to communications and, more particularly, to presence and availability management systems." Ex. 1007 ¶ 3.  Figure 1 of Diacakis is reproduced below.

IPR2022-00291
Patent 10,708,727 B2



**Fig. 1**

Figure 1 is a diagram of "a presence and availability (P&A) management system." *Id.* ¶ 24. System 10 includes P&A management server 12 in communication with client terminal 22 via network 16. *Id.* P&A management server 12 includes presence detection engine 18, availability management engine 20, and profile database 24. *Id.* Functions of P&A management server 12 include determining whether a user is *present* on the network, determining whether the user is *available* on the network, and communicating such presence and availability information to others, depending on the user's preferences. *Id.* ¶¶ 24–27.

IPR2022-00291
Patent 10,708,727 B2

Figure 4 of Diacakis is reproduced below.



Figure 4 is a diagram illustrating details of P&A management server 12. *Id.* ¶¶ 15, 38. As illustrated, presence detection engine 18 may be in communication with various devices, such as landline desk phone 44, mobile phone 46, personal computer 48, personal digital assistant 50, and pager 52, to help determine presence information. *Id.* ¶¶ 43–44. Based on the information from such devices, presence detection engine may determine an individual's status 54 on particular networks, the individual's physical location 56, and the individual's capabilities 58. *Id.* ¶ 45.

Presence information determined by presence detection engine 18 is communicated to availability management engine 20. *Id.* ¶ 46. Such presence information, in combination with the individual's situation 60 and the individual's rules and preferences 64, is used to determine the individual's availability. *Id.* ¶¶ 46–47. "Additionally, the individual may specify the observers 62 who receive the individual's contact information,"

IPR2022-00291
Patent 10,708,727 B2

with such observers 62 specified on a "group basis or an individual basis."
*Id.* ¶ 47.

### 2. Tanigawa

Tanigawa "relates to a communication technology such as Instant
Messaging (IM)," and endeavors "to achieve group chat using multimedia."
Ex. 1010 ¶¶ 1, 8. Figure 1 of Tanigawa is reproduced below.

## FIG.1



Figure 1 is a schematic diagram of a voice-over-IP ("VoIP") communication
system that includes a variety of communication devices, such as IP
terminals 7, fixed telephone 11, and mobile telephone 9. *Id.* ¶¶ 34–35. IM
server 4 "manages presence information of an IM client," AP server 5
"manages connection[s] for a voice chat using VoIP," MD server 6
"implements multi-party voice speech by mixing voice data," and VR

30

IPR2022-00291
Patent 10,708,727 B2

server 10 "performs voice relay" with publicly switched telephone network
3 and radio communication network 2. *Id.* ¶ 35.

Figure 3 of Tanigawa is reproduced below.

**FIG.3**



| 431 | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ACCOUNT NAMES | CLIENT ADDRESSES | CLIENT NICKNAMES | AUTHENTI-CATION KEYS | PRESENCE | USABLE MEDIA | CONFERENCE ADDRESSES | CONFERENCE NICKNAMES | BUDDY LIST |
| Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... |
| Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... |
| Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client G | ***.***.***.*** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |

PRESENCE INFORMATION MANAGEMENT TABLE 488

Figure 3 is an example of a "presence information management table" used
by IM server 4 to manage presence information. *Id.* ¶ 49; *see id.* ¶¶ 40, 47.
Chat participants are identified by nicknames 433, with the same nickname
being used for a particular user across all devices. *Id.* ¶¶ 133, 194. This is
illustrated in Figure 3, for example, for devices D and E, both of which
belong to "hanako," and for devices F and G, both of which belong to
"yoshi." *See id.* ¶ 50.

Figure 12 of Tanigawa is reproduced below.

31

IPR2022-00291
Patent 10,708,727 B2



Figure 12 shows an example of a user interface of an IM client, such as may be displayed on IP terminal 7. *Id.* ¶ 162. Display area 135 shows presence information of "chatting buddies." *Id.* ¶ 164. In addition, several chatting options are provided on main menu bar 130, which includes icon 131 "indicating an operation relating to presence information," icon 132 indicating one-to-one voice chatting, icon 133 indicating multiparty voice chatting, and icon 134 "indicating text chatting." *Id.* ¶ 163.

### 3. *Hullfish*

Hullfish "relates to electronic messaging systems in a computer environment." Ex. 1011, 1:6–9. Figure 5 of Hullfish is reproduced below.

IPR2022-00291
Patent 10,708,727 B2



**FIG. 5**

Figure 5 is a flow diagram depicting a method that incorporates a privacy feature into receiving short-message-service ("SMS") text messages. *Id.* at 8:59–61. The method is implemented when a first user ("User A") wants to stop receiving messages from a second user ("User B"). *Id.* at 8:62–64. To implement this, User A sends a text message containing User B's telephone number to a predetermined telephone number. *Id.* at 9:1–4. Thus, when an SMS server receives a text from User A at the predetermined telephone number at step 502, it is determined at step 504 whether the text contains a telephone number, i.e., User B's number. *Id.* at 9:5–9. If so, future messages from User B to User A are blocked at step 506. *Id.* at 9:9–18. Otherwise, future messages are forwarded "according to user preference" at step 508. *Id.* at 9:30–33.

### 4.  *Loveland*

Loveland "relates to methods, systems and computer program products for notifying a user of an event via voice notifications or other notification methods depending on the user's dynamic circumstances." Ex. 1008, 1:8–11.  Figure 3 of Loveland is reproduced below.



FIG. 3

Figure 3 is a "flowchart of a method for notifying a user of an event in a context sensitive manner that takes into consideration the user's current state." *Id.* at 2:65–67.  After the process is initiated at step 301 upon detection of an event that requires notification to a user, such notification is sent at step 302 in a manner "that is appropriate for the user's circumstances." *Id.* at 6:25–27, 6:36–38.

Appx00096

IPR2022-00291
Patent 10,708,727 B2

This includes accessing a current context of the user at step 303, such as "whether or not the user's telephone is on, busy, in hands-free mode, out of range, in meeting mode or the like for each of the user's telephones." *Id.* at 6:40–47. At step 304, one of a plurality of notification methods is identified:

> There is an endless permutation of possible rules. As an illustrative example, the rules might define which telephonic devices to notify given the current time, and what notification methods to use if the current device is on or off, in hands-free mode or not, and busy or not. As a more specific example, the user may state that she wants to be notified by audible voice message if she receives an e-mail from a certain individual, except if she is already using the telephone through which the voice message was to be rendered, in which case the user may specify to be notified via a text message.

*Id.* at 6:60–7:3. Loveland also explains that "the user may specify . . . that a voice notification interrupt the current conversation even if the user is currently on the telephone." *Id.* at 2:28–32; *see also id.* at 6:31–33 ("the notification may be that a new e-mail from an important individual has been received in the user's in-box"). At step 305, the notification is then dispatched to the user using the identified notification method. *Id.* at 7:4–6.

### 5. Takahashi

Takahashi describes "a server device for net games which is communicably connected to a plurality of terminal devices" via the Internet. Ex. 1009 ¶¶ 8, 29. Figure 7 of Takahashi is reproduced below.

IPR2022-00291
Patent 10,708,727 B2



Figure 7 depicts a set of messages that a user may send to other users. *Id.*
¶ 72. "For each one of the above messages, the member can select a desired
message out of a plurality of predetermined messages." *Id.* ¶ 74.

### F. Grounds Based on Diacakis

Petitioner challenges claims 1–6, 15, and 17 as unpatentable under
35 U.S.C. § 103(a) over Diacakis; challenges claims 7–9 as unpatentable
under 35 U.S.C. § 103(a) over Diacakis and Loveland; and challenges claim
16 as unpatentable under 35 U.S.C. § 103(a) over Diacakis and Takahashi.
Pet. 35–63. In addressing claim 1, the only challenged independent claim,
Petitioner draws a correspondence between Diacakis's P&A management

IPR2022-00291
Patent 10,708,727 B2

server and a computer that performs the recited "computer-implemented method." Pet. 35 (citing Ex. 1003 ¶ 293). In doing so, Petitioner observes that Diacakis's P&A management server is in communication with a client terminal via a network that may be the Internet. *Id.* (citing Ex. 1007 ¶¶ 24–25).

Figure 9 of Diacakis, annotated by Petitioner, is reproduced below. *See id.* at 36.



Figure 9 is a block diagram of client terminal 22, which includes indicator module 110 in communication with user interface 112 (highlighted in yellow by Petitioner). *Id.*; Ex. 1007 ¶ 63. User interface 112 "may include, for example, a GUI (Graphical User Interface) or a CUI (Character-based user interface)." Ex. 1007 ¶ 63; *see* Ex. 1003 ¶ 119. User interface 112 may display information about a user's contacts, such as the contact's name, work telephone number, work email address, home telephone number, home email address, and instant-messaging (IM) address. Ex. 1007 ¶¶ 56, 59, Fig. 8; *see* Ex. 1003 ¶¶ 116, 119. User interface 112 enables a user to

IPR2022-00291
Patent 10,708,727 B2

communicate with a contact via network 16, e.g., the Internet. Ex. 1007
¶¶ 24–25, 62–64, Fig. 9; *see* Ex. 1003 ¶ 131.

Both the preamble and the body of independent claim 1 recite "a
network-based portal." Ex. 1001, 19:63, 20:4, 20:6, 20:11, 20:15–16,
20:21–22, 20:29–30, 20:42–43, 20:46–47; *see* PO Resp. 19 (Patent Owner
contending that, because of the repeated recitation of "network-based portal"
throughout the body of independent claim 1, the "preamble therefore
breath[e]s life and meaning into claim 1"). Contending that a "network-
based portal" is "a web page or interface that connects multiple users to a
network," Petitioner identifies client-resident user-interface 112 of Diacakis
as meeting the claim's requirement for such a feature. Pet. 36. As explained
above, after evaluating the record evidence developed during the trial, we do
not adopt such a broad construction of "network-based portal." *Supra* §
II.D. Instead, we construe "network-based portal" as Patent Owner
advocates, namely as residing on a server side of a network. *Id.*

Because Petitioner does not show that Diacakis discloses a "network-
based portal" as so construed, we conclude that Petitioner does not show, by
a preponderance of the evidence, that independent claim 1 is unpatentable
under 35 U.S.C. § 103(a) over Diacakis. Because the deficiency in
Petitioner's showing applies to the claims that depend from claim 1 because
they inherit the "network-based portal" limitations, we also conclude that
Petitioner does not show that any of claims 2–5, 15, or 17 is unpatentable
under 35 U.S.C. § 103(a) over Diacakis; that any of claims 7–9 is
unpatentable under 35 U.S.C. § 103(a) over Diacakis and Loveland; nor that

IPR2022-00291
Patent 10,708,727 B2

claim 16 is unpatentable under 35 U.S.C. § 103(a) over Diacakis and
Takahashi.

### G. Grounds Based on Tanigawa and Hullfish

Petitioner challenges claims 1–3, 6, 15, and 17 as unpatentable under
35 U.S.C. § 103(a) over Tanigawa and Hullfish; challenges claims 7–9 as
unpatentable under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, and
Loveland; and challenges claim 16 as unpatentable under 35 U.S.C. § 103(a)
over Tanigawa, Hullfish, and Takahashi. Pet. 63–89.

In addressing independent claim 1, Petitioner identifies Tanigawa's
communication system as performing most of the steps of the recited
"computer-implemented method." Pet. 67–68. For the "network-based
portal," Petitioner relies on the user interface illustrated in Figure 12,
reproduced above: "Tanigawa's terminals (user devices) contain a
'network-based portal,'—a user interface connecting users to a network."
*Id.* at 68–69. That is, similar to its analysis of independent claim 1 for its
Diacakis challenge, Petitioner relies on Tanigawa's disclosure of a client-
resident user interface to meet the claim's recitations of a "network-based
portal."

The only aspects of independent claim 1 for which Petitioner relies on
a reference other than Tanigawa—specifically, Hullfish—are those that
recite aspects that involve blocking users. In particular, Petitioner contends
that the combination of Tanigawa and Hullfish renders obvious the
following two recitations: (1) "enabling the second user to block the first
user from using at least the selected mode of communication to
communicate with the second user via the network-based portal, based on

39

the identifier associated with the first user," and (2) "enabling the first message to be provided to the second user, using the selected mode of communication, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected mode of communication to communicate with the second user, via the network-based portal." *Id.* at 74–77; Ex. 1001, 20:19–30.

Under our adopted construction, Petitioner does not show that the combination of Tanigawa and Hullfish meets the claim requirements of a "network-based portal." We accordingly conclude that Petitioner does not show, by a preponderance of the evidence, that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa and Hullfish. Because the deficiency in Petitioner's showing applies to the claims that depend from claim 1 because they inherit the "network-based portal" limitations, we also conclude that Petitioner does not show, by a preponderance of the evidence that any of claims 2, 3, 6, 15, or 17 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa and Hullfish; that any of claims 7–9 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, and Loveland; nor that claim 16 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, and Takahashi.

## III. CONCLUSION

The table below summarizes our conclusions as to the challenged claims.

IPR2022-00291
Patent 10,708,727 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 15, 17 | 103(a) | Diacakis | | 1–6, 15, 17 |
| 7–9 | 103(a) | Diacakis, Loveland | | 7–9 |
| 16 | 103(a) | Diacakis, Takahashi | | 16 |
| 1–3, 6, 15, 17 | 103(a) | Tanigawa, Hullfish | | 1–3, 6, 15, 17 |
| 7–9 | 103(a) | Tanigawa, Hullfish, Loveland | | 7–9 |
| 16 | 103(a) | Tanigawa, Hullfish, Takahashi | | 16 |
| **Overall Outcome** | | | | 1–9, 15–17 |

## IV.  ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–9 and 15–17 of U.S. Patent No. 10,708,727 B2 have not been shown, by a preponderance of the evidence, to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

41

Trials@uspto.gov                                                                Paper 30
571-272-7822                                                        Entered: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

_____

IPR2022-00291
Patent 10,708,727 B2

_____

AMUNDSON, *Administrative Patent Judge*, dissenting.

I respectfully dissent from the majority's determination that a "network-based portal" does not encompass a user interface in a client device that connects clients to a network and instead may reside only on a server side of a network. In my view, the majority gives too much weight to the extrinsic evidence in making that determination. The Federal Circuit has "viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms," e.g., because expert testimony "is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).

Below, I discuss each party's claim-construction arguments and then explain my analysis of the intrinsic evidence and the extrinsic evidence and the bases for my disagreement with the majority's claim construction.

Based on my view that a "network-based portal" encompasses a user interface in a client device that connects clients to a network and my review of the evidence, I also respectfully dissent from the majority's determination that Petitioner fails to demonstrate by a preponderance of the evidence that the challenged claims are unpatentable.

## I. BACKGROUND

Independent claim 1 and certain dependent claims require a "network-based portal." Ex. 1001, 19:61–20:63 (claim 1), 21:8–41 (claims 4–7), 22:27–33 (claim 14). In their respective arguments, the parties dispute the meaning of "network-based portal." *See, e.g.*, Pet. 36, 68–69; Resp. 9–19, 46–51; Reply 6–14, 24; Sur-reply 3–4, 19.[4]

Petitioner contends that a "network-based portal" encompasses the following:

(1)    "a web page or interface that connects clients to a network";

(2)    "a user interface connecting users to a network";

(3)    "a user interface in a client terminal"; and

(4)    "a user interface that connects clients to a network."

Pet. 36, 68–69; Reply 6, 24 (emphasis omitted); *see* Tr. 12:8–16.

---

[4] This decision uses the following abbreviations and words to identify documents filed with the Board: "Pet." for the Petition (Paper 1); "Resp." for Patent Owner's Response (Paper 14); "Reply" for Petitioner's Reply (Paper 17); "Sur-reply" for Patent Owner's Sur-reply (Paper 20); and "Tr." for the transcript of the February 17, 2023, oral hearing (Paper 29).

IPR2022-00291
Patent 10,708,727 B2

Patent Owner equates a "portal" to a "networked server." *See* Resp.
11–12, 48–49; Sur-reply 3. In particular, Patent Owner contends that the
'727 patent's specification (1) defines a "portal" as a "gateway" and
(2) defines a "gateway" as a "networked server." Resp. 11–12, 48–49
(citing Ex. 1001, 4:3, 4:43–44, 6:57–58, 6:61, 15:67–16:3; Ex. 2005
¶¶ 50, 123); Tr. 44:11–17; *see* Sur-reply 3.

## II. PATENT OWNER'S ARGUMENTS

Patent Owner asserts that the '727 patent's specification uses "portal"
and "gateway" synonymously. Sur-reply 3. As support, Patent Owner
quotes the following statements in the specification where the word "or"
appears between "portal" and "gateway": "A portal or gateway approach
could provide general Internet access to one or more embodiments of the
communication management systems . . . . The portal or gateway can then
facilitate download of a database or update thereto to a communication
device, such as a phone." Resp. 12–13, 16, 49–50 (quoting Ex. 1001,
6:57–63). Patent Owner also asserts that Dr. Rouskas provides "unrebutted"
testimony that the specification uses "portal" and "gateway" synonymously
because the word "or" sometimes appears between "portal" and "gateway"
in the specification. Sur-reply 4 (citing Ex. 1043, 90:4–9, 91:10–15).
According to Patent Owner, a "portal" or "gateway" connects "distinct
networks" in contrast to a client device that does not do so. Resp. 16 (citing
Ex. 2005 ¶ 59).

To support its contention concerning the equivalence of a "gateway"
and a "networked server," Patent Owner quotes the following statements in
the specification: "The remote server computer can be a networked server
coupled to the network 108. One example of a networked server is a

3

IPR2022-00291
Patent 10,708,727 B2

gateway computer for a wireless 10 [sic] electronic device, such as a mobile telephone." Resp. 12, 49 (quoting Ex. 1001, 15:67–16:3).

Further, Patent Owner asserts that the specification "does not define" a "portal" or "network-based portal" as a client device. Resp. 12, 49 (citing Ex. 2005 ¶¶ 50, 123). Patent Owner asserts that a "portal" or "network-based portal" differs from a client device because a client device is "associated with a user," whereas a "portal" or "network-based portal" must allow "worldwide access" to a user and permit the user "to receive messages from multiple senders." *Id.* at 12–13, 15–17, 49–50 (emphasis omitted) (quoting Ex. 1001, 4:33–34, 6:12–29, 6:57–60); *see id.* at 7; Sur-reply 4–5, 7. Patent Owner also asserts that a "portal" or "network-based portal" resides at a "server distinct from" a client device. Resp. 18; *see* Sur-reply 3.

Additionally, Patent Owner contends that the claim language distinguishes a "network-based portal" from a client device. *See* Resp. 13–14, 50–51. Patent Owner bases that contention on limitation [1.8] that reads as follows:

> [1.8] wherein even when the first message is received by the second user via the selected mode of communication, contact information associated with the second user and provided by the second user to the network-based portal is not provided via the network-based portal to the first user, and contact information associated with the first user and provided by the first user to the network-based portal is not provided via the network-based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user.

*Id.* at 13, 50–51; *see* Ex. 1001, 20:39–52.

IPR2022-00291
Patent 10,708,727 B2

Specifically, Patent Owner asserts that if the first user's client device "is the claimed network-based portal," then "claim 1 could not possibly be carried out" because:

(1)    limitation [1.8] requires that the recipient's (second user's) contact information be "provided by the second user to the network-based portal";

(2)    limitation [1.8] further requires that the recipient's (second user's) contact information not be "provided via the network-based portal to" the sender (first user) or the sender's (first user's) client device; and

(3)    if the network-based portal is on the sender's (first user's) client device according to Petitioner's position, the recipient's (second user's) contact information "necessarily must also be provided to" the sender's (first user's) client device.

Resp. 14, 50–51; *see id.* at 24–25. According to Patent Owner, Petitioner's position "leads to a contradiction, making the method useless." *Id.* at 14, 51; *see id.* at 25.

To further support its position, Patent Owner quotes two undated online definitions of "portal" that Dr. Rouskas found with a Google search. Resp. 11, 48; *see* Ex. 1043, 61:17–63:10; Ex. 2005 ¶¶ 49, 122. Patent Owner quotes the first online definition located at https://www.techopedia.com/definition/13077/portal-internet as follows: "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." Resp. 11, 48; Ex. 2005 ¶¶ 49, 122. Patent Owner asserts that websites are "hosted on web servers" and not on client devices. Resp. 11, 48 (citing Ex. 2005 ¶¶ 49, 122). Patent Owner quotes the second online definition located at https://

5

www.techtarget.com/whatis/definition/portal as follows: "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site." Resp. 11, 48; Ex. 2005 ¶¶ 49, 122.

Patent Owner notes that the Institution Decision cited the embodiments in the '727 patent's Figures 7–11 when stating that the '727 patent "discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Resp. 17 (citing Inst. Dec. 11). Patent Owner contends that "claim 1 concerns 'managing electronic communications using at least a network-based portal.'" *Id.* at 18. Patent Owner then contends that the embodiments in Figures 7–11 are "methods performed by the second user's device upon receiving a message" and "not embodiments for 'managing electronic communications using at least a network based portal' as are the claims of the '727 patent." *Id.* (emphasis omitted); *see id.* at 19; Sur-reply 8–9.

### III. PETITIONER'S ARGUMENTS

Petitioner asserts that the '727 patent discloses the claimed functionality for a "network-based portal" residing in a client device, e.g., in a mobile phone. Reply 6. Petitioner asserts that claim 1 specifies that "messages are eligible to be received by the second user via the network-based portal." *Id.* at 11 (emphasis omitted). Petitioner then contends that the '727 patent discloses (1) the recipient functionality of "allowing users to specify who may contact them and see their contact information" taking place "all in the phone" and (2) the phone "automatically manag[ing] the communication." *Id.* (citing Ex. 1001, 7:6–15) (quoting Ex. 1001, 7:11–12,

IPR2022-00291
Patent 10,708,727 B2

7:14–15).  Petitioner also contends that a "network-based portal" residing

in a client device enables not only message receipt but also message

management.  *Id.* at 11–12 (citing Ex. 1003 ¶¶ 131–132).

IPR2022-00291
Patent 10,708,727 B2

To support its contentions about message receipt and message management taking place "all in the phone," Petitioner provides the highlighted version of the '727 patent's Figure 7 reproduced below (Reply 13):



FIG. 7

Figure 7 "is a flow diagram of a personal call response process 200" performed "by an electronic device, such as a mobile communication device

8

IPR2022-00291
Patent 10,708,727 B2

(e.g., mobile telephone)." Ex. 1001, 9:4–8, Fig. 7; *see id.* at 3:10–11. This highlighted version of Figure 7 includes yellow highlighting over the following steps in process 200:

- step 206 "answer the incoming voice call";
- step 214 "obtain and send audio message to caller";
- step 218 "obtain and send text message to caller"; and
- step 222 "direct to voicemail."

*See* Reply 13. Petitioner argues that "because the patent's figures are embodiments of the patent, they must include" a "network-based portal." *Id.* at 14.

Further, Petitioner asserts that the '727 patent's specification "treats the phrase 'portal or gateway' differently from the singular 'portal,' using these phrases to describe different embodiments, indicating that portals and gateways are two alternative means to establish communication." Reply 8 (citing Ex. 1001, 4:29–53, 5:44–64). Petitioner also asserts that the specification's "recitation of 'portal or gateway' means the two are alternatives, not that one redefines the other." *Id.* (citing *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)).

Regarding Patent Owner's assertion that websites are "hosted on web servers" and not on client devices, Petitioner argues that no claim requires that a "network-based portal" be "hosted." Reply 7; *see* Resp. 11, 48.

Additionally, Petitioner contends that Patent Owner's assertion about a "network-based portal" differing from a client device because a client device is "associated with a user" lacks merit since a client device may include a "network-based portal" that "connects a user to a network" even though the client device is "associated with a user." Reply 8–9; *see* Resp.

9

12–13, 49–50.  Petitioner contends that Dr. Rouskas concedes that "a user's mobile phone allows worldwide access to that user by allowing others to communicate with the user."  Reply 9 (citing Ex. 1043, 110:20–24, 114:2–5).

Petitioner criticizes the two online definitions of "portal" that Dr. Rouskas found as "cherry-picked from search results for 'portal' rather than from any nuanced inquiry or analysis."  Reply 7 (citing Ex. 1043, 62:24–63:10); Tr. 74:5–16.  According to Petitioner, Dr. Rouskas "selectively disregarded definitions that include the word 'interface.'" Reply 7.  To undermine Dr. Rouskas's credibility, Petitioner introduces two online definitions of "portal" with 2022 copyright dates that include the word "interface."  *Id.*; *see* Ex. 1041, 1, 5; Ex. 1042, 1, 5; Tr. 73:22–74:16, 75:8–76:7.  Petitioner does not rely on those online definitions to establish the meaning of "network-based portal."  Tr. 75:8–76:7.

Petitioner quotes the first online definition located at https://www. liferay.com/resources/l/web-portal as follows:  "A portal is a web-based platform that collects information from different sources into a single user interface."  Reply 7 (emphasis omitted) (quoting Ex. 1041, 1).  Petitioner quotes the second online definition located at https://www.gartner.com/en/ information-technology/glossary/mobile-portal as follows:  "A mobile portal is an Internet gateway that enables mobile devices to connect remotely . . . typically via a Web browser interface."  *Id.* (alteration by Petitioner) (emphasis omitted) (quoting Ex. 1042, 1).

## IV.  ANALYSIS

After analyzing the intrinsic evidence and the extrinsic evidence, I agree with Petitioner that a "network-based portal" encompasses a user

IPR2022-00291
Patent 10,708,727 B2

interface in a client device that connects clients to a network. *See* Pet. 36, 68–69; Reply 6, 24. Below, I explain my analysis of the intrinsic evidence and the extrinsic evidence.

Patent Owner's contention that "claim 1 concerns 'managing electronic communications using at least a network-based portal'" does not accurately reflect claim 1's language. *See* Resp. 18; Ex. 1001, 19:61–63. Claim 1 recites a method to "facilitate electronic communication of a plurality of users using at least a network-based portal." Ex. 1001, 19:61–20:63.

The '727 patent's specification discloses and depicts "facilitat[ing] electronic communication" (and "managing electronic communications") using a "phone" or a "mobile telephone," i.e., a client device with a user interface. *See id.* at 2:64–3:21, 4:29–31, 5:51–53, 6:64–7:16, 7:32–36, 7:65–8:1, 8:64–67, 9:4–13:27, 14:29–38, 14:47–52, 14:64–15:54, 16:4–64, 17:53–55, 17:61–64, 18:5–13, Figs. 1–12.

For example, Figures 7–12 depict "facilitating" functionality as recited in claim 1 (and "managing" functionality) performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)" as follows:

- providing a first user with "a plurality of modes of communication" to "allow the first user to use one of the plurality of modes of communication as a selected mode of communication for a first message to be sent from the first user to a second user" as recited in limitation [1.1];

- "messages are eligible to be received by the second user" based on "any of the plurality of modes of communication" as recited in limitation [1.3];

11

IPR2022-00291
Patent 10,708,727 B2

- "receiving a second message from the second user to the first user, to respond to the first message, after the second user has received the first message" as recited in limitation [1.6]; and

- "one of the first message or the second message is voice and the other of the first message or the second message is text" as recited in limitation [1.7].

Ex. 1001, 9:4–55, 10:17–14:42, 14:64–15:54, 16:4–64, 19:61–20:63, Figs. 7–12; *see id.* at 3:10–21, 9:56–10:2.

Further, Figures 7–12 depict "facilitating" functionality as recited in certain dependent claims (and "managing" functionality). As an example, dependent claim 10 recites text-to-speech functionality, i.e., "transforming the first message into a voice message so that the first message is provided to the second user in an audio manner." Ex. 1001, 22:1–9. The specification's disclosure of text-to-speech functionality appears in the discussion of Figure 11, i.e., for step 606 "convert the incoming text message to an audio message" and step 608 "play the audio message." *Id.* at 15:17–46, Fig. 11.

As another example, dependent claim 11 recites speech-to-text functionality, i.e., "transforming the second message from voice into text to be provided to the first user." Ex. 1001, 22:10–12. The specification's disclosure of speech-to-text functionality appears in the discussion of Figure 12, i.e., for step 710 "convert the audio message to a text message" and step 712 "transmit the text message over a wireless network." *Id.* at 16:37–54, Fig. 12.

As yet another example, dependent claim 16 specifies that the second user may "select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages

provided to the second user." Ex. 1001, 22:40–44. The specification's
disclosure about the second user "select[ing] a predetermined message to
send to the first user" appears in the discussion of Figures 8 and 9 depicting
steps performed "by an electronic device, such as a mobile communication
device (e.g., mobile telephone)." *Id.* at 9:4–8, 10:17–21, 10:46–49,
11:60–63, 12:5–7, Figs. 8–9; *see id.* at 3:10–15. As support for claim 16,
the specification explains that:

> (1)    Figure 8's step 306 "determines whether the user (i.e.,
>         called party) of the mobile communication device has
>         selected one or more of the predetermined audio
>         messages"; and
>
> (2)    Figure 9's step 406 "determines whether one (or more)
>         of the predetermined text messages has been selected."

*Id.* at 10:46–49, 12:5–7, Figs. 8–9.

Although Petitioner does not challenge claims 10 and 11, "[o]ther
claims of the patent in question, both asserted and unasserted," can be
"valuable sources of enlightenment as to the meaning of a claim term." *See
Phillips*, 415 F.3d at 1314; Pet. 1, 35–90.

As discussed above, Petitioner argues that "because the patent's
figures are embodiments of the patent, they must include" a "network-based
portal." Reply 14; *see supra* § III. Petitioner's argument disregards the
general principle that a patent may disclose unclaimed embodiments. *See
MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377 (Fed. Cir. 2007).
Nonetheless, as also discussed above, Figures 7–12 illustrate claimed
embodiments, i.e., by depicting "facilitating" functionality as recited in
various claims performed "by an electronic device, such as a mobile
communication device (e.g., mobile telephone)." *See* Ex. 1001, 9:4–55,

10:17–14:42, 14:64–15:54, 16:4–64, 19:61–20:63, 22:1–12, 22:40–44, Figs. 7–12.

Additionally, the specification indicates that a "portal" may reside in a "phone," i.e., a client device with a user interface. Ex. 1001, 4:29–31, 5:51–53, 7:4–22, 7:32–34, 14:47–50, 17:61–64, Figs. 1–5. In particular, the specification explains that "a portal provides a number of intelligent communication modes (ICM) for the user to select as shown in FIG. 1" and "the intelligent communication modes shown in FIG. 1 for the user to select are in the phone." *Id.* at 5:51–53, 7:4–5. The specification also explains that "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences." *Id.* at 4:29–31, 7:32–34, 14:47–50, 17:61–64. Because "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can be performed at an electronic device," e.g., at a "phone," the "portal" can reside in a "phone."

The specification discloses an example of "facilitat[ing] electronic communication" (and "managing electronic communications") using a "phone." *See* Ex. 1001, 7:6–16. In particular, the specification explains that "the phone could automatically manage the communication" from various individuals after a user configures the phone as follows:

> define the contact classes, such as the ones shown in FIG. 2; set up the urgency classes, such as the ones shown in FIG. 3; define the statuses, such as the ones shown in FIG. 4; set up the Access Priority Database, such as the one shown in FIG. 5; and categorize a number of the user's contacts into the corresponding ContactClasses, all in the phone.

14

IPR2022-00291
Patent 10,708,727 B2

*Id.* at 7:6–12, Figs. 1–5; *see id.* at 18:5–13.

The specification discloses other techniques for "facilitat[ing]" electronic communication" (and "managing electronic communications") using a "phone" as follows:

- "keep information in local databases, such as in such a phone";

- configure "user settings (e.g., preferences) to decline calls/messages matching certain criteria";

- "reduce user input at the mobile communication device by making use of stored data pertaining to its hardware components, configuration or preferences";

- "provide feedback to a caller without answering a voice call from the caller";

- "choose not to take the voice call from the calling party" and instead "provide the calling party with some limited information," e.g., "in an audio or textual format";

- "enable the called party to provide a brief audio or text message to the calling party";

- "automatically (i.e., without user input) respond to the calling party via an audio or text message"; and

- "communicate in different ways depending on device configuration, user preferences, prior history, time or other criteria."

Ex. 1001, 7:2–4, 7:34–36, 7:65–8:1, 8:64–67, 13:2–9, 14:29–38, 14:50–52, 17:53–55, 18:5–13; *see id.* at 13:28–39.

For these reasons, the '727 patent's specification discloses and depicts "facilitat[ing] electronic communication" (and "managing electronic communications") using a "phone" or a "mobile telephone," i.e., a client device with a user interface. *See* Ex. 1001, 2:64–3:21, 4:29–31, 5:51–53, 6:64–7:16, 7:32–36, 7:65–8:1, 8:64–67, 9:4–13:27, 14:29–38, 14:47–52,

15

IPR2022-00291
Patent 10,708,727 B2

14:64–15:54, 16:4–64, 17:53–55, 17:61–64, 18:5–13, Figs. 1–12.  For

example, the specification explains that "the portal can be used to control the

selection and setting of different intelligent communication modes" and

"communication mode changes can be performed at an electronic device,"

e.g., at a "phone" with the "portal." *Id.* at 4:29–31, 7:32–34, 14:47–50,

17:61–64.  Hence, construing "network-based portal" to exclude a user

interface in a client device that connects clients to a network would exclude

preferred embodiments from claim scope.  *See id.* at 2:64–3:21, 4:29–31,

5:51–53, 6:64–7:16, 7:32–36, 7:65–8:1, 8:64–67, 9:4–13:27, 14:29–38,

14:47–52, 14:64–15:54, 16:4–64, 17:53–55, 17:61–64, 18:5–13,

19:61–20:63, 22:1–12, 22:40–44, Figs. 1–12.  As discussed above, those

preferred embodiments include mobile devices covered by claim 1 and

certain dependent claims.

A construction excluding a preferred embodiment is "rarely, if ever

correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,

815 F.3d 747, 755 (Fed. Cir. 2016).  Those rare circumstances do not exist

here.

Moreover, a patent's drawings "must show every feature of the

invention specified in the claims." 37 C.F.R. § 1.83(a).  The '727 patent's

drawings do not show a "portal" or "network-based portal" residing at

a "server distinct from" a client device according to Patent Owner's

arguments.  *See* Ex. 1001, 3:8–9, 8:16–9:3, Fig. 6; Resp. 18; Sur-reply 3.

The drawings do not even show a server.  *See* Ex. 1001, 8:16–9:3, Fig. 6.

Patent Owner does not contend otherwise.  *See, e.g.*, Resp. 9–19, 46–51;

Sur-reply 3–9, 19.  But the drawings do show mobile telephones (items 102

IPR2022-00291
Patent 10,708,727 B2

in Figure 6) and steps performed by mobile telephones. Ex. 1001, 3:8–21, 8:16–21, 9:4–8, 10:17–21, 11:60–63, 13:1–9, 14:64–67, 16:4–7, Figs. 6–12.

Consistent with the specification, the claim language does not preclude a "network-based portal" from encompassing a user interface in a client device that connects clients to a network. *See, e.g.*, Ex. 1001, 19:61–20:63 (claim 1), 21:8–41 (claims 4–7), 22:27–33 (claim 14). For instance, no claim recites a "server." *Id.* at 19:61–22:48. And no claim specifies a location for a "network-based portal." *Id.* If the patentee had wanted to limit the location for a "network-based portal," the patentee could have readily done so by reciting a "network-based portal at a server." As evidence of this, certain claims in related U.S. Patent No. 10,492,038 B2 expressly recite a "server." IPR2022-00294, Ex. 1001, 20:13–21:18 (claim 1), 21:22–49 (claims 3–6).

Patent Owner misinterprets claim 1 when asserting that if the first user's client device "is the claimed network-based portal," then "claim 1 could not possibly be carried out." *See* Resp. 14, 50–51. Patent Owner's assertion rests on the erroneous premise that limitation [1.8] requires that the recipient's (second user's) contact information not be "provided via the network-based portal to" the sender (first user) or the sender's (first user's) client device. *See id.* at 14, 51.

Limitation [1.8] specifies that "contact information associated with the second user and provided by the second user to the network-based portal is not provided via the network-based portal to the first user." Ex. 1001, 20:41–44. Limitation [1.8] does not exclude sending the second user's "contact information" to the first user's client device and then preventing the first user from viewing the second user's "contact information," e.g., by

17

IPR2022-00291
Patent 10,708,727 B2

precluding the first user's client device from displaying the second user's "contact information." *See id.* at 20:39–52.

The '727 patent's specification supports this interpretation by explaining that (1) "the user can be aware of the identity of the caller even without being informed of the number of the caller" and (2) "the caller can reach the user without being aware of the number of the phone the user is using to receive the call." Ex. 1001, 5:13–18. Additionally, the specification discloses an example where a second user with a "cellular phone" talks to a first user and the first user "is not aware of the phone number of the cellular phone." *Id.* at 2:40–44.

Patent Owner's contention that the embodiments in Figures 7–11 are "not embodiments for 'managing electronic communications using at least a network based portal' as are the claims of the '727 patent" lacks merit. *See* Resp. 18. Among other things, the claims do not recite "managing electronic communications using at least a network based portal." Ex. 1001, 19:61–22:48. Claim 1 recites a method to "facilitate electronic communication of a plurality of users using at least a network-based portal." *Id.* at 19:61–63. Claims 2–17 depend directly or indirectly from claim 1. *Id.* at 20:64–22:48.

The '727 patent's specification explains that the description and the drawings illustrate "by way of example the principles of the invention." Ex. 1001, 2:56–60. Further, as discussed above, Figures 7–12 depict "facilitating" functionality as recited in claim 1 and certain dependent claims (and "managing" functionality) performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)." *See, e.g.*,

Ex. 1001, 9:4–55, 10:17–14:42, 14:64–15:54, 16:4–64, 19:61–20:63, 22:1–12, 22:40–44, Figs. 7–12; *see also id.* at 3:10–21, 9:56–10:2.

Additionally, contrary to Patent Owner's contention, the '727 patent's specification does not (1) define a "portal" as a "gateway" or (2) define a "gateway" as a "networked server." *See* Resp. 11–12, 48–49; Sur-reply 3. An analysis of the specification shows that each part of Patent Owner's attempt to equate a "portal" to a "networked server" fails.

Regarding a "portal" and a "gateway," the specification explains that a "portal" and a "gateway" have functionality that overlaps but differs in different embodiments as follows:

> A number of embodiments depend on the different modes of communication converging onto the internet protocol platform. A communication gateway or a portal is formed allowing the user to receive communications from numerous sources through different modes. . . .

> One embodiment of the invention uses an open portal based on the web. Based on the portal, the user can securely determine who can reach him at what conditions. . . .

> Thus, in one embodiment, the portal can be used to control the selection and setting of different intelligent communication modes for the user. These intelligent communication modes allow priorities of various kinds of communication options to be set by the user. . . . The portal . . . can dynamically determine, for example, whether a call initiated at different time by different callers should be accepted by the user in real-time or handled by other mechanisms. . . .

> In one embodiment, the portal or gateway also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. . . .

> In one embodiment, the portal can dynamically change the access priorities of a caller trying to reach the user. . . .

IPR2022-00291
Patent 10,708,727 B2

Ex. 1001, 4:1–5, 4:14–16, 4:29–37, 4:43–45, 4:53–54.

The '727 patent's specification uses the phrase "portal or gateway" three times and the phrase "communication gateway or a portal" once. Ex. 1001, 4:3–5, 4:43–47, 6:57–63. The specification uses the word "portal" or "gateway" separately and unconnected by "or" more than twenty times. *See, e.g.*, *id.* at 4:1–6:63. The specification sometimes uses the phrase "portal or gateway" and sometimes uses the word "portal" or "gateway" separately to describe functionality that overlaps but differs in different embodiments, not to avoid repetition as Patent Owner contends. The specification's infrequent use of "or" between "portal" and "gateway" does not define "portal" to mean "gateway" or show that "portal" and "gateway" are used synonymously.

The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) defines "gateway" as follows:

(1)  "A functional unit that interconnects a local area network (LAN) with another network having different higher layer protocols";

(2)  "A dedicated computer that attaches to two or more networks and that routes packets from one to the other"; and

(3)  "In networking, a device that connects two systems that use different protocols."

IEEE 100 at 477 (Ex. 3003, 3). Additionally, the Microsoft Computer Dictionary (5th ed. 2002) defines "gateway" as follows: "A device that connects networks using different communications protocols so that information can be passed from one to the other. A gateway both transfers information and converts it to a form compatible with the protocols used by the receiving network." Microsoft Comput. Dictionary at 232 (Ex. 3004, 3).

IPR2022-00291
Patent 10,708,727 B2

The Microsoft Internet & Networking Dictionary (2003) defines "gateway" the same way as the Microsoft Computer Dictionary. Microsoft Inter. & Networking Dictionary at 98 (Ex. 3005, 3).

Consistent with those definitions of "gateway," Patent Owner contends and Dr. Rouskas testifies that a "gateway connects distinct networks." Resp. 16; Ex. 2005 ¶ 59. Inconsistent with those definitions of "gateway," however, the '727 patent's specification describes a "portal" as performing other functions. *See, e.g.*, Ex. 1001, 4:29–31, 4:53–54, 4:58–60, 5:9–10, 5:44–56, 6:12–34; Tr. 15:24–16:14.

As an example, the specification explains that "a portal provides a number of intelligent communication modes (ICM) for the user to select" and "the portal can be used to control the selection and setting of different intelligent communication modes for the user." Ex. 1001, 4:29–31, 5:51–53, Fig. 1. As another example, the specification explains that "a portal also holds the user's electronic calendar." *Id.* at 5:44–45. As yet another example, the specification explains that "the portal can dynamically change the access priorities of a caller trying to reach the user." *Id.* at 4:53–54. Patent Owner does not contend that a "gateway" performs these "portal" functions. *See, e.g.*, Resp. 9–19, 46–51; Sur-reply 3–9, 19.

As noted above, Patent Owner asserts that Dr. Rouskas provides "unrebutted" testimony that the '727 patent's specification uses "portal" and "gateway" synonymously because the word "or" sometimes appears between "portal" and "gateway" in the specification. Sur-reply 4 (citing Ex. 1043, 90:4–9, 91:10–15); *see supra* § II. Although expert testimony "may be useful," e.g., to "provide background on the technology at issue" or "explain how an invention works," expert testimony "is unlikely to result

21

in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1318–19. Here, in the context of the intrinsic evidence, e.g., the specification, Dr. Rouskas's testimony seeks to contradict the specification's infrequent use of "or" between "portal" and "gateway" compared to the many places where "portal" and "gateway" appear separately to describe functionality that overlaps but differs in different embodiments. *See* Ex. 1001, 4:1–6:63; Ex. 1043, 88:5–91:15.

Moreover, Dr. Almeroth's testimony refutes Dr. Rouskas's testimony. *See* Ex. 1003 ¶¶ 34, 41, 72–81, 116, 242, 398. Specifically, Dr. Almeroth testifies that he considered the '727 patent's claims, specification, and prosecution history. *Id.* ¶¶ 34, 72–81. He understands that "claims in an IPR are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in view of the specification and prosecution history, unless those sources show an intent to depart from such meaning." *Id.* ¶ 41. He also testifies that a person of ordinary skill in the art would have understood that a "network-based portal" encompasses "an interface that users employ to connect" to a server. *Id.* ¶ 116; *see id.* ¶¶ 242, 398.

Regarding a "gateway" and a "networked server," the '727 patent's specification describes a "gateway computer" as one type of "networked server" when discussing text-to-speech conversion as follows:

> While text-to-speech conversion, particularly if high quality is desired, requires substantial processing capabilities, mobile electronic devices, such as mobile communication devices, given their small form factor and price competition, tend to have limited processing capability. Accordingly, in one embodiment, text-to-speech conversion can be off-loaded from the mobile device. For example, a remote server computer can

> be provided the text message and produce the resulting audio
> message, and then supply the audio message to the mobile
> device. The remote server computer can be a networked server
> coupled to the network 108. One example of a networked
> server is a gateway computer for a wireless electronic device,
> such as a mobile telephone.

Ex. 1001, 15:57–16:3. Hence, contrary to Patent Owner's contention, the

specification does not define "gateway" to mean "networked server" or use

"gateway" and "networked server" as synonyms. *See* Resp. 12, 49.

The '727 patent's specification also explains that "[t]he portal allows

worldwide access to the user." Ex. 1001, 4:33–34. As discussed above,

Patent Owner asserts that a "portal" or "network-based portal" must allow

"worldwide access" to a user and permit the user "to receive messages from

multiple senders." Resp. 12–13, 15–17, 49–50 (emphasis omitted) (quoting

Ex. 1001, 4:33–34, 6:12–29, 6:57–60); *see id.* at 7; Sur-reply 4–5, 7; *supra*

§ II. With that assertion, however, Patent Owner wrongly seeks to read a

limitation from the specification into the claims. *See* Resp. 12–13, 15–17,

49–50; *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). In any

event, a user interface in a client device that connects the client device to

a network such as the Internet allows "worldwide access" to a user and

permits the user "to receive messages from multiple senders." *See* Ex. 1043,

110:20–24, 114:2–5.

As for the undated or 2022 definitions of "portal" that the parties cite,

no party provides evidence that any of those definitions applied at the time

of the invention. *See* Resp. 11, 48; Reply 7; Ex. 1041, 1–5; Ex. 1042, 1–5;

Ex. 2005 ¶¶ 49, 122. The issue here involves determining the meaning of

"network-based portal" to "a person of ordinary skill in the art at the time

of the invention." *See Power Integrations*, 904 F.3d at 971. Hence, the

IPR2022-00291
Patent 10,708,727 B2

definitions of "portal" that the parties cite provide little, if any, help in resolving that issue.

As for the '727 patent's prosecution history, neither party cites the prosecution history when addressing the meaning of "network-based portal." *See* Pet. 36, 68–69; Resp. 9–19, 46–51; Reply 6–14, 24; Sur-reply 3–4, 19. I have reviewed the prosecution history and consider it unhelpful in determining the meaning of "network-based portal."

During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 119–27. In an Examiner-initiated interview early during prosecution, the Examiner suggested that the applicant submit a terminal disclaimer "to place the Application [in] condition [for] allowance." *Id.* at 127. After the applicant submitted a terminal disclaimer, the Examiner allowed the claims based on the terminal disclaimer and the "history of rejection" of ancestor applications and patents. *Id.* at 104–05, 108, 124.

After analyzing the intrinsic evidence and the extrinsic evidence, and for the reasons discussed above, I agree with Petitioner that a "network-based portal" encompasses a user interface in a client device that connects clients to a network.

IPR2022-00291
Patent 10,708,727 B2

PETITIONER:

W. Todd Baker
Yimeng Dou
KIRKLAND & ELLIS LLP
todd.baker@kirkland.com
yimeng.dou@kirkland.com


PATENT OWNER:

Stephen R. Risley
Cortney S. Alexander
KENT & RISLEY LLC
steverisley@kentrisley.com
cortneyalexander@kentrisley.com

Trials@uspto.gov                                                  Paper 30
571-272-7822                                          Date: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

————————

IPR2022-00294
Patent 10,492,038 B2

————————

Before THU A. DANG, PATRICK M. BOUCHER, and
STEVEN M. AMUNDSON, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* BOUCHER.

Opinion Dissenting filed by *Administrative Patent Judge* AMUNDSON.

BOUCHER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00294
Patent 10,492,038 B2

In response to a Petition (Paper 1, "Pet.") filed by Epic Games, Inc. ("Petitioner"), we instituted an *inter partes* review of claims 7–12, 22–24, and 33–67 of U.S. Patent No. 10,492,038 B2 (Ex. 1001, "the '038 patent"). Paper 13 ("Dec."). During the trial, IngenioShare, LLC ("Patent Owner") filed a Response (Paper 17, "PO Resp."), to which Petitioner filed a Reply (Paper 19, "Reply") and Patent Owner filed a Sur-reply (Paper 25, "Sur-reply"). The parties declined an oral hearing with the panel, and instead "rest[] on their briefs for any issues not addressed at the February 17th hearing directed to IPR2022-00202 and IPR2022-00291." Ex. 3004; Paper 29 (order canceling oral hearing).

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has not shown, by a preponderance of the evidence, that any of claims 7–12, 22–24, and 33–67 is unpatentable.

## I. BACKGROUND

### A. The '038 Patent

The '038 patent relates to "automatically remov[ing] unwanted communications." Ex. 1001, 3:52–53. Figure 6 of the '038 patent is reproduced below.

IPR2022-00294
Patent 10,492,038 B2



FIG. 6

Figure 6 depicts communication system 100, which can support different communication devices, including mobile telephones 102, computers 104, and/or wireless personal digital assistants 106. *Id.* at 8:35–40. Users of such communication devices can communicate "with like or different communication devices," each of which offers one or both of audio or text communication capabilities. *Id.* at 8:40–43. Intercommunication of devices 102–106 can take place through network 108, which "can include one or more of voice networks and data networks." *Id.* at 8:43–46.

With the system, "[a] communication gateway or a portal is formed," thereby allowing a user "to receive communications from numerous sources through different modes." *Id.* at 4:22–24. "Based on the portal, the user can securely determine who can reach him at what conditions." *Id.* at 4:34–35.

3

IPR2022-00294
Patent 10,492,038 B2

Such conditions may include the status of the user, "access priorities" of the person trying to reach the user, and/or the urgency of the message from the person. *Id.* at 4:36–41.

The following table is reproduced from the '038 patent.

| Alice (Wife) | ContactClass1 |
| Peter (Close Friend) | ContactClass2 |
| Colina (Close Friend's wife) | ContactClass2 |

The table identifies different people and their relationships to a particular user, as well as "ContactClasses" to which such people are assigned and which reflect the various access priorities. *Id.* at 6:24–32. By way of example, if Peter wants to make a mobile phone call to the user, Peter calls the portal, which can be the user's internet service provider. *Id.* at 6:33–35. After verifying Peter's identity, the portal establishes contact by creating a virtual address for a communication session and determines that Peter belongs to "ContactClass2." *Id.* at 6:35–51. The portal implements various connectivity options depending on the status of the user, Peter's access priority according to his ContactClass, and Peter's urgency setting. *Id.* at 6:56–58. Connectivity options include allowing the user to receive Peter's call directly or asking Peter to leave a voicemail message, with the user notified of Peter's call by a short mobile message. *Id.* at 6:56–61. In some instances, communication requests can be classified into "different degrees of undesirability," thereby automatically blocking some requests from the user or automatically diverting them to be handled by another mechanism, "such as diverting a phone call to an email or voice mail." *Id.* at 4:56–61.

IPR2022-00294
Patent 10,492,038 B2

*B. Illustrative Claim*

In addition to challenges of various dependent claims, Petitioner challenges three of the '038 patent's four independent claims. Independent claim 7 is representative of the challenged claims and is reproduced below.

7. A non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol, with different communication modes allowed, depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal, and without requiring the plurality of users to disclose their contact information to each other, said computer readable medium comprising:

computer program code for providing a plurality of communication modes to a first user to allow the first user to use one of the plurality of communication modes as a selected communication mode for a first message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal,

wherein the plurality of communication modes include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone, voice communication using a mobile phone, and communication with at least an image, and

wherein messages are eligible to be received by the electronic device associated with the second user based on any of the plurality of communication modes, all depending on an identifier associated with the second user being set by the second user via the network-based portal, at least in view of the network-based portal based on the Internet protocol;

computer program code for permitting the second user to block the first user from using at least the selected

5

IPR2022-00294
Patent 10,492,038 B2

    communication mode to reach the second user via the network-based portal;

        computer program code for enabling, via the network-based portal, the first message to be received by the second user via the electronic device associated with the second user, using the selected communication mode, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected communication mode to reach the second user, via the network-based portal;

        computer program code for determining availability of the second user; and

        computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal,

        wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user via an electronic device associated with the first user, and

        wherein the identifier associated with the second user is distinct from the contact information associated with the second user.

Ex. 1001, 21:50–22:43.

## C. Evidence

Petitioner relies on the following references:

| Diacakis | US 2002/0116461 A1 | Aug. 22, 2002 | Ex. 1007 |
| Loveland | US 7,287,056 B2 | Oct. 23, 2007 | Ex. 1008 |
| Takahashi | US 2002/0183114 A1 | Dec. 5, 2002 | Ex. 1009 |

In addition, Petitioner relies on Declarations by Kevin C. Almeroth, Ph.D. Exs. 1003, 1039. Patent Owner relies on a Declaration by George N.

IPR2022-00294
Patent 10,492,038 B2

Rouskas, Ph.D. Ex. 2005. Dr. Rouskas was cross-examined by Petitioner, and a transcript of his deposition was entered into the record. Ex. 1043.

### D. Instituted Grounds of Unpatentability

We instituted review of claims 7–12, 22–24, and 33–67 on the following grounds. Dec. 15, 67; Pet. 6.

| Claim(s) Challenged | 35 U.S.C. §[1] | References |
|---|---|---|
| 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, 64–66 | 103(a) | Diacakis |
| 8, 9, 43, 44, 47, 48, 50, 54 | 103(a) | Diacakis, Loveland |
| 37, 42, 56, 59–63, 67 | 103(a) | Diacakis, Takahashi |
| 45 | 103(a) | Diacakis, Loveland, Takahashi |

### E. Real Parties in Interest

The parties identify only themselves as real parties in interest. Paper 24, 1; Paper 8, 2.

### F. Related Matters

The parties identify *IngenioShare, LLC v. Epic Games, Inc.*, No 6:21-cv-00663 (W.D. Tex.) as a related matter. Paper 24, 1; Paper 8, 2. According to Petitioner, "[t]his case was dismissed by order of the court on March 18, 2022." Paper 24, 1.

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103 effective March 16, 2013. Petitioner asserts that, "[b]ased on the claimed priority date of the '038 patent, Pre-AIA versions of §102(a) and §103 apply." Pet. 4 n.1. Patent Owner does not contest that the pre-AIA versions apply, and we apply those versions herein.

IPR2022-00294
Patent 10,492,038 B2

In addition, Patent Owner notes that related patents are challenged by
Petitioner in IPR2022-00202, IPR2022-00291, IPR2022-00295, and
IPR2022-00297.  Paper 8, 2–3.  Of these, *inter partes* review was instituted
in IPR2022-00202, IPR2022-00291, and IPR2022-00295, but institution was
denied in IPR2022-00297.

## II.  ANALYSIS

### A.  Legal Principles

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if
the differences between the claimed subject matter and the prior art are
"such that the subject matter as a whole would have been obvious at the time
the invention was made to a person having ordinary skill in the art to which
said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,
406 (2007).  The question of obviousness is resolved on the basis of
underlying factual determinations, including:  (1) the scope and content of
the prior art; (2) any differences between the claimed subject matter and the
prior art; (3) the level of skill in the art; and (4) when in evidence, objective
indicia of nonobviousness, i.e., secondary considerations.[2]  *Graham v. John
Deere Co.*, 383 U.S. 1, 17–18 (1966).

Additionally,  the obviousness inquiry typically requires an analysis of
"whether there was an apparent reason to combine the known elements in
the fashion claimed by the patent at issue."  *KSR*, 550 U.S. at 418 (citing *In*

---

[2] The parties do not address objective indicia of nonobviousness, which
accordingly do not form part of our analysis.  *See* Pet. 83 ("Petitioner is
unaware of any evidence of secondary considerations that would support a
finding of non-obviousness.")

*re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

### B. Direct Testimony by Dr. Rouskas

Petitioner contends that Dr. Rouskas's Declaration testimony is entitled to no weight because it "repeats the [Patent Owner Response] nearly verbatim," "appears to contain opinions he did not develop," and "is contradicted by Dr. Rouskas's own deposition testimony." Reply 3–4. Although Petitioner makes multiple allegations of deficiencies in Dr. Rouskas's direct testimony, none of these allegations is sufficiently developed with specific examples.

First, we disagree that mere verbatim duplication between an expert declaration and an attorney brief defines "a classic example of a cursory expert declaration the Board disregards." *See id.* at 3. The Board's concern is rather whether expert testimony "cite[s] to any additional supporting evidence or provide[s] any technical reasoning to support [its] statement[s]." *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential); *see also id.* at 16 ("Dr. Jones offers only a *verbatim* restatement of the assertion being supported, *without any supporting evidence or technical reasoning*" (emphasis added)). As Patent Owner asserts, "Petitioner fail[s] to provide a single example of how Dr. Rouskas's testimony is 'cursory or unsupported.'" Sur-reply 1.

IPR2022-00294
Patent 10,492,038 B2

Second, Petitioner provides only a single example to support its allegation that the direct testimony in Dr. Rouskas's Declaration "appears to contain opinions he did not develop." This example relates to an issue we discuss at length below, namely whether a "network-based portal" recited in the challenged claims must reside at a server side of a network or can reside on a client side as a user interface in a client device. Reply 4. Petitioner accurately states that, on cross-examination, "Dr. Rouskas admitted he was retained months after the [Preliminary Response] was filed and that he did not review the [Preliminary Response]," where Patent Owner argued that a "network-based portal" must reside at a server side. *Id.* (citing Ex. 1043, 25:2–26:2).

Dr. Rouskas's cross-examination also included the following exchange:

BY MR. SHI:

Q. The essence of your opinion is that Diacakis does not teach a network-based portal because that network-based portal must be in a server device and not a client device; correct?

MR. RISLEY: Object to form.

THE WITNESS: That is correct, yes.

BY MR. SHI:

Q. Did you come up with this argument, Dr. Rouskas?

A. I did, yes.

Ex. 1043, 53:22–54:7. Petitioner characterizes Dr. Rouskas's statement as "claim[ing] he *conceived of* [Patent Owner's] [network-based portal]

IPR2022-00294
Patent 10,492,038 B2

argument." Reply 4. According to Petitioner, such a claim is "not credible" because at least some form of the argument was presented during the preliminary phase of this proceeding, before Dr. Rouskas was retained. *Id.*

Petitioner did not explore Dr. Rouskas's answer on cross-examination in a manner that would have allowed the witness to expand on his brief statement that "[he] did, yes." But even if we were to agree with Petitioner's characterization, we see insufficient reason on that basis alone to discount *all* of Dr. Rouskas's direct testimony. As Patent Owner says, "Petitioner cross-examined (deposed) Dr. Rouskas for two days," and "Petitioner does not cite to *any* cross-examination question that Dr. Rouskas was *not* able to answer." Sur-reply 1. The totality of Dr. Rouskas's testimony is useful and his direct testimony was subject to extensive cross-examination that allows us to evaluate the weight to accord his testimony in individual contexts.

Third, Petitioner contends that, on cross-examination, "Dr. Rouskas contradicted his declaration and admitted the opinions therein rest on fundamental misunderstandings of the challenged claims and prior-art references." Reply 4. We evaluate Petitioner's specific arguments in our assessment of the weight to accord Dr. Rouskas's testimony below, and see no compelling basis to discount his direct testimony wholesale. *See* Sur-reply 2 (Patent Owner asserting that "the rule of completeness shows that Dr. Rouskas did not contradict his Declaration testimony" (citing Fed. R. Evid. 106)).

For these reasons, we decline Petitioner's request to give no weight to Dr. Rouskas's direct testimony in our analysis.

### C. Level of Ordinary Skill in the Art

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person of ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). "This legal construct is akin to the 'reasonable person' used as a reference in negligence determinations" and "also presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1992)).

Petitioner proposes that a person of ordinary skill in the art "would have had a Bachelor's degree in Computer Science, or an equivalent field, and three to five years of experience working with Internet communication systems." Pet. 25. According to Petitioner, "[a]dditional education might compensate for less experience, and vice-versa." *Id.* Dr. Almeroth supports this articulation. *See* Ex. 1003 ¶¶ 92–97. Patent Owner does not propose any different expression of the level of ordinary skill, and Dr. Rouskas testifies that he has "employed Dr. Almeroth's definition" in his Declaration. Ex. 2005 ¶ 21.

Because we find Petitioner's proposal reasonable, consistent with the level of skill reflected by the prior art, and supported by the testimony of Dr. Almeroth, we adopt it for purposes of this Decision. *See Okajima v.*

IPR2022-00294
Patent 10,492,038 B2

*Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art may reflect an appropriate level of skill in the art).

### D. Claim Construction

The Board uses "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2021); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). The specification may reveal a special definition given to a claim term by the patentee. *Phillips*, 415 F.3d at 1316. If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Although Petitioner asserts in its Petition that it "does not believe that any terms need to be construed to assess the arguments presented," we specifically "invite[d] the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '038 patent's claims." Pet. 26; Dec. 24. We address this term as follows, and we do not find it necessary to construe any other term for purposes of this Decision. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

The phrase "network-based portal" is recited numerous times in the challenged independent claims of the '038 patent, and its construction is central to the parties' respective positions regarding application of Petitioner's asserted prior art to the challenged claims. *See generally* Ex. 1001, 21:50–22:43, 26:1–57, 27:37–28:39. In particular, Petitioner broadly describes a "network-based portal" as "a web page or interface that connects clients to a network." Pet. 34. Patent Owner argues that a "network-based portal" excludes a user terminal or client communication device. PO Resp. 11; *see also* Reply 5 (Petitioner asserting that Patent Owner's argument that "the [network-based portal] resides only at the server-side of a network and excludes user interfaces of 'client communication devices[']" is "wrong").

The issue before us is therefore well-defined, namely whether a "network-based portal" as recited in the challenged claims is sufficiently broad to encompass residing at either a client or server side of a network, as Petitioner contends, or is limited to residing at the server side, as Patent Owner contends. On the preliminary record, we declined to adopt Patent Owner's exclusion of residing at a client side when extending our invitation to the parties to elaborate on their positions. Dec. 23–24. But we are mindful that "the Board is not bound by any findings made in its Institution Decision. At that point, the Board is considering the matter preliminarily without the benefit of a full record. The Board is free to change its view of the merits after further development of the record, and *should do so* if convinced its initial inclinations were wrong." *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016).

The full record developed at trial includes the Declaration of Dr. Rouskas (Patent Owner's expert), who directly opines on this issue. Ex. 2005 ¶¶ 46–67. Although the record also includes a Declaration by Petitioner's expert, Dr. Almeroth, that Declaration was filed with the Petition and neither responds to Dr. Rouskas's opinions nor provides any testimonial evidence to support Petitioner's positions beyond what was available at the preliminary stage of the proceeding.[3] *See generally* Ex. 1003. In evaluating the fully developed record, we necessarily accord greater weight to Dr. Rouskas's testimony than to Petitioner's attorney argument as advanced in Petitioner's Reply. *See, e.g.*, *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("[U]nsworn attorney argument . . . is not evidence and cannot rebut . . . other admitted evidence . . . .").

Our evaluation also necessarily remains cognizant that "[i]n an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to

---

[3] Petitioner filed a second Declaration by Dr. Almeroth after institution (such that it was not available on the preliminary record), but that Declaration is provided primarily as supplemental evidence under 37 C.F.R. § 42.64(b)(2) to address objections by Patent Owner to the authenticity of various other exhibits. Ex. 1039 ¶ 2. Dr. Almeroth's second Declaration otherwise merely incorporates Dr. Almeroth's "technical opinions" by reference to his first Declaration, without providing any further facts or expressing any further opinions that bear on the merits, including claim construction. *Id.* ¶ 1.

IPR2022-00294
Patent 10,492,038 B2

each claim")).  This burden never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).  Against this backdrop, we address the parties' arguments, ultimately concluding that Patent Owner articulates the more persuasive position that a "network-based portal" as recited in the claims is limited to residing at a server side of a network.

### 1. Dictionary Definitions

Patent Owner begins its argument by quoting dictionary definitions of "portal" offered by Dr. Rouskas in his Declaration:  (1) "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources, and services," Ex. 2005 ¶ 49 (quoting https://www.techopedia.com/definition/13077/portal-internet); and (2) "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site.  There are general portals and specialized or niche portals," *id.* (quoting https://www.techtarget.com/whatis/definition/portal).  Dr. Rouskas relies on these dictionary definitions to distinguish a "portal" from a client communication device, testifying specifically that "[w]ebsites are hosted on web servers, not on client communication devices." *Id.*

While we recognize that such dictionary definitions fall within the category of extrinsic evidence, as they do not form part of an integrated

16

IPR2022-00294
Patent 10,492,038 B2

patent document, we find it useful to begin with such definitions because they provide context for evaluation of the intrinsic evidence. In doing so, we recall that the Federal Circuit has advised that dictionary definitions are "worthy of special note": "Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

With its Reply, Petitioner counters Patent Owner's position by providing dictionary definitions of its own: (1) "A portal is a web-based platform that collects information from different sources into a single user interface and presents users with the most relevant information for their context," Ex. 1041; and (2) "A mobile portal is an Internet gateway that enables mobile devices to connect remotely with an enterprise intranet or extranet, typically via a Web browser interface," Ex. 1042. According to Petitioner, Dr. Rouskas "selectively disregarded" definitions like these that include the word "interface." Reply 6. But as Patent Owner points out, "that a definition includes the term 'interface' does not mean a 'portal' is an interface." Sur-reply 4. We find Patent Owner's explanation that "[t]he term 'interface' is used to indicate *how a user accesses the portal* (i.e., via a web browser interface), *not what a portal is*" to be consistent with Petitioner's preferred definitions. *See id.*

More generally, we discern no meaningful conflict between the definitions provided by Dr. Rouskas and those provided by Petitioner. For example, the second of Petitioner's preferred definitions expressly defines a

IPR2022-00294
Patent 10,492,038 B2

"mobile portal" as an "Internet gateway" with certain features, thereby differentiating it from a web browser interface that is used to connect a device to the portal. *See* Ex. 1042; Sur-reply 3. And that definition's expression of equivalence between a "mobile portal" and an "Internet gateway" is consistent with the '038 patent specification's use of the terms "portal" and "gateway," as we discuss in the next subsection.

### 2. *Specification*
#### a. *"portal or gateway"*

Both parties quote various portions of the specification of the '038 patent as supporting their respective positions, with much of their arguments focusing particularly on the specification's repeated use of the phrase "portal or gateway" (or similar variant). *See, e.g.*, Ex. 1001, 4:22, 4:62, 7:11–12, 7:15. According to Patent Owner, such phrasing amounts to a "definition" by the specification of a "portal" as a "communication gateway." PO Resp. 11–12. And in turn, Patent Owner says, "[t]he specification also defines a 'gateway' as a 'networked server'" by stating that "[t]he remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 electronic device, such as a mobile telephone." *Id.* at 12 (quoting Ex. 1001, 16:15–18).

We do not agree that such phrases are definitional because they lack the deliberateness and precision that characterize definitions. *See Renishaw*, 158 F.3d at 1249. But they nonetheless raise a relevant question as to whether the specification's phrase "portal or gateway" uses different words to describe the same thing or instead refers to distinct alternatives. *See*

IPR2022-00294
Patent 10,492,038 B2

Reply 7 (Petitioner arguing that "the '038 Patent's recitation of 'portal or gateway' means the two are alternatives, not that one redefines the other"). As a matter of common English usage, we agree with Dr. Rouskas that both understandings are possible. *See* Ex. 1043, 90:10–20 (testifying on cross-examination that the word "or" can be a "disjunctive conjunction" or can be used "to refer to things that are synonymous to each other"). Mere use of the word "or" does not end the inquiry.

Patent Owner has the stronger position. First, Patent Owner correctly observes that "Dr. Rouskas's testimony that to a [person of ordinary skill in the art] the word 'or' in the specification means that 'portal' and 'gateway' are used synonymously is unrebutted." Sur-reply 5–6.

Second, Petitioner observes that the specification does not always use the phrase "portal or gateway," but sometimes uses one word or the other. *See, e.g.*, Ex. 1001, 4:48–61 (referring only to "portal"), 4:66–5:4 (referring only to "gateway"), 5:64–6:3 (referring only to "portal"). According to Petitioner, the specification is thus "using these phrases to describe different embodiments, indicating that portals and gateways are two alternative means to establish communication." Reply 6–7. But Petitioner does not meaningfully explain how such embodiments are, in fact, different. We have reviewed the passages Petitioner identifies and we instead agree with Dr. Rouskas's more prosaic explanation that the specification sometimes uses one of two equivalent terms to avoid repetition. *See* Ex. 1043, 91:10–15 ("So to a person skilled in the art, this implies that instead of just saying portal or gateway all the time and because the claims refer to portal, not gateway, these, you know -- you know, the two terms are used synonymously.").

Third, as we note above, one of Petitioner's own preferred dictionary definitions of "portal" expresses an equivalence between a "mobile portal" and an "Internet gateway." Ex. 1042. This independent evidence adds further support to Patent Owner's position, particularly in light of its overall consistency with Dr. Rouskas's unrebutted testimony.

### b. Implementation of Portal Functionality

When instituting this proceeding, we acknowledged that Patent Owner supported its contention that a "network-based" portal resides at a server side with examples drawn from the specification of the '038 patent. Dec. 23. Specifically, Patent Owner identified examples in which the specification describes a "portal" as separate from a "mobile phone" or from a person's "wireless device." Paper 10, 12–14 (citing Ex. 1001, 6:33–34, 6:53–55, 7:9–17, 16:17–19); *see* Dec. 23. But we *sua sponte* expressed a concern that "[t]he '038 patent's specification discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Dec. 23 (citing Ex. 1001, 3:29–38, 9:22–10:19, 10:34–13:43, 15:12–16:2, Figs. 7–11). When extending our invitation for the parties to elaborate on their positions for proper construction of "network-based portal," we accordingly stated that "construing 'network-based portal' to exclude 'client-side functionality,' such as mobile-phone functionality, would exclude preferred embodiments from claim scope." *Id.* at 24. The parties have now had a full opportunity to develop their positions and, in particular, to address the concern we raised when instituting the proceeding. We have reconsidered our initial view in light of that fully developed record.

IPR2022-00294
Patent 10,492,038 B2

The parties' dispute on this point centers on Figures 7–11, and we reproduce Figure 7 below, with highlighting provided by Petitioner. *See* Reply 11.



FIG. 7

Figure 7 is "a flow diagram of a personal call response process according to one embodiment of the invention." Ex. 1001, 3:29–30. The patent uses similar language to describe Figures 8–11, which relate respectively to "an audio message response process," "a text message response process," "an automated call response process," and "a message presentation process." Ex. 1001, 3:31–38.

IPR2022-00294
Patent 10,492,038 B2

According to Patent Owner, "the embodiment[s] in Figs. 7-11 are not embodiments concerning use of a [network-based portal]," but instead "concern how a recipient user interacting with their client device can respond to an incoming call or message." PO Resp. 20. This distinction is meaningful because each of the challenged claims is directed to either "[a] non-transitory computer readable medium" or "[a] computer-implemented method" that manages or facilitates electronic communications of users "using at least a network-based portal at least based on Internet protocol." *See, e.g.* Ex. 1001, 21:50–54, 26:1–3, 27:37–41. According to Patent Owner, the embodiments illustrated by Figures 7–11 are not directed to such a facilitation method, but are instead "methods performed by the second user's device *upon receiving a message*." PO Resp. 20 (citing Ex. 1001, Figs. 7–11; Ex. 2005 ¶ 65). As such, Patent Owner argues, "a construction that has the [network-based portal] at a server distinct from the second user's communication device *does not exclude a preferred embodiment, if anything, it enables them*." *Id.* (citing Ex. 2005 ¶ 65). Patent Owner supports its argument with testimony by Dr. Rouskas, and we additionally note that Patent Owner's argument is consistent with the '038 patent specification's description of Figures 7–11 as illustrating "message *response* process[es]." Ex. 2005 ¶ 65; Ex. 1001, 3:29–38 (emphasis added).

Petitioner notes that the challenged independent claims recite that "the first message is received by the second user." Reply 10, Ex. 1001, 22:34–35, 26:48–49, 28:23–24. The portions of Figure 7 that Petitioner highlights refer to "answer[ing] the incoming voice call" at step 206, "obtain[ing] and send[ing] audio message to caller" at step 214, "obtain[ing] and send[ing] text message to caller" at step 218, and "direct[ing] to voice mail" at step

IPR2022-00294
Patent 10,492,038 B2

222, which Petitioner contends are examples where client devices "enable messages to be received." Reply 10–11. Petitioner appears to infer that these highlighted steps must correspond to the claim limitation it identifies. *See id.* at 10–12. But even if we agree that these are examples of client devices that "enable messages to be received," Petitioner cites no evidence that links such functionality with the claims' further requirement that "the second user . . . at least receive messages" "via" the recited "network-based portal." *See* Ex. 1001, 22:32–33, 26:45–47, 28:21–22. In other words, the issue is not merely whether the client device is capable of implementing functionality in some embodiments that is implemented by a server-resident network-based portal in other embodiments (as appears to undergird the dissent's analysis); the issue is instead whether that functionality is specifically implemented at the client with what Petitioner adequately shows to be "a network-based portal."

Petitioner argues inferentially that "[a]ll of the '038 Patent's independent claims recite a[] [network-based portal]—thus, because the patent's figures are embodiments of the patent, they must include a[] [network-based portal]." Reply 11–12. But Petitioner cites no legal authority to support its implied proposition that a patent's claims and drawings must have such a correspondence. *See* Sur-reply 13 ("Petitioner's position that every issued claim must encompass every figure/embodiment of a patent is wrong as a matter of law."). Indeed, it is not particularly uncommon that a patent describes unclaimed embodiments. *See, e.g., Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1334 (Fed. Cir. 2019) ("Under the disclosure-dedication rule, subject matter disclosed by a patentee, but not claimed, is considered dedicated to the public."). Although Petitioner asserts

IPR2022-00294
Patent 10,492,038 B2

that "[Patent Owner] remains silent as to the purpose of these disclosures, if not related to the claims," Petitioner again cites no legal authority to support imposing such a requirement on a patent owner, and we are aware of none. *See* Reply 12.

In addition to failing to cite any authority that supports its legal position on this issue, Petitioner also cites no testimonial evidence that supports its factual interpretation of Figures 7–11. *See generally* Reply. We are accordingly left to discern how a person of ordinary skill in the art would understand these drawings and their related descriptions by weighing Petitioner's attorney argument against the expert testimony of Dr. Rouskas that Patent Owner cites. *See* Ex. 2005 ¶¶ 63–65. As we note above, we necessarily accord greater weight to Dr. Rouskas's testimonial evidence. We reiterate that Petitioner was notified of this issue in the Institution Decision, but declined during the trial to introduce additional expert testimonial evidence that might bear on the issue and that Patent Owner might have cross-examined. *See* Dec. 24 ("We invite the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '038 patent's claims."); 37 C.F.R. § 42.23(b) (authorizing reply that responds to arguments raised in a patent owner response or institution decision without limiting introduction of new evidence).

We accordingly determine that Petitioner does not persuasively support its contention that Patent Owner's proposed construction of "network-based portal" would exclude a preferred embodiment.

### *3. Prosecution History*

Neither party cites the prosecution history of the '038 patent when addressing the meaning of "network-based portal." *See* Pet. 34; PO Resp. 8–21; Reply 5–12; Sur-reply 3–15. During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 99–105, 164–171, 242–249, 337–344, 424–427, 517–526, 682–690. Instead, in an Examiner-initiated interview early during prosecution, the Examiner suggested that the Applicant submit a terminal disclaimer to obviate a nonstatutory obviousness-type double patenting rejection over a related patent. *Id.* at 106. The Applicant's filing of such a terminal disclaimer was followed by several Notices of Allowance as prosecution was repeatedly reopened to address Amendments and/or Information Disclosure Statements filed by the Applicant. *See id.* at 88–96, 99–105, 164–171, 242–249, 337–344, 517–526, 682–690. In each Notice of Allowance, the Examiner indicated that the claims were allowed based on the "history rejection" or "previous record[] of rejection" of ancestor applications and patents. *Id.* at 104, 169, 247, 342, 525, 688.

We note that several of the Applicant's amendments introduced language that refers to the "network-based portal," either to a then-pending claim or a newly introduced claim. *Id.* at 216–228, 298–311, 318–335, 493–515, 546–570. But the Applicant offered no explanation for those amendments other than that they "further clarify the subject matter regarded as the invention." *Id.* at 228, 311, 335; *see id.* at 515, 570 (noting addition of claims without explanation). And the Examiner similarly did not address that language. *See id.* at 99–105, 164–171, 242–249, 337–344, 517–526, 682–690.

25

IPR2022-00294
Patent 10,492,038 B2

While we have thus reviewed the prosecution history, we do not consider it helpful in construing "network-based portal," particularly in the absence of any arguments presented by either party.

### 4. Other Arguments

The parties address other points that we also do not find helpful in resolving the precise claim-construction issue before us, i.e. whether the recited "network-based portal" is broad enough to encompass residing at a client side of a network as well as residing at a server side. First, Patent Owner contends that the '038 patent specification supports concluding that a "network-based portal" has different functionality from a client communication device because the former "allows worldwide access to the user" and the latter is "associated with a user." PO Resp. 12–13. Petitioner discounts this as "a distinction without a difference." Reply 7.

While we agree that the record supports a meaningful functionality difference between a "network-based portal" and a client communication device, whether that difference lies in "worldwide access" does not bear on our analysis. When questioned about this point on cross-examination, Dr. Rouskas provided responses that we do not find illuminating because Dr. Rouskas agreed that a user's mobile phone allows that user worldwide access by allowing others to communicate with the user. *See* Ex. 1043, 110:20–24, 114:2–5 ("One is worldwide access to the user. A phone provides that. There's no question about that.").

Second, Patent Owner contends that a contradiction arises within independent claims 7, 38, and 46 if the recited "network-based portal" is mapped to a user interface on the client communication device of the recited

26

IPR2022-00294
Patent 10,492,038 B2

"first user." PO Resp. 13–15. Patent Owner's contention appears to be correct, such as it is. But the contention is clearly driven by one of Petitioner's arguments in applying the asserted prior art to the claim, rather than as a matter of claim construction itself. *See* Reply 8 (Petitioner disputing that it advances an argument that only the first user's device contains the network-based portal). That is, Patent Owner's scenario imposes an additional limit on the network-based portal (not merely residing on a client side, but residing on a specific client device). That scenario therefore does not address the broader claim-construction issue that confronts us, namely whether a "network-based portal" encompasses residing at a client side generally, rather than limited to a specific client communication device.

We accordingly give little weight to these additional arguments by Patent Owner in our evaluation of the claim-construction issue.

### 5. *Summary*

As we note above, we find certain of Patent Owner's arguments adequately rebutted by Petitioner, such that we do not consider them in our assessment. Nevertheless, Patent Owner retains compelling arguments for its proposed construction, supported by expert testimonial evidence, including dictionary definitions and the '038 patent specification's reference to a "portal or a gateway." We find such references more compellingly refer to "portal" and "gateway" as synonyms rather than alternatives. In addition, Patent Owner provides convincing evidence and argument that rebuts the concern raised by the Board at institution whether Patent Owner's proposed construction would exclude preferred embodiments. Petitioner, who bears

the overall burden, addresses that concern only with attorney argument,

which we accord less weight.

In light of these considerations, we construe "network-based portal"

as Patent Owner advocates, namely as residing on a server side of a network.

### E. Overview of the Prior Art

### 1. Diacakis

Diacakis "relates generally to communications and, more particularly,

to presence and availability management systems." Ex. 1007 ¶ 3. Figure 1

of Diacakis is reproduced below.



**Fig. 1**

Figure 1 is a diagram of "a presence and availability (P&A) management

system." *Id.* ¶ 24. System 10 includes P&A management server 12 in

communication with client terminal 22 via network 16. *Id.* P&A

management server 12 includes presence detection engine 18, availability

management engine 20, and profile database 24. *Id.* Functions of P&A

IPR2022-00294
Patent 10,492,038 B2

management server 12 include determining whether a user is *present* on the network, determining whether the user is *available* on the network, and communicating such presence and availability information to others, depending on the user's preferences. *Id.* ¶¶ 24–27.

Figure 4 of Diacakis is reproduced below.



Figure 4 is a diagram illustrating details of P&A management server 12. *Id.* ¶¶ 15, 38. As illustrated, presence detection engine 18 may be in communication with various devices, such as landline desk phone 44, mobile phone 46, personal computer 48, personal digital assistant 50, and pager 52, to help determine presence information. *Id.* ¶¶ 43–44. Based on the information from such devices, presence detection engine may determine an individual's status 54 on particular networks, the individual's physical location 56, and the individual's capabilities 58. *Id.* ¶ 45.

Presence information determined by presence detection engine 18 is communicated to availability management engine 20. *Id.* ¶ 46. Such

Appx00157

presence information, in combination with the individual's situation 60 and the individual's rules and preferences 64, is used to determine the individual's availability. *Id.* ¶¶ 46–47. "Additionally, the individual may specify the observers 62 who receive the individual's contact information," with such observers 62 specified on a "group basis or an individual basis." *Id.* ¶ 47.

### 2. *Loveland*

Loveland "relates to methods, systems and computer program products for notifying a user of an event via voice notifications or other notification methods depending on the user's dynamic circumstances." Ex. 1008, 1:8–11. Figure 3 of Loveland is reproduced below.



FIG. 3

IPR2022-00294
Patent 10,492,038 B2

Figure 3 is a "flowchart of a method for notifying a user of an event in a context sensitive manner that takes into consideration the user's current state." *Id.* at 2:65–67. After the process is initiated at step 301 upon detection of an event that requires notification to a user, such notification is sent at step 302 in a manner "that is appropriate for the user's circumstances." *Id.* at 6:25–27, 6:36–38.

This includes accessing a current context of the user at step 303, such as "whether or not the user's telephone is on, busy, in hands-free mode, out of range, in meeting mode or the like for each of the user's telephones." *Id.* at 6:40–47. At step 304, one of a plurality of notification methods is identified:

> There is an endless permutation of possible rules. As an illustrative example, the rules might define which telephonic devices to notify given the current time, and what notification methods to use if the current device is on or off, in hands-free mode or not, and busy or not. As a more specific example, the user may state that she wants to be notified by audible voice message if she receives an e-mail from a certain individual, except if she is already using the telephone through which the voice message was to be rendered, in which case the user may specify to be notified via a text message.

*Id.* at 6:60–7:3. Loveland also explains that "the user may specify . . . that a voice notification interrupt the current conversation even if the user is currently on the telephone." *Id.* at 2:28–32; *see also id.* at 6:31–33 ("the notification may be that a new e-mail from an important individual has been received in the user's in-box"). At step 305, the notification is then dispatched to the user using the identified notification method. *Id.* at 7:4–6.

31

IPR2022-00294
Patent 10,492,038 B2

### 3. Takahashi

Takahashi describes "a server device for net games which is communicably connected to a plurality of terminal devices" via the Internet. Ex. 1009 ¶¶ 8, 29. Figure 7 of Takahashi is reproduced below.



Figure 7 depicts a set of messages that a user may send to other users. *Id.* ¶ 72. "For each one of the above messages, the member can select a desired message out of a plurality of predetermined messages." *Id.* ¶ 74.

### F. Analysis

Petitioner challenges claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, and 64–66 as unpatentable under 35 U.S.C. § 103(a) over

Diacakis; challenges claims 8, 9, 43, 44, 47, 48, 50, and 54 as unpatentable under 35 U.S.C. § 103(a) over Diacakis and Loveland; challenges claims 37, 42, 56, 59–63, and 67 as unpatentable under 35 U.S.C. § 103(a) over Diacakis and Takahashi; and challenges claim 45 as unpatentable under 35 U.S.C. § 103(a) over Diacakis, Loveland, and Takahashi. Pet. 33–83. In addressing independent claim 7, Petitioner contends that "Diacakis discloses managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol" by referring to Diacakis's P&A management server. Pet. 33–35 (citing Ex. 1003 ¶ 242). In doing so, Petitioner observes that Diacakis's P&A management server is in communication with a client terminal via a network that may be the Internet. *Id.* at 34 (citing Ex. 1007 ¶¶ 24–25).

Figure 9 of Diacakis, annotated by Petitioner, is reproduced below. *See id.* at 35



Figure 9 is a block diagram of client terminal 22, which includes indicator module 110 in communication with user interface 112 (highlighted in yellow by Petitioner). *Id.*; Ex. 1007 ¶ 63. User interface 112 "may include, for

IPR2022-00294
Patent 10,492,038 B2

example, a GUI (Graphical User Interface) or a CUI (Character-based user interface)." Ex. 1007 ¶ 63; *see* Ex. 1003 ¶ 119.  User interface 112 may display information about a user's contacts, such as the contact's name, work telephone number, work email address, home telephone number, home email address, and instant-messaging (IM) address.  Ex. 1007 ¶¶ 56, 59, Fig. 8; *see* Ex. 1003 ¶¶ 116, 119.  User interface 112 enables a user to communicate with a contact via network 16, e.g., the Internet.  Ex. 1007 ¶¶ 24–25, 62–64, Fig. 9; *see* Ex. 1003 ¶ 131.

Both the preamble and the body of independent claim 7 recite "a network-based portal."  Ex. 1001, 21:53, 21:58, 22:2, 22:14–15, 22:19, 22:20–21, 22:27, 22:33, 22:38–39; *see* PO Resp. 21 (Patent Owner noting repeated recitation of "network-based portal" in independent claim 7). Contending that a "network-based portal" is "a web page or interface that connects clients to a network," Petitioner identifies client-resident user-interface 112 of Diacakis as meeting the claim's requirement for such a feature.  Pet. 34–35.  As explained above, after evaluating the record evidence developed during the trial, we do not adopt such a broad construction of "network-based portal."  *Supra* § II.D.  Instead, we construe "network-based portal" as Patent Owner advocates, namely as residing on a server side of a network.  *Id.*

Because Petitioner does not show that Diacakis discloses a "network-based portal" as so construed, we conclude that Petitioner does not show, by a preponderance of the evidence, that independent claim 7 is unpatentable under 35 U.S.C. § 103(a) over Diacakis.  The same deficiency exists with respect to Petitioner's analysis of independent claims 38 and 46.  *See* Pet. 55–56 (Petitioner's analysis of claim 38 relying substantially on analysis

IPR2022-00294
Patent 10,492,038 B2

of claim 7), 57–58 (Petitioner's analysis of claim 46 relying substantially on analysis of claim 7). Because the deficiency in Petitioner's showing also applies to the dependent claims, which inherit the "network-based portal" limitations, we conclude that Petitioner does not show that any of claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, or 64–66 is unpatentable under 35 U.S.C. § 103(a) over Diacakis; that any of claims 8, 9, 43, 44, 47, 48, 50, or 54 is unpatentable under 35 U.S.C. § 103(a) over Diacakis and Loveland; that any of claims 37, 42, 56, 59–63, or 67 is unpatentable under 35 U.S.C. § 103(a) over Diacakis and Takahashi; or that claim 45 is unpatentable under 35 U.S.C. § 103(a) over Diacakis, Loveland, and Takahashi.

## III. CONCLUSION

The table below summarizes our conclusions as to the challenged claims.

IPR2022-00294
Patent 10,492,038 B2

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, 64–66 | 103(a) | Diacakis | | 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, 64–66 |
| 8, 9, 43, 44, 47, 48, 50, 54 | 103(a) | Diacakis, Loveland | | 8, 9, 43, 44, 47, 48, 50, 54 |
| 37, 42, 56, 59–63, 67 | 103(a) | Diacakis, Takahashi | | 37, 42, 56, 59–63, 67 |
| 45 | 103(a) | Diacakis, Loveland, Takahashi | | 45 |
| **Overall Outcome** | | | | 7–12, 22–24, 33–67 |

## IV.  ORDER

In consideration of the foregoing, it is

ORDERED that claims 7–12, 22–24, and 33–67 of U.S. Patent No. 10,492,038 B2 have not been shown, by a preponderance of the evidence, to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Trials@uspto.gov                                        Paper 30
571-272-7822                                    Date: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

_____

IPR2022-00294
Patent 10,492,038 B2

_____

AMUNDSON, *Administrative Patent Judge*, dissenting.

I respectfully dissent from the majority's determination that a "network-based portal" does not encompass a user interface in a client device that connects clients to a network and instead may reside only on a server side of a network. In my view, the majority gives too much weight to the extrinsic evidence in making that determination. The Federal Circuit has "viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms," e.g., because expert testimony "is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).

IPR2022-00294
Patent 10,492,038 B2

Below, I discuss each party's claim-construction arguments and then explain my analysis of the intrinsic evidence and the extrinsic evidence and the bases for my disagreement with the majority's claim construction.

Based on my view that a "network-based portal" encompasses a user interface in a client device that connects clients to a network and my review of the evidence, I also respectfully dissent from the majority's determination that Petitioner fails to demonstrate by a preponderance of the evidence that the challenged claims are unpatentable.

## I. BACKGROUND

Each challenged independent claim requires a "network-based portal." Ex. 1001, 21:50–22:43 (claim 7), 26:1–57 (claim 38), 27:37–28:39 (claim 46). Certain challenged dependent claims also require a "network-based portal." *Id.* at 22:59–63 (claim 11), 23:28–32 (claim 16), 24:5–12 (claim 22), 25:20–51 (claims 34–35), 26:58–67 (claim 39), 28:40–49 (claim 47), 28:53–29:3 (claim 49), 29:7–48 (claims 51–53), 30:40–46 (claim 63), 30:64–31:3 (claim 66). In their respective arguments, the parties dispute the meaning of "network-based portal." *See, e.g.*, Pet. 34–35; Resp. 9–21; Reply 5–12; Sur-reply 3–15.[4]

Petitioner contends that a "network-based portal" encompasses (1) "a web page or interface that connects clients to a network" and

---

[4] This decision uses the following abbreviations and words to identify documents filed with the Board: "Pet." for the Petition (Paper 1); "Resp." for Patent Owner's Response (Paper 17); "Reply" for Petitioner's Reply (Paper 19); "Sur-reply" for Patent Owner's Sur-reply (Paper 25); and "Hr'g Tr." for the transcript of the February 17, 2023, oral hearing in IPR2022-00202 for related U.S. Patent No. 10,142,810 B2 (Paper 28 in IPR2022-00202).

IPR2022-00294
Patent 10,492,038 B2

(2) "a user interface in a client terminal." Pet. 34–35; Reply 5 (emphasis omitted).

Patent Owner equates a "portal" to a "networked server." *See* Resp. 11–12; Sur-reply 3. In particular, Patent Owner contends that the '038 patent's specification (1) defines a "portal" as a "gateway" and (2) defines a "gateway" as a "networked server." Resp. 11–12 (citing Ex. 1001, 4:22, 4:62–63, 7:11–12, 7:15, 16:15–18; Ex. 2005 ¶ 50); *see* Hr'g Tr. 44:11–17; Sur-reply 3.

## II.  PATENT OWNER'S ARGUMENTS

Patent Owner asserts that the '038 patent's specification uses "portal" and "gateway" synonymously. Sur-reply 3. As support, Patent Owner quotes the following statements in the specification where the word "or" appears between "portal" and "gateway": "A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems . . . . The portal or gateway can then facilitate download of a database or update thereto to a communication device, such as a phone." Resp. 12–13, 18 (quoting Ex. 1001, 7:11–17). Patent Owner also asserts that Dr. Rouskas provides "unrebutted" testimony that the specification uses "portal" and "gateway" synonymously because the word "or" sometimes appears between "portal" and "gateway" in the specification. Sur-reply 5–6 (citing Ex. 1043, 90:4–9, 91:10–15). According to Patent Owner, a "portal" or "gateway" connects "distinct networks" in contrast to a client device that does not do so. Resp. 18 (citing Ex. 2005 ¶ 62).

To support its contention concerning the equivalence of a "gateway" and a "networked server," Patent Owner quotes the following statements in

3

the specification: "The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 [sic] electronic device, such as a mobile telephone." Resp. 12 (quoting Ex. 1001, 16:15–18).

Further, Patent Owner asserts that the specification "does not define" a "portal" or "network-based portal" as a client device. Resp. 12 (citing Ex. 2005 ¶ 50). Patent Owner asserts that a "portal" or "network-based portal" differs from a client device because a client device is "associated with a user," whereas a "portal" or "network-based portal" must allow "worldwide access" to a user and permit the user "to receive messages from multiple senders." *Id.* at 12–13, 15–16 (emphases omitted) (quoting Ex. 1001, 2:25–29, 4:52–53, 6:33–50, 7:11–14); *see id.* at 7; Sur-reply 6–7, 9. Patent Owner also asserts that a "portal" or "network-based portal" resides at a "server distinct from" a client device. Resp. 20; *see* Sur-reply 3, 14–15.

Additionally, Patent Owner contends that the claim language distinguishes a "network-based portal" from a client device. *See* Resp. 13–14. Patent Owner bases that contention on certain limitations in independent claims 7, 38, and 46, as exemplified by the following limitations in claim 7:

> [7.7] computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal; and

> [7.8] wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second

IPR2022-00294
Patent 10,492,038 B2

> user is not provided via the network-based portal to the first
> user via an electronic device associated with the first user.

*Id.* at 13–14; *see* Ex. 1001, 22:30–40.

Specifically, Patent Owner asserts that if the first user's client device "is the claimed network-based portal," then "claim 7 (and claims 38 and 46) could not possibly be carried out" because:

(1)  limitations [7.7], [38.7], and [46.7] require the recipient's (second user's) "contact information for messages to be received" via the network-based portal, i.e., via the sender's (first user's) client device; and

(2)  limitations [7.8], [38.8], and [46.8] require that the recipient's (second user's) "contact information not be provided to" the sender's (first user's) client device.

Resp. 14; *see id.* at 27–28. According to Patent Owner, Petitioner's position "leads to a contradiction, making the method useless." *Id.* at 14; *see id.* at 28.

Patent Owner asserts that claim 7's preamble "expressly states that 'each of the plurality of users' have their 'corresponding identifier' 'set via the network-based portal'." Resp. 16 (citing Ex. 2005 ¶ 58). According to Patent Owner, Petitioner's position "would require 'a plurality' of users to have access to the first user's device so that 'each of the plurality of users' can set their respective identifier(s)," and "typically a user's contact (or anyone else) is not allowed access to the user's device." *Id.* at 16–17 (citing Ex. 2005 ¶¶ 58–59). Patent Owner also asserts that "[s]ince the recipients (contacts) cannot possibly use the sender's communication device to set their identifier, the preamble's requirement that 'each of the plurality of users' has his/her 'corresponding identifier' 'set via the network-based

IPR2022-00294
Patent 10,492,038 B2

portal' invalidates Petitioner's arguments" that a client device may include a "network based portal." *Id.* at 17 (citing Ex. 2005 ¶ 60).

To further support its position, Patent Owner quotes two undated online definitions of "portal" that Dr. Rouskas found with a Google search. Resp. 11; *see* Ex. 1043, 61:17–63:10; Ex. 2005 ¶ 49. Patent Owner quotes the first online definition located at https://www.techopedia.com/definition/ 13077/portal-internet as follows: "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." Resp. 11; Ex. 2005 ¶ 49. Patent Owner asserts that websites are "hosted on web servers" and not on client devices. Resp. 11 (citing Ex. 2005 ¶ 49). Patent Owner quotes the second online definition located at https://www.techtarget.com/whatis/definition/portal as follows: "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site." Resp. 11; Ex. 2005 ¶ 49.

Patent Owner notes that the Institution Decision cited the embodiments in the '038 patent's Figures 7–11 when stating that the '038 patent "discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Resp. 19 (quoting Inst. Dec. 23). Patent Owner contends that "[c]laim 7 concerns 'managing electronic communications of a plurality of users using at least a network-based portal.'" *Id.* at 20. Patent Owner then contends that the embodiments in Figures 7–11 are "methods performed by the second user's device upon receiving a message" and "not embodiments for 'managing electronic

IPR2022-00294
Patent 10,492,038 B2

communications using at least a network based portal' as are the claims of the '038 Patent." *Id.* (emphasis omitted); *see id.* at 20–21; Sur-reply 12–15.

### III. PETITIONER'S ARGUMENTS

Petitioner asserts that the '038 patent discloses the claimed functionality for a "network-based portal" residing in a client device, e.g., in a mobile phone. Reply 5. Petitioner asserts that independent claims 7, 38, and 46 specify that "the first message is received by the second user." *Id.* at 10. Petitioner then contends that the '038 patent discloses (1) the recipient functionality of "allowing users to specify who may contact them and see their contact information" taking place "all in the phone" and (2) the phone "automatically manag[ing] the communication." *Id.* (quoting Ex. 1001, 7:32–33, 7:35–36). Petitioner also contends that a "network-based portal" residing in a client device enables not only message receipt but also message management. *Id.* (citing Ex. 1003 ¶ 263).

IPR2022-00294
Patent 10,492,038 B2

To support its contentions about message receipt and message management taking place "all in the phone," Petitioner provides the highlighted version of the '038 patent's Figure 7 reproduced below (Reply 11):



Figure 7 "is a flow diagram of a personal call response process 200" performed "by an electronic device, such as a mobile communication device

IPR2022-00294
Patent 10,492,038 B2

(e.g., mobile telephone)." Ex. 1001, 9:22–26, Fig. 7; *see id.* at 3:29–30.
This highlighted version of Figure 7 includes yellow highlighting over the
following steps in process 200:

- step 206 "answer the incoming voice call";
- step 214 "obtain and send audio message to caller";
- step 218 "obtain and send text message to caller"; and
- step 222 "direct to voicemail."

*See* Reply 11. Petitioner argues that "because the patent's figures are
embodiments of the patent, they must include" a "network-based portal."
*Id.* at 11–12.

Further, Petitioner asserts that the '038 patent's specification "treats
the phrase 'portal or gateway' differently from the singular 'portal,' using
these phrases to describe different embodiments, indicating that portals and
gateways are two alternative means to establish communication." Reply 6–7
(citing Ex. 1001, 4:33–5:4). Petitioner also asserts that the specification's
"recitation of 'portal or gateway' means the two are alternatives, not that one
redefines the other." *Id.* at 7 (citing *Thorner v. Sony Comput. Entm't Am.
LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)).

Regarding Patent Owner's assertion that websites are "hosted on web
servers" and not on client devices, Petitioner argues that no claim requires
that a "network-based portal" be "hosted." Reply 6; *see* Resp. 11.

Additionally, Petitioner contends that Patent Owner's assertion about
a "network-based portal" differing from a client device because a client
device is "associated with a user" lacks merit since a client device may
include a "network-based portal" that "connects a user to a network" even
though the client device is "associated with a user." Reply 7; *see* Resp. 13,

9

IPR2022-00294
Patent 10,492,038 B2

15–16.  Petitioner contends that Dr. Rouskas concedes that "a user's mobile phone allows worldwide access to that user by allowing others to communicate with the user."  Reply 7–8 (citing Ex. 1043, 110:20–24, 114:2–5).

As for the claim language "each of the plurality of users" have their "corresponding identifier" "set via the network-based portal," Petitioner asserts that a "network-based portal" does not "solely exist in a sender's device."  Reply 8 (citing Ex. 1003 ¶ 242).  Petitioner also asserts that each user ("both senders and recipients") may have a client device with a "network-based portal."  *See id.* at 8–10.

Petitioner criticizes the two online definitions of "portal" that Dr. Rouskas found as "cherry-picked from search results for 'portal' rather than from any nuanced inquiry or analysis."  Reply 6 (citing Ex. 1043, 62:24–63:10); Hr'g Tr. 74:5–16.  According to Petitioner, Dr. Rouskas "selectively disregarded definitions that include the word 'interface.'"  Reply 6.  To undermine Dr. Rouskas's credibility, Petitioner introduces two online definitions of "portal" with 2022 copyright dates that include the word "interface."  *Id.*; *see* Ex. 1041, 1, 5; Ex. 1042, 1, 5; Hr'g Tr. 73:22–74:16, 75:8–76:7.  Petitioner does not rely on those online definitions to establish the meaning of "network-based portal."  Hr'g Tr. 75:8–76:7.

Petitioner quotes the first online definition located at https://www. liferay.com/resources/l/web-portal as follows:  "A portal is a web-based platform that collects information from different sources into a single user interface."  Reply 6 (emphasis omitted) (quoting Ex. 1041, 1).  Petitioner quotes the second online definition located at https://www.gartner.com/en/

information-technology/glossary/mobile-portal as follows: "A mobile portal is an Internet gateway that enables mobile devices to connect remotely . . . typically via a Web browser interface." *Id.* (alteration by Petitioner) (emphasis omitted) (quoting Ex. 1042, 1).

## IV. ANALYSIS

After analyzing the intrinsic evidence and the extrinsic evidence, I agree with Petitioner that a "network-based portal" encompasses a user interface in a client device that connects clients to a network. *See* Pet. 34–35; Reply 5. Below, I explain my analysis of the intrinsic evidence and the extrinsic evidence.

Independent claims 7 and 38 recite "managing electronic communications of a plurality of users using at least a network-based portal," and independent claim 46 recites "facilitates electronic communication of a plurality of users using at least a network-based portal." Ex. 1001, 21:52–53, 26:1–3, 27:39–40. The '038 patent's specification discloses and depicts "managing electronic communications of a plurality of users" using a "phone" or a "mobile telephone," i.e., a client device with a user interface. *See id.* at 3:16–38, 4:48–50, 6:4–6, 7:18–36, 7:52–56, 8:18–21, 9:15–18, 9:21–13:43, 14:44–53, 14:62–67, 15:12–16:2, 18:3–5, 18:11–14, 18:22–30, Figs. 1–11. Moreover, by "managing electronic communications of a plurality of users" according to claims 7 and 38, a "phone" or a "mobile telephone" facilitates electronic communication among the plurality of users according to claim 46.

For example, Figures 7–11 depict "managing" functionality as recited in claims 7 and 38 and "facilitating" functionality as recited in claim 46

IPR2022-00294
Patent 10,492,038 B2

performed "by an electronic device, such as a mobile communication device

(e.g., mobile telephone)" as follows:

- providing a first user with a voice communication mode and a text communication mode, e.g., as recited in limitations [7.1], [7.2], [38.1], [38.2], [46.1], and [46.2];

- enabling a second user to receive a voice message or a text message using the selected communication mode in view of the second user not blocking the first user, e.g., as recited in limitations [7.4], [7.5], [38.4], [38.5], [46.4], and [46.5]; and

- allowing the second user to receive messages through an electronic device associated with the second user, e.g., as recited in limitations [7.8], [38.8], and [46.8].

Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2, 21:50–22:43, 26:1–57,

27:37–28:39, Figs. 7–11; *see id.* at 3:29–38, 10:6–19.

Further, Figures 7–11 depict "managing" functionality and

"facilitating" functionality as recited in certain dependent claims.  In

particular, dependent claims 37, 42, 45, and 56 specify that the second user

may "select a predetermined message to send to the first user, the

predetermined message being selected from a set of predetermined messages

provided to the second user."  Ex. 1001, 25:62–67 (claim 37), 27:15–19

(claim 42), 27:28–36 (claim 45), 29:58–63 (claim 56); *see id.* at 30:12–18

(claim 59), 31:4–10 (claim 67).  The specification's disclosure about the

second user "select[ing] a predetermined message to send to the first user"

appears in the discussion of Figures 8 and 9 depicting steps performed "by

an electronic device, such as a mobile communication device (e.g., mobile

telephone)."  *Id.* at 9:22–26, 10:34–38, 10:63–66, 12:9–12, 12:21–23,

Figs. 8–9; *see id.* at 3:29–34.  As support for claims 37, 42, 45, and 56, the

specification explains that:

IPR2022-00294
Patent 10,492,038 B2

> (1)    Figure 8's step 306 "determines whether the user (i.e., called party) of the mobile communication device has selected one or more of the predetermined audio messages"; and
>
> (2)    Figure 9's step 406 "determines whether one (or more) of the predetermined text messages has been selected."

*Id.* at 10:63–66, 12:21–23, Figs. 8–9.

As discussed above, Petitioner argues that "because the patent's figures are embodiments of the patent, they must include" a "network-based portal." Reply 11–12; *see supra* § III. Petitioner's argument disregards the general principle that a patent may disclose unclaimed embodiments. *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377 (Fed. Cir. 2007). Nonetheless, as also discussed above, Figures 7–11 illustrate claimed embodiments, i.e., by depicting "managing" functionality and "facilitating" functionality as recited in various claims performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)." *See* Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2, 21:50–22:43, 25:62–26:57, 27:15–19, 27:28–28:39, 29:58–63, Figs. 7–11.

Additionally, the specification indicates that a "portal" may reside in a "phone," i.e., a client device with a user interface. Ex. 1001, 4:48–50, 6:4–6, 7:25–33, 7:52–54, 14:62–65, 18:11–14, Figs. 1–5. In particular, the specification explains that "a portal provides a number of intelligent communication modes (ICM) for the user to select as shown in FIG. 1" and "the intelligent communication modes shown in FIG. 1 for the user to select are in the phone." *Id.* at 6:4–6, 7:25–26. The specification also explains that "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can

be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences." *Id.* at 4:48–50, 7:52–54, 14:62–65, 18:11–14. Because "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can be performed at an electronic device," e.g., at a "phone," the "portal" can reside in a "phone."

The specification discloses an example of "managing electronic communications of a plurality of users" using a "phone." *See* Ex. 1001, 7:27–36. In particular, the specification explains that "the phone could automatically manage the communication" from various individuals after a user configures the phone as follows:

> define the contact classes, such as the ones shown in FIG. 2; set up the urgency classes, such as the ones shown in FIG. 3; define the statuses, such as the ones shown in FIG. 4; set up the Access Priority Database, such as the one shown in FIG. 5; and categorize a number of the user's contacts into the corresponding ContactClasses, all in the phone.

*Id.* at 7:27–33, Figs. 1–5; *see id.* at 18:22–30.

The specification discloses other techniques for "managing electronic communications of a plurality of users" using a "phone" as follows:

- "keep information in local databases, such as in such a phone";

- configure "user settings (e.g., preferences) to decline calls/messages matching certain criteria";

- "reduce user input at the mobile communication device by making use of stored data pertaining to its hardware components, configuration or preferences";

- "provide feedback to a caller without answering a voice call from the caller";

IPR2022-00294
Patent 10,492,038 B2

- "choose not to take the voice call from the calling party" and instead "provide the calling party with some limited information," e.g., "in an audio or textual format";

- "enable the called party to provide a brief audio or text message to the calling party";

- "automatically (i.e., without user input) respond to the calling party via an audio or text message"; and

- "communicate in different ways depending on device configuration, user preferences, prior history, time or other criteria."

Ex. 1001, 7:23–25, 7:54–56, 8:18–21, 9:15–18, 13:19–25, 14:44–53, 14:65–67, 18:3–5, 18:22–30; *see id.* at 13:44–55.

For these reasons, the '038 patent's specification discloses and depicts "managing electronic communications of a plurality of users" (and "facilitat[ing] electronic communication of a plurality of users") using a "phone" or a "mobile telephone," i.e., a client device with a user interface. *See* Ex. 1001, 3:16–38, 4:48–50, 6:4–6, 7:18–36, 7:52–56, 8:18–21, 9:15–18, 9:21–13:43, 14:44–53, 14:62–67, 15:12–16:2, 18:3–5, 18:11–14, 18:22–30, Figs. 1–11. For example, the specification explains that "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can be performed at an electronic device," e.g., at a "phone" with the "portal." *Id.* at 4:48–50, 7:52–54, 14:62–65, 18:11–14. Hence, construing "network-based portal" to exclude a user interface in a client device that connects clients to a network would exclude preferred embodiments from claim scope. *See id.* at 3:16–38, 4:48–50, 6:4–6, 7:18–36, 7:52–56, 8:18–21, 9:15–18, 9:21–13:43, 14:44–53, 14:62–67, 15:12–16:2, 18:3–5, 18:11–14, 18:22–30, 21:50–22:43, 25:62–26:57, 27:15–19, 27:28–28:39, 29:58–63,

IPR2022-00294
Patent 10,492,038 B2

Figs. 1–11. As discussed above, those preferred embodiments include mobile devices covered by the challenged independent claims and certain dependent claims.

A construction excluding a preferred embodiment is "rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016). Those rare circumstances do not exist here.

Moreover, a patent's drawings "must show every feature of the invention specified in the claims." 37 C.F.R. § 1.83(a). The '038 patent's drawings do not show a "portal" or "network-based portal" residing at a "server distinct from" a client device according to Patent Owner's arguments. *See* Ex. 1001, 3:27–28, 8:35–9:21, Fig. 6; Resp. 20; Sur-reply 3, 14–15. The drawings do not even show a server. *See* Ex. 1001, 8:35–9:21, Fig. 6. Patent Owner does not contend otherwise. *See, e.g.*, Resp. 9–21; Sur-reply 3–15. But the drawings do show mobile telephones (items 102 in Figure 6) and steps performed by mobile telephones. Ex. 1001, 3:27–38, 8:35–40, 9:22–26, 10:34–38, 12:9–12, 13:17–25, 15:12–15, Figs. 6–11.

Consistent with the specification, the claim language does not preclude a "network-based portal" from encompassing a user interface in a client device that connects clients to a network. *See, e.g.*, Ex. 1001, 21:50–22:43 (claim 7), 22:59–63 (claim 11), 23:28–32 (claim 16), 24:5–12 (claim 22), 25:20–51 (claims 34–35), 26:1–67 (claims 38–39), 27:37–28:49 (claims 46–47), 28:53–29:3 (claim 49), 29:7–48 (claims 51–53), 30:40–46 (claim 63), 30:64–31:3 (claim 66). For instance, no challenged claim recites a "server." *Id.* at 21:50–23:4, 24:5–22, 25:14–31:10. And no challenged claim specifies a location for a "network-based portal." *Id.* If the patentee

16

IPR2022-00294
Patent 10,492,038 B2

had wanted to limit the location for a "network-based portal," the patentee
could have readily done so by reciting a "network-based portal at a server."

As evidence of this, independent claim 1 and claims 3–6 that depend
directly or indirectly from claim 1 expressly recite a "server." Ex. 1001,
20:13–21:18 (claim 1), 21:22–49 (claims 3–6). Although Petitioner does not
challenge claims 1–6, "[o]ther claims of the patent in question, both asserted
and unasserted," can be "valuable sources of enlightenment as to the
meaning of a claim term." *See Phillips*, 415 F.3d at 1314; Pet. 1, 33–83.

Patent Owner misinterprets the claims when asserting that if the first
user's client device "is the claimed network-based portal," then "claim 7
(and claims 38 and 46) could not possibly be carried out." *See* Resp. 14.
Patent Owner's assertion rests on the erroneous premise that
limitations [7.8], [38.8], and [46.8] require "that the [second user's] contact
information not be provided to" the first user's client device. *See id.*

Limitations [7.8], [38.8], and [46.8] specify that "the contact
information associated with the second user is not provided via the network-
based portal to the first user." Ex. 1001, 22:37–39, 26:51–53, 28:25–27.
Limitations [7.8], [38.8], and [46.8] do not exclude sending the second
user's "contact information" to the first user's client device and then
preventing the first user from viewing the second user's "contact
information," e.g., by precluding the first user's client device from
displaying the second user's "contact information." *See id.* at 22:34–40,
26:48–54, 28:23–34.

The '038 patent's specification supports this interpretation by
explaining that (1) "the user can be aware of the identity of the caller even
without being informed of the number of the caller" and (2) "the caller can

IPR2022-00294
Patent 10,492,038 B2

reach the user without being aware of the number of the phone the user is using to receive the call." Ex. 1001, 5:33–38. Additionally, the specification discloses an example where a second user with a "cellular phone" talks to a first user and the first user "is not aware of the phone number of the cellular phone." *Id.* at 2:58–62.

As for the claim language "each of the plurality of users" have their "corresponding identifier" "set via the network-based portal," the claims earlier recite "a plurality of users using at least a network-based portal." Ex. 1001, 21:50–60, 26:1–9. The "indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). "The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning." *Id.* "The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012).

Here, Patent Owner does not identify evidence of a clear intent to limit "a network-based portal" to "one" portal in the challenged claims. *See, e.g.*, Resp. 9–21; Sur-reply 3–15. Hence, I agree with Petitioner that each user may have a client device with a "network-based portal." *See* Ex. 1001, 21:50–60, 26:1–9; Reply 8. Moreover, each user may use their "network-

based portal" to set their "corresponding identifier." *See* Ex. 1001, 21:50–60, 26:1–9.

Patent Owner's contention that the embodiments in Figures 7–11 are "not embodiments for 'managing electronic communications using at least a network based portal' as are the claims of the '038 Patent" lacks merit. *See* Resp. 20. The '038 patent's specification explains that the description and the drawings illustrate "by way of example the principles of the invention." Ex. 1001, 3:7–11. Further, as discussed above, Figures 7–11 depict "managing" functionality and "facilitating" functionality as recited in the challenged independent claims and certain dependent claims performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)." *See, e.g.*, Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2, 21:50–22:43, 25:62–26:57, 27:15–19, 27:28–36, Figs. 7–11; *see also id.* at 3:29–38, 10:6–19.

Additionally, contrary to Patent Owner's contention, the '038 patent's specification does not (1) define a "portal" as a "gateway" or (2) define a "gateway" as a "networked server." *See* Resp. 11–12; Sur-reply 3. An analysis of the specification shows that each part of Patent Owner's attempt to equate a "portal" to a "networked server" fails.

Regarding a "portal" and a "gateway," the specification explains that a "portal" and a "gateway" have functionality that overlaps but differs in different embodiments as follows:

> A number of embodiments depend on the different modes of communication converging onto the internet protocol platform. A communication gateway or a portal is formed allowing the user to receive communications from numerous sources through different modes. . . .

> One embodiment of the invention uses an open portal based on the web.  Based on the portal, the user can securely determine who can reach him at what conditions. . . .

> Thus, in one embodiment, the portal can be used to control the selection and setting of different intelligent communication modes for the user.  These intelligent communication modes allow priorities of various kinds of communication options to be set by the user. . . . The portal . . . can dynamically determine, for example, whether a call initiated at different time by different callers should be accepted by the user in real-time or handled by other mechanisms. . . .

> In one embodiment, the portal or gateway also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. . . .

> In one embodiment, the portal can dynamically change the access priorities of a caller trying to reach the user. . . .

Ex. 1001, 4:20–24, 4:33–35, 4:48–56, 4:62–64, 5:5–6.

The '038 patent's specification uses the phrase "portal or gateway" three times and the phrase "communication gateway or a portal" once. Ex. 1001, 4:22–24, 4:62–64, 7:11–17.  The specification uses the word "portal" or "gateway" separately and unconnected by "or" more than twenty times. *See, e.g.*, *id.* at 4:20–7:17, code (57).  The specification sometimes uses the phrase "portal or gateway" and sometimes uses the word "portal" or "gateway" separately to describe functionality that overlaps but differs in different embodiments, not to avoid repetition as Patent Owner contends. The specification's infrequent use of "or" between "portal" and "gateway" does not define "portal" to mean "gateway" or show that "portal" and "gateway" are used synonymously.

The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) defines "gateway" as follows:

IPR2022-00294
Patent 10,492,038 B2

> (1)   "A functional unit that interconnects a local area network (LAN) with another network having different higher layer protocols";
>
> (2)   "A dedicated computer that attaches to two or more networks and that routes packets from one to the other"; and
>
> (3)   "In networking, a device that connects two systems that use different protocols."

IEEE 100 at 477 (Ex. 3005, 3).  Additionally, the Microsoft Computer Dictionary (5th ed. 2002) defines "gateway" as follows:  "A device that connects networks using different communications protocols so that information can be passed from one to the other.  A gateway both transfers information and converts it to a form compatible with the protocols used by the receiving network."  Microsoft Comput. Dictionary at 232 (Ex. 3006, 3).  The Microsoft Internet & Networking Dictionary (2003) defines "gateway" the same way as the Microsoft Computer Dictionary.  Microsoft Inter. & Networking Dictionary at 98 (Ex. 3007, 3).

Consistent with those definitions of "gateway," Patent Owner contends and Dr. Rouskas testifies that a "gateway connects distinct networks."  Resp. 18; Ex. 2005 ¶ 62.  Inconsistent with those definitions of "gateway," however, the '038 patent's specification describes a "portal" as performing other functions.  *See, e.g.*, Ex. 1001, 4:48–50, 5:5–6, 5:10–12, 5:29–30, 5:64–6:9, 6:33–55.

As an example, the specification explains that "a portal provides a number of intelligent communication modes (ICM) for the user to select" and "the portal can be used to control the selection and setting of different intelligent communication modes for the user."  *Id.* at 4:48–50, 6:4–6, Fig. 1.  As another example, the specification explains that "a portal also holds the

IPR2022-00294
Patent 10,492,038 B2

user's electronic calendar." *Id.* at 5:64–65. As yet another example, the specification explains that "the portal can dynamically change the access priorities of a caller trying to reach the user." *Id.* at 5:5–6. Patent Owner does not contend that a "gateway" performs these "portal" functions. *See, e.g.*, Resp. 9–21; Sur-reply 3–15.

As noted above, Patent Owner asserts that Dr. Rouskas provides "unrebutted" testimony that the '038 patent's specification uses "portal" and "gateway" synonymously because the word "or" sometimes appears between "portal" and "gateway" in the specification. Sur-reply 5–6 (citing Ex. 1043, 90:4–9, 91:10–15); *see supra* § II. Although expert testimony "may be useful," e.g., to "provide background on the technology at issue" or "explain how an invention works," expert testimony "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1318–19. Here, in the context of the intrinsic evidence, e.g., the specification, Dr. Rouskas's testimony seeks to contradict the specification's infrequent use of "or" between "portal" and "gateway" compared to the many places where "portal" and "gateway" appear separately to describe functionality that overlaps but differs in different embodiments. *See* Ex. 1001, 4:20–7:17, code (57); Ex. 1043, 88:5–91:15.

Moreover, Dr. Almeroth's testimony refutes Dr. Rouskas's testimony. *See* Ex. 1003 ¶¶ 34, 41, 82–91, 116, 242, 398. Specifically, Dr. Almeroth testifies that he considered the '038 patent's claims, specification, and prosecution history. *Id.* ¶¶ 34, 82–91. He understands that "claims in an IPR are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in view of the specification and prosecution history,

unless those sources show an intent to depart from such meaning." *Id.* ¶ 41.
He also testifies that a person of ordinary skill in the art would have
understood that a "network-based portal" encompasses "an interface that
users employ to connect" to a server. *Id.* ¶ 242; *see id.* ¶¶ 116, 398.

Regarding a "gateway" and a "networked server," the '038 patent's
specification describes a "gateway computer" as one type of "networked
server" when discussing text-to-speech conversion as follows:

> While text-to-speech conversion, particularly if high quality is
> desired, requires substantial processing capabilities, mobile
> electronic devices, such as mobile communication devices,
> given their small form factor and price competition, tend to
> have limited processing capability. Accordingly, in one
> embodiment, text-to-speech conversion can be off-loaded from
> the mobile device. For example, a remote server computer can
> be provided the text message and produce the resulting audio
> message, and then supply the audio message to the mobile
> device. The remote server computer can be a networked server
> coupled to the network 108. One example of a networked
> server is a gateway computer for a wireless electronic device,
> such as a mobile telephone.

Ex. 1001, 16:5–19. Hence, contrary to Patent Owner's contention, the
specification does not define "gateway" to mean "networked server" or
use "gateway" and "networked server" as synonyms. *See* Resp. 12.

The '038 patent's specification also explains that "[t]he portal allows
worldwide access to the user." Ex. 1001, 4:52–53. As discussed above,
Patent Owner asserts that a "portal" or "network-based portal" must allow
"worldwide access" to a user and permit the user "to receive messages from
multiple senders." Resp. 12–13, 15–16 (emphasis omitted) (quoting
Ex. 1001, 4:52–53); *see id.* at 7; Sur-reply 6–7, 9; *supra* § II. With that
assertion, however, Patent Owner wrongly seeks to read a limitation from

the specification into the claims. *See* Resp. 12–13; *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). In any event, a user interface in a client device that connects the client device to a network such as the Internet allows "worldwide access" to a user and permits the user "to receive messages from multiple senders." *See* Ex. 1043, 110:20–24, 114:2–5.

As for the undated or 2022 definitions of "portal" that the parties cite, no party provides evidence that any of those definitions applied at the time of the invention. *See* Resp. 11; Reply 6; Ex. 1041, 1–5; Ex. 1042, 1–5; Ex. 2005 ¶ 49. The issue here involves determining the meaning of "network-based portal" to "a person of ordinary skill in the art at the time of the invention." *See Power Integrations*, 904 F.3d at 971. Hence, the definitions of "portal" that the parties cite provide little, if any, help in resolving that issue.

As for the '038 patent's prosecution history, neither party cites the prosecution history when addressing the meaning of "network-based portal." *See* Pet. 34–35; Resp. 9–21; Reply 5–12; Sur-reply 3–15. I have reviewed the prosecution history and consider it unhelpful in determining the meaning of "network-based portal."

During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 99–107, 164–71, 242–50, 278–81, 337–44, 424–27, 517–27, 682–90. In an Examiner-initiated interview early during prosecution, the Examiner discussed an obviousness-type double-patenting rejection based on a related application and a related patent. *Id.* at 106. In response, the applicant "agreed to submit a terminal disclaimer to obviate the rejection." *Id.* After the applicant submitted a terminal disclaimer, the Examiner allowed the claims based on the terminal

IPR2022-00294
Patent 10,492,038 B2

disclaimer and the "history of rejection" of ancestor applications and patents. *Id.* at 96, 104, 169, 247, 280, 342, 426, 525, 688.

After analyzing the intrinsic evidence and the extrinsic evidence, and for the reasons discussed above, I agree with Petitioner that a "network-based portal" encompasses a user interface in a client device that connects clients to a network.

IPR2022-00294
Patent 10,492,038 B2

PETITIONER:

W. Todd Baker
Yimeng Dou
KIRKLAND & ELLIS LLP
todd.baker@kirkland.com
yimeng.dou@kirkland.com


PATENT OWNER:

Stephen R. Risley
Cortney S. Alexander
KENT & RISLEY LLC
steverisley@kentrisley.com
cortneyalexander@kentrisley.com

Trials@uspto.gov                                              Paper 27
571-272-7822                                         Date: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

_____

IPR2022-00295
Patent 10,492,038 B2

_____

Before THU A. DANG, PATRICK M. BOUCHER, and
STEVEN M. AMUNDSON, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* BOUCHER.

Opinion Dissenting filed by *Administrative Patent Judge* AMUNDSON.

BOUCHER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00295
Patent 10,492,038 B2

In response to a Petition (Paper 1, "Pet.") filed by Epic Games, Inc. ("Petitioner"), we instituted an *inter partes* review of claims 7–12, 22–24, and 33–67 of U.S. Patent No. 10,492,038 B2 (Ex. 1001, "the '038 patent"). Paper 11 ("Dec."). During the trial, IngenioShare, LLC ("Patent Owner") filed a Response (Paper 15, "PO Resp."), to which Petitioner filed a Reply (Paper 17, "Reply") and Patent Owner filed a Sur-reply (Paper 22, "Sur-reply"). The parties declined an oral hearing with the panel, and instead "rest[] on their briefs for any issues not addressed at the February 17th hearing directed to IPR2022-00202 and IPR2022-00291." Ex. 3004; Paper 26 (order canceling oral hearing).

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has not shown, by a preponderance of the evidence, that any of claims 7–12, 22–24, and 33–67 is unpatentable.

## I. BACKGROUND

### A. The '038 Patent

The '038 patent relates to "automatically remov[ing] unwanted communications." Ex. 1001, 3:52–53. Figure 6 of the '038 patent is reproduced below.

IPR2022-00295
Patent 10,492,038 B2



FIG. 6

Figure 6 depicts communication system 100, which can support different communication devices, including mobile telephones 102, computers 104, and/or wireless personal digital assistants 106. *Id.* at 8:35–40. Users of such communication devices can communicate "with like or different communication devices," each of which offers one or both of audio or text communication capabilities. *Id.* at 8:40–43. Intercommunication of devices 102–106 can take place through network 108, which "can include one or more of voice networks and data networks." *Id.* at 8:43–46.

With the system, "[a] communication gateway or a portal is formed," thereby allowing a user "to receive communications from numerous sources through different modes." *Id.* at 4:22–24. "Based on the portal, the user can securely determine who can reach him at what conditions." *Id.* at 4:34–35.

3

Such conditions may include the status of the user, "access priorities" of the person trying to reach the user, and/or the urgency of the message from the person. *Id.* at 4:36–41.

The following table is reproduced from the '038 patent.

| | |
|---|---|
| Alice (Wife) | ContactClass1 |
| Peter (Close Friend) | ContactClass2 |
| Colina (Close Friend's wife) | ContactClass2 |

The table identifies different people and their relationships to a particular user, as well as "ContactClasses" to which such people are assigned and which reflect the various access priorities. *Id.* at 6:24–32. By way of example, if Peter wants to make a mobile phone call to the user, Peter calls the portal, which can be the user's internet service provider. *Id.* at 6:33–35. After verifying Peter's identity, the portal establishes contact by creating a virtual address for a communication session and determines that Peter belongs to "ContactClass2." *Id.* at 6:35–51. The portal implements various connectivity options depending on the status of the user, Peter's access priority according to his ContactClass, and Peter's urgency setting. *Id.* at 6:56–58. Connectivity options include allowing the user to receive Peter's call directly or asking Peter to leave a voicemail message, with the user notified of Peter's call by a short mobile message. *Id.* at 6:56–61. In some instances, communication requests can be classified into "different degrees of undesirability," thereby automatically blocking some requests from the user or automatically diverting them to be handled by another mechanism, "such as diverting a phone call to an email or voice mail." *Id.* at 4:56–61.

IPR2022-00295
Patent 10,492,038 B2

*B. Illustrative Claim*

In addition to challenges of various dependent claims, Petitioner challenges three of the '038 patent's four independent claims. Independent claim 7 is representative of the challenged claims and is reproduced below.

7. A non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol, with different communication modes allowed, depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal, and without requiring the plurality of users to disclose their contact information to each other, said computer readable medium comprising:

computer program code for providing a plurality of communication modes to a first user to allow the first user to use one of the plurality of communication modes as a selected communication mode for a first message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal,

wherein the plurality of communication modes include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone, voice communication using a mobile phone, and communication with at least an image, and

wherein messages are eligible to be received by the electronic device associated with the second user based on any of the plurality of communication modes, all depending on an identifier associated with the second user being set by the second user via the network-based portal, at least in view of the network-based portal based on the Internet protocol;

computer program code for permitting the second user to block the first user from using at least the selected

communication mode to reach the second user via the network-based portal;

computer program code for enabling, via the network-based portal, the first message to be received by the second user via the electronic device associated with the second user, using the selected communication mode, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected communication mode to reach the second user, via the network-based portal;

computer program code for determining availability of the second user; and

computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal,

wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user via an electronic device associated with the first user, and

wherein the identifier associated with the second user is distinct from the contact information associated with the second user.

Ex. 1001, 21:50–22:43.


## C. Evidence

Petitioner relies on the following references:

| Loveland | US 7,287,056 B2 | Oct. 23, 2007 | Ex. 1008 |
| Takahashi | US 2002/0183114 A1 | Dec. 5, 2002 | Ex. 1009 |
| Tanigawa | US 2004/0001480 A1 | Jan. 1, 2004 | Ex. 1010 |
| Hullfish | US 7,428,580 B2 | Sept. 23, 2008 | Ex. 1011 |

In addition, Petitioner relies on Declarations by Kevin C. Almeroth, Ph.D. Exs. 1003, 1039. Patent Owner relies on a Declaration by George N.

IPR2022-00295
Patent 10,492,038 B2

Rouskas, Ph.D.  Ex. 2005.  Dr. Rouskas was cross-examined by Petitioner,
and a transcript of his deposition was entered into the record.  Ex. 1043.

### D.  Instituted Grounds of Unpatentability

We instituted review of claims 7–12, 22–24, and 33–67 on the
following grounds.  Dec. 15–16, 73; Pet. 6.

| Claim(s) Challenged | 35 U.S.C. §[1] | References |
|---|---|---|
| 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, 64–66 | 103(a) | Tanigawa, Hullfish |
| 8, 9, 43, 44, 47, 48, 50, 54 | 103(a) | Tanigawa, Hullfish, Loveland |
| 37, 42, 56, 59–63, 67 | 103(a) | Tanigawa, Hullfish, Takahashi |
| 45 | 103(a) | Tanigawa, Hullfish, Loveland, Takahashi |

### E.  Real Parties in Interest

The parties identify only themselves as real parties in interest.
Paper 21, 1; Paper 6, 2.

### F.  Related Matters

The parties identify *IngenioShare, LLC v. Epic Games, Inc.*, No 6:21-
cv-00663 (W.D. Tex.) as a related matter.  Paper 21, 1; Paper 6, 2.

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125
Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103 effective
March 16, 2013.  Petitioner asserts that, "[b]ased on the claimed priority date
of the '038 patent, Pre-AIA versions of §102(a) and §103 apply."  Pet. 4 n.1.
Patent Owner does not contest that the pre-AIA versions apply, and we
apply those versions herein.

IPR2022-00295
Patent 10,492,038 B2

According to Petitioner, "[t]his case was dismissed by order of the court on March 18, 2022." Paper 21, 1.

In addition, Patent Owner notes that related patents are challenged by Petitioner in IPR2022-00202, IPR2022-00291, IPR2022-00294, and IPR2022-00297. Paper 6, 2–3. Of these, *inter partes* review was instituted in IPR2022-00202, IPR2022-00291, and IPR2022-00294, but institution was denied in IPR2022-00297.

## II. ANALYSIS

### A. Legal Principles

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of nonobviousness, i.e., secondary considerations.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

---

[2] The parties do not address objective indicia of nonobviousness, which accordingly do not form part of our analysis. *See* Pet. 86 ("Petitioner is unaware of any evidence of secondary considerations that would support a finding of non-obviousness.")

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

## B. Direct Testimony by Dr. Rouskas

Petitioner contends that Dr. Rouskas's Declaration testimony is entitled to no weight because it "repeats the [Patent Owner Response] nearly verbatim," "appears to contain opinions he did not develop," and "is contradicted by Dr. Rouskas's own deposition testimony." Reply 4–5. Although Petitioner makes multiple allegations of deficiencies in Dr. Rouskas's direct testimony, none of these allegations is sufficiently developed with specific examples.

First, we disagree that mere verbatim duplication between an expert declaration and an attorney brief defines "a classic example of a cursory expert declaration the Board disregards." *See id.* at 4. The Board's concern is rather whether expert testimony "cite[s] to any additional supporting evidence or provide[s] any technical reasoning to support [its] statement[s]." *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential); *see also id.* at 16 ("Dr. Jones offers only a *verbatim* restatement of the assertion being supported, *without any supporting evidence or technical reasoning*" (emphasis added)). As Patent Owner

IPR2022-00295
Patent 10,492,038 B2

asserts, "Petitioner fail[s] to provide a single example of how Dr. Rouskas's testimony is 'cursory or unsupported.'" Sur-reply 1.

Second, Petitioner provides only a single example to support its allegation that the direct testimony in Dr. Rouskas's Declaration "appears to contain opinions he did not develop." This example relates to an issue we discuss at length below, namely whether a "network-based portal" recited in the challenged claims must reside at a server side of a network or can reside on the client side as a user interface in a client device. Reply 4–5. Petitioner accurately states that, on cross-examination, "Dr. Rouskas admitted he was retained months after the [Preliminary Response] was filed and that he did not review the [Preliminary Response]," where Patent Owner argued that a "network-based portal" must reside at a server side. *Id.* at 5 (citing Ex. 1043, 25:2–26:2).

Dr. Rouskas's cross-examination also included the following exchange:

BY MR. SHI:

Q. The essence of your opinion is that Diacakis [i.e., a reference relied on by Petitioner in related cases] does not teach a network-based portal because that network-based portal must be in a server device and not a client device; correct?

MR. RISLEY: Object to form.

THE WITNESS: That is correct, yes.

BY MR. SHI:

Q. Did you come up with this argument, Dr. Rouskas?

A. I did, yes.

IPR2022-00295
Patent 10,492,038 B2

Ex. 1043, 53:22–54:7.  Petitioner characterizes Dr. Rouskas's statement as "claim[ing] he **conceived of** [Patent Owner's] [network-based portal] argument."  Reply 5.  According to Petitioner, such a claim is "not credible" because at least some form of the argument was presented during the preliminary phase of this proceeding, before Dr. Rouskas was retained.  *Id.*

Petitioner did not explore Dr. Rouskas's answer on cross-examination in a manner that would have allowed the witness to expand on his brief statement that "[he] did, yes."  But even if we were to agree with Petitioner's characterization, we see insufficient reason on that basis alone to discount *all* of Dr. Rouskas's direct testimony.  As Patent Owner says, "Petitioner cross-examined (deposed) Dr. Rouskas for two days," and "Petitioner does not cite to *any* cross-examination question that Dr. Rouskas was *not* able to answer."  Sur-reply 1.  The totality of Dr. Rouskas's testimony is useful and his direct testimony was subject to extensive cross-examination that allows us to evaluate the weight to accord his testimony in individual contexts.

Third, Petitioner contends that, on cross-examination, "Dr. Rouskas contradicted his declaration and admitted the opinions therein rest on fundamental misunderstandings of the challenged claims and prior-art references."  Reply 5.  We evaluate Petitioner's specific arguments in our assessment of the weight to accord Dr. Rouskas's testimony below, and see no compelling basis to discount his direct testimony wholesale.  *See* Sur-reply 2 (Patent Owner asserting that "the rule of completeness shows that Dr. Rouskas did not contradict his Declaration testimony" (citing Fed. R. Evid. 106)).

For these reasons, we decline Petitioner's request to give no weight to Dr. Rouskas's direct testimony in our analysis.

## C. Level of Ordinary Skill in the Art

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person of ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). "This legal construct is akin to the 'reasonable person' used as a reference in negligence determinations" and "also presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1992)).

Petitioner proposes that a person of ordinary skill in the art "would have had a Bachelor's degree in Computer Science, or an equivalent field, and three to five years of experience working with Internet communication systems." Pet. 25. According to Petitioner, "[a]dditional education might compensate for less experience, and vice-versa." *Id.* Dr. Almeroth supports this articulation. *See* Ex. 1003 ¶¶ 92–97. Patent Owner does not propose any different expression of the level of ordinary skill, and Dr. Rouskas testifies that he has "employed Dr. Almeroth's definition" in his Declaration. Ex. 2005 ¶ 21.

IPR2022-00295
Patent 10,492,038 B2

Because we find Petitioner's proposal reasonable, consistent with the level of skill reflected by the prior art, and supported by the testimony of Dr. Almeroth, we adopt it for purposes of this Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art may reflect an appropriate level of skill in the art).

## D. Claim Construction

The Board uses "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2021); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). The specification may reveal a special definition given to a claim term by the patentee. *Phillips*, 415 F.3d at 1316. If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Although Petitioner asserts in its Petition that it "does not believe that any terms need to be construed to assess the arguments presented," we specifically "invite[d] the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '038 patent's claims." Pet. 26; Dec. 25. We address this term as follows, and we do not find it necessary to construe any other term for purposes of this Decision. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only

construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

The phrase "network-based portal" is recited numerous times in the challenged independent claims of the '038 patent, and its construction is central to the parties' respective positions regarding application of Petitioner's asserted prior art to the challenged claims. *See generally* Ex. 1001, 21:50–22:43, 26:1–57, 27:37–28:39. In particular, Petitioner broadly describes a "network-based portal" as "a user interface that connects clients to a network." Pet. 38. Patent Owner argues that a "network-based portal" excludes a user terminal or client communication device. PO Resp. 16–17; *see also* Reply 9 (Petitioner asserting that Patent Owner's argument that "the [network-based portal] resides only at the server-side of a network and excludes user interfaces of 'client communication devices[']" is "wrong").

The issue before us is therefore well-defined, namely whether a "network-based portal" as recited in the challenged claims is sufficiently broad to encompass residing at either a client or server side of a network, as Petitioner contends, or is limited to residing at the server side, as Patent Owner contends. On the preliminary record, we declined to adopt Patent Owner's exclusion of residing at a client side when extending our invitation to the parties to elaborate on their positions. Dec. 23–25. But we are mindful that "the Board is not bound by any findings made in its Institution Decision. At that point, the Board is considering the matter preliminarily without the benefit of a full record. The Board is free to change its view of the merits after further development of the record, and *should do so* if

IPR2022-00295
Patent 10,492,038 B2

convinced its initial inclinations were wrong." *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016).

    The full record developed at trial includes the Declaration of Dr. Rouskas (Patent Owner's expert), who directly opines on this issue. Ex. 2005 ¶¶ 60–85. Although the record also includes a Declaration by Petitioner's expert, Dr. Almeroth, that Declaration was filed with the Petition and neither responds to Dr. Rouskas's opinions nor provides any testimonial evidence to support Petitioner's positions beyond what was available at the preliminary stage of the proceeding.[3] *See generally* Ex. 1003. In evaluating the fully developed record, we necessarily accord greater weight to Dr. Rouskas's testimony than to Petitioner's attorney argument as advanced in Petitioner's Reply. *See, e.g.*, *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("[U]nsworn attorney argument . . . is not evidence and cannot rebut . . . other admitted evidence . . . .").

    Our evaluation also necessarily remains cognizant that "[i]n an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C.

---

[3] Petitioner filed a second Declaration by Dr. Almeroth after institution (such that it was not available on the preliminary record), but that Declaration is provided primarily as supplemental evidence under 37 C.F.R. § 42.64(b)(2) to address objections by Patent Owner to the authenticity of various other exhibits. Ex. 1039 ¶ 2. Dr. Almeroth's second Declaration otherwise merely incorporates Dr. Almeroth's "technical opinions" by reference to his first Declaration, without providing any further facts or expressing any further opinions that bear on the merits, including claim construction. *Id.* ¶ 1.

§ 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Against this backdrop, we address the parties' arguments, ultimately concluding that Patent Owner articulates the more persuasive position that a "network-based portal" as recited in the claims is limited to residing at a server side of a network.

## 1. Dictionary Definitions

Patent Owner begins its argument by quoting dictionary definitions of "portal" offered by Dr. Rouskas in his Declaration: (1) "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources, and services," Ex. 2005 ¶ 64 (quoting https://www.techopedia.com/definition/13077/portal-internet); and (2) "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals," *id.* (quoting https://www.techtarget.com/whatis/definition/portal). Dr. Rouskas relies on these dictionary definitions to distinguish a "portal" from a client communication device, testifying specifically that "[w]ebsites are hosted on web servers, not on client communication devices." *Id.*

While we recognize that such dictionary definitions fall within the category of extrinsic evidence, as they do not form part of an integrated patent document, we find it useful to begin with such definitions because they provide context for evaluation of the intrinsic evidence.  In doing so, we recall that the Federal Circuit has advised that dictionary definitions are "worthy of special note":  "Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996).

With its Reply, Petitioner counters Patent Owner's position by providing dictionary definitions of its own:  (1) "A portal is a web-based platform that collects information from different sources into a single user interface and presents users with the most relevant information for their context," Ex. 1041; and (2) "A mobile portal is an Internet gateway that enables mobile devices to connect remotely with an enterprise intranet or extranet, typically via a Web browser interface," Ex. 1042.  According to Petitioner, Dr. Rouskas "selectively disregarded" definitions like these that include the word "interface."  Reply 10.  But as Patent Owner points out, "that a definition includes the term 'interface' does not mean a 'portal' is an interface."  Sur-reply 7.  We find Patent Owner's explanation that "[t]he term 'interface' is used to indicate *how a user accesses the portal* (i.e., via a web browser interface), *not what a portal is*" to be consistent with Petitioner's preferred definitions.  *See id.*

IPR2022-00295
Patent 10,492,038 B2

More generally, we discern no meaningful conflict between the definitions provided by Dr. Rouskas and those provided by Petitioner. For example, the second of Petitioner's preferred definitions expressly defines a "mobile portal" as an "Internet gateway" with certain features, thereby differentiating it from a web browser interface that is used to connect a device to the portal. *See* Ex. 1042; Sur-reply 6–7. And that definition's expression of equivalence between a "mobile portal" and an "Internet gateway" is consistent with the '038 patent specification's use of the terms "portal" and "gateway," as we discuss in the next subsection.

### 2. *Specification*

#### a. *"portal or gateway"*

Both parties quote various portions of the specification of the '038 patent as supporting their respective positions, with much of their arguments focusing particularly on the specification's repeated use of the phrase "portal or gateway" (or similar variant). *See, e.g.*, Ex. 1001, 4:22, 4:62, 7:11–12, 7:15. According to Patent Owner, such phrasing amounts to a "definition" by the specification of a "portal" as a "communication gateway." PO Resp. 17. And in turn, Patent Owner says, "[t]he specification also defines a 'gateway' as a 'networked server'" by stating that "[t]he remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 electronic device, such as a mobile telephone." *Id.* (quoting Ex. 1001, 16:15–18).

We do not agree that such phrases are definitional because they lack the deliberateness and precision that characterize definitions. *See Renishaw*,

158 F.3d at 1249. But they nonetheless raise a relevant question as to whether the specification's phrase "portal or gateway" uses different words to describe the same thing or instead refers to distinct alternatives. *See* Reply 11 (Petitioner arguing that "the '038 Patent's recitation of 'portal or gateway' means the two are alternatives, not that one redefines the other"). As a matter of common English usage, we agree with Dr. Rouskas that both understandings are possible. *See* Ex. 1043, 90:10–20 (testifying on cross-examination that the word "or" can be a "disjunctive conjunction" or can be used "to refer to things that are synonymous to each other"). Mere use of the word "or" does not end the inquiry.

Patent Owner has the stronger position. First, Patent Owner correctly observes that "Dr. Rouskas's testimony that to a [person of ordinary skill in the art] the word 'or' in the specification means that 'portal' and 'gateway' are used synonymously is unrebutted." Sur-reply 9.

Second, Petitioner observes that the specification does not always use the phrase "portal or gateway," but sometimes uses one word or the other. *See, e.g.*, Ex. 1001, 4:48–61 (referring only to "portal"), 4:66–5:4 (referring only to "gateway"), 5:64–6:3 (referring only to "portal"). According to Petitioner, the specification is thus "using these phrases to describe different embodiments, indicating that portals and gateways are two alternative means to establish communication." Reply 11. But Petitioner does not meaningfully explain how such embodiments are, in fact, different. We have reviewed the passages Petitioner identifies and we instead agree with Dr. Rouskas's more prosaic explanation that the specification sometimes uses one of two equivalent terms to avoid repetition. *See* Ex. 1043, 91:10–15 ("So to a person skilled in the art, this implies that instead of just saying

IPR2022-00295
Patent 10,492,038 B2

portal or gateway all the time and because the claims refer to portal, not gateway, these, you know -- you know, the two terms are used synonymously.").

Third, as we note above, one of Petitioner's own preferred dictionary definitions of "portal" expresses an equivalence between a "mobile portal" and an "Internet gateway." Ex. 1042. This independent evidence adds further support to Patent Owner's position, particularly in light of its overall consistency with Dr. Rouskas's unrebutted testimony.

### b. Implementation of Portal Functionality

When instituting this proceeding, we acknowledged that Patent Owner supported its contention that a "network-based" portal resides at a server side with examples drawn from the specification of the '038 patent. Dec. 23. Specifically, Patent Owner identified examples in which the specification describes a "portal" as separate from a "mobile phone" or from a person's "wireless device." Paper 8, 13–14 (citing Ex. 1001, 6:33–34, 6:53–55, 7:9–17, 16:17–19); *see* Dec. 23. But we *sua sponte* expressed a concern that "[t]he '038 patent's specification discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Dec. 23 (citing Ex. 1001, 3:29–38, 9:22–10:19, 10:34–13:43, 15:12–16:2, Figs. 7–11). When extending our invitation for the parties to elaborate on their positions for proper construction of "network-based portal," we accordingly stated that "construing 'network-based portal' to exclude 'client-side functionality,' such as mobile-phone functionality, would exclude preferred embodiments from claim scope." *Id.* at 24. The parties have now had a full opportunity to develop their positions and, in particular,

20

IPR2022-00295
Patent 10,492,038 B2

to address the concern we raised when instituting the proceeding. We have reconsidered our initial view in light of that fully developed record.

The parties' dispute on this point centers on Figures 7–11, and we reproduce Figure 7 below, with highlighting provided by Petitioner. *See* Reply 15.



FIG. 7

Figure 7 is "a flow diagram of a personal call response process according to one embodiment of the invention." Ex. 1001, 3:29–30. The patent uses similar language to describe Figures 8–11, which relate respectively to "an audio message response process," "a text message response process," "an

automated call response process," and "a message presentation process." Ex. 1001, 3:31–38.

According to Patent Owner, "the embodiment[s] in Figs. 7-11 are not embodiments concerning use of a [network-based portal]," but instead "concern how a recipient user interacting with their client device can respond to an incoming call or message." PO Resp. 23–24. This distinction is meaningful because each of the challenged claims is directed to either "[a] non-transitory computer readable medium" or "[a] computer-implemented method" that manages or facilitates electronic communications of users "using at least a network-based portal at least based on Internet protocol." *See, e.g.* Ex. 1001, 21:50–54, 26:1–3, 27:37–41. According to Patent Owner, the embodiments illustrated by Figures 7–11 are not directed to such a facilitation method, but are instead "methods performed by the second user's device *upon receiving a message*." PO Resp. 24 (citing Ex. 1001, Figs. 7–11; Ex. 2005 ¶ 77). As such, Patent Owner argues, "a construction that has the [network-based portal] at a server distinct from the second user's communication device *does not exclude a preferred embodiment, if anything, it enables them*." *Id.* (citing Ex. 2005 ¶ 77). Patent Owner supports its argument with testimony by Dr. Rouskas, and we additionally note that Patent Owner's argument is consistent with the '038 patent specification's description of Figures 7–11 as illustrating "message *response* process[es]." Ex. 2005 ¶ 77; Ex. 1001, 3:29–38 (emphasis added).

Petitioner notes that the challenged independent claims recite that "the first message is received by the second user." Reply 14, Ex. 1001, 22:34–35, 26:48–49, 28:23–24. The portions of Figure 7 that Petitioner highlights refer to "answer[ing] the incoming voice call" at step 206, "obtain[ing] and

send[ing] audio message to caller" at step 214, "obtain[ing] and send[ing] text message to caller" at step 218, and "direct[ing] to voice mail" at step 222, which Petitioner contends are examples where client devices "enable messages to be received." Reply 15–16. Petitioner appears to infer that these highlighted steps must correspond to the claim limitation it identifies. *See id.* at 14–16. But even if we agree that these are examples of client devices that "enable messages to be received," Petitioner cites no evidence that links such functionality with the claims' further requirement that "the second user . . . at least receive messages" "via" the recited "network-based portal." *See* Ex. 1001, 22:32–33, 26:45–47, 28:21–22. In other words, the issue is not merely whether the client device is capable of implementing functionality in some embodiments that is implemented by a server-resident network-based portal in other embodiments (as appears to undergird the dissent's analysis); the issue is instead whether that functionality is specifically implemented at the client with what Petitioner adequately shows to be "a network-based portal."

Petitioner argues inferentially that "[a]ll of the '038 Patent's independent claims recite a[] [network-based portal]—thus, because the patent's figures are embodiments of the patent, they must include a[] [network-based portal]." Reply 16. But Petitioner cites no legal authority to support its implied proposition that a patent's claims and drawings must have such a correspondence. *See* Sur-reply 14 ("Petitioner's position that every issued claim must encompass every figure/embodiment of a patent is wrong as a matter of law."). Indeed, it is not particularly uncommon that a patent describes unclaimed embodiments. *See, e.g., Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1334 (Fed. Cir. 2019) ("Under the disclosure-

IPR2022-00295
Patent 10,492,038 B2

dedication rule, subject matter disclosed by a patentee, but not claimed, is considered dedicated to the public.").  Although Petitioner asserts that "[Patent Owner] remains silent as to the purpose of these disclosures, if not related to the claims," Petitioner again cites no legal authority to support imposing such a requirement on a patent owner, and we are aware of none. *See* Reply 16.

In addition to failing to cite any authority that supports its legal position on this issue, Petitioner also cites no testimonial evidence that supports its factual interpretation of Figures 7–11.  *See generally* Reply.  We are accordingly left to discern how a person of ordinary skill in the art would understand these drawings and their related descriptions by weighing Petitioner's attorney argument against the expert testimony of Dr. Rouskas that Patent Owner cites.  *See* Ex. 2005 ¶¶ 74–77.  As we note above, we necessarily accord greater weight to Dr. Rouskas's testimonial evidence. We reiterate that Petitioner was notified of this issue in the Institution Decision, but declined during the trial to introduce additional expert testimonial evidence that might bear on the issue and that Patent Owner might have cross-examined.  *See* Dec. 25 ("We invite the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '038 patent's claims."); 37 C.F.R. § 42.23(b) (authorizing reply that responds to arguments raised in a patent owner response or institution decision without limiting introduction of new evidence).

We accordingly determine that Petitioner does not persuasively support its contention that Patent Owner's proposed construction of "network-based portal" would exclude a preferred embodiment.

IPR2022-00295
Patent 10,492,038 B2

### 3. Prosecution History

Neither party cites the prosecution history of the '038 patent when addressing the meaning of "network-based portal." *See* Pet. 38; PO Resp. 14–28; Reply 9–16; Sur-reply 6–16. During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 99–105, 164–171, 242–249, 337–344, 424–427, 517–526, 682–690. Instead, in an Examiner-initiated interview early during prosecution, the Examiner suggested that the Applicant submit a terminal disclaimer to obviate a nonstatutory obviousness-type double patenting rejection over a related patent. *Id.* at 106. The Applicant's filing of such a terminal disclaimer was followed by several Notices of Allowance as prosecution was repeatedly reopened to address Amendments and/or Information Disclosure Statements filed by the Applicant. *See id.* at 88–96, 99–105, 164–171, 242–249, 337–344, 517–526, 682–690. In each Notice of Allowance, the Examiner indicated that the claims were allowed based on the "history rejection" or "previous record[] of rejection" of ancestor applications and patents. *Id.* at 104, 169, 247, 342, 525, 688.

We note that several of the Applicant's amendments introduced language that refers to the "network-based portal," either to a then-pending claim or a newly introduced claim. *Id.* at 216–228, 298–311, 318–335, 493–515, 546–570. But the Applicant offered no explanation for those amendments other than that they "further clarify the subject matter regarded as the invention." *Id.* at 228, 311, 335; *see id.* at 515, 570 (noting addition of claims without explanation). And the Examiner similarly did not address

IPR2022-00295
Patent 10,492,038 B2

that language. *See id.* at 99–105, 164–171, 242–249, 337–344, 517–526, 682–690.

While we have thus reviewed the prosecution history, we do not consider it helpful in construing "network-based portal," particularly in the absence of any arguments presented by either party.

### 4. Other Arguments

The parties address other points that we also do not find helpful in resolving the precise claim-construction issue before us, i.e. whether the recited "network-based portal" is broad enough to encompass residing at a client side of a network as well as residing at a server side. First, Patent Owner contends that the '038 patent specification supports concluding that a "network-based portal" has different functionality from a client communication device because the former "allows worldwide access to the user" and the latter is "associated with a user." PO Resp. 18–19. Petitioner discounts this as "a distinction without a difference." Reply 11–12.

While we agree that the record supports a meaningful functionality difference between a "network-based portal" and a client communication device, whether that difference lies in "worldwide access" does not bear on our analysis. When questioned about this point on cross-examination, Dr. Rouskas provided responses that we do not find illuminating because Dr. Rouskas agreed that a user's mobile phone allows that user worldwide access by allowing others to communicate with the user. *See* Ex. 1043, 110:20–24, 114:2–5 ("One is worldwide access to the user. A phone provides that. There's no question about that.").

26

Second, Patent Owner contends that a contradiction arises within independent claims 7, 38, and 46 if the recited "network-based portal" is mapped to a user interface on the client communication device of the recited "first user." PO Resp. 24–25. Patent Owner's contention appears to be correct, such as it is. But the contention is clearly driven by one of Petitioner's arguments in applying the asserted prior art to the claim, rather than as a matter of claim construction itself. *See* Reply 12 (Petitioner disputing that it advances an argument that only the first user's device contains the network-based portal). That is, Patent Owner's scenario imposes an additional limit on the network-based portal (not merely residing on a client side, but residing on a specific client device). That scenario therefore does not address the broader claim-construction issue that confronts us, namely whether a "network-based portal" encompasses residing at a client side generally, rather than limited to a specific client communication device.

We accordingly give little weight to these additional arguments by Patent Owner in our evaluation of the claim-construction issue.

### 5. Summary

As we note above, we find certain of Patent Owner's arguments adequately rebutted by Petitioner, such that we do not consider them in our assessment. Nevertheless, Patent Owner retains compelling arguments for its proposed construction, supported by expert testimonial evidence, including dictionary definitions and the '038 patent specification's reference to a "portal or a gateway." We find such references more compellingly refer to "portal" and "gateway" as synonyms rather than alternatives. In addition,

IPR2022-00295
Patent 10,492,038 B2

Patent Owner provides convincing evidence and argument that rebuts the concern raised by the Board at institution whether Patent Owner's proposed construction would exclude preferred embodiments. Petitioner, who bears the overall burden, addresses that concern only with attorney argument, which we accord less weight.

In light of these considerations, we construe "network-based portal" as Patent Owner advocates, namely as residing on a server side of a network.

### E. Overview of the Prior Art

#### 1. Tanigawa

Tanigawa "relates to a communication technology such as Instant Messaging (IM)," and endeavors "to achieve group chat using multimedia." Ex. 1010 ¶¶ 1, 8. Figure 1 of Tanigawa is reproduced below.

## FIG.1



IPR2022-00295
Patent 10,492,038 B2

Figure 1 is a schematic diagram of a voice-over-IP ("VoIP") communication system that includes a variety of communication devices, such as IP terminals 7, fixed telephone 11, and mobile telephone 9. *Id.* ¶¶ 34–35. IM server 4 "manages presence information of an IM client," AP server 5 "manages connection[s] for a voice chat using VoIP," MD server 6 "implements multi-party voice speech by mixing voice data," and VR server 10 "performs voice relay" with publicly switched telephone network 3 and radio communication network 2. *Id.* ¶ 35.

Figure 3 of Tanigawa is reproduced below.

## FIG.3



| ACCOUNT NAMES 431 | CLIENT ADDRESSES 432 | CLIENT NICKNAMES 433 | AUTHENTI-CATION KEYS 434 | PRESENCE 435 | USABLE MEDIA 436 | CONFERENCE ADDRESSES 437 | CONFERENCE NICKNAMES 438 | BUDDY LIST 439 |
|---|---|---|---|---|---|---|---|---|
| Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... |
| Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... |
| Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client G | ***.***(***)*** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | | | | | | | | |

PRESENCE INFORMATION MANAGEMENT TABLE 488

Figure 3 is an example of a "presence information management table" used by IM server 4 to manage presence information. *Id.* ¶ 49; *see id.* ¶¶ 40, 47. Chat participants are identified by nicknames 433, with the same nickname being used for a particular user across all devices. *Id.* ¶¶ 133, 194. This is

IPR2022-00295
Patent 10,492,038 B2

illustrated in Figure 3, for example, for devices D and E, both of which belong to "hanako," and for devices F and G, both of which belong to "yoshi." *See id.* ¶ 50.

Figure 12 of Tanigawa is reproduced below.



Figure 12 shows an example of a user interface of an IM client, such as may be displayed on IP terminal 7. *Id.* ¶ 162. Display area 135 shows presence information of "chatting buddies." *Id.* ¶ 164. In addition, several chatting options are provided on main menu bar 130, which includes icon 131 "indicating an operation relating to presence information," icon 132 indicating one-to-one voice chatting, icon 133 indicating multiparty voice chatting, and icon 134 "indicating text chatting." *Id.* ¶ 163.

IPR2022-00295
Patent 10,492,038 B2

*2. Hullfish*

Hullfish "relates to electronic messaging systems in a computer environment." Ex. 1011, 1:6–9. Figure 5 of Hullfish is reproduced below.



**FIG. 5**

Figure 5 is a flow diagram depicting a method that incorporates a privacy feature into receiving short-message-service ("SMS") text messages. *Id.* at 8:59–61. The method is implemented when a first user ("User A") wants to stop receiving messages from a second user ("User B"). *Id.* at 8:62–64. To implement this, User A sends a text message containing User B's telephone number to a predetermined telephone number. *Id.* at 9:1–4. Thus, when an SMS server receives a text from User A at the predetermined telephone number at step 502, it is determined at step 504 whether the text contains a telephone number, i.e., User B's number. *Id.* at 9:5–9. If so, future

31

IPR2022-00295
Patent 10,492,038 B2

messages from User B to User A are blocked at step 506. *Id.* at 9:9–18.
Otherwise, future messages are forwarded "according to user preference" at
step 508. *Id.* at 9:30–33.

### 3. Loveland

Loveland "relates to methods, systems and computer program
products for notifying a user of an event via voice notifications or other
notification methods depending on the user's dynamic circumstances."
Ex. 1008, 1:8–11. Figure 3 of Loveland is reproduced below.



FIG. 3

Figure 3 is a "flowchart of a method for notifying a user of an event in a
context sensitive manner that takes into consideration the user's current
state." *Id.* at 2:65–67. After the process is initiated at step 301 upon

Appx00222

IPR2022-00295
Patent 10,492,038 B2

detection of an event that requires notification to a user, such notification is sent at step 302 in a manner "that is appropriate for the user's circumstances." *Id.* at 6:25–27, 6:36–38.

This includes accessing a current context of the user at step 303, such as "whether or not the user's telephone is on, busy, in hands-free mode, out of range, in meeting mode or the like for each of the user's telephones." *Id.* at 6:40–47. At step 304, one of a plurality of notification methods is identified:

> There is an endless permutation of possible rules. As an illustrative example, the rules might define which telephonic devices to notify given the current time, and what notification methods to use if the current device is on or off, in hands-free mode or not, and busy or not. As a more specific example, the user may state that she wants to be notified by audible voice message if she receives an e-mail from a certain individual, except if she is already using the telephone through which the voice message was to be rendered, in which case the user may specify to be notified via a text message.

*Id.* at 6:60–7:3. Loveland also explains that "the user may specify that a voice notification interrupt the current conversation even if the user is currently on the telephone." *Id.* at 2:28–32; *see also id.* at 6:31–33 ("the notification may be that a new e-mail from an important individual has been received in the user's in-box"). At step 305, the notification is then dispatched to the user using the identified notification method. *Id.* at 7:4–6.

### 4. Takahashi

Takahashi describes "a server device for net games which is communicably connected to a plurality of terminal devices" via the Internet. Ex. 1009 ¶¶ 8, 29. Figure 7 of Takahashi is reproduced below.

33

IPR2022-00295
Patent 10,492,038 B2



Figure 7 depicts a set of messages that a user may send to other users. *Id.*
¶ 72. "For each one of the above messages, the member can select a desired
message out of a plurality of predetermined messages." *Id.* ¶ 74.

### *F. Analysis*

Petitioner challenges claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49,
51–53, 55, 57, 58, and 64–66 as unpatentable under 35 U.S.C. § 103(a) over
Tanigawa and Hullfish; challenges claims 8, 9, 43, 44, 47, 48, 50, and 54 as
unpatentable under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, and
Loveland; challenges claims 37, 42, 56, 59–63, and 67 as unpatentable under
35 U.S.C. § 103(a) over Tanigawa, Hullfish, and Takahashi; and challenges

IPR2022-00295
Patent 10,492,038 B2

claim 45 as unpatentable under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, Loveland, and Takahashi.  Pet. 33–86.  In addressing independent claim 7, Petitioner contends that "Tanigawa discloses managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol" by referring to the communication system illustrated in Figure 1 of Tanigawa, reproduced above.  *Id.* at 37–38. For the "network-based portal," Petitioner relies on the user interface illustrated in Figure 12, also reproduced above:  "Tanigawa's IP terminal contains a 'network-based portal,' which is a user interface that connects clients to a network."  *Id.* at 38–39.  That is, Petitioner relies on Tanigawa's disclosure of a client-resident interface to meet the claim's recitation of a "network-based portal."

The only aspects of independent claim 7 for which Petitioner relies on a reference other than Tanigawa—specifically, Hullfish—are those that recite aspects that involve blocking users.  In particular, Petitioner contends that the combination of Tanigawa and Hullfish renders obvious the following two recitations:  (1) "computer program code for permitting the second user to block the first user from using at least the selected communication mode to reach the second user via the network-based portal"; and (2) "computer program code for enabling, via the network-based portal, the first message to be received by the second user via the electronic device associated with the second user, using the selected communication mode, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected

35

communication mode to reach the second user, via the network-based portal." *Id.* at 49–52; Ex. 1001, 22:16–27.

Both the preamble and the body of independent claim 7 recite "a network-based portal." Ex. 1001, 21:53, 21:58, 22:2, 22:14–15, 22:19, 22:20–21, 22:27, 22:33, 22:38–39; *see* PO Resp. 28 (Patent Owner noting repeated recitation of "network-based portal" in independent claim 7). Under our adopted construction, Petitioner does not show that the combination of Tanigawa and Hullfish meets the claim requirements of a "network-based portal." That is, Petitioner's reliance on a client-resident interface to meet the claim's recitation of a "network-based portal" is incompatible with our construction of that phrase.

We accordingly conclude that Petitioner does not show, by a preponderance of the evidence, that independent claim 7 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa and Hullfish. The same deficiency exists with respect to Petitioner's analysis of independent claims 38 and 46. *See* Pet. 64 (Petitioner's analysis of claim 38 relying substantially on analysis of claim 7), 65–67 (Petitioner's analysis of claim 46 relying substantially on analysis of claim 7). Because the deficiency in Petitioner's showing also applies to the dependent claims, which inherit the "network-based portal" limitations, we conclude that Petitioner does not show that any of claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, or 64–66 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa and Hullfish; that any of claims 8, 9, 43, 44, 47, 48, 50, or 54 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, and Loveland; that any of claims 37, 42, 56, 59–63, or 67 is unpatentable under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, and Takahashi; or that claim 45 is unpatentable

IPR2022-00295
Patent 10,492,038 B2

under 35 U.S.C. § 103(a) over Tanigawa, Hullfish, Loveland, and Takahashi.

### III.  CONCLUSION

The table below summarizes our conclusions as to the challenged claims.

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, 64–66 | 103(a) | Tanigawa, Hullfish | | 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, 64–66 |
| 8, 9, 43, 44, 47, 48, 50, 54 | 103(a) | Tanigawa, Hullfish, Loveland | | 8, 9, 43, 44, 47, 48, 50, 54 |
| 37, 42, 56, 59–63, 67 | 103(a) | Tanigawa, Hullfish, Takahashi | | 37, 42, 56, 59–63, 67 |
| 45 | 103(a) | Tanigawa, Hullfish, Loveland, Takahashi | | 45 |
| **Overall Outcome** | | | | 7–12, 22–24, 33–67 |

37

IPR2022-00295
Patent 10,492,038 B2

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 7–12, 22–24, and 33–67 of U.S. Patent No. 10,492,038 B2 have not been shown, by a preponderance of the evidence, to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Trials@uspto.gov                                                  Paper 27
571-272-7822                                              Date: May 19, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

————————

IPR2022-00295
Patent 10,492,038 B2

————————

AMUNDSON, *Administrative Patent Judge*, dissenting.


I respectfully dissent from the majority's determination that a "network-based portal" does not encompass "a user interface that connects clients to a network" and instead may reside only on a server side of a network. In my view, the majority gives too much weight to the extrinsic evidence in making that determination. The Federal Circuit has "viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms," e.g., because expert testimony "is generated at the time of and for the purpose of litigation

IPR2022-00295
Patent 10,492,038 B2

and thus can suffer from bias that is not present in intrinsic evidence." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).

Below, I discuss each party's claim-construction arguments and then explain my analysis of the intrinsic evidence and the extrinsic evidence and the bases for my disagreement with the majority's claim construction.

Based on my view that a "network-based portal" encompasses "a user interface that connects clients to a network" and my review of the evidence, I also respectfully dissent from the majority's determination that Petitioner fails to demonstrate by a preponderance of the evidence that the challenged claims are unpatentable.

## I. BACKGROUND

Each challenged independent claim requires a "network-based portal." Ex. 1001, 21:50–22:43 (claim 7), 26:1–57 (claim 38), 27:37–28:39 (claim 46). Certain challenged dependent claims also require a "network-based portal." *Id.* at 22:59–63 (claim 11), 23:28–32 (claim 16), 24:5–12 (claim 22), 25:20–51 (claims 34–35), 26:58–67 (claim 39), 28:40–49 (claim 47), 28:53–29:3 (claim 49), 29:7–48 (claims 51–53), 30:40–46 (claim 63), 30:64–31:3 (claim 66). In their respective arguments, the parties dispute the meaning of "network-based portal." *See, e.g.*, Pet. 38–39; Resp. 14–28; Reply 9–16; Sur-reply 6–16.[4]

---

[4] This decision uses the following abbreviations and words to identify documents filed with the Board: "Pet." for the Petition (Paper 1); "Resp." for Patent Owner's Response (Paper 15); "Reply" for Petitioner's Reply (Paper 17); "Sur-reply" for Patent Owner's Sur-reply (Paper 22); and "Hr'g Tr." for the transcript of the February 17, 2023, oral hearing in IPR2022-00202 for related U.S. Patent No. 10,142,810 B2 (Paper 28 in IPR2022-00202).

IPR2022-00295
Patent 10,492,038 B2

Petitioner contends that a "network-based portal" encompasses "a user interface that connects clients to a network." Pet. 38–39; Reply 9, 12.

Patent Owner equates a "portal" to a "networked server." *See* Resp. 17; Sur-reply 6. In particular, Patent Owner contends that the '038 patent's specification (1) defines a "portal" as a "gateway" and (2) defines a "gateway" as a "networked server." Resp. 17 (citing Ex. 1001, 4:22, 4:62–63, 7:11–12, 7:15, 16:15–18; Ex. 2005 ¶ 65); *see* Hr'g Tr. 44:11–17; Sur-reply 6.

## II. PATENT OWNER'S ARGUMENTS

Patent Owner asserts that the '038 patent's specification uses "portal" and "gateway" synonymously. Sur-reply 6. As support, Patent Owner quotes the following statements in the specification where the word "or" appears between "portal" and "gateway": "A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems . . . . The portal or gateway can then facilitate download of a database or update thereto to a communication device, such as a phone." Resp. 18, 22 (quoting Ex. 1001, 7:11–17). Patent Owner also asserts that Dr. Rouskas provides "unrebutted" testimony that the specification uses "portal" and "gateway" synonymously because the word "or" sometimes appears between "portal" and "gateway" in the specification. Sur-reply 9 (citing Ex. 1043, 90:4–9, 91:10–15). According to Patent Owner, a "portal" or "gateway" connects "distinct networks" in contrast to a client device that does not do so. Resp. 22 (citing Ex. 2005 ¶ 73).

To support its contention concerning the equivalence of a "gateway" and a "networked server," Patent Owner quotes the following statements in

IPR2022-00295
Patent 10,492,038 B2

the specification: "The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 [sic] electronic device, such as a mobile telephone." Resp. 17 (quoting Ex. 1001, 16:15–18).

Further, Patent Owner asserts that the specification "does not define" a "portal" or "network-based portal" as a client device. Resp. 17 (citing Ex. 2005 ¶ 65). Patent Owner asserts that a "portal" or "network-based portal" differs from a client device because a client device is "associated with a user," whereas a "portal" or "network-based portal" must allow "worldwide access" to a user. *Id.* at 18–19 (quoting Ex. 1001, 2:25–29, 4:52–53, 6:33–39, 7:11–14); Sur-reply 9. Patent Owner also asserts that a "portal" or "network-based portal" resides at a "server distinct from" a client device. Resp. 24; *see* Sur-reply 7, 15–16.

Additionally, Patent Owner contends that the claim language distinguishes a "network-based portal" from a client device. *See* Resp. 19. Patent Owner bases that contention on certain limitations in independent claims 7, 38, and 46, as exemplified by the following limitations in claim 7:

> [7.7] computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal; and

> [7.8] wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user via an electronic device associated with the first user.

*Id.*; *see* Ex. 1001, 22:30–40.

4

IPR2022-00295
Patent 10,492,038 B2

Patent Owner contends that if the "network-based portal" is "on the client-side of the sender/originator of a communication" according to Petitioner's position, then the "contact information of the recipient is also necessarily on" the sender's client device. Resp. 35. Patent Owner also contends that this arrangement would violate claims 7, 38, and 46 because the claims require that "the contact information is not available to the sender," i.e., the first user. *Id.* at 35, 46 (emphasis omitted).

Patent Owner asserts that claim 7's preamble "expressly states that 'each of the plurality of users' have their 'corresponding identifier' 'set via the network-based portal'." Resp. 20 (citing Ex. 2005 ¶ 69). Patent Owner further asserts that claim 7's preamble requires a single "network-based portal" through "which each of the plurality of users set their corresponding identifier." Sur-reply 13. According to Patent Owner, Petitioner's position "would require 'a plurality' of users to have access to the first user's device so that 'each of the plurality of users' can set their respective identifier(s)," and "typically a user's contact (or anyone else) is not allowed access to the user's device." Resp. 20–21 (citing Ex. 2005 ¶¶ 69, 71). Patent Owner also asserts that "[s]ince the recipients (contacts) cannot possibly use the sender's communication device to set their identifier, the preamble's requirement that 'each of the plurality of users' has his/her 'corresponding identifier' 'set via the network-based portal' invalidates Petitioner's arguments" that a client device may include a "network based portal." *Id.* at 21 (citing Ex. 2005 ¶ 71); *see id.* at 25; Sur-reply 13.

To further support its position, Patent Owner quotes two undated online definitions of "portal" that Dr. Rouskas found with a Google search. Resp. 16–17; *see* Ex. 1043, 61:17–63:10; Ex. 2005 ¶ 64. Patent Owner

IPR2022-00295
Patent 10,492,038 B2

quotes the first online definition located at https://www.techopedia.com/ definition/13077/portal-internet as follows: "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." Resp. 16; Ex. 2005 ¶ 64. Patent Owner asserts that websites are "hosted on web servers" and not on client devices. Resp. 17 (citing Ex. 2005 ¶ 64). Patent Owner quotes the second online definition located at https://www.techtarget.com/whatis/definition/portal as follows: "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site." Resp. 16–17; Ex. 2005 ¶ 64.

Patent Owner notes that the Institution Decision cited the embodiments in the '038 patent's Figures 7–11 when stating that the '038 patent "discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Resp. 23 (quoting Inst. Dec. 23). Patent Owner contends that "[c]laim 7 concerns 'managing electronic communications of a plurality of users using at least a network-based portal.'" *Id.* at 24. Patent Owner then contends that the embodiments in Figures 7–11 are "methods performed by the second user's device upon receiving a message" and "not embodiments for 'managing electronic communications using at least a network based portal' as are the claims of the '038 Patent." *Id.* (emphasis omitted); *see* Sur-reply 14–18.

## III. PETITIONER'S ARGUMENTS

Petitioner asserts that the '038 patent discloses the claimed functionality for a "network-based portal" residing in a client device, e.g., in

IPR2022-00295
Patent 10,492,038 B2

a mobile phone.  Reply 9.  Petitioner asserts that independent claims 7, 38, and 46 specify that "the first message is received by the second user."  *Id.* at 14.  Petitioner then contends that the '038 patent discloses (1) the recipient functionality of "allowing users to specify who may contact them and see their contact information" taking place "all in the phone" and (2) the phone "automatically manag[ing] the communication."  *Id.* at 14–15 (quoting Ex. 1001, 7:32–33, 7:35–36).  Petitioner also contends that a "network-based portal" residing in a client device enables not only message receipt but also message management.  *Id.* at 15 (citing Ex. 1003 ¶¶ 397–398).

IPR2022-00295
Patent 10,492,038 B2

To support its contentions about message receipt and message management taking place "all in the phone," Petitioner provides the highlighted version of the '038 patent's Figure 7 reproduced below (Reply 15):



FIG. 7

Figure 7 "is a flow diagram of a personal call response process 200" performed "by an electronic device, such as a mobile communication device

IPR2022-00295
Patent 10,492,038 B2

(e.g., mobile telephone)." Ex. 1001, 9:22–26, Fig. 7; *see id.* at 3:29–30.
This highlighted version of Figure 7 includes yellow highlighting over the
following steps in process 200:

- step 206 "answer the incoming voice call";

- step 214 "obtain and send audio message to caller";

- step 218 "obtain and send text message to caller"; and

- step 222 "direct to voicemail."

*See* Reply 15. Petitioner argues that "because the patent's figures are
embodiments of the patent, they must include" a "network-based portal."
*Id.* at 16.

Further, Petitioner asserts that the '038 patent's specification "treats
the phrase 'portal or gateway' differently from the singular 'portal,' using
these phrases to describe different embodiments, indicating that portals and
gateways are two alternative means to establish communication." Reply 11
(citing Ex. 1001, 4:33–5:4). Petitioner also asserts that the specification's
"recitation of 'portal or gateway' means the two are alternatives, not that one
redefines the other." *Id.* (citing *Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362, 1368 (Fed. Cir. 2012)).

Regarding Patent Owner's assertion that websites are "hosted on web
servers" and not on client devices, Petitioner argues that no claim requires
that a "network-based portal" be "hosted." Reply 10; *see* Resp. 17.

Additionally, Petitioner contends that Patent Owner's assertion about
a "network-based portal" differing from a client device because a client
device is "associated with a user" lacks merit since a client device may
include a "network-based portal" that "connects a user to a network" even
though the client device is "associated with a user." Reply 11; *see* Resp.

9

IPR2022-00295
Patent 10,492,038 B2

18–19.  Petitioner contends that Dr. Rouskas concedes that "a user's mobile phone allows worldwide access to that user by allowing others to communicate with the user."  Reply 11–12 (citing Ex. 1043, 110:20–24, 114:2–5).

As for the claim language "each of the plurality of users" have their "corresponding identifier" "set via the network-based portal," Petitioner asserts that a "network-based portal" does not "solely exist in a sender's device."  Reply 12 (citing Ex. 1003 ¶ 398).  Petitioner also asserts that each user ("both senders and recipients") may have a client device with a "network-based portal."  *See id.* at 12–14.

Petitioner criticizes the two online definitions of "portal" that Dr. Rouskas found as "cherry-picked from search results for 'portal' rather than from any nuanced inquiry or analysis."  Reply 10 (citing Ex. 1043, 62:24–63:10); Hr'g Tr. 74:5–16.  According to Petitioner, Dr. Rouskas "selectively disregarded definitions that include the word 'interface.'"  Reply 10.  To undermine Dr. Rouskas's credibility, Petitioner introduces two online definitions of "portal" with 2022 copyright dates that include the word "interface."  *Id.*; *see* Ex. 1041, 1, 5; Ex. 1042, 1, 5; Hr'g Tr. 73:22–74:16, 75:8–76:7.  Petitioner does not rely on those online definitions to establish the meaning of "network-based portal."  Hr'g Tr. 75:8–76:7.

Petitioner quotes the first online definition located at https://www.liferay.com/resources/l/web-portal as follows:  "A portal is a web-based platform that collects information from different sources into a single user interface."  Reply 10 (emphasis omitted) (quoting Ex. 1041, 1).  Petitioner quotes the second online definition located at https://www.gartner.com/en/

10

IPR2022-00295
Patent 10,492,038 B2

information-technology/glossary/mobile-portal as follows: "A mobile portal is an Internet gateway that enables mobile devices to connect remotely . . . typically via a Web browser interface." *Id.* (alteration by Petitioner) (emphasis omitted) (quoting Ex. 1042, 1).

## IV. ANALYSIS

After analyzing the intrinsic evidence and the extrinsic evidence, I agree with Petitioner that a "network-based portal" encompasses "a user interface that connects clients to a network." *See* Pet. 38–39; Reply 9, 12. Below, I explain my analysis of the intrinsic evidence and the extrinsic evidence.

Independent claims 7 and 38 recite "managing electronic communications of a plurality of users using at least a network-based portal," and independent claim 46 recites "facilitates electronic communication of a plurality of users using at least a network-based portal." Ex. 1001, 21:52–53, 26:1–3, 27:39–40. The '038 patent's specification discloses and depicts "managing electronic communications of a plurality of users" using a "phone" or a "mobile telephone," i.e., a client device with a user interface. *See id.* at 3:16–38, 4:48–50, 6:4–6, 7:18–36, 7:52–56, 8:18–21, 9:15–18, 9:21–13:43, 14:44–53, 14:62–67, 15:12–16:2, 18:3–5, 18:11–14, 18:22–30, Figs. 1–11. Moreover, by "managing electronic communications of a plurality of users" according to claims 7 and 38, a "phone" or a "mobile telephone" facilitates electronic communication among the plurality of users according to claim 46.

For example, Figures 7–11 depict "managing" functionality as recited in claims 7 and 38 and "facilitating" functionality as recited in claim 46

11

IPR2022-00295
Patent 10,492,038 B2

performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)" as follows:

- providing a first user with a voice communication mode and a text communication mode, e.g., as recited in limitations [7.1], [7.2], [38.1], [38.2], [46.1], and [46.2];

- enabling a second user to receive a voice message or a text message using the selected communication mode in view of the second user not blocking the first user, e.g., as recited in limitations [7.4], [7.5], [38.4], [38.5], [46.4], and [46.5]; and

- allowing the second user to receive messages through an electronic device associated with the second user, e.g., as recited in limitations [7.8], [38.8], and [46.8].

Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2, 21:50–22:43, 26:1–57, 27:37–28:39, Figs. 7–11; *see id.* at 3:29–38, 10:6–19.

Further, Figures 7–11 depict "managing" functionality and "facilitating" functionality as recited in certain dependent claims. In particular, dependent claims 37, 42, 45, and 56 specify that the second user may "select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages provided to the second user." Ex. 1001, 25:62–67 (claim 37), 27:15–19 (claim 42), 27:28–36 (claim 45), 29:58–63 (claim 56); *see id.* at 30:12–18 (claim 59), 31:4–10 (claim 67). The specification's disclosure about the second user "select[ing] a predetermined message to send to the first user" appears in the discussion of Figures 8 and 9 depicting steps performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)." *Id.* at 9:22–26, 10:34–38, 10:63–66, 12:9–12, 12:21–23, Figs. 8–9; *see id.* at 3:29–34. As support for claims 37, 42, 45, and 56, the specification explains that:

IPR2022-00295
Patent 10,492,038 B2

> (1)   Figure 8's step 306 "determines whether the user (i.e., called party) of the mobile communication device has selected one or more of the predetermined audio messages"; and
>
> (2)   Figure 9's step 406 "determines whether one (or more) of the predetermined text messages has been selected."

*Id.* at 10:63–66, 12:21–23, Figs. 8–9.

As discussed above, Petitioner argues that "because the patent's figures are embodiments of the patent, they must include" a "network-based portal." Reply 16; *see supra* § III. Petitioner's argument disregards the general principle that a patent may disclose unclaimed embodiments. *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377 (Fed. Cir. 2007). Nonetheless, as also discussed above, Figures 7–11 illustrate claimed embodiments, i.e., by depicting "managing" functionality and "facilitating" functionality as recited in various claims performed "by an electronic device, such as a mobile communication device (e.g., mobile telephone)." *See* Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2, 21:50–22:43, 25:62–26:57, 27:15–19, 27:28–28:39, 29:58–63, Figs. 7–11.

Additionally, the specification indicates that a "portal" may reside in a "phone," i.e., a client device with a user interface. Ex. 1001, 4:48–50, 6:4–6, 7:25–33, 7:52–54, 14:62–65, 18:11–14, Figs. 1–5. In particular, the specification explains that "a portal provides a number of intelligent communication modes (ICM) for the user to select as shown in FIG. 1" and "the intelligent communication modes shown in FIG. 1 for the user to select are in the phone." *Id.* at 6:4–6, 7:25–26. The specification also explains that "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can

IPR2022-00295
Patent 10,492,038 B2

be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences." *Id.* at 4:48–50, 7:52–54, 14:62–65, 18:11–14. Because "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can be performed at an electronic device," e.g., at a "phone," the "portal" can reside in a "phone."

The specification discloses an example of "managing electronic communications of a plurality of users" using a "phone." *See* Ex. 1001, 7:27–36. In particular, the specification explains that "the phone could automatically manage the communication" from various individuals after a user configures the phone as follows:

> define the contact classes, such as the ones shown in FIG. 2;
> set up the urgency classes, such as the ones shown in FIG. 3;
> define the statuses, such as the ones shown in FIG. 4; set up
> the Access Priority Database, such as the one shown in FIG. 5;
> and categorize a number of the user's contacts into the
> corresponding ContactClasses, all in the phone.

*Id.* at 7:27–33, Figs. 1–5; *see id.* at 18:22–30.

The specification discloses other techniques for "managing electronic communications of a plurality of users" using a "phone" as follows:

- "keep information in local databases, such as in such a phone";

- configure "user settings (e.g., preferences) to decline calls/messages matching certain criteria";

- "reduce user input at the mobile communication device by making use of stored data pertaining to its hardware components, configuration or preferences";

- "provide feedback to a caller without answering a voice call from the caller";

14

IPR2022-00295
Patent 10,492,038 B2

- "choose not to take the voice call from the calling party" and instead "provide the calling party with some limited information," e.g., "in an audio or textual format";

- "enable the called party to provide a brief audio or text message to the calling party";

- "automatically (i.e., without user input) respond to the calling party via an audio or text message"; and

- "communicate in different ways depending on device configuration, user preferences, prior history, time or other criteria."

Ex. 1001, 7:23–25, 7:54–56, 8:18–21, 9:15–18, 13:19–25, 14:44–53, 14:65–67, 18:3–5, 18:22–30; *see id.* at 13:44–55.

For these reasons, the '038 patent's specification discloses and depicts "managing electronic communications of a plurality of users" (and "facilitat[ing] electronic communication of a plurality of users") using a "phone" or a "mobile telephone," i.e., a client device with a user interface. *See* Ex. 1001, 3:16–38, 4:48–50, 6:4–6, 7:18–36, 7:52–56, 8:18–21, 9:15–18, 9:21–13:43, 14:44–53, 14:62–67, 15:12–16:2, 18:3–5, 18:11–14, 18:22–30, Figs. 1–11. For example, the specification explains that "the portal can be used to control the selection and setting of different intelligent communication modes" and "communication mode changes can be performed at an electronic device," e.g., at a "phone" with the "portal." *Id.* at 4:48–50, 7:52–54, 14:62–65, 18:11–14. Hence, construing "network-based portal" to exclude "a user interface that connects clients to a network" would exclude preferred embodiments from claim scope. *See id.* at 3:16–38, 4:48–50, 6:4–6, 7:18–36, 7:52–56, 8:18–21, 9:15–18, 9:21–13:43, 14:44–53, 14:62–67, 15:12–16:2, 18:3–5, 18:11–14, 18:22–30, 21:50–22:43, 25:62–26:57, 27:15–19, 27:28–28:39, 29:58–63, Figs. 1–11. As discussed

15

above, those preferred embodiments include mobile devices covered by the challenged independent claims and certain dependent claims.

A construction excluding a preferred embodiment is "rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016). Those rare circumstances do not exist here.

Moreover, a patent's drawings "must show every feature of the invention specified in the claims." 37 C.F.R. § 1.83(a). The '038 patent's drawings do not show a "portal" or "network-based portal" residing at a "server distinct from" a client device according to Patent Owner's arguments. *See* Ex. 1001, 3:27–28, 8:35–9:21, Fig. 6; Resp. 24; Sur-reply 7, 15–16. The drawings do not even show a server. *See* Ex. 1001, 8:35–9:21, Fig. 6. Patent Owner does not contend otherwise. *See, e.g.*, Resp. 14–28; Sur-reply 6–16. But the drawings do show mobile telephones (items 102 in Figure 6) and steps performed by mobile telephones. Ex. 1001, 3:27–38, 8:35–40, 9:22–26, 10:34–38, 12:9–12, 13:17–25, 15:12–15, Figs. 6–11.

Consistent with the specification, the claim language does not preclude a "network-based portal" from encompassing "a user interface that connects clients to a network." *See, e.g.*, Ex. 1001, 21:50–22:43 (claim 7), 22:59–63 (claim 11), 23:28–32 (claim 16), 24:5–12 (claim 22), 25:20–51 (claims 34–35), 26:1–67 (claims 38–39), 27:37–28:49 (claims 46–47), 28:53–29:3 (claim 49), 29:7–48 (claims 51–53), 30:40–46 (claim 63), 30:64–31:3 (claim 66). For instance, no challenged claim recites a "server." *Id.* at 21:50–23:4, 24:5–22, 25:14–31:10. And no challenged claim specifies a location for a "network-based portal." *Id.* If the patentee had wanted to

IPR2022-00295
Patent 10,492,038 B2

limit the location for a "network-based portal," the patentee could have readily done so by reciting a "network-based portal at a server."

As evidence of this, independent claim 1 and claims 3–6 that depend directly or indirectly from claim 1 expressly recite a "server." Ex. 1001, 20:13–21:18 (claim 1), 21:22–49 (claims 3–6). Although Petitioner does not challenge claims 1–6, "[o]ther claims of the patent in question, both asserted and unasserted," can be "valuable sources of enlightenment as to the meaning of a claim term." *See Phillips*, 415 F.3d at 1314; Pet. 1, 33–86.

Patent Owner misinterprets the claims when contending that locating a "network-based portal" on the first user's client device would violate claims 7, 38, and 46 because, according to Patent Owner, the claims require that "the contact information is not available to the sender," i.e., the first user. *See* Resp. 35, 46. Patent Owner's contention rests on the erroneous premise that the claims require that the second user's contact information not be provided to the first user's client device. *See id.* at 35–36.

Limitations [7.8], [38.8], and [46.8] specify that "the contact information associated with the second user is not provided via the network-based portal to the first user." Ex. 1001, 22:37–39, 26:51–53, 28:25–27. Limitations [7.8], [38.8], and [46.8] do not exclude sending the second user's "contact information" to the first user's client device and then preventing the first user from viewing the second user's "contact information," e.g., by precluding the first user's client device from displaying the second user's "contact information." *See id.* at 22:34–40, 26:48–54, 28:23–34.

The '038 patent's specification supports this interpretation by explaining that (1) "the user can be aware of the identity of the caller even

IPR2022-00295
Patent 10,492,038 B2

without being informed of the number of the caller" and (2) "the caller can reach the user without being aware of the number of the phone the user is using to receive the call." Ex. 1001, 5:33–38. Additionally, the specification discloses an example where a second user with a "cellular phone" talks to a first user and the first user "is not aware of the phone number of the cellular phone." *Id.* at 2:58–62.

As for the claim language "each of the plurality of users" have their "corresponding identifier" "set via the network-based portal," the claims earlier recite "a plurality of users using at least a network-based portal." Ex. 1001, 21:50–60, 26:1–9. The "indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). "The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning." *Id.* "The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012).

Here, Patent Owner does not identify evidence of a clear intent to limit "a network-based portal" to "one" portal in the challenged claims. *See, e.g.*, Resp. 14–28; Sur-reply 6–16. Hence, I agree with Petitioner that each user may have a client device with a "network-based portal." *See* Ex. 1001, 21:50–60, 26:1–9; Reply 12. Moreover, each user may use their "network-

IPR2022-00295
Patent 10,492,038 B2

based portal" to set their "corresponding identifier." *See* Ex. 1001,
21:50–60, 26:1–9.

Patent Owner's contention that the embodiments in Figures 7–11 are
"not embodiments for 'managing electronic communications using at least a
network based portal' as are the claims of the '038 Patent" lacks merit. *See*
Resp. 24. The '038 patent's specification explains that the description and
the drawings illustrate "by way of example the principles of the invention."
Ex. 1001, 3:7–11. Further, as discussed above, Figures 7–11 depict
"managing" functionality and "facilitating" functionality as recited in the
challenged independent claims and certain dependent claims performed "by
an electronic device, such as a mobile communication device (e.g., mobile
telephone)." *See, e.g.*, Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2,
21:50–22:43, 25:62–26:57, 27:15–19, 27:28–36, Figs. 7–11; *see also id.* at
3:29–38, 10:6–19.

Additionally, contrary to Patent Owner's contention, the '038 patent's
specification does not (1) define a "portal" as a "gateway" or (2) define a
"gateway" as a "networked server." *See* Resp. 17; Sur-reply 6. An analysis
of the specification shows that each part of Patent Owner's attempt to equate
a "portal" to a "networked server" fails.

Regarding a "portal" and a "gateway," the specification explains that
a "portal" and a "gateway" have functionality that overlaps but differs
in different embodiments as follows:

> A number of embodiments depend on the different
> modes of communication converging onto the internet protocol
> platform. A communication gateway or a portal is formed
> allowing the user to receive communications from numerous
> sources through different modes. . . .

19

One embodiment of the invention uses an open portal based on the web. Based on the portal, the user can securely determine who can reach him at what conditions. . . .

Thus, in one embodiment, the portal can be used to control the selection and setting of different intelligent communication modes for the user. These intelligent communication modes allow priorities of various kinds of communication options to be set by the user. . . . The portal . . . can dynamically determine, for example, whether a call initiated at different time by different callers should be accepted by the user in real-time or handled by other mechanisms. . . .

In one embodiment, the portal or gateway also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. . . .

In one embodiment, the portal can dynamically change the access priorities of a caller trying to reach the user. . . .

Ex. 1001, 4:20–24, 4:33–35, 4:48–56, 4:62–64, 5:5–6.

The '038 patent's specification uses the phrase "portal or gateway" three times and the phrase "communication gateway or a portal" once. Ex. 1001, 4:22–24, 4:62–64, 7:11–17. The specification uses the word "portal" or "gateway" separately and unconnected by "or" more than twenty times. *See, e.g.*, *id.* at 4:20–7:17, code (57). The specification sometimes uses the phrase "portal or gateway" and sometimes uses the word "portal" or "gateway" separately to describe functionality that overlaps but differs in different embodiments, not to avoid repetition as Patent Owner contends. The specification's infrequent use of "or" between "portal" and "gateway" does not define "portal" to mean "gateway" or show that "portal" and "gateway" are used synonymously.

The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) defines "gateway" as follows:

IPR2022-00295
Patent 10,492,038 B2

> (1) "A functional unit that interconnects a local area network (LAN) with another network having different higher layer protocols";
>
> (2) "A dedicated computer that attaches to two or more networks and that routes packets from one to the other"; and
>
> (3) "In networking, a device that connects two systems that use different protocols."

IEEE 100 at 477 (Ex. 3005, 3). Additionally, the Microsoft Computer Dictionary (5th ed. 2002) defines "gateway" as follows: "A device that connects networks using different communications protocols so that information can be passed from one to the other. A gateway both transfers information and converts it to a form compatible with the protocols used by the receiving network." Microsoft Comput. Dictionary at 232 (Ex. 3006, 3). The Microsoft Internet & Networking Dictionary (2003) defines "gateway" the same way as the Microsoft Computer Dictionary. Microsoft Inter. & Networking Dictionary at 98 (Ex. 3007, 3).

Consistent with those definitions of "gateway," Patent Owner contends and Dr. Rouskas testifies that a "gateway connects distinct networks." Resp. 22; Ex. 2005 ¶ 73. Inconsistent with those definitions of "gateway," however, the '038 patent's specification describes a "portal" as performing other functions. *See, e.g.*, Ex. 1001, 4:48–50, 5:5–6, 5:10–12, 5:29–30, 5:64–6:9, 6:33–55.

As an example, the specification explains that "a portal provides a number of intelligent communication modes (ICM) for the user to select" and "the portal can be used to control the selection and setting of different intelligent communication modes for the user." *Id.* at 4:48–50, 6:4–6, Fig. 1. As another example, the specification explains that "a portal also holds the

user's electronic calendar." *Id.* at 5:64–65. As yet another example, the specification explains that "the portal can dynamically change the access priorities of a caller trying to reach the user." *Id.* at 5:5–6. Patent Owner does not contend that a "gateway" performs these "portal" functions. *See, e.g.*, Resp. 14–28; Sur-reply 6–16.

As noted above, Patent Owner asserts that Dr. Rouskas provides "unrebutted" testimony that the '038 patent's specification uses "portal" and "gateway" synonymously because the word "or" sometimes appears between "portal" and "gateway" in the specification. Sur-reply 5–6 (citing Ex. 1043, 90:4–9, 91:10–15); *see supra* § II. Although expert testimony "may be useful," e.g., to "provide background on the technology at issue" or "explain how an invention works," expert testimony "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1318–19. Here, in the context of the intrinsic evidence, e.g., the specification, Dr. Rouskas's testimony seeks to contradict the specification's infrequent use of "or" between "portal" and "gateway" compared to the many places where "portal" and "gateway" appear separately to describe functionality that overlaps but differs in different embodiments. *See* Ex. 1001, 4:20–7:17, code (57); Ex. 1043, 88:5–91:15.

Moreover, Dr. Almeroth's testimony refutes Dr. Rouskas's testimony. *See* Ex. 1003 ¶¶ 34, 41, 82–91, 116, 242, 398. Specifically, Dr. Almeroth testifies that he considered the '038 patent's claims, specification, and prosecution history. *Id.* ¶¶ 34, 82–91. He understands that "claims in an IPR are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in view of the specification and prosecution history,

unless those sources show an intent to depart from such meaning." *Id.* ¶ 41. He also testifies that a person of ordinary skill in the art would have understood that a "network-based portal" encompasses "a user interface . . . connecting clients devices to a network." *Id.* ¶ 398; *see id.* ¶¶ 116, 242.

Regarding a "gateway" and a "networked server," the '038 patent's specification describes a "gateway computer" as one type of "networked server" when discussing text-to-speech conversion as follows:

> While text-to-speech conversion, particularly if high quality is desired, requires substantial processing capabilities, mobile electronic devices, such as mobile communication devices, given their small form factor and price competition, tend to have limited processing capability. Accordingly, in one embodiment, text-to-speech conversion can be off-loaded from the mobile device. For example, a remote server computer can be provided the text message and produce the resulting audio message, and then supply the audio message to the mobile device. The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless electronic device, such as a mobile telephone.

Ex. 1001, 16:5–19. Hence, contrary to Patent Owner's contention, the specification does not define "gateway" to mean "networked server" or use "gateway" and "networked server" as synonyms. *See* Resp. 17.

The '038 patent's specification also explains that "[t]he portal allows worldwide access to the user." Ex. 1001, 4:52–53. As discussed above, Patent Owner asserts that a "portal" or "network-based portal" must allow "worldwide access" to a user. Resp. 18–19 (quoting Ex. 1001, 4:52–53); Sur-reply 9; *supra* § II. With that assertion, however, Patent Owner wrongly seeks to read a limitation from the specification into the claims. *See* Resp. 18–19; Sur-reply 9; *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

IPR2022-00295
Patent 10,492,038 B2

In any event, a user interface in a client device that connects the client device to a network such as the Internet allows "worldwide access" to a user. *See* Ex. 1043, 110:20–24, 114:2–5.

As for the undated or 2022 definitions of "portal" that the parties cite, no party provides evidence that any of those definitions applied at the time of the invention. *See* Resp. 16–17; Reply 10; Ex. 1041, 1–5; Ex. 1042, 1–5; Ex. 2005 ¶ 64. The issue here involves determining the meaning of "network-based portal" to "a person of ordinary skill in the art at the time of the invention." *See Power Integrations*, 904 F.3d at 971. Hence, the definitions of "portal" that the parties cite provide little, if any, help in resolving that issue.

As for the '038 patent's prosecution history, neither party cites the prosecution history when addressing the meaning of "network-based portal." *See* Pet. 38–39; Resp. 14–28; Reply 9–16; Sur-reply 6–16. I have reviewed the prosecution history and consider it unhelpful in determining the meaning of "network-based portal."

During prosecution, the Examiner did not reject any claim based on any prior art. *See, e.g.*, Ex. 1002, 99–107, 164–71, 242–50, 278–81, 337–44, 424–27, 517–27, 682–90. In an Examiner-initiated interview early during prosecution, the Examiner discussed an obviousness-type double-patenting rejection based on a related application and a related patent. *Id.* at 106. In response, the applicant "agreed to submit a terminal disclaimer to obviate the rejection." *Id.* After the applicant submitted a terminal disclaimer, the Examiner allowed the claims based on the terminal disclaimer and the "history of rejection" of ancestor applications and patents. *Id.* at 96, 104, 169, 247, 280, 342, 426, 525, 688.

IPR2022-00295
Patent 10,492,038 B2

After analyzing the intrinsic evidence and the extrinsic evidence, and for the reasons discussed above, I agree with Petitioner that a "network-based portal" encompasses "a user interface that connects clients to a network."

IPR2022-00295
Patent 10,492,038 B2

PETITIONER:

W. Todd Baker
Yimeng Dou
KIRKLAND & ELLIS LLP
todd.baker@kirkland.com
yimeng.dou@kirkland.com


PATENT OWNER:

Stephen R. Risley
Cortney S. Alexander
KENT & RISLEY LLC
steverisley@kentrisley.com
cortneyalexander@kentrisley.com



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

September 30, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *10,142,810*
ISSUE DATE: *November 27, 2018*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

Epic Games Ex. 1001
Page 1



US010142810B2

(12) **United States Patent**
Cheung et al.

(54) **METHOD AND APPARATUS TO MANAGE DIFFERENT OPTIONS OF COMMUNICATION USING ONE USER IDENTIFIER BASED ON INTERNET PROTOCOL**

(71) Applicant: **IpVenture, Inc.**, Los Altos, CA (US)

(72) Inventors: **Kwok Wai Cheung**, Tai Po (HK); **Peter P. Tong**, Mountain View, CA (US); **C. Douglass Thomas**, Saratoga, CA (US)

(73) Assignee: **IpVenture, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/469,440**

(22) Filed: **Mar. 24, 2017**

(65) **Prior Publication Data**

US 2017/0201872 A1     Jul. 13, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/922,344, filed on Oct. 26, 2015, now Pat. No. 9,736,664, which is a
(Continued)

(51) **Int. Cl.**
**H04M 3/42**          (2006.01)
**H04W 4/14**          (2009.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. **H04W 4/14** (2013.01); **G06Q 10/10** (2013.01); **H04M 3/436** (2013.01);
(Continued)

---

(10) **Patent No.:     US 10,142,810 B2**
(45) **Date of Patent:         *Nov. 27, 2018**

(58) **Field of Classification Search**
CPC ............... H04W 76/02; H04W 88/184; H04M 1/72552; H04M 3/42059
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,425,516 A | 6/1995 | Daines |
| 5,548,636 A | 8/1996 | Bannister et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1453981 | 11/2003 |
| WO | WO 01/45343 A2 | 6/2001 |

OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 12/798,995 dated Sep. 29, 2011.
(Continued)

*Primary Examiner* — Kiet M Doan

(57) **ABSTRACT**

Computer-implemented systems and methods to manage electronic communications are disclosed. In one embodiment, an apparatus, using at least a network-based portal based on Internet protocol, receives a message with a user identifier from a person's wireless device; receives a communication option from the person based on options provided to the person, with all the options using the user identifier, in view of the portal being based on the Internet protocol; permits the user to block the person from accessing the user; enables the message to be received by the user if the person is not blocked by the user; and determines user availability to receive the message. In the embodiment, the apparatus requires user contact information for the user to receive messages, with the user contact information not provided to the person, and with the user contact information being distinct from the user identifier.

**20 Claims, 9 Drawing Sheets**



Epic Games Ex. 1001
Page 2

**US 10,142,810 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 14/272,632, filed on May 8, 2014, now Pat. No. 9,204,268, which is a continuation of application No. 12/798,995, filed on Apr. 14, 2010, now Pat. No. 8,744,407, which is a continuation of application No. 11/452,115, filed on Jun. 12, 2006, now Pat. No. 7,759,688, which is a continuation-in-part of application No. 11/006,343, filed on Dec. 7, 2004, now Pat. No. 7,116,976.

(60) Provisional application No. 60/527,565, filed on Dec. 8, 2003, provisional application No. 60/689,686, filed on Jan. 10, 2005.

(51) **Int. Cl.**

| | |
|---|---|
| *G06Q 10/10* | (2012.01) |
| *H04M 3/436* | (2006.01) |
| *H04W 4/16* | (2009.01) |
| *H04W 4/12* | (2009.01) |

(52) **U.S. Cl.**
CPC ........... *H04M 3/4365* (2013.01); *H04W 4/12* (2013.01); *H04W 4/16* (2013.01); *H04M 2201/60* (2013.01); *H04M 2203/2011* (2013.01); *H04M 2203/651* (2013.01); *H04M 2207/18* (2013.01)

(58) **Field of Classification Search**
USPC ... 455/466, 456.1, 414.1, 557, 426.1, 435.1, 455/424, 455, 423, 39, 417; 379/88.04, 379/268, 88.25, 210.01; 340/7.22, 7.42; 709/206, 247; 704/235
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,610,970 A * | 3/1997 | Fuller | ................. H04M 1/006 379/207.03 |
| 5,752,191 A * | 5/1998 | Fuller | ................. H04M 1/006 455/445 |
| 5,758,079 A | 5/1998 | Ludwig et al. | |
| 5,828,731 A | 10/1998 | Szlam et al. | |
| 5,930,700 A * | 7/1999 | Pepper | ................. H04M 1/663 379/211.02 |
| 5,970,388 A | 10/1999 | Will | |
| 6,119,022 A | 9/2000 | Osborn et al. | |
| 6,327,628 B1 | 12/2001 | Anuff et al. | |
| 6,359,982 B1 | 3/2002 | Szlam et al. | |
| 6,463,462 B1 | 10/2002 | Smith et al. | |
| 6,577,859 B1 | 6/2003 | Zahavi et al. | |
| 6,636,888 B1 | 10/2003 | Bookspan et al. | |
| 6,665,534 B1 | 12/2003 | Conklin et al. | |
| 6,788,766 B2 | 9/2004 | Logan | |
| 6,801,793 B1 | 10/2004 | Aarnio et al. | |
| 6,816,578 B1 | 11/2004 | Kredo et al. | |
| 6,819,757 B1 | 11/2004 | Cook et al. | |
| 6,819,945 B1 | 11/2004 | Chow et al. | |
| 6,978,136 B2 | 12/2005 | Jenniges et al. | |
| 7,010,288 B2 | 3/2006 | Brown et al. | |
| 7,010,332 B1 | 3/2006 | Irvin et al. | |
| 7,027,842 B2 | 4/2006 | Zhang et al. | |
| 7,043,261 B2 | 5/2006 | Krishnan | |
| 7,072,452 B1 | 7/2006 | Roberts et al. | |
| 7,085,253 B2 | 8/2006 | Yang | |
| 7,107,010 B2 | 9/2006 | Heinonen et al. | |
| 7,110,963 B2 | 9/2006 | Negreiro | |
| 7,111,044 B2 | 9/2006 | Lee | |
| 7,116,976 B2 | 10/2006 | Thomas et al. | |
| 7,188,073 B1 | 3/2007 | Tam et al. | |
| 7,224,775 B1 | 5/2007 | Shaffer et al. | |
| 7,317,706 B1 * | 1/2008 | Hao | ................. H04W 72/1242 370/329 |
| 7,346,630 B2 * | 3/2008 | Eichstaedt | ............... G06F 9/542 |
| 7,376,434 B2 | 5/2008 | Thomas et al. | |
| 7,403,972 B1 | 7/2008 | Lau et al. | |
| 7,729,688 B2 | 6/2010 | Cheung et al. | |
| 7,792,552 B2 | 9/2010 | Thomas et al. | |
| 7,890,128 B1 | 2/2011 | Thomas et al. | |
| 8,112,104 B1 | 2/2012 | Thomas et al. | |
| 8,280,419 B1 | 10/2012 | Thomas et al. | |
| 8,391,459 B2 | 3/2013 | Jackson et al. | |
| 8,429,231 B2 | 4/2013 | Wu et al. | |
| 8,737,978 B1 | 5/2014 | Thomas et al. | |
| 9,204,268 B2 | 12/2015 | Cheung et al. | |
| 2001/0011014 A1 | 8/2001 | Higuchi et al. | |
| 2001/0014611 A1 | 8/2001 | Dufort | |
| 2001/0028709 A1 | 10/2001 | Makela et al. | |
| 2001/0031633 A1 | 10/2001 | Tuomela et al. | |
| 2002/0067806 A1 | 6/2002 | Rodriguez et al. | |
| 2002/0073207 A1 | 6/2002 | Widger et al. | |
| 2002/0094067 A1 | 7/2002 | August | |
| 2002/0142756 A1 | 10/2002 | Rutledge et al. | |
| 2003/0039339 A1 | 2/2003 | Luehrig et al. | |
| 2003/0041048 A1 | 2/2003 | Balasuriya | |
| 2003/0065779 A1 | 4/2003 | Malik | |
| 2003/0103600 A1 | 6/2003 | Potter | |
| 2003/0105854 A1 | 6/2003 | Thorsteinsson et al. | |
| 2003/0112948 A1 | 6/2003 | Brown et al. | |
| 2003/0129968 A1 | 7/2003 | Earl | |
| 2003/0191676 A1 | 10/2003 | Templeton | |
| 2003/0191814 A1 | 10/2003 | Tran | |
| 2003/0232629 A1 | 12/2003 | Jang et al. | |
| 2004/0024882 A1 | 2/2004 | Austin et al. | |
| 2004/0072585 A1 | 4/2004 | Le et al. | |
| 2004/0122979 A1 | 6/2004 | Kirkland | |
| 2004/0203919 A1 | 10/2004 | Ross et al. | |
| 2004/0240650 A1 | 12/2004 | Bear et al. | |
| 2004/0248596 A1 * | 12/2004 | Panchal | ................. H04W 4/06 455/466 |
| 2005/0020288 A1 | 1/2005 | Davis | |
| 2005/0027385 A1 | 2/2005 | Yuch | |
| 2005/0037785 A1 | 2/2005 | Chen | |
| 2005/0038690 A1 | 2/2005 | Hayes-Roth | |
| 2005/0071253 A1 | 3/2005 | Yang | |
| 2005/0107130 A1 | 5/2005 | Peterson, II | |
| 2005/0136955 A1 | 6/2005 | Mumick et al. | |
| 2005/0191994 A1 | 9/2005 | May et al. | |
| 2005/0192061 A1 | 9/2005 | May et al. | |
| 2005/0273327 A1 | 12/2005 | Krishnan | |
| 2006/0003803 A1 | 1/2006 | Thomas et al. | |
| 2006/0075038 A1 | 4/2006 | Mason et al. | |
| 2006/0239419 A1 | 10/2006 | Joseph et al. | |
| 2006/0259565 A1 | 11/2006 | Cheung et al. | |
| 2006/0276210 A1 | 12/2006 | Thomas et al. | |
| 2006/0288099 A1 | 12/2006 | Jefferson et al. | |
| 2007/0005368 A1 | 1/2007 | Chutorash et al. | |
| 2007/0047522 A1 | 3/2007 | Jefferson et al. | |
| 2007/0238474 A1 | 10/2007 | Ballas | |
| 2008/0261636 A1 | 10/2008 | Lau et al. | |
| 2010/0114958 A1 | 5/2010 | Korenshtein | |
| 2010/0205272 A1 | 8/2010 | Cheung et al. | |
| 2011/0151582 A1 * | 6/2011 | Basile | ................. G01N 33/585 436/501 |
| 2011/0151852 A1 | 6/2011 | Olincy et al. | |
| 2014/0242956 A1 | 8/2014 | Cheung et al. | |
| 2014/0256293 A1 | 9/2014 | Thomas et al. | |
| 2016/0044474 A1 | 2/2016 | Cheung et al. | |
| 2018/0014169 A1 | 1/2018 | Cheung et al. | |

#### OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 12/798,995 dated Jan. 3, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Oct. 3, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Oct. 30, 2013.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Feb. 20, 2014.
Office Action for U.S. Appl. No. 14/272,632, dated Jul. 27, 2015.

Epic Games Ex. 1001
Page 3

US 10,142,810 B2

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 14/272,632, dated Sep. 18, 2015.
Office Action for U.S. Appl. No. 14/922,344, dated Apr. 27, 2016.
Office Action for U.S. Appl. No. 14/922,344, dated Oct. 7, 2016.
First Office Action for CN Patent Application No. 200680027964.9, dated Mar. 26, 2010 (17 pages).
Second Office Action for CN Patent Application No. 200680027964.9, dated Oct. 25, 2010 (14 pages).
Third Office Action for CN Patent Application No. 200680027964.9, dated Apr. 8, 2011 (11 pages).
Notice of Rejection for CN Patent Application No. 200680027964.9, dated Jan. 6, 2012 (11 pgs.).
"Company Overview", http://www.fastmobile.com/company_overview.html, downloaded Nov. 5, 2003, p. 1.
"Introducing the Tellme Voice Application Network", Tellme, http://www.tellme.com/products/, downloaded Oct. 2, 2003, p. 1.
"iotum History," Lotum Corp., http://iotum.com/simplyrelevant/2006/04/03/iotum-history/, downloaded May 15, 2006, pp. 1-4.
"messaging", Vodafone Group, 2001, http:www.vodafone.co.nz/business/10.2.3_messaging.jsp, downloaded Oct. 14, 2003, pp. 1-2.
"Microsoft Windows Messenger: Go Beyond Text with Voice & Video Chats", Dell Inc., http://www.dell.com/us/en/dhs/topics/segtopic_002_xp_im.htm, downloaded Oct. 2, 2003, pp. 1-2.
"Microsoft Windows Messenger: Instantly Communicate with Family and Friends Messenger", Dell Inc., http://www.dell.com/us/en/dhs/topics/segtopic_001_xp_im.htm, downloaded Oct. 2, 2003, pp. 1-3.
"Our Solution," Lotum Corp., http://www.iotum.com/our_solution.php, downloaded May 15, 2006, pp. 1-2.
Short Message Service/Interactive Voice Response (SMS/IVR), Lucent Technologies, 2003, pp. 1-2.
"text messaging", Vodafone Group, 2001, Vodafone—Services, "All about text messaging", http://www.vodafone.co.nz/services/07.a.1_two_way_messaging.jsp?hd=4yourbusiness& . . . , downloaded Oct. 14, 2003, pp. 1-2.
"We bring relevance to communications," Cnet News, Ina Fried, Jul. 21, 2005, pp. 1-2.
Appenzeller, et al., "The Mobile People Architecture", Technical Report: CSL-TR-00000, Computer Systems Laboratory, Departments of Electrical Engineering and Computer Science, Stanford University, Jan. 1999, pp. 1-13.
BlackBerry, "Voice and SMS", http://www.blackberry.com/products/service/voices_sms.shtml?DCPID=hmsvoice downloaded Oct. 2, 2003, p. 1.
Calsyn, Martin and Desseault, Lisa, "Presence Information Protocol Requirements," Internet Draft, Feb. 9, 1998, pp. 1-27.
Emergin Inc., "Emergin WirelessOffice 5.0", http://www.emergin.com/?source=overture, downloaded Oct. 2, 2003, p. 1.
fastmobile Inc., "Dialog GSM launches Push 'n' Talk walkie talkie service Push to Talk over Cellular Now in Sri Lanka Dialog GSM Pioneers Latest GSM Advancement", Press Release, Dec. 1, 2004, pp. 1-2.
fastmobile, "fastmobile's fastchat™ Instant Communications Application is Coming to Thousands of Mobile Phone Retail Stores Nationwide", fastmobile Press Release, Sep. 15, 2003, pp. 1-3.

IMBOT, Press Release, "IMBOT offers new Text 2 Voice Service Text 2 Voice service enables wireless customers to send voice messages from 2-Way devices", Oct. 29, 2001, pp. 1-2.
Internet Traveler, "Welcome to the Inter.Net Communicator Tour!", http://www.inter.net/traveler/tour/communicator_messaging.php, downloaded Oct. 14, 2003, p. 1.
J. Rosenberg, H. Schulzrinne, Internet Draft, "SIP for Presence," http://www.alternic.org/drafts/drafts-r-s/draft-rosenberg-sip-pip-00.txt, Nov. 13, 1998, Bell Laboratories, Columbia, pp. 1-31.
Joseph, Anthony D. et al., "The Case for Services over Cascaded Networks", EECS Department, CS Division, University of California, Berkeley, http://iceberg.cs.berkeley.edu/, International Conference on Wireless and Mobile Multimedia 1998, pp. 1-9.
MobileShop, "SMS—also know as text messaging", http://www.mobileshop.org/howitworks.sms.htm, downloaded Oct. 14, 2003, pp. 1-2.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf-simple-rpid-06.txt, Jun. 2, 2005, http://www1.ietf.org/mail-archive/web/simple/current/msg05398.html, downloaded Nov. 15, 2006, pp. 1-35.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf-simple-rpid-10.txt, Dec. 20, 2005, pp. 1-41.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf-simple-rpid-10.txt, Dec. 4, 2005, pp. 1-35.
Sonim Technologies, Inc., "Integrated voice and text messaging over GPRS showcased jointly by Sonim, Symbian and Texas Instruments", Sonim Press Release, Dec. 2, 2002, pp. 1-2.
Symbian Ltd., "Symbian OS Version 7.0: Functional description", Revision 1.5, Feb. 2003, pp. 1-24.
Symbian Ltd., "Symbian OS Version 7.0s: Functional description", Revision 2.1, Jun. 2003, pp. 1-29.
Symbian Ltd., "Technology: Creating Symbian OS phones", http://www.symbian.com/technology/create-symb-OS-phones.html, downloaded Nov. 5, 2003, p. 1-8.
Symbian Ltd., "Technology: Why is a different operating system needed", http://www.symbian.com/technology/why-diff-os.html, downloaded Nov. 5, 2003, pp. 1-5.
Verizon Wireless, "TXT messaging", http://www.vtext.com/customer_site/jsp/messaging_lo.jsp, downloaded Oct. 2, 2003, p. 1.
W3C, Voice Extensible Markup Language (VoiceXML) Version 2.0, W3C, www.w3.org, Feb. 20, 2003.
Yahoo!Messenger, "Yahoo!Messenger Talk for Free!", http://messenger.yahoo.com/messenger/help/voicechat.html, downloaded Oct. 2, 2003, pp. 1-2.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated May 9, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Jul. 16, 2013.
Notice of Allowance for U.S. Appl. No. 14/922,344, dated Feb. 14, 2017.
Notice of Allowance for U.S. Appl. No. 14/922,344, dated Mar. 6, 2017.
Notice of Allowance for U.S. Appl. No. 15/704,181, dated Apr. 27, 2018.
Notice of Allowance for U.S. Appl. No. 15/704,181, dated Aug. 22, 2018.

* cited by examiner

Epic Games Ex. 1001
Page 4

| ICM | | Default |
|---|---|---|
| 1 | Mobile phone | Voice mail |
| 2 | Office phone | Voice mail |
| 3 | Home phone | Voice mail |
| 4 | Mobile SMS/pager from mobile phone or PDA | Email |
| 5 | Home/office SMS (to office/home PC) | Email |
| 6 | Mobile Online chat (to mobile phone or PDA) | Voice mail |
| 7 | Home Online chat (Net Meeting, AOL, ICQ etc.) | Voice mail |
| 8 | Voice mail with instant notification to mobile devices of the user | |
| 9 | Voice mail without notification to mobile devices | |
| 10 | Office fax | |
| 11 | Home fax | Reject |
| 12 | Mobile Email (Blackberry etc.) | Email |
| 13 | Email | Reject |
| 14 | User defined | |

**FIGURE 1**

| ContactClass1 | Kinship family members, love ones |
|---|---|
| ContactClass2 | Relatives and friends |
| ContactClass3 | Boss and VIP |
| ContactClass4 | Colleagues |
| ContactClass5 | Subordinates |
| ContactClass6 | Business acquaintances |
| ContactClass7 | VIP Clients |
| ContactClass8 | Clients |
| ContactClass9 | Secretary |
| ContactClass10 | User defined |

**FIGURE 2**

Epic Games Ex. 1001
Page 5

| UrgClass1 | Life threatening – interrupt at any time and occasion |
|---|---|
| UrgClass2 | Urgent confirmed meeting reminder – interruption allowed |
| UrgClass3 | Urgent matter requiring immediate attention |
| UrgClass4 | Important matter requiring quick attention |
| UrgClass5 | Regular work related matter |
| UrgClass6 | Casual contact |
| UrgClass7 | Cold calls from unknown person |
| UrgClass8 | User defined |

**FIGURE 3**

| MyBusyState1 | Important meeting |
|---|---|
| MyBusyState2 | Ordinary meeting |
| MyBusyState3 | Available |
| MyBusyState4 | Sleeping |
| MyBusyState5 | Resting |
| MyBusyState6 | User defined |

**FIGURE 4**

| ContactClass | UrgClass | MyBusyState | ICM allowed |
|---|---|---|---|
| ContactClass2 | UrgClass1-3 | All | All |
| | UrgClass4-6 | MyBusyState1 | All |
| | | MyBusyState2-3 | All |
| | | MyBusyState4-5 | All |
| | UrgClass7-8 | All | ICM 13 |

**FIGURE 5**

Epic Games Ex. 1001
Page 6



FIG. 6

Epic Games Ex. 1001
Page 7



FIG. 7

Epic Games Ex. 1001
Page 8



FIG. 8

Epic Games Ex. 1001
Page 9



FIG. 9

Epic Games Ex. 1001
Page 10



FIG. 10

Epic Games Ex. 1001
Page 11



FIG. 11

Epic Games Ex. 1001
Page 12



FIG. 12

Epic Games Ex. 1001
Page 13

US 10,142,810 B2

**1**

# METHOD AND APPARATUS TO MANAGE DIFFERENT OPTIONS OF COMMUNICATION USING ONE USER IDENTIFIER BASED ON INTERNET PROTOCOL

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/922,344, filed Oct. 26, 2015, now U.S. Pat. No. 9,736,664, which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 14/272,632, filed May 8, 2014, now U.S. Pat. No. 9,204,268, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 12/798,995, filed Apr. 14, 2010, now U.S. Pat. No. 8,744,407, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 11/452,115, filed Jun. 12, 2006, now U.S. Pat. No. 7,729,688, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation-in-part application of U.S. patent application Ser. No. 11/006,343, filed Dec. 7, 2004, now U.S. Pat. No. 7,116,976, and entitled "ADAPTABLE COMMUNICATION TECHNIQUES FOR ELECTRONIC DEVICES," which is hereby incorporated herein by reference, which claims priority to U.S. Provisional Patent Application No. 60/527,565, filed Dec. 8, 2003, entitled "ADAPTABLE COMMUNICATION TECHNIQUES FOR ELECTRONIC DEVICES," and which is hereby incorporated herein by reference.

This application, by way of U.S. patent application Ser. No. 11/452,115, also claims priority to U.S. Provisional Patent Application No. 60/689,686, filed Jun. 10, 2005, entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," and which is hereby incorporated herein by reference.

## BACKGROUND OF THE INVENTION

For many years, other than mails from post offices, we typically only received information from afar through telephones. However, in the past few years, ways that others can send us information have increased significantly. Just to list a few different modes of communication, we can be reached from standard desk phones, fax, cell phones, electronic mails, and instant messages. In addition, we can have more than one phone number and multiple electronic mail addresses. There are people we like to communicate with, and there are those we prefer to avoid. Managing information from all such different modes can be quite time consuming.

It should be apparent from the foregoing that there is still a need to help manage the numerous modes of communication.

## SUMMARY OF THE INVENTION

Different embodiments of a computer-implemented system and method to manage the communication of a user are disclosed. In one embodiment, an apparatus, using at least a

**2**

network-based portal based on Internet protocol, could provide a number of communication options to a first user, with all the options using an identifier associated with a second user for the second user to receive messages via an electronic device associated with the second user, the options including text messaging, voice communication, multimedia messaging, and group messaging; could receive an indication from the first user via an electronic device associated with the first user, indicating the selection of a communication option for a message for the second user; could permit the second user to block the first user from accessing the second user; and could determine availability of the second user to receive the message. In the embodiment, the apparatus could require contact information associated with the second user to allow the second user to receive messages via the network-based portal, with the contact information associated with the second user not provided to the first user via the electronic device associated with the first user, even when the message is received by the second user via the electronic device associated with the second user, and with the contact information associated with the second user being distinct from the identifier associated with the second user.

A person tries to electronically convey a message to the user. In one embodiment, the status of the user is identified; the identity of the person is identified; the urgency of the message is identified; the access priority of the person is determined based on the person's identity; and a process is set to manage the message using one or more rules, and in view of the status of the user, the access priority of the person and the urgency of the message.

Based on different embodiments, the status of the user depends on the current activity or location of the user, or the current time. The status of the user can also be defined by the user. Similarly, the access priority of the person can be defined by the user, or is set depending on the user's reaction towards a prior message from the person. Also, the urgency of the message is set by the person.

The process can depend on the mode of communication of the message. For example, the mode of communication can include a mobile phone, an office phone, a home phone, a mobile SMS, a pager from a mobile phone or PDA, a home/office SMS, mobile online chat, home online chat, a voice mail with/without instant notification, an office fax, a home fax, a mobile email, and an email.

In one embodiment, the user receives the message through a handheld device, such as a cellular phone. In another embodiment, the message is electronically conveyed based on Internet protocol through a website.

In one embodiment, though the process allows the user to receive the message, the person is not aware of the contact information of the user. For example, the person is not aware of the phone number of the cellular phone that the user used to talk to the person. This prevents the person from directly accessing the user without going through an intermediate control, such as a website. Similarly, the user does not have to be aware of the contact information of the person.

In another embodiment, the defined access priority of the person is stored at a website, allowing the website to access such information without asking for the user's permission. In one embodiment, the defined access priority is stored in a private database under the user's control.

In one embodiment, text messages could be received in an audio manner, and audio messages could be sent as text messages.

Other aspects and advantages of the present invention will become apparent from the following detailed description,

Epic Games Ex. 1001
Page 14

US 10,142,810 B2

3

which, when taken in conjunction with the accompanying drawings, illustrates by way of example the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a number of intelligent communication modes according to one embodiment of the invention.

FIG. **2** shows a number of contact classes according to one embodiment of the invention.

FIG. **3** shows a number of urgency classes according to one embodiment of the invention.

FIG. **4** shows a number of statuses of a user according to one embodiment of the invention.

FIG. **5** shows one embodiment of an example of an Access Priority Database according to one embodiment of the invention.

FIG. **6** is a communication system according to one embodiment of the invention.

FIG. **7** is a flow diagram of a personal call response process according to one embodiment of the invention.

FIG. **8** is a flow diagram of an audio message response process according to one embodiment of the invention.

FIG. **9** is a flow diagram of a text message response process according to one embodiment of the invention.

FIG. **10** is a flow diagram of an automated call response process according to one embodiment of the invention.

FIG. **11** is a flow diagram of a message presentation process according to one embodiment of the invention.

FIG. **12** is a flow diagram of a message presentation process according to one embodiment of the invention.

Same numerals in FIGS. **1-12** are assigned to similar elements in all the figures. Embodiments of the invention are discussed below with reference to FIGS. **1-12**. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

## DETAILED DESCRIPTION OF THE INVENTION

One embodiment of the invention can automatically remove unwanted communications. Certain communications are relatively easy to determine to be unwanted, such as marketing cold calls and wrong number calls. Other communications may be more difficult. They can depend not just on the sources of the communication, but also the conditions or status of the receiver (a user) of the communication. The status can be related to the user's current activity and/or location. For example, when the user is on a train going to work, the user probably does not mind chatting with his grandchild. However, if the user is having his yearly review meeting with his boss, the user probably would prefer to avoid the call from his grandchild, unless it is an emergency. Based on the embodiment, communications from sources the user wants to postpone receiving can be automatically diverted.

In one embodiment, the user can get appropriate notification on the source of the incoming communication request. The attributes of the notification can depend on the urgency of the communication and/or the status of the user.

The user may receive information from different modes of communication. For example, the user can have mobile phones, fixed lines at home or office, emails, SMS, and faxes, with their different numbers and/or addresses. One embodiment can help the user efficiently manage informa-

4

tion from the different modes. The user only has to remember one specific address from one mode of communication. Through that address, the user can receive communications from all modes of communication, independent of where the user is, or the type of hardware the user has. This allows the user to efficiently maintain his communication from the numerous modes even when he is traveling. For example, the user does not have to change phones (and the phone numbers) when he moves from areas covering 3G to areas that do not.

A number of embodiments depend on the different modes of communication converging onto the internet protocol platform. A communication gateway or a portal is formed allowing the user to receive communications from numerous sources through different modes. This, in turn, could reduce the numerous addresses the user has to remember, to one address. For example, an e-mail address for the user can serve as an access identifier for the different communication addresses from different communication modes. The access identifier can become the user's digital identity. In one embodiment, the user's other types of identification, such as the user's driver licenser number, can be the user's access identifier.

One embodiment of the invention uses an open portal based on the web. Based on the portal, the user can securely determine who can reach him at what conditions. This can be done based on a status indicator. As an example, this indicator is determined according to the status of the user, the access priorities of the person trying to reach the user (or the relationship or the lack of relationship between the user and the person), and/or the urgency of the message from the person. The status of the user can be dynamically determined, based on the current condition(s) of the user. The portal can allow the user and the person to select different options, which can be modified as desired. For example, the relationship can be preset by the user and stored in a database, while the urgency of the message can be set by the person.

Thus, in one embodiment, the portal can be used to control the selection and setting of different intelligent communication modes for the user. These intelligent communication modes allow priorities of various kinds of communication options to be set by the user. The portal allows worldwide access to the user, and can dynamically determine, for example, whether a call initiated at different time by different callers should be accepted by the user in real-time or handled by other mechanisms. From this information, communication requests can be classified, for example, into different degrees of undesirability. Some requests can be automatically blocked from the user. Others can be diverted and handled by other mechanism, such as diverting a phone call to an email or voice mail.

In one embodiment, the portal or gateway also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. The user can modify information in the database, such as assigning and/or changing the priorities of the contacts. Based on the information (or lack of information) in the database of the contact trying to access the user, and based on the status of the user, the gateway can automatically select an intelligent mode of communication for the user. This selection can be done dynamically.

In one embodiment, the portal can dynamically change the access priorities of a caller trying to reach the user. For example, previously the caller is of high priority to the user, and the user has set her access priorities accordingly. Lately, every time the caller trying to reach the user, the request was

Epic Games Ex. 1001
Page 15

US 10,142,810 B2

5

denied. After a preset number of rejections, the portal can automatically send a message to the user, asking the user if the user would like to lower the access priority of the caller. If the response is affirmative, the caller's priority is automatically reduced.

In another embodiment, the user does not have to set priorities of each contact. The system monitors every call, and provides the contact's identity to the user. Based on the user's reaction to the call (e.g. accepting or rejecting it), the system automatically sets the contact's priorities. In one embodiment, the system can then query the user for approval on the setting, and allow the user to adjust it as necessary. In another embodiment, the system can continue to modify the caller's priorities based on the user's reaction to the caller's subsequent calls.

In one embodiment, the user could keep information he believes to be sensitive local in a different database. Such information can be stored securely under the user's direct control. The portal can retrieve information from the different database when required. In another embodiment, the user can restrict or limit such retrieval process.

Additional confidentiality can be provided. In one embodiment, using phone calls as an example, the user can be aware of the identity of the caller even without being informed of the number of the caller. Similarly, the caller can reach the user without being aware of the number of the phone the user is using to receive the call. The user can keep his location and/or status confidential but still can receive the communication. This can be useful because there are situations, for example, when the user does not want to disclose his contact information but the user needs to receive services provided by the caller.

One approach to maintain such confidentiality while maintaining real-time communication is based on a system that digitally identifies the identities of the caller and the receiver. Note that the term caller is used in general. It is not just limited to phone calls, but they can be any person or entity requesting to communicate with the user, such as trying to send a message to the user. As a separate note, the caller can also be a user of different embodiments of the invention.

After determining the identities, the system can establish connections between the caller and the user in real time. Though contacts are established, the system only needs to ensure the identities of the caller and the user to each other. However, the system does not have to disclose the phone numbers, electronic addresses, physical locations and/or other attributes of the caller and the user to each other. In one embodiment, real time implies that the time required for the identification is similar to the typical time required to set up, for example, a telephone call. The system can be a portal based on the web.

In one embodiment, a portal also holds the user's electronic calendar. The calendar can be programmable, with entries set by the user. The portal can automatically and securely set appointments for the user since the portal knows the identity of the caller, and the status and schedule of the user. For example, the appointment can be for a conference call.

To illustrate, in one embodiment, a portal provides a number of intelligent communication modes (ICM) for the user to select as shown in FIG. 1. There are three columns in the table. If the communication mode selected in the second column does not work, the portal automatically defaults to the corresponding approach in the third column. For example, under ICM 1, if the mobile phone is busy, default to voice mail. Some of the selections do not have any

6

default because it may not be necessary to default. For example, under ICM 8, the incoming message goes directly to voice mail with instant notification to mobile devices of the user. The incoming message can usually go to voice mail. There is no need to default.

As a receiver of communication, the user can define a number of contact classes, as shown in FIG. 2. The user can set up a number of urgency classes, as shown in FIG. 3. The user can define a number of status in FIG. 4. Then, based on tables in FIGS. 1-4, the user can set up an Access Priority Database for different ContactClasses, as shown in FIG. 5.

As another example, the user can categorize the following contacts into the corresponding ContactClasses:

| | |
|---|---|
| Alice (Wife) | ContactClass1 |
| Peter (Close Friend) | ContactClass2 |
| Colina (Close Friend's wife) | ContactClass2 |

Peter wants to make a mobile phone call to the user. In one embodiment, Peter calls a portal. As an example, the portal can be the user's ISP. The portal first verifies the caller's identity to be Peter. This can be done, for example, by a public key challenge based on Peter having a public key digital certificate. In another example, Peter is also a registered user of the portal. Then, Peter's identity can be more readily identified or verified.

In one embodiment, after verification, a virtual address/number for the communication session is created allowing Peter to reach the user, which can be by phone. The user's phone number does not have to be disclosed to Peter. Similarly, Peter's mobile phone number does not have to be disclosed to the user. The portal can assure the user that the person calling is Peter based on an identification verification process, such as ones described above.

In establishing contact, the portal can access the user's database and determine that Peter belongs to ContactClass2. The database can, for example, be in the portal.

In another embodiment, the database is in a personal communication device of the user. The portal accesses the personal communication device to determine Peter's ContactClass.

Based on the ContactClass information, the status of the user and Peter's urgency setting, the user may receive Peter's call directly. As another example, Peter may be asked to leave a voice mail to the user, while the user is notified by a mobile short message regarding an incoming call from Peter.

As additional examples, in one embodiment, location information of the user could be determined based on GPS information from, for example, the user's cell phone.

In one embodiment, the user receives messages through a handheld device, such as a phone, and the phone has a switch. The switch can be a physical button or a software setting, such as a pull-down menu. The user could set his status dynamically by changing the physical or logical position of the switch. For example, one position can indicate that the user is very busy, and should only be interrupted by an urgent message from the user's closest contacts, such as his wife or parents. Another position can indicate that the user's status allows the user to receive any messages from anyone.

As explained above, based on an embodiment, a message is electronically conveyed by a central network server, such as a web server based on Internet protocol. A portal or gateway approach could provide general Internet access to

Epic Games Ex. 1001
Page 16

US 10,142,810 B2

7

one or more embodiments of the communication management systems so that users can configure the system behavior they desire. The portal or gateway can then facilitate download of a database or update thereto to a communication device, such as a phone.

Also, as explained above, based on an embodiment, a user could efficiently maintain his communication, and does not even have to change phones when he moves from areas covering 3G to areas that do not. These phones could be based on different communication mechanisms, such as GSM, CDMA, 3G and 4G systems. Also as explained above, the user could keep information in local databases, such as in such a phone. For example, the intelligent communication modes shown in FIG. 1 for the user to select are in the phone. The user could define the contact classes, such as the ones shown in FIG. 2; set up the urgency classes, such as the ones shown in FIG. 3; define the statuses, such as the ones shown in FIG. 4; set up the Access Priority Database, such as the one shown in FIG. 5; and categorize a number of the user's contacts into the corresponding ContactClasses, all in the phone. When a caller places a call to the phone, based on information previously set in the phone and based on the urgency class selected by the caller, the phone could automatically manage the communication. Note that the phone does not have to be a cellular phone. In one embodiment, the phone is a desk top phone.

Again as explained above, the person or the caller trying to contact the user could select different options. For example, the urgency of the message can be set by the caller. This selection is typically in the call setup phase. In one embodiment, the caller has pre-selected the urgency class before making the call. In another embodiment, if the caller has not selected the urgency class, the system could prompt the caller to input an urgency class or status before the call or message is routed to the user. In yet another embodiment, different urgency classes could be defined by the caller.

Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. In still another advantage, a user can provide feedback to a caller without answering a voice call from the caller.

Another aspect of the invention pertains to improved approaches to respond to an incoming text message. The improved approaches enable a recipient to provide a reply message to an initiator. The incoming text message can be presented to the recipient with an audio or textual presentation. Thereafter, a reply text message can be sent back to the initiator. The recipient can form the reply text message by recording a brief audio message or entering a text message. In the case in which a brief audio message is used, the audio message can be automatically converted to a text message before being transmitted to the initiator.

Further, the computer-implemented methods and systems discussed above can be used in conjunction with one or more of the various approaches discussed in U.S. patent application Ser. No. 11/006,343. For example, the automated actions or decisions (e.g., intelligent secretary, decision 204 in FIG. 2, etc.) of U.S. patent application Ser. No. 11/006,343 can be automatically made by the systems/methods described above. Still further, the various approaches discussed in U.S. patent application Ser. No. 11/006,343 can be used in conjunction with one or more the various methods/systems discussed above. For example, the systems/methods

8

described above can use the messaging approaches (e.g., audio or textual messages) described in U.S. patent application Ser. No. 11/006,343.

Different embodiments of the invention pertain to improved approaches for users of electronic devices to communicate with one another. The electronic devices have audio and/or textual output capabilities. The improved approaches can enable users to communicate in different ways depending on device configuration, user preferences, prior history, time or other criteria. In one embodiment, the communication between users is achieved by short audio or textual messages.

The electronic device can be any computing device having communication capabilities. Such computing devices can be referred to as communication devices. Examples of electronic devices include personal computers, personal digital assistants, pagers or mobile telephones.

Embodiments of the invention are discussed below with reference to FIGS. 6-12. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

FIG. 6 is a communication system 100 according to one embodiment of the invention. The communication system 100 can support different communication devices, including mobile telephones 102, computers 104 (e.g., personal computers) and/or wireless personal digital assistants (PDAs) 106. Users of the communication devices 102-106 can communicate with like or different communication devices. Each communication device 102-106 offers one or both of audio or textual communication capabilities. These communication devices 102-106 can inter-communicate with one another through a network 108. The network 108 can include one or more of voice networks and data networks. For example, one network is a data network providing a slow speed data channel for transmission of Short Message Service (SMS) messages (which are typically limited to 160 text characters) to a Short Message Service Center (SMSC) and then forwarded on to the destination. Besides short messages (e.g., SMS messages), the network 108 can also support other messaging protocols for sending and receiving enhanced messages (EMS), multimedia messages (MMS), email and fax messages. Other networks support faster data channels and voice channels, such as GPRS, UMTS, G4, GSM, CDMA and various protocols, such as UDP, TCP, WAP, P3P other protocols.

According to one embodiment of the invention, one of the communication devices 102-106 can send a short message to another of the communication devices 102-106. The short message can be text-based or audio-based. The sending communication device allows its user to create the short message as the user desires and/or as the device permits. For example, the user might interact with a keypad or keyboard to enter the short message, or the user might record audio inputs (e.g., speech) for the short message. The short message can then be sent to the receiving communication device. The sending of the short message may involve converting the short message from an audio message to a text message, or vice versa. Also, the receiving communication device can further convert the short message from audio-to-text or from text-to-audio. In any case, the short message is presented (e.g., displayed or played) to the user of the receiving communication device. The presentation can vary as the user desires or as the device permits.

One aspect of the invention pertains to improved approaches to respond to incoming voice calls. The

Epic Games Ex. 1001
Page 17

US 10,142,810 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

improved approaches enable a called party (i.e., a party being called) to provide some information to a calling party without directly engaging in a voice call with the calling party. The called party can choose not to take the voice call from the calling party. Instead, the called party can provide the calling party with some limited information. The limited information can be provided in an audio or textual format. In one embodiment, the limited information provides the calling party with feedback as to why the voice call was not taken.

FIG. 7 is a flow diagram of a personal call response process 200 according to one embodiment of the invention. The personal call response process 200 is performed by an electronic device, such as a mobile communication device (e.g., mobile telephone). The personal call response process 200 begins with a decision 202 that determines whether there is an incoming voice call. When the decision 202 determines that there is no incoming voice call, then the personal call response process 200 awaits such a call. Once the decision 202 determines that there is an incoming voice call, a decision 204 determines whether the incoming voice call is to be answered. Typically, the user of the electronic device would signal the electronic device as to whether or not to answer the incoming voice call. Alternatively, the electronic device could automatically decide whether to answer the call.

When the decision 204 determines that the user desires the incoming voice call to be answered, the incoming voice call is answered 206 and the user engages 208 in a voice call with the calling party. A decision 210 then determines whether the call has ended. When the decision 210 determines that the call has not yet ended, then the personal call response process 200 can return to repeat the block 208 while the voice call continues. Once the decision 210 determines that the voice call has ended, then the personal call response process 200 ends.

When the decision 204 determines that the user does not desire to answer the incoming voice call, a decision 212 determines whether the user desires to provide an audio message to the calling party. When the decision 212 determines that the user does desire to provide an audio message to the calling party, an audio message is obtained and sent 214 to the calling party (caller).

Alternatively, when the decision 212 determines that the user does not desire to provide an audio message, a decision 216 determines whether the user desires to provide a text message to the calling party. When the decision 216 determines that the user desires to provide a text message to the calling party, a text message is obtained and sent 218 to the calling party.

Still further, when the decision 216 determines that the user does not desire to provide a text message to the calling party, a decision 220 determines whether the incoming voice call is to be directed to voice mail. When the decision 220 determines that the incoming voice call should be directed to voice mail, then the incoming voice call is directed 222 to voice mail. On the other hand, when the decision 220 determines that the incoming voice call is not to be directed to voice mail, the incoming voice call is dropped 224. Following the blocks 214, 218, 222 and 224, the personal call response process 200 is complete and ends.

In another embodiment, a personal call response process could announce the calling party to the called party (user). In announcing the calling party, the personal call response process would present the called party with information pertaining to the calling party (e.g., display or audio sound). Such information could, for example, help the called party

to decide whether to answer the incoming voice call. The information can, for example, include one or more of name (individual or business), telephone number, or other caller identification. The information could also include status information of the calling party, such as position, health, mood, etc. As an example, the information could be presented to the user prior to the decision 204 of the personal call response process 200 shown in FIG. 7.

In still another embodiment, an automated decision process to decide whether to answer a call can be based on time (e.g., decision 204). For example, the called party can previously set a rule, such as that from midnight to 6 am, the party does not want to answer voice calls. Then, during this time period, the electronic device can automatically decide not to answer incoming calls. In one implementation, when the electronic device decides not to answer incoming calls, no indication of incoming calls will be provided to the called party. For example, from midnight to 6 am, the device would not produce any ring tone. Additionally, if desired, the called party can also configure the electronic device to automatically provide an audio message or a text message to the calling party (e.g., I'm asleep call me tomorrow").

FIG. 8 is a flow diagram of an audio message response process 300 according to one embodiment of the invention. The audio message response process 300 is, for example, suitable for use as the processing carried out by block 214 illustrated in FIG. 7.

The audio message response process 300 initially answers 302 the incoming voice call. In this operation, the incoming voice call is answered 302 but not in a traditional way. Instead, the electronic circuitry associated with a mobile communication device (e.g., mobile telephone) that receives the incoming voice call operates to answer the incoming voice call for purposes of an audio message response. For example, a voice channel is established between the calling party and the mobile communication device, but the speaker and microphone of the mobile communication device are disabled. In effect, in such an embodiment, neither the called party nor the calling party perceives that the voice calling has been answered.

Next, one or more predetermined audio messages can be presented 304 by the mobile communication device. The presentation 304 of the one or more predetermined audio messages can, for example, be achieved by audio or visual means. For example, the predetermined audio messages can be audio output to a speaker associated with the mobile communication device for the called party or can be visual output (e.g., text) to a display of the mobile communication device for the called party (e.g., user of the mobile communication device).

A decision 306 then determines whether a predetermined audio message has been selected. Here, the decision 306 determines whether the user (i.e., called party) of the mobile communication device has selected one or more of the predetermined audio messages. When the decision 306 determines that a predetermined audio message has been selected, then the selected audio message is played 308 for the calling party. Here, the mobile communication device can output the selected audio message to the calling party over the voice channel. Typically, the mobile communication device of the called party would not produce an audible output at the mobile communication device, so that the called party would not be disturbed by the sending of the audio response. The predetermined audio messages are normally short messages (e.g., not more than 160 characters)

Epic Games Ex. 1001
Page 18

US 10,142,810 B2

11                                                                        12

so that the duration of time the voice channel is needed and/or the amount of network bandwidth consumed is minimal.

On the other hand, when the decision 306 determines that none of the predetermined audio messages have been selected, then a decision 310 determines whether a custom audio message is requested. A custom audio message is an audio message that is specifically provided for the calling party. When the decision 310 determines that a custom audio message is not being requested, then the audio message response process 300 returns to repeat the decision 306 and subsequent operations. Alternatively, when the decision 310 determines that a custom audio message is requested, then a custom audio message is recorded 312. Thereafter, the custom audio message that has been recorded can be played 314 for the calling party (caller). Here, typically, the custom audio message would be output by the mobile communication device of the called party over the voice channel to the calling party. Typically, the mobile communication device of the called party would not produce an audible output at the mobile communication device, so that the called party would not be disturbed by the sending of the audio response. The custom audio messages are also normally short messages (e.g., not more than 160 characters) so that the duration of time the voice channel is needed and/or the amount of network bandwidth consumed is minimal.

Following the operations 308 and 314, the incoming voice call is closed 316. In other words, after the selected audio message or the custom audio message is played 308, 314, the incoming voice call can be closed 316. Following the block 316, the audio message response process 300 is complete and ends.

The predetermined audio messages that are presented 304 to a called party can be determined in a static or dynamic manner. A static determination would, for example, be when the called party has previously set or recorded an audio message to be utilized. Typically, with static determination, the list of audio messages remains the same (i.e., static) until changed (e.g., by the called party). A dynamic determination would allow the audio messages in the list (or the ordering of the audio messages in the list) to change without specific action by the user or the called party. For example, the list or ordering of the audio messages can depend on configuration settings, configuration information, or prior usage. Prior usage can include biasing the list of audio messages such that those messages being most often selected appear higher in the list. The list or ordering of the audio messages can also depend on the calling party, type of calling party, location of calling party or called party, and the like. The list of audio messages can be represented by text and/or graphics (e.g., icons).

The audio message response process 300 flexibly enables a user to either select one or more predetermined audio messages or provide a custom audio message to be used as an audio message response to a calling party. However, it should be recognized that, in other embodiments, an audio message response process can alternatively simply pertain to only providing a custom audio message, or only permitting selection of a predetermined audio message. Further, in still other embodiments, an audio message response process can first determine whether a custom audio message is to be provided before presenting predetermined audio messages. In yet other embodiments, an audio message response process can answer the incoming voice call later in the processing than operation 302 as shown in FIG. 8 (e.g., before operations 308 and 314).

FIG. 9 is a flow diagram of a text message response process 400 according to one embodiment of the invention. The text message response process 400 is, for example, processing performed by the block 218 illustrated in FIG. 7.

The text message response process 400 initially drops 402 the incoming voice call. Here, the information to be supplied to the calling party is a short text message; therefore, there is no need for a voice channel.

Next, one or more predetermined text messages are displayed 404. Here, the one or more predetermined text messages would normally be displayed on a display screen associated with the mobile communication device being utilized by the called party. A decision 406 then determines whether one (or more) of the predetermined text messages has been selected. When the decision 406 determines that a predetermined text message has been selected, then the selected text message is transmitted 408 to the caller (i.e., the calling party).

On the other hand, when the decision 406 determines that a predetermined text message has not been selected, then a decision 410 determines whether a custom text message is requested. When the decision 410 determines that a custom text message is not requested, then the text message response process 400 returns to repeat the decision 406 and subsequent operations. Alternatively, when the decision 410 determines that a custom text message is requested, then the custom text message is entered 412. Here, the called party interacts with the mobile communication device to enter the custom text message. Then, the custom text message is transmitted 414 to the caller. In one embodiment, the transmission 408, 414 of the text message can be performed over a communication network, such as a network having a Short Message Service Center (SMSC) supporting Short Message Service (SMS) messages. Following the transmission 408 of the selected text message or the transmission 414 of the custom text message, the text message response process 400 is complete and ends.

An alternative embodiment of a text message response process could operate to answer the incoming voice call and announce to the caller that a text message will be forthcoming. Then, the incoming voice call could be promptly dropped. This additional operation could, for example, be used with the text message response process 400 by providing an additional operation prior to the block 402 illustrated in FIG. 9.

The predetermined text messages being displayed 404 to a called party can be determined in a static or dynamic manner. A static determination would, for example, be a text message the called party has previously set or entered. Typically, with static determination, the list of text messages remains the same (i.e., static) until changed (e.g., by the called party). A dynamic determination would allow the text messages in the list (or the ordering of the text messages in the list) to change automatically, and not by the user. For example, the list or ordering of the text messages can depend on preference settings, configuration information, or prior usage. To illustrate, prior usage can include biasing the list of text messages such that those messages being most often selected appear higher in the list. The list or ordering of text messages can also depend on the calling party, type of calling party, location of calling party or called party, and the like. The list of text messages can identify each text message with text (e.g., at least a portion of the corresponding text message, or an abbreviation) and/or graphics (e.g., icons).

The text message response process 400 flexibly enables a user to either select one or more predetermined text messages or provide a custom text message to be used as a text

Epic Games Ex. 1001
Page 19

US 10,142,810 B2

13

message response to a calling party. However, it should be recognized that, in other embodiments, a text message response process can alternatively simply pertain to only providing a custom text message, or only permitting selection of a predetermined text message. Further, in still other embodiments, a text message response process can first determine whether a custom text message is to be provided before presenting predetermined text messages.

FIG. **10** is a flow diagram of an automated call response process **500** according to one embodiment of the invention. The automatic call response process **500** is substantially similar in many ways to the personal call response process **200** illustrated in FIG. **7**. However, the automated call response process **500** operates to reduce user input at the mobile communication device by making use of stored data pertaining to its hardware components, configuration or preferences. In this regard, the automatic call response process **500** includes a decision **502** that determines whether a head-set is active. When the decision **502** determines that a head-set is active, then the automatic call response process **500** can prefer, suggest or require the user to obtain and send **214** an audio message to the caller in response to an incoming voice call. Alternatively, when the decision **502** determines that a head-set is not active, then a decision **504** can determine whether a display is present. In other words, the decision **504** can determine whether the mobile communication device has a display. When the decision **504** determines that the mobile communication device does have a display, then the mobile communication device can operate to obtain and send **218** a text message to the caller. Of course, this assumes that the caller can support text messages even though they initially called with a voice call. Hence, in another embodiment, the automatic call response process can operate to query or obtain information regarding the caller's communication device capabilities.

An exemplary scenario of how the previously described automatic call response process could work according to one implementation is as follows:

1. From his mobile phone, Bill calls Tom's mobile phone.

2. Tom is alerted by his mobile phone of an incoming call. Optionally, caller information (i.e., pertaining to Bill) can be displayed or announced to Tom.

3. Tom can choose to answer the incoming call or decline to answer the call.

4. In the event that Tom declines to answer the call, Tom can have the opportunity to provide the caller with a brief audio or text message.

5. If an audio message is to be provided, then Tom can either record a personalized message or select one of a plurality of predetermined audio messages. In this case, the incoming call is answered by Tom's mobile phone and then the audio message is played for the caller, thereafter the call is dropped. The audio messages are typically brief (i.e., short), and examples of audio messages are: (i) "Will call in 10 minutes," (ii) "Cannot talk now," (iii) "I'm in a meeting," or (iv) "Please don't call anymore."

6. On the other hand, if a text message is to be provided, then Tom can either enter a personalized text message or select from a plurality of predetermined text messages. In this case, the incoming call is dropped, and the entered text message or the selected one of the predetermined text messages is sent. Examples of text messages are: (i) "Will call in 10 minutes," (ii) "Cannot talk now," (iii) "I'm in a meeting," or (iv) "Please don't call anymore." The text messages can be English (or other language) words or phrases, or can be condensed text strings (e.g., such as slang or chat language). In one embodiment, the predetermined

14

text messages presented to Tom can be dependent on some criteria (i.e., automatically selected). Alternatively, it is possible that Tom might want to edit the predetermined text message, such can be permitted. As yet another example, the text message can embed dynamic information, such as position, e.g., "I'm in [position] now, so I'll get back to you later." The position can be determined using a GPS receiver in the mobile phone or acquired by a remote computer and provided to the mobile phone. The position may also be further processed (locally or remotely) into a more user-friendly form, such as city, school, restaurant name, or street type addresses. The position could also be used above to assist the user in deciding whether to answer the incoming call or decline to answer the call.

7. If hardware components, configuration or preferences are taken into consideration, as illustrated in FIG. **10**, the above scenario can be modified. For example, if Tom is using a head-set with his mobile phone, then an audio message may be most convenient, assuming that Tom wants to provide a particular (i.e., customized) message to Bill. The head-set allows Tom to record a brief audio message. Less conveniently, the head-set can be used to present a list of predetermined audio messages and allow Tom's selection therefrom by a button or voice-command.

8. If Tom is not using a head-set, then a text message response might be more suitable. This would typically require that Tom's mobile phone have a display and a keypad. Even so, without a head-set, Tom could still record an audio message, though such would likely be less convenient.

9. Tom can also not provide an audio message or a text message and simply let the incoming call roll-over into voice mail.

The exemplary scenario can also be used in a case where the called party is using one line but the mobile device has multi-line capabilities or call waiting. In such case, the mobile phone can enable the called party to provide a brief audio or text message to the calling party as noted above. Alternatively, the mobile phone can itself automatically (i.e., without user input) respond to the calling party via an audio or text message since the mobile phone is aware that the called party is on the other line.

In this aspect of the invention, the calling party and the called party often use mobile communication devices, such as mobile phones. However, the parties can alternatively use other electronic devices, such as a PDA, a computer, etc. Further, the option to provide a text response could be prevented if the caller's device is known to not support text messages.

The advantages of the previously described embodiments are numerous. Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. In still another advantage, a user can provide feedback to a caller without answering a voice call from the caller.

Another aspect of the invention pertains to improved approaches to respond to an incoming text message. The improved approaches enable a recipient to provide a reply message to an initiator. The incoming text message can be presented to the recipient with an audio or textual presentation. Thereafter, a reply text message can be sent back to the initiator. The recipient can form the reply text message by recording a brief audio message or entering a text

Epic Games Ex. 1001
Page 20

US 10,142,810 B2

15

message. In the case in which a brief audio message is used, the audio message can be automatically converted to a text message before being transmitted to the initiator.

FIG. 11 is a flow diagram of a message presentation process 600 according to one embodiment of the invention. The message presentation process 600 is performed by an electronic device, such as a mobile communication device.

The message presentation process 600 begins with a decision 602 that determines whether an incoming text message is present. Typically, the incoming text message would be transmitted to the mobile communication device from another communication device. When the decision 602 determines that an incoming text message is not present, then the message presentation process 600 awaits such message. Once the decision 602 determines that an incoming text message has been received, a decision 604 determines whether an audio or text presentation is to be utilized. The decision 604 can be performed in a variety of different ways. For example, the determination of whether to utilize an audio or text presentation can be based on user input or can be automatically determined through a use of configuration or preference information or hardware components (e.g., display, speaker, head-set).

When the decision 604 determines that an audio presentation is to be utilized, the incoming text message is converted 606 to an audio message. For example, a text-to-speech conversion can be performed. In one embodiment, a user of the electronic device can be permitted to choose speech characteristics, such as a voice, tone, pace, accent, or mood, for the resulting speech. For example, a user could choose speech characteristics by preference settings. In another embodiment, the incoming text message can include or reference speech characteristics so that the initiator can control or influence speech characteristics. In still another embodiment, if the text to be converted contains condensed text (e.g., such as slang or chat language), the resulting speech can pertain to an uncondensed form of the text. The ability to convert from condensed text to resulting speech for uncondensed text can be facilitated by pattern matching. For example, in chat language "LOL" can be converted to an audio message for "lots of love." In one implementation, a table can store audio messages corresponding to chat terms or phrases. In another implementation, a first table would store uncompressed terms or phrases corresponding to chat terms or phrases, and a second table would store audio messages corresponding to the uncompressed terms or phrases.

After the incoming text message is converted to the audio message, the audio message is played 608. Typically, the audio message is played 608 by the mobile communication device for the user. For example, the audio message can be output to a speaker of the mobile communication device or a headset used therewith. As a result, the user of the mobile wireless communication device receives an audio message even though the incoming message was a text message.

On the other hand, when the decision 604 determines that a text presentation is to be utilized, the incoming text message is displayed 610. Here, the incoming text message would be displayed 610 on a display associated with the mobile communication device. Following the blocks 608 and 610, the message presentation process 600 ends.

As discussed above, text-to-speech conversion can be invoked and performed on an electronic device, which may be a mobile communication device. While text-to-speech conversion, particularly if high quality is desired, requires substantial processing capabilities, mobile electronic devices, such as mobile communication devices, given their

16

small form factor and price competition, tend to have limited processing capability. Accordingly, in one embodiment, text-to-speech conversion can be off-loaded from the mobile device. For example, a remote server computer can be provided the text message and produce the resulting audio message, and then supply the audio message to the mobile device. The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless electronic device, such as a mobile telephone.

FIG. 12 is a flow diagram of a reply message process 700 according to one embodiment of the invention. The reply message process 700 is performed by an electronic device, such as a mobile communication device.

The reply message process 700 begins with a decision 702 that determines whether a reply message is to be sent. Typically, the reply message process 700 follows the presentation of an incoming text message to a user of a mobile communication device. Hence, the reply message to be sent is a reply to the incoming text message. However, in other embodiments, the reply message to be sent can be merely an initial message as opposed to a response to an earlier message.

In any case, when the decision 702 determines that a reply message is not to be sent, then the reply message process 700 ends or simply awaits the need to send a reply message. On the other hand, when the decision 702 determines that a reply message is to be sent, then a decision 704 determines whether an audio or text message is to be formed. The decision 704 can be performed in a variety of different ways. For example, the determination of whether to send an audio or text message can be based on user input or can be automatically determined through a use of configuration or preference information or hardware components (e.g., display, speaker, head-set).

When the decision 704 determines that an audio message is to be formed, then the reply message process 700 prompts 706 for an audio message. Here, the prompt 706 can be directed to the user of the mobile communication device. The prompt can be an audio or textual indication. Next, a decision 708 determines whether an audio message has been recorded. When the decision 708 determines that the audio message has not been recorded, then the reply message process 700 awaits the audio message. Once the decision 708 determines that the audio message has been recorded, then the audio message is converted 710 to a text message. In one embodiment, if the audio message recorded is greater than a maximum text message size (e.g., 150 or 160 characters), then the audio message can be shortened so that the resulting text message does not exceed the maximum text message size. One way to shorten the text message is to use abbreviations. For example, the words "For example" can be changed to "e.g.". Such conversion can be again be performed by matching entries in tables. Another way to shorten is to remove non-essential text. Still another way to shorten is to clip off or truncate the text message at the maximum text message size. In another embodiment, the resulting text message might provide an indication that it was converted from an audio message. Following the block 710, the text message is transmitted 712 over a wireless network.

Alternatively, when the decision 704 determines that a text message is to be formed, then a text entry screen is displayed 714. Next, a decision 716 determines whether a text message has been entered. When the decision 716 determines that a text message has not yet been entered, then the reply message process 700 awaits entry of the text

Epic Games Ex. 1001
Page 21

US 10,142,810 B2

**17**

message. Once the text message has been entered, the text message is transmitted 712 over the wireless network. Following the block 712, the reply message process 700 ends.

Although the reply message process 700 provides for the user to enter a custom text or audio message, it should be understood that the reply message can alternatively be formed through use of semi-custom or predetermined reply messages from which the user of the mobile communication device can choose. The use of semi-custom or predetermined reply messages can be achieved as noted above in a number of embodiments, and can serve to simplify the conversion process.

An exemplary scenario of how message presentation and reply message processes could work according to one implementation of the second aspect is as follows:

1. From his mobile phone, Bill prepares and sends a text message to Tom's mobile phone.

2. Tom is alerted by his mobile phone of an incoming text message, such as by displaying at least a portion of the text message and/or otherwise notifying Tom of the text message.

3. Tom's mobile phone can decide whether to present the text message on a display screen of Tom's mobile phone, or to first convert the text message to an audio message and then present the audio message to Tom (e.g., play the audio message). Of course, Tom can interact with Tom's mobile phone to assist in making the determination on how to present the message.

4. Thereafter, if desired, Tom can prepare and send a reply message back to Bill. This reply message can be prepared initially as a text message or an audio message. Tom's mobile phone and/or Tom can determine whether the reply message is initially prepared as a text message or as an audio message. If an audio message is initially created, such audio message must be converted to a text message prior to transmission. Eventually, the reply message is sent to Bill as a text message. Tom's mobile phone can assist with the creation of the reply message through use of custom, semi-custom or predetermined reply message from which Tom and/or Tom's mobile phone can choose.

5. If Tom is using a head-set with his mobile phone, then an audio message may be more convenient, assuming that Tom wants to provide a particular (i.e., customized) message to Bill. The head-set allows Tom to easily record a brief audio message. Less conveniently, the head-set can be used to present a list of predetermined audio messages and allow Tom's selection therefrom by a button or voice-command.

6. If Tom is not using a head-set, then a text message response might be more suitable. This would typically require that Tom's mobile phone have a display and a keypad. Even so, without a head-set, Tom could still record an audio message, though such would likely be less convenient.

7. Tom can also not provide a reply message and simply not respond to the incoming text message. Alternatively, Tom can configure his mobile phone to automatically produce and send a reply message based on user settings or preferences, position, configuration, status, etc.

In this aspect of the invention, the calling party and the called party often use mobile communication devices, such as mobile phones. However, the parties can alternatively use other electronic devices, such as a PDA, a computer, etc.

The advantages of the invention exemplified by FIGS. 11-12 are numerous. Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be

**18**

flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. Still another advantage is that conversion of an audio message to a text message facilitates use a low cost network (such as the SMS network). Another advantage is reduced network bandwidth load. Yet still another advantage is that the sender can get back a message in the same format as they sent the original message, though the recipient may use the message in a different format or mode (e.g., recipient hears the text message as an audio message).

Moreover, it should be noted that with regards to any of the embodiments in which a voice call or a text message is incoming to an electronic device, not only can the user of the mobile device take an action (e.g., button press or voice-command) to decline the call/message but also the electronic device itself can automatically decline the call/message such that the user is not disturbed. For example, an electronic device can be configured through user settings (e.g., preferences) to decline calls/messages matching certain criteria. Also, an auto reply message can be configured to be automatically sent in response to the call/message. For a known, undesired marketing caller/message sender, the electronic device can automatically send a reply message demanding the sender not to call or send messages anymore, and to remove your information from their database.

Text messages received or sent can optionally embed indications of speech characteristics to be used, should the text message be converted to an audio format. The speech characteristics can pertain to voice, tone, pace, accent, and/or mood. The speech characteristics for the resulting speech can be set in preference or configuration information, set on a per message basis by users, or set by evaluation of monitored data pertaining to the user.

Additionally, the messages being transmitted can be encrypted for security purposes.

In one embodiment, an electronic device performing communications using audio and/or text messages according to the invention can further integrate (or have tethered thereto) one or more electrical components for enhancing the hearing of the user of the electronic device. The electronic device will normally include a microphone and a speaker. The invention described herein can be considered an automated secretary for a user of an electronic device. The automated secretary can completely or partially respond to an incoming call/message so as to reduce disturbances to the user. The user can personalize the automated secretary through user settings (e.g., preferences), or the automated secretary can learn over time how to handle different incoming calls/messages. Besides handling or assisting the user with incoming calls/messages, the automated secretary can also assist with other activities, such as making calendar entries (e.g., meetings) in a calendar or responding to incoming callers/messages with relevant information pertaining to the user's schedule as maintained by the calendar (though the user could restrict such access to certain information and/or inquiring parties). For example, if an incoming text message asks "available for lunch today?", the automated secretary can check the user's availability for lunch by way of the user's calendar, then if the user is not available the automated secretary can quickly informing the inquiring party of same or propose another date. On the other hand, if the lunch time period is available in the user's calendar, then the automated secretary can either directly respond to the inquiring party of acceptance or propose a response to the user for review, modification and/or transmission.

Epic Games Ex. 1001
Page 22

US 10,142,810 B2

19

It should be obvious to those skilled in the art that a number of embodiments performing communications using voice as well as audio and/or text messages can be implemented using voice over Internet Protocol technologies, with signals delivered over the Web. For example, a calling party's communication or mobile device can include an adapter to convert voice signals to data packets before sending them over the Internet. A service provider can convert the packets back into voice signals before sending the voice signals to the called party's communication device. Similarly, embodiments can be implemented using voice over wireless protocols, such as Wi-Fi or Wi-Max networks. Using such technologies, computing devices can become communication devices.

The various embodiments, implementations, features and aspects of the invention noted above can be combined in various ways or used separately. Those skilled in the art will understand from the description that the invention can be equally applied to or used in other different settings with respect to various combinations, embodiments, implementations or features provided in the description herein.

The invention can be implemented in software, hardware or a combination of hardware and software. A number of embodiments of the invention can also be embodied as computer readable code on a computer readable medium. The computer readable medium is any data storage device that can store data which can thereafter be read by a computer system. Examples of the computer readable medium include read-only memory, random-access memory, CD-ROMs, magnetic tape, optical data storage devices, and carrier waves. The computer readable medium can also be distributed over network-coupled computer systems so that the computer readable code is stored and executed in a distributed fashion.

Numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will become obvious to those skilled in the art that the invention may be practiced without these specific details. The description and representation herein are the common meanings used by those experienced or skilled in the art to most effectively convey the substance of their work to others skilled in the art. In other instances, well-known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the present invention.

In the foregoing description, reference to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

The many features and advantages of the present invention are apparent from the written description and, thus, it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

20

What is claimed is:

1. A computer-implemented method for managing electronic communications using at least a network-based portal at least based on Internet protocol, the method comprising:
   providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user,
   wherein the plurality of communication options include text messaging and voice communication, and
   wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;
   receiving an indication regarding one of the plurality of communication options, via the network-based portal, from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided;
   permitting the second user to block the first user from reaching the second user via the network-based portal; and
   enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user,
   wherein the method comprises determining availability of the second user,
   wherein the method requires contact information associated with the second user to allow the second user to receive messages via the network-based portal,
   wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user, and
   wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.

2. A computer-implemented method as recited in claim 1, wherein the plurality of communication options include multimedia messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.

3. A computer-implemented method as recited in claim 1, wherein the plurality of communication options include group messaging using the one identifier associated with the

Epic Games Ex. 1001
Page 23

US 10,142,810 B2

21

second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.

**4**. A computer-implemented method as recited in claim **3**, wherein the one identifier associated with the second user includes a digital identity of the second user.

**5**. A computer-implemented method as recited in claim **4**, wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

**6**. A computer-implemented method as recited in claim **5**, wherein the electronic device associated with the second user is a wireless electronic device, and

wherein the electronic device associated with the first user is a wireless electronic device.

**7**. A computer-implemented method as recited in claim **4**, wherein the enabling the message to be received by the second user depends on a time.

**8**. A computer-implemented method as recited in claim **7**, wherein the enabling the message to be received by the second user depends on a period of time.

**9**. A computer-implemented method as recited in claim **8**, wherein the method comprises not presenting the message to the second user depending on the period of time.

**10**. A computer-implemented method as recited in claim **4**, wherein the enabling the message to be received by the second user enables leaving a voice mail.

**11**. A computing apparatus for managing electronic communications using at least a network-based portal at least based on Internet protocol, the computing apparatus comprising:

at least one computing device; and

one or more storage devices coupled to the at least one computing device, with the one or more storage devices storing instructions that, when executed, cause the computing apparatus to:

providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified by the computing apparatus at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user,

wherein the plurality of communication options include text messaging and voice communication, and

wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;

receiving an indication regarding one of the plurality of communication options, via the network-based portal, from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided;

permitting the second user to block the first user from reaching the second user via the network-based portal; and

enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one

22

identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user,

wherein the instructions, when executed, cause the computing apparatus to determine availability of the second user, and to require contact information associated with the second user to allow the second user to receive messages via the network-based portal,

wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user, and

wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.

**12**. A computing apparatus as recited in claim **11**, wherein the plurality of communication options include multimedia messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.

**13**. A computing apparatus as recited in claim **11**, wherein the plurality of communication options include group messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.

**14**. A computing apparatus as recited in claim **13**, wherein the one identifier associated with the second user includes a digital identity of the second user.

**15**. A computing apparatus as recited in claim **14**, wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

**16**. A computing apparatus as recited in claim **15**, wherein the enabling the message to be received by the second user includes not presenting the message to the second user depending on a period of time.

**17**. A computing apparatus as recited in claim **15**, wherein the electronic device associated with the second user is a wireless electronic device, and

wherein the electronic device associated with the first user is a wireless electronic device.

**18**. A computing apparatus as recited in claim **14**, wherein the enabling the message to be received enables leaving a voice mail.

**19**. A non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications using at least a network-based portal at least based on Internet protocol, said computer readable medium comprising:

computer program code for providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the

Epic Games Ex. 1001
Page 24

US 10,142,810 B2

23

network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user,

wherein the plurality of communication options include text messaging and voice communication, and

wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;

computer program code for receiving an indication regarding one of the plurality of communication options, via the network-based portal, from the electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided;

computer program code for permitting the second user to block the first user from reaching the second user via the network-based portal;

computer program code for enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user;

24

computer program code for determining availability of the second user; and

computer program code for requiring contact information associated with the second user to allow the second user to receive messages via the network-based portal,

wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user does not have to be provided to the first user through the electronic device associated with the first user,

wherein the one identifier associated with the second user is distinct from the contact information associated with the second user,

wherein the plurality of communication options include multimedia messaging and group messaging, all of which using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol,

wherein the one identifier associated with the second user includes a digital identity of the second user, and

wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

20. A non-transitory computer readable medium as recited in claim **19**,

wherein the electronic device associated with the second user is a wireless electronic device, and

wherein the electronic device associated with the first user is a wireless electronic device.

* * * * *

Epic Games Ex. 1001
Page 25



U 8162580

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**

**United States Patent and Trademark Office**

September 30, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

**U.S. PATENT:** *10,708,727*
**ISSUE DATE:** *July 07, 2020*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

**SYLVIA HOLLEY**
Certifying Officer

Epic Games Ex. 1001
Page 1



US010708727B2

(12) **United States Patent**
Cheung et al.

(10) Patent No.: **US 10,708,727 B2**
(45) Date of Patent: **\*Jul. 7, 2020**

(54) **METHOD AND APPARATUS TO MANAGE MESSAGING PROVIDING DIFFERENT COMMUNICATION MODES USING ONE IDENTIFIER AND NOT REQUIRING TO DISCLOSE CONTACT INFORMATION**

(71) Applicant: **IpVenture, Inc.**, San Jose, CA (US)

(72) Inventors: **Kwok Wai Cheung**, Tai Po (HK); **Peter P. Tong**, Mountain View, CA (US); **C. Douglass Thomas**, Saratoga, CA (US)

(73) Assignee: **IpVenture, Inc.**, San Jose, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/556,205**

(22) Filed: **Aug. 29, 2019**

(65) **Prior Publication Data**

US 2019/0387371 A1    Dec. 19, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/704,181, filed on Sep. 14, 2017, now Pat. No. 10,492,038, which is a (Continued)

(51) **Int. Cl.**
| *H04W 4/14* | (2009.01) |
| *G06Q 10/10* | (2012.01) |
| *H04M 3/436* | (2006.01) |
| *H04W 4/16* | (2009.01) |
| *H04W 4/12* | (2009.01) |

(52) **U.S. Cl.**
CPC .............. *H04W 4/14* (2013.01); *G06Q 10/10* (2013.01); *H04M 3/436* (2013.01); *H04M*

*3/4365* (2013.01); *H04W 4/12* (2013.01); *H04W 4/16* (2013.01); *H04M 2201/60* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ............................ H04M 1/2473; H04L 51/32
USPC .......... 455/435.3, 446, 512, 432.1, 411, 518, 455/520
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,425,516 A | 6/1995 | Daines |
| 5,548,636 A | 8/1996 | Bannister et al. |
| (Continued) | | |

FOREIGN PATENT DOCUMENTS

| CN | 1453981 | 11/2003 |
| WO | WO 01/45343 A2 | 6/2001 |

OTHER PUBLICATIONS

Office Action for U.S. Appl. No. 12/798,995, dated Apr. 11, 2011.
(Continued)

*Primary Examiner* — Kiet M Doan

(57) **ABSTRACT**

A computer-implemented system and method to manage the communication of a user are disclosed. In one embodiment, when a person tries to electronically convey a message to the user, the status of the user, the identity of the person, and the urgency of the message can be identified. The access priority of the person can be determined based on the person's identity. Then, the message can be managed using one or more rules and in view of the status of the user, the access priority of the person and the urgency of the message.

**17 Claims, 9 Drawing Sheets**

| ICM | | Default |
|---|---|---|
| 1 | Mobile phone | Voice mail |
| 2 | Office phone | Voice mail |
| 3 | Home phone | Voice mail |
| 4 | Mobile SMS/pager from mobile phone or PDA | Email |
| 5 | Home/office SMS (to office/home PC) | Email |
| 6 | Mobile Online chat (to mobile phone or PDA) | Voice mail |
| 7 | Home Online chat (Net Meeting, AOL, ICQ etc.) | Voice mail |
| 8 | Voice mail with instant notification to mobile devices of the user | |
| 9 | Voice mail without notification to mobile devices | |
| 10 | Office fax | |
| 11 | Home fax | Reject |
| 12 | Mobile Email (Blackberry etc.) | Email |
| 13 | Email | Reject |
| 14 | User defined | |

Epic Games Ex. 1001
Page 2

**US 10,708,727 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 15/469,440, filed on Mar. 24, 2017, now Pat. No. 10,142,810, which is a continuation of application No. 14/922,344, filed on Oct. 26, 2015, now Pat. No. 9,736,664, which is a continuation of application No. 14/272,632, filed on May 8, 2014, now Pat. No. 9,204,268, which is a continuation of application No. 12/798,995, filed on Apr. 14, 2010, now Pat. No. 8,744,407, which is a continuation of application No. 11/452,115, filed on Jun. 12, 2006, now Pat. No. 7,729,688, which is a continuation-in-part of application No. 11/006,343, filed on Dec. 7, 2004, now Pat. No. 7,116,976.

(60) Provisional application No. 60/527,565, filed on Dec. 8, 2003, provisional application No. 60/689,686, filed on Jun. 10, 2005.

(52) **U.S. Cl.**
CPC .............. *H04M 2203/2011* (2013.01); *H04M 2203/651* (2013.01); *H04M 2207/18* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,610,970 A | 3/1997 | Fuller et al. |
| 5,752,191 A | 5/1998 | Fuller et al. |
| 5,758,079 A | 5/1998 | Ludwig et al. |
| 5,828,731 A | 10/1998 | Szlam et al. |
| 5,930,700 A | 7/1999 | Pepper et al. |
| 5,970,388 A | 10/1999 | Will |
| 6,119,022 A | 9/2000 | Osborn et al. |
| 6,327,628 B1 | 12/2001 | Anuff et al. |
| 6,359,892 B1 | 3/2002 | Szlam |
| 6,463,462 B1 | 10/2002 | Smith et al. |
| 6,577,859 B1 | 6/2003 | Zahavi et al. |
| 6,636,888 B1 | 10/2003 | Bookspan et al. |
| 6,665,534 B1 | 12/2003 | Conklin et al. |
| 6,788,766 B2 | 9/2004 | Logan |
| 6,801,793 B1 | 10/2004 | Aarnio et al. |
| 6,816,578 B1 | 11/2004 | Kredo et al. |
| 6,819,757 B1 | 11/2004 | Cook et al. |
| 6,819,945 B1 | 11/2004 | Chow et al. |
| 6,978,136 B2 | 12/2005 | Jenniges et al. |
| 7,010,288 B2 | 3/2006 | Brown et al. |
| 7,010,332 B1 | 3/2006 | Irvin et al. |
| 7,027,842 B2 | 4/2006 | Zhang et al. |
| 7,043,261 B2 | 5/2006 | Krishnan |
| 7,072,452 B1 | 7/2006 | Roberts et al. |
| 7,085,253 B2 | 8/2006 | Yang |
| 7,107,010 B2 | 9/2006 | Heinonen et al. |
| 7,110,963 B2 | 9/2006 | Negreiro |
| 7,111,044 B2 | 9/2006 | Lee |
| 7,116,976 B2 | 10/2006 | Thomas et al. |
| 7,188,073 B1 | 3/2007 | Tam et al. |
| 7,224,775 B1 | 5/2007 | Shaffer et al. |
| 7,317,706 B1 | 1/2008 | Hao et al. |
| 7,346,630 B2 | 3/2008 | Eichstaedt et al. |
| 7,376,434 B2 | 5/2008 | Thomas et al. |
| 7,403,972 B1 | 7/2008 | Lau et al. |
| 7,686,693 B2 | 3/2010 | Danieli et al. |
| 7,729,688 B2 | 6/2010 | Cheung et al. |
| 7,792,552 B2 | 9/2010 | Thomas et al. |
| 7,890,128 B1 | 2/2011 | Thomas et al. |
| 8,112,104 B1 | 2/2012 | Thomas et al. |
| 8,280,419 B1 | 10/2012 | Thomas et al. |
| 8,353,773 B2 | 1/2013 | Sasaki et al. |
| 8,391,459 B2 | 3/2013 | Jackson et al. |
| 8,429,231 B2 | 4/2013 | Wu et al. |
| 8,737,978 B1 | 5/2014 | Thomas et al. |
| 8,744,407 B2 | 6/2014 | Cheung et al. |
| 8,827,811 B2 | 9/2014 | Kim et al. |
| 9,204,268 B2 | 12/2015 | Cheung et al. |

| | | | |
|---|---|---|---|
| 9,555,334 B2 | 1/2017 | Bernard et al. |
| 9,736,664 B2 | 8/2017 | Cheung et al. |
| 10,142,810 B2 | 11/2018 | Cheung et al. |
| 10,183,219 B2 | 1/2019 | Linden et al. |
| 10,207,191 B2 | 2/2019 | Jensen |
| 10,492,038 B2 | 11/2019 | Cheung et al. |
| 2001/0011014 A1 | 8/2001 | Higuchi et al. |
| 2001/0014611 A1 | 8/2001 | Dufort |
| 2001/0028709 A1 | 10/2001 | Makela et al. |
| 2001/0031633 A1 | 10/2001 | Tuomela et al. |
| 2002/0067806 A1 | 6/2002 | Rodriguez et al. |
| 2002/0073207 A1 | 6/2002 | Widger et al. |
| 2002/0094067 A1 | 7/2002 | August |
| 2002/0142756 A1 | 10/2002 | Rutledge et al. |
| 2002/0181672 A1 | 12/2002 | Cannell et al. |
| 2003/0039339 A1 | 2/2003 | Luehrig et al. |
| 2003/0041048 A1 | 2/2003 | Balasuriya |
| 2003/0065779 A1 | 4/2003 | Malik et al. |
| 2003/0103600 A1 | 6/2003 | Potter |
| 2003/0105854 A1 | 6/2003 | Thorsteinsson et al. |
| 2003/0112948 A1 | 6/2003 | Brown et al. |
| 2003/0129968 A1 | 7/2003 | Earl |
| 2003/0191676 A1 | 10/2003 | Templeton |
| 2003/0191814 A1 | 10/2003 | Tran |
| 2003/0232629 A1 | 12/2003 | Jang et al. |
| 2004/0024882 A1 | 2/2004 | Austin et al. |
| 2004/0072585 A1 | 4/2004 | Le et al. |
| 2004/0078340 A1 | 4/2004 | Evans |
| 2004/0122979 A1 | 6/2004 | Kirkland |
| 2004/0143667 A1 | 7/2004 | Jerome |
| 2004/0203794 A1 | 10/2004 | Brown et al. |
| 2004/0203919 A1 | 10/2004 | Ross et al. |
| 2004/0240650 A1 | 12/2004 | Bear et al. |
| 2004/0248596 A1 | 12/2004 | Panchal |
| 2005/0020288 A1 | 1/2005 | Davis |
| 2005/0027385 A1 | 2/2005 | Yuch |
| 2005/0037785 A1 | 2/2005 | Chen |
| 2005/0038690 A1 | 2/2005 | Hayes-Roth |
| 2005/0071253 A1 | 3/2005 | Yang |
| 2005/0107130 A1 | 5/2005 | Peterson, II |
| 2005/0136955 A1 | 6/2005 | Mumick et al. |
| 2005/0191994 A1 | 9/2005 | May et al. |
| 2005/0192061 A1 | 9/2005 | May et al. |
| 2005/0273327 A1 | 12/2005 | Krishnan |
| 2006/0003803 A1 | 1/2006 | Thomas et al. |
| 2006/0075038 A1 | 4/2006 | Mason et al. |
| 2006/0168054 A1 | 7/2006 | Burkhart et al. |
| 2006/0212561 A1 | 9/2006 | Feng |
| 2006/0239419 A1 | 10/2006 | Joseph et al. |
| 2006/0259565 A1 | 11/2006 | Cheung et al. |
| 2006/0276210 A1 | 12/2006 | Thomas et al. |
| 2006/0288099 A1 | 12/2006 | Jefferson et al. |
| 2007/0005368 A1 | 1/2007 | Chutorash et al. |
| 2007/0047522 A1 | 3/2007 | Jefferson et al. |
| 2007/0238474 A1 | 10/2007 | Ballas |
| 2008/0261636 A1 | 10/2008 | Lau et al. |
| 2010/0114958 A1 | 5/2010 | Korenshtein |
| 2010/0205272 A1 | 8/2010 | Cheung et al. |
| 2011/0151582 A1 | 6/2011 | Basile |
| 2011/0151852 A1 | 6/2011 | Olincy et al. |
| 2014/0242956 A1 | 8/2014 | Cheung et al. |
| 2014/0256293 A1 | 9/2014 | Thomas et al. |
| 2016/0044474 A1 | 2/2016 | Cheung et al. |
| 2017/0201872 A1 | 7/2017 | Cheung et al. |
| 2018/0014169 A1 | 1/2018 | Cheung et al. |

#### OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 12/798,995 dated Sep. 29, 2011.
Notice of Allowance for U.S. Appl. No. 12/798,995 dated Jan. 3, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated May 9, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Oct. 3, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Jul. 16, 2013.

Epic Games Ex. 1001
Page 3

US 10,708,727 B2

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 12/798,995, dated Oct. 30, 2013.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Feb. 20, 2014.
Office Action for U.S. Appl. No. 14/272,632, dated Jul. 27, 2015.
Notice of Allowance for U.S. Appl. No. 14/272,632, dated Sep. 18, 2015.
Office Action for U.S. Appl. No. 14/922,344, dated Apr. 27, 2016.
Office Action for U.S. Appl. No. 14/922,344, dated Oct. 7, 2016.
Notice of Allowance for U.S. Appl. No. 14/922,344, dated Jan. 14, 2017.
Notice of Allowance for U.S. Appl. No. 14/922,344, dated Mar. 6, 2017.
Notice of Allowance for U.S. Appl. No. 15/469,440, dated Sep. 6, 2017.
Notice of Allowance for U.S. Appl. No. 15/469,440, dated Dec. 19, 2017.
Notice of Allowance for U.S. Appl. No. 15/469,440, dated Aug. 8, 2018.
Notice of Allowance for U.S. Appl. No. 15/469,440, dated Sep. 27, 2018.
Notice of Allowance for U.S. Appl. No. 15/704,181, dated Apr. 27, 2018.
Notice of Allowance for U.S. Appl. No. 15/704,181, dated Aug. 22, 2018.
Notice of Allowance for U.S. Appl. No. 15/704,181, dated Nov. 6, 2018.
Notice of Allowance for U.S. Appl. No. 15/704,181, dated Jul. 2, 2019.
First Office Action for CN Patent Application No. 200680027964.9, dated Mar. 26, 2010 (17 pages).
Second Office Action for CN Patent Application No. 200680027964.9, dated Oct. 25, 2010 (14 pages).
Third Office Action for CN Patent Application No. 200680027964.9, dated Apr. 8, 2011 (11 pages).
Notice of Rejection for CN Patent Application No. 200680027964.9, dated Jan. 6, 2012 (11 pages.).
AIM Buddy List, https://web.archive.org/web/20050531083304/http://www.aim.com/help_faq/starting_out/buddylist.adp?aolp=, downloaded Aug. 9, 2019, 1 pg.
AIM® Inside the Sidekick, https://web.archive.org/web/20050519114310/http:/mymobile.aol.com/portal/im/pdfs/tmobile/AIM_SIDEKICK_UG_tmobile.pdf, copyright 2002 by America Online, Inc., 13 pgs.
AIM Registration, https://web.archive.org/web/20041216085601/http://www.aim.com:80/help_faq/starting_out/registration.adp?aolp=, downloaded Aug. 9, 2019, 2 pgs.
"AOL ® Instant Messenger ™," https://web.archive.org/web/20050601001345/https:/www.aim.com/, downloaded Aug. 6, 2019, 2 pgs.
"Company Overview", http://www.fastmobile.com/company_overview.html, downloaded Nov. 5, 2003, p. 1.
Download AIM for Windows, https://web.archive.org/web/20050204020358/http:/channels.netscape.com/wrap/linker.jsp?floc=at_oswin_1_I2&ref=http://www.aim.com/get_aim/win/latest_win.adp?aolp=#whatsnew, downloaded Aug. 9, 2019, 2 pgs.
"Introducing the Tellme Voice Application Network", Tellme, http://www.tellme.com/products/, downloaded Oct. 2, 2003, p. 1.
"iotum History," Iotum Corp., http://iotum.com/simplyrelevant/2006/04/03/iotum-history/, downloaded May 15, 2006, pp. 1-4.
"Messaging", Vodafone Group, 2001, http:www.vodafone.co.nz/business/10.2.3_messaging.jsp, downloaded Oct. 14, 2003, pp. 1-2.
"Microsoft Windows Messenger: Go Beyond Text with Voice & Video Chats", Dell Inc., http://www.dell.com/us/en/dhs/topics/segtopic_002_xp_im.htm, downloaded Oct. 2, 2003, pp. 1-2.
"Microsoft Windows Messenger: Instantly Communicate with Family and Friends Messenger", Dell Inc., http://www.dell.com/us/en/dhs/topics/segtopic_001_xp_im.htm, downloaded Oct. 2, 2003, pp. 1-3.

"Our Solution," Iotum Corp., http://www.iotum.com/our_solution.php, downloaded May 15, 2006, pp. 1-2.
Short Message Service/Interactive Voice Response (SMS/IVR), Lucent Technologies, 2003, pp. 1-2.
"Text messaging", Vodafone Group, 2001, Vodafone—Services, "All about text messaging", http://www.vodafone.co.nz/services/07.a.1_two_way_messaging.jsp?hd=4yourbusiness& . . . , downloaded Oct. 14, 2003, pp. 1-2.
"We bring relevance to communications," CNET News, Ina Fried, Jul. 21, 2005, pp. 1- 2.
Appenzeller, et al., "The Mobile People Architecture", Technical Report: CSL-TR-00000, Computer Systems Laboratory, Departments of Electrical Engineering and Computer Science, Stanford University, Jan. 1999, pp. 1-13.
BlackBerry, "Voice and SMS", http://www.blackberry.com/products/service/voices_sms.shtml?DCPID=hmsvoice downloaded Oct. 2, 2003, p. 1.
Bulk, F. "Final Project: Skype," http://www1.cs.columbia.edu/~salman/skype/frank.pdf, May 5, 2004, pp. 23.
Calsyn, Martin and Desseault, Lisa, "Presence Information Protocol Requirements," Internet Draft, Feb. 9, 1998, pp. 1-27.
Emergin Inc., "Emergin WirelessOffice 5.0", http://www.emergin.com/?source=overture, downloaded Oct. 2, 2003, p. 1.
Fastmobile Inc., "Dialog GSM launches Push 'n' Talk walkie talkie service Push to Talk over Cellular Now in Sri Lanka Dialog GSM Pioneers Latest GSM Advancement", Press Release, Dec. 1, 2004, pp. 1-2.
Fastmobile, "fastmobile's fastchat™ Instant Communications Application is Coming to Thousands of Mobile Phone Retail Stores Nationwide", fastmobile Press Release, Sep. 15, 2003, pp. 1-3.
IMBOT, Press Release, "IMBOT offers new Text 2 Voice Service Text 2 Voice service enables wireless customers to send voice messages from 2-Way devices", Oct. 29, 2001, pp. 1-2.
Internet Traveler, "Welcome to the Inter.Net Communicator Tour!", http://www.inter.net/traveler/tour/communicator_messaging.php, downloaded Oct. 14, 2003, p. 1.
J. Rosenberg, H. Schulzrinne, Internet Draft, "SIP for Presence," http://www.alternic.org/drafts/drafts-r-s/draft-rosenberg-sip-pip-00.txt, Nov. 13, 1998, Bell Laboratories, Columbia, pp. 1-31.
Joseph, Anthony D. et al., "The Case for Services over Cascaded Networks", EECS Department, CS Division, University of California, Berkeley, http://iceberg.cs.berkeley.edu/, International Conference on Wireless and Mobile Multimedia 1998, pp. 1-9.
MSN Messenger Version 7.0, "Messenger," https://web.archive.org/web/20050601023444/http:/messenger.msn.com . . . , downloaded Aug. 6, 2019, 2 pgs.
MobileShop, "SMS—also know as text messaging", http://www.mobileshop.org/howitworks.sms.htm, downloaded Oct. 14, 2003, pp. 1-2.
MSN Messenger.mac, https://web.archive.org/web/20050604080622/http://www.microsoft.com/mac/default.aspx?pid=msnmessenger, downloaded Aug. 9, 2019, 2 pgs.
MSN Messenger, "Communicate with MSN® Messenger," https://web.archive.org/web/20051013055708/http://www.imagine-msn.com/messenger/post/communicate/instantmessage.aspx, downloaded Aug. 9, 2019, 2 pgs.
MSN Messenger, "Download MSN Messenger," https://web.archive.org/web/20050601002632/http://messenger.msn.com/download/, downloaded Aug. 9, 2019, 1 pg.
MSN Messenger, "Most Frequently Asked Questions," https://web.archive.org/web/20050601014205/http://messenger.msn.com/Help/, downloaded Aug. 9, 2019, 8 pgs.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf-simple-rpid-06.txt, Jun. 2, 2005, http://www1.ietf.org/mail-archive/web/simple/current/msg05398.html, downloaded Nov. 15, 2006, pp. 1-35.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf-simple-rpid-10.txt, Dec. 20, 2005, pp. 1-41.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf-simple-rpid-10.txt, Dec. 4, 2005, pp. 1-35.

Epic Games Ex. 1001
Page 4

**US 10,708,727 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

Skype™, "Skype is free Internet telephony that just works," https://web.archive.org/web/20050601003206/http:/www.skype.com, downloaded Aug. 6, 2019, 3 pgs.
Skype™, "Skype is free Internet telephony that just works," https://web.archive.org/web/20050601003206/http:/www.skype.com/, downloaded Aug. 9, 2019, 21 pgs.
Skype™, "How to Use Skype," https://web.archive.org/web/20041229163311/http:/www.skype.com/help/guides/usingskype.html, downloaded Aug. 9, 2019, 6 pgs.
Skype™, "How to Add a Contact—User Guide," https://web.archive.org/web/20041230160101/http:/www.skype.com/help/guides/adduser.html, 10 pgs.
Skype™, "Registering a Skype Name—User Guide," https://web.archive.org/web/20041229042631/http:/www.skype.com/help/guides/registration.html, 10 pgs.
Sonim Technologies, Inc., "Integrated voice and text messanging over GPRS showcased jointly by Sonim, Symbian and Texas Instruments", Sonim Press Release, Dec. 2, 2002, pp. 1-2.
Symbian Ltd., "Symbian OS Version 7.0: Functional description", Revision 1.5, Feb. 2003, pp. 1-24.
Symbian Ltd., "Symbian OS Version 7.0s: Functional description", Revision 2.1, Jun. 2003, pp. 1-29.
Symbian Ltd., "Technology: Creating Symbian OS phones", http://www.symbian.com/technology/create-symb-OS-phones.html, downloaded Nov. 5, 2003, p. 1-8.

Symbian Ltd., "Technology: Why is a different operating system needed", http://www.symbian.com/technology/why-diff-os.html, downloaded Nov. 5, 2003, pp. 1-5.
Using AIM on Windows—Video IM, https://web.archive.org/web/20050307231707/http:/www.aim.com/help_faq/using/win/video_im.adp?aolp=, downloaded Aug. 9, 2019, 2 pgs.
Using AIM on Windows—Mar. 8, 2005, https://web.archive.org/web/20050308012857/http://www.aim.com/help_faq/using/win/aimtalk.adp?aolp=, downloaded Aug. 9, 2019, 2 pgs.
Using AIM on Windows—Mar. 5, 2005, https://web.archive.org/web/20050305095328/http:/www.aim.com:80/help_faq/using/win/instant_message.adp?aolp=, downloaded Aug. 9, 2019, 2 pgs.
Verizon Wireless, "TXT messaging", http://www.vtext.com/customer_site/jsp/messaging_lo.jsp, downloaded Oct. 2, 2003, p. 1.
W3C, Voice Extensible Markup Language (VoiceXML) Version 2.0, W3C, www.w3.org, Feb. 20, 2003.
Yahoo!Messenger, "Yahoo!Messenger Talk for Free!", http://messenger.yahoo.com/messenger/help/voicechat.html, downloaded Oct. 2, 2003, pp. 1-2.
"Yahoo! Messenger," https://web.archive.org/web/20050601012258/http:/messenger.yahoo.com, downloaded Aug. 6, 2019, 1 pg.
"Yahoo! Messenger," https://web.archive.org/web/20050601042101/http:/messenger.yahoo.com/newtoim.php, downloaded Aug. 9, 2019, 2 pgs.
"Yahoo! Help—All-New Messenger 6.0," https://web.archive.org/web/20040806142252/http:/help.yahoo.com/help/us/messenger/win/abuse/abuse-02.html, downloaded Aug. 9, 2019, 2 pgs.

Epic Games Ex. 1001
Page 5

| ICM | | Default |
|---|---|---|
| 1 | Mobile phone | Voice mail |
| 2 | Office phone | Voice mail |
| 3 | Home phone | Voice mail |
| 4 | Mobile SMS/pager from mobile phone or PDA | Email |
| 5 | Home/office SMS (to office/home PC) | Email |
| 6 | Mobile Online chat (to mobile phone or PDA) | Voice mail |
| 7 | Home Online chat (Net Meeting, AOL, ICQ etc.) | Voice mail |
| 8 | Voice mail with instant notification to mobile devices of the user | |
| 9 | Voice mail without notification to mobile devices | |
| 10 | Office fax | |
| 11 | Home fax | Reject |
| 12 | Mobile Email (Blackberry etc.) | Email |
| 13 | Email | Reject |
| 14 | User defined | |

**FIGURE 1**

| ContactClass1 | Kinship family members, love ones |
|---|---|
| ContactClass2 | Relatives and friends |
| ContactClass3 | Boss and VIP |
| ContactClass4 | Colleagues |
| ContactClass5 | Subordinates |
| ContactClass6 | Business acquaintances |
| ContactClass7 | VIP Clients |
| ContactClass8 | Clients |
| ContactClass9 | Secretary |
| ContactClass10 | User defined |

**FIGURE 2**

Epic Games Ex. 1001
Page 6

| | |
|---|---|
| UrgClass1 | Life threatening – interrupt at any time and occasion |
| UrgClass2 | Urgent confirmed meeting reminder – interruption allowed |
| UrgClass3 | Urgent matter requiring immediate attention |
| UrgClass4 | Important matter requiring quick attention |
| UrgClass5 | Regular work related matter |
| UrgClass6 | Casual contact |
| UrgClass7 | Cold calls from unknown person |
| UrgClass8 | User defined |

**FIGURE 3**

| | |
|---|---|
| MyBusyState1 | Important meeting |
| MyBusyState2 | Ordinary meeting |
| MyBusyState3 | Available |
| MyBusyState4 | Sleeping |
| MyBusyState5 | Resting |
| MyBusyState6 | User defined |

**FIGURE 4**

| ContactClass | UrgClass | MyBusyState | ICM allowed |
|---|---|---|---|
| ContactClass2 | UrgClass1-3 | All | All |
| | UrgClass4-6 | MyBusyState1 | All |
| | | MyBusyState2-3 | All |
| | | MyBusyState4-5 | All |
| | UrgClass7-8 | All | ICM 13 |

**FIGURE 5**

Epic Games Ex. 1001
Page 7



FIG. 6

Epic Games Ex. 1001
Page 8



FIG. 7

Epic Games Ex. 1001
Page 9



FIG. 8

Epic Games Ex. 1001
Page 10



FIG. 9

Epic Games Ex. 1001
Page 11



FIG. 10

Epic Games Ex. 1001
Page 12



FIG. 11

Epic Games Ex. 1001
Page 13



FIG. 12

Epic Games Ex. 1001
Page 14

US 10,708,727 B2

**1**

## METHOD AND APPARATUS TO MANAGE MESSAGING PROVIDING DIFFERENT COMMUNICATION MODES USING ONE IDENTIFIER AND NOT REQUIRING TO DISCLOSE CONTACT INFORMATION

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/704,181, filed Sep. 14, 2017, and entitled "METHOD AND APPARATUS TO MANAGE MESSAGING PROVIDING DIFFERENT OPTIONS OF COMMUNICATION DEPENDING ON ONE IDENTIFIER AND NOT REQUIRING TO DISCLOSE CONTACT INFORMATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 15/469,440, filed Mar. 24, 2017, now U.S. Pat. No. 10,142,810, and entitled "A NETWORD-BASED PORTAL TO MANAGE COMMUNICATION,", which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 14/922,344, filed Oct. 26, 2015, now U.S. Pat. No. 9,736,664, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 14/272,632, filed May 8, 2014, now U.S. Pat. No. 9,204,268, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 12/798,995, filed Apr. 14, 2010, now U.S. Pat. No. 8,744,407, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 11/452,115, filed Jun. 12, 2006, now U.S. Pat. No. 7,729,688, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICA-TION", which is hereby incorporated herein by reference, which application is a continuation-in-part application of U.S. patent application Ser. No. 11/006,343, filed Dec. 7, 2004, now U.S. Pat. No. 7,116,976, and entitled "ADAPTABLE COMMUNICATION TECHNIQUES FOR ELECTRONIC DEVICES," which is hereby incorporated herein by reference, which claims priority to U.S. Provisional Patent Application No. 60/527,565, filed Dec. 8, 2003, entitled "ADAPTABLE COMMUNICATION TECHNIQUES FOR ELECTRONIC DEVICES," and which is hereby incorporated herein by reference.

This application, by way of U.S. patent application Ser. No. 11/452,115, also claims priority to U.S. Provisional Patent Application No. 60/689,686, filed Jun. 10, 2005, entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," and which is hereby incorporated herein by reference.

### BACKGROUND OF THE INVENTION

For many years, other than mails from post offices, we typically only received information from afar through telephones. However, in the past few years, ways that others can send us information have increased significantly. Just to list a few different modes of communication, we can be reached from standard desk phones, fax, cell phones, electronic mails, and instant messages. In addition, we can have more

**2**

than one phone number and multiple electronic mail addresses. There are people we like to communicate with, and there are those we prefer to avoid. Managing information from all such different modes can be quite time consuming.

It should be apparent from the foregoing that there is still a need to help manage the numerous modes of communication.

### SUMMARY OF THE INVENTION

Different embodiments of a computer-implemented system and method to manage the communication of a user are disclosed. A person tries to electronically convey a message to the user. In one embodiment, the status of the user is identified; the identity of the person is identified; the urgency of the message is identified; the access priority of the person is determined based on the person's identity; and a process is set to manage the message using one or more rules, and in view of the status of the user, the access priority of the person and the urgency of the message.

Based on different embodiments, the status of the user depends on the current activity or location of the user, or the current time. The status of the user can also be defined by the user. Similarly, the access priority of the person can be defined by the user, or is set depending on the user's reaction towards a prior message from the person. Also, the urgency of the message is set by the person.

The process can depend on the mode of communication of the message. For example, the mode of communication can include a mobile phone, an office phone, a home phone, a mobile SMS, a pager from a mobile phone or PDA, a home/office SMS, mobile online chat, home online chat, a voice mail with/without instant notification, an office fax, a home fax, a mobile email, and an email.

In one embodiment, the user receives the message through a handheld device, such as a cellular phone. In another embodiment, the message is electronically conveyed based on Internet protocol through a website.

In one embodiment, though the process allows the user to receive the message, the person is not aware of the contact information of the user. For example, the person is not aware of the phone number of the cellular phone that the user used to talk to the person. This prevents the person from directly accessing the user without going through an intermediate control, such as a website. Similarly, the user does not have to be aware of the contact information of the person.

In another embodiment, the defined access priority of the person is stored at a website, allowing the website to access such information without asking for the user's permission. In one embodiment, the defined access priority is stored in a private database under the user's control.

In one embodiment, text messages could be received in an audio manner, and audio messages could be sent as text messages.

Other aspects and advantages of the present invention will become apparent from the following detailed description, which, when taken in conjunction with the accompanying drawings, illustrates by way of example the principles of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a number of intelligent communication modes according to one embodiment of the invention.

FIG. 2 shows a number of contact classes according to one embodiment of the invention.

Epic Games Ex. 1001
Page 15

3

FIG. **3** shows a number of urgency classes according to one embodiment of the invention.

FIG. **4** shows a number of statuses of a user according to one embodiment of the invention.

FIG. **5** shows one embodiment of an example of an Access Priority Database according to one embodiment of the invention.

FIG. **6** is a communication system according to one embodiment of the invention.

FIG. **7** is a flow diagram of a personal call response process according to one embodiment of the invention.

FIG. **8** is a flow diagram of an audio message response process according to one embodiment of the invention.

FIG. **9** is a flow diagram of a text message response process according to one embodiment of the invention.

FIG. **10** is a flow diagram of an automated call response process according to one embodiment of the invention.

FIG. **11** is a flow diagram of a message presentation process according to one embodiment of the invention.

FIG. **12** is a flow diagram of a message presentation process according to one embodiment of the invention.

Same numerals in FIGS. **1-12** are assigned to similar elements in all the figures. Embodiments of the invention are discussed below with reference to FIGS. **1-12**. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

## DETAILED DESCRIPTION OF THE INVENTION

One embodiment of the invention can automatically remove unwanted communications. Certain communications are relatively easy to determine to be unwanted, such as marketing cold calls and wrong number calls. Other communications may be more difficult. They can depend not just on the sources of the communication, but also the conditions or status of the receiver (a user) of the communication. The status can be related to the user's current activity and/or location. For example, when the user is on a train going to work, the user probably does not mind chatting with his grandchild. However, if the user is having his yearly review meeting with his boss, the user probably would prefer to avoid the call from his grandchild, unless it is an emergency. Based on the embodiment, communications from sources the user wants to postpone receiving can be automatically diverted.

In one embodiment, the user can get appropriate notification on the source of the incoming communication request. The attributes of the notification can depend on the urgency of the communication and/or the status of the user.

The user may receive information from different modes of communication. For example, the user can have mobile phones, fixed lines at home or office, emails, SMS, and faxes, with their different numbers and/or addresses. One embodiment can help the user efficiently manage information from the different modes. The user only has to remember one specific address from one mode of communication. Through that address, the user can receive communications from all modes of communication, independent of where the user is, or the type of hardware the user has. This allows the user to efficiently maintain his communication from the numerous modes even when he is traveling. For example, the user does not have to change phones (and the phone numbers) when he moves from areas covering 3G to areas that do not.

4

A number of embodiments depend on the different modes of communication converging onto the internet protocol platform. A communication gateway or a portal is formed allowing the user to receive communications from numerous sources through different modes. This, in turn, could reduce the numerous addresses the user has to remember, to one address. For example, an e-mail address for the user can serve as an access identifier for the different communication addresses from different communication modes. The access identifier can become the user's digital identity. In one embodiment, the user's other types of identification, such as the user's driver licenser number, can be the user's access identifier.

One embodiment of the invention uses an open portal based on the web. Based on the portal, the user can securely determine who can reach him at what conditions. This can be done based on a status indicator. As an example, this indicator is determined according to the status of the user, the access priorities of the person trying to reach the user (or the relationship or the lack of relationship between the user and the person), and/or the urgency of the message from the person. The status of the user can be dynamically determined, based on the current condition(s) of the user. The portal can allow the user and the person to select different options, which can be modified as desired. For example, the relationship can be preset by the user and stored in a database, while the urgency of the message can be set by the person.

Thus, in one embodiment, the portal can be used to control the selection and setting of different intelligent communication modes for the user. These intelligent communication modes allow priorities of various kinds of communication options to be set by the user. The portal allows worldwide access to the user, and can dynamically determine, for example, whether a call initiated at different time by different callers should be accepted by the user in real-time or handled by other mechanisms. From this information, communication requests can be classified, for example, into different degrees of undesirability. Some requests can be automatically blocked from the user. Others can be diverted and handled by other mechanism, such as diverting a phone call to an email or voice mail.

In one embodiment, the portal or gateway also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. The user can modify information in the database, such as assigning and/or changing the priorities of the contacts. Based on the information (or lack of information) in the database of the contact trying to access the user, and based on the status of the user, the gateway can automatically select an intelligent mode of communication for the user. This selection can be done dynamically.

In one embodiment, the portal can dynamically change the access priorities of a caller trying to reach the user. For example, previously the caller is of high priority to the user, and the user has set her access priorities accordingly. Lately, every time the caller trying to reach the user, the request was denied. After a preset number of rejections, the portal can automatically send a message to the user, asking the user if the user would like to lower the access priority of the caller. If the response is affirmative, the caller's priority is automatically reduced.

In another embodiment, the user does not have to set priorities of each contact. The system monitors every call, and provides the contact's identity to the user. Based on the user's reaction to the call (e.g. accepting or rejecting it), the system automatically sets the contact's priorities. In one

Epic Games Ex. 1001
Page 16

US 10,708,727 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

embodiment, the system can then query the user for approval on the setting, and allow the user to adjust it as necessary. In another embodiment, the system can continue to modify the caller's priorities based on the user's reaction to the caller's subsequent calls.

In one embodiment, the user could keep information he believes to be sensitive local in a different database. Such information can be stored securely under the user's direct control. The portal can retrieve information from the different database when required. In another embodiment, the user can restrict or limit such retrieval process.

Additional confidentiality can be provided. In one embodiment, using phone calls as an example, the user can be aware of the identity of the caller even without being informed of the number of the caller. Similarly, the caller can reach the user without being aware of the number of the phone the user is using to receive the call. The user can keep his location and/or status confidential but still can receive the communication. This can be useful because there are situations, for example, when the user does not want to disclose his contact information but the user needs to receive services provided by the caller.

One approach to maintain such confidentiality while maintaining real-time communication is based on a system that digitally identifies the identities of the caller and the receiver. Note that the term caller is used in general. It is not just limited to phone calls, but they can be any person or entity requesting to communicate with the user, such as trying to send a message to the user. As a separate note, the caller can also be a user of different embodiments of the invention.

After determining the identities, the system can establish connections between the caller and the user in real time. Though contacts are established, the system only needs to ensure the identities of the caller and the user to each other. However, the system does not have to disclose the phone numbers, electronic addresses, physical locations and/or other attributes of the caller and the user to each other. In one embodiment, real time implies that the time required for the identification is similar to the typical time required to set up, for example, a telephone call. The system can be a portal based on the web.

In one embodiment, a portal also holds the user's electronic calendar. The calendar can be programmable, with entries set by the user. The portal can automatically and securely set appointments for the user since the portal knows the identity of the caller, and the status and schedule of the user. For example, the appointment can be for a conference call.

To illustrate, in one embodiment, a portal provides a number of intelligent communication modes (ICM) for the user to select as shown in FIG. 1. There are three columns in the table. If the communication mode selected in the second column does not work, the portal automatically defaults to the corresponding approach in the third column. For example, under ICM 1, if the mobile phone is busy, default to voice mail. Some of the selections do not have any default because it may not be necessary to default. For example, under ICM 8, the incoming message goes directly to voice mail with instant notification to mobile devices of the user. The incoming message can usually go to voice mail. There is no need to default.

As a receiver of communication, the user can define a number of contact classes, as shown in FIG. 2. The user can set up a number of urgency classes, as shown in FIG. 3. The user can define a number of status, as shown in FIG. 4. Then,

based on tables in FIGS. 1-4, the user can set up an Access Priority Database for different ContactClasses, as shown in FIG. 5.

As another example, the user can categorize the following contacts into the corresponding ContactClasses:

| | |
|---|---|
| Alice (Wife) | ContactClass1 |
| Peter (Close Friend) | ContactClass2 |
| Colina (Close Friend's wife) | ContactClass2 |

Peter wants to make a mobile phone call to the user. In one embodiment, Peter calls a portal. As an example, the portal can be the user's ISP. The portal first verifies the caller's identity to be Peter. This can be done, for example, by a public key challenge based on Peter having a public key digital certificate. In another example, Peter is also a registered user of the portal. Then, Peter's identity can be more readily identified or verified.

In one embodiment, after verification, a virtual address/ number for the communication session is created allowing Peter to reach the user, which can be by phone. The user's phone number does not have to be disclosed to Peter. Similarly, Peter's mobile phone number does not have to be disclosed to the user. The portal can assure the user that the person calling is Peter based on an identification verification process, such as ones described above.

In establishing contact, the portal can access the user's database and determine that Peter belongs to ContactClass2. The database can, for example, be in the portal.

In another embodiment, the database is in a personal communication device of the user. The portal accesses the personal communication device to determine Peter's ContactClass.

Based on the ContactClass information, the status of the user and Peter's urgency setting, the user may receive Peter's call directly. As another example, Peter may be asked to leave a voice mail to the user, while the user is notified by a mobile short message regarding an incoming call from Peter.

As additional examples, in one embodiment, location information of the user could be determined based on GPS information from, for example, the user's cell phone.

In one embodiment, the user receives messages through a handheld device, such as a phone, and the phone has a switch. The switch can be a physical button or a software setting, such as a pull-down menu. The user could set his status dynamically by changing the physical or logical position of the switch. For example, one position can indicate that the user is very busy, and should only be interrupted by an urgent message from the user's closest contacts, such as his wife or parents. Another position can indicate that the user's status allows the user to receive any messages from anyone.

As explained above, based on an embodiment, a message is electronically conveyed by a central network server, such as a web server based on Internet protocol. A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems so that users can configure the system behavior they desire. The portal or gateway can then facilitate download of a database or update thereto to a communication device, such as a phone.

Also, as explained above, based on an embodiment, a user could efficiently maintain his communication, and does not even have to change phones when he moves from areas covering 3G to areas that do not. These phones could be

Epic Games Ex. 1001
Page 17

US 10,708,727 B2

7

based on different communication mechanisms, such as GSM, CDMA, 3G and 4G systems. Also as explained above, the user could keep information in local databases, such as in such a phone. For example, the intelligent communication modes shown in FIG. 1 for the user to select are in the phone. The user could define the contact classes, such as the ones shown in FIG. 2; set up the urgency classes, such as the ones shown in FIG. 3; define the statuses, such as the ones shown in FIG. 4; set up the Access Priority Database, such as the one shown in FIG. 5; and categorize a number of the user's contacts into the corresponding ContactClasses, all in the phone. When a caller places a call to the phone, based on information previously set in the phone and based on the urgency class selected by the caller, the phone could automatically manage the communication. Note that the phone does not have to be a cellular phone. In one embodiment, the phone is a desk top phone.

Again as explained above, the person or the caller trying to contact the user could select different options. For example, the urgency of the message can be set by the caller. This selection is typically in the call setup phase. In one embodiment, the caller has pre-selected the urgency class before making the call. In another embodiment, if the caller has not selected the urgency class, the system could prompt the caller to input an urgency class or status before the call or message is routed to the user. In yet another embodiment, different urgency classes could be defined by the caller.

Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. In still another advantage, a user can provide feedback to a caller without answering a voice call from the caller.

Another aspect of the invention pertains to improved approaches to respond to an incoming text message. The improved approaches enable a recipient to provide a reply message to an initiator. The incoming text message can be presented to the recipient with an audio or textual presentation. Thereafter, a reply text message can be sent back to the initiator. The recipient can form the reply text message by recording a brief audio message or entering a text message. In the case in which a brief audio message is used, the audio message can be automatically converted to a text message before being transmitted to the initiator.

Further, the computer-implemented methods and systems discussed above can be used in conjunction with one or more of the various approaches discussed in U.S. patent application Ser. No. 11/006,343. For example, the automated actions or decisions (e.g., intelligent secretary, decision 204 in FIG. 2, etc.) of U.S. patent application Ser. No. 11/006, 343 can be automatically made by the systems/methods described above. Still further, the various approaches discussed in U.S. patent application Ser. No. 11/006,343 can be used in conjunction with one or more the various methods/ systems discussed above. For example, the systems/methods described above can use the messaging approaches (e.g., audio or textual messages) described in U.S. patent application Ser. No. 11/006,343.

Different embodiments of the invention pertain to improved approaches for users of electronic devices to communicate with one another. The electronic devices have audio and/or textual output capabilities. The improved approaches can enable users to communicate in different ways depending on device configuration, user preferences,

8

prior history, time or other criteria. In one embodiment, the communication between users is achieved by short audio or textual messages.

The electronic device can be any computing device having communication capabilities. Such computing devices can be referred to as communication devices. Examples of electronic devices include personal computers, personal digital assistants, pagers or mobile telephones.

Embodiments of the invention are discussed below with reference to FIGS. 6-12. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

FIG. 6 is a communication system 100 according to one embodiment of the invention. The communication system 100 can support different communication devices, including mobile telephones 102, computers 104 (e.g., personal computers) and/or wireless personal digital assistants (PDAs) 106. Users of the communication devices 102-106 communicate with like or different communication devices. Each communication device 102-106 offers one or both of audio or textual communication capabilities. These communication devices 102-106 can inter-communicate with one another through a network 108. The network 108 can include one or more of voice networks and data networks. For example, one network is a data network providing a slow speed data channel for transmission of Short Message Service (SMS) messages (which are typically limited to 160 text characters) to a Short Message Service Center (SMSC) and then forwarded on to the destination. Besides short messages (e.g., SMS messages), the network 108 can also support other messaging protocols for sending and receiving enhanced messages (EMS), multimedia messages (MMS), email and fax messages. Other networks support faster data channels and voice channels, such as GPRS, UMTS, G4, GSM, CDMA and various protocols, such as UDP, TCP, WAP, PDP other protocols.

According to one embodiment of the invention, one of the communication devices 102-106 can send a short message to another of the communication devices 102-106. The short message can be text-based or audio-based. The sending communication device allows its user to create the short message as the user desires and/or as the device permits. For example, the user might interact with a keypad or keyboard to enter the short message, or the user might record audio inputs (e.g., speech) for the short message. The short message can then be sent to the receiving communication device. The sending of the short message may involve converting the short message from an audio message to a text message, or vice versa. Also, the receiving communication device can further convert the short message from audio-to-text or from text-to-audio. In any case, the short message is presented (e.g., displayed or played) to the user of the receiving communication device. The presentation can vary as the user desires or as the device permits.

One aspect of the invention pertains to improved approaches to respond to incoming voice calls. The improved approaches enable a called party (i.e., a party being called) to provide some information to a calling party without directly engaging in a voice call with the calling party. The called party can choose not to take the voice call from the calling party. Instead, the called party can provide the calling party with some limited information. The limited information can be provided in an audio or textual format.

Epic Games Ex. 1001
Page 18

US 10,708,727 B2

9

In one embodiment, the limited information provides the calling party with feedback as to why the voice call was not taken.

FIG. 7 is a flow diagram of a personal call response process 200 according to one embodiment of the invention. The personal call response process 200 is performed by an electronic device, such as a mobile communication device (e.g., mobile telephone). The personal call response process 200 begins with a decision 202 that determines whether there is an incoming voice call. When the decision 202 determines that there is no incoming voice call, then the personal call response process 200 awaits such a call. Once the decision 202 determines that there is an incoming voice call, a decision 204 determines whether the incoming voice call is to be answered. Typically, the user of the electronic device would signal the electronic device as to whether or not to answer the incoming voice call. Alternatively, the electronic device could automatically decide whether to answer the call.

When the decision 204 determines that the user desires the incoming voice call to be answered, the incoming voice call is answered 206 and the user engages 208 in a voice call with the calling party. A decision 210 then determines whether the call has ended. When the decision 210 determines that the call has not yet ended, then the personal call response process 200 can return to repeat the block 208 while the voice call continues. Once the decision 210 determines that the voice call has ended, then the personal call response process 200 ends.

When the decision 204 determines that the user does not desire to answer the incoming voice call, a decision 212 determines whether the user desires to provide an audio message to the calling party. When the decision 212 determines that the user does desire to provide an audio message to the calling party, an audio message is obtained and sent 214 to the calling party (caller).

Alternatively, when the decision 212 determines that the user does not desire to provide an audio message, a decision 216 determines whether the user desires to provide a text message to the calling party. When the decision 216 determines that the user desires to provide a text message to the calling party, a text message is obtained and sent 218 to the calling party.

Still further, when the decision 216 determines that the user does not desire to provide a text message to the calling party, a decision 220 determines whether the incoming voice call is to be directed to voice mail. When the decision 220 determines that the incoming voice call should be directed to voice mail, then the incoming voice call is directed 222 to voice mail. On the other hand, when the decision 220 determines that the incoming voice call is not to be directed to voice mail, the incoming voice call is dropped 224. Following the blocks 214, 218, 222 and 224, the personal call response process 200 is complete and ends.

In another embodiment, a personal call response process could announce the calling party to the called party (user). In announcing the calling party, the personal call response process would present the called party with information pertaining to the calling party (e.g., display or audio sound). Such information could, for example, help the called party to decide whether to answer the incoming voice call. The information can, for example, include one or more of name (individual or business), telephone number, or other caller identification. The information could also include status information of the calling party, such as position, health, mood, etc. As an example, the information could be pre-

10

sented to the user prior to the decision 204 of the personal call response process 200 shown in FIG. 7.

In still another embodiment, an automated decision process to decide whether to answer a call can be based on time (e.g., decision 204). For example, the called party can previously set a rule, such as that from midnight to 6 am, the party does not want to answer voice calls. Then, during this time period, the electronic device can automatically decide not to answer incoming calls. In one implementation, when the electronic device decides not to answer incoming calls, no indication of incoming calls will be provided to the called party. For example, from midnight to 6 am, the device would not produce any ring tone. Additionally, if desired, the called party can also configure the electronic device to automatically provide an audio message or a text message to the calling party (e.g., I'm asleep call me tomorrow").

FIG. 8 is a flow diagram of an audio message response process 300 according to one embodiment of the invention. The audio message response process 300 is, for example, suitable for use as the processing carried out by block 214 illustrated in FIG. 7.

The audio message response process 300 initially answers 302 the incoming voice call. In this operation, the incoming voice call is answered 302 but not in a traditional way. Instead, the electronic circuitry associated with a mobile communication device (e.g., mobile telephone) that receives the incoming voice call operates to answer the incoming voice call for purposes of an audio message response. For example, a voice channel is established between the calling party and the mobile communication device, but the speaker and microphone of the mobile communication device are disabled. In effect, in such an embodiment, neither the called party nor the calling party perceives that the voice calling has been answered.

Next, one or more predetermined audio messages can be presented 304 by the mobile communication device. The presentation 304 of the one or more predetermined audio messages can, for example, be achieved by audio or visual means. For example, the predetermined audio messages can be audio output to a speaker associated with the mobile communication device for the called party or can be visual output (e.g., text) to a display of the mobile communication device for the called party (e.g., user of the mobile communication device).

A decision 306 then determines whether a predetermined audio message has been selected. Here, the decision 306 determines whether the user (i.e., called party) of the mobile communication device has selected one or more of the predetermined audio messages. When the decision 306 determines that a predetermined audio message has been selected, then the selected audio message is played 308 for the calling party. Here, the mobile communication device can output the selected audio message to the calling party over the voice channel. Typically, the mobile communication device of the called party would not produce an audible output at the mobile communication device, so that the called party would not be disturbed by the sending of the audio response. The predetermined audio messages are normally short messages (e.g., not more than 160 characters) so that the duration of time the voice channel is needed and/or the amount of network bandwidth consumed is minimal.

On the other hand, when the decision 306 determines that none of the predetermined audio messages have been selected, then a decision 310 determines whether a custom audio message is requested. A custom audio message is an audio message that is specifically provided for the calling

Epic Games Ex. 1001
Page 19

US 10,708,727 B2

11

party. When the decision 310 determines that a custom audio message is not being requested, then the audio message response process 300 returns to repeat the decision 306 and subsequent operations. Alternatively, when the decision 310 determines that a custom audio message is requested, then a custom audio message is recorded 312. Thereafter, the custom audio message that has been recorded can be played 314 for the calling party (caller). Here, typically, the custom audio message would be output by the mobile communication device of the called party over the voice channel to the calling party. Typically, the mobile communication device of the called party would not produce an audible output at the mobile communication device, so that the called party would not be disturbed by the sending of the audio response. The custom audio messages are also normally short messages (e.g., not more than 160 characters) so that the duration of time the voice channel is needed and/or the amount of network bandwidth consumed is minimal.

Following the operations 308 and 314, the incoming voice call is closed 316. In other words, after the selected audio message or the custom audio message is played 308, 314, the incoming voice call can be closed 316. Following the block 316, the audio message response process 300 is complete and ends.

The predetermined audio messages that are presented 304 to a called party can be determined in a static or dynamic manner. A static determination would, for example, be when the called party has previously set or recorded an audio message to be utilized. Typically, with static determination, the list of audio messages remains the same (i.e., static) until changed (e.g., by the called party). A dynamic determination would allow the audio messages in the list (or the ordering of the audio messages in the list) to change without specific action by the user or the called party. For example, the list or ordering of the audio messages can depend on preference settings, configuration information, or prior usage. Prior usage can include biasing the list of audio messages such that those messages being most often selected appear higher in the list. The list or ordering of the audio messages can also depend on the calling party, type of calling party, location of calling party or called party, and the like. The list of audio messages can be represented by text and/or graphics (e.g., icons).

The audio message response process 300 flexibly enables a user to either select one or more predetermined audio messages or provide a custom audio message to be used as an audio message response to a calling party. However, it should be recognized that, in other embodiments, an audio message response process can alternatively simply pertain to only providing a custom audio message, or only permitting selection of a predetermined audio message. Further, in still other embodiments, an audio message response process can first determine whether a custom audio message is to be provided before presenting predetermined audio messages. In yet other embodiments, an audio message response process can answer the incoming voice call later in the processing than operation 302 as shown in FIG. 8 (e.g., before operations 308 and 314).

FIG. 9 is a flow diagram of a text message response process 400 according to one embodiment of the invention. The text message response process 400 is, for example, processing performed by the block 218 illustrated in FIG. 7.

The text message response process 400 initially drops 402 the incoming voice call. Here, the information to be supplied to the calling party is a short text message; therefore, there is no need for a voice channel.

12

Next, one or more predetermined text messages are displayed 404. Here, the one or more predetermined text messages would normally be displayed on a display screen associated with the mobile communication device being utilized by the called party. A decision 406 then determines whether one (or more) of the predetermined text messages has been selected. When the decision 406 determines that a predetermined text message has been selected, then the selected text message is transmitted 408 to the caller (i.e., the calling party).

On the other hand, when the decision 406 determines that a predetermined text message has not been selected, then a decision 410 determines whether a custom text message is requested. When the decision 410 determines that a custom text message is not requested, then the text message response process 400 returns to repeat the decision 406 and subsequent operations. Alternatively, when the decision 410 determines that a custom text message is requested, then the custom text message is entered 412. Here, the called party interacts with the mobile communication device to enter the custom text message. Then, the custom text message is transmitted 414 to the caller. In one embodiment, the transmission 408,414 of the text message can be performed over a communication network, such as a network having a Short Message Service Center (SMSC) supporting Short Message Service (SMS) messages. Following the transmission 408 of the selected text message or the transmission 414 of the custom text message, the text message response process 400 is complete and ends.

An alternative embodiment of a text message response process could operate to answer the incoming voice call and announce to the caller that a text message will be forthcoming. Then, the incoming voice call could be promptly dropped. This additional operation could, for example, be used with the text message response process 400 by providing an additional operation prior to the block 402 illustrated in FIG. 9.

The predetermined text messages being displayed 404 to a called party can be determined in a static or dynamic manner. A static determination would, for example, be a text message the called party has previously set or entered. Typically, with static determination, the list of text messages remains the same (i.e., static) until changed (e.g., by the called party). A dynamic determination would allow the text messages in the list (or the ordering of the text messages in the list) to change automatically, and not by the user. For example, the list or ordering of the text messages can depend on preference settings, configuration information, or prior usage. To illustrate, prior usage can include biasing the list of text messages such that those messages being most often selected appear higher in the list. The list or ordering of the text messages can also depend on the calling party, type of calling party, location of calling party or called party, and the like. The list of text messages can identify each text message with text (e.g., at least a portion of the corresponding text message, or an abbreviation) and/or graphics (e.g., icons).

The text message response process 400 flexibly enables a user to either select one or more predetermined text messages or provide a custom text message to be used as a text message response to a calling party. However, it should be recognized that, in other embodiments, a text message response process can alternatively simply pertain to only providing a custom text message, or only permitting selection of a predetermined text message. Further, in still other embodiments, a text message response process can first determine whether a custom text message is to be provided before presenting predetermined text messages.

Epic Games Ex. 1001
Page 20

US 10,708,727 B2

13

FIG. **10** is a flow diagram of an automated call response process **500** according to one embodiment of the invention. The automatic call response process **500** is substantially similar in many ways to the personal call response process **200** illustrated in FIG. **7**. However, the automated call response process **500** operates to reduce user input at the mobile communication device by making use of stored data pertaining to its hardware components, configuration or preferences. In this regard, the automatic call response process **500** includes a decision **502** that determines whether a head-set is active. When the decision **502** determines that a head-set is active, then the automatic call response process **500** can prefer, suggest or require the user to obtain and send **214** an audio message to the caller in response to an incoming voice call. Alternatively, when the decision **502** determines that a head-set is not active, then a decision **504** can determine whether a display is present. In other words, the decision **504** can determine whether the mobile communication device has a display. When the decision **504** determines that the mobile communication device does have a display, then the mobile communication device can operate to obtain and send **218** a text message to the caller. Of course, this assumes that the caller can support text messages even though they initially called with a voice call. Hence, in another embodiment, the automatic call response process can operate to query or obtain information regarding the caller's communication device capabilities.

An exemplary scenario of how the previously described automatic call response process could work according to one implementation is as follows:

1. From his mobile phone, Bill calls Tom's mobile phone.

2. Tom is alerted by his mobile phone of an incoming call. Optionally, caller information (i.e., pertaining to Bill) can be displayed or announced to Tom.

3. Tom can choose to answer the incoming call or decline to answer the call.

4. In the event that Tom declines to answer the call, Tom can have the opportunity to provide the caller with a brief audio or text message.

5. If an audio message is to be provided, then Tom can either record a personalized message or select one of a plurality of predetermined audio messages. In this case, the incoming call is answered by Tom's mobile phone and then the audio message is played for the caller, thereafter the call is dropped. The audio messages are typically brief (i.e., short), and examples of audio messages are: (i) "Will call in 10 minutes," (ii) "Cannot talk now," (iii) "I'm in a meeting," or (iv) "Please don't call anymore."

6. On the other hand, if a text message is to be provided, then Tom can either enter a personalized text message or select from a plurality of predetermined text messages. In this case, the incoming call is dropped, and the entered text message or the selected one of the predetermined text messages is sent. Examples of text messages are: (i) "Will call in 10 minutes," (ii) "Cannot talk now," (iii) "I'm in a meeting," or (iv) "Please don't call anymore." The text messages can be English (or other language) words or phrases, or can be condensed text strings (e.g., such as slang or chat language). In one embodiment, the predetermined text messages presented to Tom can be dependent on some criteria (i.e., automatically selected). Alternatively, it is possible that Tom might want to edit the predetermined text message, such can be permitted. As yet another example, the text message can embed dynamic information, such as position, e.g., "I'm in [position] now, so I'll get back to you later." The position can be determined using a GPS receiver in the mobile phone or acquired by a remote computer and

14

provided to the mobile phone. The position may also be further processed (locally or remotely) into a more user-friendly form, such as city, school, restaurant name, or street type addresses. The position could also be used above to assist the user in deciding whether to answer the incoming call or decline to answer the call.

7. If hardware components, configuration or preferences are taken into consideration, as illustrated in FIG. **10**, the above scenario can be modified. For example, if Tom is using a head-set with his mobile phone, then an audio message may be most convenient, assuming that Tom wants to provide a particular (i.e., customized) message to Bill. The head-set allows Tom to record a brief audio message. Less conveniently, the head-set can be used to present a list of predetermined audio messages and allow Tom's selection therefrom by a button or voice-command.

8. If Tom is not using a head-set, then a text message response might be more suitable. This would typically require that Tom's mobile phone have a display and a keypad. Even so, without a head-set, Tom could still record an audio message, though such would likely be less convenient.

9. Tom can also not provide an audio message or a text message and simply let the incoming call roll-over into voice mail.

The exemplary scenario can also be used in a case where the called party is using one line but the mobile device has multi-line capabilities or call waiting. In such case, the mobile phone can enable the called party to provide a brief audio or text message to the calling party as noted above. Alternatively, the mobile phone can itself automatically (i.e., without user input) respond to the calling party via an audio or text message since the mobile phone is aware that the called party is on the other line.

In this aspect of the invention, the calling party and the called party often use mobile communication devices, such as mobile phones. However, the parties can alternatively use other electronic devices, such as a PDA, a computer, etc. Further, the option to provide a text response could be prevented if the caller's device is known to not support text messages.

The advantages of the previously described embodiments are numerous. Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. In still another advantage, a user can provide feedback to a caller without answering a voice call from the caller.

Another aspect of the invention pertains to improved approaches to respond to an incoming text message. The improved approaches enable a recipient to provide a reply message to an initiator. The incoming text message can be presented to the recipient with an audio or textual presentation. Thereafter, a reply text message can be sent back to the initiator. The recipient can form the reply text message by recording a brief audio message or entering a text message. In the case in which a brief audio message is used, the audio message can be automatically converted to a text message before being transmitted to the initiator.

FIG. **11** is a flow diagram of a message presentation process **600** according to one embodiment of the invention. The message presentation process **600** is performed by an electronic device, such as a mobile communication device.

Epic Games Ex. 1001
Page 21

US 10,708,727 B2

15

The message presentation process **600** begins with a decision **602** that determines whether an incoming text message is present. Typically, the incoming text message would be transmitted to the mobile communication device from another communication device. When the decision **602** determines that an incoming text message is not present, then the message presentation process **600** awaits such message. Once the decision **602** determines that an incoming text message has been received, a decision **604** determines whether an audio or text presentation is to be utilized. The decision **604** can be performed in a variety of different ways. For example, the determination of whether to utilize an audio or text presentation can be based on user input or can be automatically determined through a use of configuration or preference information or hardware components (e.g., display, speaker, head-set).

When the decision **604** determines that an audio presentation is to be utilized, the incoming text message is converted **606** to an audio message. For example, a text-to-speech conversion can be performed. In one embodiment, a user of the electronic device can be permitted to choose speech characteristics, such as a voice, tone, pace, accent, or mood, for the resulting speech. For example, a user could choose speech characteristics by preference settings. In another embodiment, the incoming text message can include or reference speech characteristics so that the initiator can control or influence speech characteristics. In still another embodiment, if the text to be converted contains condensed text (e.g., such as slang or chat language), the resulting speech can pertain to an uncondensed form of the text. The ability to convert from condensed text to resulting speech for uncondensed text can be facilitated by pattern matching. For example, in chat language "LOL" can be converted to an audio message for "lots of love." In one implementation, a table can store audio messages corresponding to chat terms or phrases. In another implementation, a first table would store uncompressed terms or phrases corresponding to chat terms or phrases, and a second table would store audio messages corresponding to the uncompressed terms or phrases.

After the incoming text message is converted to the audio message, the audio message is played **608**. Typically, the audio message is played **608** by the mobile communication device for the user. For example, the audio message can be output to a speaker of the mobile communication device or a headset used therewith. As a result, the user of the mobile wireless communication device receives an audio message even though the incoming message was a text message.

On the other hand, when the decision **604** determines that a text presentation is to be utilized, the incoming text message is displayed **610**. Here, the incoming text message would be displayed **610** on a display associated with the mobile communication device. Following the blocks **608** and **610**, the message presentation process **600** ends.

As discussed above, text-to-speech conversion can be invoked and performed on an electronic device, which may be a mobile communication device. While text-to-speech conversion, particularly if high quality is desired, requires substantial processing capabilities, mobile electronic devices, such as mobile communication devices, given their small form factor and price competition, tend to have limited processing capability. Accordingly, in one embodiment, text-to-speech conversion can be off-loaded from the mobile device. For example, a remote server computer can be provided the text message and produce the resulting audio message, and then supply the audio message to the mobile device. The remote server computer can be a networked

16

server coupled to the network **108**. One example of a networked server is a gateway computer for a wireless electronic device, such as a mobile telephone.

FIG. **12** is a flow diagram of a reply message process **700** according to one embodiment of the invention. The reply message process **700** is performed by an electronic device, such as a mobile communication device.

The reply message process **700** begins with a decision **702** that determines whether a reply message is to be sent. Typically, the reply message process **700** follows the presentation of an incoming text message to a user of a mobile communication device. Hence, the reply message to be sent is a reply to the incoming text message. However, in other embodiments, the reply message to be sent can be merely an initial message as opposed to a response to an earlier message.

In any case, when the decision **702** determines that a reply message is not to be sent, then the reply message process **700** ends or simply awaits the need to send a reply message. On the other hand, when the decision **702** determines that a reply message is to be sent, then a decision **704** determines whether an audio or text message is to be formed. The decision **704** can be performed in a variety of different ways. For example, the determination of whether to send an audio or text message can be based on user input or can be automatically determined through a use of configuration or preference information or hardware components (e.g., display, speaker, head-set).

When the decision **704** determines that an audio message is to be formed, then the reply message process **700** prompts **706** for an audio message. Here, the prompt **706** can be directed to the user of the mobile communication device. The prompt can be an audio or textual indication. Next, a decision **708** determines whether an audio message has been recorded. When the decision **708** determines that the audio message has not been recorded, then the reply message process **700** awaits the audio message. Once the decision **708** determines that the audio message has been recorded, then the audio message is converted **710** to a text message. In one embodiment, if the audio message recorded is greater than a maximum text message size (e.g., 150 or 160 characters), then the audio message can be shortened so that the resulting text message does not exceed the maximum text message size. One way to shorten the text message is to use abbreviations. For example, the words "For example" can be changed to "e.g.". Such conversion can be again be performed by matching entries in tables. Another way to shorten is to remove non-essential text. Still another way to shorten is to clip off or truncate the text message at the maximum text message size. In another embodiment, the resulting text message might provide an indication that it was converted from an audio message. Following the block **710**, the text message is transmitted **712** over a wireless network.

Alternatively, when the decision **704** determines that a text message is to be formed, then a text entry screen is displayed **714**. Next, a decision **716** determines whether a text message has been entered. When the decision **716** determines that a text message has not yet been entered, then the reply message process **700** awaits entry of the text message. Once the text message has been entered, the text message is transmitted **712** over the wireless network. Following the block **712**, the reply message process **700** ends.

Although the reply message process **700** provides for the user to enter a custom text or audio message, it should be understood that the reply message can alternatively be

Epic Games Ex. 1001
Page 22

US 10,708,727 B2

17

formed through use of semi-custom or predetermined reply messages from which the user of the mobile communication device can choose. The use of semi-custom or predetermined reply messages can be achieved as noted above in a number of embodiments, and can serve to simplify the conversion process.

An exemplary scenario of how message presentation and reply message processes could work according to one implementation of the second aspect is as follows:

1. From his mobile phone, Bill prepares and sends a text message to Tom's mobile phone.

2. Tom is alerted by his mobile phone of an incoming text message, such as by displaying at least a portion of the text message and/or otherwise notifying Tom of the text message.

3. Tom's mobile phone can decide whether to present the text message on a display screen of Tom's mobile phone, or to first convert the text message to an audio message and then present the audio message to Tom (e.g., play the audio message). Of course, Tom can interact with Tom's mobile phone to assist in making the determination on how to present the message.

4. Thereafter, if desired, Tom can prepare and send a reply message back to Bill. This reply message can be prepared initially as a text message or an audio message. Tom's mobile phone and/or Tom can determine whether the reply message is initially prepared as a text message or as an audio message. If an audio message is initially created, such audio message must be converted to a text message prior to transmission. Eventually, the reply message is sent to Bill as a text message. Tom's mobile phone can assist with the creation of the reply message through use of custom, semi-custom or predetermined reply message from which Tom and/or Tom's mobile phone can choose.

5. If Tom is using a head-set with his mobile phone, then an audio message may be more convenient, assuming that Tom wants to provide a particular (i.e., customized) message to Bill. The head-set allows Tom to easily record a brief audio message. Less conveniently, the head-set can be used to present a list of predetermined audio messages and allow Tom's selection therefrom by a button or voice-command.

6. If Tom is not using a head-set, then a text message response might be more suitable. This would typically require that Tom's mobile phone have a display and a keypad. Even so, without a head-set, Tom could still record an audio message, though such would likely be less convenient.

7. Tom can also not provide a reply message and simply not respond to the incoming text message. Alternatively, Tom can configure his mobile phone to automatically produce and send a reply message based on user settings or preferences, position, configuration, status, etc.

In this aspect of the invention, the calling party and the called party often use mobile communication devices, such as mobile phones. However, the parties can alternatively use other electronic devices, such as a PDA, a computer, etc.

The advantages of the invention exemplified by FIGS. 11-12 are numerous. Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device or user preferences. Still another advantage is that conversion of an audio message to a text message facilitates use a low cost network (such as the SMS network). Another advantage is reduced network bandwidth load. Yet still another advan-

18

tage is that the sender can get back a message in the same format as they sent the original message, though the recipient may use the message in a different format or mode (e.g., recipient hears the text message as an audio message).

Moreover, it should be noted that with regards to any of the embodiments in which a voice call or a text message is incoming to an electronic device, not only can the user of the mobile device take an action (e.g., button press or voice-command) to decline the call/message but also the electronic device itself can automatically decline the call/message such that the user is not disturbed. For example, an electronic device can be configured through user settings (e.g., preferences) to decline calls/messages matching certain criteria. Also, an auto reply message can be configured to be automatically sent in response to the call/message. For a known, undesired marketing caller/message sender, the electronic device can automatically send a reply message demanding the sender not to call or send messages anymore, and to remove your information from their database.

Text messages received or sent can optionally embed indications of speech characteristics to be used, should the text message be converted to an audio format. The speech characteristics can pertain to voice, tone, pace, accent, and/or mood. The speech characteristics for the resulting speech can be set in preference or configuration information, set on a per message basis by users, or set by evaluation of monitored data pertaining to the user.

Additionally, the messages being transmitted can be encrypted for security purposes.

In one embodiment, an electronic device performing communications using audio and/or text messages according to the invention can further integrate (or have tethered thereto) one or more electrical components for enhancing the hearing of the user of the electronic device. The electronic device will normally include a microphone and a speaker. The invention described herein can be considered an automated secretary for a user of an electronic device. The automated secretary can completely or partially respond to an incoming call/message so as to reduce disturbances to the user. The user can personalize the automated secretary through user settings (e.g., preferences), or the automated secretary can learn over time how to handle different incoming calls/messages. Besides handling or assisting the user with incoming calls/messages, the automated secretary can also assist with other activities, such as making calendar entries (e.g., meetings) in a calendar or responding to incoming callers/messages with relevant information pertaining to the user's schedule as maintained by the calendar (though the user could restrict such access to certain information and/or inquiring parties). For example, if an incoming text message asks "available for lunch today?", the automated secretary can check the user's availability for lunch by way of the user's calendar, then if the user is not available the automated secretary can quickly informing the inquiring party of same or propose another date. On the other hand, if the lunch time period is available in the user's calendar, then the automated secretary can either directly respond to the inquiring party of acceptance or propose a response to the user for review, modification and/or transmission.

It should be obvious to those skilled in the art that a number of embodiments performing communications using voice as well as audio and/or text messages can be implemented using voice over Internet Protocol technologies, with signals delivered over the Web. For example, a calling party's communication or mobile device can include an adapter to convert voice signals to data packets before

Epic Games Ex. 1001
Page 23

US 10,708,727 B2

19

sending them over the Internet. A service provider can convert the packets back into voice signals before sending the voice signals to the called party's communication device. Similarly, embodiments can be implemented using voice over wireless protocols, such as Wi-Fi or Wi-Max networks. Using such technologies, computing devices can become communication devices.

The various embodiments, implementations, features and aspects of the invention noted above can be combined in various ways or used separately. Those skilled in the art will understand from the description that the invention can be equally applied to or used in other different settings with respect to various combinations, embodiments, implementations or features provided in the description herein.

The invention can be implemented in software, hardware or a combination of hardware and software. A number of embodiments of the invention can also be embodied as computer readable code on a computer readable medium. The computer readable medium is any data storage device that can store data which can thereafter be read by a computer system. Examples of the computer readable medium include read-only memory, random-access memory, CD-ROMs, magnetic tape, optical data storage devices, and carrier waves. The computer readable medium can also be distributed over network-coupled computer systems so that the computer readable code is stored and executed in a distributed fashion.

Numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will become obvious to those skilled in the art that the invention may be practiced without these specific details. The description and representation herein are the common meanings used by those experienced or skilled in the art to most effectively convey the substance of their work to others skilled in the art. In other instances, well-known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the present invention.

In the foregoing description, reference to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

The many features and advantages of the present invention are apparent from the written description and, thus, it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

1. A computer-implemented method to facilitate electronic communication of a plurality of users using at least a network-based portal at least based on Internet protocol, the method comprising:

providng a plurality of modes of communication to a first user to allow the first user to use one of the plurality of modes of communication as a selected mode of com-

20

munication for a first message to be sent from the first user to a second user, based on an identifier associated with the first user previously set by the first user via the network-based portal,

wherein the plurality of modes of communication supported by the network-based portal include at least text communication using a personal computer, voice communication using a personal computer, and communication with at least an image, and

wherein messages are eligible to be received by the second user via the network-based portal, based on any of the plurality of modes of communication, all depending on an identifier associated with the second user previously set by the second user via the network-based portal, which allows the second user to efficiently maintain the second user's communication using the plurality of modes of communication;

enabling the second user to block the first user from using at least the selected mode of communication to communicate with the second user via the network-based portal, based on the identifier associated with the first user;

enabling the first message to be provided to the second user, using the selected mode of communication, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected mode of communication to communicate with the second user, via the network-based portal;

and

receiving a second message from the second user to the first user, to respond to the first message, after the second user has received the first message,

wherein one of the first message or the second message is voice and the other of the first message or the second message is text,

wherein even when the first message is received by the second user via the selected mode of communication, contact information associated with the second user and provided by the second user to the network-based portal is not provided via the network-based portal to the first user, and contact information associated with the first user and provided by the first user to the network-based portal is not provided via the network-based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user,

wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the contact information associated with the first user,

wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user, and

wherein the contact information associated with the first user includes at least one of a phone number or an email address of the first user.

2. A computer-implemented method as recited in claim 1 comprising enabling a message to be provided to the second user from the first user, with the message based on a mode of communication that is different from the selected mode,

Epic Games Ex. 1001
Page 24

US 10,708,727 B2

21

even though the second user has blocked the first user from using the selected mode of communication to communicate with the second user.

**3.** A computer-implemented method as recited in claim **2,** wherein the mode of communication different from the selected mode includes communication with at least an image and communication in an audio manner.

**4.** A computer-implemented method as recited in claim **2** comprising enabling a message to be provided to the second user from another user using the selected mode to communicate, but not enabling messages to be provided to the second user from the another user using the mode of communication different from the selected mode to communicate, via the network-based portal.

**5.** A computer-implemented method as recited in claim **1** comprising:

enabling a message to be provided to the second user from the first user, with the message based on a mode of communication that is different from the selected mode; and

enabling a message to be provided to the second user from another user using the selected mode to communication, but not enabling messages to be provided to the second user from the another user using the mode of communication different from the selected mode, via the network-based portal.

**6.** A computer-implemented method as recited in claim **1,** wherein the plurality of modes of communication supported by the network-based portal include at least communication using an electronic device without a computer keyboard, and wherein the method supports a user to use an electronic device with a computer keyboard to communicate with another user using an electronic device without a computer keyboard.

**7.** A computer-implemented method as recited in claim **1** comprising:

receiving an indication from the second user for the first user via the network-based portal to generate an urgent notification for the first user; and

enabling the urgent notification to be generated to notify the first user at least in view of receiving the indication.

**8.** A computer-implemented method as recited in claim **7,** wherein the urgent notification is enabled to be generated at least in an audio manner.

**9.** A computer-implemented method as recited in claim **1** comprising enabling an urgent notification to be provided to the second user from the first user, even though the second user has blocked the first user from using the selected mode of communication to communicate with the second user.

22

**10.** A computer-implemented method as recited in claim 1,

wherein the first message is a text message, and

wherein the method comprises transforming the first message into a voice message so that the first message is provided to the second user in an audio manner via a speaker if the first user is not blocked from using the selected mode of communication to communicate with the second user.

**11.** A computer-implemented method as recited in claim **10,** wherein the method comprises transforming the second message from voice into text to be provided to the first user.

**12.** A computer-implemented method as recited in claim **1,** wherein the method comprises:

keeping track of the number of times the second user has blocked the first user to communicate with the second user; and

blocking the first user to communicate with the second user at least via the selected mode of communication after the number of times has reached a preset number.

**13.** A computer-implemented method as recited in claim **12,** wherein the method comprises asking the second user for permission before blocking the first user to communicate with the second user at least via the selected mode of communication.

**14.** A computer-implemented method as recited in claim **1,** wherein the method comprises receiving at least an indication from the second user specifying the first user having a right to access the second user before messages are eligible to be provided to the second user from the first user via the network-based portal.

**15.** A computer-implemented method as recited in claim **1,** wherein the method comprises:

determining availability of the second user related to receiving messages; and

sending data to the first user regarding the availability of the second user related to receiving messages.

**16.** A computer-implemented method as recited in claim **1** comprising enabling the second user to select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages provided to the second user.

**17.** A computer-implemented method as recited in claim **1** wherein the plurality of communication modes include at least text communication using a mobile phone, and voice communication using a mobile phone.

\* \* \* \* \*

Epic Games Ex. 1001
Page 25



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

UNITED STATES DEPARTMENT OF COMMERCE

**United States Patent and Trademark Office**

September 30, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

**U.S. PATENT:** *10,492,038*
**ISSUE DATE:** *November 26, 2019*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

Epic Games Ex. 1001
Page 1



US010492038B2

(12) **United States Patent**     (10) **Patent No.:    US 10,492,038 B2**
Cheung et al.                     (45) **Date of Patent:        *Nov. 26, 2019**

(54) **METHOD AND APPARATUS TO MANAGE MESSAGING PROVIDING DIFFERENT COMMUNICATION MODES DEPENDING ON ONE IDENTIFIER AND NOT REQUIRING TO DISCLOSE CONTACT INFORMATION**

(71) Applicant: **IpVenture, Inc.**, Los Altos, CA (US)

(72) Inventors: **Kwok Wai Cheung**, Tai Po (HK); **Peter P. Tong**, Mountain View, CA (US); **C. Douglass Thomas**, Saratoga, CA (US)

(73) Assignee: **IpVenture, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/704,181**

(22) Filed: **Sep. 14, 2017**

(65) **Prior Publication Data**

US 2018/0014169 A1     Jan. 11, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/469,440, filed on Mar. 24, 2017, now Pat. No. 10,142,810, which is a
(Continued)

(51) **Int. Cl.**
*H04W 4/14*         (2009.01)
*G06Q 10/10*        (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *H04W 4/14* (2013.01); *G06Q 10/10* (2013.01); *H04M 3/436* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ....... H04M 2203/651; H04M 3/42059; H04M 3/42093
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,425,516 A     6/1995  Daines
5,548,636 A     8/1996  Bannister et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN      1453981      11/2003
WO      WO 01/45343 A2     6/2001

OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 12/798,995 dated Sep. 29, 2011.
(Continued)

*Primary Examiner* — Kiet M Doan

(57)     **ABSTRACT**

A number of embodiments regarding computer-implemented systems and methods to manage electronic communications are disclosed. In one embodiment, an apparatus, using at least a network-based portal based on Internet protocol, provides different communication modes to a first user, with messages eligible to be received by a second user based on any of the modes, depending on an identifier associated with the second user; and receives an indication from the first user to select a communication mode for a message for the second user. In the embodiment, the apparatus could receive contact information associated with the second user to allow the second user to participate, with the contact information not provided to the first user even when the message is received by the second user, and with the contact information being distinct from the identifier.

**70 Claims, 9 Drawing Sheets**



Epic Games Ex. 1001
Page 2

**US 10,492,038 B2**

Page 2

**Related U.S. Application Data**

continuation of application No. 14/922,344, filed on Oct. 26, 2015, now Pat. No. 9,736,664, which is a continuation of application No. 14/272,632, filed on May 8, 2014, now Pat. No. 9,204,268, which is a continuation of application No. 12/798,995, filed on Apr. 14, 2010, now Pat. No. 8,744,407, which is a continuation of application No. 11/452,115, filed on Jun. 12, 2006, now Pat. No. 7,729,688, which is a continuation-in-part of application No. 11/006,343, filed on Dec. 7, 2004, now Pat. No. 7,116,976.

(60) Provisional application No. 60/527,565, filed on Dec. 8, 2003, provisional application No. 60/689,686, filed on Jun. 10, 2005.

(51) **Int. Cl.**
| | |
|---|---|
| *H04M 3/436* | (2006.01) |
| *H04W 4/16* | (2009.01) |
| *H04W 4/12* | (2009.01) |

(52) **U.S. Cl.**
CPC ........... **H04M 3/4365** (2013.01); **H04W 4/12** (2013.01); **H04W 4/16** (2013.01); *H04M 2201/60* (2013.01); *H04M 2203/2011* (2013.01); *H04M 2203/651* (2013.01); *H04M 2207/18* (2013.01)

(58) **Field of Classification Search**
USPC .............. 455/417, 414.1, 466, 412.2, 435.3; 379/88.16, 390.01, 207.04
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,610,970 A | | 3/1997 | Fuller et al. |
| 5,752,191 A | | 5/1998 | Fuller et al. |
| 5,758,079 A | | 5/1998 | Ludwig et al. |
| 5,828,731 A | * | 10/1998 | Szlam et al. |
| 5,930,700 A | * | 7/1999 | Pepper et al. ........... H04Q 7/24 455/414 |
| 5,970,388 A | | 10/1999 | Will |
| 6,119,022 A | | 9/2000 | Osborn et al. |
| 6,327,628 B1 | | 12/2001 | Anuff et al. |
| 6,359,982 B1 | | 3/2002 | Szlam |
| 6,463,462 B1 | | 10/2002 | Smith et al. |
| 6,577,859 B1 | | 6/2003 | Zahavi et al. |
| 6,636,888 B1 | | 10/2003 | Bookspan et al. |
| 6,665,534 B1 | | 12/2003 | Conklin et al. |
| 6,788,766 B2 | | 9/2004 | Logan |
| 6,801,793 B1 | | 10/2004 | Aarnio et al. |
| 6,816,578 B1 | | 11/2004 | Kredo et al. |
| 6,819,757 B1 | | 11/2004 | Cook et al. |
| 6,819,945 B1 | | 11/2004 | Chow et al. |
| 6,978,136 B2 | | 12/2005 | Jenniges et al. |
| 7,010,288 B2 | | 3/2006 | Brown et al. |
| 7,010,332 B1 | | 3/2006 | Irvin et al. |
| 7,027,842 B2 | | 4/2006 | Zhang et al. |
| 7,043,261 B2 | | 5/2006 | Krishnan |
| 7,072,452 B1 | | 7/2006 | Roberts et al. |
| 7,085,253 B2 | | 8/2006 | Yang |
| 7,107,010 B2 | | 9/2006 | Heinonen et al. |
| 7,110,963 B2 | | 9/2006 | Negreiro |
| 7,111,044 B2 | | 9/2006 | Lee |
| 7,116,976 B2 | | 10/2006 | Thomas et al. |
| 7,188,073 B1 | | 3/2007 | Tam et al. |
| 7,224,775 B1 | | 5/2007 | Shaffer et al. |
| 7,317,706 B1 | | 1/2008 | Hao et al. |
| 7,346,630 B2 | | 3/2008 | Eichstaedt et al. |
| 7,376,434 B2 | | 5/2008 | Thomas et al. |
| 7,376,630 B2 | | 5/2008 | Blair et al. |
| 7,403,972 B1 | | 7/2008 | Lau et al. |

| | | | | |
|---|---|---|---|---|
| 7,686,693 B2 | | 3/2010 | Danieli et al. | |
| 7,729,688 B2 | | 6/2010 | Cheung et al. | |
| 7,792,552 B2 | | 9/2010 | Thomas et al. | |
| 7,890,128 B1 | | 2/2011 | Thomas et al. | |
| 8,112,104 B1 | | 2/2012 | Thomas et al. | |
| 8,280,419 B1 | | 10/2012 | Thomas et al. | |
| 8,353,773 B2 | | 1/2013 | Sasaki et al. | |
| 8,429,231 B2 | | 4/2013 | Wu et al. | |
| 8,391,459 B2 | * | 5/2013 | Jasckson et al. | .... G06Q 10/109 379/210.01 |
| 8,737,978 B1 | | 5/2014 | Thomas et al. | |
| 8,744,407 B2 | | 6/2014 | Cheung et al. | |
| 8,827,811 B2 | | 9/2014 | Kim et al. | |
| 9,204,268 B2 | | 12/2015 | Cheung et al. | |
| 9,555,334 B2 | | 1/2017 | Bernard et al. | |
| 9,736,664 B2 | | 8/2017 | Cheung et al. | |
| 10,142,810 B2 | | 11/2018 | Cheung et al. | |
| 10,183,219 B2 | | 1/2019 | Linden et al. | |
| 10,207,191 B2 | | 2/2019 | Jensen | |
| 2001/0011014 A1 | | 8/2001 | Higuchi et al. | |
| 2001/0014611 A1 | | 8/2001 | Dufort | |
| 2001/0028709 A1 | | 10/2001 | Makela et al. | |
| 2001/0031633 A1 | | 10/2001 | Tuomela et al. | |
| 2002/0067806 A1 | | 6/2002 | Rodriguez et al. | |
| 2002/0073207 A1 | | 6/2002 | Widger et al. | |
| 2002/0094067 A1 | | 7/2002 | August | |
| 2002/0142756 A1 | | 10/2002 | Rutledge et al. | |
| 2002/0181672 A1 | | 12/2002 | Cannell et al. | |
| 2003/0039339 A1 | | 2/2003 | Luehrig et al. | |
| 2003/0041048 A1 | | 2/2003 | Balasuriya | |
| 2003/0065779 A1 | | 4/2003 | Malik | |
| 2003/0103600 A1 | | 6/2003 | Potter | |
| 2003/0105854 A1 | | 6/2003 | Thorsteinsson et al. | |
| 2003/0112948 A1 | | 6/2003 | Brown et al. | |
| 2003/0129968 A1 | | 7/2003 | Earl | |
| 2003/0191676 A1 | | 10/2003 | Templeton | |
| 2003/0191814 A1 | | 10/2003 | Tran | |
| 2003/0232629 A1 | | 12/2003 | Jang et al. | |
| 2004/0024882 A1 | | 2/2004 | Austin et al. | |
| 2004/0072585 A1 | | 4/2004 | Le et al. | |
| 2004/0078340 A1 | * | 4/2004 | Evans | ................... G06Q 20/10 705/64 |
| 2004/0122979 A1 | | 6/2004 | Kirkland | |
| 2004/0143667 A1 | * | 7/2004 | Jerome | ............. G06F 17/30882 709/228 |
| 2004/0203919 A1 | | 10/2004 | Ross et al. | |
| 2004/0240650 A1 | | 12/2004 | Bear et al. | |
| 2004/0248596 A1 | | 12/2004 | Panchal | |
| 2005/0020288 A1 | | 1/2005 | Davis | |
| 2005/0027385 A1 | | 2/2005 | Yueh | |
| 2005/0037785 A1 | | 2/2005 | Chen | |
| 2005/0386690 A1 | | 2/2005 | Hayes-Roth | |
| 2005/0071253 A1 | | 3/2005 | Yang | |
| 2005/0107130 A1 | | 5/2005 | Peterson, II | |
| 2005/0136955 A1 | | 6/2005 | Mumick et al. | |
| 2005/0191994 A1 | | 9/2005 | May et al. | |
| 2005/0192061 A1 | | 9/2005 | May et al. | |
| 2005/0273327 A1 | | 12/2005 | Krishnan | |
| 2006/0003803 A1 | | 1/2006 | Thomas et al. | |
| 2006/0075038 A1 | | 4/2006 | Mason et al. | |
| 2006/0168054 A1 | * | 7/2006 | Burkhart | ................. H04L 51/04 709/206 |
| 2006/0212561 A1 | * | 9/2006 | Feng | ................... H04L 63/0227 709/223 |
| 2006/0239419 A1 | | 10/2006 | Joseph et al. | |
| 2006/0259565 A1 | | 11/2006 | Cheung et al. | |
| 2006/0276210 A1 | | 12/2006 | Thomas et al. | |
| 2006/0288099 A1 | | 12/2006 | Jefferson et al. | |
| 2007/0005368 A1 | | 1/2007 | Chutorash et al. | |
| 2007/0047522 A1 | | 3/2007 | Jefferson et al. | |
| 2007/0238474 A1 | | 10/2007 | Ballas | |
| 2008/0261636 A1 | | 10/2008 | Lau et al. | |
| 2010/0114958 A1 | | 5/2010 | Korenshtein | |
| 2010/0205272 A1 | | 8/2010 | Cheung et al. | |
| 2011/0151582 A1 | | 6/2011 | Basile | |
| 2011/0151852 A1 | | 6/2011 | Olincy et al. | |
| 2014/0242956 A1 | | 8/2014 | Cheung et al. | |

Epic Games Ex. 1001
Page 3

US 10,492,038 B2

Page 3

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2014/0256293 A1 | 9/2014 | Thomas et al. |
| 2016/0044474 A1 | 2/2016 | Cheung et al. |
| 2017/0201872 A1 | 7/2017 | Cheung et al. |

OTHER PUBLICATIONS

Notice of Allowance for U.S. Appl. No. 12/798,995 dated Jan. 3, 2012.
Notice of Allowance for U.S. Appl. No. 12,798,995, dated May 9, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Oct. 3, 2012.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Jul. 16, 2013.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Oct. 30, 2013.
Notice of Allowance for U.S. Appl. No. 12/798,995, dated Feb. 20, 2014.
Office Action for U.S. Appl. No. 14/272,632, dated Jul. 27, 2015.
Notice of Allowance for U.S. Appl. No. 14/272,632, dated Sep. 18, 2015.
Office Action for U.S. Appl. No. 14/922,344, dated Apr. 27, 2016.
Office Action for U.S. Appl. No. 14/922,344, dated Oct. 7, 2016.
Notice of Allowance for U.S. Appl. No. 14/922,344, dated Feb. 14, 2017.
Notice of Allowance for U.S. Appl. No. 14/922,344, dated Mar. 6, 2017.
Notice of Allowance for U.S. Appl. No. 15/469,440, dated Sep. 6, 2017.
First Office Action for CN Patent Application No. 200680027964.9, dated Mar. 26, 2010 (17 pages).
Second Office Action for CN Patent Application No. 200680027964. 9, dated Oct. 25, 2010 (14 pages).
Third Office Action for CN Patent Application No. 200680027964. 9, dated Apr. 8, 2011 (11 pages.).
Notice of Rejection for CN Patent Application No. 200680027964. 9, dated Jan. 6, 2012 (11 pgs.).
"Company Overview", http://www.fastmobile.com/company_overview.html, downloaded Nov. 5, 2003, p. 1.
"Introducing the Tellme Voice Application Network", Tellme, http://www.tellme.com/products/, downloaded Oct. 2, 2003, p. 1.
"Iotum History," Iotum Corp., http://iotum.com/simplyrelevant/2006/04/03/iotum-history/, downloaded May 15, 2006, pp. 1-4.
"Messaging", Vodafone Group, 2001, http:www.vodafone.co.nz/business/10.2.3_messaging.jsp, downloaded Oct. 14, 2003, pp. 1-2.
"Microsoft Windows Messenger: Go Beyond Text with Voice & Video Chats", Dell Inc., http://www.dell.com/us/en/dhs/topics/segtopic_002_xp_im.htm, downloaded Oct. 2, 2003, pp. 1-2.
"Microsoft Windows Messenger: Instantly Communicate with Family and Friends Messenger", Dell Inc., http://www.dell.com/us/en/dhs/topics/segtopic_001_xp_im.htm, downloaded Oct. 2, 2003, pp. 1-3.
"Our Solution," Iotum Corp., http://www.iotum.com/our_solution.php, downloaded May 15, 2006, pp. 1-2.
Short Message Service/Interactive Voice Response (SMS/IVR), Lucent Technologies, 2003, pp. 1-2.
"Text messaging", Vodafone Group, 2001, Vodafone—Services, "All about text messaging", http://www.vodafone.co.nz/services/07.a.1_two_way_messaging.jsp?hd=4yourbusiness& . . . , downloaded Oct. 14, 2003, pp. 1-2.
"We bring relevance to communications," Cnet News, Ina Fried, Jul. 21, 2005, pp. 1-2.
Appenzeller, et al., "The Mobile People Architecture", Technical Report: CSI.-TR-00000, Computer Systems Laboratory, Departments of Electrical Engineering and Computer Science, Stanford University, Jan. 1999, pp. 1-13.

BlackBerry, "Voice and SMS", http://www.blackberry.com/products/service/voices_sms.shtml?DCPID=hmsvoice downloaded Oct. 2, 2003, p. 1.
Calsyn, Martin and Desseault, Lisa, "Presence Information Protocol Requirements," Internet Draft, Feb. 9, 1998, pp. 1-27.
Emergin Inc., "Emergin WirelessOffice 5.0", http://www.emergin.com/?source=overture, downloaded Oct. 2, 2003, p. 1.
Fastmobile Inc., "Dialog GSM launches Push 'n' Talk walkie talkie service Push to Talk over Cellular Now in Sri Lanka Dialog GSM Pioneers Latest GSM Advancement", Press Release, Dec. 1, 2004, pp. 1-2.
Fastmobile, "fastmobile's fastchat™ Instant Communications Application is Coming to Thousands of Mobile Phone Retail Stores Nationwide", fastmobile Press Release, Sep. 15, 2003, pp. 1-3.
IMBOT, Press Release, "IMBOT offers new Text 2 Voice Service Text 2 Voice service enables wireless customers to send voice messages from 2-Way devices", Oct. 29, 2001, pp. 1-2.
Internet Traveler, "Welcome to the Inter.Net Communicator Tour!", http://www.inter.net/traveler/tour/communicator_messaging.php, downloaded Oct. 14, 2003, p. 1.
J. Rosenberg, H. Schulzrinne, Internet Draft, "SIP for Presence," http://www.alternic.org/drafts/drafts-r-s/draft-rosenberg=sip-pip-00.txt, Nov. 13, 1998, Bell Laboratories, Columbia, pp. 1-31.
Joseph, Anthony D. et al., "The Case for Services over Cascaded Networks", EECS Department, CS Division, University of California, Berkeley, http://iceberg.cs.berkeley.edu/, International Conference on Wireless and Mobile Multimedia 1998, pp. 1-9.
MobileShop, "SMS—also know as text messaging", http://www.mobileshop.org/howitworks.sms.htm, downloaded Oct. 14, 2003, pp. 1-2.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf=simple-rpid-06.txt, Jun. 2, 2005, http://www1.ietf.org/mail-archive/web/simple/current/msg05398.html, downloaded Nov. 15, 2006, pp. 1-35.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf=simple-rpid-10.txt, Dec. 20, 2005, pp. 1-41.
Schulzrinne, H. et al., RPID: Rich Presence Extensions to the Presence Information Data Format (PIDF), draft-ietf=simple-rpid-10.txt, Dec. 4, 2005, pp. 1-35.
Sonim Technologies, Inc., "Integrated voice and text messaging over GPRS showcased jointly by Sonim, Symbian and Texas Instruments", Sonim Press Release, Dec. 2, 2002, pp. 1-2.
Symbian Ltd., "Symbian OS Version 7.0: Functional description", Revision 1.5, Feb. 2003, pp. 1-24.
Symbian Ltd., "Symbian OS Version 7.0s: Functional description", Revision 2.1, Jun. 2003, pp. 1-29.
Symbian Ltd., "Technology: Creating Symbian OS phones", http://www.symbian.com/technology/create-symb-OS-phones.html, downloaded Nov. 5, 2003, p. 1-8.
Symbian Ltd., "Technology: Why is a different operating system needed", http://www.symbian.com/technology/why-diff-os.html, downloaded Nov. 5, 2003, pp. 1-5.
Verizon Wireless, "TXT messaging", http://www.vtext.com/customer_site/jsp/messaging_lo.jsp, downloaded Oct. 2, 2003, p. 1.
W3C, Voice Extensible Markup Language (VoiceXML) Version 2.0, W3C, www.w3.org, Feb. 20, 2003.
Yahoo!Messenger, "Yahoo!Messenger Talk for Free!", http://messenger.yahoo.com/messenger/help/voicechat.html, downloaded Oct. 2, 2003, pp. 1-2.
Notice of Allowance for U.S. Patent Application No. 15/469,440, dated Dec. 19, 2017.
Notice of Allowance for U.S. Appl. No. 15/469,440, dated Sep. 27, 2018.
Notice of Allowance for U.S. Appl. No. 15/469,440, dated Aug. 8, 2018.
Bulk, F. "Final Project: Skype," http://www1.cs.columbia.edu/~salman/skype/frank.pdf, May 5, 2010, pp. 1-23.
Using AIM on Windows — Video IM, https://web.archive.org/web/20050307231707/http:www.aim.com/help_faq/using/win/video_im.adp?aolp=, downloaded Aug. 9, 2019, 2 pgs.
Download AIM for Windows, https://web.archive.org/web/20050204020358/http://channels.netscape.com/wrap/linker.jsp?floc=

Epic Games Ex. 1001
Page 4

US 10,492,038 B2
Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

at_oswin_1_l2&ref=http://www.aim.com/get_aim/win/latest_win.
adp?aolp=#whatsnew, downloaded Aug. 9, 2019, 2 pgs.
Using AIM on Windows—Mar. 8, 2005, https://web.archive.org/
web/20050308012857/http://www.aim.com/help_faq/using/win/
aimtalk.adp?aolp=, downloaded Aug. 9, 2019, 2 pgs.
AIM Buddy List, https://web.archive.org/web/20050531083304/
http://www.aim.com/help_faq/starting_out/buddylist.adp?aolp=, down-
loaded Aug. 9, 2019, 1 pg.
AIM Registration, https://web.archive.org/web/20041216085601/
http://wwww.aim.com:80/help_faq/starting_out/registration.adp?
aolp=, downloaded Aug. 9, 2019, 2 pgs.
Using AIM on Windows — Mar. 5, 2005, https://web.archive.org/
web/20050305095328/http://www.aim.com:80/help_faq/using/win/
instant_message.adp?aolp=, downloaded Aug. 9, 2019, 2 pgs.
AIM® Inside the Sidekick, https://web.archive.org/web/
20050519114310/http:/mymobile.aol.com/portal/im/pdfs/tmobile/
AIM_SIDEKICK_UG_tmobile.pdf, copyright 2002 by America
Online, Inc., 13 pgs.
MSN Messenger.mac, https://web.archive.org/web/20050604080622/
http://www.microsoft.com/mac/default.aspx?pid=msnmessenger, down-
loaded Aug. 9, 2019, 2 pgs.
MSN Messenger, "Communicate with MSN® Messenger," https://
web.archive.org/web/20051013055708/http://www.imagine-msn.
com/messenger/post/communicate/instantmessage.aspx, down-
loaded Aug. 9, 2019, 2 pgs.
MSN Messenger, "Download MSN Messenger," https://web.archive.
org/web/20050601002632/http://messenger.msn.com/download/, down-
loaded Aug. 9, 2019, 1 pg.

MSN Messenger, "Most Frequently Asked Questions," https://web.
archive.org/web/20050601014205/http://messenger.msn.com/
Help/, downloaded Aug. 9, 2019, 8 pgs.
Skype TM, "Skype is free Internet telephony that just works,"
https://web.archive.org/web/20050601003206/http://www.skype.
com/, downloaded Aug. 9, 2019, 21 pgs.
Skype TM, "How to Use Skype," https://web.archive.org/web/
20041229163311/http:/www.skype.com/help/guides/usingskype.html,
downloaded Aug. 9, 2019, 6 pgs.
Skype TM, "How to Add a Contact — User Guide," https://web.
archive.org/web/20041230160101/http:/www.skype.com/help/guides/
adduser.html, 10 pgs.
Skype TM, "Registering a Skype Name — User Guide," https://
web.archive.org/web/20041229042631/http:/www.skype.com/help/
guides/registration.html, 10 pgs.
"Yahoo! Messenger," https://web.archive.org/web/20050601042101/
http://messenger.yahoo.com/newtoim.php , downloaded Aug. 9, 2019,
3 pgs.
"Yahoo! Help — All-New Messenger 6.0," https://web.archive.org/
web/20040806142252/http://help.yahoo.com/help/us/messenger/w
intabuse/abuse-02.html, downloaded Aug. 9, 2019, 2 pgs.
"AOL 8 Instant Messenger TM," https://web.archive.org/web/
20050601001345/http:/www.aim.com/, downloaded Aug. 6, 2019,
2 pgs.
MSN Messenger Version 7.0, "Messenger," https://web.archive.org/
web/20050601023444/http:/messenger.msn.com . . ., downloaded
Aug. 6, 2019, 2 pgs.
Skype TM, "Skype is free Internet telephony that just works,"
https://web.archive.org/web/20050601003206/http:/www.skype.
com, downloaded Aug. 6, 2019, 3 pgs.
"Yahoo! Messenger," https://web.archive.org/web/2005060101258/
http:/messenger.yahoo.com, downloaded Aug. 6, 2019, 1 pg.

* cited by examiner

Epic Games Ex. 1001
Page 5

| ICM | | Default |
|---|---|---|
| 1 | Mobile phone | Voice mail |
| 2 | Office phone | Voice mail |
| 3 | Home phone | Voice mail |
| 4 | Mobile SMS/pager from mobile phone or PDA | Email |
| 5 | Home/office SMS (to office/home PC) | Email |
| 6 | Mobile Online chat (to mobile phone or PDA) | Voice mail |
| 7 | Home Online chat (Net Meeting, AOL, ICQ etc.) | Voice mail |
| 8 | Voice mail with instant notification to mobile devices of the user | |
| 9 | Voice mail without notification to mobile devices | |
| 10 | Office fax | |
| 11 | Home fax | Reject |
| 12 | Mobile Email (Blackberry etc.) | Email |
| 13 | Email | Reject |
| 14 | User defined | |

**FIGURE 1**

| | |
|---|---|
| ContactClass1 | Kinship family members, love ones |
| ContactClass2 | Relatives and friends |
| ContactClass3 | Boss and VIP |
| ContactClass4 | Colleagues |
| ContactClass5 | Subordinates |
| ContactClass6 | Business acquaintances |
| ContactClass7 | VIP Clients |
| ContactClass8 | Clients |
| ContactClass9 | Secretary |
| ContactClass10 | User defined |

**FIGURE 2**

Epic Games Ex. 1001
Page 6

| UrgClass1 | Life threatening – interrupt at any time and occasion |
| UrgClass2 | Urgent confirmed meeting reminder – interruption allowed |
| UrgClass3 | Urgent matter requiring immediate attention |
| UrgClass4 | Important matter requiring quick attention |
| UrgClass5 | Regular work related matter |
| UrgClass6 | Casual contact |
| UrgClass7 | Cold calls from unknown person |
| UrgClass8 | User defined |

**FIGURE 3**

| MyBusyState1 | Important meeting |
| MyBusyState2 | Ordinary meeting |
| MyBusyState3 | Available |
| MyBusyState4 | Sleeping |
| MyBusyState5 | Resting |
| MyBusyState6 | User defined |

**FIGURE 4**

| ContactClass | UrgClass | MyBusyState | ICM allowed |
|---|---|---|---|
| ContactClass2 | UrgClass1-3 | All | All |
| | UrgClass4-6 | MyBusyState1 | All |
| | | MyBusyState2-3 | All |
| | | MyBusyState4-5 | All |
| | UrgClass7-8 | All | ICM 13 |

**FIGURE 5**

Epic Games Ex. 1001
Page 7



FIG. 6

Epic Games Ex. 1001
Page 8



FIG. 7

Epic Games Ex. 1001
Page 9



FIG. 8

Epic Games Ex. 1001
Page 10



FIG. 9

Epic Games Ex. 1001
Page 11



FIG. 10

Epic Games Ex. 1001
Page 12



FIG. 11

Epic Games Ex. 1001
Page 13



FIG. 12

Epic Games Ex. 1001
Page 14

US 10,492,038 B2

**1**

# METHOD AND APPARATUS TO MANAGE MESSAGING PROVIDING DIFFERENT COMMUNICATION MODES DEPENDING ON ONE IDENTIFIER AND NOT REQUIRING TO DISCLOSE CONTACT INFORMATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/469,440, filed Mar. 24, 2017, and entitled "A NETWORK-BASED PORTAL TO MANAGE COMMUNICATION,", which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 14/922,344, filed Oct. 26, 2015, now U.S. Pat. No. 9,736,664, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 14/272,632, filed May 8, 2014, now U.S. Pat. No. 9,204,268, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 12/798,995, filed Apr. 14, 2010, now U.S. Pat. No. 8,744,407, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," which is hereby incorporated herein by reference, which application is a continuation of U.S. patent application Ser. No. 11/452,115, filed Jun. 12, 2006, now U.S. Pat. No. 7,729,688, and entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION", which is hereby incorporated herein by reference, which application is a continuation-in-part application of U.S. patent application Ser. No. 11/006,343, filed Dec. 7, 2004, now U.S. Pat. No. 7,116,976, and entitled "ADAPTABLE COMMUNICATION TECHNIQUES FOR ELECTRONIC DEVICES," which is hereby incorporated herein by reference, which claims priority to U.S. Provisional Patent Application No. 60/527,565, filed Dec. 8, 2003, entitled "ADAPTABLE COMMUNICATION TECHNIQUES FOR ELECTRONIC DEVICES," and which is hereby incorporated herein by reference.

This application, by way of U.S. patent application Ser. No. 11/452,115, also claims priority to U.S. Provisional Patent Application No. 60/689,686, filed Jun. 10, 2005, entitled "SYSTEMS AND PROCESSES TO MANAGE MULTIPLE MODES OF COMMUNICATION," and which is hereby incorporated herein by reference.

## BACKGROUND OF THE INVENTION

For many years, other than mails from post offices, we typically only received information from afar through telephones. However, in the past few years, ways that others can send us information have increased significantly. Just to list a few different modes of communication, we can be reached from standard desk phones, fax, cell phones, electronic mails, and instant messages. In addition, we can have more than one phone number and multiple electronic mail addresses. There are people we like to communicate with, and there are those we prefer to avoid. Managing information from all such different modes can be quite time consuming.

**2**

It should be apparent from the foregoing that there is still a need to help manage the numerous modes of communication.

## SUMMARY OF THE INVENTION

Different embodiments of a computer-implemented system and method to manage the communication of a user are disclosed. In one embodiment, an apparatus, using at least a network-based portal based on Internet protocol, could provide a number of communication options to a first user, with messages eligible to be received via an electronic device associated with a second user based on any of the options depending on an identifier associated with the second user, the options including text messaging and voice communication; could receive an indication from the first user via an electronic device associated with the first user, indicating the selection of a communication option for a message for the second user; could permit the second user to block the first user from accessing the second user; and could determine availability of the second user to receive the message. In the embodiment, the apparatus could require contact information associated with the second user to allow the second user to receive messages via the network-based portal, with the contact information associated with the second user not provided to the first user via the electronic device associated with the first user, even when the message is received by the second user via the electronic device associated with the second user, and with the contact information associated with the second user being distinct from the identifier associated with the second user.

A person tries to electronically convey a message to the user. In one embodiment, the status of the user is identified; the identity of the person is identified; the urgency of the message is identified; the access priority of the person is determined based on the person's identity; and a process is set to manage the message using one or more rules, and in view of the status of the user, the access priority of the person and the urgency of the message.

Based on different embodiments, the status of the user depends on the current activity or location of the user, or the current time. The status of the user can also be defined by the user. Similarly, the access priority of the person can be defined by the user, or is set depending on the user's reaction towards a prior message from the person. Also, the urgency of the message is set by the person.

The process can depend on the mode of communication of the message. For example, the mode of communication can include a mobile phone, an office phone, a home phone, a mobile SMS, a pager from a mobile phone or PDA, a home/office SMS, mobile online chat, home online chat, a voice mail with/without instant notification, an office fax, a home fax, a mobile email, and an email.

In one embodiment, the user receives the message through a handheld device, such as a cellular phone. In another embodiment, the message is electronically conveyed based on Internet protocol through a website.

In one embodiment, though the process allows the user to receive the message, the person is not aware of the contact information of the user. For example, the person is not aware of the phone number of the cellular phone that the user used to talk to the person. This prevents the person from directly accessing the user without going through an intermediate control, such as a website. Similarly, the user does not have to be aware of the contact information of the person.

In another embodiment, the defined access priority of the person is stored at a website, allowing the website to access

Epic Games Ex. 1001
Page 15

3    4

such information without asking for the user's permission. In one embodiment, the defined access priority is stored in a private database under the user's control.

In one embodiment, text messages could be received in an audio manner, and audio messages could be sent as text messages.

Other aspects and advantages of the present invention will become apparent from the following detailed description, which, when taken in conjunction with the accompanying drawings, illustrates by way of example the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a number of intelligent communication modes according to one embodiment of the invention.

FIG. 2 shows a number of contact classes according to one embodiment of the invention.

FIG. 3 shows a number of urgency classes according to one embodiment of the invention.

FIG. 4 shows a number of statuses of a user according to one embodiment of the invention.

FIG. 5 shows one embodiment of an example of an Access Priority Database according to one embodiment of the invention.

FIG. 6 is a communication system according to one embodiment of the invention.

FIG. 7 is a flow diagram of a personal call response process according to one embodiment of the invention.

FIG. 8 is a flow diagram of an audio message response process according to one embodiment of the invention.

FIG. 9 is a flow diagram of a text message response process according to one embodiment of the invention.

FIG. 10 is a flow diagram of an automated call response process according to one embodiment of the invention.

FIG. 11 is a flow diagram of a message presentation process according to one embodiment of the invention.

FIG. 12 is a flow diagram of a message presentation process according to one embodiment of the invention.

Same numerals in FIGS. 1-12 are assigned to similar elements in all the figures. Embodiments of the invention are discussed below with reference to FIGS. 1-12. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

## DETAILED DESCRIPTION OF THE INVENTION

One embodiment of the invention can automatically remove unwanted communications. Certain communications are relatively easy to determine to be unwanted, such as marketing cold calls and wrong number calls. Other communications may be more difficult. They can depend not just on the sources of the communication, but also the conditions or status of the receiver (a user) of the communication. The status can be related to the user's current activity and/or location. For example, when the user is on a train going to work, the user probably does not mind chatting with his grandchild. However, if the user is having his yearly review meeting with his boss, the user probably would prefer to avoid the call from his grandchild, unless it is an emergency. Based on the embodiment, communications from sources the user wants to postpone receiving can be automatically diverted.

In one embodiment, the user can get appropriate notification on the source of the incoming communication request. The attributes of the notification can depend on the urgency of the communication and/or the status of the user.

The user may receive information from different modes of communication. For example, the user can have mobile phones, fixed lines at home or office, emails, SMS, and faxes, with their different numbers and/or addresses. One embodiment can help the user efficiently manage information from the different modes. The user only has to remember one specific address from one mode of communication. Through that address, the user can receive communications from all modes of communication, independent of where the user is, or the type of hardware the user has. This allows the user to efficiently maintain his communication from the numerous modes even when he is traveling. For example, the user does not have to change phones (and the phone numbers) when he moves from areas covering 3G to areas that do not.

A number of embodiments depend on the different modes of communication converging onto the internet protocol platform. A communication gateway or a portal is formed allowing the user to receive communications from numerous sources through different modes. This, in turn, could reduce the numerous addresses the user has to remember, to one address. For example, an e-mail address for the user can serve as an access identifier for the different communication addresses from different communication modes. The access identifier can become the user's digital identity. In one embodiment, the user's other types of identification, such as the user's driver licenser number, can be the user's access identifier.

One embodiment of the invention uses an open portal based on the web. Based on the portal, the user can securely determine who can reach him at what conditions. This can be done based on a status indicator. As an example, this indicator is determined according to the status of the user, the access priorities of the person trying to reach the user (or the relationship or the lack of relationship between the user and the person), and/or the urgency of the message from the person. The status of the user can be dynamically determined, based on the current condition(s) of the user. The portal can allow the user and the person to select different options, which can be modified as desired. For example, the relationship can be preset by the user and stored in a database, while the urgency of the message can be set by the person.

Thus, in one embodiment, the portal can be used to control the selection and setting of different intelligent communication modes for the user. These intelligent communication modes allow priorities of various kinds of communication options to be set by the user. The portal allows worldwide access to the user, and can dynamically determine, for example, whether a call initiated at different time by different callers should be accepted by the user in real-time or handled by other mechanisms. From this information, communication requests can be classified, for example, into different degrees of undesirability. Some requests can be automatically blocked from the user. Others can be diverted and handled by other mechanism, such as diverting a phone call to an email or voice mail.

In one embodiment, the portal or gateway also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. The user can modify information in the database, such as assigning and/or changing the priorities of the contacts. Based on the information (or lack of information) in the database of

Epic Games Ex. 1001
Page 16

US 10,492,038 B2

5

the contact trying to access the user, and based on the status of the user, the gateway can automatically select an intelligent mode of communication for the user. This selection can be done dynamically.

In one embodiment, the portal can dynamically change the access priorities of a caller trying to reach the user. For example, previously the caller is of high priority to the user, and the user has set her access priorities accordingly. Lately, every time the caller trying to reach the user, the request was denied. After a preset number of rejections, the portal can automatically send a message to the user, asking the user if the user would like to lower the access priority of the caller. If the response is affirmative, the caller's priority is automatically reduced.

In another embodiment, the user does not have to set priorities of each contact. The system monitors every call, and provides the contact's identity to the user. Based on the user's reaction to the call (e.g. accepting or rejecting it), the system automatically sets the contact's priorities. In one embodiment, the system can then query the user for approval on the setting, and allow the user to adjust it as necessary. In another embodiment, the system can continue to modify the caller's priorities based on the user's reaction to the caller's subsequent calls.

In one embodiment, the user could keep information he believes to be sensitive local in a different database. Such information can be stored securely under the user's direct control. The portal can retrieve information from the different database when required. In another embodiment, the user can restrict or limit such retrieval process.

Additional confidentiality can be provided. In one embodiment, using phone calls as an example, the user can be aware of the identity of the caller trying to reach the user even without being informed of the number of the caller. Similarly, the caller can reach the user without being aware of the number of the phone the user is using to receive the call. The user can keep his location and/or status confidential but still can receive the communication. This can be useful because there are situations, for example, when the user does not want to disclose his contact information but the user needs to receive services provided by the caller.

One approach to maintain such confidentiality while maintaining real-time communication is based on a system that digitally identifies the identities of the caller and the receiver. Note that the term caller is used in general. It is not just limited to phone calls, but they can be any person or entity requesting to communicate with the user, such as trying to send a message to the user. As a separate note, the caller can also be a user of different embodiments of the invention.

After determining the identities, the system can establish connections between the caller and the user in real time. Though contacts are established, the system only needs to ensure the identities of the caller and the user to each other. However, the system does not have to disclose the phone numbers, electronic addresses, physical locations and/or other attributes of the caller and the user to each other. In one embodiment, real time implies that the time required for the identification is similar to the typical time required to set up, for example, a telephone call. The system can be a portal based on the web.

In one embodiment, a portal also holds the user's electronic calendar. The calendar can be programmable, with entries set by the user. The portal can automatically and securely set appointments for the user since the portal knows

6

the identity of the caller, and the status and schedule of the user. For example, the appointment can be for a conference call.

To illustrate, in one embodiment, a portal provides a number of intelligent communication modes (ICM) for the user to select as shown in FIG. 1. There are three columns in the table. If the communication mode selected in the second column does not work, the portal automatically defaults to the corresponding approach in the third column. For example, under ICM 1, if the mobile phone is busy, default to voice mail. Some of the selections do not have any default because it may not be necessary to default. For example, under ICM 8, the incoming message goes directly to voice mail with instant notification to mobile devices of the user. The incoming message can usually go to voice mail. There is no need to default.

As a receiver of communication, the user can define a number of contact classes, as shown in FIG. 2. The user can set up a number of urgency classes, as shown in FIG. 3. The user can define a number of status, as shown in FIG. 4. Then, based on tables in FIGS. 1-4, the user can set up an Access Priority Database for different ContactClasses, as shown in FIG. 5.

As another example, the user can categorize the following contacts into the corresponding ContactClasses:

| | |
|---|---|
| Alice (Wife) | ContactClass1 |
| Peter (Close Friend) | ContactClass2 |
| Colina (Close Friend's Wife) | ContactClass2 |

Peter wants to make a mobile phone call to the user. In one embodiment, Peter calls a portal. As an example, the portal can be the user's ISP. The portal first verifies the caller's identity to be Peter. This can be done, for example, by a public key challenge based on Peter having a public key digital certificate. In another example, Peter is also a registered user of the portal. Then, Peter's identity can be more readily identified or verified.

In one embodiment, after verification, a virtual address/number for the communication session is created allowing Peter to reach the user, which can be by phone. The user's phone number does not have to be disclosed to Peter. Similarly, Peter's mobile phone number does not have to be disclosed to the user. The portal can assure the user that the person calling is Peter based on an identification verification process, such as ones described above.

In establishing contact, the portal can access the user's database and determine that Peter belongs to ContactClass2. The database can, for example, be in the portal.

In another embodiment, the database is in a personal communication device of the user. The portal accesses the personal communication device to determine Peter's ContactClass.

Based on the ContactClass information, the status of the user and Peter's urgency setting, the user may receive Peter's call directly. As another example, Peter may be asked to leave a voice mail to the user, while the user is notified by a mobile short message regarding an incoming call from Peter.

As additional examples, in one embodiment, location information of the user could be determined based on GPS information from, for example, the user's cell phone.

In one embodiment, the user receives messages through a handheld device, such as a phone, and the phone has a switch. The switch can be a physical button or a software

Epic Games Ex. 1001
Page 17

US 10,492,038 B2

7

setting, such as a pull-down menu. The user could set his status dynamically by changing the physical or logical position of the switch. For example, one position can indicate that the user is very busy, and should only be interrupted by an urgent message from the user's closest contacts, such as his wife or parents. Another position can indicate that the user's status allows the user to receive any messages from anyone.

As explained above, based on an embodiment, a message is electronically conveyed by a central network server, such as a web server based on Internet protocol. A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems so that users can configure the system behavior they desire. The portal or gateway can then facilitate download of a database or update thereto to a communication device, such as a phone.

Also, as explained above, based on an embodiment, a user could efficiently maintain his communication, and does not even have to change phones when he moves from areas covering 3G to areas that do not. These phones could be based on different communication mechanisms, such as GSM, CDMA, 3G and 4G systems. Also as explained above, the user could keep information in local databases, such as in such a phone. For example, the intelligent communication modes shown in FIG. 1 for the user to select are in the phone. The user could define the contact classes, such as the ones shown in FIG. 2; set up the urgency classes, such as the ones shown in FIG. 3; define the statuses, such as the ones shown in FIG. 4; set up the Access Priority Database, such as the one shown in FIG. 5; and categorize a number of the user's contacts into the corresponding ContactClasses, all in the phone. When a caller places a call to the phone, based on information previously set in the phone and based on the urgency class selected by the caller, the phone could automatically manage the communication. Note that the phone does not have to be a cellular phone. In one embodiment, the phone is a desk top phone.

Again as explained above, the person or the caller trying to contact the user could select different options. For example, the urgency of the message can be set by the caller. This selection is typically in the call setup phase. In one embodiment, the caller has pre-selected the urgency class before making the call. In another embodiment, if the caller has not selected the urgency class, the system could prompt the caller to input an urgency class or status before the call or message is routed to the user. In yet another embodiment, different urgency classes could be defined by the caller.

Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. In still another advantage, a user can provide feedback to a caller without answering a voice call from the caller.

Another aspect of the invention pertains to improved approaches to respond to an incoming text message. The improved approaches enable a recipient to provide a reply message to an initiator. The incoming text message can be presented to the recipient with an audio or textual presentation. Thereafter, a reply text message can be sent back to the initiator. The recipient can form the reply text message by recording a brief audio message or entering a text message. In the case in which a brief audio message is used, the audio message can be automatically converted to a text message before being transmitted to the initiator.

8

Further, the computer-implemented methods and systems discussed above can be used in conjunction with one or more of the various approaches discussed in U.S. patent application Ser. No. 11/006,343. For example, the automated actions or decisions (e.g., intelligent secretary, decision **204** in FIG. **2**, etc.) of U.S. patent application Ser. No. 11/006,343 can be automatically made by the systems/methods described above. Still further, the various approaches discussed in U.S. patent application Ser. No. 11/006,343 can be used in conjunction with one or more the various methods/systems discussed above. For example, the systems/methods described above can use the messaging approaches (e.g., audio or textual messages) described in U.S. patent application Ser. No. 11/006,343.

Different embodiments of the invention pertain to improved approaches for users of electronic devices to communicate with one another. The electronic devices have audio and/or textual output capabilities. The improved approaches can enable users to communicate in different ways depending on device configuration, user preferences, prior history, time or other criteria. In one embodiment, the communication between users is achieved by short audio or textual messages.

The electronic device can be any computing device having communication capabilities. Such computing devices can be referred to as communication devices. Examples of electronic devices include personal computers, personal digital assistants, pagers or mobile telephones.

Embodiments of the invention are discussed below with reference to FIGS. **6-12**. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

FIG. **6** is a communication system **100** according to one embodiment of the invention. The communication system **100** can support different communication devices, including mobile telephones **102**, computers **104** (e.g., personal computers) and/or wireless personal digital assistants (PDAs) **106**. Users of the communication devices **102-106** can communicate with like or different communication devices. Each communication device **102-106** offers one or both of audio or textual communication capabilities. These communication devices **102-106** can inter-communicate with one another through a network **108**. The network **108** can include one or more of voice networks and data networks. For example, one network is a data network providing a slow speed data channel for transmission of Short Message Service (SMS) messages (which are typically limited to 160 text characters) to a Short Message Service Center (SMSC) and then forwarded on to the destination. Besides short messages (e.g., SMS messages), the network **108** can also support other messaging protocols for sending and receiving enhanced messages (EMS), multimedia messages (MMS), email and fax messages. Other networks support faster data channels and voice channels, such as GPRS, UMTS, G4, GSM, CDMA and various protocols, such as UDP, TCP, WAP, PDP other protocols.

According to one embodiment of the invention, one of the communication devices **102-106** can send a short message to another of the communication devices **102-106**. The short message can be text-based or audio-based. The sending communication device allows its user to create the short message as the user desires and/or as the device permits. For example, the user might interact with a keypad or keyboard to enter the short message, or the user might record audio inputs (e.g., speech) for the short message. The short mes-

Epic Games Ex. 1001
Page 18

US 10,492,038 B2

9

sage can then be sent to the receiving communication device. The sending of the short message may involve converting the short message from an audio message to a text message, or vice versa. Also, the receiving communication device can further convert the short message from audio-to-text or from text-to-audio. In any case, the short message is presented (e.g., displayed or played) to the user of the receiving communication device. The presentation can vary as the user desires or as the device permits.

One aspect of the invention pertains to improved approaches to respond to incoming voice calls. The improved approaches enable a called party (i.e., a party being called) to provide some information to a calling party without directly engaging in a voice call with the calling party. The called party can choose not to take the voice call from the calling party. Instead, the called party can provide the calling party with some limited information. The limited information can be provided in an audio or textual format. In one embodiment, the limited information provides the calling party with feedback as to why the voice call was not taken.

FIG. 7 is a flow diagram of a personal call response process 200 according to one embodiment of the invention. The personal call response process 200 is performed by an electronic device, such as a mobile communication device (e.g., mobile telephone). The personal call response process 200 begins with a decision 202 that determines whether there is an incoming voice call. When the decision 202 determines that there is no incoming voice call, then the personal call response process 200 awaits such a call. Once the decision 202 determines that there is an incoming voice call, a decision 204 determines whether the incoming voice call is to be answered. Typically, the user of the electronic device would signal the electronic device as to whether or not to answer the incoming voice call. Alternatively, the electronic device could automatically decide whether to answer the call.

When the decision 204 determines that the user desires the incoming voice call to be answered, the incoming voice call is answered 206 and the user engages 208 in a voice call with the calling party. A decision 210 then determines whether the call has ended. When the decision 210 determines that the call has not yet ended, then the personal call response process 200 can return to repeat the block 208 while the voice call continues. Once the decision 210 determines that the voice call has ended, then the personal call response process 200 ends.

When the decision 204 determines that the user does not desire to answer the incoming voice call, a decision 212 determines whether the user desires to provide an audio message to the calling party. When the decision 212 determines that the user does desire to provide an audio message to the calling party, an audio message is obtained and sent 214 to the calling party (caller).

Alternatively, when the decision 212 determines that the user does not desire to provide an audio message, a decision 216 determines whether the user desires to provide a text message to the calling party. When the decision 216 determines that the user desires to provide a text message to the calling party, a text message is obtained and sent 218 to the calling party.

Still further, when the decision 216 determines that the user does not desire to provide a text message to the calling party, a decision 220 determines whether the incoming voice call is to be directed to voice mail. When the decision 220 determines that the incoming voice call should be directed to voice mail, then the incoming voice call is directed 222 to

10

voice mail. On the other hand, when the decision 220 determines that the incoming voice call is not to be directed to voice mail, the incoming voice call is dropped 224. Following the blocks 214, 218, 222 and 224, the personal call response process 200 is complete and ends.

In another embodiment, a personal call response process could announce the calling party to the called party (user). In announcing the calling party, the personal call response process would present the called party with information pertaining to the calling party (e.g., display or audio sound). Such information could, for example, help the called party to decide whether to answer the incoming voice call. The information can, for example, include one or more of name (individual or business), telephone number, or other caller identification. The information could also include status information of the calling party, such as position, health, mood, etc. As an example, the information could be presented to the user prior to the decision 204 of the personal call response process 200 shown in FIG. 7.

In still another embodiment, an automated decision process to decide whether to answer a call can be based on time (e.g., decision 204). For example, the called party can previously set a rule, such as that from midnight to 6 am, the party does not want to answer voice calls. Then, during this time period, the electronic device can automatically decide not to answer incoming calls. In one implementation, when the electronic device decides not to answer incoming calls, no indication of incoming calls will be provided to the called party. For example, from midnight to 6 am, the device would not produce any ring tone. Additionally, if desired, the called party can also configure the electronic device to automatically provide an audio message or a text message to the calling party (e.g., I'm asleep call me tomorrow").

FIG. 8 is a flow diagram of an audio message response process 300 according to one embodiment of the invention. The audio message response process 300 is, for example, suitable for use as the processing carried out by block 214 illustrated in FIG. 7.

The audio message response process 300 initially answers 302 the incoming voice call. In this operation, the incoming voice call is answered 302 but not in a traditional way. Instead, the electronic circuitry associated with a mobile communication device (e.g., mobile telephone) that receives the incoming voice call operates to answer the incoming voice call for purposes of an audio message response. For example, a voice channel is established between the calling party and the mobile communication device, but the speaker and microphone of the mobile communication device are disabled. In effect, in such an embodiment, neither the called party nor the calling party perceives that the voice calling has been answered.

Next, one or more predetermined audio messages can be presented 304 by the mobile communication device. The presentation 304 of the one or more predetermined audio messages can, for example, be achieved by audio or visual means. For example, the predetermined audio messages can be audio output to a speaker associated with the mobile communication device for the called party or can be visual output (e.g., text) to a display of the mobile communication device for the called party (e.g., user of the mobile communication device).

A decision 306 then determines whether a predetermined audio message has been selected. Here, the decision 306 determines whether the user (i.e., called party) of the mobile communication device has selected one or more of the predetermined audio messages. When the decision 306 determines that a predetermined audio message has been

Epic Games Ex. 1001
Page 19

US 10,492,038 B2

11

selected, then the selected audio message is played **308** for the calling party. Here, the mobile communication device can output the selected audio message to the calling party over the voice channel. Typically, the mobile communication device of the called party would not produce an audible output at the mobile communication device, so that the called party would not be disturbed by the sending of the audio response. The predetermined audio messages are normally short messages (e.g., not more than 160 characters) so that the duration of time the voice channel is needed and/or the amount of network bandwidth consumed is minimal.

On the other hand, when the decision **306** determines that none of the predetermined audio messages have been selected, then a decision **310** determines whether a custom audio message is requested. A custom audio message is an audio message that is specifically provided for the calling party. When the decision **310** determines that a custom audio message is not being requested, then the audio message response process **300** returns to repeat the decision **306** and subsequent operations. Alternatively, when the decision **310** determines that a custom audio message is requested, then a custom audio message is recorded **312**. Thereafter, the custom audio message that has been recorded can be played **314** for the calling party (caller). Here, typically, the custom audio message would be output by the mobile communication device of the called party over the voice channel to the calling party. Typically, the mobile communication device of the called party would not produce an audible output at the mobile communication device, so that the called party would not be disturbed by the sending of the audio response. The custom audio messages are also normally short messages (e.g., not more than 160 characters) so that the duration of time the voice channel is needed and/or the amount of network bandwidth consumed is minimal.

Following the operations **308** and **314**, the incoming voice call is closed **316**. In other words, after the selected audio message or the custom audio message is played **308**, **314**, the incoming voice call can be closed **316**. Following the block **316**, the audio message response process **300** is complete and ends.

The predetermined audio messages that are presented **304** to a called party can be determined in a static or dynamic manner. A static determination would, for example, be when the called party has previously set or recorded an audio message to be utilized. Typically, with static determination, the list of audio messages remains the same (i.e., static) until changed (e.g., by the called party). A dynamic determination would allow the audio messages in the list (or the ordering of the audio messages in the list) to change without specific action by the user or the called party. For example, the list or ordering of the audio messages can depend on preference settings, configuration information, or prior usage. Prior usage can include biasing the list of audio messages such that those messages being most often selected appear higher in the list. The list or ordering of the audio messages can also depend on the calling party, type of calling party, location of calling party or called party, and the like. The list of audio messages can be represented by text and/or graphics (e.g., icons).

The audio message response process **300** flexibly enables a user to either select one or more predetermined audio messages or provide a custom audio message to be used as an audio message response to a calling party. However, it should be recognized that, in other embodiments, an audio message response process can alternatively simply pertain to only providing a custom audio message, or only permitting

12

selection of a predetermined audio message. Further, in still other embodiments, an audio message response process can first determine whether a custom audio message is to be provided before presenting predetermined audio messages. In yet other embodiments, an audio message response process can answer the incoming voice call later in the processing than operation **302** as shown in FIG. **8** (e.g., before operations **308** and **314**).

FIG. **9** is a flow diagram of a text message response process **400** according to one embodiment of the invention. The text message response process **400** is, for example, processing performed by the block **218** illustrated in FIG. **7**.

The text message response process **400** initially drops **402** the incoming voice call. Here, the information to be supplied to the calling party is a short text message; therefore, there is no need for a voice channel.

Next, one or more predetermined text messages are displayed **404**. Here, the one or more predetermined text messages would normally be displayed on a display screen associated with the mobile communication device being utilized by the called party. A decision **406** then determines whether one (or more) of the predetermined text messages has been selected. When the decision **406** determines that a predetermined text message has been selected, then the selected text message is transmitted **408** to the caller (i.e., the calling party).

On the other hand, when the decision **406** determines that a predetermined text message has not been selected, then a decision **410** determines whether a custom text message is requested. When the decision **410** determines that a custom text message is not requested, then the text message response process **400** returns to repeat the decision **406** and subsequent operations. Alternatively, when the decision **410** determines that a custom text message is requested, then the custom text message is entered **412**. Here, the called party interacts with the mobile communication device to enter the custom text message. Then, the custom text message is transmitted **414** to the caller. In one embodiment, the transmission **408**,**414** of the text message can be performed over a communication network, such as a network having a Short Message Service Center (SMSC) supporting Short Message Service (SMS) messages. Following the transmission **408** of the selected text message or the transmission **414** of the custom text message, the text message response process **400** is complete and ends.

An alternative embodiment of a text message response process could operate to answer the incoming voice call and announce to the caller that a text message will be forthcoming. Then, the incoming voice call could be promptly dropped. This additional operation could, for example, be used with the text message response process **400** by providing an additional operation prior to the block **402** illustrated in FIG. **9**.

The predetermined text messages being displayed **404** to a called party can be determined in a static or dynamic manner. A static determination would, for example, be a text message the called party has previously set or entered. Typically, with static determination, the list of text messages remains the same (i.e., static) until changed (e.g., by the called party). A dynamic determination would allow the text messages in the list (or the ordering of the text messages in the list) to change automatically, and not by the user. For example, the list or ordering of the text messages can depend on preference settings, configuration information, or prior usage. To illustrate, prior usage can include biasing the list of text messages such that those messages being most often selected appear higher in the list. The list or ordering of the

Epic Games Ex. 1001
Page 20

US 10,492,038 B2

13

text messages can also depend on the calling party, type of calling party, location of calling party or called party, and the like. The list of text messages can identify each text message with text (e.g., at least a portion of the corresponding text message, or an abbreviation) and/or graphics (e.g., icons).

The text message response process **400** flexibly enables a user to either select one or more predetermined text messages or provide a custom text message to be used as a text message response to a calling party. However, it should be recognized that, in other embodiments, a text message response process can alternatively simply pertain to only providing a custom text message, or only permitting selection of a predetermined text message. Further, in still other embodiments, a text message response process can first determine whether a custom text message is to be provided before presenting predetermined text messages.

FIG. **10** is a flow diagram of an automated call response process **500** according to one embodiment of the invention. The automatic call response process **500** is substantially similar in many ways to the personal call response process **200** illustrated in FIG. **7**. However, the automated call response process **500** operates to reduce user input at the mobile communication device by making use of stored data pertaining to its hardware components, configuration or preferences. In this regard, the automatic call response process **500** includes a decision **502** that determines whether a head-set is active. When the decision **502** determines that a head-set is active, then the automatic call response process **500** can prefer, suggest or require the user to obtain and send **214** an audio message to the caller in response to an incoming voice call. Alternatively, when the decision **502** determines that a head-set is not active, then a decision **504** can determine whether a display is present. In other words, the decision **504** can determine whether the mobile communication device has a display. When the decision **504** determines that the mobile communication device does have a display, then the mobile communication device can operate to obtain and send **218** a text message to the caller. Of course, this assumes that the caller can support text messages even though they initially called with a voice call. Hence, in another embodiment, the automatic call response process can operate to query or obtain information regarding the caller's communication device capabilities.

An exemplary scenario of how the previously described automatic call response process could work according to one implementation is as follows:

1. From his mobile phone, Bill calls Tom's mobile phone.

2. Tom is alerted by his mobile phone of an incoming call. Optionally, caller information (i.e., pertaining to Bill) can be displayed or announced to Tom.

3. Tom can choose to answer the incoming call or decline to answer the call.

4. In the event that Tom declines to answer the call, Tom can have the opportunity to provide the caller with a brief audio or text message.

5. If an audio message is to be provided, then Tom can either record a personalized message or select one of a plurality of predetermined audio messages. In this case, the incoming call is answered by Tom's mobile phone and then the audio message is played for the caller, thereafter the call is dropped. The audio messages are typically brief (i.e., short), and examples of audio messages are: (i) "Will call in 10 minutes," (ii) "Cannot talk now," (iii) "I'm in a meeting," or (iv) "Please don't call anymore."

6. On the other hand, if a text message is to be provided, then Tom can either enter a personalized text message or select from a plurality of predetermined text messages. In

14

this case, the incoming call is dropped, and the entered text message or the selected one of the predetermined text messages is sent. Examples of text messages are: (i) "Will call in 10 minutes," (ii) "Cannot talk now," (iii) "I'm in a meeting," or (iv) "Please don't call anymore." The text messages can be English (or other language) words or phrases, or can be condensed text strings (e.g., such as slang or chat language). In one embodiment, the predetermined text messages presented to Tom can be dependent on some criteria (i.e., automatically selected). Alternatively, it is possible that Tom might want to edit the predetermined text message, such can be permitted. As yet another example, the text message can embed dynamic information, such as position, e.g., "I'm in [position] now, so I'll get back to you later." The position can be determined using a GPS receiver in the mobile phone or acquired by a remote computer and provided to the mobile phone. The position may also be further processed (locally or remotely) into a more user-friendly form, such as city, school, restaurant name, or street type addresses. The position could also be used above to assist the user in deciding whether to answer the incoming call or decline to answer the call.

7. If hardware components, configuration or preferences are taken into consideration, as illustrated in FIG. **10**, the above scenario can be modified. For example, if Tom is using a head-set with his mobile phone, then an audio message may be most convenient, assuming that Tom wants to provide a particular (i.e., customized) message to Bill. The head-set allows Tom to record a brief audio message. Less conveniently, the head-set can be used to present a list of predetermined audio messages and allow Tom's selection therefrom by a button or voice-command.

8. If Tom is not using a head-set, then a text message response might be more suitable. This would typically require that Tom's mobile phone have a display and a keypad. Even so, without a head-set, Tom could still record an audio message, though such would likely be less convenient.

9. Tom can also not provide an audio message or a text message and simply let the incoming call roll-over into voice mail.

The exemplary scenario can also be used in a case where the called party is using one line but the mobile device has multi-line capabilities or call waiting. In such case, the mobile phone can enable the called party to provide a brief audio or text message to the calling party as noted above. Alternatively, the mobile phone can itself automatically (i.e., without user input) respond to the calling party via an audio or text message since the mobile phone is aware that the called party is on the other line.

In this aspect of the invention, the calling party and the called party often use mobile communication devices, such as mobile phones. However, the parties can alternatively use other electronic devices, such as a PDA, a computer, etc. Further, the option to provide a text response could be prevented if the caller's device is known to not support text messages.

The advantages of the previously described embodiments are numerous. Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. In still another advantage, a user can provide feedback to a caller without answering a voice call from the caller.

Epic Games Ex. 1001
Page 21

US 10,492,038 B2

15

Another aspect of the invention pertains to improved approaches to respond to an incoming text message. The improved approaches enable a recipient to provide a reply message to an initiator. The incoming text message can be presented to the recipient with an audio or textual presentation. Thereafter, a reply text message can be sent back to the initiator. The recipient can form the reply text message by recording a brief audio message or entering a text message. In the case in which a brief audio message is used, the audio message can be automatically converted to a text message before being transmitted to the initiator.

FIG. **11** is a flow diagram of a message presentation process **600** according to one embodiment of the invention. The message presentation process **600** is performed by an electronic device, such as a mobile communication device.

The message presentation process **600** begins with a decision **602** that determines whether an incoming text message is present. Typically, the incoming text message would be transmitted to the mobile communication device from another communication device. When the decision **602** determines that an incoming text message is not present, then the message presentation process **600** awaits the text message. Once the decision **602** determines that an incoming text message has been received, a decision **604** determines whether an audio or text presentation is to be utilized. The decision **604** can be performed in a variety of different ways. For example, the determination of whether to utilize an audio or text presentation can be based on user input or can be automatically determined through a use of configuration or preference information or hardware components (e.g., display, speaker, head-set).

When the decision **604** determines that an audio presentation is to be utilized, the incoming text message is converted **606** to an audio message. For example, a text-to-speech conversion can be performed. In one embodiment, a user of the electronic device can be permitted to choose speech characteristics, such as a voice, tone, pace, accent, or mood, for the resulting speech. For example, a user could choose speech characteristics by preference settings. In another embodiment, the incoming text message can include or reference speech characteristics so that the initiator can control or influence speech characteristics. In still another embodiment, if the text to be converted contains condensed text (e.g., such as slang or chat language), the resulting speech can pertain to an uncondensed form of the text. The ability to convert from condensed text to resulting speech for uncondensed text can be facilitated by pattern matching. For example, in chat language "LOL" can be converted to an audio message for "lots of love." In one implementation, a table can store audio messages corresponding to chat terms or phrases. In another implementation, a first table would store uncompressed terms or phrases corresponding to chat terms or phrases, and a second table would store audio messages corresponding to the uncompressed terms or phrases.

After the incoming text message is converted to the audio message, the audio message is played **608**. Typically, the audio message is played **608** by the mobile communication device for the user. For example, the audio message can be output to a speaker of the mobile communication device or a headset used therewith. As a result, the user of the mobile wireless communication device receives an audio message even though the incoming message was a text message.

On the other hand, when the decision **604** determines that a text presentation is to be utilized, the incoming text message is displayed **610**. Here, the incoming text message would be displayed **610** on a display associated with the

16

mobile communication device. Following the blocks **608** and **610**, the message presentation process **600** ends.

As discussed above, text-to-speech conversion can be invoked and performed on an electronic device, which may be a mobile communication device. While text-to-speech conversion, particularly if high quality is desired, requires substantial processing capabilities, mobile electronic devices, such as mobile communication devices, given their small form factor and price competition, tend to have limited processing capability. Accordingly, in one embodiment, text-to-speech conversion can be off-loaded from the mobile device. For example, a remote server computer can be provided the text message and produce the resulting audio message, and then supply the audio message to the mobile device. The remote server computer can be a networked server coupled to the network **108**. One example of a networked server is a gateway computer for a wireless electronic device, such as a mobile telephone.

FIG. **12** is a flow diagram of a reply message process **700** according to one embodiment of the invention. The reply message process **700** is performed by an electronic device, such as a mobile communication device.

The reply message process **700** begins with a decision **702** that determines whether a reply message is to be sent. Typically, the reply message process **700** follows the presentation of an incoming text message to a user of a mobile communication device. Hence, the reply message to be sent is a reply to the incoming text message. However, in other embodiments, the reply message to be sent can be merely an initial message as opposed to a response to an earlier message.

In any case, when the decision **702** determines that a reply message is not to be sent, then the reply message process **700** ends or simply awaits the need to send a reply message. On the other hand, when the decision **702** determines that a reply message is to be sent, then a decision **704** determines whether an audio or text message is to be formed. The decision **704** can be performed in a variety of different ways. For example, the determination of whether to send an audio or text message can be based on user input or can be automatically determined through a use of configuration or preference information or hardware components (e.g., display, speaker, head-set).

When the decision **704** determines that an audio message is to be formed, then the reply message process **700** prompts **706** for an audio message. Here, the prompt **706** can be directed to the user of the mobile communication device. The prompt can be an audio or textual indication. Next, a decision **708** determines whether an audio message has been recorded. When the decision **708** determines that the audio message has not been recorded, then the reply message process **700** awaits the audio message. Once the decision **708** determines that the audio message has been recorded, then the audio message is converted **710** to a text message. In one embodiment, if the audio message recorded is greater than a maximum text message size (e.g., 150 or 160 characters), then the audio message can be shortened so that the resulting text message does not exceed the maximum text message size. One way to shorten the text message is to use abbreviations. For example, the words "For example" can be changed to "e.g.". Such conversion can be again performed by matching entries in tables. Another way to shorten is to remove non-essential text. Still another way to shorten is to clip off or truncate the text message at the maximum text message size. In another embodiment, the resulting text message might provide an indication that it

Epic Games Ex. 1001
Page 22

US 10,492,038 B2

17

was converted from an audio message. Following the block **710**, the text message is transmitted **712** over a wireless network.

Alternatively, when the decision **704** determines that a text message is to be formed, then a text entry screen is displayed **714**. Next, a decision **716** determines whether a text message has been entered. When the decision **716** determines that a text message has not yet been entered, then the reply message process **700** awaits entry of the text message. Once the text message has been entered, the text message is transmitted **712** over the wireless network. Following the block **712**, the reply message process **700** ends.

Although the reply message process **700** provides for the user to enter a custom text or audio message, it should be understood that the reply message can alternatively be formed through use of semi-custom or predetermined reply messages from which the user of the mobile communication device can choose. The use of semi-custom or predetermined reply messages can be achieved as noted above in a number of embodiments, and can serve to simplify the conversion process.

An exemplary scenario of how message presentation and reply message processes could work according to one implementation of the second aspect is as follows:

1. From his mobile phone, Bill prepares and sends a text message to Tom's mobile phone.

2. Tom is alerted by his mobile phone of an incoming text message, such as by displaying at least a portion of the text message and/or otherwise notifying Tom of the text message.

3. Tom's mobile phone can decide whether to present the text message on a display screen of Tom's mobile phone, or to first convert the text message to an audio message and then present the audio message to Tom (e.g., play the audio message). Of course, Tom can interact with Tom's mobile phone to assist in making the determination on how to present the message.

4. Thereafter, if desired, Tom can prepare and send a reply message back to Bill. This reply message can be prepared initially as a text message or an audio message. Tom's mobile phone and/or Tom can determine whether the reply message is initially prepared as a text message or as an audio message. If an audio message is initially created, such audio message must be converted to a text message prior to transmission. Eventually, the reply message is sent to Bill as a text message. Tom's mobile phone can assist with the creation of the reply message through use of custom, semi-custom or predetermined reply message from which Tom and/or Tom's mobile phone can choose.

5. If Tom is using a head-set with his mobile phone, then an audio message may be more convenient, assuming that Tom wants to provide a particular (i.e., customized) message to Bill. The head-set allows Tom to easily record a brief audio message. Less conveniently, the head-set can be used to present a list of predetermined audio messages and allow Tom's selection therefrom by a button or voice-command.

6. If Tom is not using a head-set, then a text message response might be more suitable. This would typically require that Tom's mobile phone have a display and a keypad. Even so, without a head-set, Tom could still record an audio message, though such would likely be less convenient.

7. Tom can also not provide a reply message and simply not respond to the incoming text message. Alternatively, Tom can configure his mobile phone to automatically pro-

18

duce and send a reply message based on user settings or preferences, position, configuration, status, etc.

In this aspect of the invention, the calling party and the called party often use mobile communication devices, such as mobile phones. However, the parties can alternatively use other electronic devices, such as a PDA, a computer, etc.

The advantages of the invention exemplified by FIGS. **11-12** are numerous. Different embodiments or implementations may yield different advantages. One advantage is that communications for users of electronic devices can be flexibly provided. Another advantage is that communication mode changes can be performed at an electronic device to better suit the needs or condition of the electronic device or user preferences. Still another advantage is that conversion of an audio message to a text message facilitates use a low cost network (such as the SMS network). Another advantage is reduced network bandwidth load. Yet still another advantage is that the sender can get back a message in the same format as they sent the original message, though the recipient may use the message in a different format or mode (e.g., recipient hears the text message as an audio message).

Moreover, it should be noted that with regards to any of the embodiments in which a voice call or a text message is incoming to an electronic device, not only can the user of the mobile device take an action (e.g., button press or voice-command) to decline the call/message but also the electronic device itself can automatically decline the call/message such that the user is not disturbed. For example, an electronic device can be configured through user settings (e.g., preferences) to decline calls/messages matching certain criteria. Also, an auto reply message can be configured to be automatically sent in response to the call/message. For a known, undesired marketing caller/message sender, the electronic device can automatically send a reply message demanding the sender not to call or send messages anymore, and to remove your information from their database.

Text messages received or sent can optionally embed indications of speech characteristics to be used, should the text message be converted to an audio format. The speech characteristics can pertain to voice, tone, pace, accent, and/or mood. The speech characteristics for the resulting speech can be set in preference or configuration information, set on a per message basis by users, or set by evaluation of monitored data pertaining to the user.

Additionally, the messages being transmitted can be encrypted for security purposes.

In one embodiment, an electronic device performing communications using audio and/or text messages according to the invention can further integrate (or have tethered thereto) one or more electrical components for enhancing the hearing of the user of the electronic device. The electronic device will normally include a microphone and a speaker. The invention described herein can be considered an automated secretary for a user of an electronic device. The automated secretary can completely or partially respond to an incoming call/message so as to reduce disturbances to the user. The user can personalize the automated secretary through user settings (e.g., preferences), or the automated secretary can learn over time how to handle different incoming calls/messages. Besides handling or assisting the user with incoming calls/messages, the automated secretary can also assist with other activities, such as making calendar entries (e.g., meetings) in a calendar or responding to incoming callers/messages with relevant information pertaining to the user's schedule as maintained by the calendar (though the user could restrict such access to certain information and/or inquiring parties). For example, if an incom-

Epic Games Ex. 1001
Page 23

US 10,492,038 B2

<table>
<tr><td>19</td><td>20</td></tr>
</table>

ing text message asks "available for lunch today?", the automated secretary can check the user's availability for lunch by way of the user's calendar, then if the user is not available the automated secretary can quickly informing the inquiring party of same or propose another date. On the other hand, if the lunch time period is available in the user's calendar, then the automated secretary can either directly respond to the inquiring party of acceptance or propose a response to the user for review, modification and/or transmission.

It should be obvious to those skilled in the art that a number of embodiments performing communications using voice as well as audio and/or text messages can be implemented using voice over Internet Protocol technologies, with signals delivered over the Web. For example, a calling party's communication or mobile device can include an adapter to convert voice signals to data packets before sending them over the Internet. A service provider can convert the packets back into voice signals before sending the voice signals to the called party's communication device. Similarly, embodiments can be implemented using voice over wireless protocols, such as Wi-Fi or Wi-Max networks. Using such technologies, computing devices can become communication devices.

The various embodiments, implementations, features and aspects of the invention noted above can be combined in various ways or used separately. Those skilled in the art will understand from the description that the invention can be equally applied to or used in other different settings with respect to various combinations, embodiments, implementations or features provided in the description herein.

The invention can be implemented in software, hardware or a combination of hardware and software. A number of embodiments of the invention can also be embodied as computer readable code on a computer readable medium. The computer readable medium is any data storage device that can store data which can thereafter be read by a computer system. Examples of the computer readable medium include read-only memory, random-access memory, CD-ROMs, magnetic tape, optical data storage devices, and carrier waves. The computer readable medium can also be distributed over network-coupled computer systems so that the computer readable code is stored and executed in a distributed fashion.

Numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will become obvious to those skilled in the art that the invention may be practiced without these specific details. The description and representation herein are the common meanings used by those experienced or skilled in the art to most effectively convey the substance of their work to others skilled in the art. In other instances, well-known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the present invention.

In the foregoing description, reference to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

The many features and advantages of the present invention are apparent from the written description and, thus, it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

1. An article for managing messaging of a plurality of users using at least a network-based portal at least based on Internet protocol, with different communication modes allowed, depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal, and without requiring the plurality of users to disclose their contact information to each other, the article comprising:

a non-transitory computer readable storage medium comprising a plurality of instructions, when executed by at least a server, result in the at least a server:

providing a plurality of communication modes to a first user to allow the first user to use one of the plurality of communication modes as a selected communication mode for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal,

wherein the plurality of communication modes include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone, voice communication using a mobile phone, and communication with at least an image, and

wherein messages are eligible to be received by the electronic device associated with the second user based on any of the plurality of communication modes, all depending on an identifier associated with the second user being set by the second user via the network-based portal, at least in view of the network-based portal based on the Internet protocol;

receiving an urgency indication regarding the message, wherein the urgency indication being from the first user via an electronic device associated with the first user; and

enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected communication mode, based on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected communication mode to reach the second user, via the network-based portal, while the plurality of instructions, when executed by the at least a server,

further result in the at least a server:

receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal;

Epic Games Ex. 1001
Page 24

US 10,492,038 B2

<table>
<tr><td>21</td><td>22</td></tr>
</table>

determining availability of the second user; and

enabling a notification to reach the second user via the network- based portal, at least in view of receiving the urgency indication regarding the message and at least in view of the first user not being blocked from reaching the second user via the network-based portal, with the notification for notifying the second user,

wherein even when the message is received by the second user through the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user, and

wherein the identifier associated with the second user is distinct from the contact information associated with the second user.

**2.** An article for managing messaging as recited in claim **1,** wherein the notification is enabled to be generated at least in an audio manner.

**3.** An article for managing messaging as recited in claim **2,** wherein the plurality of instructions, when executed by the at least a server, further result in the at least a server not interrupting the second user by the message unless overridden based on the urgency indication regarding the message.

**4.** An article for managing messaging as recited in claim **3,** wherein the plurality of instructions, when executed by the at least a server, further result in the at least a server receiving data regarding a setting digitally set by the second user at the electronic device associated with the second user, wherein the second user would not be interrupted by the message in view of the received data regarding the setting, unless overridden based on the urgency indication regarding the message.

**5.** An article for managing messaging as recited in claim **1,** wherein the plurality of instructions, when executed by the at least a server, further result in the at least a server not interrupting the second user by the message unless overridden based on the urgency indication regarding the message.

**6.** An article for managing messaging as recited in claim **1,** wherein the plurality of instructions, when executed by the at least a server, further result in the at least a server receiving data regarding a setting digitally set by the second user at the electronic device associated with the second user, wherein the second user would not be interrupted by the message in view of the received data regarding the setting, unless overridden based on the urgency indication regarding the message.

**7.** A non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol, with different communication modes allowed, depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal, and without requiring the plurality of users to disclose their contact information to each other, said computer readable medium comprising:

computer program code for providing a plurality of communication modes to a first user to allow the first user to use one of the plurality of communication modes as a selected communication mode for a first message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior

registration process by the first user regarding the use of the network-based portal,

wherein the plurality of communication modes include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone, voice communication using a mobile phone, and communication with at least an image, and

wherein messages are eligible to be received by the electronic device associated with the second user based on any of the plurality of communication modes, all depending on an identifier associated with the second user being set by the second user via the network-based portal, at least in view of the network-based portal based on the Internet protocol;

computer program code for permitting the second user to block the first user from using at least the selected communication mode to reach the second user via the network-based portal;

computer program code for enabling, via the network-based portal, the first message to be received by the second user via the electronic device associated with the second user, using the selected communication mode, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected communication mode to reach the second user, via the network-based portal;

computer program code for determining availability of the second user; and

computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal,

wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user via an electronic device associated with the first user, and

wherein the identifier associated with the second user is distinct from the contact information associated with the second user.

**8.** A non-transitory computer readable medium as recited in claim **7,** wherein said computer readable medium comprises computer program code for:

receiving an urgency indication from the first user to the second user via the electronic device associated with the first user; and

enabling an urgent notification to be generated to notify the second user at least in view of receiving the urgency indication.

**9.** A non-transitory computer readable medium as recited in claim **8,** wherein the urgent notification is enabled to be generated at least in an audio manner.

**10.** A non-transitory computer readable medium as recited in claim **7,** wherein the identifier associated with the second user includes a digital identity of the second user.

**11.** A non-transitory computer readable medium as recited in claim **7,** wherein the contact information associated with the second user allows the second user to be electronically contacted based on the contact information, without using the network-based portal.

**12.** A non-transitory computer readable medium as recited in claim **7,**

wherein the availability of the second user is related to receiving messages,

Epic Games Ex. 1001
Page 25

US 10,492,038 B2

<div style="display:flex; justify-content:space-between"><span>23</span><span>24</span></div>

wherein the electronic device associated with the second user is a mobile phone, and

wherein the electronic device associated with the first user is a mobile phone.

**13.** A non-transitory computer readable medium as recited in claim **7**, wherein said computer readable medium comprises computer program code for receiving an audio message from the second user after the second user has received the first message, if the first user is not blocked from reaching the second user, and transforming the audio message into a text message to be received by the first user.

**14.** A non-transitory computer readable medium as recited in claim **13**,

wherein the first message is a text message from the first user, and

wherein said computer readable medium comprises computer program code for transforming the text message from the first user into an audio message so that the first message from the first user is received by the second user in an audio manner via a speaker if the first user is not blocked from reaching the second user.

**15.** A non-transitory computer readable medium as recited in claim **14**,

wherein the electronic device associated with the second user is a mobile phone, and

wherein the electronic device associated with the first user is a mobile phone.

**16.** A non-transitory computer readable medium as recited in claim **13**, wherein the contact information associated with the second user allows the second user to be electronically contacted based on the contact information, without using the network-based portal.

**17.** A non-transitory computer readable medium as recited in claim **16**,

wherein the first message is a text message from the first user, and

wherein said computer readable medium comprises computer program code for transforming the text message into an audio message so that the text message is received by the second user in an audio manner via a speaker if the first user is not blocked from reaching the second user.

**18.** A non-transitory computer readable medium as recited in claim **16**, wherein said computer readable medium comprises computer program code for:

receiving an urgency indication for the second user, with the urgency indication being from the first user; and

enabling an urgent notification to be generated to notify the second user at least in view of receiving the urgency indication from the first user to the second user.

**19.** A non-transitory computer readable medium as recited in claim **18**, wherein the urgent notification is enabled to be generated at least in an audio manner.

**20.** A non-transitory computer readable medium as recited in claim **7**,

wherein the first message is a text message, and

wherein said computer readable medium comprises computer program code for transforming the text message into an audio message so that the text message is received by the second user in an audio manner via a speaker if the first user is not blocked from reaching the second user.

**21.** A non-transitory computer readable medium as recited in claim **7**,

wherein the first message is not an audio message, and

wherein said computer readable medium comprises computer program code for transforming the first message into an audio message so that the first message is received by the second user in an audio manner via a speaker if the first user is not blocked from reaching the second user.

**22.** A non-transitory computer readable medium as recited in claim **7**,

wherein the identifier associated with the second user includes a digital identity of the second user, and

wherein the contact information associated with the second user allows the second user to be electronically contacted based on the contact information, without using the network-based portal.

**23.** A non-transitory computer readable medium as recited in claim **22**, wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

**24.** A non-transitory computer readable medium as recited in claim **23**,

wherein the electronic device associated with the second user is a mobile phone, and

wherein the electronic device associated with the first user is a mobile phone.

**25.** A non-transitory computer readable medium as recited in claim **24**, wherein said computer readable medium comprises computer program code for receiving an audio message from the second user after the second user has received the first message, if the first user is not blocked from reaching the second user, and transforming the audio message into a text message to be received by the first user.

**26.** A non-transitory computer readable medium as recited in claim **25**, wherein the first message is a text message from the first user.

**27.** A non-transitory computer readable medium as recited in claim **26**, wherein said computer readable medium comprises computer program code for transforming the text message from the first user into an audio message so that the text message from the first user is received by the second user in an audio manner via a speaker if the first user is not blocked from reaching the second user.

**28.** A non-transitory computer readable medium as recited in claim **25**,

wherein the first message is not an audio message, and

wherein said computer readable medium comprises computer program code for transforming the first message into an audio message so that the first message is received by the second user in an audio manner via a speaker if the first user is not blocked from reaching the second user.

**29.** A non-transitory computer readable medium as recited in claim **28**, wherein said computer readable medium comprises computer program code for:

receiving a notification indication from the second user via the electronic device associated with the second user, with the notification indication regarding another message;

enabling a notification to reach the first user via the network-based portal, at least in view of receiving the notification indication; and

not interrupting the first user by the another message, unless overridden based on the notification indication regarding the another message.

**30.** A non-transitory computer readable medium as recited in claim **29**, wherein the notification at least conveys urgency.

**31.** A non-transitory computer readable medium as recited in claim **23**, wherein said computer readable medium comprises computer program code for:

Epic Games Ex. 1001
Page 26

US 10,492,038 B2

25

receiving a notification indication from the second user via the electronic device associated with the second user, with the notification indication regarding another message;

enabling a notification to reach the first user via the network-based portal, at least in view of receiving the notification indication; and

not interrupting the first user by the another message, unless overridden based on the notification indication regarding the another message.

**32.** A non-transitory computer readable medium as recited in claim **31**, wherein the notification at least conveys urgency.

**33.** A non-transitory computer readable medium as recited in claim **7**, wherein said computer readable medium comprises computer program code for receiving a second message from the second user to the first user, wherein one of the first message or the second message is voice and the other one of the first message or the second message is text.

**34.** A non-transitory computer readable medium as recited in claim **7**,

wherein the enabling the first message to be received by the second user depends on an identifier associated with the first user,

wherein the identifier associated with the second user is a digital identity of the second user,

wherein the identifier associated with the first user is a digital identity of the first user, and

wherein the contact information associated with the second user allows the second user to be electronically contacted based on the contact information, without using the network-based portal.

**35.** A non-transitory computer readable medium as recited in claim **7**,

wherein the enabling the first message to be received by the second user depends on an identifier associated with the first user,

wherein the contact information associated with the second user allows the second user to be electronically contacted based on the contact information, without using the network-based portal, and

wherein said computer readable medium comprises computer program code for receiving a second message from the second user for the first user, wherein one of the first message or the second message is a voice message, and the other one of the first message or the second message is a text message, thereby allowing the first user and the second user to communicate using different communication modes, based on the identifier associated with the first user and the identifier associated with the second user.

**36.** A non-transitory computer readable medium as recited in claim **35**,

wherein one of the electronic device associated with the first user or the electronic device associated with the second user is an electronic device with a computer keyboard, and

wherein the other one of the electronic device associated with the first user or the electronic device associated with the second user is an electronic device without a computer keyboard.

**37.** A non-transitory computer readable medium as recited in claim **36**, wherein said computer readable medium comprises computer program code to enable the second user to select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages provided to the second user.

26

**38.** A computer-implemented method for managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol, with different communication modes allowed, depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal, and without requiring the plurality of users to disclose their contact information to each other, said method comprising:

providing a plurality of communication modes to a first user to allow the first user to use one of the plurality of communication modes as a selected communication mode for a first message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal,

wherein the plurality of communication modes include at least text communication using a mobile phone, voice communication using a mobile phone, and communication with at least an image, and

wherein messages are eligible to be received by the electronic device associated with the second user based on any of the plurality of communication modes, all depending on an identifier associated with the second user being set by the second user via the network-based portal, at least in view of the network-based portal based on the Internet protocol;

permitting the second user to block the first user from using at least the selected communication mode to reach the second user via the network-based portal;

enabling, via the network-based portal, the first message to be received by the second user via the electronic device associated with the second user, using the selected communication mode, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected communication mode to reach the second user, via the network-based portal;

determining availability of the second user; and

receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal,

wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user via the electronic device associated with the first user, and

wherein the identifier associated with the second user is distinct from the contact information associated with the second user.

**39.** A computer-implemented method as recited in claim **38**,

wherein the enabling the first message to be received by the second user depends on an identifier associated with the first user, and

wherein the contact information associated with the second user allows the second user to be electronically contacted based on the contact information, without using the network-based portal.

Epic Games Ex. 1001
Page 27

US 10,492,038 B2

27

**40**. A computer-implemented method as recited in claim **39**,

wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

**41**. A computer-implemented method as recited in claim **40** comprising receiving a second message from the second user for the first user, wherein one of the first message or the second message is a voice message, and the other one of the first message or second message is a text message, thereby allowing the first user and the second user to communicate using different communication modes, based on the identifier associated with the first user and the identifier associated with the second user.

**42**. A computer-implemented method as recited in claim **41** comprising enabling the second user to select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages provided to the second user.

**43**. A computer-implemented method as recited in claim **41** comprising receiving an urgency indication from the second user to the first user via the electronic device associated with the second user to generate an urgent notification to notify the first user.

**44**. A computer-implemented method as recited in claim **43**, wherein the urgent notification is enabled to be generated at least in an audio manner.

**45**. A computer-implemented method as recited in claim **41** comprising enabling the second user to select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages provided to the second user,

wherein an urgency indication is received from the second user to the first user via the electronic device associated with the second user to generate an urgent notification to notify the first user.

**46**. A non-transitory computer readable medium including at least executable computer program code stored therein that facilitates electronic communication of a plurality of users using at least a network-based portal at least based on Internet protocol, with a plurality of modes of communication available for the plurality of users to communicate, with each of the plurality of users having an identifier for use with the plurality of modes of communication, and without requiring the plurality of users to disclose their contact information to each other, the computer readable medium comprising:

computer program code for providing a plurality of modes of communication to a first user to allow the first user to use one of the plurality of modes of communication as a selected mode of communication for a first message to be sent from the first user to a second user, based on an identifier associated with the first user previously set by the first user via the network-based portal,

wherein the plurality of modes of communication supported by the network-based portal include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone voice communication using a mobile phone, and communication with at least an image, and

wherein messages are eligible to be received electronically by the second user via the network-based portal, based on any of the plurality of modes of communication, all depending on an identifier associated with the second user previously set by the

28

second user via the network-based portal, which allows the second user to efficiently maintain the second user's communication using the plurality of modes of communication;

computer program code for permitting the second user to block the first user from using at least the selected mode of communication to communicate with the second user via the network-based portal, based on the identifier associated with the first user;

computer program code for enabling the first message to be electronically provided to the second user, using the selected mode of communication, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected mode of communication to communicate with the second user, via the network-based portal;

computer program code for determining availability of the second user related to receiving messages; and

computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal,

wherein even when the first message is received by the second user via the selected mode of communication, the contact information associated with the second user is not provided via the network-based portal to the first user, and contact information associated with the first user is not provided via the network- based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user, and

wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the contact information associated with the first user.

**47**. A non-transitory computer readable medium as recited in claim **46**, wherein the computer readable medium comprises:

computer program code for receiving an indication from the second user for the first user via the network-based portal to generate an urgent notification for the first user; and

computer program code for enabling the urgent notification to be generated to notify the first user at least in view of receiving the indication.

**48**. A non-transitory computer readable medium as recited in claim **47**, wherein the urgent notification is enabled to be generated at least in an audio manner.

**49**. A non-transitory computer readable medium as recited in claim **46**, wherein the computer readable medium comprises:

computer program code for determining whether the second user has blocked the first user from using the selected mode of communication to communicate the first message with the second user, via the network-based portal;

computer program code for receiving a notification indication from the first user to the second user via the network-based portal, with the notification indication regarding another message; and

computer program code for enabling the another message to be electronically provided to the second user, in view of the notification indication, even though the second

Epic Games Ex. 1001
Page 28

US 10,492,038 B2

user has blocked the first user from using the selected mode of communication to communicate the first message with the second user.

**50.** A non-transitory computer readable medium as recited in claim **49**, wherein the another message conveys at least urgency.

**51.** A non-transitory computer readable medium as recited in claim **46**,

wherein the network-based portal allows the first user to receive messages from the second user via an electronic device associated with the second user that has a first set of buttons for receiving user input,

wherein the network-based portal allows the second user to receive messages from the first user via an electronic device associated with the first user that has a second set of buttons for receiving user input, and

wherein the number of buttons in the first set is different from the number of buttons in the second set.

**52.** A non-transitory computer readable medium as recited in claim **46**,

wherein the network-based portal allows the first user to receive messages from the second user via an electronic device associated with the second user that has a computer keyboard, and

wherein the network-based portal allows the second user to receive messages from the first user via an electronic device associated with the first user that does not have a computer keyboard.

**53.** A non-transitory computer readable medium as recited in claim **52**, wherein the computer readable medium comprises:

computer program code for determining whether the second user has blocked the first user from using the selected mode of communication to communicate the first message with the second user, via the network-based portal;

computer program code for receiving a notification indication from the first user to the second user via the network-based portal, with the notification indication regarding another message; and

computer program code for enabling the another message to be electronically provided to the second user, in view of the notification indication, even though the second user has blocked the first user from using the selected mode of communication to communicate the first message with the second user.

**54.** A non-transitory computer readable medium as recited in claim **53**, wherein the another message conveys at least urgency.

**55.** A non-transitory computer readable medium as recited in claim **46**, wherein said computer readable medium comprises computer program code for receiving a second message from the second user to the first user, wherein one of the first message or the second message is voice and the other of the first message or the second message is text.

**56.** A non-transitory computer readable medium as recited in claim **46**, wherein said computer readable medium comprises computer program code for enabling the second user to select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages provided to the second user.

**57.** A non-transitory computer readable medium as recited in claim **46**, wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

**58.** A non-transitory computer readable medium as recited in claim **46**,

wherein said computer readable medium comprises computer program code for receiving a second message from the second user to the first user, with one of the first message or the second message being voice and the other one of the first message or the second message being text, and

wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

**59.** A non-transitory computer readable medium as recited in claim **58**, wherein said computer readable medium comprises computer program code for enabling the second user to select a predetermined message to send to the first user via at least one of the plurality of modes of communication, the predetermined message being selected from a set of predetermined messages provided to the second user.

**60.** A non-transitory computer readable medium as recited in claim **59**, the computer readable medium comprises computer program code for enabling a message to be provided to the second user from the first user, with the message based on a mode of communication that is different from the selected mode, even though the second user has blocked the first user from using the selected mode of communication to communicate the first message with the second user.

**61.** A non-transitory computer readable medium as recited in claim **60**, wherein the mode of communication different from the selected mode includes communication with at least an image and communication in an audio manner.

**62.** A non-transitory computer readable medium as recited in claim **61**,

wherein one of the electronic device associated with the first user or the electronic device associated with the second user is a personal computer, and

wherein the other one of the electronic device associated with the first user or the electronic device associated with the second user is a mobile phone.

**63.** A non-transitory computer readable medium as recited in claim **61**, wherein said computer readable medium comprises computer program code for permitting the second user to block the first user from using the mode of communication different from the selected mode to communicate with the second user via the network-based portal, based on the identifier associated with the first user.

**64.** A non-transitory computer readable medium as recited in claim **46**,

wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user, and

wherein said computer readable medium comprises computer program code for enabling a message to be provided to the second user from the first user, with the message based on a mode of communication that is different from the selected mode, even though the second user has blocked the first user from using the selected mode of communication to communicate the first message with the second user.

**65.** A non-transitory computer readable medium as recited in claim **64**, wherein the mode of communication different from the selected mode includes communication with at least an image and communication in an audio manner.

**66.** A non-transitory computer readable medium as recited in claim **65**, wherein said computer readable medium comprises computer program code for permitting the second user to block the first user from using the mode of communica-

Epic Games Ex. 1001
Page 29

US 10,492,038 B2

31

tion different from the selected mode to communicate with the second user via the network-based portal, based on the identifier associated with the first user.

**67**. A non-transitory computer readable medium as recited in claim **65**, wherein said computer readable medium comprises computer program code for enabling the second user to select a predetermined message to send to the first user via at least one of the plurality of modes of communication, the predetermined message being selected from a set of predetermined messages provided to the second user.

**68**. A non-transitory computer readable medium as recited in claim **67**,

wherein the first message is a text message,

wherein said computer readable medium comprises computer program code for transforming the first message into an audio message so that the first message is received by the second user in an audio manner via a speaker if the first user is not blocked from using the selected mode of communication to communicate with the second user, and

wherein said computer readable medium comprises computer program code for receiving an audio message

32

from the second user to the first user, and transforming the audio message into a text message to be received by the first user.

**69**. A non-transitory computer readable medium as recited in claim **46**,

wherein the first message is a text message, and

wherein said computer readable medium comprises computer program code for transforming the first message into an audio message so that the first message is received by the second user in an audio manner via a speaker if the first user is not blocked from using the selected mode of communication to communicate with the second user.

**70**. A non-transitory computer readable medium as recited in claim **69**, wherein said computer readable medium comprises computer program code for receiving an audio message from the second user to the first user, and transforming the audio message into a text message to be received by the first user.

\*   \*   \*   \*   \*

Epic Games Ex. 1001
Page 30

## U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

August 30, 2023

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

**EPIC GAMES, INC.,**
**Petitioner,**

**v.**

**INGENIOSHARE, LLC,**
**Patent Owner.**

**Case:  IPR2022-00202**
**Patent No. 10,142,810 B2**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Laura J. Peterson*

Certifying Officer

## Prosecution History for IPR2022-00202

| Filing Date | Document |
| --- | --- |
| 11/15/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810 |
| 11/15/2021 | Petitioner's Power of Attorney |
| 11/29/2021 | Notice of Filing Date Accorded to Petition |
| 12/06/2021 | Patent Owner's Mandatory Notices |
| 12/06/2021 | Patent Owner's Power of Attorney |
| 02/28/2022 | Patent Owner's Preliminary Response |
| 03/31/2022 | Order - Conduct of the Proceeding |
| 04/07/2022 | Petitioner's Reply to Preliminary Response |
| 05/23/2022 | Decision - Institute *Inter Partes* Review |
| 05/23/2022 | Scheduling Order |
| 06/06/2022 | Patent Owner's Objections to Evidence |
| 06/24/2022 | Order - Panel Change |
| 08/12/2022 | Patent Owner's Response |
| 10/07/2022 | Joint Stipulation to Extend Portions of Due Dates 2 and 3 |
| 10/12/2022 | Petitioner's Notice of Deposition of Rouskas |
| 11/11/2022 | Petitioner's Reply to Patent Owner's Response |
| 12/09/2022 | Petitioner's Motion for Pro Hac Vice Admission of Shi |
| 12/20/2022 | Order - Motion for Pro Hac Vice Admission |
| 12/23/2022 | Patent Owner's Sur-Reply |
| 12/30/2022 | Petitioner's Power of Attorney |
| 12/30/2022 | Petitioner's Mandatory Notices |
| 01/06/2023 | Patent Owner's Request for Oral Argument |
| 01/06/2023 | Petitioner's Request for Oral Argument |
| 01/18/2023 | Order - Granting Requests for Oral Argument |
| 02/13/2023 | Petitioner's LEAP Practitioner Request Granted |
| 02/14/2023 | Patent Owner's Demonstrative Exhibits |
| 02/14/2023 | Petitioner's Demonstratives |
| 03/03/2023 | Oral Hearing Transcript |
| 05/19/2023 | PTAB Decision |
| 07/20/2023 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

_August 30, 2023_

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the _Inter Partes_ Review proceeding identified below:

**EPIC GAMES, INC.,**
**Petitioner,**

**v.**

**INGENIOSHARE, LLC,**
**Patent Owner.**

**Case:  IPR2022-00291**
**Patent No. 10,708,727 B2**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

_Laura J. Peterson_

_Certifying Officer_

## Prosecution History for IPR2022-00291

| Filing Date | Document |
| --- | --- |
| 11/15/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727 |
| 11/15/2021 | Petitioner's Power of Attorney |
| 11/29/2021 | Notice of Filing Date Accorded to Petition |
| 12/06/2021 | Patent Owner's Mandatory Notices |
| 12/06/2021 | Patent Owner's Power of Attorney |
| 02/28/2022 | Patent Owner's Preliminary Response |
| 03/31/2022 | Order - Conduct of the Proceeding |
| 04/07/2022 | Petitioner's Reply to Preliminary Response |
| 05/23/2022 | Decision - Institute *Inter Partes* Review |
| 05/23/2022 | Scheduling Order |
| 06/06/2022 | Patent Owner's Objections to Evidence |
| 06/24/2022 | Order - Panel Change |
| 08/12/2022 | Patent Owner's Response |
| 10/07/2022 | Joint Stipulation to Extend Portions of Due Dates 2 and 3 |
| 10/12/2022 | Petitioner's Notice of Deposition of Rouskas |
| 11/11/2022 | Petitioner's Reply to Patent Owner's Response |
| 12/09/2022 | Petitioner's Motion for Pro Hac Vice Admission of Shi |
| 12/20/2022 | Order - Motion for Pro Hac Vice Admission |
| 12/23/2022 | Patent Owner's Sur-Reply |
| 12/30/2022 | Petitioner's Power of Attorney |
| 12/30/2022 | Petitioner's Mandatory Notices |
| 01/06/2023 | Patent Owner's Request for Oral Argument |
| 01/06/2023 | Petitioner's Request for Oral Argument |
| 01/18/2023 | Order - Granting Requests for Oral Argument |
| 02/13/2023 | Petitioner's LEAP Practitioner Request Granted |
| 02/14/2023 | Patent Owner's Demonstrative Exhibits |
| 02/14/2023 | Petitioner's Demonstratives |
| 03/03/2023 | Oral Hearing Transcript |
| 05/19/2023 | PTAB Decision |
| 07/20/2023 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

August 30, 2023

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

**EPIC GAMES, INC.,**
**Petitioner,**

**v.**

**INGENIOSHARE, LLC,**
**Patent Owner.**

**Case:  IPR2022-00294**
**Patent No. 10,492,038 B2**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Laura J. Peterson*

*Certifying Officer*

## Prosecution History for IPR2022-00294

| Filing Date | Document |
|---|---|
| 12/07/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038 |
| 12/07/2021 | Petitioner's Power of Attorney |
| 12/07/2021 | Petitioner's Explanation of Material Differences Between Petitions and Ranking |
| 12/13/2021 | Notice of Filing Date Accorded to Petition |
| 12/14/2021 | Petitioner's Exhibit List |
| 12/28/2021 | Patent Owner's Mandatory Disclosures |
| 12/28/2021 | Patent Owner's Power of Attorney |
| 03/13/2022 | Patent Owner's Preliminary Response |
| 03/31/2022 | Order - Conduct of the Proceeding |
| 04/07/2022 | Petitioner's Reply to Preliminary Response |
| 06/07/2022 | Decision - Institute *Inter Partes* Review |
| 06/07/2022 | Scheduling Order |
| 06/17/2022 | Patent Owner's Objections to Evidence |
| 06/29/2022 | Order - Panel Change |
| 08/31/2022 | Patent Owner's Response |
| 10/12/2022 | Petitioner's Notice of Deposition of Rouskas |
| 11/23/2022 | Petitioner's Reply to Patent Owner's Response |
| 12/09/2022 | Petitioner's Motion for Pro Hac Vice Admission of Shi |
| 12/20/2022 | Order - Motion for Pro Hac Vice Admission |
| 12/30/2022 | Petitioner's Power of Attorney |
| 12/30/2022 | Petitioner's Mandatory Notices |
| 01/04/2023 | Patent Owner's Sur-Reply |
| 01/25/2023 | Patent Owner's Request for Oral Argument |
| 01/25/2023 | Petitioner's Request for Oral Argument |
| 01/30/2023 | Order - Granting Requests for Oral Argument |
| 02/28/2023 | Order - Cancel Oral Argument |
| 05/19/2023 | PTAB Decision |
| 07/20/2023 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

August 30, 2023

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

**EPIC GAMES, INC.,**
**Petitioner,**

**v.**

**INGENIOSHARE, LLC,**
**Patent Owner.**

**Case:  IPR2022-00295**
**Patent No. 10,492,038 B2**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Laura J. Peterson*

*Certifying Officer*

## Prosecution History for IPR2022-00295

| Filing Date | Document |
| --- | --- |
| 12/07/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038 |
| 12/07/2021 | Petitioner's Power of Attorney |
| 12/07/2021 | Petitioner's Explanation of Material Differences Between Petitions and Ranking |
| 12/13/2021 | Notice of Filing Date Accorded to Petition |
| 12/28/2021 | Patent Owner's Mandatory Disclosures |
| 12/28/2021 | Patent Owner's Power of Attorney |
| 03/13/2022 | Patent Owner's Preliminary Response |
| 03/31/2022 | Order - Conduct of the Proceeding |
| 04/07/2022 | Petitioner's Reply to Preliminary Response |
| 06/07/2022 | Decision - Institute *Inter Partes* Review |
| 06/07/2022 | Scheduling Order |
| 06/17/2022 | Patent Owner's Objections to Evidence |
| 06/29/2022 | Order - Panel Change |
| 08/31/2022 | Patent Owner's Response |
| 10/12/2022 | Petitioner's Notice of Deposition of Rouskas |
| 11/23/2022 | Petitioner's Reply to Patent Owner's Response |
| 12/09/2022 | Petitioner's Motion for Pro Hac Vice Admission of Shi |
| 12/20/2022 | Order - Motion for Pro Hac Vice Admission |
| 12/30/2022 | Petitioner's Power of Attorney |
| 12/30/2022 | Petitioner's Mandatory Notices |
| 01/04/2023 | Patent Owner's Sur-Reply |
| 01/25/2023 | Patent Owner's Request for Oral Argument |
| 01/25/2023 | Petitioner's Request for Oral Argument |
| 01/30/2023 | Order - Granting Requests for Oral Argument |
| 02/28/2023 | Order - Cancel Oral Argument |
| 05/19/2023 | PTAB Decision |
| 07/20/2023 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————————————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

———————————————————————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner

**U.S. PATENT NO. 10,142,810**

Case IPR2021-TBD

**PETITION FOR *INTER PARTES* REVIEW
UNDER 35 U.S.C. §312 AND 37 C.F.R. §42.104**

Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810

The above prior-art references predate the '810 Patent, which claims priority to a provisional application filed on June 10, 2005. IngenioShare asserts an earlier priority date of April 27, 2005. *See* Ex. 1010 (IngenioShare's Infringement Contentions) at 2.[2] The above references and the combinations presented herein were not presented to or considered by the Examiner during prosecution. *See generally* Ex. 1002.

## B.    Relief Requested

Petitioner requests cancellation of the Challenged Claims as unpatentable under 35 U.S.C. §103. The specific grounds of the challenge are set forth below, and are supported by the declaration of Dr. Kevin Almeroth (Ex. 1003).

| Ground | Claims | Proposed Statutory Rejection |
|--------|--------|------------------------------|
| I | 1–20 | Obvious under §103 in view of Diacakis |
| II | 1–9, 11–17, 19, 20 | Obvious under §103 in view of Tanigawa in combination with Hullfish |

## VI.   DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE

### A.    The '810 Patent Has Not Been Subject to a Prior Petition

The '810 Patent has not been subject to any prior IPR or PGR petitions. Thus, this is not a "follow-on" petition and there is no basis for the Board to exercise its

---

[2]    Petitioner reserves the right to challenge the April 27, 2005 date; the June 10, 2005 date; or any other alleged priority date.

Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810

## IX.    CLAIM CONSTRUCTION

Claim terms in an IPR should be construed in accordance with the principles set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc); 37 C.F.R. §42.104(b)(3).  "[W]ords of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Phillips*, 415 F.3d at 1312–13. Petitioner does not believe that any terms need to be construed to assess the arguments presented herein.

## X.    OVERVIEW OF THE PRIOR ART

### A.    Overview of Diacakis

Diacakis teaches a "presence and availability management system," and related methods.  Ex. 1007, Title, Abstract.  Diacakis describes a communication network with several users communicating with one another.  *See id.*, [0008]. Individual users use client terminals (*e.g.*, computers or mobile telephones) connected to a presence and availability ("P&A") management server through a network (such as the Internet).  *See id.*, [0024]–[0025].  The main functions of the P&A server are to: (1) determine whether a user is ***present*** on the network (*i.e.*, whether the user's device is powered on); (2) determine whether a user is ***available*** on the network (whether the user is willing to receive communications from others); and (3) communicate P&A information to others, depending on the user's

25

Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810

user to a "pre-determined" telephone number, thereby blocking future communications from the first user. *See id.*, 9:5–18, 9:34–42, Fig. 5. Once a second user blocks a first user, the first user's "blocked" status remains in the second user's user preferences, which are stored in a database. *See id.*, 3:32–35, 9:49–67. Hullfish's users may also set preferences to block messages based on time—for instance, by setting pre-determined rules blocking messages sent between midnight and 6 am. *See id.*, 11:38–45, Fig. 7.

## XI.    SPECIFIC GROUNDS FOR PETITION

### A.    <u>Ground I</u>: Claims 1–20 Are Rendered Obvious by Diacakis

#### 1.    Independent Claim 1

##### a.    Element 1.0[4]

To the extent the preamble is limiting, Diacakis discloses a computer-implemented method for managing electronic communications using at least a network-based portal at least based on an Internet protocol. Diacakis teaches a "presence and availability [P&A] management" server within a communication system. Ex. 1007, [0003], [0009]. This P&A management server is a "computer" implementing a "computer-implemented method." Ex. 1003, ¶88. Moreover, Diacakis teaches a "P&A management server 12 in communication with a client terminal 22 via a network 16," where "network 16 may include, for example, the

---

[4]    Ex. 1033 is a claim listing that enumerates each claim element.

Appx00384

Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810

Internet[.]" Ex. 1007, [0024]–[0025]. These components are shown below in Figure 1:



Fig. 1

*Id.*, Fig. 1. As shown below in Figures 8 and 9, Diacakis' client terminal 22 also contains a "network-based portal," which is a web page or interface that connects clients to a network:



Fig. 9

34

Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810



**Fig. 8**

*Id.*, Figs. 9, 8, [0056]; Ex. 1003, ¶89.

### b.    **Element 1.1**

Diacakis discloses this element.  ***First***, Diacakis discloses a message from the first user to a second user: a first user (or "subscriber") may wish to communicate with a second user (or "individual").  *See* Ex. 1007, [0008], [0029], [0062].

***Second***, Diacakis discloses providing a plurality of communication options to a first user to be selected as a selected option of communication: the first user may send "text files, audio files, streaming audio files, video files, streaming video files,

35

Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810

is based on the Internet protocol (*i.e.*, "IP Network"), which connects various servers

and client terminals:



*Id.*, Fig. 1; *see also id.*, [0003], [0009], [0014], [0034], [0035], [0040], [0041],

[0057], [0103], [0104].

Moreover, Tanigawa's IP terminal contains a "network-based portal," which

is a user interface that connects clients to a network (shown below in Figure 12):

65

Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810



Ex. 1008, Fig. 12, [0162]; Ex. 1003, ¶¶191–192.

b.     **Element 1.1**

Tanigawa discloses this element.   ***First***, Tanigawa discloses a message from

the first user to a second user: various users use "client" devices as shown below in

Figure 3 (a presence information management table used to manage client devices):

UNITED STATES PATENT AND TRADEMARK OFFICE

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner

---

**U.S. PATENT NO. 10,142,810**

Case IPR2021-TBD

---

**DECLARATION OF DR. KEVIN ALMEROTH
IN SUPPORT OF PETITION FOR *INTER PARTES* REVIEW OF U.S.
PATENT NO. 10,142,810**

Epic Games Ex. 1003
Page 1

# TABLE OF CONTENTS

I.     ASSIGNMENT................................................................................1

II.    BACKGROUND AND QUALIFICATIONS .................................2

III.   MATERIALS AND OTHER INFORMATION CONSIDERED.................14

IV.    UNDERSTANDING OF PATENT LAW ......................................15

V.     SUMMARY OF OPINIONS .........................................................18

VI.    OVERVIEW OF TECHNOLOGY AND OF THE '810 PATENT .............18

    A.    Technological Background ................................................18

        1.    Network Protocols and Architecture............................18
        2.    Modes of Internet Communications ............................22

    B.    Overview of the '810 Patent.................................................26

        1.    Claims ..............................................................27
        2.    Summary of the Specification........................................27
        3.    Summary of the Prosecution History........................30

VII.   LEVEL OF ORDINARY SKILL IN THE ART ...........................31

VIII.  DETAILED INVALIDITY ANALYSIS .....................................33

    A.    Background on Prior Art References ...............................33

        1.    Overview of Diacakis (Ex. 1007) ............................33
        2.    Overview of Tanigawa (Ex. 1008)..........................37
        3.    Overview of Hullfish (Ex. 1009) .............................40

    B.    Ground I: Claims 1–20 Are Obvious in View of Diacakis .................41

        1.    Independent Claim 1 ..............................................41
        2.    Dependent Claim 2 ................................................69
        3.    Dependent Claim 3 ................................................70
        4.    Dependent Claim 4 ................................................72
        5.    Dependent Claim 5 ................................................73
        6.    Dependent Claim 6 ................................................75
        7.    Dependent Claim 7 ................................................76

Epic Games Ex. 1003
Page 2

8.      Dependent Claim 8 .................................................................78
9.      Dependent Claim 9 .................................................................79
10.     Dependent Claim 10 ...............................................................79
11.     Independent Claim 11 .............................................................82
12.     Dependent Claim 12 ...............................................................86
13.     Dependent Claim 13 ...............................................................86
14.     Dependent Claim 14 ...............................................................87
15.     Dependent Claim 15 ...............................................................87
16.     Dependent Claim 16 ...............................................................87
17.     Dependent Claim 17 ...............................................................88
18.     Dependent Claim 18 ...............................................................88
19.     Independent Claim 19 .............................................................89
20.     Dependent Claim 20 ...............................................................93

C.   Ground II: Claims 1–9, 11–17, 19, and 20 Are Rendered
     Obvious by Tanigawa in View of Hullfish .........................................93

1.      Motivation to Combine ...........................................................94
2.      Independent Claim 1 .............................................................100
3.      Dependent Claim 2 ...............................................................124
4.      Dependent Claim 3 ...............................................................125
5.      Dependent Claim 4 ...............................................................126
6.      Dependent Claim 5 ...............................................................128
7.      Dependent Claim 6 ...............................................................128
8.      Dependent Claim 7 ...............................................................130
9.      Dependent Claim 8 ...............................................................131
10.     Dependent Claim 9 ...............................................................132
11.     Independent Claim 11 ...........................................................133
12.     Dependent Claim 12 ..............................................................139
13.     Dependent Claim 13 ..............................................................139
14.     Dependent Claim 14 ..............................................................140
15.     Dependent Claim 15 ..............................................................140
16.     Dependent Claim 16 ..............................................................141
17.     Dependent Claim 17 ..............................................................141
18.     Independent Claim 19 ...........................................................141
19.     Dependent Claim 20 ..............................................................147

IX.   SECONDARY CONSIDERATIONS .....................................................147

X.    CONCLUSION...........................................................................148

Epic Games Ex. 1003
Page 3

## LIST OF EXHIBITS IN THE PETITION

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 10,142,810 |
| 1002 | File History of U.S. Patent No. 10,142,810 |
| 1003 | Declaration of Dr. Kevin Almeroth in Support of *Inter Partes Review* of U.S. Patent No. 10,142,810 |
| 1004 | *Curriculum Vitae* of Dr. Kevin Almeroth |
| 1005 | U.S. Provisional Patent Application No. 60/527,565 |
| 1006 | U.S. Provisional Patent Application No. 60/689,686 |
| 1007 | U.S. Patent Application 2002/0116461 ("Diacakis") |
| 1008 | U.S. Patent Application 2004/0001480 ("Tanigawa") |
| 1009 | U.S. Patent No. 7,428,580 ("Hullfish") |
| 1010 | Patent Owner's Infringement Contentions |
| 1011 | Texas Litigation Proposed Scheduling Order |
| 1012 | Fourteenth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic |
| 1013 | Judge Albright's Standing Order re Inter-District Transfer |
| 1014 | Kurose, J. and Ross, K., Computer Networking: A Top-Down Approach Feature the Internet (2000) |
| 1015 | Kuehn, S., A Play Theory Analysis of Computer-Mediated Telecommunication (Apr. 20, 1990) |
| 1016 | Telecomputing in Japan |
| 1017 | Hernandez, R., ECPA and Online Computer Privacy (1988) |
| 1018 | Miller, A., Applications of Computer Conferencing to Teacher Education and Human Resource Development (1991) |
| 1019 | Benimoff, N. and Burns, M., Multimedia User Interfaces for Telecommunications Products and Services (1993) |

Epic Games Ex. 1003
Page 4

| Exhibit No. | Description |
|---|---|
| 1020 | Falconer, W. and Hooke, J., Telecommunications Services in the Next Decade (1986) |
| 1021 | Hine, N.A., et al., An Adaptable User Interface to a Multimedia Telecommunications Conversation Service for People with Disabilities (1995) |
| 1022 | Bazaios, A., et al., Multimedia Architecture Offering Open Distance Learning Services over Internet |
| 1023 | Stein, J., et al., Chat and Instant Messaging Systems (2002) |
| 1024 | U.S. Patent Application 2002/ 0183114 ("Takahashi") |
| 1025 | U.S. Patent No. 6,241,612 ("Heredia") |
| 1026 | U.S. Patent Application 2003/0216178 ("Danieli") |
| 1027 | International Patent Application WO 01/45343 ("Davies") |
| 1028 | Grinter, R. and Palen, L., Instant Messaging in Teen Life (2002) |
| 1029 | File History of U.S. Patent No. 7,729,688 |
| 1030 | File History of U.S. Patent No. 8,744,407 |
| 1031 | File History of U.S. Patent No. 9,204,268 |
| 1032 | File History of U.S. Patent No. 9,736,664 |
| 1033 | U.S. Patent No. 10,142,810 Claim Listing |
| 1034 | Patil, S. and Kobsa, A., The Challenges in Preserving Privacy in Awareness Systems (2003) |
| 1035 | Internet Engineering Task Force RFC 2779 (Instant Messaging/Presence Protocol Requirements) (2000) |

Epic Games Ex. 1003
Page 5

I, Dr. Kevin C. Almeroth, hereby declare as follows:

## I.    ASSIGNMENT

1.    I have been retained as an expert witness on behalf of Epic Games, Inc. ("Epic Games" or "Petitioner") to offer technical opinions in connection with the above-captioned Petition for *Inter Partes* Review ("IPR") of U.S. Patent No. 10,142,810 ("the '810 Patent") (Ex. 1001).

2.    I have been asked to provide my independent analysis of the '810 Patent in light of the prior art patents and publications cited below.

3.    I have been asked to provide my opinions regarding whether claims 1–20 of the '810 Patent (the "Challenged Claims") are invalid as being anticipated and/or obvious to a person having ordinary skill in the art (a POSITA) at the time of the alleged invention.

4.    In preparing my Declaration, I reviewed the '810 Patent, the file history of the patent, prior art references, technical references, and other publications from the time of the alleged invention, which are discussed herein.

5.    For the purposes of my Declaration, I have been asked to assume that the priority date of the alleged invention recited in the '810 Patent is April 27, 2005 (hereinafter the "Priority Date").

6.    I am not currently, and never have been, an employee of Epic Games. I received no compensation for this Declaration beyond my normal hourly

Epic Games Ex. 1003
Page 6

compensation based on my time actually spent analyzing the '810 Patent, the prior art patents and publications cited below, and issues related thereto, and I will not receive any added compensation based on the outcome of any IPR or other proceeding involving the '810 Patent. I have no financial interest in Epic Games.

## II.    BACKGROUND AND QUALIFICATIONS

7.    I am over the age of 18 and am competent to write this Declaration. I have personal knowledge and expertise concerning the relevant technologies based upon my education, training, or experience. My relevant experience includes a deep understanding of the systems that we broadly refer to as the Internet and computer networking.

8.    My CV, which includes my complete education, work experience, and past testimony, is included as Ex. 1004 hereto. I describe several relevant aspects of my experience below.

9.    I am currently a Professor Emeritus in the Department of Computer Science at the University of California, Santa Barbara (UCSB). While active at UCSB, I held faculty appointments and was a founding member of the Computer Engineering (CE) Program, Media Arts and Technology (MAT) Program, and the Technology Management Program (TMP). I also served as the Associate Director of the Center for Information Technology and Society (CITS) from 1999 to 2012. I have been a faculty member at UCSB since July 1997.

Epic Games Ex. 1003
Page 7

10.    I hold three degrees from the Georgia Institute of Technology: (1) a Bachelor of Science degree in Information and Computer Science (with minors in Economics, Technical Communication, and American Literature) earned in June 1992; (2) a Master of Science degree in Computer Science (with specialization in Networking and Systems) earned in June 1994; and (3) a Doctor of Philosophy (Ph.D.) degree in Computer Science (Dissertation Title: Networking and System Support for the Efficient, Scalable Delivery of Services in Interactive Multimedia System, minor in Telecommunications Public Policy) earned in June 1997.  During my education, I have taken a wide variety of courses as demonstrated by my minor. My undergraduate degree also included a number of courses more typical of a degree in electrical engineering including digital logic, signal processing, and telecommunications theory.

11.    One of the major concentrations of my research over the past 30+ years has been the delivery of multimedia content and data between computing devices, including various network architectures.  In my research, I have studied large-scale content delivery systems, and the use of servers located in a variety of geographic locations to provide scalable delivery to hundreds or thousands of users simultaneously.  I have also studied smaller-scale content delivery systems in which content is exchanged between individual computers and portable devices.  My work has emphasized the exchange of content more efficiently across computer networks,

3

Epic Games Ex. 1003
Page 8

including the scalable delivery of content to many users, mobile computing, satellite networking, delivering content to mobile devices, and network support for data delivery in wireless networks.

12.     In 1992, the initial focus of my research was on the provision of interactive functions (e.g., VCR-style functions like pause, rewind, and fast-forward) for near video-on-demand systems in cable systems; in particular, how to aggregate requests for movies at a cable head-end and then how to satisfy a multitude of requests using one audio/video stream broadcast to multiple receivers simultaneously.   This research has continually evolved and resulted in the development of techniques to scalably deliver on-demand content, including audio, video, web documents, and other types of data, through the Internet and over other types of networks, including over cable systems, broadband telephone lines, and satellite links.

13.     An important component of my research has been investigating the challenges of communicating multimedia content, including video, between computers and across networks including the Internet.  Although the early Internet was used mostly for text-based, non-real time applications, the interest in sharing multimedia content, such as video, quickly developed.   Multimedia-based applications ranged from downloading content to a device to streaming multimedia content to be instantly used.  One of the challenges was that multimedia content is

Epic Games Ex. 1003
Page 9

typically larger than text-only content, but there are also opportunities to use different delivery techniques since multimedia content is more resilient to errors. I have worked on a variety of research problems and used a number of systems that were developed to deliver multimedia content to users. One content-delivery method I have researched is the one-to-many communication facility called "multicast," first deployed as the Multicast Backbone, a virtual overlay network supporting one-to-many communication. Multicast is one technique that can be used on the Internet to provide streaming media support for complex applications like video-on-demand, distance learning, distributed collaboration, distributed games, and large-scale wireless communication. The delivery of media through multicast often involves using Internet infrastructure, devices and protocols, including protocols for routing and TCP/IP.

14.    Starting in 1997, I worked on a project to integrate the streaming media capabilities of the Internet together with the interactivity of the web. I developed a project called the Interactive Multimedia Jukebox (IMJ). Users would visit a web page and select content to view. The content would then be scheduled on one of a number of channels, including delivery to students in Georgia Tech dorms delivered via the campus cable plant. The content of each channel was delivered using multicast communication.

Epic Games Ex. 1003
Page 10

15.    In the IMJ, the number of channels varied depending on the capabilities of the server including the available bandwidth of its connection to the Internet. If one of the channels was idle, the requesting user would be able to watch their selection immediately. If all channels were streaming previously selected content, the user's selection would be queued on the channel with the shortest wait time. In the meantime, the user would see what content was currently playing on other channels, and because of the use of multicast, would be able to join one of the existing channels and watch the content at the point it was currently being transmitted.

16.    The IMJ service combined the interactivity of the web with the streaming capabilities of the Internet to create a jukebox-like service. It supported true Video-on-Demand when capacity allowed, but scaled to any number of users based on queuing requested programs. As part of the project, we obtained permission from Turner Broadcasting to transmit cartoons and other short-subject content. We also connected the IMJ into the Georgia Tech campus cable television network so that students in their dorms could use the web to request content and then view that content on one of the campus's public access channels.

17.    More recently, I have also studied issues concerning how users choose content, especially when considering the price of that content. My research has examined how dynamic content pricing can be used to control system load. By

Epic Games Ex. 1003
Page 11

raising prices when systems start to become overloaded (*i.e.*, when all available resources are fully utilized) and reducing prices when system capacity is readily available, users' capacity to pay as well as their willingness can be used as factors in stabilizing the response time of a system. This capability is particularly useful in systems where content is downloaded or streamed on-demand to users.

18.    As a parallel research theme, starting in 1997, I began researching issues related to wireless devices and sensors. In particular, I was interested in showing how to provide greater communication capability to "lightweight devices," *i.e.*, small form-factor, resource-constrained (*e.g.*, CPU, memory, networking, and power) devices. Starting in 1998, I published several papers on my work to develop a flexible, lightweight, battery-aware network protocol stack. The lightweight protocols we envisioned were similar in nature to protocols like Bluetooth, Universal Plug and Play (UPnP) and Digital Living Network Alliance (DLNA).

19.    From this initial work, I have made wireless networking—including ad hoc, mesh networks and wireless devices—one of the major themes of my research. My work in wireless network spans the protocol stack from applications through to the encoding and exchange of data at the data link and physical layers.

20.    At the application layer, even before the large-scale "app stores" were available, my research looked at building, installing, and using apps for a variety of purposes, from network monitoring to support for traditional computer-based

Epic Games Ex. 1003
Page 12

applications (*e.g.,* content retrieval) to new applications enabled by ubiquitous, mobile devices. For example, my research has looked at developing applications for virally exchanging and tracking "coupons" through "opportunistic contact" (*i.e.,* communication with other devices coming into communication range with a user). In many of the courses I have taught there is a project component. Through these projects I have supervised numerous efforts to develop new "apps" for download and use across a variety of mobile platforms.

21. Toward the middle of the protocol stack, my research also looked to build wireless infrastructure support to enable communication among a set of mobile devices unaided by any other kind of network infrastructure. These kinds of networks are useful either in challenged network environments (e.g., when a natural disaster has destroyed existing infrastructure) or when suitable support for network communication never existed. The deployment of such networks (or even the use of traditional network support) are critical to support services like disaster relief, catastrophic event coordination, and emergency services deployment.

22. Yet another theme is monitoring wireless networks, in particular different variants of IEEE 802.11 compliant networks, to (1) understand the operation of the various protocols used in real-world deployments, (2) use these measurements to characterize use of the networks and identify protocol limitations and weaknesses, and (3) propose and evaluate solutions to these problems. I have

Epic Games Ex. 1003
Page 13

successfully used monitoring techniques to study wireless data link layer protocol operation and to improve performance by enhancing the operation of such protocols. For wireless protocols, this research includes functions like network acquisition and channel bonding.

23.     Protecting networks, including their operation and content, has been an underlying theme of my research almost since the beginning of my research career. Starting in 2000, I have been involved in several projects that specifically address security, network protection, and firewalls.  After significant background work, a team on which I was a member successfully submitted a $4.3M grant proposal to the Army Research Office (ARO) at the Department of Defense to propose and develop a high-speed intrusion detection system.  Key aspects of the system included associating streams of packets and analyzing them for viruses and other malware. Once the grant was awarded, we spent several years developing and meeting the milestones of the project.  A number of my students worked on related projects and published papers on topics ranging from intrusion detection to developing advanced techniques to be incorporated into firewalls.  I have also used firewalls, including their associated malware detection features, in developing techniques for the classroom to ensure that students are not distracted by online content.

24.     Recent work ties some of the various threads of my past research together.  I have investigated content delivery in online social networks and

Epic Games Ex. 1003
Page 14

proposed reputation management systems in large-scale social networks and marketplaces. On the content delivery side, I have looked at issues of caching and cache placement, especially when content being shared and the cache has geographical relevance. We were able to show that effective caching strategies can greatly improve performance and reduce deployment costs. Our work on reputation systems showed that reputations have economic value, and as such, creates a motivation to manipulate reputations. In response, we developed a variety of solutions to protect the integrity of reputations in online social networks. The techniques we developed for content delivery and reputation management were particularly relevant in peer-to-peer communication and recommendations for downloadable "apps."

25.    As an important component of my research program, I have been involved in the development of academic research into available technology in the market place. One aspect of this work is my involvement in the Internet Engineering Task Force (IETF). The IETF is a large and open international community of network designers, operators, vendors, and researchers concerned with the evolution of the Internet architecture and the smooth operation of the Internet. I have been involved in various IETF groups including many content delivery-related working groups like the Audio Video Transport (AVT) group, the MBone Deployment (MBONED) group, Source Specific Multicast (SSM) group, the Inter-Domain

Epic Games Ex. 1003
Page 15

Multicast Routing (IDMR) group, the Reliable Multicast Transport (RMT) group, the Protocol Independent Multicast (PIM) group, etc. I have also served as a member of the Multicast Directorate (MADDOGS), which oversaw the standardization of all things related to multicast in the IETF. Finally, I was the Chair of the Internet2 Multicast Working Group for seven years.

26. My involvement in the research community extends to leadership positions for several academic journals and conferences. I am the co-chair of the Steering Committee for the ACM Network and System Support for Digital Audio and Video (NOSSDAV) workshop and on the Steering Committees for the International Conference on Network Protocols (ICNP), ACM Sigcomm Workshop on Challenged Networks (CHANTS), and IEEE Global Internet (GI) Symposium. I have served or am serving on the Editorial Boards of IEEE/ACM Transactions on Networking, IEEE Transactions on Mobile Computing, IEEE Network, ACM Computers in Entertainment, AACE Journal of Interactive Learning Research (JILR), and ACM Computer Communications Review. I have co-chaired a number of conferences and workshops including the IEEE International Conference on Network Protocols (ICNP), IEEE Conference on Sensor, Mesh and Ad Hoc Communications and Networks (SECON), International Conference on Communication Systems and Networks (COMSNETS), IFIP/IEEE International Conference on Management of Multimedia Networks and Services (MMNS), the

Epic Games Ex. 1003
Page 16

International Workshop On Wireless Network Measurement (WiNMee), ACM Sigcomm Workshop on Challenged Networks (CHANTS), the Network Group Communication (NGC) workshop, and the Global Internet Symposium, and I have served on the program committees for numerous conferences.

27.    Furthermore, in the courses I taught at UCSB, a significant portion of my curriculum covered aspects of the Internet and network communication including the physical and data link layers of the Open System Interconnect (OSI) protocol stack, and standardized protocols for communicating across a variety of physical media such as cable systems, telephone lines, wireless, and high-speed Local Area Networks (LANs).  The courses I have taught also cover most major topics in Internet communication, including data communication, multimedia encoding, and mobile application design.  My research and courses have covered a range of physical infrastructures for delivering content over networks, including cable, Integrated Services Digital Network (ISDN), Ethernet, Asynchronous Transfer Mode (ATM), fiber, and Digital Subscriber Line (DSL).  For a complete list of courses I have taught, see my curriculum vitae (CV).

28.    In addition, I co-founded a technology company called Santa Barbara Labs that was working under a sub-contract from the U.S. Air Force to develop very accurate emulation systems for the military's next generation internetwork.  Santa Barbara Labs' focus was in developing an emulation platform to test the

Epic Games Ex. 1003
Page 17

performance characteristics of the network architecture in the variety of environments in which it was expected to operate, and, in particular, for network services including IPv6, multicast, Quality of Service (QoS), satellite-based communication, and security. Applications for this emulation program included communication of a variety of multimedia-based services, including video conferencing and video-on-demand.

29.    In addition to having co-founded a technology company myself, I have worked for, consulted with, and collaborated with companies for nearly 30 years. These companies range from well-established companies to start-ups and include IBM, Hitachi Telecom, Turner Broadcasting System (TBS), Bell South, Digital Fountain, RealNetworks, Intel Research, Cisco Systems, and Lockheed Martin.

30.    Through my graduate education, leadership with CITS, involvement in TMP, role in the development of the Internet2 infrastructure, and consulting with ISPs, I have gained a strong understanding in the role of the Internet in our society and the challenges of deploying large-scale production networking infrastructure. CITS, since its inception, has looked at the role of the Internet in society, including how the evolution of technology have created communication opportunities and challenges, including, for example through disruptive technologies like P2P. TMP looks to focus on non-purely technical issues, including, for example, state-of-the-art business methods, strategies for successful technology commercialization, new

13

Epic Games Ex. 1003
Page 18

venture creation, and best practices for fostering innovation. Through my industry collaborations and Internet2 work, I have developed significant experience in the challenges of deploying, monitoring, managing, and scaling communication infrastructure to support evolving Internet services like streaming media, conferencing, content exchange, social networking, and e-commerce.

31.    I am a Member of the Association of Computing Machinery (ACM) and a Fellow of the Institute of Electrical and Electronics Engineers (IEEE).

32.    Additional details about my employment history, fields of expertise, courses taught, and publications are further included in my CV attached as Exhibit 1004 to this Report.

## III.    MATERIALS AND OTHER INFORMATION CONSIDERED

33.    In forming the opinions expressed in this Declaration, I relied upon my education and many years of experience in the relevant field of the art and have considered the viewpoint of a person having ordinary skill in the art (a POSITA) as of the Priority Date of the '810 Patent.

34.    I have considered the materials referenced in this Declaration, including the '810 Patent, its file history, and other documents listed in the Exhibit List to the '810 Petition, reproduced above. In particular, I have considered the prior art references listed below.

Epic Games Ex. 1003
Page 19

35.    U.S. Patent Application 2002/0116461 ("Diacakis") (Ex. 1007) was filed on February 5, 2002 and published on August 22, 2002—before the Priority Date—and is therefore prior art under pre-AIA 35 U.S.C. §§102(a) and 102(b).

36.    U.S. Patent Application 2004/0001480 ("Tanigawa") (Ex. 1008) was filed on August 30, 2002 and published on January 1, 2004—before the Priority Date—and is prior art under pre-AIA 35 U.S.C. §§102(a) and 102(b).

37.    U.S. Patent No. 7,428,580 ("Hullfish") (Ex. 1009), was filed on November 26, 2003—before the Priority Date—and is prior art under pre-AIA 35 U.S.C. §102(e).

## IV.    UNDERSTANDING OF PATENT LAW

38.    I understand that prior art to the '810 Patent includes patents and printed publications in the relevant art that predate the Priority Date of the '810 Patent.

39.    I understand that claims in an IPR are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in view of the specification and prosecution history, unless those sources show an intent to depart from such meaning.

40.    I understand that a patent claim is invalid if it is anticipated or obvious. Anticipation of a claim requires that every element of a claim be disclosed expressly or inherently in a single prior art reference, arranged in the prior art reference as arranged in the claim.    Obviousness of a claim requires that the claim be obvious

Epic Games Ex. 1003
Page 20

from the perspective of a POSITA at the time of the alleged invention.  I understand that a claim may be obvious in view of one reference or a combination of two or more prior art references.

42.     I understand that an obviousness analysis requires an understanding of the scope and content of the prior art, any differences between the alleged invention and the prior art, and the level of ordinary skill in evaluating the pertinent art.

42.     I understand that certain factors—often called "secondary considerations"—may support or rebut an assertion of obviousness of a claim.  I understand that such secondary considerations include, among other things, commercial success of the alleged invention, skepticism of those having ordinary skill in the art at the time of the alleged invention, unexpected results of the alleged invention, any long-felt but unsolved need in the art that was satisfied by the alleged invention, the failure of others to make the alleged invention, praise of the alleged invention by those having ordinary skill in the art, and copying of the alleged invention by others in the field.  I further understand that there must be a nexus—a connection—between any such secondary considerations and the alleged invention.  I also understand that contemporaneous and independent invention by others is a secondary consideration tending to show obviousness.

43.     I further understand that a claim can be found obvious if it unites old elements with no change to their respective functions, or alters prior art by mere

Epic Games Ex. 1003
Page 21

substitution of one element for another known in the field, with that combination yielding predictable results.  While it may be helpful to identify a reason for this combination, there is no rigid requirement for a teaching, suggestion, or motivation to combine.  When a product is available, design incentives and other market forces can prompt variations of it, either in the same field or different one.  If a person having ordinary skill in the relevant art can implement a predictable variation, obviousness likely bars patentability.  Similarly, if a technique has been used to improve one device, and a person having ordinary skill in the art would have recognized that the technique would improve similar devices in the same way, use of the technique is obvious.

44.     I also understand that the following rationales may support a finding of obviousness:

- Combining prior art elements according to known methods to yield predictable results;

- Simple substitution of one known element for another to obtain predictable results;

- Use of known technique to improve similar devices (methods, or products) in the same way;

- Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

- "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

- Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or

17

Epic Games Ex. 1003
Page 22

other market forces if the variations are predictable to one of ordinary skill in the art;

- Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

## V.    SUMMARY OF OPINIONS

45.    It is my opinion that claims 1–20 of the '810 Patent are at least obvious in view of Diacakis.

46.    It is further my opinion that claims 1–9, 11–17, and 19–20 of the '810 Patent are rendered obvious by Tanigawa in view of Hullfish.

## VI.    OVERVIEW OF TECHNOLOGY AND OF THE '810 PATENT

### A.    Technological Background

#### 1.    <u>Network Protocols and Architecture</u>

47.    The Internet is a computer network that connects various computer, telephone, and other electronic devices around the world. *See* Ex. 1014, 2–3. Like many computing functions, the Internet runs "protocols," which are sets of rules that define how these functions will be performed. *See id.*, 3. Importantly, protocols ensure that two or more communicating parties act in ways that are understood by others. *See id.*, 8 ("All activity in the Internet that involves two or more communicating remote entities is governed by a protocol."), 9 ("A **protocol** defines the format and the order of messages exchanged between two or more communicating entities, as well as the actions taken on the transmission and/or

Epic Games Ex. 1003
Page 23

receipt of a message or other event.") (bolding in original).  By way of example, the

HyperText Transfer Protocol ("HTTP") defines both how requests/responses for

data and objects should be made and the "syntax" of such messages—meaning the

particular way information in a message should be formatted.  Two of the most

prominent protocols used by the Internet are the TCP ("Transmission Control

Protocol") and IP ("Internet Protocol").  *See id.*  The IP protocol specifies the format

the information of data and information transmitted through the Internet and to end

users' devices.  *See id.*  ("Any network connected to the Internet must run the IP

protocol and conform to certain naming and addressing conventions.").  For specific

messaging applications (such as text, voice, and/or image messaging), protocols are

implemented both in client devices (such as users' computers and mobile

telephones) and server devices, which facilitate communication.  *See id.*, 3–4, 9–10.

48.     End user devices (*e.g.* computers, mobile phones, "smart" devices) may

connect to a network directly or connect to a Local Area Network (LAN), which

connects to a larger network.  *See id.*, 9–12.  Home users connected to an Internet

Service Provider (ISP) usually connect devices to the Internet with modems

following the Internet Protocol (IP).  *See id.*, 30–31.  The modem connects to the

Internet via a telephone (POTS or "plain old telephone service") or cable network—

from there, the ISP connects to other ISPs and to the Internet, as shown below:

Epic Games Ex. 1003
Page 24



**Figure 1.17 ◆ A hybrid fiber-coax access network**

*Id.*, Fig. 1.17; *see also id.*, 31–33.  In this way, the Internet connects hundreds of

millions of user devices worldwide, as partially shown below:

Epic Games Ex. 1003
Page 25



*Id.*, Fig. 1.1.

49.    The particularities of the various protocols that comprise the Internet are developed by the Internet Engineering Task Force (IETF), a standards developing organization focused on the "creation, testing, and implementation of Internet standards." Ex. 1014 at 4. The IETF authors standards documents called "RFCs (request for comments") which, "though not formally standards, have evolved to the point where they are cited as such." *Id.* ("RFCs tend to be quite

21

Epic Games Ex. 1003
Page 26

technical and detailed.  They define protocols such as TCP, IP, HTTP (for the Web), and SMTP (for open-standards e-mail.").  As an example, in 2000, the IETF authored RFC 2779, which governs "Instant Messaging/Presence Protocol Requirements."  *See generally* Ex. 1035.

## 2. <u>Modes of Internet Communications</u>

50.    Computer users have been using email (or "electronic mail") to communicate with one another 1960s.  Put simply, email allows individuals to send and receive messages to one another through networks—typically the Internet.  Ex. 1015 at 3.

51.    Email is thought of as "asynchronous" communication, akin to two people sending letters through a traditional postal service.  One person composes a message to another, the message is transmitted, and the recipient receives and interprets the message at a point in time after delivery.  This is different from "real-time" communications, similar to a conversation between two people.  In this case, a message is composed, transmitted, received, and interpreted almost simultaneously.

52.    In the early 1980s, various companies began offering real-time chatting services (in addition to asynchronous email communications) for computer users.  For instance, companies The Source and CompuServe offered "mini telecomputing systems" which allowed "user PC's to 'chat' with one another in real time" over

Epic Games Ex. 1003
Page 27

"ordinary telephone lines." Ex. 1016 at 8; *see also* Ex. 1015. "Bulletin board services" (BBS) offered a hybrid approach: these digital bulletin boards allowed both "'live' real time interaction" and "'asynchronous' e-mail type exchange of messages." *See* Ex. 1015 at 5. And "larger computer services provide conferencing capabilities between many users. Compuserve is the largest and best known of these systems." *Id.* at 5–6; *see also id.* at 6 (describing "the ability to chat with other computer users in a Compuserve conference or on a local BBS").

53.     More and more companies began offering chat services over the Internet in the 1980s and 1990s. *See* Ex. 1017 at 19. Specifically, Internet Relay Chat (IRC) was developed in the early 1990s and quickly became a popular and widely used instant messaging system. *See* Ex. 1018 at 13.

54.     As the Internet's bandwidth capacity increased in the 1990s, user began using email and chat for more than simple text messages. Around this time, users began sending images, video snippets, and other types of files through chat applications. *See* Ex. 1019; Ex. 1020. By way of example, Hine *et al*. developed a prototype videophone system in 1995 incorporating both with text message and image sharing functionality:

Epic Games Ex. 1003
Page 28



Figure 1 - Emulated Videophone with additional text exchange and picture display/annotation functionality.

Ex. 1021 at Fig. 1, 394 ("It is now possible to choose either dedicated videophone terminals or to add videophone functionality to suitably powerful desktop computer systems.").

55.    Hine *et al.* demonstrated text, video, and image chatting for medical and therapeutic applications. *See* Ex. 1021. Other users found a variety of different applications for Internet-based communications, including education, business, and gaming. Cruz teaches "interactive" (*i.e.*, real-time) computer conferencing used in higher education for "research and instruction." Ex. 1018 at 11–13. Bazaios described "[m]ultimedia telematics applications" such as "text, images, audio, and video" communications for "the delivery of courses and specially prepared teaching material" in a "distance learning service." Ex. 1022 at 1. Similarly, Stein described

Epic Games Ex. 1003
Page 29

file transfer, webcam integration, and audio features of AOL Instant Messenger

("AIM") and Yahoo Messenger for educational applications. *See* Ex. 1023 at 1–2.

Video gamers similarly took to the Internet, and gamers began to use the Internet to

communicate with others using text and voice messages—these chatting tools

including features allowing users to send predetermined messages or to block

communications from others. *See* Exs. 1024, 1025, 1026.

56.    With a wide variety of applications, Internet-based text and voice

chatting became a commonplace tool for everyday Internet users to contact friends,

family, and acquaintances. Along with this surge in usage came tools for users to

manage their online status. For instance, 1990s-era IM service ICQ (pronounced as

the English phrase "I seek you") "enables users to identify others who are online"

and "alerts users when specified individuals log onto the ICQ service." *See* Ex.

1027, 4:7–26; *see also* Ex. 1007 (users establish several tiers of contacts who may

communicate with the user at different times—*e.g.*, at work or outside of work).

Additionally, as IM services became more user-friendly, they allowed user to

determine how much of their personal information to share with other users. For

instance, ICQ's and AIM's users set their own screen names (instead of using their

real names) and were able to communicate with other users (*i.e.*, "buddies")

similarly identified by screen name. *See* Ex. 1027, 4:7–26, 5:11–13; Ex. 1023 at 1

(describing IM and audio communicating through the "buddies list"). By using

Epic Games Ex. 1003
Page 30

screen names and communicating with others on that basis, users could communicate with one another while keeping their personal contact information private. *See* Ex. 1027, 23:22–26:4 (describing "enabl[ing] the anonymity of watched parties to be managed," including where "the watching party does not find out what the connection address for the watched party is"); Ex. 1023 at 1–2 (describing "privacy of groups" and "chat privacy" in AIM and Yahoo Messenger). Moreover, these IM services featured tools allowing users to "mute" and "block[]" chat participants. *See* Ex. 1023 at 1–2; Ex. 1028 at 27–28 ("Access permission settings explicitly permit ('allow') or restrict ('block') messages from certain people.").

57.    In summary, by the early 2000s, computer users had access to a broad range of chatting applications and features, including the ability to communicate beyond text, the ability to represent themselves with screen names, the ability to manage their availability, and the ability to keep their personal information private.

### B.    Overview of the '810 Patent

58.    I understand that the '810 Patent issued on November 27, 2018 from U.S. Application No. 15/469,440, filed on March 24, 2017. For purposes of this declaration, I have been asked to assume that the '810 Patent is entitled to a Priority Date of April 27, 2005.

Epic Games Ex. 1003
Page 31

1.    **Claims**

59.    The '810 Patent has 20 claims, including independent claims 1, 11, and 19.  The '810 Patent has 17 dependent claims.  Claims 2-10 depend from claim 1; claims 12-18 depend from claim 11; and claim 20 depends from claim 19.  All 20 claims are the Challenged Claims.

2.    **Summary of the Specification**

60.    The specification of the '810 Patent describes similarly technological features that I describe above in Section VI.A, indicating that a POSITA would have known the claimed limitations of the purported invention before the Priority Date. In its "Background" section, the '810 Patent describes a "network-based portal based on [sic] Internet portal" with different options of communication, including "text messaging, voice communication, multimedia messaging, and group messaging." Ex. 1001, 1:67–2:7.  The Background section further describes two users: a sender (first user) and a recipient (second user) (although the roles are fungible and reversible).  *See id.*  The '810 Patent states that the second user can block the first user from sending messages to the second user, while the first user can determine whether the second user is available to receive messages.  *See id.*, 2:10–13. Moreover, the second user may be required to provide contact information (*e.g.*, a telephone number or email address), but this contact information would remain unknown to the first user.  *See id.*, 2:13–23.  The '810 patent states that, when the

27

Epic Games Ex. 1003
Page 32

first user attempts to convey a message to the second user, several variables are identified to determine the resolution of this attempt, including the identity of the recipient, the identity of the sender, the "access priority" of the sender, the urgency of the message, and a process (consisting of rules) to manage priority. *See id.*, 2:24–31.

61. The specification of the '810 Patent describes several variations on the known principles described above. For instance, the specification describes the receiver (second user) postponing non-urgent communications from one of her relatives. *See id.*, 3:51–58. The specification describes the second user receiving information indicating the urgency of an intended communication. *See id.*, 3:59–62, 7:28–37. The specification also describes embodiments where several of a second user's devices (including home phone, mobile phone, computer with email address, etc.) are associated with a single name, allowing the first user to communicate "efficiently" over different modes. *See id.*, 3:64–4:52, 7:6–27. The specification describes a second user managing a priority hierarchy of first users trying to send messages to her. *See id.*, 4:53–5:15, 5:60–6:49. The specification further describes a first user and second user communicating using text and audio messages. *See id.*, 7:46–56, 8:24–65.

62. The '810 Patent describes these features against the backdrop of "automated actions or decisions" (akin to an "intelligent secretary") used to

Epic Games Ex. 1003
Page 33

automate a user's message management.  *See id.*, 7:57–8:3.  For instance, the specification describes a second user providing "limited information" in response to a first user, but that a "personal call response process" (*e.g.*, answering machine) would provide certain information (such as "health" or "mood" status) to a caller, or set particular rules for when calls can be answered (*e.g.*, no calls at nighttime).  *See id.*, 8:66–10:23.  This automated process is handled by "predetermined audio messages."  *See id.*, 10:24–14:59.  The specification describes similar procedures for deferring and automating responses to incoming text messages.  *See id.*, 14:60–18:67.

63.    In my opinion, much of the disclosure of the '810 specification would have been known to a POSITA simply by virtue of certain prior-art references publicly available at the time.  Further, in my opinion, the alleged novelty of the '810 patent described by the specification is "manag[ing] the numerous modes of communication" allowing one user to block another user in a computer-based communications system. *See id.*, 1:47–61.  Accordingly, as I explain in further detail below, my opinion is that the Challenged Claims of the '810 patent are all rendered at least obvious by Diacakis and further rendered obvious by Tanigawa in view of Hullfish.

Epic Games Ex. 1003
Page 34

### 3.    **Summary of the Prosecution History**

64.    I have reviewed the prosecution history of the '810 Patent.  During prosecution of the '810 Patent, the Examiner issued a Notice of Allowance—finding the pending claims patentable—a mere six months after the application was filed. Ex. 1002, 113.  The Examiner found that the claims were "allowance [sic] base [sic] on Terminal Disclaimer field [sic] and history of rejection of US Patent 7,729,688, US Patent 8,744,407, US Patent 9,204,268 and US Patent 9,736,664."  *See id.* Subsequently, the Applicant of the '810 Patent filed five Requests for Continued Examination, amending the claims and specification.  *See id.*, 146, 184, 240, 303, 338.  The Examiner allowed these amendments.  *See id.*, 169. 209, 278, 319, 371.

65.    My understanding of the Examiner's actions is that, because the Examiner had examined patent applications related to the '810 Patent, and issued rejections thereupon, he decided it was appropriate to allow the then-pending claims of the '810 Patent within six months.

66.    I have reviewed the prosecution history of the four prior examinations on which the '810 Examiner based his allowance.  Across these four prior examinations, the Examiner only entered four office actions.  *See* Exs. 1029–1032 ('688, '407, '268, and '664 FHs).  First, with respect to the '688 patent, the Examiner issued a §103 rejection based on two references: Balasuriya and Rodriguez.  *See* Ex. 1032 ('664 FH), 142–49.  The Applicant traversed, and the Examiner withdrew the

Epic Games Ex. 1003
Page 35

rejection, issuing a final rejection based on U.S. 5,930,700 ("Pepper"). *See id.*, 178–81, 188–94. The Applicant again traversed, and the Examiner withdrew the objections after an inventor interview. *See id.*, 217–19, 225–26.

67.    Similarly, with respect to the '407 patent, the Examiner issued a single §102/§103 rejection based on Pepper as a primary reference (Ex. 1030 ('407 FH)), but withdrew the rejection after a telephonic inventor interview. *See id.*, 111–14, 129–30.

68.    With respect to the '268 patent, the Examiner issued zero office actions. *See* Ex. 1031 ('268 FH).

69.    With respect to the '664 patent, the Examiner's only §102/§103 rejection applied Pepper as a primary reference (Ex. 1032 ('664 FH), 66–70)—again, the Examiner withdrew the rejection after the Applicant traversed. *See id.* 130–33, 187.

## VII.  LEVEL OF ORDINARY SKILL IN THE ART

70.    I have been informed that a person of ordinary skill in the art is a hypothetical person who is presumed to have the skill and experience of an ordinary worker in the field at the time of the alleged invention.

71.    I understand that there are multiple factors relevant to determining the level of ordinary skill in the pertinent art, including the educational level of active workers in the field at the time of the alleged invention, the sophistication of the

Epic Games Ex. 1003
Page 36

technology, the type of problems encountered in the art, and the prior art solutions to those problems.

72.     In determining the characteristics of a hypothetical person of ordinary skill in the art of the '810 Patent at the time of the claimed invention, I considered several things, including the type of problems encountered in this field, and the rapidity with which innovations were made.  I also considered the sophistication of the technology involved, and the educational background and experience of those actively working in the field, and the level of education that would be necessary to understand the '810 Patent.

73.     Finally, I placed myself back in the relevant period of time, and considered the state of the art and the level of skill of the engineers working in this field at that time.

74.     Based on the materials I have considered and my own experience consulting for companies and training thousands of practicing engineers, as well as the knowledge required to understand the relevant standards, I came to the conclusion that the characteristics of a POSITA of the '810 Patent would be someone who had a Bachelor's degree in Computer Science or an equivalent field and three to five years of experience working with Internet communication systems. Additional education might compensate for less experience, and vice-versa.

Epic Games Ex. 1003
Page 37

75.    I also note that my opinions provided in this Declaration would not change in view of minor modifications to this level of ordinary skill.

## VIII.  DETAILED INVALIDITY ANALYSIS

### A.    Background on Prior Art References

#### 1.    <u>Overview of Diacakis (Ex. 1007)</u>

76.    Diacakis is a patent application directed to a "presence and availability management system," and related methods.  Ex. 1007, Title, Abstract.  Diacakis teaches a real-time communication network with several users who may wish to communicate with one another.  *See id.*, [0008].  These individual users use client terminals (*e.g.*, computers or mobile telephones) that are connected to a presence and availability ("P&A") management server through a network (such as the Internet).  *See id.*, [0024]–[0025].

77.    As Diacakis explains, the three main functions of the P&A server are to: (1) determine whether a user is ***present*** on the network (for example, whether the user's device is powered on); (2) determine whether a user is ***available*** on the network (for example, whether the user is willing to receive communications from others); and (3) communicate the user's P&A information to others, depending on the user's preferences.  *See id.*, [0026]–[0027].  Diacakis' Figure 1 shows client terminal 22 connected to P&A server 12 via network 16:

Epic Games Ex. 1003
Page 38



*Id.*, Fig. 1.

78.    Diacakis describes several additional features of the P&A server.  As shown below in Figure 4 (in yellow), a user may be present (and therefore able to receive communications) on various client terminals such as a desk phone, mobile phone, PC, PDA, and pager.  *See id.*, Fig. 4, [0024], [0044], [0060]. The user's "presence" may also depend on other factors, including the user's status, the user's location, capabilities of the user's devices, the user's schedule, and the time of day (all shown in green below).  *See id.*, Fig. 4, [0031]–[0048].  The user's "availability" may depend on the user's situation and self-defined rules and preferences (all shown in blue) with respect to observers.  *See id.*, Fig. 4, [0031]–[0048].

Epic Games Ex. 1003
Page 39



*Id.*, Fig. 4.

79.     Diacakis allows its users to control their interactions with others using two main techniques.   ***First***, each user's P&A information is distributed "to interested individuals on a selective basis, according to a variety of user-defined preferences and settings."   *Id.*, [0006].   In other words, individual users specify which other users can see their availability information (and thereby contact them). As shown in Figures 2 and 3 below, users group others into different tiers of access, including "Important," "Normal," "Restricted," and "Blocked":

Epic Games Ex. 1003
Page 40



**OFFICE PROFILE**

| Communication Media | Address | Important | Normal | Restricted | Blocked |
|---|---|---|---|---|---|
| Home telephone | (412) 555-1234 | No | No | No | No |
| Office telephone | (412) 555-0101 | Yes (preferred) | Yes | No | No |
| Mobile telephone | (412) 555-4567 | Yes | No | No | No |
| Voicemail | (800) 555-mail | Yes | Yes (preferred) | Yes | No |
| Personal e-mail | user@domain.com | Yes | No | No | No |
| Work e-mail | user@company.com | Yes (preferred) | Yes (preferred) | No | No |
| Instant messaging | user@someplace.com | Yes | No | No | No |

**Fig. 2**

*Id.*, Figs. 2, 3; *see also id.*, [0031]–[0037], [0049].

80.    ***Second***, Diacakis teaches that users have the "ability to control what contact information observers are allowed to view." *Id.*, [0007]; *see also id.*, [0047] ("Additionally, the individual may specify the observers 62 who receive the

Epic Games Ex. 1003
Page 41

individual's contact information."). Diacakis' users thus do not see others' contact information (*e.g.*, telephone number or email address) simply by communicating with them. In fact, Diacakis explains that knowledge of others' contact information is unnecessary, because the P&A system collects and merges this information into a single "indicator" that identifies the user. *See id.*, [0059]–[0062]. For instance, if a second user ("John Doe") has three telephone numbers and is available to be reached by only one of them, "the server 12 may notify subscribers of John Doe's information that he is present and available for telephone calls *regardless of the particular telephone John Doe is currently capable of using.*" *See id.*, [0062]. As Diacakis further explains, in this way users can communicate "without having to be concerned about different communication devices, their addresses and capabilities. Subscribers may instead refer to a single indicator and use that information to initiate point-to-point contact." *Id.*

### 2.    <u>Overview of Tanigawa (Ex. 1008)</u>

81.    Tanigawa is a patent application directed to a communications system with several users employing text and voice communications over the Internet. Ex. 1008, [0006], [0035]. Specifically, Tanigawa teaches allowing users to transition between text and voice chat, even in a multi-party chat environment. *See id.*, [0006], [0035]. As illustrated below in Figure 1, Tanigawa's users can use several client terminal devices, including personal computers (with or without telephones), fixed

Epic Games Ex. 1003
Page 42

telephones, and mobile telephones. Moreover, several servers facilitate communications among these client terminal devices: IM server 4 manages presence information, AP server 5 manages VoIP communications, MD server 6 mixes and distributes voice data, and VR server 10 performs voice relay with mobile telephone networks:



Ex. 1008, Fig. 1, [0009]–[0013], [0035].

82. Tanigawa explains that its users may communicate with one another using text or voice chatting. For instance, as shown below in Figure 12, Tanigawa

Epic Games Ex. 1003
Page 43

teaches a user interface showing two users using devices (called Client A and Client C) participating in a chat room (140) transitioning from text chat to voice chat (136):



*Id.*, Fig. 12. Moreover, in Figure 12, Tanigawa teaches several other chatting features and options (130), including review of presence information (131), one-to-one voice chatting (132), multi-party voice chatting (133), and text chatting (134) *See id.*, Fig. 12, [0163]–[0164].

83. Tanigawa further explains that its users identify one another by nicknames registered with the IM server. *See id.*, [0050], [0116]. For instance, when a first user sends a chat invitation to second users, the first user's nickname is

Epic Games Ex. 1003
Page 44

displayed to the invitees. *See id.*, [0133]. And if a particular user has multiple devices, she is identified using the same nickname across all devices. *See id.*, [0194]. This is shown below in Figure 3 (showing a "presence information management table" used by the IM server):



*Id.*, Fig. 3. As shown above, client devices D and E belong to Hanako while client devices F and G belong to Yoshi. *See id.*; *see also id.*, [0120]–[0121], [0132].

### 3.  **Overview of Hullfish (Ex. 1009)**

84.  Hullfish is a patent directed to managing users' SMS communications with respect to an IM service. Specifically, Hullfish describes forwarding SMS

Epic Games Ex. 1003
Page 45

communications sent by a first user either to a second user's mobile phone or to the second user as an instant message. *See* Ex. 1009, Title, Abstract, 4:61–5:4, 6:54–62, Fig. 3.

85.    Notably, Hullfish describes a "privacy feature," implemented in situations where a second user "wants to stop receiving messages from" a first user. *See id.*, 8:59–65, Fig. 5. In this event, Hullfish teaches that the second user can send a text message identifying the first user to a "pre-determined" telephone number, which will block future communications from the first user to the second user. *See id.*, 9:5–18, 9:34–42, Fig. 5. Moreover, once a second user blocks a first user, the first user's "blocked" status remains in the second user's user preferences, which are stored in a database. *See id.*, 3:32–35, 9:49–67.

86.    Hullfish further teaches that its users may also set their user preferences to block messages based on the time and date. For instance, users may set pre-determined rules blocking messages sent between midnight and 6 am. *See id.*, 11:38–45, Fig. 7.

### B.    Ground I: Claims 1–20 Are Obvious in View of Diacakis

87.    In my opinion, the Challenged Claims are at least obvious in view of Diacakis (Ex. 1007).

###### 1.    <u>Independent Claim 1</u>

a.    <u>Preamble: "A computer-implemented method for managing electronic communications using at least a</u>

41

Epic Games Ex. 1003
Page 46

network-based portal at least based on [sic] Internet protocol, the method comprising:"

88.     In my opinion, Diacakis teaches a computer-implemented method for managing electronic communications using an interface, such as a web page. In Diacakis, multiple users connect to a "presence and availability [P&A] management" over a network. Ex. 1007, [0003], [0009]. This P&A management server is a computer that detects when any one user is present on any network connected to the P&A management server. Diacakis explains that "P&A management server 12 in communication with a client terminal 22 via a network 16," where "network 16 may include, for example, the Internet[.]" *Id.*, [0024]– [0025]. Although Diacakis' system refers to the Internet as a network, it is not limited to the Internet. *See id.* Diacakis' P&A management server 12 is connected to client terminal 22 as shown below in Figure 1:



Fig. 1

Epic Games Ex. 1003
Page 47

*Id.*, Fig. 1.

89.    Diacakis further discloses an interface that users employ to connect to the server through an Internet Protocol-based connection, which a POSITA would have understood to be a "network-based portal."  *See id.*, [0056].  This interface is shown below in Figure 9:



*Id.*, Fig. 9 (showing user interface in yellow within client terminal 22).  The interface is shown in further detail below in Figure 8:

Epic Games Ex. 1003
Page 48



**Fig. 8**

*Id.*, Fig. 8.

> b.  Element [1.1]: providing a plurality of communication
> options to a first user to be selected as a selected option of
> communication for a message from the first user to a
> second user via an electronic device associated with the
> second user, with the first user being identified at least
> depending on a prior registration process by the first user
> regarding the use of the network-based portal, and with the
> plurality of communication options provided to the first
> user to send messages to the electronic device associated
> with the second user.

90.    In my opinion, Diacakis discloses this element. Diacakis discloses that

a "subscriber" (*i.e.*, the claimed "first user") may wish to communicate with an

"individual" (*i.e.*, the claimed "a second user"). *See* Ex. 1007, [0029]. Specifically,

Epic Games Ex. 1003
Page 49

Diacakis discloses that individuals on a network may "may want to communicate with other individuals on the communications network." *Id.*, [0008].    To communicate with other individuals on the network, a subscriber initiates communication with an individual on the network. *Id.*, [0062].

91.    Diacakis further discloses providing a plurality of communication options to a first user to be selected as a selected option of communication.  Diacakis discloses that when an individual is connected to the network, the subscriber may send "text files, audio files, streaming audio files, video files, streaming video files, graphics files and streaming graphics files" to the second user. *See id.*, [0059], [0062].    A POSITA would have recognized that these different forms of communication constitute a plurality of communication options.

92.    Diacakis also teaches a "Contacts Program" window as a component of the user interface (*i.e.*, the network-based portal) which allows a subscriber to determine which modes of communication are available for an individual on the network:

Epic Games Ex. 1003
Page 50



**Fig. 8**

*Id.*, Fig. 8.  This Contacts Program window provides a subscriber with information about what communication methods are available to contact an individual on the subscriber's contact list.  *Id.*  The individual (*i.e.*, the "second user") sets up a profile indicating what communication methods are available for a subscriber to contact them.  For example, as shown above, Tom's profile indicates that he can be contacted via voice, but not Instant Messaging ("IM," which refers to an internet-based text messaging system).  Similarly, Pete may only be contacted by IM, while Corby and Cyndi can be contacted via both voice and IM.  *Id.*

Epic Games Ex. 1003
Page 51

93.    Diacakis further teaches that the availability of any one method of communication can depend on an access level coding.  For example, as shown below in Figure 2, a subscriber with a "Restricted" access level would only be able to communicate with the individual via voicemail, while a subscriber with a "Normal" access level would be able to communicate with the individual via an office telephone, voicemail, and work e-mail:

OFFICE PROFILE

| Communication Media | Address | Important | Normal | Restricted | Blocked |
|---|---|---|---|---|---|
| Home telephone | (412) 555-1234 | No | No | No | No |
| Office telephone | (412) 555-0101 | Yes (preferred) | Yes | No | No |
| Mobile telephone | (412) 555-4567 | Yes | No | No | No |
| Voicemail | (800) 555-mail | Yes | Yes (preferred) | Yes | No |
| Personal e-mail | user@domain.com | Yes | No | No | No |
| Work e-mail | user@company.com | Yes (preferred) | Yes (preferred) | No | No |
| Instant messaging | user@someplace.com | Yes | No | No | No |

**Fig. 2**

*Id.*, Fig. 2.

94.    Diacakis further teaches that the subscriber communicates with the individual through an electronic device associated with the second user, such as a "wireless telephone, landline telephone, personal digital assistant (PDA), computer . . . a SMS phone, a pager, a two-way pager, a wireless PDA, a WAP phone, and a GPRS phone." *Id.*, [0060].  And the subscriber can access the P&A

47

Epic Games Ex. 1003
Page 52

management system from multiple electronic devices, including mobile phones or computers. *Id.*, [0007]; *see also id.*, [0031].

95.    Diacakis further teaches that a first user is identified depending on a prior registration process by the first user.  In Diacakis' system, subscribers (*i.e.*, first users) receive individuals' (*i.e.*, second users) presence and availability information.  *Id.*, [0009].  Subscribers must first "subscribe" to seconds users' P&A information, which is a prior registration process.  *See id.*, [0029] ("[T]he server publishes the change to each of the connected clients 22 that are subscribers of the individual's information."); *see also id.*, [0024], [0030] (indicating subscribers "place a subscription" to second users' P&A information).

96.    Diacakis further teaches that this prior registration process, where a first user subscribes to a second user's P&A information, identifies the first user to the second user using an identifier.  Diacakis teaches that the second user "***identifies and categorizes the people*** to whom he wants his information published," including the first user.  *See* Ex. 1007, [0031].  This categorization determines what type of information the individual publishes to that subscriber.  *See id.*, [0034], [0059]– [0062].

        c.    <u>Element [1.2]: wherein the plurality of communication options include text messaging and voice communication</u>

97.    In my opinion, Diacakis discloses this element.  Diacakis discloses that an individual using the communication system may receive "text files, audio files,

streaming audio files, video files, streaming video files, graphics files and streaming

graphics files."  Ex. 1007, [0059].  Moreover, Diacakis' communication system

allow users to use text messaging and voice communication to communicate with

one another.  As shown below in Figure 8, Diacakis discloses that some users (like

Tom and Pete) are available by one communication option while others (like Corby

and Cyndi) are available via text messaging and voice communication.



Fig. 8

*Id.*, Fig. 8, [0056]; *see also id.*, [0045], [0066].

Epic Games Ex. 1003
Page 54

      d.    <u>Element [1.3]: wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.</u>

98.    In my opinion, Diacakis discloses this element. Diacakis teaches that each user (both subscribers and individuals) are associated with a unique identifier. Specifically, with respect to a subscriber, Diacakis teaches an "indicator" (the claimed "one identifier")—which is listed alongside "listed individual[s]" (the claimed "second user(s)"). *Id.*, [0056]. As Diacakis explains, "[t]he indicator may identify the individual, such as by name, as illustrated in FIG. 8":

Epic Games Ex. 1003
Page 55



Fig. 8

*Id.*, Fig. 8, [0062], [0064].  As shown above, "the indicator for Jonathan identifies
Jonathan by name and indicates that Jonathan is available to the subscriber to receive
data content by telephone and instant messaging." *Id.*, [0062]–[0064].

99.    Diacakis further explains that all of the subscriber's communication
options use the same unique indicator associated with the individual.  As Diacakis
explains, the communication system "may relate the various entries for an individual
and merge them together as one entry." *Id.*, [0059].  In other words, regardless of
the different communication devices through which any individual can be contacted,

Epic Games Ex. 1003
Page 56

"[s]ubscribers may instead refer to a single indicator and use that information to initiate point-to-point contact." *Id.*, [0062].  For instance, and "with reference to FIG. 8, there is one entry (indicator) for Alex, indicating that Alex is available on a telephone network and an IM network.  This is indicated by the telephone icon and the IM icon next to Alex's name.  Thus, the single summary indicator may be a summary of the individual's availability, with the single summary indicator containing several different icons or states that convey the availability information." *Id.*, 1007, [0059]; *see also id.*, [0062] (even where an individual has three different telephone numbers, if the individual is available via at least one telephone number, a subscriber is simply notified that the individual is available by telephone without regards as to the specific number(s)).  In short, where an individual is available through multiple communication options, multiple devices, or multiple addresses, the P&A server merges these identities to provide a single point of reference (the "single summary indicator") that summarizes the various ways a subscriber can contact that individual.

    e.    <u>Element [1.4]: receiving an indication regarding one of the plurality of communication options, via the network-based portal, from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided.</u>

100.  In my opinion, Diacakis renders this element at least obvious.  As I explain above, Diacakis teaches that a second user indicates to a first user (the

Epic Games Ex. 1003
Page 57

"subscriber") on which communications options the second user (the "individual")

is available. *See supra*, §§VIII.B.1.c–VIII.B.1.d; *see, e.g.*, Ex. 1007, [0059], [0062],

[0066]. As shown below, these options are presented to the first user (the

"subscriber") using graphical icons depicted next to the second user's name:



**Fig. 8**

*Id.*, Fig. 8, [0059]. For example, if the second user is available via telephone, a

graphical depiction of a telephone appears next to the second user's name. *See id.*

If the second user is available via IM, an IM icon appears next to the second user's

name. *See id.*

Epic Games Ex. 1003
Page 58

101.   Diacakis further discloses that server 12 provides a response to the first user depending on the selected option of communication.  For instance, telephone communication is the selected option, the server will notify the first user of the second user's availability for telephone calls "regardless of the particular telephone" the second user is capable of using.  *See id.*, [0062].  Likewise, if text-based instant messaging is the selected option, the server "provides the appropriate IM address to the subscriber."  *See id.*  A POSITA would have understood that, in order for the server to provide the first user such a response, the server must receive an indication indicating which option of communication is the selected option.

102.   Moreover, if this element is determined to require that the ***communications network*** receives the claimed indication, in my opinion, a POSITA would have found this obvious as well.  As I explain above, Diacakis teaches that the first user may send text, audio, video, or graphic messages.  *See id.*, [0045], [0059], [0066].  These different modes of communication convey different types of data and are commonly transmitted as different file types.  Accordingly, these different types of messages would be encoded, processed, and decoded differently.  A POSITA would have understood, that when such multiple modes of communication are possible, the communications system will typically identify the selected mode so that the receiving device understand how to process and interpret the transmitted message.  To this end, the communications network would typically

54

Epic Games Ex. 1003
Page 59

be provided with (at least) what communication option is the selected option, and carry that information to the receiving device.  Thus, a POSITA would have understood that the network would receive an indication specifying the communication option chosen in order to transmit the message over the Internet.

103.   Additionally, providing an indication to the communications network specifying the selected mode of communication would be an obvious design choice.  In a communications system (like Diacakis') where multiple modes of communication are possible, the receiving device either will be explicitly informed of the selected communication mode or will be left to figure out the selected communication mode on its own.  A POSITA would have found it obvious that the communications network would typically carry an indication identifying the selected mode of communicating to the receiving device to eliminate the risk that the receiving device misidentifies the selected mode, which would cause errors.

104.   Furthermore, if this element is determined to require that the ***second user*** receives the claimed indication, in my opinion, a POSITA would have found this obvious as well.  Diacakis teaches that if telephone communication are selected (*i.e.*, if the first user tries to call the second user), the second user will receive a notification of an incoming telephone call (*e.g.*, a ringtone), which is an indication. *See, e.g.*, Ex. 1007, [0027], [0052]–[0053] (describing the telephone ringing as in indication to the second user of an incoming call).

Epic Games Ex. 1003
Page 60

105. Moreover, a POSITA would have understood that a second user receiving a text-based communication (like an e-mail or an IM) would commonly receive a notification. For instance, a POSITA would have been aware that incoming e-mails and instant messages are typically accompanied by both audio notifications (*e.g.*, "You've Got Mail") and visual notifications (*e.g.*, flashing icons or a numerical indication of unread messages). At a minimum, a POSITA would have understood that notifications in such systems were optional and certainly at least sometimes used. Therefore, a POSITA would have found it obvious that, if text messages are the selected option in Diacakis' system, the second user would receive an indication prior to receiving the content of message, such as a visual icon or sound alert, similar to how a recipient of a telephone call receives an indication (*e.g.*, a ringtone) prior to receiving a telephone call.

      f.    <u>Element [1.5]: permitting the second user to block the first user from reaching the second user via the network-based portal</u>

106. In my opinion, Diacakis discloses this element. One of Diacakis' "primary functions" is to "distribute the availability information of a given person to interested individuals on a selective basis, according to a variety of user-defined preferences and settings." *Id.*, [0006]. To achieve this, a second user "identifies and categorizes the people to whom he wants his information published. This allows individuals to select the 'more important' people and to give them easier access,

Epic Games Ex. 1003
Page 61

whereas the 'less important' people are given minimum access, and undesirable groups of people are restricted from access altogether." *Id.*, [0031].  In other words, Diacakis teaches that the second user creates categories for people who subscribe to the second user's presence and availability information.  The second user can then restrict or block what type of presence and availability information the first user receives.  These categories are shown below in Figure 2:

---

**OFFICE PROFILE**

| Communication Media | Address | Important | Normal | Restricted | Blocked |
|---|---|---|---|---|---|
| Home telephone | (412) 555-1234 | No | No | No | No |
| Office telephone | (412) 555-0101 | Yes (preferred) | Yes | No | No |
| Mobile telephone | (412) 555-4567 | Yes | No | No | No |
| Voicemail | (800) 555-mail | Yes | Yes (preferred) | Yes | No |
| Personal e-mail | user@domain.com | Yes | No | No | No |
| Work e-mail | user@company.com | Yes (preferred) | Yes (preferred) | No | No |
| Instant messaging | user@someplace.com | Yes | No | No | No |

**Fig. 2**

---

*Id.*, Fig. 2.  Thus, Diacakis makes clear that the ***second user*** (the "individual") can determine availability information based on an access level (*id.*, Fig. 5, step 94), and block the first user from reaching the second user.  *See id.*, [0032] ("The individual may specify which persons belong to each access level for each profile.").

> g.  Element [1.6]: enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one

Epic Games Ex. 1003
Page 62

<u>identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user,</u>

107.   In my opinion, Diacakis discloses this limitation.  First, as I explain above, Diacakis teaches that a second user receives a message through an electronic device, via a network-based portal, in a particular selected mode of communication, based on the second user's identifier, when that second user has not blocked the first user.  *See supra* §§VIII.B.1.b–VIII.B.1.f.  Indeed, Diacakis discloses that its system "provide[s] a user-friendly interface allowing **subscribers** [*i.e.*, first users] **to contact individuals** [i.e., second users]."  Ex. 1007, [0062]; *see also id.*, [0008] (describing users "communicat[ing] with other individuals on the communications network").  Given this disclosure, a POSITA would have understood that Diacakis enables the second user to receive messages from the first user.  Indeed, a POSITA would have recognized that in order to "communicate with other individuals on the communications network," the second user must be able to receive a message from a first user.

108.   Diacakis also teaches that, when a second user blocks a first user, a "piece of information" regarding the blocking is stored in a storage medium.  "An individual may define his profile set, including his rules and preferences, via a user-

Epic Games Ex. 1003
Page 63

interface in communication with the P&A management server . . . .  Once defined, the P&A management server 12 may ***store the profiles, rules and preferences in a database*** (not shown)."  Ex. 1007, [0036].  Indeed, Diacakis illustrates in Figures 1 and 4 (reproduced below) that an "individual's rules and preferences may be stored in a database 64" or "may be stored with the profile information in the database 24." *Id.*, [0047].  "Additionally, the individual may specify the observers 62 who receive the individual's contact information. . . . The observer classification information may also be stored in a database, such as the profile database 24."  *Id.*  In other words, the "blocked" status of a first user vis-à-vis a second user is stored either in profile database 24 (shown below in Figure 1) or in "Rules & Preferences" database 64 (shown below in Figure 4):



*Id.*, Fig. 1.

Epic Games Ex. 1003
Page 64



*Id.*, Fig. 4.

109.   Further, Diacakis teaches that whether a first user is "blocked" (or given some other level of access) is based on the second user's input.  As I explain above in Section VIII.B.1.f, one of Diacakis' "primary functions" is to distribute the availability of information of a given person to interested individuals on a selective basis, according to a variety of user-defined preferences and settings.  *Id.*, [0006]. The user who defines these preferences and settings is the second user, who can selectively block "undesirable groups of people . . . from access altogether."  *Id.*, [0031].

60

Epic Games Ex. 1003
Page 65

h.  Element [1.7]: wherein the method comprises determining availability of the second user,

110.  In my opinion, Diacakis discloses this element.  Diacakis' "presence and availability [P&A] management" server within a communication system "enables users to control their availability and how that is displayed to users." *Id.*, [0003].  A P&A management server "enables users to control their availability and how that is displayed to other users." *Id.*, [0005].  This is especially apparent in light of Diacakis' teaching that "the present invention is directed to presence and availability (P&A) management server for communicating communication network availability information regarding an individual to at least one subscriber of the individual's availability information." *Id.*, [0009].  As Diacakis makes clear, "availability" is the "willingness of an individual . . . to be reached by one or more persons." *Id.*, [0027].  Availability management engine 20, shown below in Figure 4, governs the availability of the second user using the communication system:

Epic Games Ex. 1003
Page 66



*Id.*, Fig. 4.

111. Furthermore, Diacakis' Figures 5–7 and 10 (reproduced below) describe determining availability of the second user. Figure 5 "illustrate[s] the process flow through the P&A management server," and expressly indicates that the process flow "[d]etermine[s] availability information." *Id.*, Fig. 5, [0016]; *see also id.*, Fig. 7 (indicating that P&A management server "[d]etermine[s] availability information.").

Epic Games Ex. 1003
Page 67



*Id.*, Fig. 5.

Epic Games Ex. 1003
Page 68



*Id.*, Fig. 7.

> i.   <u>Element [1.8]: wherein the method requires contact information associated with the second user to allow the second user to receive messages via the network-based portal,</u>

112.  In my opinion, Diacakis discloses that the second user is required to provide contact information to receiving messages via the network-based portal. According to Diacakis, the second user first "initially configure[s] his P&A profile settings in order to instruct the system 12 how his information is to be distributed" such that the second user is able to receive messages via the network-based portal. *Id.*, [0031]. Thus, "the individual is ***requested to enter information*** regarding each

64

Epic Games Ex. 1003
Page 69

of the communication devices that the individual uses and a ***corresponding address*** for each of those devices. For example, the individual may have a landline telephone with ***a phone number*** and a computer workstation with ***an e-mail address***." *Id.*

113. Diacakis also discloses that the second user can "control what contact information observers are allowed to view." *Id.*, [0007]; *see also id.*, [0032] (stating that a user may selectively control who sees certain information based on classifications), [0047]–[0048] (stating that the "availability management engine 20 may consider the individual's rules and preferences" and that "[t]he availability information may then be published to the individual's subscribers"), [0056] (stating that an indicator "may identify the availability means for the particular individual"), [0064] (stating that the indicator next to a second user's name shows what methods of communication can be used to reach the second user), [0066] (stating that an indicator next to a second user shows what type of data the second user is available to receive), [0070] (stating that users "may configure their P&A profiles to specify how their availability information is distributed"). Therefore, a POSITA would have understood that the second user is required to enter contact information such as a phone number or email address in order to publish that information, which is required for Diacakis' method to work.

       j.     <u>Element [1.9]: wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information</u>

Epic Games Ex. 1003
Page 70

associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user, and

114.   In my opinion, Diacakis discloses this limitation.  As Diacakis teaches, a second user specifies which observers may see her availability information (Ex. 1007, [0006]) and has "the ability to control what contact information observers are allowed to view."  *Id.*, [0007].  Indeed, Diacakis discloses that an individual may dictate who receives the individual's contact information. *See id.*, [0047] (explaining that, beyond specifying which observers receive her availability information, "the individual may specify the observers 62 who receive the individual's contact information").  A POSITA would have recognized that the second user's contact information is not provided via the network-based portal to the first user upon message transmission; instead, the second user decides whether or not the first user may view the second user's contact information.

115.   A POSITA would have understood the second user's contact information is not provided to the first user because Diacakis obviates the need for the first user to receive the second user's contact information.  Instead, Diacakis teaches that the second user's possible user devices are merged into one entry that tells the first user what communication methods may be used to reach the second user.  *Id.*, [0059].  In other words, the first user does not need to know the second user's contact information (*e.g.*, telephone number or email address), because

Epic Games Ex. 1003
Page 71

Diacakis' communication system "relate[s] the various entries for an individual and merge[s] them together as one entry. For example, with reference to FIG. 8, there is one entry (indicator) for Alex, indicating that Alex is available on a telephone network and an IM network." *Id.*, [0059]; *see also id.*, [0062], Fig. 8. Specifically, Diacakis teaches that a first user uses the single indicator to contact a second user without the need to display the second user's contact information. For instance, if second user John Doe has three phone numbers but is only available on one network, the server will "notify subscribers of John Doe's information that he is present and available for telephone calls regardless of the particular telephone John Doe is currently capable of using." *See id.*, [0062]. As Diacakis explains, "the present invention may provide a user-friendly interface allowing subscribers to contact individuals without having to be concerned about different communication devices, their addresses and capabilities. Subscribers may instead refer to a single indicator and use that information to initiate point-to-point contact." *Id.*; *see also id.*, [0064] (describing that the system replaces "the contact information for each individual" with a "single indicator" used to identify the individual across all of the individual's devices).

Epic Games Ex. 1003
Page 72

k.   <u>Element [1.10]: wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.</u>

116.   In my opinion, Diacakis discloses this limitation.  As I explain above in Section VIII.B.1.d, Diacakis teaches an "indicator," which is an identifier that identifies individual users by name.   Moreover, as I explain above in Section VIII.B.1.i, Diacakis teaches that each of the second user's electronic devices has contact information associated with it, such as an email address or a telephone number.  A POSITA would have recognized that, as shown below in Figure 8, a second user's name (which is her indicator in Diacakis' system) is distinct from her email address and telephone number.

Epic Games Ex. 1003
Page 73



**Fig. 8**

*Id.*, Fig. 8 (showing "Jonathan" as an identifier, which is neither an email address nor a telephone number).

    2.    <u>Dependent Claim 2</u>

        a.    <u>Preamble: A computer-implemented method as recited in claim 1</u>

117.   In my opinion, Diacakis renders the method of claim 1 at least obvious for the reasons I explain above in Section VIII.B.1.

        b.    <u>Element [2.1]: wherein the plurality of communication options include multimedia messaging using the one identifier associated with the second user for the second</u>

Epic Games Ex. 1003
Page 74

> user to receive messages, at least in view of the network-based portal being based on the Internet protocol

118.   In my opinion, Diacakis discloses this element.  Specifically, Diacakis teaches that the plurality of communication options includes "text files, audio files, streaming audio files, video files, streaming video files, graphics files and streaming graphics files." *Id.*, [0059].  A POSITA would have recognized that these file types encompass "multimedia messaging," which refers to transmission of messages with multimedia content (such as images, video, audio, etc.).

119.   As I explain above, these messages use the one identifier associated with the second user in view of the network-based (Internet) portal.  *See supra,* §§VIII.B.1.a, VIII.B.1.d.

### 3.   Dependent Claim 3

#### a.   Preamble: A computer-implemented method as recited in claim 1

120.   In my opinion, Diacakis renders the method of claim 1 at least obvious for the reasons I explain above in Section VIII.B.1.

#### b.   Element [3.1]: wherein the plurality of communication options include group messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.

121.   In my opinion, Diacakis discloses this element.  Diacakis explains that a user may communicate with a "group of people" so long as a certain number of members of that group are available.  For instance, Diacakis expressly discloses that

Epic Games Ex. 1003
Page 75

its method allows users to communicate with such groups as "sales staff," "technical support," "customer service," "employees of a company," "volunteers," and/or "members of a club or social group." *Id.*, [0061]. Diacakis explains that "[a]ny type of group may be used." *See id.* And as I explain above, the second user receives such group messages via the one identifier in view of the network-based (Internet) portal, which is the user interface shown at the client terminal 22. *See supra*, §§VIII.B.1.a, VIII.B.1.d

122.   In addition, Diacakis expressly states that the second user uses the P&A management server to facilitate messages among groups of people. For example, Diacakis states that "users may select . . . how that person (*or group of people*) may or may not contact them." Ex. 1007, [0005]. Further, Diacakis notes that "a person can be available to a first group of people, but unavailable to a second group." *Id.*, [0028]. A POSITA would have understood this to mean that a second user could communicate with a group of users on the network. In fact, Diacakis repeatedly explains that the plurality of communication options depends on classifying groups of users. *See also id.*, [0031], [0033]–[0034] (describing how subscribers can be placed into access groups to control which groups can contact the individual), [0047] (stating that "observers may be specified according to . . . a group basis or an individual basis").

Epic Games Ex. 1003
Page 76

123.  As shown below in Figure 4, the second user may communicate with "groups," "individuals," and "unknown" users (collectively "observers"):



*Id.*, Fig. 4; *see also id.*, Fig. 8 (showing, for example, groups of contacts including "Business," "Friends," "School," and "Misc").

### 4.    Dependent Claim 4

#### a.    Preamble: A computer-implemented method as recited in claim 3

124.  In my opinion, Diacakis renders the method of claim 3 at least obvious for the reasons I explain above in Section VIII.B.3.

Epic Games Ex. 1003
Page 77

b.    Element [4.1]: wherein the one identifier associated with the second user includes a digital identity of the second user.

125.    In my opinion, Diacakis discloses that the second user's one identifier includes a digital identity of the second user.  As I explain above, Diacakis teaches an "indicator" to "*identify the individual, such as by name*."  *See supra*, §VIII.B.1.d; Ex. 1007, Fig. 8, [0064].  Moreover, Diacakis merges multiple devices belonging to a second user into a single entry and identifies the second user by name—which is the second user's digital identity.  *Id.*, [0059] (noting that "various entries for an individual" are "merge[d] . . . together as one entry."); *see also id.*, [0062] ("[A] large number of inputs for each of an individual's communications devices on the various networks may be processed using the presence detection engine 20 to determine the P&A status of that individual, thus allowing the results to be combined in a single availability indicator.").  Therefore, a POSITA would have understood Diacakis' indicator to be a "digital identity" because it is the "one identifier" associated with that user over a network-based protocol.

5.    Dependent Claim 5

a.    Preamble: A computer-implemented method as recited in claim 4

126.    In my opinion, Diacakis renders the method of claim 4 at least obvious for the reasons I explain above in Section VIII.B.4.

Epic Games Ex. 1003
Page 78

      b.    <u>Element [5.1]: wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.</u>

127. In my opinion, Diacakis discloses this element. As I explain above, the second user "is requested to enter information regarding each of the communication devices that the individual uses and a corresponding address for each of those devices." *See supra*, §VIII.B.1.i; Ex. 1007, [0031]. Diacakis states that this contact information may include "a landline telephone with a phone number and a computer workstation with an e-mail address." *Id.*; *see also id.*, [0007] ("[U]sers can access the presence and availability management service if they are on a cellular phone, a handheld device or a computer workstation), [0032], [0047]–[0048], [0056] (stating that Diacakis' illustrations show that an individual is "available by telephone"), [0064] (stating that the indicator module disclosed by Diacakis can show that a user is available "to receive data content by telephone and instant messaging"), [0066] (describing "telephone, text (IM), video, graphic, [and] audio" as data content types), [0070].

Epic Games Ex. 1003
Page 79

128.   Furthermore, Figure 2 illustrates that the contact information associated with a user includes at least one of a phone number or an email address.

OFFICE PROFILE

| Communication Media | Address | Important | Normal | Restricted | Blocked |
|---|---|---|---|---|---|
| Home telephone | (412) 555-1234 | No | No | No | No |
| Office telephone | (412) 555-0101 | Yes (preferred) | Yes | No | No |
| Mobile telephone | (412) 555-4567 | Yes | No | No | No |
| Voicemail | (800) 555-mail | Yes | Yes (preferred) | Yes | No |
| Personal e-mail | user@domain.com | Yes | No | No | No |
| Work e-mail | user@company.com | Yes (preferred) | Yes (preferred) | No | No |
| Instant messaging | user@someplace.com | Yes | No | No | No |

**Fig. 2**

*Id.*, Fig. 2 (showing multiple telephone numbers and email addresses associated with a user).

6.   Dependent Claim 6

a.   Preamble: A computer-implemented method as recited in claim 5

129.   In my opinion, Diacakis renders the method of claim 5 at least obvious for the reasons I explain above in Section VIII.B.5.

b.   Element 6.1: wherein the electronic device associated with the second user is a wireless electronic device, and wherein the electronic device associated with the first user is a wireless electronic device.

130.   In my opinion, Diacakis discloses this element.  Diacakis teaches that "users can access the presence and availability management service if they are on a cellular phone, a handheld device or a computer workstation."  Ex. 1007, [0007].  A POSITA would have recognized that a cellular phone and a handheld device are

Epic Games Ex. 1003
Page 80

wireless devices. Further, Diacakis expressly discloses that that the P&A management server is deployed within a communications system with several client terminals, which may be personal computers or "a wireless telephone . . . or a wireless [] personal digital assistant (PDA)." *Id.*, [0024]; *see also id.*, [0025] ("[T]he network 16 may include . . . a wireless telephone or radio network."), [0026] (stating that a person is present if they are near a "wireless telephone"), [0027] (describing wireless telephone), [0043]–[0044] (disclosing that the presence detection engine can receive inputs from wireless networks such as a wireless telephone or wireless LAN network), [0052] (stating that the adaptive feedback module can rely on a mobile telephone to update an individual's availability), [0056]–[0058] (describing situations where individuals are available on mobile devices), [0060] (stating that an individual could be available on a "wireless telephone . . . . a SMS phone, a pager, a two-way pager, [or] a wireless PDA."), [0062] (same), Figs. 2–4.

### 7.    Dependent Claim 7

#### a.    Preamble: A computer-implemented method as recited in claim 4

131.   In my opinion, Diacakis renders the method of claim 4 at least obvious for the reasons I explain above in Section VIII.B.4.

#### b.    Element [7.1]: wherein the enabling the message to be received by the second user depends on a time.

132.   In my opinion, Diacakis discloses this element. As I explain above, Diacakis teaches that the second user sets rules and preferences to block certain users

Epic Games Ex. 1003
Page 81

from sending certain messages. *See supra*, §VIII.B.1.f. Additionally, Diacakis teaches that an individual (*i.e.*, a second user) may selectively enable these messages to be received depending on a time. For instance, Diacakis explains that "the individual may configure his profile such that his boss has access to the individual's P&A while the individual is at work; his wife has access all the time; and his parents have access only on weekends while not at work." Ex. 1007, [0034]. In each of these instances, a POSITA would have recognized that Diacakis discloses a time-based protocol to enable the second user to receive messages because each of the disclosed criteria are related to times in the day. *See id.*, [0037] ("[O]ther factors may trigger changes in the individual's profile including, for example, *time of day* and the individual's mood."), [0031] ("[T]he individual may identify how he wishes to be communicated with for each profile and for each access level."). Indeed, Diacakis expressly discloses that "[o]ne type of input that the presence detection engine 18 may use to help determine the individual's presence is time-based input." *Id.*, [0040].

133. With reference to the above example, a POSITA would have understood that messages from the individual's boss are enabled to be received depending on a time (*e.g.*, 9am on Monday). Similarly, messages from the individual's parents are enabled to be received depending on a time (*e.g.*, Saturday).

Epic Games Ex. 1003
Page 82

8. <u>Dependent Claim 8</u>

    a.    <u>Preamble: A computer-implemented method as recited in claim 7</u>

134.   In my opinion, Diacakis renders the method of claim 7 at least obvious for the reasons I explain above in Section VIII.B.7.

    b.    <u>Element [8.1]: wherein the enabling the message to be received by the second user depends on a period of time.</u>

135.   In my opinion, Diacakis discloses this element. In the example illustrated above in Section VIII.B.7, the second user "configure[s] his profile such that his boss has access to the individual's P&A while the individual is at work; his wife has access all the time; and his parents have access only on weekends while not work." Ex. 1007, [0034] *see also id.*, [0031], [0037]. With reference to the above example, a POSITA would have understood that messages from the individual's boss are enabled to be received depending on a period of time (*e.g.*, the period from 9am to 5pm on weekdays). *See id.*, [0040] ("For example, if the individual had scheduled to be in his office from 9am to 5pm, the presence detection engine 18 may determine that ***during that time period*** the individual is present on the networks available to him in his office, which may be, for example, telephone and instant messaging."). Similarly, a POSITA would have understood that messages from the individual's parents are enabled to be received depending on a period of time (*e.g.*, the period from Saturday to Sunday).

Epic Games Ex. 1003
Page 83

9.     Dependent Claim 9

a.     Preamble: A computer-implemented method as recited in claim 7

136.   In my opinion, Diacakis renders the method of claim 7 at least obvious for the reasons I explain above in Section VIII.B.7.

b.     Element [9.1]: wherein the method comprises not presenting the message to the second user depending on the period of time.

137.   In my opinion, Diacakis discloses this element.   In the example illustrated above in Section VIII.B.7, the second user "configure[s] his profile such that his boss has access to the individual's P&A while the individual is at work; his wife has access all the time; and his parents have access only on weekends while not at work."  Ex. 1007, [0034]; *see also id.*, [0031], [0037], [0040].  With reference to the above example, a POSITA would have understood that messages from certain users are not presented to the second user depending on a period of time— specifically, the period of time while the second user is not at work.  Similarly, a POSITA would have recognized that messages from the second user's parents are not presented outside of Saturday and Sunday.

10.     **Dependent Claim 10**

a.     Preamble: A computer-implemented method as recited in claim 4

138.   In my opinion, Diacakis renders the method of claim 4 at least obvious for the reasons I explain above in Section VIII.B.4.

Epic Games Ex. 1003
Page 84

       b.    <u>Element [10.1]: wherein the enabling the message to be received by the second user enables leaving a voice mail.</u>

139.  In my opinion, Diacakis discloses this element. As shown below in Figures 2, 3, and 8, one of the options of communication disclosed by Diacakis is voicemail:

## OFFICE PROFILE

| Communication Media | Address | Important | Normal | Restricted | Blocked |
|---|---|---|---|---|---|
| Home telephone | (412) 555-1234 | No | No | No | No |
| Office telephone | (412) 555-0101 | Yes (preferred) | Yes | No | No |
| Mobile telephone | (412) 555-4567 | Yes | No | No | No |
| Voicemail | (800) 555-mail | Yes | Yes (preferred) | Yes | No |
| Personal e-mail | user@domain.com | Yes | No | No | No |
| Work e-mail | user@company.com | Yes (preferred) | Yes (preferred) | No | No |
| Instant messaging | user@someplace.com | Yes | No | No | No |

## Fig. 2

Epic Games Ex. 1003
Page 85





*Id.*, Figs. 2, 3, 8.

Epic Games Ex. 1003
Page 86

11. **Independent Claim 11**

    a.    <u>Preamble: A computing apparatus for managing electronic communications using at least a network-based portal at least based on Internet protocol, the computing apparatus comprising:</u>

140. In my opinion, Diacakis discloses a "presence and availability management system" which is a computer apparatus for managing electronic communications. *See supra*, §VIII.B.1.a.

    b.    <u>Element [11.1]: at least one computing device; and</u>

141. In my opinion, Diacakis discloses this element. As explained above, Diacakis teaches a presence and availability management server, which is at least one computing device. *See supra*, §VIII.B.1.a

    c.    <u>Element [11.2]: one or more storage devices coupled to the at least one computing device, with the one or more storage devices storing instructions that, when executed, cause the computing apparatus to:</u>

142. In my opinion, Diacakis discloses this element. As I indicate above, Diacakis teaches that "the server 12 includes a presence detection engine 18 and an availability management engine 20." Ex. 1007, [0038]. Moreover, "engines 18, 20 may be implemented as software code to be executed by a processor in the server 12 using any suitable computer language such as, for example, Java, C++ or Perl using, for example, conventional or object-oriented techniques. The software code may be **stored as a series of instructions or commands on a computer readable medium**, such as a random access memory (RAM), a read only memory (ROM), a magnetic

Epic Games Ex. 1003
Page 87

medium such as a hard-drive or a floppy disk, or an optical medium such as a CD-ROM." *Id.*, [0039].  From these disclosures, a POSITA would have understood that the instructions (*i.e.*, software code)—which, when executed, cause the server to follow the below steps—are stored in a conventional storage device coupled to the server.

> d.  Element [11.3]: providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified by the computing apparatus at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user

143.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.b.

> e.  Element [11.4]: wherein the plurality of communication options include text messaging and voice communication, and

144.   In my opinion, Diacakis renders this element at least obvious for the reasons I explain above in Section VIII.B.1.c.

> f.  Element [11.5]: wherein all of the communication options use one identifier associated with the second user for the

Epic Games Ex. 1003
Page 88

> second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;

145.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.d.

> g.   Element [11.6]: receiving an indication regarding one of the plurality of communication options, via the network-based portal from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided;

146.   In my opinion, Diacakis renders this element at least obvious for the reasons I explain above in Section VIII.B.1.e.

> h.   Element [11.7]: permitting the second user to block the first user from reaching the second user via the network-based portal; and

147.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.f.

> i.   Element [11.8]: enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second

Epic Games Ex. 1003
Page 89

<u>user, with the piece of information being based on at least an input previously submitted by the second user,</u>

148.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.g.

j.   <u>Element [11.9]: wherein the instructions, when executed, cause the computing apparatus to determine availability of the second user, and to require contact information associated with the second user to allow the second user to receive messages via the network-based portal,</u>

149.   In my opinion, Diacakis discloses this element for the reasons I explain above in Sections VIII.B.1.h and VIII.B.1.i.

k.   <u>Element [11.10]: wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user, and</u>

150.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.j.

l.   <u>Element [11.11]: wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.</u>

151.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.k.

Epic Games Ex. 1003
Page 90

12.    <u>Dependent Claim 12</u>

    a.    <u>Preamble: A computing apparatus as recited in claim 11</u>

152.   In my opinion, Diacakis renders the computing apparatus in claim 11 at least obvious for the reasons I explain above in Section VIII.B.10.

    b.    <u>Element [12.1]: wherein the plurality of communication options include multimedia messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.</u>

153.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.2.

13.    <u>Dependent Claim 13</u>

    a.    <u>Preamble: A computing apparatus as recited in claim 11</u>

154.   In my opinion, Diacakis renders the computing apparatus in claim 11 at least obvious for the reasons I explain above in Section VIII.B.10.

    b.    <u>Element [13.1]: wherein the plurality of communication options include group messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.</u>

155.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.3,

Epic Games Ex. 1003
Page 91

14.    <u>Dependent Claim 14</u>

a.    <u>Preamble: A computing apparatus as recited in claim 13</u>

156.   In my opinion, Diacakis renders the computing apparatus in claim 13 at least obvious for the reasons I explain above in Section VIII.B.13.

b.    <u>Element 14.1: wherein the one identifier associated with the second user includes a digital identity of the second user.</u>

157.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.4

15.    <u>Dependent Claim 15</u>

a.    <u>Preamble: A computing apparatus as recited in claim 14</u>

158.    In my opinion, Diacakis renders the computing apparatus in claim 14 at least obvious for the reasons I explain above in Section VIII.B.14.

b.    <u>Element [15.1]: wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.</u>

159.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.5.

16.    <u>Dependent Claim 16</u>

a.    <u>Preamble: A computing apparatus as recited in claim 15</u>

160.   In my opinion, Diacakis renders the computing apparatus in claim 15 at least obvious for the reasons I explain above in Section VIII.B.15.

Epic Games Ex. 1003
Page 92

      b.    <u>Element [16.1]: wherein the method comprises not presenting the message to the second user depending on the period of time.</u>

161.   In my opinion, Diacakis discloses this element for the reasons I explain above in Sections VIII.B.7–VIII.B.9.

      17.   <u>Dependent Claim 17</u>

      a.    <u>Preamble: A computing apparatus as recited in claim 15</u>

162.   In my opinion, Diacakis renders the computing apparatus in claim 15 at least obvious for the reasons I explain above in Section VIII.B.15.

      b.    <u>Element [17.1]: wherein the electronic device associated with the second user is a wireless electronic device, and wherein the electronic device associated with the first user is a wireless electronic device.</u>

163.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.6.

      18.   <u>Dependent Claim 18</u>

      a.    <u>Preamble: A computing apparatus as recited in claim 14</u>

164.   In my opinion, Diacakis renders the computing apparatus in claim 14 at least obvious for the reasons I explain above in Section VIII.B.14.

      b.    <u>Element [18.1]: wherein the enabling the message to be received by the second user enables leaving a voice mail.</u>

165.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.10.

Epic Games Ex. 1003
Page 93

19.    <u>Independent Claim 19</u>

a.    <u>Preamble: A non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications using at least a network-based portal at least based on Internet protocol, said computer readable medium comprising:</u>

166.    In my opinion, Diacakis discloses a non-transitory computer readable medium including at least executable program code for managing electronic communications using a network-based portal. As I explain above in Section VIII.B.11.c, Diacakis teaches that "the [P&A management] server 12 includes a presence detection engine 18 and an availability management engine 20." Ex. 1007, [0038]. In addition, "engines 18, 20 may be implemented *as software code to be executed by a processor* in the server 12 using any suitable computer language such as, for example, Java, C++ or Perl using, for example, conventional or object-oriented techniques. The software code may be stored as a series of instructions or commands *on a computer readable medium*, such as a random access memory (RAM), a read only memory (ROM), a magnetic medium such as a hard-drive or a floppy disk, or an optical medium such as a CD-ROM." *Id.*, [0039]. In my opinion, a POSITA (in view of these disclosures) would have understood that Diacakis teaches a non-transitory computer readable medium containing executable software code for the communications and methods described throughout Diacakis and this petition.

Epic Games Ex. 1003
Page 94

   b.   Element [19.1]: computer program code for providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user,

167. In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.b.

   c.   Element [19.2]: wherein the plurality of communication options include text messaging and voice communication, and

168. In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.c.

   d.   Element [19.3]: wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;

169. In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.d.

   e.   Element [19.4]: computer program code receiving an indication regarding one of the plurality of communication options, via the network-based portal from an electronic device associated with the first user, the indication indicating the selected option of communication for the

Epic Games Ex. 1003
Page 95

message from the plurality of communication options provided;

170.   In my opinion, Diacakis renders this element at least obvious for the reasons I explain above in Section VIII.B.1.e.

   f.   Element [19.5]: computer program code for permitting the second user to block the first user from reaching the second user via the network-based portal;

171.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.f.

   g.   Element [19.6]: computer program code for enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user;

172.   In my opinion, Diacakis renders this element at least obvious for the reasons I explain above in Section VIII.B.1.g.

   h.   Element [19.7]: computer program code for determining availability of the second user; and

173.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.h.

Epic Games Ex. 1003
Page 96

      i.    <u>Element [19.8]: computer program code for requiring contact information associated with the second user to allow the second user to receive messages via the network-based portal</u>

174. In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.i.

      j.    <u>Element [19.9]: wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user,</u>

175. In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.j.

      k.    <u>Element [19.10]: wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.</u>

176. In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.1.k.

      l.    <u>Element [19.11]: wherein the plurality of communication options include multimedia messaging and group messaging, all of which using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol,</u>

177. In my opinion, Diacakis discloses this element for the reasons I explain above in Sections VIII.B.2 and VIII.B.3.

Epic Games Ex. 1003
Page 97

      m.    <u>Element [19.12]: wherein the one identifier associated with the second user includes a digital identity of the second user, and</u>

178.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.4.

      n.    <u>Element [19.13]: wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.</u>

179.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.5.

     20.   <u>Dependent Claim 20</u>

      a.    <u>Preamble: A non-transitory computer readable medium as recited in claim 19</u>

180.   In my opinion, Diacakis discloses the non-transitory computer readable medium for the reasons I explain above in Section VIII.B.19.

      b.    <u>Element [20.1]: wherein the electronic device associated with the second user is a wireless electronic device, and wherein the electronic device associated with the first user is a wireless electronic device.</u>

181.   In my opinion, Diacakis discloses this element for the reasons I explain above in Section VIII.B.6.

**C.   Ground II: Claims 1–9, 11–17, 19, and 20 Are Rendered Obvious by Tanigawa in View of Hullfish**

182.   In my opinion, the Challenged Claims are at least obvious in view of Tanigawa (Ex. 1008) in further view of Hullfish (Ex. 1009).

Epic Games Ex. 1003
Page 98

### 1.    **Motivation to Combine**

183.   In my opinion, a POSITA would have been motivated to combine the specific blocking features of Hullfish into Tanigawa's communications system. Hullfish specifically describes: (1) a process where a second user can block a first user from communicating with the second user and (2) a process where a second user can automatically block certain messages depending on time, or a period of time.  *See* Ex. 1009, 8:59–10:8, 11:38–45; *see infra*, §§VIII.C.2.f–VIII.C.2.g, VIII.C.8–VIII.C.10.  Moreover, a POSITA would have had several specific reasons for implementing Hullfish's blocking features in Tanigawa's communications system, which I explain below.

184.   ***First***, in my opinion, Tanigawa and Hullfish provide express teachings, suggestions, and motivations that would have led a POSITA to use Hullfish's blocking features in Tanigawa's system.  Tanigawa explains that, where a first user invites the second user to communicate, the second user "can determine[] whether or not she will respond to the participation invitation."  Ex. 1008, [0134].  In other words, Tanigawa expressly discloses the situation where an invitee does not wish to communicate with an inviter, does not which to accept the invitation, and does not respond.  These concepts were well known in the prior art and related systems.  For instance, even before the ubiquity of instant messaging, individuals used caller ID, call screening techniques, and email spam filtering to avoid engaging in unwanted

Epic Games Ex. 1003
Page 99

communications. And prior to the Priority Date of the '810 Patent, instant messaging services already allowed users to "mute," "restrict," and/or "block" messages from other users. *See, e.g.* Ex. 1023 (Stein) at 1–2; Ex. 1028 (Grinter) at 27–28 ("[Us]ers can also block everyone or specific others. The block feature can be used in an interesting way: When user A blocks user B, user A simply appears to be off-line to user B. Some participants reported using the block feature to hide from certain people in this way, making themselves appear as if they were not on-line, even while actively messaging others."); Ex. 1034 (Patil) at 4–5, Table 1 (explaining that the four major IM services as of April 2003—AIM, MSN, Yahoo, and ICQ— all allowed users to block one another). Moreover, a POSITA would have known that users of such an instant messaging service would not be available to converse with other all times, and set up predefined "away" statuses (such as "busy," "out to lunch," and "away from the desk"), or may set up auto reply functionality to respond to messages while unavailable. *See* Ex. 1034 at 4–5 (describing status, "customized status," and "auto reply"). Thus, a POSITA would have been motivated to supplement Tanigawa's teachings with features giving the second user greater control over who may reach her via the network-based portal.

185. A POSITA would have been aware of various design choices to implement the above-described blocking functionality. A POSITA would have understood further that Hullfish illustrates certain examples of these design choices

Epic Games Ex. 1003
Page 100

typically available in Internet-based communications systems, and would have turned to Hullfish's teachings of blocking features to supplement Tanigawa's communications systems.  In fact, Hullfish describes its blocking capabilities as a "privacy feature" specifically used when a second user "wants to stop receiving messages from" a first user.  Ex. 1009, 8:59–65.  A POSITA would have understood that users of Internet-based communications systems (such as those described by both Tanigawa and Hullfish) may find themselves in conversations with annoying, abusive, or unpleasant users, or may simply find themselves not wanting to engage in certain conversations or with certain users.  Moreover, Hullfish provides a further reason to implement such blocking features—they "provide[] a method of parental control to allow parents to supervise a minor's use of . . . message systems."  Ex. 1009, 10:53–55.  Similarly, a POSITA would have understood that users may wish to block messages at certain times, including while they are asleep, while they are busy, or while they are traveling.  *See* Ex. 1009, 11:38–45.

186.  ***Second***, in my opinion, the combination of Tanigawa and Hullfish is no more than using a known technique to improve similar devices and methods in the same way.  As I explain above, the need and ability to block users in online communications systems was well known in the prior art (*e.g.*, call blocking, call screening, email spam filtering, etc.), and prior to the '810 Patent, various instant messaging clients (including AIM, MSN Messenger, Yahoo! Messenger, and ICQ)

Epic Games Ex. 1003
Page 101

gave users the ability to block other users and maintain their privacy. *See* Ex. 1034, 4–5, Table 1; Ex. 1023; Ex. 1026 (Danieli). A POSITA therefore would have been motivated to use Hullfish's blocking and privacy features to improve Tanigawa's communications system, as Hullfish's users could have blocked unwanted communications, blocked communications at inconvenient times (*e.g.*, when busy, asleep, or traveling), and "supervise[d] a minor's use" of communications systems. *See* Ex. 1009, 9:19–10:55, Figs. 5, 7.

187. Moreover, a POSITA would have understood Tanigawa and Hullfish to disclose similar teachings. For instance, both references describe text communications and voice communications among several users over the Internet. *See* Ex. 1008, [0012], [0034]–[0035]; Ex. 1009, 1:12–63, 2:23–28, 5:48–52, 12:7–13. Both references explain that their respective users use electronic devices to communicate, and that these electronic devices can be personal computers or handheld, wireless devices (such as mobile phones). *See* Ex. 1008, [0035]; Ex. 1009, 2:28–30, 4:42–49, 4:67–5:20, 12:13–16. Both references further describe similar processes of Internet-based communications—including describing the steps of a message to be transmitted being compressed into packets, transmitted over a network, decompressed on the receiving end, and interpreted on the receiving end. *See* Ex. 1008, [0041]–[0042], [0046], [0048], Fig. 6; Ex. 1009, 9:49–10:6, Fig. 6. Both references also explain that their respective users are identified to one another

Epic Games Ex. 1003
Page 102

users using nicknames, screen names, or aliases to interact with one another, which differ from email addresses and telephone numbers. *See* Ex. 1008, [0050], [0116]; Ex. 1009, 1:49–52, 6:12–18, 7:53–57, 8:35–48. Both references teach methods of determining users' presence and availability, including with respect to specific options of communication (such as text and voice). *See* Ex. 1008, [0120], Fig. 3; Ex. 1009, 2:6–22, 2:52–67, 3:43–50 6:50–65, Figs. 3, 4. In light of these similarities, in my opinion, a POSITA would have understood that Tanigawa and Hullfish describe extremely similar components, devices, and methods, and would have been motivated to use Hullfish's known blocking techniques in Tanigawa's system. And given their complementary teachings, in my opinion combining Tanigawa and Hullfish would have involved routine implementation with little-to-no technical risk.

188. **Third**, in my opinion, for the reasons described above, the combination of Tanigawa and Hullfish is no more than using a known technique (Hullfish's blocking features) in a known method and device (Tanigawa's communications system) ready for improvement to yield predictable results. Specifically, the need and ability to block users in online communications systems was known in the prior art (*e.g.*, call blocking, call screening, email spam filtering, etc.), and prior to the '810 Patent, various instant messaging clients gave users the ability to block other users and maintain their privacy. *See* Exs. 1023, 1026, 1034. A POSITA therefore would have been motivated to use Hullfish's blocking and privacy features to

Epic Games Ex. 1003
Page 103

improve Tanigawa's communications system. *See* Ex. 1009, 9:19–10:55, Figs. 5, 7. These features would have had the predictable result of improving the online chatting experience of Hullfish's users.

189. ***Fourth***, in my opinion, the combination of Tanigawa and Hullfish is no more than combining known prior-art elements according to known methods to yield the same predictable result, as I explain above. Specifically, the need and ability to block users in online communications systems was known in the prior art (*e.g.*, call blocking, call screening, email spam filtering, etc.), and prior to the '810 Patent, various instant messaging clients gave users the ability to block other users and maintain their privacy. *See* Exs. 1023, 1026, 1034. A POSITA therefore would have been motivated to use Hullfish's blocking and privacy features to improve Tanigawa's communications system. *See* Ex. 1009, 9:19–10:55, Figs. 5, 7. These features would have had the predictable result of improving the online chatting experience of Hullfish's users.

190. ***Fifth***, in my opinion, a POSITA would have had a reasonable expectation of success when combining Hullfish's blocking features with Tanigawa's communications system. Given their disclosures, a POSITA would have understood that Tanigawa's and Hullfish's teachings are compatible with each other. Specifically, both references are directed to communication over similar networks. For instance, Tanigawa's users use the Internet and/or a radio

Epic Games Ex. 1003
Page 104

communication network (such as a cellular telephone network) to send and receive text and voice messages using computers and handheld devices. *See* Ex. 1008, [0035], Fig. 1. Similarly, Hullfish's users use computers and mobile devices to send and receive Internet-based communications (*e.g.*, through AOL Instant Messenger or similar IM software (Ex. 1009, 1:22–63)) as well as SMS messaging, which a POSITA would have understood could use a radio communication network. *See id.*, 1:40–56, 2:23–51, 4:7–19, 5:48–53, Fig. 1.

### 2.  **Independent Claim 1**

a.  Preamble: "A computer-implemented method for managing electronic communications using at least a network-based portal at least based on [sic] Internet protocol, the method comprising:"

191.  In my opinion, Tanigawa discloses a computer-implemented method for managing electronic communications using at least a network-based portal at least based on an Internet protocol. Tanigawa describes a "communication system and communication method" where users use client devices (such as computers) to engage in "text chatting" and "voice chatting" with one another. *See* Ex. 1008, Title, Abstract, [0036]. Tanigawa's communication system uses an IP network (reproduced below in Figure 1) that connects various servers 4, 5, 6, and 10 and various client terminals, including IP terminals 7, radio terminal 9, and fixed telephone 11:

Epic Games Ex. 1003
Page 105



*Id.*, Fig. 1; *see also id.*, [0035], [0040], [0041], [0057], [0103], [0104].

192.   Tanigawa makes clear that its communications system is based on the Internet Protocol.  As shown above in Figure 1, Tanigawa's "IP Network" refers to an "Internet Protocol Network."  *See id.*, [0003], [0009], [0014], [0034]. Additionally, Tanigawa's IP terminals 7 contain a user interface (*i.e.*, the claimed "network-based portal") connecting clients devices to a network.  *See id.*, [0162]. This user interface is shown below in Figure 12:

Epic Games Ex. 1003
Page 106



*Id.*, Fig. 12, [0162].

      b.    <u>Element [1.1]: providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user.</u>

193.  In my opinion, Tanigawa discloses this element.  ***First***, Tanigawa discloses that a first user sends a message to a second user.  Users of Tanigawa's

Epic Games Ex. 1003
Page 107

system communicate on a one-to-one or multi-party basis using their respective client devices.  *See id.*, [0116], [0179], [0194].  Such devices (and corresponding users) are shown below in Figure 3, which depicts a "presence information management table" used by one of Tanigawa's server uses to manage different client devices:



**FIG.3**

| | 431 | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 |
|---|---|---|---|---|---|---|---|---|---|
| | ACCOUNT NAMES | CLIENT ADDRESSES | CLIENT NICKNAMES | AUTHENTI-CATION KEYS | PRESENCE | USABLE MEDIA | CONFERENCE ADDRESSES | CONFERENCE NICKNAMES | BUDDY LIST |
| | Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... |
| | Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... |
| | Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client G | ***(***)***** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |

440

PRESENCE INFORMATION MANAGEMENT TABLE 488

*Id.*, Fig. 3 (showing at least client devices A through G, owned by five different users (Taro, Jiro, Ichiro, Hanako, and Yoshi)).

194.  **Second**, Tanigawa discloses providing a plurality of communication options to a first user to be selected as a selected option of communication for the

103

Epic Games Ex. 1003
Page 108

message and that this plurality of communications options is provided to the first user.  Specifically Tanigawa's users can engage in "text chat" and "voice chat."  *Id.*, [0036].  Moreover, Tanigawa indicates that its users can also "chat[] using images," and engage in "video chatting."  *Id.*, [0221].

195.  ***Third***, Tanigawa discloses that the message from the first user to a second user is via an electronic device associated with the second user.  For instance, electronics devices include personal computers (like IP terminals 7) (*see id.*, [0068]), mobile phones (as in radio terminal 9) (*see id.*, [0157]), or fixed telephones 11.  *See id.*, [0035].  These devices are shown below in Figure 1:

Epic Games Ex. 1003
Page 109



*Id.*, Fig. 1.

196.   ***Fourth***, Tanigawa discloses that the first user is identified at least depending on a prior registration process by the first user regarding the use of the network-based portal.   As I explain above, and with reference to Figure 3 (reproduced below), Tanigawa's users are identified to one another via nickname, such as Taro, Jiro, Ichiro, Hanako, and Yoshi (*see id.*, [0050], [0141]–[0143]):

Epic Games Ex. 1003
Page 110

**FIG.3**

| ACCOUNT NAMES | CLIENT ADDRESSES | CLIENT NICKNAMES | AUTHENTI-CATION KEYS | PRESENCE | USABLE MEDIA | CONFERENCE ADDRESSES | CONFERENCE NICKNAMES | BUDDY LIST |
|---|---|---|---|---|---|---|---|---|
| | 431 | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 |
| Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G.... |
| Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G.... |
| Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G.... |
| Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G.... |
| Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G.... |
| Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G.... |
| Client G | ***(***)***** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G.... |

PRESENCE INFORMATION MANAGEMENT TABLE 488

*Id.*, Fig. 3.   As Tanigawa explains, these nicknames are stored in a presence information management table (shown in Figure 3) above, which is used by IM server 4 to manage presence and availability information among various users.  *See id.*, [0040], [0049].  And as shown above in column 433, Tanigawa further teaches that this table contains "a field 433 for ***registering a nickname*** of the user of the IM client."  *Id.*, [0050].  These nicknames are identifiers for both first users and second users that are registered and associated with their respective client devices.  *See id.*, [0065] (describing similar VoIP connection management table 586, which includes a field for "registering a nickname of the user of the IM client"), [0085] (explaining

Epic Games Ex. 1003
Page 111

that user nicknames are registered in tags 631), [0116], [0119], [0126]. [0129]–[0136] (describing first user with nickname Taro inviting users with nicknames Hanako and Yoshi to chat), [0141]–[0143] (describing first user with nickname Taro requesting presence information regarding other users).

   c. <u>Element [1.2]: wherein the plurality of communication options include text messaging and voice communication</u>

197. In my opinion, Tanigawa discloses this element.  As Tanigawa explains, "it is desirable that not only text but also voice can be handled."  *See id.*, [0005]; *see also id.*, [0006]–[0009], [0011] (describing users "participating in a text chat" as "***text participating clients***"), [0012] (describing users "participating in a voice chat" as "***voice participating clients***").  By way of example, Tanigawa shows a sample conversation between two client devices that begin with text chat and switch to voice chat, as shown below in Figure 12:

Epic Games Ex. 1003
Page 112



*Id.*, Fig. 12; *see also id.*, [0036], [0050]–[0052], [0114]–[0163], [0176]–[0220].

> d. <u>Element [1.3]: wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.</u>

198. In my opinion, Tanigawa discloses this element. Specifically, and as I explain above, Tanigawa teaches user uses a "nickname" (which is the claimed "one identifier") to engage in text and voice chatting. *See supra*, §VIII.C.2.b. A second user using Tanigawa's system receives messages (through the network-based Internet portal) using the one identifier associated with the second user. *See* Ex.

Epic Games Ex. 1003
Page 113

1008, [0133]–[0135] (describing users with nicknames Hanako and Yoshi receiving communications from a user named Taro), [0178]–[0179], [0194].

199.   Moreover, Tanigawa further explains that, regardless of the capabilities of the first user's client device(s), the first user is identified using the same one identifier.  For instance, as shown below in Figures 3 and 10,  even where a user has multiple client devices, all devices belonging to that user are identified by the same nickname:

## FIG.3

| 431 ACCOUNT NAMES | 432 CLIENT ADDRESSES | 433 CLIENT NICKNAMES | 434 AUTHENTICATION KEYS | 435 PRESENCE | 436 USABLE MEDIA | 437 CONFERENCE ADDRESSES | 438 CONFERENCE NICKNAMES | 439 BUDDY LIST |
|---|---|---|---|---|---|---|---|---|
| Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... |
| Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... |
| Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| Client G | ***(***)**** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |

PRESENCE INFORMATION MANAGEMENT TABLE 488

Epic Games Ex. 1003
Page 114



*Id.*, Figs. 3, 10 (excerpt). As shown in the figures above, clients D and E both belong to the user with nickname Hanako while client devices F and G both belong to the user with nickname Yoshi. *See id.*; *see also id.*, [0194].

    e.    <u>Element [1.4]: receiving an indication regarding one of the plurality of communication options, via the network-based portal, from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided.</u>

200. In my opinion, Tanigawa renders this element at least obvious. Tanigawa teaches that—for a message from a first user to a second user—once the communication option is selected, the first user's device sends to the IP network an indication indicating the selected option of communication for the message. *See* Ex. 1008, [0081]. For example, if voice communication is the selected option, "a voice chat request command is created" by the first user's client device. *Id.* Conversely, if text communication is the selected option, "data representing the message is created" by the first user's client device. *Id.* Regardless of the selected option, however, the "data/command" is packetized into an IP packet, which is sent "to the

Epic Games Ex. 1003
Page 115

IP network 1." *Id.*, [0082]; *see also id.*, [0069]–[0070]. Thereafter, the IP network forwards the IP packet to either the IM, AP, MD, or VR server, depending on the type of message. *See id.*, [0040], [0058], [0091], [0105]. Thus, Tanigawa's servers receive an indication indicating the selected option of communication—namely, the packetized data/command.

201. Moreover, if this element is determined to require that the **communications network** receives the claimed indication, in my opinion, a POSITA would have found this obvious as well. As I explain in the preceding paragraph, even before the "data/command" is forwarded to one of Tanigawa's servers, it is sent from the first user's device to the IP network. *See id.*, [0082]; *see also id.*, [0069]–[0070]. And as I explain above in Section VIII.B.1.e (discussing Diacakis), where a communications system involves different types of data and are commonly transmitted as different file types, it would have been obvious design choice for the communications network to specify for the receiving device the selected communication option. To this end, the communications network would typically be provided with (at least) what communication option is the selected option to carry that information to the receiving device. Thus, a POSITA would have understood that the network would receive an indication specifying the communication option chosen in order to transmit the message over the Internet.

Epic Games Ex. 1003
Page 116

202.   Furthermore, if this element is determined to require that the ***second user*** receives the claimed indication, in my opinion, a POSITA would have found this obvious as well.  In my opinion, to the extent that the communications network itself must receive the indication indicating the selected option of communication, a POSITA would have found this obvious.   Tanigawa teaches that, when voice communication is the selected option, Tanigawa's communications system "***notifies*** the [second] user" with "tone data" that is "outputted from the speaker."  *See id.*, [0150]–[0151]; *see also id.*, [0133].  In other words, Tanigawa describes a scenario akin to a second user's telephone ringing before a voice message is transmitted. Moreover, a POSITA would have understood that a second user receiving a text-based communication (like an e-mail or an IM) would similarly receive a notification.  For instance, a POSITA would have been aware that incoming e-mails and instant messages are accompanied by both audio notifications (*e.g.*, "You've Got Mail") and visual notifications (*e.g.*, flashing icons or a numerical indication of unread messages).  Therefore, a POSITA would have found it obvious that, if text messages are the selected option in Tanigawa's system, the second user would receive an indication prior to receiving the content of message, such as a visual icon or sound alert, similar to how a recipient of a telephone call receives an indication (*e.g.*, a ringtone) prior to receiving a telephone call.

Epic Games Ex. 1003
Page 117

203.   Furthermore, as I explain above in Section VIII.B.1.e (discussing Diacakis), where a communications system involves different types of data and are commonly transmitted as different file types, it would have been obvious design choice for the communications network to specify for the receiving device the selected communication option.  To this end, the receiving device (*i.e.*, the second user's device) would typically be provided with (at least) what communication option is the selected option so that it understands how to process and interpret the data.

>    f.    Element [1.5]: permitting the second user to block the first user from reaching the second user via the network-based portal

204.   In my opinion, the combination of Tanigawa and Hullfish renders this element obvious.  Specifically, Hullfish teaches a communication system where a first user sends a message to a second user (*see* Ex. 1009, Abstract, 2:3–51, 3:40–55), and further teaches a "privacy feature" comprising "a method of discontinuing receiving . . . messages from an undesired source," which is implemented when when "User A [*i.e.*, the second user] wants to stop receiving messages from User B [*i.e.*, the first user]."  *Id.*, 8:59–65.  According to Hullfish, a second user can block a first user by sending a text message to a "pre-determined telephone number," where this text message contains the first user's telephone number.  See *id.*, 8:66–9:15, Fig. 5 at 504.  Subsequently, any "future . . . message from User B to User A will be

Epic Games Ex. 1003
Page 118

blocked" and "fall[] on a 'deaf ear.'"  *Id.*, 9:15–18; *see also id.*, 6:19–28, 9:34–42,

9:60–63.  This is process is shown below in Figure 5:



*Id.*, Fig. 5 (steps 502 and 504 illustrating that a second user can block a first user by

sending the first user's telephone number to a "predetermined telephone number";

step 506 illustrating that, if a second user undertakes this process, then the first user's

messages to the second user are not transmitted to the second user).

> g.  Element [1.6]: enabling, via the network-based portal, the
> message to be received by the second user through the
> electronic device associated with the second user, using
> the selected option of communication, based on the one
> identifier associated with the second user, in view of the

Epic Games Ex. 1003
Page 119

<u>second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user,</u>

205.    In my opinion, the combination of Tanigawa and Hullfish renders this element obvious.  As I explain above, Tanigawa and Hullfish teach that a second user receives a message through an electronic device, via a network-based portal, in a particular selected mode of communication, based on the second user's identifier, when that second user has not blocked the first user.  *See supra* §§VIII.C.2.b–VIII.C.2.f.

206.    In my opinion, Hullfish further teaches that, where the second user has ***not*** blocked the first user (*i.e.*, the second user has ***not*** sent the first user's telephone number in a text message to a "predetermined telephone number"), the message is then forwarded to the second user via the network-based portal to the second user's electronic device.  This is shown below in Figure 5 (in green),:

Epic Games Ex. 1003
Page 120



*FIG. 5*

*Id.*, Fig. 5 (illustrating that, if the second user has not blocked the first user, the message is forwarded to the second user "according to user preference"), 8:59–9:24, 9:30–42, 10:1–8.

207.  Hullfish also teaches that, when a second user blocks a first user, a "piece of information" regarding the blocking is stored in a storage medium. Hullfish explains that whether a specific first user is blocked is indicated "in the user preference." *Id.*, 9:60–63. Moreover, Hullfish teaches that a second user specifies user preferences that are "stored in a database." *See id.*, 2:32–35. In other words, when a second user blocks a first user, a piece of information (*i.e.*, information

Epic Games Ex. 1003
Page 121

indicating that the first user is blocked) is stored in the user preference, which is stored in a database.  A POSITA would have understood that database is a storage medium containing information indicating which users are blocked.  *See id.*, 9:15–63 (describing unwanted message are also stored), 13:1–9, 13:32–35, 14:24–33, 14:59–62, 16:1–12, 16:40–43 (claims 6, 7, 15, 27, 28, 35, 46, 47, 55).

208.  In my opinion, a POSITA would have been motivated to combine Tanigawa and Hullfish for the reasons explained in Section VIII.C.1.  Specifically, a POSITA would have combined Hullfish's blocking and privacy features with Tanigawa's similar communications system to give Tanigawa's users specific tools to avoid unwanted messages and to allow adults to protect underage users of the communications system, which would have improved Tanigawa's users' overall communications experience.  *See id.*, 10:53–55 ("In this way, the invention provides a method of parental control to allow parents to supervise a minor's use of . . . message systems.").

209.  Further, in my opinion, a POSITA would have understood that Hullfish discloses blocking voice communications in addition to blocking text communications.  As Hullfish explains, its "methods can be further used with other types of electronic messages.  Other types of electronic messages include ***any type of electronic messages*** capable of being delivered and received by SMS/MMS-

Epic Games Ex. 1003
Page 122

enabled and/or IMS-enabled electronic devices, ***such as a text message, an MMS message, a video message and an audio message etc.***" Ex. 1009, 12:7–13.

        h.    <u>Element [1.7]: wherein the method comprises determining availability of the second user,</u>

210.   In my opinion, Tanigawa discloses this element.  Tanigawa teaches that IM server 4 (which Tanigawa describes as a "presence managing server") keeps track of the presence information of its users.  Ex. 1008, [0120].  For instance, IM server 4 creates "presence information" for each user, including "information indicating the user can chat: 'available' and information indicating that the user is busy and cannot chat: 'Don't Disturb.'"  *See id.*; *see also id.*, [0002], [0009] (describing "manag[ing] presence information indicating a state of each of the IM clients") [0010]–[0012], [0035], [0039], [0047], [0164].  Column 435 of Figure 3 (reproduced below)—which is a presence information management table—indicates the availability of several users of Tanigawa's system:

Epic Games Ex. 1003
Page 123

FIG.3

| | 431 | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 |
|---|---|---|---|---|---|---|---|---|---|
| | ACCOUNT NAMES | CLIENT ADDRESSES | CLIENT NICKNAMES | AUTHENTI-CATION KEYS | PRESENCE | USABLE MEDIA | CONFERENCE ADDRESSES | CONFERENCE NICKNAMES | BUDDY LIST |
| | Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... |
| | Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... |
| | Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client G | ***(***)**** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |

440

PRESENCE INFORMATION MANAGEMENT TABLE 488

*Id.*, Fig. 3. As shown above, Taro has one client device (Client A) and is available over text and voice through this device; Jiro has one device (Client B) and is offline; Ichiro has one device (Client C) and is idle; Hanako has two devices, one for text (Client D) and one for voice (Client E); and Yoshi also has two devices, one for text (Client F) and one for voice (Client G). *See id.*, Fig. 2, [0049]–[0054], [0120]–[0124], [0125], [0164].

      i.   <u>Element [1.8]: wherein the method requires contact information associated with the second user to allow the</u>

Epic Games Ex. 1003
Page 124

<u>second user to receive messages via the network-based
portal,</u>

211.  In my opinion, Tanigawa renders this element at least obvious.
Tanigawa explains that users participating in voice communications (via telephone)
must register at least one telephone number, and that this telephone is "***required*** for
an IM client to participate in IM." *See* Ex. 1008, [0084].  Similarly, Tanigawa states
that "[w]hen the terminal in which the IM client is installed is a mobile telephone
and/or a fixed telephone, a telephone number and an IP address or a DNS of a VR
server 10 which voice relays between the mobile telephone and/or the fixed
telephone and the IP network 1 are registered therein." *Id.*, [0051]; *see id.*, [0132],
[0150], [0204].

212.  Furthermore, Tanigawa refers to the "Instant Messaging & Presence
Protocol (IMPP) working group of Internet Engineer Task Force (IETF)." *Id.*,
[0003].  IETF is a standards organization that has developed and promoted Internet
standards for more than three decades, and whose work would have been known to
a POSITA (especially given Tanigawa's express reference to IETF).  Specifically,
Tanigawa cites to IETF "RFC 2799" which defines "protocol requirements" related
to instant messages.  *See id.*  RFCs (which originally stood for "Request for
Comments") lay out specific, defined Internet protocols and best practices for
practitioners of Internet technologies to adopt.

Epic Games Ex. 1003
Page 125

213.   RFC 2799, published in 2000, is titled "Instant Messaging/Presence Protocol Requirements" and lays out requirements and best practices for Internet-based instant messaging programs.  *See* Ex. 1035.  RFC 2799 makes clear that "[a]ll ENTITIES sending and receiving INSTANT MESSAGES MUST implement at least a common base format for INSTANT MESSAGES."  *Id.*, §4.1.1.  And this "common message format SHOULD include standard forms of addresses or contact means for media other than INSTANT MESSAGES, such as telephone numbers or email addresses."  *Id.*, §4.1.4.

214.   Thus, a POSITA would have understood from these disclosures that an instant messaging service (such as Tanigawa's) would implement a "common format" for instant messages which would include telephone numbers or emails addresses that allow for contact means other than IMs.  This is especially true given Tanigawa's express citation of RFC 2799 and Tanigawa's acknowledgment that RFC 2799 sets "protocol requirements" for instant messaging systems.  Ex. 1008, [0003].

j.    Element [1.9]: wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the

Epic Games Ex. 1003
Page 126

> network-based portal to the first user through the
> electronic device associated with the first user, and

215.  In my opinion, Tanigawa renders this limitation at least obvious.  As I explain above, a POSITA would have understood that Tanigawa's instant messaging system includes a message format including contact information such as telephone numbers or email address of the users.  *See supra*, §VIII.C.2.i.

216.  Tanigawa additionally teaches that when a first user invites a second user to a text chat or voice chat, the second user's contact information (*i.e.*, telephone number or email address) is not shown to the first user.  Instead, the only pieces of user information provided are the users' nicknames, the chatroom's nickname, users' presence information, usable media (*i.e.*, whether users have text and/or voice chatting enabled), and which user devices are being used.  *See* Ex. 1008, [0124], [0130], [0134], [0144].  Moreover, to the extent that contact information is required to maintain a connection (*e.g.*, a telephone call must be placed to an invitee), this contact information is provided only to the IM server to bridge this connection—not to the users themselves.  *See id.*, [0135], [0137].

217.  This is illustrated below in Figure 12, which is the user interface as displayed in IP terminal 7.  As shown below, even though two users have begun engaging in text conversation and voice conversation, no contact information (belonging to either user) is provided via the network-based protocol:

Epic Games Ex. 1003
Page 127



*Id.*, Fig. 12.

> k.    Element [1.10]: wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.

218.   In my opinion, Tanigawa discloses this limitation.  As I explain above in Section VIII.C.2.d, Tanigawa teaches a "nickname," which is an identifier that identifies individual users and their electronic devices.  Moreover, as I explain above in Section VIII.C.2.i, Tanigawa makes clear that the IM protocol implements a message format including users' contact information, such as an email address or a telephone number.  A POSITA would have understood that, a user's nickname (such

Epic Games Ex. 1003
Page 128

as Taro, Hanako, Ichiro, or Yoshi, as used in Tanigawa) is distinct from her her email address (which consists of the @ sign and a domain name) and telephone number.

        3.    <u>Dependent Claim 2</u>

            a.    <u>Preamble: A computer-implemented method as recited in claim 1</u>

219.   In my opinion, Tanigawa and Hullfish render the method of claim 1 at least obvious for the reasons I explain above in Section VIII.C.2.

            b.    <u>Element [2.1]: wherein the plurality of communication options include multimedia messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol</u>

220.   In my opinion, Tanigawa discloses this element. Specifically, Tanigawa teaches that the plurality of communication options includes "chatting using images" and "video chatting" which encompass multimedia messaging. Ex. 1008, [0221]. A POSITA would have recognized that these file types encompass "multimedia messaging," which refers to transmission of messages with multimedia content (such as images, video, audio, etc.). Moreover, Tanigawa makes clear that "it is an object of the present invention to achieve group chat ***using multimedia***. For example, the switching between a group chat ***through electronic documents*** and a group chat through voice and/or the switching between a one-to-one chat through voice and a group chat through voice can be handled flexibly." *See id.*, [0008].

Epic Games Ex. 1003
Page 129

221.   As I explain above, these messages use the one identifier associated with the second user in view of the network-based (Internet) portal.  *See supra,* §§VIII.C.2.a, VIII.C.2.d.

    4.   <u>Dependent Claim 3</u>

        a.   <u>Preamble: A computer-implemented method as recited in claim 1</u>

222.   In my opinion, Tanigawa and Hullfish render the method of claim 1 at least obvious for the reasons I explain above in Section VIII.C.2.

        b.   <u>Element [3.1]: wherein the plurality of communication options include group messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.</u>

223.   In my opinion, Tanigawa discloses this element.  Tanigawa explains that "the present invention implements a chat between/***among*** IM clients," specifically for "multi-party" communications.  *See* Ex. 1008, [0009].  Moreover, Tanigawa makes clear that "it is an object of the present invention to ***achieve group chat*** using multimedia.  For example, the switching between a ***group chat*** through electronic documents and a group chat through voice and/or the switching between a one-to-one chat through voice and a ***group chat*** through voice can be handled flexibly."  *See id.*, [0008]; *see also id.*, [0012], [0035], [0163], [0218].

Epic Games Ex. 1003
Page 130

224.  As I explain above, these messages use the one identifier associated with the second user in view of the network-based (Internet) portal.  *See supra,* §§VIII.C.2.a, VIII.C.2.d.

     5.    <u>Dependent Claim 4</u>

       a.    <u>Preamble: A computer-implemented method as recited in claim 3</u>

225.  In my opinion, Tanigawa and Hullfish render the method of claim 3 at least obvious for the reasons I explain above in Section VIII.C.4.

       b.    <u>Element [4.1]: wherein the one identifier associated with the second user includes a digital identity of the second user.</u>

226.  In my opinion, Tanigawa discloses this element.  As I explain above, users of Tanigawa's system use nicknames to identify themselves, such as "Taro," "Hanako," etc.  *See supra* §VIII.C.2.d; Ex. 1008, Fig. 3, [0050].  Moreover, where a user has multiple devices, all her devices are identified by her nickname.  As shown below in excerpted Figure 10, Hanako uses the IP terminal 7-1 (client D) and VoiP telephone 8 (client E)—both devices are associated with the same nickname, Hanako.  Similarly, Yoshi uses IP terminal 7-3 (client F) and radio terminal 9 (*i.e.*, mobile telephone) (client G)—both devices are associated with the same nickname, Yoshi.

Epic Games Ex. 1003
Page 131



*Id.*, Fig. 10 (excerpt), [0194].  This same information is shown below in Figure 3:

## FIG.3

| | 431 | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 |
|---|---|---|---|---|---|---|---|---|---|
| | ACCOUNT NAMES | CLIENT ADDRESSES | CLIENT NICKNAMES | AUTHENTI-CATION KEYS | PRESENCE | USABLE MEDIA | CONFERENCE ADDRESSES | CONFERENCE NICKNAMES | BUDDY LIST |
| | Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... |
| | Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... |
| | Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... |
| | Client G | ***.***.***.*** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... |

440

PRESENCE INFORMATION MANAGEMENT TABLE 488

*Id.*, Fig. 3.

Appx00978

Epic Games Ex. 1003
Page 132

6.     Dependent Claim 5

a.     Preamble: A computer-implemented method as recited in claim 4

227.   In my opinion, Tanigawa and Hullfish render the method of claim 4 at least obvious for the reasons I explain above in Section VIII.C.5.

b.     Element [5.1]: wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

228.   In my opinion, Tanigawa renders this element at least obvious.  As I explain above in section VIII.C.2.i, Tanigawa indicates that its IM protocol implements a message format including users' contact information, such as an email address or a telephone number.   Specifically, RFC 2779—which Tanigawa acknowledges defines IM protocol requirements (*id.*, [0003])—indicates that "[t]he common message format [for IMs] SHOULD include standard forms of addresses or contact means for media other than INSTANT MESSAGES, ***such as telephone numbers or email addresses***."  Ex. 1035, §4.1.4.  Thus, a POSITA would have found it at least obvious that in Tanigawa's instant message system, the second user would register contact information including a telephone number or email address.

7.     Dependent Claim 6

a.     Preamble: A computer-implemented method as recited in claim 5

229.   In my opinion, Tanigawa and Hullfish render the method of claim 5 at least obvious for the reasons I explain above in Section VIII.C.6.

128

Epic Games Ex. 1003
Page 133

      b.    <u>Element 6.1: wherein the electronic device associated with the second user is a wireless electronic device, and wherein the electronic device associated with the first user is a wireless electronic device.</u>

230.   In my opinion, Tanigawa discloses this element. Tanigawa teaches that client devices can include a radio terminal such as a "mobile telephone" "connected to the radio communication network." Ex. 1008, [0035]; *see also id.*, [0151], [0157] ("Thus, the radio terminal 9 may be an existing radio terminal such as a mobile telephone."). Exemplary radio terminal 9 (which is a wireless electronic device) is shown below in Figure 1:



Epic Games Ex. 1003
Page 134

*Id.*, Fig. 1.

    8.    <u>Dependent Claim 7</u>

        a.    <u>Preamble: A computer-implemented method as recited in claim 4</u>

231.  In my opinion, Tanigawa and Hullfish render the method of claim 4 at least obvious for the reasons I explain above in Section VIII.C.5.

        b.    <u>Element [7.1]: wherein the enabling the message to be received by the second user depends on a time.</u>

232.  In my opinion, Hullfish discloses this element.  As I explain above, Hullfish teaches that the second user sets rules and preferences to block certain users from sending certain messages.  *See supra*, §VIII.C.2.f.  Hullfish further teaches that this blocking can be "based on time and dates."  Ex. 1009, 11:38–40.  Specifically, Hullfish states that "there could be a pre-determined rule stating that within a certain time period, e.g. 12:00 am–6:00 am . . . messages would not be forwarded either to the instant message receiver and/or the mobile device."  *See id.*, 11:40–45, Fig. 7 (Step 706, discussing "certain selection rules" which affect whether the message is received).  In this example, a POSITA would have understood that a message may be received depending on a time, such as 6:00 am.

233.  A POSITA would have been motivated to combine Tanigawa and Hullfish for the reasons I explain in Section VIII.C.1.  Specifically, a POSITA would found it obvious to use Hullfish's user-defined, time-based rules in Tanigawa's system to allow users to block messages sent at inconvenient times (*e.g.*, while the

Epic Games Ex. 1003
Page 135

user is busy or sleeping), which would accordingly improve the communications experience of Tanigawa's users.

9. Dependent Claim 8

a. Preamble: A computer-implemented method as recited in claim 7

234. In my opinion, Tanigawa and Hullfish render the method of claim 7 at least obvious for the reasons I explain above in Section VIII.C.8.

b. Element [8.1]: wherein the enabling the message to be received by the second user depends on a period of time.

235. In my opinion, Hullfish discloses this element. As I explain above, Hullfish teaches that the second user sets rules and preferences to block certain users from sending certain messages. *See supra*, §VIII.C.2.f. Hullfish further teaches that this blocking can be "based on time and dates." Ex. 1009, 11:38–40. Specifically, Hullfish states that "there could be a pre-determined rule stating that within a certain time period, e.g. 12:00 am–6:00 am . . . messages would not be forwarded either to the instant message receiver and/or the mobile device." *See id.*, 11:40–45, Fig. 7 (Step 706, discussing "certain selection rules" which affect whether the message is received). In this example, a POSITA would have understood that a message may be received depending on a period of time, such as between 6:00 am and midnight the next day.

236. A POSITA would have been motivated to combine Tanigawa and Hullfish for the reasons I explain in Section VIII.C.1. Specifically, a POSITA would

Epic Games Ex. 1003
Page 136

found it obvious to use Hullfish's user-defined, time-based rules in Tanigawa's system to allow users to block messages sent at inconvenient times (*e.g.*, while the user is busy or sleeping), which would accordingly improve the communications experience of Tanigawa's users.

### 10.    Dependent Claim 9

#### a.    Preamble: A computer-implemented method as recited in claim 7

237.    In my opinion, Tanigawa and Hullfish render the method of claim 7 at least obvious for the reasons I explain above in Section VIII.C.8.

#### b.    Element [9.1]: wherein the method comprises not presenting the message to the second user depending on the period of time.

238.    In my opinion, Hullfish discloses this element.  As I explain above, Hullfish teaches that the second user sets rules and preferences to block certain users from sending certain messages. *See supra*, §VIII.C.2.f.  Hullfish further teaches that this blocking can be "based on time and dates."  Ex. 1009, 11:38–40.  Specifically, Hullfish states that "there could be a pre-determined rule stating that within a certain time period, e.g. 12:00 am–6:00 am . . . messages would not be forwarded either to the instant message receiver and/or the mobile device." *See id.*, 11:40–45, Fig. 7 (Step 706, discussing "certain selection rules" which affect whether the message is received).  In this example, a POSITA would have understood that Hullfish's method

Epic Games Ex. 1003
Page 137

comprises not presenting the message to the second user depending on a period of time, such as between midnight and 6:00 am.

239.   A POSITA would have been motivated to combine Tanigawa and Hullfish for the reasons I explain in Section VIII.C.1.  Specifically, a POSITA would found it obvious to use Hullfish's user-defined, time-based rules in Tanigawa's system to allow users to block messages sent at inconvenient times (*e.g.*, while the user is busy or sleeping), which would accordingly improve the communications experience of Tanigawa's users.

11.   **Independent Claim 11**

   a.   Preamble: A computing apparatus for managing electronic communications using at least a network-based portal at least based on Internet protocol, the computing apparatus comprising:

240.   In my opinion, Tanigawa discloses a "presence and availability management system" which is a computer apparatus for managing electronic communications.  *See supra*, §VIII.C.2.a.  As shown below in Figure 1, Tanigawa discloses four servers and several terminals, which form at least a computer apparatus.  The four servers include an IM presence managing server, a VoIP communication connection managing server, a media server, and a voice relay server:

Epic Games Ex. 1003
Page 138



*See* Ex. 1008, Fig. 1, [0135].

      b.    <u>Element [11.1]: at least one computing device; and</u>

241. In my opinion, Tanigawa discloses this element. As I explain above, Tanigawa teaches an IM presence managing server, a VoIP communication connection managing server, a media server, and a voice relay server—each of which is at least one computing device. *See supra*, §VIII.C.2.a; Ex. 1008, [0135].

      c.    <u>Element [11.2]: one or more storage devices coupled to the</u>
                  <u>at least one computing device, with the one or more</u>

Epic Games Ex. 1003
Page 139

storage devices storing instructions that, when executed, cause the computing apparatus to:

242. In my opinion, Tanigawa discloses this element. As I indicate above, Tanigawa teaches an IM server 4 that "manages presence information of the IM clients," as shown below:



Ex. 1008, Fig. 1, [0039]. As Tanigawa teaches, "IM server 4 is achieved by configuring functional blocks 481 to 487 shown within a balloon 48 in FIG. 2 when a CPU 41 executes a predetermined program loaded onto a memory 42 in a *general purpose computer system including the CPU 41*, the *memory 42*, an *external*

135

Epic Games Ex. 1003
Page 140

**storage device 42, such as an HDD**, an input device 44, such as a keyboard, a mouse and a pen, an output device 45, such as a speaker and a display, an IP network interface (IF) 46 which performs communication over the IP network 1, and a bus 47 for connecting these devices 41 to 46." *Id.*, [0040].  Moreover, Tanigawa further explains that  "[t]he program for configuring the functional blocks 481 to 487 [of IM server 4] may be directly loaded from a **storage medium** (not shown) such as a CD-ROM through a reading device (not shown), or from the IP network 1 to the memory 42 through the IP network IF 46.  Alternatively, the program may be **stored in the external memory device 43** and then may be loaded to the **memory 42**." *Id.*

243.  From these disclosures, a POSITA would have understood that Tanigawa's apparatus contains storage devices coupled to the IM server 4 with executable instructions (*i.e.*, a predetermined program).   Moreover, a POSITA would have known that Tanigawa's apparatus contains instructions (*i.e.*, software code) which, when executed, cause the server to follow the steps described below, and which are stored in a conventional storage device coupled to the server.  *See also id.*, [0057] (describing similar components with respect to AP server 5), [0068] (same with respect to IP terminals 7), [0090] (same with respect to MD server 6), [0104] (same with respect to VR server 10).

        d.    <u>Element [11.3]: providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the</u>

Epic Games Ex. 1003
Page 141

second user, with the first user being identified by the computing apparatus at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user

244.   In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.2.b.

      e.    Element [11.4]: wherein the plurality of communication options include text messaging and voice communication, and

245.   In my opinion, Tanigawa discloses this element at least obvious for the reasons I explain above in Section VIII.C.2.c.

      f.    Element [11.5]: wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;

246.   In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.2.d.

      g.    Element [11.6]: receiving an indication regarding one of the plurality of communication options, via the network-based portal from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided;

247.   In my opinion, Tanigawa renders this element at least obvious for the reasons I explain above in Section VIII.C.2.e.

Epic Games Ex. 1003
Page 142

> h. Element [11.7]: permitting the second user to block the first user from reaching the second user via the network-based portal; and

248.   In my opinion, Tanigawa and Hullfish render this element obvious for the reasons I explain above in Section VIII.C.2.f.

> i. Element [11.8]: enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user,

249.   In my opinion, Tanigawa and Hullfish render this element obvious for the reasons I explain above in Section VIII.C.2.g.

> j. Element [11.9]: wherein the instructions, when executed, cause the computing apparatus to determine availability of the second user, and to require contact information associated with the second user to allow the second user to receive messages via the network-based portal,

250.   In my opinion, Tanigawa renders this element at least obvious for the reasons I explain above in Sections VIII.C.2.h and VIII.C.2.i.

> k. Element [11.10]: wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the

Epic Games Ex. 1003
Page 143

network-based portal to the first user through the
electronic device associated with the first user, and

251.   In my opinion, Tanigawa renders this element at least obvious for the

reasons I explain above in Section VIII.C.2.j.

        l.     Element [11.11]: wherein the one identifier associated
with the second user is distinct from the contact
information associated with the second user.

252.   In my opinion, Tanigawa discloses this element for the reasons I

explain above in Section VIII.C.2.k.

    12.   **Dependent Claim 12**

        a.     Preamble: A computing apparatus as recited in claim 11

253.   In my opinion, Tanigawa and Hullfish render the computing apparatus

in claim 11 at least obvious for the reasons I explain above in Section VIII.C.11.

        b.     Element [12.1]: wherein the plurality of communication
options include multimedia messaging using the one
identifier associated with the second user for the second
user to receive messages, at least in view of the network-
based portal being based on the Internet protocol.

254.   In my opinion, Tanigawa discloses this element for the reasons I

explain above in Section VIII.C.3.

    13.   **Dependent Claim 13**

        a.     Preamble: A computing apparatus as recited in claim 11

255.   In my opinion, Tanigawa and Hullfish render the computing apparatus

in claim 11 at least obvious for the reasons I explain above in Section VIII.C.11.

139

Epic Games Ex. 1003
Page 144

> b. **Element [13.1]: wherein the plurality of communication options include group messaging using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol.**

256. In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.4,

### 14. **Dependent Claim 14**

> a. Preamble: A computing apparatus as recited in claim 13

257. In my opinion, Tanigawa and Hullfish render the computing apparatus in claim 13 at least obvious for the reasons I explain above in Section VIII.C.13.

> b. Element 14.1: wherein the one identifier associated with the second user includes a digital identity of the second user.

258. In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.5

### 15. **Dependent Claim 15**

> a. Preamble: A computing apparatus as recited in claim 14

259. In my opinion, Tanigawa and Hullfish render the computing apparatus in claim 14 at least obvious for the reasons I explain above in Section VIII.C.14.

> b. Element [15.1]: wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

260. In my opinion, Tanigawa renders this element at least obvious for the reasons I explain above in Section VIII.C.6.

Epic Games Ex. 1003
Page 145

### 16. **Dependent Claim 16**

a. Preamble: A computing apparatus as recited in claim 15

261. In my opinion, Tanigawa and Hullfish render the computing apparatus

in claim 15 at least obvious for the reasons I explain above in Section VIII.C.15.

b. Element [16.1]: wherein the method comprises not presenting the message to the second user depending on the period of time.

262. In my opinion, Tanigawa and Hullfish render this element obvious for

the reasons I explain above in Sections VIII.C.8–VIII.C.10.

### 17. **Dependent Claim 17**

a. Preamble: A computing apparatus as recited in claim 15

263. In my opinion, Tanigawa and Hullfish render the computing apparatus

in claim 15 at least obvious for the reasons I explain above in Section VIII.C.15.

b. Element [17.1]: wherein the electronic device associated with the second user is a wireless electronic device, and wherein the electronic device associated with the first user is a wireless electronic device.

264. In my opinion, Tanigawa discloses this element for the reasons I

explain above in Section VIII.C.7.

### 18. **Independent Claim 19**

a. Preamble: A non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications using at least a network-based portal at least based on

Epic Games Ex. 1003
Page 146

Internet protocol, said computer readable medium comprising:

265.   In my opinion, Tanigawa discloses the preamble.  As I indicate above, Tanigawa teaches an IM server 4 that "manages presence information of the IM clients," as shown below:



Ex. 1008, Fig. 1, [0039].   As Tanigawa teaches, "IM server 4 is achieved by configuring functional blocks 481 to 487 shown within a balloon 48 in FIG. 2 when a CPU 41 *executes a predetermined program* loaded onto a memory 42 in a general purpose computer system including the CPU 41, the memory 42, an external storage

Epic Games Ex. 1003
Page 147

device 42, such as an HDD, an input device 44, such as a keyboard, a mouse and a pen, an output device 45, such as a speaker and a display, an IP network interface (IF) 46 which performs communication over the IP network 1, and a bus 47 for connecting these devices 41 to 46." *Id.*, [0040]. Moreover, Tanigawa further explains that "***[t]he program for configuring the functional blocks 481 to 487*** [of IM server 4] may be directly loaded from a storage medium (not shown) such as a CD-ROM through a reading device (not shown), or from the IP network 1 to the memory 42 through the IP network IF 46. Alternatively, ***the program*** may be stored in the external memory device 43 and then may be loaded to the memory 42." *Id.*

266. From these disclosures, a POSITA would have understood that Tanigawa's apparatus contains storage devices coupled to the IM server 4 with executable instructions (*i.e.*, executable program code). Moreover, a POSITA would have known that Tanigawa's apparatus contains instructions (*i.e.*, software code) which, when executed, cause the server to follow the steps described below, and which are stored in a conventional storage device coupled to the server. *See also id.*, [0057] (describing similar components with respect to AP server 5), [0068] (same with respect to IP terminals 7), [0090] (same with respect to MD server 6), [0104] (same with respect to VR server 10).

        b.   <u>Element [19.1]: computer program code for providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an</u>

Epic Games Ex. 1003
Page 148

<u>electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user,</u>

267. In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.2.b.

      c.    <u>Element [19.2]: wherein the plurality of communication options include text messaging and voice communication, and</u>

268. In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.2.c.

      d.    <u>Element [19.3]: wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;</u>

269. In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.2.d.

      e.    <u>Element [19.4]: computer program code receiving an indication regarding one of the plurality of communication options, via the network-based portal from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided;</u>

270. In my opinion, Tanigawa renders this element at least obvious for the reasons I explain above in Section VIII.C.2.e.

Epic Games Ex. 1003
Page 149

      f.     <u>Element [19.5]: computer program code for permitting the second user to block the first user from reaching the second user via the network-based portal;</u>

271.   In my opinion, Tanigawa and Hullfish render this element obvious for the reasons I explain above in Section VIII.C.2.f.

      g.     <u>Element [19.6]: computer program code for enabling, via the network-based portal, the message to be received by the second user through the electronic device associated with the second user, using the selected option of communication, based on the one identifier associated with the second user, in view of the second user not blocking the first user from reaching the second user, wherein a piece of information regarding the second user blocking the first user from reaching the second user is stored in a storage medium if the second user has blocked the first user from reaching the second user, with the piece of information being based on at least an input previously submitted by the second user;</u>

272.   In my opinion, Tanigawa and Hullfish render this element obvious for the reasons I explain above in Section VIII.C.2.g.

      h.     <u>Element [19.7]: computer program code for determining availability of the second user; and</u>

273.   In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.2.h.

      i.     <u>Element [19.8]: computer program code for requiring contact information associated with the second user to allow the second user to receive messages via the network-based portal</u>

274.   In my opinion, Tanigawa renders this element at least obvious for the reasons I explain above in Section VIII.C.2.i.

Epic Games Ex. 1003
Page 150

j.    Element [19.9]: wherein even when the message is received by the second user through the electronic device associated with the second user based on the one identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user through the electronic device associated with the first user,

275.   In my opinion, Tanigawa renders this element at least obvious for the reasons I explain above in Section VIII.C.2.j.

k.    Element [19.10]: wherein the one identifier associated with the second user is distinct from the contact information associated with the second user.

276.   In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.2.k.

l.    Element [19.11]: wherein the plurality of communication options include multimedia messaging and group messaging, all of which using the one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol,

277.   In my opinion, Tanigawa discloses this element for the reasons I explain above in Sections VIII.C.3 and VIII.C.4.

m.    Element [19.12]: wherein the one identifier associated with the second user includes a digital identity of the second user, and

278.   In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.5.

Epic Games Ex. 1003
Page 151

n.    Element [19.13]: wherein the contact information associated with the second user includes at least one of a phone number or an email address of the second user.

279.    In my opinion, Tanigawa renders this element at least obvious for the reasons I explain above in Section VIII.C.6.

19.    **Dependent Claim 20**

a.    Preamble: A non-transitory computer readable medium as recited in claim 19

280.    In my opinion, Tanigawa and Hullfish disclose the non-transitory computer readable medium for the reasons I explain above in Section VIII.C.18.

b.    Element [20.1]: wherein the electronic device associated with the second user is a wireless electronic device, and wherein the electronic device associated with the first user is a wireless electronic device.

281.    In my opinion, Tanigawa discloses this element for the reasons I explain above in Section VIII.C.7.

## IX.    SECONDARY CONSIDERATIONS

282.    I have seen no evidence of, and I am not aware of any, secondary considerations that would tend to show non-obviousness of the Challenged Claims of the '810 Patent, including commercial success, long-felt need, failure of others, skepticism, praise, teaching away, recognition of a problem or copying by competitors.  However, should Patent Owner assert any secondary considerations of non-obviousness, I reserve the right to respond.

Epic Games Ex. 1003
Page 152

## X.    CONCLUSION

283.   I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that all statements made of my own knowledge are true and that all statements made on information and belief are believed to be true.  I understand that willful false statements are punishable by fine or imprisonment or both.  *See* 18 U.S.C. §1001.

Date:  November 15, 2021

Respectfully submitted

*Kevin C Almeroth*

_____

Kevin C. Almeroth, Ph.D.

Epic Games Ex. 1003
Page 153