# 2023-2177(L); -2178; -2179; -2180
## Volume III of III (Pages: Appx4071–7246)

In The

# United States Court Of Appeals
## For The Federal Circuit

## EPIC GAMES, INC.,

*Appellant,*

v.

## INGENIOSHARE, LLC,

*Appellee.*

**APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE PATENT TRIAL AND APPEAL BOARD IN IPR2022-00202, IPR2022-00291, IPR2022-00294, IPR2022-00295**

---

## JOINT APPENDIX

---

**Carolyn Chang**
**Ryan J. Marton**
**MARTON RIBERA SCHUMANN & CHANG LLP**
**548 Market Street, Suite 36117**
**San Francisco, CA 94014**
**carolyn@martonribera.com**
**ryan@martonribera.com**

*Counsel for Appellant*

**Stephen R. Risley**
**KENT & RISLEY LLC**
**5755 N Point Parkway**
**Alpharetta, GA 30022**
**(770) 585-2101**
**steverisley@kentrisley.com**

*Counsel for Appellee*

## TABLE OF CONTENTS
### Joint Appendix Volume I of III

| Paper/Exhibit No. | Description | Appendix Pages |
|---|---|---|
| 29 | Final Written Decision (IPR2022-00202) | Appx00001-00062 |
| 30 | Final Written Decision (IPR2022-00291) | Appx00063-00128 |
| 30 | Final Written Decision (IPR2022-00294) | Appx00129-00190 |
| 27 | Final Written Decision (IPR2022-00295) | Appx00191-00254 |
| Exhibit 1001 (IPR2022-00202) | U.S. Patent No. 10,142,810 | Appx00255-00279 |
| Exhibit 1001 (IPR2022-00291) | U.S. Patent No. 10,708,727 | Appx00280-00304 |
| Exhibit 1001 (IPR2022-00294; IPR2022-00295) | U.S. Patent No. 10,492,038 | Appx00305-00334 |
| | Certified List IPR2022-00202 (without attachment) | Appx00335-00336 |
| | Certified List IPR2022-00291 (without attachment) | Appx00337-00338 |
| | Certified List IPR2022-00294 (without attachment) | Appx00339-00340 |
| | Certified List IPR2022-00295 (without attachment) | Appx00341-00342 |

| IPR2022-00202 | | |
|---|---|---|
| 2 | Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810 | Appx00343; Appx00356; Appx00376; Appx00384-00386; Appx00416-00417 |
| Exhibit 1003 | Declaration of Kevin Almeroth in Support of Petition for *Inter Partes* Review of U.S. Patent No. 10,142,810 | Appx00847-00999 |

## TABLE OF CONTENTS
### Joint Appendix Volume II of III

| Paper/Exhibit No. | Description | Appendix Pages |
|---|---|---|
| Exhibit 1007 | U.S. Patent Application 2002/0016461 (Diacakis) | Appx01088-01107 |
| Exhibit 1008 | U.S. Patent Application 2004/0001480 (Tanigawa) | Appx01108-01143 |
| 6 | Patent Owner's Preliminary Response | Appx03126-03155 |
| Exhibit 2001 | Complaint IngenioShare v. Epic Games | Appx03156; Appx03173-03179 |
| Exhibit 3001 | Memorandum Opinion and Order Granting Defendant Epic Games, Inc.'s Motion to Dismiss for Improper Venue | Appx03290; Appx03298 |
| 8 | Petitioner's Reply to Patent Owner's Preliminary Response | Appx03306 |
| 9 | Institution Decision | Appx03311-03320; Appx03327-03329 |
| 13 | Patent Owner's Response | Appx03395; Appx03407-03411; Appx03413-03416 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx03483; Appx03496-03503 |
| Exhibit 2006 | Decision Denying Institution of IPR2022-00297 | Appx03552-03553 |
| Exhibit 2008 | Dr. Rouskas CV | Appx03586-03615 |
| 16 | Petitioner's Reply to Patent Owner's Response | Appx03621; Appx03628-03655 |

| Exhibit 1040 | What is a Web Portal | Appx03816-03820 |
|---|---|---|
| Exhibit 1041 | Gartner Glossary – Mobile Portal | Appx03821-03825 |
| Exhibit 1042 | Deposition of George Rouskas, Ph.D. | Appx03826-04070 |

## TABLE OF CONTENTS
### Joint Appendix Volume III of III

| Paper/Exhibit No. | Description | Appendix Pages |
|---|---|---|
| Exhibit 1042 | Deposition of George Rouskas, Ph.D., Continued | Appx04071-04251 |
| 19 | Patent Owner's Sur-Reply | Appx04256-04261; Appx04263-04264 |
| 27 | Epic Games' Demonstratives | Appx04404; Appx04410-04424 |
| 28 | Hearing Transcript | Appx04475; Appx04478-04490; Appx04515-04518 |
| Exhibit 3003 | IEEE 100 The Authoritative Dictionary of IEEE Standards Terms | Appx04554-04556 |
| Exhibit 3004 | Microsoft Computer Dictionary (5th Edition) | Appx04557-04559 |
| Exhibit 3005 | Microsoft Internet & Networking Dictionary | Appx04560-04562 |
| **IPR2022-00291** | | |
| 1 | Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727 | Appx04563; Appx04577; Appx4596; Appx04606-4608; Appx04639-04640 |

| Exhibit 1003 | Declaration of Dr. Kevin Almeroth in support of Inter Partes Review of U.S. Patent Nos. 10,708,727 and 10,492,038 | Appx04842; Appx04869-04870; Appx04882-04890; Appx04905-04906; Appx04993-04997; Appx05066-05067 |
|---|---|---|
| 7 | Patent Owner's Preliminary Response | Appx05209-05210 |
| 10 | Decision Granting Institution of Inter Partes Review | Appx05264-05265; Appx05273-05274 |
| 14 | Patent Owner's Response | Appx05323-05326; Appx05329-05331 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx05412-05413 |
| 17 | Petitioner's Reply to Patent Owner's Response | Appx05480-05487 |
| 20 | Patent Owner's Sur-Reply | Appx05682-05683 |
| **IPR2022-00294** | | |
| 1 | Petition for Inter Partes Review for U.S. Patent No. 10,492,038 | Appx05699; Appx05714; Appx05734; Appx05741-05743 |
| 10 | Patent Owner's Preliminary Response | Appx06563-06564 |
| 13 | Institution Grant | Appx06604-06605 |
| 17 | Patent Owner's Response | Appx06678-06682; Appx06686-06688 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx06733-06734 |
| 19 | Petitioner's Reply to Patent Owner's Response | Appx06838-06845 |

| IPR2022-00295 | | |
|---|---|---|
| 1 | Petition for Inter Partes Review for U.S. Patent No. 10,492,038 | Appx06896; Appx06911; Appx06931; Appx06942-06944 |
| 8 | Patent Owner's Preliminary Response | Appx07011-07017 |
| 10 | Petitioner's Reply to Patent Owner's Preliminary Response | Appx07018-07027 |
| 11 | Institution Decision:  Grant | Appx07028-07101 |
| Exhibit 1039 | Supplemental Declaration of Dr. Kevin Almeroth | Appx07102-07108 |
| 15 | Patent Owner's Response | Appx07109-07112; Appx07129-07132; Appx07135-07137 |
| Exhibit 2005 | Declaration of Dr. Rouskas | Appx07195-07196 |
| 17 | Petitioner's Reply to Patent Owner's Response | Appx07239-07246 |
| | CERTIFICATE OF FILING AND SERVICE | |

Page 246

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD


```
--------------------------X
EPIC GAMES, INC.,             ) U.S. Patent No.
                             ) 10,142,810
          Petitioner,        )
                             ) Case IPR2022-00202
 vs.                         )      IPR2022-00291
                             )      IPR2022-00294
INGENIOSHARE, LLC,           )      IPR2022-00295
                             )
          Patent Owner.      )
--------------------------X
```


VIDEOTAPED DEPOSITION OF

GEORGE N. ROUSKAS, Ph.D. (VOLUME II)

Friday, October 28, 2022

(Taken by Petitioner)


Reported by:

Christine A. Taylor, RPR,

Job No.: 5946

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 246

Page 247

1          Videotaped deposition of GEORGE N.

2     ROUSKAS, Ph.D., (VOLUME II) taken before

3     CHRISTINE A. TAYLOR, Registered Professional

4     Reporter, held on Friday, October 28, 2022, at

5     Residence Inn by Marriott, 616 South Salisbury

6     Street, Raleigh, North Carolina, commencing at

7     9:07 a.m.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04072

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 247

1    A P P E A R A N C E S:

2

3    Representing the Petitioner:

4        KIRKLAND & ELLIS LLP

5        LINDSEY SHI, ESQ.

6        W. TODD BAKER, ESQ. (Washington, D.C.)

7        555 South Flower Street, Suite 3700

8        Los Angeles, California 90071

9        213.680.8400

10       lindsey.shi@kirkland.com

11       todd.baker@kirkland.com

12

13   Representing the Patent Owner:

14       KENT & RISLEY, LLC

15       STEPHEN R. RISLEY, ESQ.

16       5755 North Point Parkway, Suite 57

17       Alpharetta, Georgia  30022

18       404.585.2101

19       steverisley@kentrisley.com

20

21   ALSO PRESENT:

22       Dr. Kevin Almeroth, University of

23        California at Santa Barbara

24

25       Brent Troublefield, Videographer

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 248

Page 249

1                    C O N T E N T S

2                                                    PAGE

3  EXAMINATION CONTINUED BY MR. SHI                  250

4  EXAMINATION BY MR. RISLEY                         414

5  FURTHER EXAMINATION BY MR. SHI                    424

6

7

8                          * * *

9

10                   E X H I B I T S

11     EXHIBIT          DESCRIPTION              PAGE

12  Exhibit 15   Petition for Inter Partes Review for   280

13               US Patent 10,142.810

14

15

16

17

18

19

20

21

22

23

24

25

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04074
Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 249

```
 1                P R O C E E D I N G S

 2                       - - -

 3           THE VIDEOGRAPHER:  On record at

 4      9:07 a.m.  Today's date is October 28,

 5      2022.  This is day two of the deposition.

 6                EXAMINATION CONTINUED

 7  BY MR. SHI:

 8      Q.    Good morning, Dr. Rouskas.

 9      A.    Good morning.

10      Q.    Between when we broke yesterday and

11  today, did you do anything to prepare for your

12  giving testimony today?

13      A.    No.  Actually what I did after --

14  after we broke, I rushed home to take my son to

15  soccer practice at 6:30.

16      Q.    Great.  Great.  Did you speak with

17  Mr. Risley between yesterday and today?

18      A.    We did speak with Mr. Risley just

19  before -- you know, just after the deposition,

20  you know, when walking to the parking deck.

21      Q.    I see.  Did you discuss the contents

22  of your testimony at all?

23      A.    No, we did not.

24      Q.    Okay.  One thing that you mentioned

25  yesterday that I want to briefly just confirm
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04075

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 250

1    something, and I have the rough transcript

2    open, and so I'm going to read your testimony,

3    but let me know if there's anything you

4    disagree with because, you know, it is just a

5    rough.

6              Yesterday I asked you -- maybe it

7    would help if we could -- if you have Exhibit 1

8    in front of you.

9         A.    Exhibit 1.

10        Q.    Exhibit 1 is the list of the

11   challenge claims of the '810 Patent; right?

12        A.    Yes.

13        Q.    So if you turn to element 1.9.

14        A.    Yes.

15        Q.    So you understand element 1.9 to be

16   the negative limitation of this claim?

17        A.    It is -- yes.  It is the negative

18   limitation, yes.

19        Q.    Okay.  So a question I asked you

20   yesterday, I asked you about your basis for

21   your opinion that Diacakis does not teach the

22   negative limitation.  Do you recall this

23   questioning?

24        A.    I do, yes.

25        Q.    And I asked you about your basis and

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 251

1    you indicated that, in your opinion, Diacakis

2    does not meet this negative limitation, not

3    only because Diacakis sends contact information

4    to the sender's device, but your opinion is

5    also that the sender actually sees the contact

6    information through the device; right?

7              MR. RISLEY:  Object to form.

8              THE WITNESS:  That is correct.  The

9         user can also see the contact information.

10   BY MR. SHI:

11        Q.   Right.  Because if we look closely

12   at the text of element 1.9, if you look with me

13   to the last bit of that limitation, it says,

14   "The contact information associated with the

15   second user is not provided via the

16   network-based portal to the first user through

17   the electronic device associated with the first

18   user."

19              Is that what it says?

20        A.   Yes, that is what it says.

21        Q.   So your -- strike that.

22              In your opinion, does the negative

23   limitation of element 1.9 of the '810 Patent

24   prohibit not just -- strike that.

25              In your opinion, does the negative

1    limitation of element 1.9 of the '810 Patent

2    prohibit the user from receiving contact

3    information or the device from receiving

4    contact information?

5              MR. RISLEY:  Object to form.

6              THE WITNESS:  So this is really a

7         claim construction issue, I believe, but

8         my -- my opinion is that the second

9         limitation permits neither.  In other

10        words, it does not permit the second

11        user -- sorry.  It does not permit the

12        first user device to receive it and it does

13        not permit the first user to actually see

14        that information displayed.  And the -- you

15        know -- so, typically, when the information

16        is provided to the first user's device via

17        this interface and since the first user

18        accesses that interface, then just by

19        virtue of having the device -- I mean, the

20        device received the information, the user

21        may also see.  So the device itself should

22        not receive the contact information.

23             And so, you know, the whole point of

24        the invention is that there's a clear

25        separation between the first user, who is

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 253

Page 254

1          the sender, and the second user, who's the

2          receiver, and the -- it is the portal that

3          provides that separation.  So the first

4          user or their device should not receive any

5          information.

6                You know, once the information

7          reaches the device, the user, if they're

8          sophisticated enough, they can get access

9          to that information.  And so I think the

10          limitation here is very clear that there's

11          a sender point that's the -- that's the

12          portal that hides that information,

13          provides this information hiding between

14          senders and receivers.  And, therefore,

15          this limitation does not allow the

16          information to be sent to the first user's

17          device in the first place.

18   BY MR. SHI:

19          Q.    Okay.  Dr. Rouskas, there was a lot

20   of information there.  So I want to go through

21   your response piece by piece here.

22                Is it your opinion that this

23   limitation prohibits contact information to be

24   sent to the first user, not just the first

25   user's device?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04079

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 254

1          MR. RISLEY:  Object to form.

2          THE WITNESS:  I think the limitation

3     is clear.  So the -- so let me read again.

4     The contact information associated with the

5     second user is not provided via the

6     network-based portal to the first user

7     through the electronic device associated

8     with the first user.

9          So, for instance, what this

10    limitation does not prohibit is let's say,

11    you know, Mr. Risley is the first user and

12    I am the second user.  And Mr. Risley uses

13    the portal to, you know, call me.  The

14    portal cannot provide my phone number to

15    Mr. Risley or his device.

16          However, for instance, I can provide

17    offline my phone number to Mr. Risley who

18    can then put it into his device.

19    Obviously, the claim doesn't cover that

20    case.  What it says is that the portal

21    cannot provide this information through the

22    device of Mr. Risley.  And so the portal

23    cannot transmit that information to

24    Mr. Risley's device in the first place.

25          If Mr. Risley is, as I said before,

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04080

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 255

Page 256

1       a sophisticated user, then even if the

2       display -- if the data contact information

3       is not displayed whereas, you know, of

4       course, Diacakis clearly states that

5       information is displayed.  But even if it

6       were not displayed, if someone -- someone

7       who's sophisticated could get access to

8       that information.  And this is not allowed

9       by claim element 1.9.

10  BY MR. SHI:

11      Q.   So let me make your -- let me try to

12  that clarify that because, again, that was a

13  lot of information, so I want to break this

14  down bit by bit.

15           In your opinion, with respect to

16  element 1.9, if contact information is sent to

17  the first user's device but not displayed to

18  the first user, is this limitation unmet?

19           MR. RISLEY:  Object to form.

20           THE WITNESS:  Could you repeat the

21      question?  Because that was a long

22      question.  I want make sure I understand

23      it.

24  BY MR. SHI:

25      Q.   In your opinion, with respect to

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04081

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 256

1      element 1.9, if contact information is sent to

2      the first user's device but not displayed to

3      the first user, is this limitation unmet?

4              MR. RISLEY:  Object to form.

5              THE WITNESS:  It is unmet.  Yes, it

6          is unmet.  And you remember, you know,

7          this -- this portal allows the users to

8          register with the portal, allows the users

9          to set access privileges, and how the

10         information is provided and so on and so

11         forth, you know, set in a unique identifier

12         and all that.

13             So everything that is described here

14         is basically taken by action of the user.

15         And so it's -- in other words, the -- it is

16         the user's devices, so it specifically

17         talks about, you know, the whole claim as

18         we -- as we -- if you consider it total, he

19         talks about the client devices that are

20         associated with its user.  So, you know,

21         the information here -- I mean, the

22         negative limitation would be violated if

23         that contact information was sent to the

24         first user's device in the first place.

25     BY MR. SHI:

1          Q.    Let me ask you this.  Is the first

2     user a different entity from the device

3     associated with the first user?

4               MR. RISLEY:  Object to form.

5               THE WITNESS:  So the -- so I think

6          because the -- so, again, this is a claim

7          construction argument, and I don't -- you

8          know, I haven't really looked at the claims

9          from that lens.  So I can't really, you

10         know, just sitting here give you an answer

11         whether the first user and the device

12         associated with that first user are two

13         different entities or not.  I think I would

14         have to look at the specific case, and I

15         would have to look at the claims carefully

16         to make that determination.  And, as I

17         said, this is not something that I

18         addressed in my declaration.  This is not

19         something that I analyzed.

20    BY MR. SHI:

21         Q.    I see.  So what you're saying is

22    you're not offering an opinion as to the

23    construction of limitation 1.9; right?

24              MR. RISLEY:  Object to form.

25              THE WITNESS:  As of the construction

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04083

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 258

Page 259

1          of those terms within Limitation 1.9, yes.

2     BY MR. SHI:

3          Q.    So you have no opinion as to the

4     construction of the term "first user" as used

5     in element 1.9; right?

6               MR. RISLEY:  Object to form.

7               THE WITNESS:  I think you asked me a

8          specific question before, and what I said

9          is that I don't have, you know, I analyzed

10         whether first user and electronic device

11         agree with the first user are two different

12         entities in this case.

13    BY MR. SHI:

14         Q.    If I use a communications network,

15    am I a user?

16         A.    If you use a communication network,

17    are you a user?  Yes, you are a user.

18         Q.    And if I use my mobile phone on the

19    communication network, is my mobile phone an

20    electronic device associated with me as a user?

21         A.    Yes, in that case -- yes, your

22    mobile phone is an electronic device associated

23    with you.

24         Q.    And there is a difference between me

25    as a person and me -- strike that.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 259

1                There is a difference between me as

2        a person and my mobile phone; correct?

3                MR. RISLEY:  Object to form.

4                THE WITNESS:  So, you know, the --

5            what you said before was that if you are

6            using a communication network, are you a

7            user, and I said yes.  And then you said if

8            the -- you are using your mobile phone on

9            the network, if that is a device, and I

10           said yes.  But a user cannot just use a

11           network unless they're using a device;

12           right?

13               And so when you say you are a user

14           on that network, that means you are

15           using your -- the device that is associated

16           with you to access the network, okay.  I

17           mean, people don't access network via

18           telepathy or something.  They actually use

19           devices to do that.  And so in that sense,

20           you know, the user and the device are --

21           you know, the user must use a device to use

22           the network.  There is no other way around

23           that.

24       BY MR. SHI:

25               Q.   I understand that a user uses with a

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 260

1      device.  What I'm asking is are the user and

2      the device two different things?

3                  MR. RISLEY:  Object to form.

4                  THE WITNESS:  So, obviously, a human

5            user is not the same as a mobile phone.

6            That is true.  But, again, you know, one

7            has to look at these in the context of, you

8            know, the operation that is performed here.

9            And that's the -- I think that's the issue

10           at hand, which, again, I have not really

11           analyzed in this case.

12     BY MR. SHI:

13           Q.    So we agree that a human user is not

14     the same as a mobile phone; right?

15                 MR. RISLEY:  Object to form.

16                 THE WITNESS:  As I said before, you

17           know, generally speaking, of course, a

18           human user is not a mobile phone.  It's not

19           the same as a mobile phone.

20     BY MR. SHI:

21           Q.    Thank you.  You see in element 1.9

22     that the term "first user" is used in that

23     element?

24           A.    Yes.  The term "first user" is used

25     in element 1.9, yes.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 261

1      Q.   Do you see that in element 1.9 the

2  term electronic device associated with the

3  first user is used?

4      A.   I see that as well, yes.

5      Q.   Do you see that in element 1.9 it

6  says, "Contact information associated with the

7  second user is not provided via the

8  network-based portal to the first user"; right?

9      A.   I see that in the claim, yes.

10      Q.   This claim prohibits the contact

11  information from being sent to the first user;

12  right?

13          MR. RISLEY:  Object to form.

14          THE WITNESS:  That certainly

15      prohibits the contact information to reach

16      the first user, yes.

17  BY MR. SHI:

18      Q.   The prohibition is that contact

19  information must not be sent through the

20  electronic device to the first user; correct?

21          MR. RISLEY:  Object to form.

22          THE WITNESS:  So -- yeah, so the

23      contact information should not be provided

24      through the electronic device associated

25      with the first user.  That's what the claim

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04087

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 262

1        reads.

2   BY MR. SHI:

3        Q.    But, in your opinion, if the contact

4   information is sent to the device, but the user

5   never sees it, this element is unmet?

6            MR. RISLEY:  Object to form.

7            THE WITNESS:  That's my

8            understanding from, you know, as I'm

9            sitting here and reading the claim.  And as

10           I said, this is my understanding that is

11           not, you know, through -- yeah, so if --

12           so, again, you know, my point here is that

13           the -- the portal is this intermediary that

14           provides this information hiding between

15           the second user and the first user; right?

16               And so it's, for instance -- and,

17           you know, if -- you know, in order to

18           provide that information hiding, you

19           certainly is -- service provider, in this

20           case the portal is a service provider,

21           cannot rely on the users to provide that

22           information hiding.  The server provider,

23           in this case the portal, has to ensure this

24           information hiding.  Once you give

25           information to the users, even to the

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 263

Page 264

1          user's devices, then the service provider

2          has lost complete control of that

3          information hiding.

4               In other words, let's say it's the

5          same thing as when I say, you know, I will

6          send you a photograph and you promise never

7          to show it anywhere.  Right.  If I send you

8          an image of me and then you store it on

9          your device and you say I promise I will

10         never share it with anyone.  But then you

11         turn around and you share it with the rest

12         of the world.

13              And so it's the same dilemma for the

14         service providers, in this case the portal

15         service provider, that, you know, who's

16         objective here is this very clear

17         information hiding as long as they

18         prevent -- they make that information

19         available at the user device, which is

20         completely outside the control of that

21         service provider, that service provider has

22         absolutely no control over that information

23         anymore.

24              As I said, there may be a hacker who

25         goes into my phone if it has information.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04089

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 264

1          Even if I cannot display it, a hacker may

2          go in and get that information.  So from

3          the point of view of the service provider,

4          what is important is not only that this

5          information is displayed and, as I said,

6          Diacakis clearly displays that information,

7          but also that information does not even

8          reads the client device.  Otherwise, this

9          information hiding cannot be granted,

10         period.

11  BY MR. SHI:

12         Q.    With respect, Dr. Rouskas, that

13  answer was pretty irrelevant and didn't address

14  my question.  So I'm going to try this a

15  different way.

16         MR. RISLEY:  That's just really

17         uncalled for.  That's derogatory.  It's

18         demeaning and it's, frankly,

19         unprofessional.

20         MR. SHI:  Mr. Risley, I disagree.  I

21         am --

22         MR. RISLEY:  He answered your

23         question.  Just because you don't like the

24         answer doesn't mean that there's something

25         wrong with the answer.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04090

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 265

1          MR. SHI:  I'm entitled to answers to

2      my questions.  And I'm entitled to

3      responsive --

4          MR. RISLEY:  He answered your --

5          MR. SHI:  -- answers to my questions

6      and that was not a responsive answer.  And

7      I'll just ask --

8          MR. RISLEY:  You might think it's

9      unresponsive.  Obviously, the witness does.

10          MR. SHI:  Just I'm going to keep

11      asking my questions, which I'm entitled to

12      do --

13          MR. RISLEY:  And he can keep

14      answering them how he sees fit.  You can't

15      program his responses.

16          MR. SHI:  That's fine.

17  BY MR. SHI:

18      Q.   Dr. Rouskas, you said a couple of

19  things in there, though, that I want to

20  address.  So do you understand the difference

21  between a positive limitation and a negative

22  limitation?

23          MR. RISLEY:  Object to form.

24          THE WITNESS:  Not in legal terms.  I

25      understand what the negative communication

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 266

1          here means, but I may have -- I may have

2          discussed this difference in the past, but

3          I do not recall it.

4     BY MR. SHI:

5          Q.    Do you understand that a negative

6     limitation is a prohibition on something?

7               MR. RISLEY:  Object to form.

8               THE WITNESS:  Yes, I understand that

9          the negative limitation is a prohibition.

10         Yes, I understand that.

11    BY MR. SHI:

12         Q.    So you under -- were you done with

13    your answer?  So we agree that a negative

14    limitation is a prohibition rather than a

15    requirement; right?

16              MR. RISLEY:  Object to form.

17              THE WITNESS:  It is a prohibition,

18         yes.

19    BY MR. SHI:

20         Q.    A negative limitation is not a

21    requirement; right?

22              MR. RISLEY:  Object to form.

23              THE WITNESS:  I believe you, yes.

24    BY MR. SHI:

25         Q.    In your opinion, does this

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04092

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 267

1    limitation require, as you say, information

2    hiding?

3         A.    I'm sorry, can you repeat the

4    question?

5         Q.    In your opinion, does this

6    limitation, as you say, require information

7    hiding?

8              MR. RISLEY:  Object to form.

9              THE WITNESS:  My comment about

10            information hiding is -- comes from my

11            understanding of the overall claim and the

12            specification of what the system is

13            supposed to do.  And so -- and so to a

14            degree there is, you know, if it -- it --

15            by prohibiting the user to receive that

16            information, to see that information or

17            receive that information, is a form of

18            information hiding.

19    BY MR. SHI:

20         Q.    Do you see the word "hiding" in this

21    claim at all?

22             MR. RISLEY:  Object to form.

23             THE WITNESS:  The word "hiding" is

24            not in this claim, no.

25    BY MR. SHI:

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04093

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 268

1          Q.    What is your basis for your opinion

2     that this claim requires information hiding?

3               MR. RISLEY:  Object to form.

4               THE WITNESS:  The fact that the

5               contact, you know -- it doesn't -- so -- if

6               you prohibit someone from receiving a piece

7               of information, that means you are hiding

8               that information from that someone.  So,

9               for instance, if -- so it's a different way

10              of saying that you are hiding that

11              information.  So you are not permitting

12              that person to receive that information.

13              That means you are not -- you are -- you

14              are not -- if you're not providing, then

15              you're hiding that information; right?

16              That's my basis.  But let me -- actually,

17              it's in the specification of the '810

18              Patent.  And they probably describe it more

19              eloquently than I did.

20              So if you go, for instance, in

21              column 5, line 15 says, "In one embodiment,

22              the user could keep information he believes

23              to be sensitive local in a different

24              database."  Okay.

25              Then later in that paragraph, "In

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04094

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 269

Page 270

1         another embodiment, the user can restrict

2         or limit such retrieval process."

3              Then the beginning of the next

4         paragraph, line 22, "Additional

5         confidentiality can be provided."

6         Confidentiality, by definition, is

7         information hiding.  "In one embodiment,"

8         that's the essence of the invention here,

9         "using phone calls as an example, the user

10        may be aware of the identity of the caller

11        even without being informed of the number

12        of the caller," that's the contact

13        information.

14             So that is information hiding.  I

15        know the name of the caller.  I know that

16        Mr. Risley called me, but I don't know his

17        number, and so I cannot call him directly.

18        That's information hiding.  That's

19        confidentiality.

20             So, you know, later on it talks

21        about confidentiality starting at line 33.

22        "One approach to maintain such

23        confidentiality while maintaining real-time

24        communication is based on a system," et

25        cetera.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04095

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 270

1          So that is my basis for it.  It's

2          the understanding of how the system works.

3          That's why they prohibit the device from

4          receiving that information because they

5          want to ensure confidentiality information

6          hiding, as I mentioned it.

7     BY MR. SHI:

8          Q.    In your opinion, if contact

9     information goes to a user's device, it

10    necessarily goes to that user; correct?

11         MR. RISLEY:  Object to form.

12         THE WITNESS:  That is not what I

13         said.  For instance, when I have -- when I

14         go to a website -- I'll give you an

15         example.  When I go to the website, the

16         website install cookies on my computer.  A

17         user, you know, any lay user of the web

18         does not know where the cookies are.  The

19         cookies are on the user's device.  However,

20         I know exactly where the users because I've

21         used the technology, I can go directly to

22         that folder where the cookies are, and I

23         can actually list them and do whatever I

24         want with those cookies.  Okay?

25              I can analyze them and that's how

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04096

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 271

Page 272

1          people analyze, you know, we can follow

2          them on the web and so on and so forth.  So

3          the fact that the information is on the

4          user's device, okay, makes that information

5          available and outside the control of the

6          service provider, in this case the portal.

7                So once the portal has downloaded

8          that contact information into my device --

9          maybe I'm a lay person, I don't understand

10         it.  But if someone hacks my device, then

11         they can get that information.

12               So that's -- there is no

13         confidentiality in that sense; right?

14               So confidentiality is provided by a

15         central server and, you know, that's why

16         for instance, you know, you get the -- from

17         all these very subscription services that

18         you may have do not store your passwords on

19         your device.  That's why you have password

20         servers.  If you store the password on your

21         device, it's subject to be discovered.

22         Even if you don't know how to do it as a

23         user, someone else may.

24               And so the point here is that once

25         the information is outside the portal, it's

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04097

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 272

Page 273

```
 1           outside the portal's control.

 2           Confidentiality cannot be ensured.

 3     BY MR. SHI:

 4           Q.    So, in your opinion, if contact

 5     information is provided to a user's device, it

 6     does not necessarily go to the user; correct?

 7                 MR. RISLEY:  Object to form.

 8                 THE WITNESS:  So it depends on the

 9           context; right?  And In the context of the

10           Diacakis, it necessarily is displayed to

11           the user because Diacakis explicitly say so

12           in multiple locations.  My answer is -- you

13           know, my point was that even if the user

14           somehow is enabled to access the

15           information, that information becomes

16           outside of the control of a service

17           provider.  Therefore, a service provider

18           would never provide sensitive information.

19           And in this case because of the

20           confidentiality arguments in the patent, in

21           the specification of the '810 patent,

22           contact information is strictly the

23           sensitive information.

24                 So a sender provider will never

25           provide that sensitive provider information
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04098

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 273

1           to the user's device, but -- you know, so

2           depending on the context, as I said, in the

3           context of a cookie that is installed on

4           your device by the browser, the user may

5           not be able to see it.  But the information

6           is there if the user looks up, you know,

7           searches the web and says how do I find my

8           cookies on the Mac OS or the MacBook.  Then

9           it would get all the instructions they need

10          to go into their MacBook and find where the

11          cookies are and actually take a look at the

12          cookies.  So there is no confidentiality

13          there.  The cookies are available to the

14          user.

15     BY MR. SHI:

16          Q.   Is this similar to the hacker

17     scenario you were describing?

18          A.   Not similar in the sense that the

19     hacker has to get access to your device in

20     order to find the information, but yes, once

21     the hacker is on your device, then the process

22     is similar, yes.

23          Q.   So let me try to break down your

24     opinion.  It's true that, in your opinion,

25     Limitation 1.9 is not met if a second user's

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04099

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 274

1    contact information is provided to the first

2    user's device; correct?

3            MR. RISLEY:  Object to form.

4            THE WITNESS:  Yes, Limitation 1.9 is

5        not met if the second user's contact

6        information is available on the electronic

7        device of the first user.

8    BY MR. SHI:

9        Q.    And the basis for that opinion is

10    that a hacker could figure out a way to reach

11    that contact information; right?

12            MR. RISLEY:  Object to form.

13            THE WITNESS:  No, that is not what I

14        said.  What I said is that the user can get

15        access to that even if the -- even if the

16        particular technology does not explicitly

17        display that information.  And, again, let

18        me say again that Diacakis explicitly --

19        Diacakis invention explicitly displays that

20        information so there's nothing for the user

21        to do.

22            But my point is that even if another

23        technology does not display that

24        information I gave you a concrete example

25        of that that does not involve Diacakis and

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04100

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 275

1          that's the cookies that the web browsers

2          install on the client device.  Even in that

3          case where the cookies are not displayed by

4          default, the user can very easily figure

5          out, even if they don't understand what

6          cookies are or how to find them, they can

7          do a very simple Google search and find

8          them.  So it has nothing to do with

9          hackers.

10          The user himself or herself can get

11          to that information, even if they are not

12          by default displayed -- by default

13          displayed as Diacakis does.

14  BY MR. SHI:

15          Q.    Okay.  So with that in mind, let me

16  ask this question again.  In your opinion,

17  Limitation 1.9 is not met if a second user's

18  contact information is provided to the first

19  user's device; correct?

20          MR. RISLEY:  Object to form.

21          THE WITNESS:  That is correct, yes.

22  BY MR. SHI:

23          Q.    And the basis for your opinion is

24  that once that contact information is within

25  the electronic device of the first user, the

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04101

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 276

1    first user may be able to do something to view

2    that information; correct?

3               MR. RISLEY:  Object to form.

4               THE WITNESS:  The user can always

5          take a look at what it is in their device.

6          So they can certainly, you know, find that

7          information, yes, if it is on their device.

8    BY MR. SHI:

9          Q.   Okay.  So, in your opinion,

10   Limitation 1.9 is not met if a second user's

11   contact information is provided to the first

12   user's device; correct?

13              MR. RISLEY:  Object to form.

14              THE WITNESS:  I think I answered

15         that and, yes, it is correct.

16   BY MR. SHI:

17         Q.   And the basis for that opinion is

18   that a first user can always look at the

19   information contained in their device; correct?

20              MR. RISLEY:  Object to form.

21              THE WITNESS:  So in the context of

22         Diacakis, again, in the context of contact

23         information, the answer is certainly true,

24         yes.

25   BY MR. SHI:

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04102

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 277

1        Q.    Can we go off the record.  I think

2    maybe we can take like a quick ten-minute

3    break.

4        A.    Sure.

5              THE VIDEOGRAPHER:  Off record at

6        9:46 a.m.

7    (Recess taken from 9:46 a.m. until 9:59 a.m.)

8              THE VIDEOGRAPHER:  On record at

9        9:59 a.m.

10   BY MR. SHI:

11       Q.    Dr. Rouskas, do you have Exhibit 4

12   in front of you?

13       A.    I do.

14       Q.    Exhibit 4 is your declaration with

15   respect to the '810 petition; correct?

16       A.    Yes, it is.

17       Q.    Can you turn to page 38,

18   paragraph 89 of Exhibit 4?

19       A.    Paragraph 89, yes.

20       Q.    Now, down at the bottom of that page

21   you write, "Figure 8 also clearly shows in the

22   left-hand window that the contact information

23   of each contact has been sent to the sender."

24              Do you see that?

25       A.    I see that, yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04103

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 278

1          Q.    And you're specifically talking

2     about Figure 8 of the Diacakis reference, which

3     is Exhibit 9; right?

4          A.    Yes.

5          Q.    And, in fact, you have included a

6     screenshot of Exhibit 9, Figure 8 on the next

7     page, page 39 of Exhibit 4; right?

8          A.    Yes, it is there.

9          Q.    So in Figure 8 we see two windows;

10    correct?

11         A.    Correct.

12         Q.    We see on the left-hand side a

13    window that says "contact properties" and it

14    lists a contact named Jonathan?

15         A.    I see that.

16         Q.    And it shows certain phone numbers

17    and e-mail addresses with respect to Jonathan;

18    right?

19         A.    Yes, this is Jonathan's information.

20         Q.    It doesn't show Alex's contact

21    information; right?

22              MR. RISLEY:  Object to form.

23              THE WITNESS:  The left-hand side of

24         Figure 8 shows Jonathan's information, not

25         Alex's.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 279

1    BY MR. SHI:

2        Q.    Right.  And it doesn't show any

3    information from any other of the contacts on

4    the right-hand side of the page; right?

5                MR. RISLEY:  Object to form.

6                THE WITNESS:  Yes.  Again, this is

7            Jonathan's information.  It's not the

8            information of the other contacts that are

9            shown on the right-hand side of the figure.

10   BY MR. SHI:

11       Q.    Okay.  You can put that aside for

12   now.

13               Dr. Rouskas, you reviewed the

14   petitions in this case; right?

15       A.    I reviewed the petitions, yes, in

16   preparing the declaration, yes.

17       Q.    I'd like to mark for the record a

18   new Exhibit 15.

19               (Exhibit 15 marked for

20   identification.)

21               Dr. Rouskas, do you recognize this

22   exhibit?

23       A.    Yes.  This is the petition for the

24   '810 Patent.

25       Q.    This is the petition that you

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04105

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 280

1    reviewed with respect to the '810 petition;

2    correct?

3         A.    Yes.

4         Q.    So you're familiar with the -- with

5    all of the text in the petition?

6         A.    So I reviewed it some time ago.

7    This is not something that I reviewed as part

8    of preparation for this deposition for the

9    preparation and mostly focused on the prior art

10   patents, the patents in suit, and my

11   declaration.  So, yes, I have seen this and I

12   have reviewed it, but it was some time ago.

13        Q.    Great.  So just to be clear, you did

14   review this petition; right?

15        A.    Yes, I --

16             MR. RISLEY:  Object to form.

17             THE WITNESS:  I have reviewed the

18        petition, yes.

19   BY MR. SHI:

20        Q.    You reviewed additionally the '727

21   petition; correct?

22        A.    Yes, that's correct.

23        Q.    You additionally reviewed two

24   petitions with respect to the '038 patent;

25   correct?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04106

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 281

```
 1          A.     Yes, that's correct.  I reviewed

 2     those petitions as well.

 3          Q.     I'd like to direct your attention to

 4     page 13 of Exhibit 15?

 5          A.     Yes.

 6          Q.     This is the overview of the

 7     technology section; right?

 8          A.     Yes, it is.

 9                 MR. RISLEY:  Object to form.

10     BY MR. SHI:

11          Q.     Did you review this section in your

12     review of Exhibit 15?

13          A.     Yes.  As I said, I reviewed the

14     petition, and I reviewed the whole petition, so

15     I reviewed this section as well, yes.

16          Q.     Let's turn to page 18 of Exhibit 15.

17          A.     Yes.

18          Q.     So do you see that on this page and

19     in this section the petition discusses various

20     Internet-based communication platforms such as

21     Yahoo Messenger?

22          A.     I see that, yes.

23          Q.     And you see that the petition also

24     discusses AOL Instant Messenger as an example?

25          A.     I see that as well.
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04107

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 282

1          Q.    And you see that the petition also

2    identifies ICQ as an example?

3                MR. RISLEY:  Object to form.

4                THE WITNESS:  I can see that, yes.

5    BY MR. SHI:

6          Q.    Are you familiar with these

7    communication platforms?

8                MR. RISLEY:  Object to form.

9                THE WITNESS:  I have not used those,

10           but, yes, of course, I'm familiar with

11           those -- those were, you know, popular a

12           long time ago, maybe 25, 30 years ago, yes.

13   BY MR. SHI:

14         Q.    So it's your understanding that

15   these platforms were available in the 1990s?

16         A.    Yes, absolutely.  I'm aware that

17   these were available and popular in the 1990s.

18         Q.    And I think you said this, but I

19   want to confirm.  You have never used AOL

20   Instant Messenger yourself?

21         A.    I have not.

22         Q.    You've never used Yahoo Messenger

23   yourself?

24         A.    I have not.

25         Q.    You've never used ICQ yourself?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04108

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 283

Page 284

1          A.    No.  I was more of an e-mail guy,

2     not an Instant Messenger messaging guy.

3          Q.    Understood.

4                Do you think a person of ordinary

5     skill in the art as of the early 2000s, 2005

6     and earlier would have been familiar with these

7     platforms?

8          A.    I believe so, yes.

9          Q.    I want to direct your attention to

10    the second -- the bottom half of page 18?

11         A.    Okay.

12         Q.    Where the petition says, "For

13    instance, ICQ, an Internet-based instant

14    messaging service that was first developed in

15    the 1990s enables users to identify others who

16    are online and alerts users when specified

17    individuals log on to the ICQ service."

18                Do you see that?

19         A.    I see that, yes.

20         Q.    Do you have any reason to disagree

21    with that characterization?

22         A.    No, I do not.

23         Q.    Let's turn to page to page 19 of

24    Exhibit 15.  At the top of the page the

25    petition reads, "For instance, ICQs and AIMs

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04109

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 284

Page 285

1      users," referring to AOL Instant Messenger,

2      "used unique identifiers or screen names and

3      were able to communicate with other users as

4      buddies."

5              Do you see that?

6      A.    I see that, yes.

7      Q.    Do you have any reason to disagree

8      with that characterization?

9      A.    I don't.

10     Q.    The next sentence says, "In such

11     systems, users could communicate with one

12     another while keeping their personal contact

13     information private."

14             Do you see that?

15     A.    I see that, yes.

16     Q.    Do you have any reason to disagree

17     with the characterization of that?

18     A.    It depends on what you mean by

19     personal contact information in this case.  So,

20     for instance, if -- if -- let's say, I'm on ICQ

21     with a buddy of mine, I use there as that first

22     sentence at the top of the page says, if I know

23     my -- the only way that I can communicate with

24     my buddy on ICQ is if I know the -- their

25     screen name.  So I have to use their screen

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04110

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 285

1    name, you know, to communicate with them.  And

2    so I have that piece of information.

3              Now, I may not necessarily know

4    their -- I may not know necessarily know their

5    phone number because they have not shared their

6    phone number with me.  However, they have

7    shared their screen name with me because there

8    is no other way for me to conduct on ICQ

9    without their screen name.  And this

10   information, so going back to, you know,

11   your -- you know, the sentence at the top of

12   the page, ICQ and AIM allow buddies to

13   communicate directly.

14             So in other words, if I want to AIM

15   in my -- the buddy, all I have to do is tap,

16   you know, their screen name, which in that case

17   is contact information because that's how I

18   contact that buddy on ICQ and send the instant

19   message.

20             So, again, you know, that second

21   sentence that you quoted from the petition,

22   well, it says keeping their personal contact

23   information private, it's basically part of the

24   personal information private.  It's exactly

25   like the Diacakis system.  It says I'm going to

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04111

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 286

Page 287

1    make available only my instant messaging

2    account, right, but I'm not going to make

3    available the telephone number, you know, based

4    on the access group.  So this is no different

5    than what Diacakis discloses.

6         Q.    I think I understand your testimony

7    here.  Let me know if I have this right.  In

8    your opinion, looking at platforms such as ICQ

9    or AIM in this sort of situation, a person's

10   screen name is their personal contact

11   information; right?

12            MR. RISLEY:  Object to form.

13            THE WITNESS:  So a person's screen

14        name is part of their contact information

15        because you necessarily need the screen

16        name to contact them.

17   BY MR. SHI:

18        Q.    Okay.  So in this particular

19   sentence which -- strike that.  I'll reread the

20   sentence for the record.

21            The petition says, "In such systems,

22   users could communicate with one another while

23   keeping their personal contact information

24   private."

25            Do you see that?

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 287

1          A.    I see that.

2                MR. RISLEY:  I'm sorry, are you on

3          18 or 19?

4                MR. SHI:  19.  So I'll read that

5          again.

6                MR. RISLEY:  Thanks.

7    BY MR. SHI:

8          Q.    The petition says, "In such

9    systems," referring to ICQ and AIM, "users

10   could communicate with one another while

11   keeping their personal contact information

12   private."

13                Do you see that?

14         A.    I see that, yes.

15         Q.    And from what I understand your

16   testimony to be, you disagree to the extent

17   that the users are not keeping their screen

18   names private from one another; right?

19                MR. RISLEY:  Object to form.

20                THE WITNESS:  Okay.  So that is

21         correct and let me just clarify some more,

22         right.  So what is contact information?

23         Contact information is a piece of

24         information that you need to -- to get in

25         touch with someone over some media.  So,

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04113

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 288

1        for instance, my -- my home address, if you
2        want to send me postal mail, you need my
3        home address.  So in that sense contact
4        information is my home address.  If you
5        want to call me using the telephone
6        network, then the telephone number -- my
7        telephone number is my contact address.
8              In this particular case, if you want
9        to contact me over ICQ, then you need to
10       know my ICQ screen name.  Without that, you
11       cannot contact me.  So -- so, again, the
12       correct statement here would be while
13       keeping other personal contacts private;
14       okay?  If that read like that, then I would
15       agree.  But in this case when it says their
16       personal contact information private, that
17       is not possible because they do provide
18       the, you know, a specific screen name that
19       can be used to contact that person on a
20       specific communication means.
21  BY MR. SHI:
22       Q.   I think I understand that.  So let
23  me know if I'm characterizing this correctly.
24  In your opinion, because in instant messaging
25  platforms, such as ICQ and AIM, necessarily use

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04114

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 289

1      screen names for the users to communicate.

2      There's no way that they can keep that screen

3      name contact information private from one

4      another; right?

5              MR. RISLEY:  Object to form.

6              THE WITNESS:  That's correct.  This

7          is actually corroborated in Diacakis where,

8          for instance, you know, in Figure 8 it

9          provides the screen name of Jonathan on the

10         left-hand side or, you know, for instance,

11         it talks about the instant message

12         information addresses and it lists that

13         information there.  So that clearly is part

14         of the contact information for Jonathan.

15         And so in this particular case, the

16         buddy -- or the screen name is part of the

17         contact information, yes.

18     BY MR. SHI:

19         Q.    Right.  Right.  I understand what

20     you're saying.

21             You would agree that when users of

22     the AIM platform or the ICQ platform

23     communicate, they're not communicating using

24     their phone numbers; right?

25             MR. RISLEY:  Object to form.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 290

1              THE WITNESS:  So ICQ and AOL AIM,

2         you know, they -- they do not use their

3         phone numbers to communicate, correct.

4         They use their screen names.

5    BY MR. SHI:

6         Q.    And users of ICQ and AIM do not use

7    personal e-mail addresses to communicate,

8    rather they use screen names; right?

9              MR. RISLEY:  Object to form.

10             THE WITNESS:  Correct.  They, you

11        know, to use ICQ and AIM, you would need

12        screen name, yes, on that service.  So, for

13        instance, on ICQ, screen name would not

14        work on AIM and vice versa.

15   BY MR. SHI:

16        Q.    Thank you.  Moving down to the next

17   sentence on page 19 of Exhibit 15, the petition

18   says, "These synchronous chat applications

19   commonly feature tools allowing users to mute

20   and block chat participants."

21             Do you see that?

22        A.    I'm sorry.  Okay.  Yeah, it's

23   further here.

24        Q.    Okay.  I'll read that again just so

25   the record is clear.

1              On page 19 of Exhibit 15, the

2    petition says, "Moreover, these synchronous

3    chat applications commonly feature tools

4    allowing users to mute and block chat

5    participants."

6              Do you see that?

7         A.    I see that, yes.

8         Q.    Do you have any reason to disagree

9    with this characterization?

10             MR. RISLEY:  Object to form.

11             THE WITNESS:  I do not.

12    BY MR. SHI:

13        Q.    Great.  You can put Exhibit 15 to

14    the side for now.

15             So yesterday when we left off, we

16    were discussing your opinions related to the

17    Tanigawa reference.  Do you recall that?

18        A.    I do.

19        Q.    So if you have Exhibit 4 in front of

20    you.

21        A.    I do, yes.

22        Q.    I'd like to direct your attention to

23    page 49 of Exhibit 4 beginning with

24    paragraph 113.

25        A.    I am there.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04117

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 292

1          Q.    Okay.  So in this paragraph you're

2     explaining one reason why you believe a POSITA

3     would not be motivated to combine Hullfish

4     within Tanigawa; correct?

5               MR. RISLEY:  Object to form.

6               THE WITNESS:  Yes.

7     BY MR. SHI:

8          Q.    The reason that you refer to in this

9     paragraph 113 is that within Tanigawa users who

10    are communicating have mutually agreed to

11    engage in communication; right?

12              MR. RISLEY:  Object to form.

13              THE WITNESS:  That's what I state,

14         yes.

15    BY MR. SHI:

16         Q.    And that's because in your opinion a

17    Tanigawa user who wishes to stop communicating

18    with someone would simply remove that person

19    from his or her buddy list; correct?

20              MR. RISLEY:  Object to form.

21              THE WITNESS:  No, that is not the

22         user.  The, you know, what -- let me --

23         that is not the whole user.

24              So, you know, for instance, if you

25         refer to paragraph 8, which I cite in this

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04118

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 293

1        paragraph.

2            MR. RISLEY:  Excuse me you're

3        talking about -- can you identify that

4        document?

5            THE WITNESS:  Yeah, this is

6        Exhibit 13, the Tanigawa patent

7        application.

8            So as -- so, you know, when I say in

9        paragraph 113 that "Tanigawa expressly

10       states that it is an object of the

11       invention to achieve group chat using

12       multimedia among buddies," that is "users

13       who have mutually agreed to engage in

14       communication," you know, one of the

15       reasons is what is stated, let's say, in

16       paragraph 8, but also from, you know, the

17       overall functionality of the Tanigawa

18       system.

19           So let's go to paragraph 8, it says,

20       for example, the switching between a group

21       chat through electronic documents and a

22       group chat through voice and all of the

23       switching between the one-and-one chats

24       through voice and the group chat through

25       voice can be handled flexibly.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04119

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 294

```
 1              So -- and, actually, they said this

 2         before that says more specifically these

 3         are not object of the present invention to

 4         achieve group chat using multimedia.

 5              And so what Tanigawa talks about in

 6         this paragraph is that, you know, you're

 7         switching from a group chat to, let's say,

 8         a voice chat or you're switching from a

 9         one-to-one chat to a group chat.  And so

10         these are parties where only communicating

11         in chats, and now what they're doing is

12         they're switching to a voice chat.  So

13         these buddies have already agreed to

14         communicate.  Otherwise, they wouldn't be

15         communicating with the chat in the first

16         place; right?

17              And then the other aspect that's,

18         you know, leads me to write this sentence

19         here that these users have mutually agreed

20         to engage communication is that the

21         Tanigawa system as shown in the various

22         figures starting with Figure 10, 11, and so

23         on, they issue invitations to parties to

24         join and the invitation -- the parties

25         would -- can decide whether to join or not.
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04120

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 295

Page 296

1              And so if they decide to join, they agree

2              to communicate.  If they decide not to

3              join, then they do not join and do not

4              communicate.

5                   So the functionality of the Tanigawa

6              system basically is -- it's a second reason

7              why I'm writing this sentence here in my

8              paragraph, in paragraph 113.

9        BY MR. SHI:

10             Q.   Dr. Rouskas, I want to be clear, in

11       the scope of what you're talking about because,

12       you know, as we said yesterday, Tanigawa

13       discloses both group and one-to-one

14       communication.  Do you recall?

15                  MR. RISLEY:  Object to form.

16                  THE WITNESS:  I recall that, yes.

17       BY MR. SHI:

18             Q.   You recall -- strike that.

19                  So to be clear, you agree with me

20       that Tanigawa teaches both group communication

21       and one-to-one communication; right?

22                  MR. RISLEY:  Object to form.

23                  THE WITNESS:  I agree with that,

24             yes.

25       BY MR. SHI:

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 296

1          Q.    In paragraph 113 you say in the

2    first sentence, "Tanigawa expressly states that

3    it is an object of the invention to achieve

4    group chat using multimedia among buddies";

5    right?

6              MR. RISLEY:  Object to form.

7              THE WITNESS:  Yes, that's what it

8         says.

9    BY MR. SHI:

10         Q.    And then with respect to that, you

11    say, "i.e., users who have mutually agreed to

12    engage in communication"; right?

13              MR. RISLEY:  Object to form.

14              THE WITNESS:  Right.  That's, you

15         know, so, again, that's, you know -- that's

16         actually a third reason, you know, I

17         mention on that.  Here is because of what

18         the term "buddy" means.  Buddy is someone

19         who has agreed with me to share their

20         contact information or let's say their

21         screen name, and they're on my buddy list,

22         and these are people that -- it's not a

23         phone call or it's not a number, it's

24         someone who -- okay, I'll get back to that.

25              So the definition of the word

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04122

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 297

1          "buddy" is someone with whom I have some

2          type of relationship, and I have agreed

3          with them to exchange our screen names.  A

4          buddy is not an unsolicited phone call --

5          it is not a telemarketer that's, you know,

6          places an unsolicited phone call to me

7          during dinnertime.  And so there's a clear

8          distinction there.

9               You know, if Steve Risley is my

10          buddy, that means I have his phone number

11          and he has my phone number.  We have agreed

12          to communicate with each other.  And he is

13          on my buddy list and I am on his buddy

14          list.  You know, if it's a telemarketer and

15          I receive a phone call, I don't recognize

16          it because they are not on my buddy list.

17     BY MR. SHI:

18          Q.    That's very interesting.  We can

19     talk about buddies in just a second.  I want to

20     direct your attention to the quoted phrase in

21     paragraph 113 where you say, "The object of the

22     invention is to achieve group chat using

23     multimedia"; right?

24               MR. RISLEY:  Object to form.

25               THE WITNESS:  Right.  I mean, but

1          that -- so that sentence, you know, has

2          another part, right, which says among

3          buddies.  You know, we have to look at the

4          whole sentence there.  It says, you know --

5          the achieved group chat using multimedia is

6          a quote from the Tanigawa prior art

7          reference, and so that's one thing.  But

8          then there's this other thing among

9          buddies; right?

10          And so the users who have mutually

11          agreed to engage in communication, you

12          know, that's a highlighted part of the

13          sentence.  It really goes to buddies.  It

14          doesn't go to the group chat itself because

15          it's after the word "buddies."

16   BY MR. SHI:

17          Q.    So just help me understand.  Does

18   this sentence refer to group chat, or does it

19   refer to group chat and one-to-one chat?

20          MR. RISLEY:  Object to form.

21          THE WITNESS:  So, again, this is a

22          quote that's from Tanigawa that references

23          group chat.  That's fine.  As you said,

24          Tanigawa also discloses one-on-one chats.

25          And actually one-on-one chat is not, you

Page 300

1        know -- so let me go to -- because you --

2        you know, you refer to group chat and

3        one-to-one chat as they are two different

4        things.  I just want to point out that

5        essentially they're the same.

6            So if you can turn please to

7        Figure 11 of the Tanigawa, you know,

8        Exhibit 13.  So if you see there, there

9        is -- so there is a packet labeled S1018

10       that says "call," and this comes from the

11       AP server 5.  And this call goes to the IP

12       terminal, so the clients, if they not on

13       the IP terminals, it's forwarded to the

14       telephone number and so on.  And so it

15       basically goes to the user's buddies.

16           The user's response, you can see

17       that there are three packets labeled

18       S1020A, S1020B, and S1020C that say

19       "respond."  Once those packets are

20       received, then, as you can see there, the

21       setting is complete and the voice chatting

22       begins; right.  So you can see those double

23       arrows that mention voice chatting and so

24       on.  And so now you have voice chatting

25       between these three users; right.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04125

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 300

1          Now immediately after that you can

2     see that you have a disconnect.  So you

3     have three users engaged in voice chatting.

4     That's a group chat.

5          Immediately after that you see that

6     that packet S0120 -- S1025, that says

7     "disconnect."  So the first user Taro on

8     client A, it sends this disconnect to the

9     AP server, and there's a disconnect

10    notification.  Now the voice chatting

11    proceeds as a one-on-one voice chatting

12    between the other two users that were

13    participating in the group chat.

14          So group chats, one-on-one chats, it

15    doesn't make any difference in Tanigawa.

16    It's the same thing.  You have to send

17    invitations, they have to agree, you

18    continue communicating, some of them

19    disconnect, and then eventually you are

20    left with two people and then perhaps they

21    will disconnect at some point.  Okay.

22          So, you know -- so when I say here

23    group chats, I -- you know, referring back

24    to Figure 11, it's means both the case

25    where the three users voice chatting here.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04126

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 301

1           It also includes the case where only the

2           two users voice chat because the first user

3           disconnect.  Okay.

4                 And so the point of this is not just

5           the group chat.  You know, again, in my

6           mind, I agreed with you that Tanigawa

7           discloses one-on-one chat, that's because

8           in group communication there's a special

9           case.  When you have a group of two, then

10          that's a one-on-one chat and that's exactly

11          what Tanigawa shows on this figure.

12                And so the essence of this is that,

13          you know, the three users Taro, Hanako, and

14          Yoshi that are shown, these are buddies.

15          And the reason that they were able to join

16          the call is because, according to Tanigawa,

17          Taro received the buddy list notification,

18          figure out whether they're available,

19          sent -- or cause the invitations to be sent

20          and so on and so forth.  So they agreed to

21          communicate.  And so it's on here, once

22          they respond to that call, they have agreed

23          to communicate.

24     BY MR. SHI:

25          Q.   I understand what you're saying.

1    But, again, please let me know if I get this

2    right.  In your opinion, one-to-one chatting is

3    a special case of the group chatting disclosed

4    by Tanigawa; correct?

5              MR. RISLEY:  Object to form.

6              THE WITNESS:  It's my opinion

7         because this is exactly what is shown in

8         Tanigawa in Figure 11, for instance.

9    BY MR. SHI:

10        Q.    In your opinion, Tanigawa shows that

11   one-to-one chatting is a special case within

12   group chatting; right?

13             MR. RISLEY:  Object to form.

14             THE WITNESS:  Yes, that is what

15        Figure 11 shows in Tanigawa.

16   BY MR. SHI:

17        Q.    In your opinion, there's no

18   functional difference within Tanigawa between

19   one-to-one chatting and group chatting; right?

20             MR. RISLEY:  Object to form.

21             THE WITNESS:  I could not find

22        anything in Tanigawa that differentiates

23        between group chatting and one-on-one

24        chatting in terms of the functionality.

25   BY MR. SHI:

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 303

1          Q.    I want to talk now about the buddies

2    concept that you brought up earlier,

3    Dr. Rouskas.

4          I believe you said this, but I just

5    want to make the record clear.  In your

6    opinion, buddies are users who have mutually

7    agreed to engage in communication; right?

8              MR. RISLEY:  Object to form.

9              THE WITNESS:  That is my opinion,

10        yes.

11   BY MR. SHI:

12        Q.    It's your opinion that Tanigawa

13   never teaches a user to block a buddy; right?

14             MR. RISLEY:  Object to form.

15             THE WITNESS:  So as I mentioned that

16        paragraph 113, Tanigawa does teach that a

17        buddy may decline invitation.  But it --

18        Tanigawa does not teach someone to block a

19        buddy.

20   BY MR. SHI:

21        Q.    In your opinion, a user of the

22   Tanigawa system, if he or she wanted to stop

23   communicating with a buddy, that person could

24   simply remove the buddy from his or her buddy

25   list; right?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04129

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 304

1          MR. RISLEY:  Object to form.

2          THE WITNESS:  My opinion is that the

3     Tanigawa teaches that in order to engage

4     the communication, a buddy would have to

5     send invitations for other buddies to join

6     a group.  And, therefore, if someone is not

7     a buddy of that person, then obviously they

8     do not receive an invitation, and if they

9     do not receive an invitation, then they do

10    not participate in the group chat.  So you

11    know -- so, you know, if someone is removed

12    from the buddy list, then it would not

13    receive an invitation to go to Tanigawa.

14          Now, once the communication is going

15    on, all the buddies agreed, there is point

16    to the invitation, they agree to the

17    invitation and, therefore, they join.  So

18    why block them?  I don't understand why you

19    want to block them.  If they want to leave,

20    they can -- everyone can just leave the

21    conversation just like Figure 11 shows it

22    disconnect, and they will disconnect and

23    will leave that information.  There is no

24    reason to block someone.

25          And not only that, but even blocking

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 305

1          when you're doing things like mixing and

2          the -- you are mixing the text or the voice

3          and so what you receive actually comes from

4          a server.  It doesn't come from the

5          buddies.  There's no way to block the

6          buddies.  If you're going to block

7          something, you're going to block the server

8          and, therefore, you're going to miss all

9          the communication.  But in that case, you

10         don't have to do that, you can just simply

11         disconnect.  If you're going to leave the

12         group chat in the first place, then just

13         disconnect.

14   BY MR. SHI:

15         Q.    Dr. Rouskas, let me set up a

16   hypothetical example, if that's okay.

17         A.    That's okay, yes.

18         Q.    Let's say that eight people are in a

19   chat room.  Is that okay?

20              MR. RISLEY:  Object to form.

21              THE WITNESS:  So by eight people

22         being in the chat room, you mean that in

23         the context of Tanigawa they have received

24         invitations to join the chat room, they

25         have even been given the conference room

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04131

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 306

```
 1          address and they have responded to the

 2          invitations to join the chat room?

 3   BY MR. SHI:

 4          Q.    Yes.  So with all of those

 5   assumptions, let's assume that there are eight

 6   people in a chat room for voice?  Is that okay?

 7          A.    That is okay, yes.

 8                MR. RISLEY:  Object to form.

 9   BY MR. SHI:

10          Q.    So in this scenario, all eight

11   people are speaking and when one person speaks,

12   the other seven people can hear.  Do you agree?

13                MR. RISLEY:  Object to form.

14                THE WITNESS:  Yes, I agree.

15   BY MR. SHI:

16          Q.    And let's say that -- let's call the

17   people A through H.  Is that okay?

18                MR. RISLEY:  Object to form.

19                THE WITNESS:  A through H, yes.

20   BY MR. SHI:

21          Q.    Let's say in person A's background

22   there's a very, very loud fire truck.

23                MR. RISLEY:  Object to form.

24   BY MR. SHI:

25          Q.    Is that okay?
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04132

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 307

Page 308

```
 1                 MR. RISLEY:  Same objection.
 2                 THE WITNESS:  Okay.  In the
 3            background of A's chat -- room there's a
 4            fire truck noise, yes.  Okay.
 5      BY MR. SHI:
 6            Q.    Let's say that the fire truck is so
 7      loud that B through H can hear the fire truck
 8      in their group chat room.
 9                 MR. RISLEY:  Object to form.
10      BY MR. SHI:
11            Q.    Is that okay?
12            A.    That is okay, yes.
13            Q.    Do you see why person B may wish to
14      block or mute person A but not leave the chat
15      room?
16                 MR. RISLEY:  Object to form.
17                 THE WITNESS:  So that is -- actually
18            is a good point, but the -- you know, the
19            way that this is the result -- and,
20            certainly, this situation arises all the
21            time.  In fact, it has been arising, you
22            know, with work from home where people are
23            on a Zoom meeting and, you know, they have
24            kids running around or pets running around
25            and so on.  So there's noise in the
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04133

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 308

1        background, doesn't have to be a big fire

2        truck, and there's noise and that disturbs

3        the overall Zoom meeting; right?  When I

4        say Zoom, it can be any other technology

5        that we use today.

6            And so there's a very simple way to

7        deal with that which is to tell the person

8        to mute themselves.  You know, you don't

9        want to do a wholesale block of that person

10       because of that, you know, transient noise;

11       right?  The fire truck will come by and

12       30 seconds later it will go away.  You

13       don't want to completely block that person

14       and not have them participate assuming that

15       this is a conversation that necessarily

16       needs that person or, you know, an

17       invitation has been sent to that person to

18       participate.  So the easy technical

19       solution to that is to simply tell that

20       person can you please mute yourself until

21       the noise goes away.

22  BY MR. SHI:

23       Q.   I think I understand that you're

24  saying that there are alternatives to blocking

25  that a person might employ in this situation;

1      right?

2                  MR. RISLEY:  Object to form.

3                  THE WITNESS:  It's not just an

4          alternative blocking.  What I'm saying that

5          in this situation the blocking is not a

6          desirable solution.  It's not a desired

7          option.  It's not an option that any

8          reasonable person would take.

9      BY MR. SHI:

10         Q.   Would you agree that in this

11     situation it would be desirable to stop hearing

12     the background noise of one person?

13                 MR. RISLEY:  Object to form.

14                 THE WITNESS:  I completely agree

15         with that and this is why I said that there

16         are technical solutions at the very simple

17         like a mute button.

18     BY MR. SHI:

19         Q.   So a mute button is one possible

20     technical solution to the problem of someone's

21     background noise; right?

22         A.   I think --

23                 MR. RISLEY:  Object to form.

24                 THE WITNESS:  I think it's the

25         perfect solution, and that's why all the

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 310

1          video platforms today, you know, implement

2          a mute button.  And so the mute button is

3          there -- it's like a perfect solution and

4          so, you know, I don't see why anyone else

5          would need to implement something very

6          complex instead of a mute button.

7                But, again, blocking and muting is

8          not the same thing.  Blocking means

9          basically taking that person -- so your

10         objective here is to not distract other

11         people because of the background noise in

12         one person's room.  And the solution -- so

13         the mute solution is a perfect solution.

14         You mute that person, the noise goes away,

15         then the person can participate a few

16         minutes or a few seconds later depending

17         on -- what you're saying is that, okay,

18         there's background noise in that room,

19         let's throw that person out of the group

20         chat.  I don't think that's a reasonable

21         solution with any, you know -- any not to

22         implement.

23    BY MR. SHI:

24         Q.    Let me modify the hypothetical

25    situation a little bit.  If that's okay with

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 311

1    you?

2          A.    That's okay.

3          Q.    Let's say person A stepped out for

4    15 minutes.

5                MR. RISLEY:  Object to form.

6    BY MR. SHI:

7          Q.    Can we agree that that's a situation

8    that could happen?

9                MR. RISLEY:  Object to form.

10               THE WITNESS:  Yes.  That situation

11          that could happen, yes.

12   BY MR. SHI:

13         Q.    So person A is absent from his or

14   her computer; right?

15               MR. RISLEY:  Object to form.

16               THE WITNESS:  Okay.

17   BY MR. SHI:

18         Q.    Let's say that that person does not

19   mute their microphone before stepping away?

20               MR. RISLEY:  Object to form.

21               THE WITNESS:  Okay.

22   BY MR. SHI:

23         Q.    And then immediately after they step

24   away a very loud fire truck pulls out in front

25   of their house or computer such that the other

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04137

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 312

1    people can hear the fire truck.

2              MR. RISLEY:  Object to form.

3    BY MR. SHI:

4         Q.    Is that okay?

5              MR. RISLEY:  Object to form.

6              THE WITNESS:  Okay.

7    BY MR. SHI:

8         Q.    In that situation, would it be

9    desirable to have some mechanism for other

10   people participating in the group chat to

11   prevent the background noise of person A's

12   computer?

13             MR. RISLEY:  Object to form.

14             THE WITNESS:  Okay.  So, again, this

15        all goes to, you know, what is the purpose

16        of the solution and so on; right?  So

17        someone who is, you know, using group chat

18        and is familiar with group chat and the

19        problems may arise in group chat, the first

20        thing that they're going to do is

21        especially not just when they go away from

22        their computer, but also when they're not

23        speaking is to mute themselves.  That's the

24        first thing that I do when there's a large

25        group of people talking, generally not

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04138

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 313

1         everyone talks at the same time.  The way

2         that it works is that, you know, someone

3         takes the lead and perhaps they ask

4         questions and so, you know, these

5         technologies will have features like, you

6         know, lift your hands so that you can take

7         a turn to speak.

8              And so there's one person speaking

9         and seven in your case or 100 or 1,000

10        people muting their device so that, you

11        know, there are no distraction.  So any

12        reasonable person who has done this, as

13        soon as they step -- even if they're not

14        muted, as soon they step and they are going

15        to be away even for a few seconds, they

16        will just mute their microphone.  That's

17        something.

18             Now, there may be coordinate cases

19        extremely, you know, unlikely cases where,

20        you know, this can happen.  Now, would you

21        like to implement -- would someone want to

22        implement a blocking solution in these

23        situations?  I don't even know that this

24        would be desirable to do.

25             And so, you know, to answer your

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04139

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 314

1   question, you know, perhaps, but that would

2   only be other, you know, very unlikely

3   situations and this would not be the prime

4   motivating factor, you know, saying that

5   someone stepped away from their desk for

6   ten minutes and then immediately after

7   there was a fire truck is not a motivation

8   for implementing a software feature; right.

9       The motivation is because it will be

10  useful to a lot of people a lot of the

11  time.  It's not going to be useful for one

12  Zoom meeting or one group chat every so

13  often and so on.

14      But even if we were to assume --

15  even if we assume that a blocking feature

16  like that would be desirable, okay, then

17  these would not be possible with Tanigawa

18  because Tanigawa takes that -- takes the

19  voice or the text chats and mixes it and

20  sends it to the rest of the group.  And so

21  it may not even possible depending on how

22  the mixing is done.  Tanigawa does not

23  explain how the mixing is done.  So it only

24  says mixing.  It is possible, especially

25  for voice in the example that you said, I

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04140

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 315

1          don't even know who's -- who's, you know,

2          room has this really loud voice.  I may not

3          be able to know who is the one who's

4          causing the voice or the disturbance.  And

5          second, it may not even be possible to

6          block that person unless I block the server

7          itself and so block everyone.  So that's --

8          that would be my answer, I guess, to your

9          second hypothetical.

10   BY MR. SHI:

11      Q.   What I'm understanding from your

12   testimony is there may be cases where it is

13   perhaps desirable to use a blocking feature in

14   Tanigawa, but in your opinion, the technical

15   specifics of the Tanigawa system make that

16   impossible; right?

17          MR. RISLEY:  Object to form.

18          THE WITNESS:  Correct.  The second

19          part, you know, the technical specifics

20          make it impossible in terms of the first

21          part, you know, as I said, perhaps there

22          may be some situations, but they are

23          probably extremely unlikely.  And it's --

24          to me, it would not be a basis for

25          introducing -- or not just to me, but I

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04141

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 316

1           think to anyone skilled in the art would

2           not be a basis for implementing or

3           extending the Tanigawa system to implement

4           such a feature.

5    BY MR. SHI:

6           Q.    Is it your opinion that a POSITA

7    could not come up with any reason for one user

8    to block another user?

9                MR. RISLEY:  Object to form.

10                THE WITNESS:  So I -- this is not

11           something that I can answer in terms of,

12           you know, absolutes.  Again, as I said, I

13           think another question yesterday, you know,

14           everything is -- may be possible.  And so,

15           you know, if someone wants to find the

16           reason to do something, they will probably

17           find the reason.

18                But the question here is not if

19           someone is interested or finds a reason

20           doing something.  You know, to extend a

21           particular system and make it, you know,

22           implement a new feature involves a lot of

23           expenditures; right?  I mean, it's not

24           free.  Someone has to spend a lot of time.

25           They have to actually implement.  They have

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04142

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 317

1           to test.  They have to debug.  And then

2           they have to maintain that system.  Make

3           sure it works and if there's any bugs, you

4           know, fix it later.  So it's a whole

5           software development cycle that goes on.

6           That's expensive.

7                And my point is if you're going to

8           implement a feature, you know, the

9           motivation for doing that has to well

10          exceed -- so the benefit would have to well

11          exceed the cost of implementing that

12          feature.  And for this particular case,

13          even if someone were to find a blocking

14          feature available for some coordinate case,

15          for some extremely unlikely case like the

16          example that you provided, I don't see that

17          the benefits would exceed the costs -- well

18          exceed -- not just exceed it, but exceed

19          it, you know, as sufficiently so they can

20          make a profit to implement that feature or

21          to combine features and so on.

22     BY MR. SHI:

23          Q.   We can take a break in just a

24     second.

25                Dr. Rouskas, on that last response,

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04143

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 318

Page 319

1        I think my question was a little different.  So

2    let me try to ask this again.  You know for now

3    I'm not talking about modifying Tanigawa.  My

4    question is, is it your opinion that a POSITA

5    could not come up with any reason for one user

6    to block another user in a communications

7    platform?

8              MR. RISLEY:  Object to form.

9              THE WITNESS:  Okay.  I mean, I

10         understand that you are asking your

11         question in the abstracts, and you want to

12         know an answer, a yes or no answer.  But my

13         point here is that when I wrote this

14         declaration, I did not look at all the

15         possible synchronous communication systems

16         and all the possible blocking features or

17         all the possible motivations for blocking;

18         right?

19              I looked specifically at Tanigawa.

20         I looked specifically at Hullfish.  And my

21         opinions here reflects, you know, the

22         combination -- the specific combination

23         that the petitioner proposed, which is

24         Hullfish with Tanigawa.  And so, you know,

25         my opinion here is that in such a system

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04144

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 319

1          there is no motivation to combine, period.

2          You know, asking me abstract question, I

3          don't know whether that is relevant to this

4          particular proceeding because these

5          proceedings are not about any blocking

6          feature on any communication system by any

7          person skilled in the art.

8               This petition is specifically does a

9          person skilled in the art have the

10         motivation to combine Tanigawa specifically

11         with Hullfish specifically, and that's what

12         declaration is.  I cannot really give you

13         an answer about any person skilled in the

14         art and any communication system and any

15         blocking feature in general because I have

16         not studied that situation.

17    BY MR. SHI:

18         Q.   When you wrote your declaration, you

19    did not look at all the possible motivations

20    for blocking; is that your testimony?

21              MR. RISLEY:  Object to form.

22              THE WITNESS:  So when I -- my

23         testimony is that when I prepared my

24         declaration, I looked at the petition, I

25         looked at the prior art references that the

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04145

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 320

1          petition provided, and I looked at the two

2          specific inventions, Tanigawa and Hullfish

3          because that's what the petition -- you

4          know, the petition argues that a person

5          skilled in the art would be motivated to

6          combine Tanigawa and Hullfish.

7               The petition was not can any -- any

8          blocking feature could be implemented with

9          Tanigawa, or any reason for blocking could

10         be a motivation to introduce Tanigawa.  The

11         petition was specifically Tanigawa system

12         and Hullfish system.  And this is what I --

13         this is what I studied and analyzed.  And

14         based on that analysis, I provided the

15         declarations.

16     BY MR. SHI:

17         Q.    Right.  When you wrote your

18     declaration, you didn't look at all the

19     possible motivations for blocking; right?

20              MR. RISLEY:  Object to form.

21              THE WITNESS:  So when I -- when I

22         prepared my declaration, as I said, I

23         looked at Tanigawa system and Hullfish

24         system.  Hullfish proposes a blocking

25         feature.  I did not look at -- so the

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04146

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 321

1        question is not if -- again, the question

2        that I got on this from the petition was

3        not that is there any motivation to block.

4        The question was can the blocking features

5        of Hullfish be implemented with the system

6        of Tanigawa.  That the -- so was there any

7        motivation to combine Hullfish with

8        Tanigawa.  And that's what I answered.

9             I did not really, you know,

10       enumerate all the possible blocking

11       features because that was not part of what

12       the -- that is not what the petition did.

13       The petition did not say, you know, it's

14       easy to say, well, I have a motivation, you

15       know -- I mean, it's easy to say a person

16       skilled in the art has a motivation to

17       combine a blocking feature of Hullfish with

18       the system of Tanigawa without actually

19       listing that motivation, all right, or that

20       particular reason.  And so, you know, my

21       point here is that I looked specifically at

22       Tanigawa and Hullfish's blocking features.

23  BY MR. SHI:

24       Q.    Right.  When you wrote your

25  declaration, you specifically looked at

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04147

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 322

1    Tanigawa.  You didn't look at all the possible

2    motivations for blocking; right?

3              MR. RISLEY:  Object to form.

4              THE WITNESS:  I think I answered

5         that question.  I think you've asked it two

6         or three times, and I think I've answered

7         it.  I'm not sure I can give you a better

8         answer than what I have already given

9         regarding this question.

10   BY MR. SHI:

11        Q.   Okay.  When you wrote your

12   declaration, did you consider the knowledge of

13   a person of ordinary skill in the art?

14        A.   Of course I did.

15        Q.   Okay.  Let's take a break here.

16             THE VIDEOGRAPHER:  Off record at

17        10:57 a.m.

18   (Recess taken from 10:57 a.m. until 11:11 a.m.)

19             THE VIDEOGRAPHER:  On record at

20        11:11 a.m.

21   BY MR. SHI:

22        Q.   Dr. Rouskas, before the break I

23   presented a hypothetical situation involving

24   eight people in a voice chat room.  Do you

25   recall that?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04148

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 323

1          A.    I do.

2          Q.    And in that hypothetical situation,

3     I provided an example where there was a lot of

4     background noise coming from one person; right?

5               MR. RISLEY:  Object to form.

6               THE WITNESS:  Yes, you did.

7     BY MR. SHI:

8          Q.    And I think you, yourself, raised

9     other examples of background noise including

10    children or pets running around; right?

11         A.    Yes.

12         Q.    Do you think it's a reasonable

13    scenario for several people in a conference

14    room to experience a lot of background noise

15    coming from one person?

16              MR. RISLEY:  Object to form.

17              THE WITNESS:  Okay.  So I mean

18         before I answered your question, I want to

19         just take a step back and kind of clarify

20         my earlier question -- my earlier answer

21         here where you asked me, you know, if I can

22         think of any possible reasons for

23         implementing -- for blocking a user.  And

24         so I just, you know, I answered you, but

25         then, you know, what the -- as I said, I

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04149

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 324

Page 325

1          really studied the Tanigawa and Hullfish

2          prior art references and, you know, my

3          understanding is that it is better if the

4          petitioner to provide a reason, a

5          motivation to combine.  So to the extent

6          that the petition included any motivation,

7          any reasons or motivations to combine, I

8          have certainly addressed that.

9               You know, the example that you

10          provided last time, I don't recall seeing

11          that in the petition at all.  And so,

12          obviously, I did not address it because it

13          was not in the petition.  But, you know,

14          to -- you know, when you asked me if I can

15          think of any, you know, motivations to

16          implement blocking in Tanigawa or other

17          group communication, you know, the point is

18          I -- it's not on me to do that; right?

19               I mean, my job here was to address

20          the motivations that were provided within

21          the petition.  And I believe I have done

22          that and so those opinions are addressing

23          the motivating factors that were cited in

24          the petition.  So the example that you

25          are -- you presented before and you are

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04150

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 325

1           continuing with that same hypothetical,

2           that was not in the -- that was not part of

3           the petition as I understand.

4    BY MR. SHI:

5           Q.    So I understand that you're pointing

6    out that the hypothetical situation that I'm

7    bringing up is not in the petition.  Let me ask

8    the question again.

9                 You think it's a fairly common

10   occurrence for several people in a conference

11   room to experience a lot of background noise

12   that comes from one person?

13               MR. RISLEY:  Object to form.

14               THE WITNESS:  What do you mean?  I

15          mean, can you describe the scenario?  So

16          when you say a conference room, is that

17          in-person conference room or is it Zoom

18          call or what is the --

19   BY MR. SHI:

20          Q.    So let me try it this way.  You

21   understand that patent owner believes that the

22   priority date of the '810 Patent and the other

23   patents in these proceedings is somewhere in

24   2005?

25               MR. RISLEY:  Object to form.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04151

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 326

1              THE WITNESS:  I believe so, yes.

2       BY MR. SHI:

3           Q.    And do you understand that prior to

4       2005 it was possible for several people to

5       communicate through voice chatting

6       synchronously online?

7           A.    So I understand that, you know,

8       Tanigawa presents an example of group chatting

9       and the dates is January 1, 2004, so that is

10      certainly before 2005, yes.

11          Q.    Right.  So you agree with me that

12      prior to 2005 it was possible for several

13      people to communicate synchronously online

14      through voice chatting?

15          A.    Yes.  That was possible before 2005,

16      yes.

17          Q.    And in such a -- strike that.

18              In such an online synchronous voice

19      chat, would it have been possible for the

20      participants to experience a lot of background

21      noise coming from one particular person?

22              MR. RISLEY:  Object to form.

23              THE WITNESS:  I think what I

24          mentioned, you know, before the break

25          about, you know, Zoom calls and working

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04152

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 327

1          from home, one does not have to go all the

2          way back to 2005.  It certainly happens

3          today and I'm sure that it's happened

4          before 2005.  And, therefore, there are

5          easy solutions to avoid this problem.

6    BY MR. SHI:

7          Q.   Okay.  So you agree that in today's

8    day and age with Zoom, it's fairly common for

9    people participating in a Zoom call to

10   experience, you know, a lot of unwanted

11   background noise that comes from one person or

12   participant in particular; right?

13              MR. RISLEY:  Object to form.

14              THE WITNESS:  Okay.  That, I don't

15          necessarily agree to that.  I agree that,

16          you know, background noise is certainly a

17          problem in online conference systems.  But

18          I do not agree with the statement that it's

19          always one person who is causing that.  So

20          in all the Zoom calls that are taking place

21          worldwide as we speak and there are

22          probably tens of thousands, it, you know,

23          it's extremely unlikely if at all that

24          there's one person in each of these calls

25          that is causing the background noise.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 328

1              So the background noise in Zoom

2         calls and the reason there is a mute button

3         is because, you know, if you're flipping

4         pages or if you open the drawers of your

5         shelves and so on, that would cause it.  So

6         anyone in the Zoom call would be, you know,

7         responsible for that, not a single person

8         in every group chat.

9    BY MR. SHI:

10        Q.    Thank you for that.  I apologize,

11   perhaps the question was unclear.  I see that

12   now.  But I think where we agree is that --

13   strike that.

14             Dr. Rouskas, would you agree with me

15   that background noise is a problem in online

16   conference systems?

17             MR. RISLEY:  Object to form.

18             THE WITNESS:  Background noise,

19        generally speaking, can be a problem in

20        online systems.  But in the context of the

21        proceedings here, which is motivation to

22        combine, I don't see background noise -- a

23        noise in the abstract as a motivation for

24        implementing blocking features.

25   BY MR. SHI:

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04154

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 329

1          Q.    Dr. Rouskas, in general, would you

2     agree with me that background noise is a

3     problem in online conference systems?

4               MR. RISLEY:  Object to form.

5               THE WITNESS:  Again, it -- you know,

6          depends on -- there are certainly -- I

7          mean, I participate in many Zoom calls, and

8          I have not experienced what you are

9          experiencing -- what you are describing

10         here, that is, that background noise is

11         always a problem.  Background noise can be

12         a problem in some situations.  You know, in

13         professional meetings where you have, you

14         know, other faculty or college deans or,

15         you know, someone from the provost office,

16         they all behave professionally, that is not

17         issue at all.

18              There are some situations here and

19         there that could be a problem.  But as a

20         general, you know, if you're asking me to

21         generally agree that it is a problem, I do

22         not think so.  It can be a problem in some

23         situations.

24    BY MR. SHI:

25         Q.    Dr. Rouskas, would you agree with me

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04155

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 330

1    that in general background could be a problem

2    in online conference systems?

3              MR. RISLEY:  Object to form.

4              THE WITNESS:  Okay.  I'm going to

5         say that again.  Background showing --

6         background noise in general could be a

7         problem in online video conference or chat

8         systems.  It's a general problem.  It's not

9         attributed to one particular person.

10   BY MR. SHI:

11        Q.   Would you agree that in 2022, in

12   general, background noise could be a problem in

13   online Zoom calls?

14             MR. RISLEY:  Object to form.

15             THE WITNESS:  I thought that's

16        the -- the time of relevance here is before

17        2005, not 2022.

18   BY MR. SHI:

19        Q.   Right.  And my question is directed

20   to 2022.  So I'll ask that again.  Would you

21   agree that in 2022 in general background noise

22   could be a problem in online Zoom calls?

23             MR. RISLEY:  Object to form.

24             THE WITNESS:  I believe that's what

25        I said before, so I would agree with that

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04156

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 331

1        statement.

2   BY MR. SHI:

3        Q.   Would you agree that Zoom did not

4   exist in 2005?

5             MR. RISLEY:  Object to form.

6             THE WITNESS:  I agree that Zoom did

7        not exist in 2005.

8   BY MR. SHI:

9        Q.   But prior to 2005, would you agree

10  that there were online synchronous voice chat

11  platforms?

12            MR. RISLEY:  Object to form.

13            THE WITNESS:  I agree that there

14       were, you know, systems that allowed, you

15       know, people to communicate using voice

16       chat.

17  BY MR. SHI:

18       Q.   Would you agree that prior to 2005

19  in general background noise could have been a

20  problem in such online voice chat communication

21  systems?

22            MR. RISLEY:  Object to form.

23            THE WITNESS:  So now we are moving

24       the time reference back to 2005.  And so

25       there's a very distinct difference between

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04157
Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 332

1    2005 and 2022.  As you said, Zoom did not

2    exist in 2005.  And so the distinct

3    difference was that at the time any tools

4    that would provide voice chatting were very

5    limited.  And so they were accessible only

6    to -- mostly to persons that were very

7    familiar with the technology.  So today in

8    2022, you know, one can have a Zoom meeting

9    with extended family or one could have a

10   Zoom meeting with co-workers who are

11   working from their -- from their home and

12   so on.  So pretty much everyone who has a

13   computer or an iPhone can download Zoom or

14   any similar system and, you know, carry on

15   a video chat.

16        And so since this is available to

17   billions of people in the world that -- the

18   background noise is much more prevalent

19   today.  Let's say I'm doing a Zoom call and

20   I'm working down the street.  Well, then,

21   you know, background noise obviously

22   becomes very important.

23        But in 2005 that was not possible.

24   There was no -- the iPhone was invented in

25   2007.  So back in 2005 with my phone I

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04158

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 333

1          could not, you know, walk down the street

2          and have a Zoom meeting.

3                   And so as you can see here, Tanigawa

4          refers to computers.  So computers at that

5          time were -- and not only computers but

6          also software platforms that were very

7          advanced for their time.  So voice -- you

8          know, voice chatting was not available to

9          the masses.  It was available to only a

10         small group of people who were

11         professionals.  And it's my understanding

12         and my impression is that 2005 the

13         background noise issue was much, much less

14         prevalent, you know, in voice chatting than

15         it is today that the products are available

16         to a -- to, you know, all -- you know,

17         basically anyone who can download an

18         application and run it.

19    BY MR. SHI:

20         Q.    In your opinion, the background

21    noise issue that we've been talking about is

22    more prevalent today than it was in 2005;

23    correct?

24                   MR. RISLEY:  Object to form.

25                   THE WITNESS:  This is my opinion and

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04159

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 334

1          if you look at Tanigawa, I do not believe

2          that there is any reference to background

3          noise or how to deal with background noise,

4          you know, I believe I -- you know, to the

5          best of my knowledge, as I'm stating here.

6     BY MR. SHI:

7          Q.   So for a moment let's set aside what

8     is more prevalent today or back then.  In your

9     opinion, in 2005 could background noise have

10    been a problem for online voice communications?

11          MR. RISLEY:  Object to form.

12          THE WITNESS:  As I said, in 2005 the

13          technology was limited to just a small

14          number of professionals.  So, you know, a

15          professional could have a truck outside

16          their home, you know -- you know, making a

17          loud noise.  So in that sense, background

18          noise could be a problem, but, again, it

19          was not something that, you know, in my

20          opinion was any -- any important

21          declaration in those systems at that time.

22    BY MR. SHI:

23          Q.   In 2005, a small number of

24    professionals could have participated with one

25    another in online voice communications;

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04160

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 335

1    correct?

2            MR. RISLEY:  Object to form.

3            THE WITNESS:  Right.  My testimony

4        is that in 2005 this technology was not

5        available for the masses.  So in order to

6        have access to the technology, you would

7        really have to know it.  And not only that,

8        you know, Zoom is relatively inexpensive or

9        many of these systems, you know, FaceTime

10       is -- comes for free with your phone.  So

11       anyone can use it.

12           So at that time this technology was,

13       you know, extremely -- I'm not sure if

14       extremely is right word, but certainly

15       quite expensive.  And so only -- you only

16       used the system if you really needed to.

17       So it was basically a much smaller

18       community and that community was either

19       professionals or understanding the

20       technology better.  And so that's why I

21       think that, you know, background noise

22       would not be such a big issue 17 years ago.

23   BY MR. SHI:

24       Q.   In your opinion, in 2005, certain

25   people could participate in online voice

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 336

1    communications; right?

2            MR. RISLEY:  Object to form.

3            THE WITNESS:  I agree that certain

4        people could participate in voice group --

5        voice group communication back in 2005.

6    BY MR. SHI:

7        Q.    For those people who could

8    participate in voice group communications in

9    2005, could background noise have been a

10   problem for them?

11           MR. RISLEY:  Object to form.

12           THE WITNESS:  The background noise,

13       again as I said before, could have been a

14       problem, but because it was a special set

15       of people familiar with technology, it may

16       not have been as problematic as it is

17       today.

18   BY MR. SHI:

19       Q.    So I think you have an answer there

20   in the explanation.  I want to ask you

21   questions about them separately.

22           So I asked for those people who

23   could participate in voice group communications

24   in 2005, could background noise have been a

25   problem for them.  And I believe you said it

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04162

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 337

1    could be a problem for them; correct?

2          MR. RISLEY:  Object to form.

3          THE WITNESS:  Okay.  So, again, you

4       know, background noise, I don't believe

5       that it was covered in the petition.  So

6       this is not something that I have really

7       analyzed in depth in order to provide my

8       declarations or for my deposition today.

9       You know, this is -- background noise is an

10      example that you -- to the best of my

11      knowledge, you first mentioned, you know,

12      just before we broke earlier in the

13      session.  So, you know, I have not really

14      studied the systems there.  I -- that were

15      available in 2005, how good or how not so

16      good they were.

17          My only, you know, reference here

18      that I studied was Tanigawa.  He doesn't

19      talk about background noise at all.  So,

20      you know, in the hypothetical, background

21      noise could be a problem in 2005 or prior

22      to 2005.  But in the specific context of

23      whether that background problem could have

24      been a motivation to introduce blocking

25      features, my opinion, no.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04163

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 338

Page 339

1    BY MR. SHI:

2        Q.    So I think -- strike that.

3              I understand your testimony

4    regarding the motivation.  I think where we do

5    agree is that in 2005 background noise could

6    have been a problem for those people who are

7    able to use online voice group communications;

8    right?

9              MR. RISLEY:  Object to form.

10             THE WITNESS:  I think I answered

11         your question.  I mean, I think you've

12         asked the same question two or three times.

13         So I provided the best answer I can

14         provide.  I don't know that I can, you

15         know, say the same thing in different

16         words.  I think I've answered the question.

17   BY MR. SHI:

18       Q.    Is the answer to my question yes?

19             MR. RISLEY:  Object to form.

20             THE WITNESS:  No.  My answer is the

21         one that I gave you earlier.

22   BY MR. SHI:

23       Q.    All right.  Dr. Rouskas, I want to

24   present another hypothetical situation for you,

25   if that's okay?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04164

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 339

1          A.     That's okay.

2          Q.     Do you have children?

3          A.     I do.

4                 MR. RISLEY:  I'm not sure where

5          we're going with this, but --

6     BY MR. SHI:

7          Q.     So can you imagine a situation where

8     a group of parents may be involved in an online

9     group chat to discuss soccer practice or

10    sharing rides to school or things of that

11    nature?

12         A.     I can -- again, I can just imagine

13    that has happened, you know, especially with

14    soccer practice, we get Zoom calls with the

15    coaches at the beginning of the season, the

16    middle of the season, the end of season, and so

17    on.  So I do that.  So I certainly have

18    experience with that.

19                Again, you know, the hypothetical,

20    this is new again, that was not in the

21    petition.  But, you know, with that caveat,

22    then you can continue.

23         Q.     Thank you.  Let's say that there are

24    eight parents engaged in an online voice

25    communication.  Is that okay?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04165

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 340

Page 341

1              MR. RISLEY:  Object to form.

2              THE WITNESS:  Okay.

3     BY MR. SHI:

4        Q.    And let's call those parents A

5     through H.  Sorry, eight -- sorry.  It's fine.

6     Strike that.

7              Let's say that parent A does not get

8     along with parent B.  Can you imagine that?

9              MR. RISLEY:  Object to form.

10             THE WITNESS:  I can imagine that.

11    BY MR. SHI:

12       Q.    Can you imagine a situation where

13    parent A wants to participate in this larger

14    group conversation but does not want to hear

15    from parent B?

16             MR. RISLEY:  Object to form.

17             THE WITNESS:  Actually, I cannot

18         imagine such a situation because, as I

19         said, you know, I do have experience with

20         these type of chats.  And I certainly, you

21         know, may have differences with, you know,

22         the parents of one of my, you know, son's

23         friends and so on for whatever reasons;

24         right?

25             But we have to understand what the

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04166

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 341

1          context is; right?  The context is you said

2          it's a conference call among parents, you

3          know, to discuss, let's say -- you said

4          soccer practice for their children.

5                  And so if it is a conference call

6          for an issue that is of interest to

7          everyone, I certainly want to hear from all

8          the people, not just those that I agree

9          with.  And in particular, I also want to

10         know from the people that I don't agree

11         with or I have issues with because that's,

12         you know, I would know how, you know, their

13         behavior or their opinions will affect,

14         let's say, whatever is the subject today,

15         which is -- let's say it's soccer practice;

16         right?

17                 So if I don't like, you know, person

18         X, even though that person is a parent of

19         one of my son's teammates, I certainly not

20         give him a call.  But if it is, you know, a

21         team group chat, I certainly want to not

22         only hear what -- I mean, I certainly want

23         to be able to hear what they have to say

24         because that will affect, you know, what's

25         my -- you know, my son's participation in

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04167

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 342

Page 343

1      the team and so on and so forth.  That's

2      one thing.

3           The second thing that I would like

4      to hear this person is that suppose I block

5      that person, and I don't say -- I don't

6      hear what that particular person says, but

7      then when the person Y responds to that, I

8      have no clue what Y is talking about.  I

9      can hear Y, but Y is referring to something

10     that X said.  I blocked X and now when Y

11     speaks, I have no idea what Y is saying

12     because I don't have a context.

13          And so I would absolutely in that

14     scenario not want to block X.  I would

15     certainly want to hear that even if I don't

16     get well with that person.

17  BY MR. SHI:

18     Q.   You understand that some people

19  communicate via voice chat when they play

20  online video games?

21          MR. RISLEY:  Object to form.

22          THE WITNESS:  Okay.  So now that's

23     another hypothetical that you are proposing

24     here.  And, again, this was not in the

25     petition.  And with that caveat, I would

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04168

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 343

Page 344

```
1              say that yes, my son does that all the
2              time.
3    BY MR. SHI:
4         Q.   So you're familiar with the concept
5    that people communicate via voice chat online
6    when they play online video games; right?
7         A.   As I said, yes, I've seen my son do
8    that.
9         Q.   Can you imagine a situation where if
10   someone is playing video games and
11   simultaneously communicating online with
12   others, that someone that they're connected to
13   is using inappropriate language?
14              MR. RISLEY:  Object to form.
15              THE WITNESS:  Okay.  So, again,
16         you're getting into territory here that I
17         really have not analyzed or studied; right?
18         And so the -- okay.  So -- but if we go to
19         Exhibit 14, which is the Hullfish patent,
20         okay.  And so if we go to column 10,
21         line 22 or 23, it says, "Referring now to
22         Figure 7, in one embodiment, at least one
23         user preference is provided to allow a user
24         to register and make rules of forwarding
25         the SMS text messages.  One or more
```

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 344

1        specific undesired words may be entered

2        into a database that are available to be

3        checked against later.  For example, a user

4        may make rules of dealing with specific

5        words of profanity from all incoming SMS

6        text messages before the messages are

7        forwarded as an instant message or

8        delivered to the telephone as SMS text

9        messages."

10           So Hullfish specifically talks about

11       blocking or modifying or filtering SMS text

12       messages based on certain words of

13       profanity that are input into a database.

14       And so in my declaration I considered this

15       particular situation which is similar to

16       what you -- you know, you described as, you

17       know, someone who's playing a game and

18       video chatting and using cursing, okay.

19       And my opinion is a user as in this

20       declaration is that even in this situation,

21       there is no motivation.  And not only

22       there's no motivation, but it's also not

23       technically possible to combine this

24       particular blocking feature of Hullfish

25       with the system of Tanigawa.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 345

Page 346

1      BY MR. SHI:

2          Q.    Dr. Rouskas, I understand your

3      testimony.  You're getting a little ahead of

4      me, which is fine, but I'll just need to go

5      back and break down the responses bit by bit.

6              So my question here -- before even

7      getting into Hullfish, my question was this.

8      Can you imagine a situation where if someone is

9      playing video games and simultaneously

10     communicating online with others, that someone

11     that that person is connected to may be

12     swearing?

13             MR. RISLEY:  Object to form.

14             THE WITNESS:  As I said, Hullfish

15         provides a similar example and so, you

16         know, what you're proposing is possible,

17         yes.

18     BY MR. SHI:

19         Q.    Right.  It's possible that if you're

20     playing video games online with someone that a

21     person you're connected to could be swearing;

22     right?

23             MR. RISLEY:  Object to form.

24             THE WITNESS:  As I said, it is

25         possible, yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04171
Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 346

1    BY MR. SHI:

2         Q.    And what I think what I understand

3    your testimony -- strike that.

4              What I understand your testimony to

5    be is that the solution is to selectively

6    filter out messages that contain particular

7    swear words; right?

8              MR. RISLEY:  Object to form.

9              THE WITNESS:  No, that is not my

10             testimony.  What I pointed to is the

11             invention of Hullfish who proposes to do

12             that.  I did not say that this is a

13             technical solution or feasible solution or

14             any solution that can be combined with

15             Tanigawa or even the most desirable

16             solutions from the point of view of a

17             general system.  All I did is I pointed to

18             Hullfish and said this is what Hullfish

19             proposes to do.

20   BY MR. SHI:

21        Q.    Your testimony is that Hullfish

22   proposes a solution which is to selectively

23   filter out messages that contain particular

24   words; right?

25             MR. RISLEY:  Object to form.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04172

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 347

Page 348

1          THE WITNESS:  Yes, that's what

2          Hullfish proposes, yes.

3   BY MR. SHI:

4          Q.    Can you think of any other way to

5   solve the problem of people swearing in online

6   video game chatting?

7          MR. RISLEY:  Object to form.

8          THE WITNESS:  So, again, you know,

9          the -- you know, we're getting into a lot

10          of issues, even First Amendment issues

11          here.  And so, you know, the -- you are

12          asking me for reasons in the abstract,

13          right.  As I said before, I think the

14          burden is on the petitioner to provide the

15          reasons, and then for someone like me to

16          come in and say, you know, whether they

17          agree with that reason or do not.  And so

18          for me to propose reasons, I don't think

19          that is, you know, what my job is here.

20          My job is to address what is in the

21          petition here; okay?  And so, you know, I

22          don't know that I can answer the question

23          as you posed it.

24   BY MR. SHI:

25          Q.    You're not a lawyer, are you?

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 348

1          A.    I'm sorry?

2          Q.    You're not a lawyer, are you?

3          A.    I'm not a lawyer, no.

4                MR. RISLEY:  And happy about that.

5                THE WITNESS:  I never went to law

6          school, no.

7     BY MR. SHI:

8          Q.    Just so I have some clarity on your

9     testimony, I believe what you're saying is that

10    you can't answer the question that I propose,

11    which is can you think of any other way to

12    solve the problem of people swearing in online

13    video game chat platforms?

14                MR. RISLEY:  Object to form.

15                THE WITNESS:  I mean, I can, I

16          guess, tell you a couple of different ways;

17          right?  I mean, one is to have a moderator

18          and, you know, the moderator pushes a

19          button from, you know, the portal and the

20          moderator, you know, basically or eject the

21          user from the system.  So that would be one

22          way of doing that.

23                But, again, that's a First Amendment

24          issue, I think, though.  So that's one I

25          think.  Now there's another thing; right?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04174

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 349

Page 350

1           But one has to -- you know, when I say

2      eject the person, meaning get them out of

3      the video -- sorry, the game playing.  But,

4      you know -- you know, my answer can be

5      related back to what I said regarding the

6      parent group meeting; right?

7           So if you're playing a video game,

8      like my son -- I have seen my son doing,

9      one of the things that -- one of the main

10     reasons why they're using the group chat is

11     because they want to coordinate on

12     strategy.  So they -- you know, they, let's

13     say, try to attack another group of users

14     or want to figure out how to, you know,

15     proceed stuff or, you know, beyond an

16     obstacle and things like that.  So they

17     needed to do that.

18          And so if one person is actually

19     cursing, right, and one of the -- the group

20     of people that my son plays with and

21     collaborates and starts cursing, again, if

22     we just block that person, then you

23     basically completely lost that.  Because

24     you can't hear what this other person says

25     and maybe he will say a curse word or two,

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 350

1          but then he may also provide some really

2          good strategies, you know, to defeat the

3          other Army or whatever that game is about.

4          So, you know, it would not be appropriate.

5               If it comes to my attention, I'll

6          tell you what my solution would be to my

7          son.  You never play with that person

8          again, period.  You don't join the group

9          chat.  You have the group chat and play the

10          game, they have to be all there together.

11          So if they invite you because I see the

12          Discord invitations, then that person is

13          part of that, decline, period.  Don't play

14          with them.

15     BY MR. SHI:

16          Q.    So as I understand your response,

17     you've provided a few examples of potential

18     solutions, one of which is to have a moderator

19     to eject a user who is swearing; is that right?

20               MR. RISLEY:  Object to form.

21               THE WITNESS:  I did say that, yes.

22     BY MR. SHI:

23          Q.    And a second solution could be that

24     that person simply chooses not to engage in

25     further communications with an abusive person;

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04176

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 351

Page 352

1    right?

2              MR. RISLEY:  Object to form.

3              THE WITNESS:  Correct.  You decline

4         invitations to play together, yes.

5    BY MR. SHI:

6         Q.   And these two solutions are, to be

7    clear, addressing the problem which is you

8    could potentially encounter someone online who

9    is abusive or swearing; right?

10             MR. RISLEY:  Object to form.

11             THE WITNESS:  Right.  That's the

12        context in which I provided them, but,

13        again, as I said, this is not really

14        addressed in the petition and not in my

15        declaration because, you know, this is --

16        this is new motivations the way I

17        understand it that I did not address in the

18        declarations.

19   BY MR. SHI:

20        Q.   Can I direct your attention to --

21   sorry, strike that.

22             Before we get into that, I think

23   earlier I asked you a question about Hullfish

24   and you said -- sorry.  Strike that.

25             I just want to confirm something you

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04177

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 352

Page 353

1    said about Hullfish.  Earlier, Dr. Rouskas, you

2    said that Hullfish proposes a solution which is

3    to filter out swear words or things of that

4    nature.  Do you recall that?

5              MR. RISLEY:  Object to form.

6              THE WITNESS:  I do.

7    BY MR. SHI:

8         Q.    Do you have an understanding that

9    Hullfish also describes ways to block other

10   people that goes beyond simply filtering out

11   messages that contain swear words?

12        A.    I have reviewed the Hullfish patent,

13   and he does give blocking features that go

14   beyond what you just described.

15        Q.    Can I direct your attention please

16   to paragraph 107 of Exhibit 4.  Let me know

17   when you see that.

18        A.    107, yes.

19        Q.    About halfway through the paragraph

20   your declaration says, "Then the terminal sends

21   a participation request to IM sever that

22   includes the list of buddies to be invited to

23   the group chat."

24              Do you see that?

25        A.    I see that.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04178

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 353

```
1           Q.    And then you say, "The IM server
2     then sends a call for participation invitation
3     to each of the buddies.  The invitation
4     includes the nickname and address of the
5     conference room."
6                 Do you see that?
7           A.    I see that.
8           Q.    You then say, "Each buddy wishing to
9     participate in the group chat responds to the
10    IM server with an admission request."
11                Do you see that?
12          A.    I do.
13          Q.    So these are your opinions in this
14    case?
15          A.    They're in my declaration.  So, yes,
16    they are my opinions based on the description
17    in Tanigawa.
18          Q.    Can you think of a reason why a
19    buddy would decline participation?
20                MR. RISLEY:  Object to form.
21                THE WITNESS:  So if you -- if you
22          turn to page 50, paragraph 113 of my
23          declaration, the first complete sentence at
24          the top reads, "Even if Tanigawa dictates
25          that the user may decline an invitation to
```

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 354

1          join a group chat, a POSITA would

2          understand that just because a user who is

3          in an important meeting may decline a call

4          or group chat invitation from a buddy."

5               So that gives you a reason why

6          someone might want to decline that

7          invitation.

8     BY MR. SHI:

9          Q.    In that same paragraph, I want to

10    focus on the portion of the sentence where you

11    stopped reading.  So we're looking at

12    Exhibit 4, paragraph 113, you say, "It does not

13    mean the user wishes to block the buddies in

14    the list and permanently stop receiving all

15    messages from them."

16               Do you see that?

17          A.    I see that, yes.

18          Q.    In your opinion, if a user blocks a

19    buddy in the list, does that mean that that

20    user will permanently stop receiving all

21    messages from that buddy?

22               MR. RISLEY:  Object to form.

23               THE WITNESS:  So, again, the -- you

24          know, my opinions in this declaration is

25          really directed to, as I said, you know,

1      the Tanigawa and Hullfish that I reference;

2      right?

3          And so Hullfish has this blocking

4      feature as you mentioned.  So, for

5      instance, so the Figure 5 -- so this is

6      Exhibit 14, Figure 5, and then column 8

7      starting at line 59, so Hullfish says,

8      "Figure 5 is flow diagram showing a method

9      of receiving the SMS text message with a

10     privacy feature according to one embodiment

11     of the invention.  User A receives from and

12     sends SMS text messages to user B using

13     mobile devices.  Subsequently, user A wants

14     to stop receiving messages from user B.

15     They -- the invention provides a method of

16     discontinuing receiving SMS text messages

17     from an undesired source."

18         And then goes on to explain how this

19     happens by referring to Figure 5 by -- you

20     know, I'm not going to read any further.

21         But, yeah, so this is an example of

22     a Hullfish feature in which, you know,

23     blocking person means that you do not

24     receive any further messages from that

25     person.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04181

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 356

1    BY MR. SHI:

2        Q.    In your opinion, do the disclosures

3    in Hullfish related to blocking indicate that

4    the blocking is permanent and cannot be undone?

5            MR. RISLEY:  Object to form.

6            THE WITNESS:  So, you know, I'm not

7            sure where the "can be undone" is.  I do

8            not imply here that it is not -- it cannot

9            be undone.  So my sentence here does not

10           imply that if I block a user and

11           subsequently -- and, therefore,

12           subsequently I do not receive any messages

13           from that user, okay, it does not mean that

14           the feature cannot be undone.  I can

15           certainly, you know, undo things.  But if I

16           don't undo them, see, that's the thing, a

17           block is permanent unless I undo it.  So

18           Hullfish's disclosure says "of

19           discontinuing receiving SMS messages from

20           an undesired source."

21           So if we look at that, it's

22           permanent.  You know, you will not receive

23           again any messages.  The fact that it

24           cannot be undone, that's a different story,

25           okay.  But if you place a block, the block

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 357

1          is permanent until you undo it.

2     BY MR. SHI:

3          Q.    So, in your opinion, according to

4     Hullfish -- strike that.

5               In your opinion, in paragraph 113 of

6     your declaration, Exhibit 4, where you say

7     "permanently stop receiving all messages," what

8     you mean is that that is permanent until the

9     blocking is undone; right?

10              MR. RISLEY:  Object to form.

11              THE WITNESS:  Right.  So we're

12         talking about a blocking feature.  So, you

13         know, if you make that blocking feature,

14         then unless you undo -- I mean, if you take

15         the blocking action, then that's permanent

16         unless you undo that blocking action.

17    BY MR. SHI:

18         Q.    Dr. Rouskas, can I please direct

19    your attention to the Hullfish reference which

20    is Exhibit 14, column 11, line 38.

21         A.    Okay.

22         Q.    So before we get into that, is it

23    your understanding that Hullfish discloses

24    message forwarding as an alternative to message

25    blocking?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04183

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 358

Page 359

1          MR. RISLEY:  Object to form.

2          THE WITNESS:  Hullfish discloses

3      message forwarding.

4  BY MR. SHI:

5      Q.    Right.  For Hullfish, forwarding is

6  sort of the opposite of blocking; right?

7          MR. RISLEY:  Object to form.

8          THE WITNESS:  So if you forward the

9      message, then -- I mean, depends on where

10     you forward; right?  So if you forward --

11     so because, for instance, Hullfish says --

12     okay.

13         So if you go to column 9, line 19,

14     okay, it says, "Alternatively, the unwanted

15     messages may be forward" -- I think it

16     means may be forwarded -- "to a storage

17     media for permanent storage."

18         So that's a blocking where you

19     don't -- you know, you don't delete the

20     message.  It's not that you don't accept

21     the message, you don't receive the message,

22     instead you're sending it to a transfolder.

23  BY MR. SHI:

24     Q.    I understood the nuance in what

25  you're saying, so let's look at it this way.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04184

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 359

1      If you go back to Figure 5 of Exhibit 14.  This

2      is a flowchart describing the blocking feature;

3      correct?

4           A.    Correct.

5                 MR. RISLEY:  Object to form.

6      BY MR. SHI:

7           Q.    You see that in the middle there's a

8      diamond block 504; right?

9           A.    I see that, yes.

10          Q.    And you understand that a diamond

11     block in a flow cart represents a branch in

12     path?

13          A.    I do.

14          Q.    So you see that from block 504, if

15     communications are blocked, it goes to block

16     506; right?

17          A.    That is correct, yes.

18          Q.    And in 506, what happens is if

19     communication is blocked, it is not forwarded

20     to the telephone number of the intended

21     recipient; correct?

22          A.    That's what it says there, yes.

23          Q.    If a message is blocked -- excuse

24     me, strike that.

25                If a message is not blocked from

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04185

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 360

Page 361

1      block 504, we go to block 508; right?

2          A.    Correct.

3          Q.    In 508, what happens is if a message

4      is not blocked is that that message is

5      forwarded according to that recipient's

6      preference; right?

7          A.    Yes.

8          Q.    So with that in mind, let's turn

9      back to column 11, line 38, the paragraph

10     starting there.  Do you see that?

11         A.    Sorry.  Column 11, line 38, yes.

12         Q.    Hullfish says additionally -- strike

13     that.

14               Hullfish says, "Alternatively, some

15     additional user preferences can be set to

16     condition the message delivery to the instant

17     message receiver based on time and dates."

18               Right?

19         A.    Yes.

20         Q.    Hullfish then says, "For instance,

21     in Figure 7, there could be a predetermined

22     rule stating that within a certain time

23     period ... messages would not be forwarded

24     either to the instant message receiver and/or

25     the mobile device."

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04186

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 361

1           Do you see that?

2      A.    Yes, I see that.

3      Q.    So Hullfish describes forwarding for

4  a particular time period and blocking for a

5  different time period; right?

6           MR. RISLEY:  Object to form.

7           THE WITNESS:  So this passage says

8      that the rule is that within that time

9      period that is listed there, messages would

10      not be forwarded.  That's what that passage

11      says.

12  BY MR. SHI:

13      Q.    Right.  So this passage says for a

14  certain time period messages are forwarded and

15  for certain other time period messages or not

16  forwarded; right?

17           MR. RISLEY:  Object to form.

18           THE WITNESS:  It says -- it doesn't

19      says would not be forwarded.  I don't see

20      any -- the positive action there.

21  BY MR. SHI:

22      Q.    This passage says that for a certain

23  specified time period, messages are not

24  forwarded; correct?

25      A.    That's what it says, yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04187

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 362

1      Q.    Can I direct you back to

2   paragraph 113 of Exhibit 4 which is the '810

3   declaration.

4      A.    Yes.

5      Q.    Earlier I asked if you could think

6   of a reason why someone using Tanigawa may

7   decline to participate in an invitation and you

8   directed me here.  Do you recall that?

9      A.    I -- yes, I recall that.

10      Q.    In fact, you said that a user who is

11   in an important meeting may decline a call or

12   group chat invitation; right?

13      A.    I said that, yes.

14      Q.    Okay.  Can you think of any other

15   reasons beyond being in an important meeting

16   where someone may decline an invitation?

17           MR. RISLEY:  Object to form.

18           THE WITNESS:  Yeah, I guess one

19      could think of other such situations.

20   BY MR. SHI:

21      Q.    Right.  There could be several

22   situations where a user may decline to

23   participate; right?

24      A.    Yes.  Right.

25      Q.    For instance, if that user doesn't

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04188
Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 363

1      wish to communicate with certain people that

2      they know to be involved in the communication,

3      they may decline; right?

4              MR. RISLEY:  Object to form.

5              THE WITNESS:  I'm sorry, I'm not

6          sure I understood your question.

7      BY MR. SHI:

8          Q.    If a person is invited to

9      communicate and they're aware of certain others

10     in the communication that they do not wish to

11     speak to, that might be a reason that they

12     would decline an invitation; right?

13             MR. RISLEY:  Object to form.

14             THE WITNESS:  I guess that would be

15         a reason as well, yes.

16     BY MR. SHI:

17         Q.    I want to ask about some other

18     opinions you have with respect to Tanigawa.  So

19     if you look with me in Exhibit 4, page 62,

20     paragraph 146.

21         A.    Paragraph 146, yes.

22         Q.    In this section, your opinion is

23     that the combination of Tanigawa and Hullfish

24     does not teach all of the communication options

25     use one identifier; correct?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04189

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 364

1             MR. RISLEY:  Object to form.

2             THE WITNESS:  That is what I state

3         in paragraph 150, yes.

4    BY MR. SHI:

5         Q.   Let me direct your attention to

6    paragraph 147 of Exhibit 4.  Do you understand

7    that the petition sets forth that the nicknames

8    disclosed in Tanigawa are the claimed

9    identifier?

10        A.   I think that's what I state there in

11   the paragraph 147.

12        Q.   And then in paragraph 148, your

13   criticism of this argument is the nickname is

14   not by itself sufficient information to route

15   the message correctly; right?

16        A.   That is correct, yes.

17        Q.   Does the claim require the

18   identifier to be independently sufficient to

19   route messages correctly?

20            MR. RISLEY:  Object to form.

21            THE WITNESS:  This is claim 1.3.

22        Right.  So the claim states wherein all of

23        the communication options use one

24        identifier associated with a second user

25        for the second user to receive messages.

TransPerfect Legal Solutions
212-400-8845 – Depo@TransPerfect.com
Appx04190

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 365

1          So the messages have to be received by the

2          second user, so they have -- they have to

3          be correctly directed to the second user,

4          and this must happen by using one

5          identifier associated with the second user.

6    BY MR. SHI:

7          Q.    In your opinion, does claim element

8    1.3 require the identifier to be independently

9    sufficient to route messages correctly?

10               MR. SHI:  Object to form.

11               THE WITNESS:  Could you please

12          repeat that?

13   BY MR. SHI:

14         Q.    In your opinion, does claim element

15   1.3 require the identifier to be independently

16   sufficient to route messages correctly?

17               MR. RISLEY:  Object to form.

18               THE WITNESS:  The answer is, yes,

19          the one identifier has to be used

20          independently -- okay.  Could you please --

21          let me go back.  Could you please repeat

22          the question so I am sure that I answer

23          correctly?

24   BY MR. SHI:

25         Q.    In your opinion, does claim element

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04191

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 366

1    1.3 require the identifier to be -- strike

2    that.

3            I'm going to ask the question based

4    on what you have here.  So give me a quick

5    second.

6            In your opinion, does claim element

7    1.3 require the identifier by itself to be

8    sufficient information to route the message

9    correctly?

10           MR. RISLEY:  Object to form.

11           THE WITNESS:  My answer is yes, and

12       so can -- the answer is yes.

13   BY MR. SHI:

14       Q.    Do you understand that in Claim 1.3

15   the phrase "route the message correctly" does

16   not appear; right?

17           MR. RISLEY:  Object to form.

18           THE WITNESS:  In Claim 3 the -- does

19       not include the language "route the message

20       correctly," but it does say that -- that

21       for the second user to receive messages.

22       And so for the second user to receive the

23       messages, the messages must reach the user.

24   BY MR. SHI:

25       Q.    Dr. Rouskas, you don't offer any

1    claim construction opinions in your declaration

2    related to this element, do you?

3           MR. RISLEY:  Object to form.

4           THE WITNESS:  I do not.

5    BY MR. SHI:

6        Q.   Dr. Rouskas, you can set that aside

7    for now.

8           Let's -- I want to move on quickly

9    to talk about the '727 and '038 patents.  Now,

10   I believe yesterday -- and correct me if I have

11   this wrong, but I believe yesterday you

12   testified that it's your understanding that

13   many of the limitations in the '810 claims

14   appear in similar form in the challenge claims

15   of the '727 and '038 patents; right?

16          MR. RISLEY:  Object to form.

17          THE WITNESS:  Yeah, some of the

18      claim terms do appear in similar form in

19      other two patents.

20   BY MR. SHI:

21       Q.   And so with respect to the claim

22   elements that are in common from one patent to

23   another, I believe you confirmed yesterday that

24   your opinions are also similar; right?

25          MR. RISLEY:  Object to form.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04193

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 368

1          THE WITNESS:  So my opinions are

2          certainly similar, but you know -- you

3          know, some of the arguments that I raise

4          may be different.  And they may depend on

5          the specifics of the claims because the

6          claims may have similar elements, but

7          they're certainly not identical.

8     BY MR. SHI:

9          Q.   I understand that.  Dr. Rouskas, are

10    you aware that there is some text in your '810

11    declaration that is very similar to some of the

12    text in your '038 and '727 declarations?

13         MR. RISLEY:  Object to form.

14         THE WITNESS:  I am aware, yes.

15    BY MR. SHI:

16         Q.   And so is it fair to say that where

17    the text is the same or very similar that your

18    opinions relevant to that text is the same

19    across patents?

20         A.   Okay.  What I'm going to agree to is

21    that if the text is the same, then the opinions

22    are the same.

23         Q.   So where the text is the same across

24    your declaration for these three patents, your

25    opinions are the same; correct?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04194

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 369

1        A.    Correct.

2        Q.    And in that situation our

3   discussions relevant to '810 Patent would

4   similarly apply to the other patents; right?

5        A.    Yes, when the text is the same.

6        Q.    Okay.  So let's -- if you have

7   Exhibit 5 in front of you.

8            MR. RISLEY:  Can we squeeze in a

9        break whenever it's convenient?

10           MR. SHI:  Sure.  Why don't we

11       squeeze in a break now and I can see how

12       much we have left.

13           MR. RISLEY:  Just need a two-minute

14       break.

15           THE VIDEOGRAPHER:  Off record at

16       12:19 p.m.

17  (Recess taken from 12:19 p.m. until 12:30 p.m.)

18           THE VIDEOGRAPHER:  On record at

19       12:30 p.m.

20  BY MR. SHI:

21       Q.    So, Dr. Rouskas, before the break I

22  asked you some questions about, you know, the

23  common elements from one patent to another and

24  the common elements from one declaration to

25  another.  Do you recall that?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04195

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 370

1          A.    I do.

2          Q.    I just want to make perfectly clear,

3     and it's actually from a timesaving perspective

4     because I need to know if I need to ask

5     specific questions about '727 and '038.  So my

6     question is this, where you have similar

7     arguments from one declaration to another

8     declaration, is your testimony in the

9     deposition applicable to -- across multiple

10    patents?

11              MR. RISLEY:  Object to form.

12              THE WITNESS:  Could you repeat the

13         question?  I want to make sure that I

14         understand it.

15    BY MR. SHI:

16         Q.    Yes.  So let me break it down this

17    way.  You understand that many of the

18    challenged claims from one patent to another

19    patent are similar; right?

20         A.    They have similar elements or

21    claimed elements.

22         Q.    And you understand that in your

23    declaration you address similar claim elements

24    in the same way; right?

25         A.    Yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04196

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 371

1          Q.    And so where you have addressed

2    those similar claim elements in the same way

3    from one declaration to another, my question is

4    if our discussion yesterday and today will

5    equally apply to those similar claim elements?

6          A.    If there are similar claim elements

7    and I have used the same arguments, then the

8    discussion would apply.

9          Q.    Thank you.  And, honestly, that

10   saves a lot of time for us, for everyone.

11              Okay.  So with that out of the way,

12   let us turn now to Exhibit 5, which I believe

13   you have in front of you.

14         A.    Yes.

15         Q.    Now, Exhibit 5 is your declaration

16   with respect to the '727 Patent; correct?

17         A.    Correct.

18         Q.    Let me direct your attention to

19   paragraph 84, which is on page 39.  Oh, excuse

20   me, excuse me.  Paragraph 64 on page 29.

21         A.    64.  This is Exhibit 5, the '727

22   Patent, and you said paragraph 64?

23         Q.    Paragraph 64 -- let me start over.

24   Let me direct your attention to the bottom of

25   page 28 of Exhibit 5 which has paragraph 64.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04197

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 372

Page 373

1          A.     Okay.

2          Q.     So, in your opinion, Diacakis does

3     not disclose a network-based portal with

4     respect to element 1.0 of the '727 Patent;

5     correct?

6          A.     Correct.

7          Q.     In your opinion, this discussion

8     equally applies to claim elements 1.1, 1.2,

9     1.3, 1.4, 1.5, and 1.8 of the '727 Patent;

10    correct?

11         A.     Correct.

12         Q.     You also opine that this opinion

13    applies to claims 2 through 6, 15, and 17 with

14    respect to the '727 Patent; correct?

15         A.     Correct.

16         Q.     Now with respect to claim elements

17    1.1 through 1.5 and 1.8 and claims 2 through 6,

18    15, and 17, you don't offer independent

19    opinions related to those elements of claims;

20    right?

21              MR. RISLEY:  Object to form.

22              THE WITNESS:  I'm sorry, could you

23         repeat the question?

24    BY MR. SHI:

25         Q.     Yeah, let me try to make that a bit

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 373

Page 374

1      clearer.  So we just mentioned claim elements

2      1.1 through 1.5 and 1.8, as well as claims 2

3      through 6, 15, and 17; right?

4           A.   Yes.

5           Q.   So with respect to those elements

6      and claims and the network-based portal claim

7      term used in the '727 Patent, you don't have

8      specific opinions related to those elements and

9      claims beyond what you've opined for element

10     1.0; correct?

11               MR. RISLEY:  Object to form.

12               THE WITNESS:  Correct.  When you say

13          those elements, you mean the network-based

14          portal element specifically?

15     BY MR. SHI:

16          Q.   Correct.

17          A.   Yes.

18          Q.   Now, let me direct your attention

19     please to paragraph 70 on page 31.  In your

20     opinion, Diacakis does not render obvious the

21     indicator or identifier limitation of element

22     1.3 of the '727 Patent; right?

23          A.   That is correct.

24          Q.   In your opinion claims 2 through 6,

25     15, and 17 are not met with respect to the

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 374

Page 375

1    identifier limitation for the same reasons;

2    right?

3              MR. RISLEY:  Object to form.

4              THE WITNESS:  Correct.

5    BY MR. SHI:

6         Q.    You don't offer specific opinions

7    related to the identifier limitation of the

8    '727 with respect to those claims; right?

9         A.    With respect to the identifier

10   limitation, yes, I do not.

11        Q.    Let me direct your attention now to

12   paragraph 75 on page 33.  In your opinion,

13   element 1.5 of the '727 Patent is not met by

14   Diacakis; right?

15        A.    Right.

16        Q.    And you similarly opine that claims

17   2 through 6, 15, and 17 are not rendered

18   obvious with respect to what's required by

19   element 1.5 for the same reasons; correct?

20        A.    That is correct, yes.

21        Q.    You don't offer specific opinions

22   related to what's required by element 1.5 with

23   respect to those claims; right?

24             MR. RISLEY:  Object to form.

25             THE WITNESS:  That's correct, yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04200

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 375

1    BY MR. SHI:

2         Q.    And I apologize, my allergies are

3    acting up.

4              Let me direct your attention now,

5    Dr. Rouskas, to paragraph 84 on page 39.  In

6    paragraph 84, you're discussing or summarizing

7    your opinions regarding element 1.8 of the '727

8    Patent; correct?

9         A.    Correct.

10        Q.    And within the '727 Patent the

11   element 1.8 is similar to the negative

12   limitation that we previously discussed that's

13   element 1.9 of the '810 Patent; correct?

14             MR. RISLEY:  Object to form.

15             THE WITNESS:  Correct.

16   BY MR. SHI:

17        Q.    In paragraph 84 you opine that

18   Diacakis does not teach element 1.8, the

19   negative limitation of the '727 Patent;

20   correct?

21        A.    Correct.

22        Q.    You further opine that claims 2

23   through 6, 15, and 17 are not met with respect

24   to the negative limitation for the same

25   reasons; right?

TransPerfect Legal Solutions
212-400-8845 – Depo@TransPerfect.com
Appx04201

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 376

1          MR. RISLEY:  Object to form.

2          THE WITNESS:  Yes.

3    BY MR. SHI:

4          Q.    You don't offer specific opinions

5    related to the negative limitation with respect

6    to claims 2 through 6, 15, and 17; right?

7          A.    Right.

8          Q.    Let's look at the next paragraph,

9    paragraph 85 of Exhibit 5.  Here you discuss

10    claim 3; correct?

11          A.    I do.

12          Q.    In your opinion, Diacakis does not

13    teach claim 3 because in your opinion Diacakis

14    does not enable a message to be provided to the

15    second user from the first user or that the

16    different mode includes an image and

17    communication in an audio manner; correct?

18          A.    Correct.

19          Q.    You don't have any further opinions

20    listed in your declaration related to claim 3;

21    right?

22          A.    Right.

23          Q.    Let's look at the next paragraph 86

24    of Exhibit 5.

25          A.    Okay.

Page 378

1          Q.    In this paragraph, you are talking

2     about claim 6; right?

3          A.    Yes.

4          Q.    In your opinion, claim 6 is not met

5     by Diacakis because in your opinion Diacakis

6     does not support a user to use an electronic

7     device with a computer keyboard to communicate

8     with another user using an electronic device

9     without a computer keyboard; right?

10                MR. RISLEY:  Object to form.

11                THE WITNESS:  Yes.

12    BY MR. SHI:

13         Q.    You don't have any further opinions

14    listed in your declaration relating to claim 6;

15    right?

16         A.    I do not.

17         Q.    Let's move to paragraph 87 of

18    Exhibit 5.  In this paragraph you discuss Claim

19    9 of the '727 Patent; correct?

20         A.    Correct.

21         Q.    With respect to Claim 9, your

22    opinion is that the combination of Diacakis and

23    Loveland does not meet Claim 9; right?

24                MR. RISLEY:  Object to form.

25                THE WITNESS:  That is correct.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04203

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 378

1    BY MR. SHI:

2        Q.    And the basis for that opinion, as

3    you say in paragraph 87, is that Diacakis and

4    Loveland will not be combined as their

5    objectives are diametrically opposite to each

6    other; right?

7              MR. RISLEY:  Object to form.

8              THE WITNESS:  Right.  That's what I

9        write there.

10   BY MR. SHI:

11       Q.    Because in your opinion Diacakis'

12   teachings are directed to notifying senders of

13   certain information while Loveland teaches

14   notifying recipients of certain information;

15   correct?

16             MR. RISLEY:  Object to form.

17             THE WITNESS:  That is correct, yes.

18   BY MR. SHI:

19       Q.    And based on that difference, in

20   your opinion, Diacakis cannot make use of the

21   teachings of Loveland; correct?

22             MR. RISLEY:  Object to form.

23             THE WITNESS:  Correct.

24   BY MR. SHI:

25       Q.    In this section -- strike that.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 379

1              In your declaration, you don't offer

2       other opinions related to Diacakis and Loveland

3       in terms of the motivation to combine; right?

4              MR. RISLEY:  Object to form.

5              THE WITNESS:  I do not believe so,

6          but let me -- one second.

7              So -- so I offer, you know, two

8          opinions on paragraph 87 which says that

9          the two systems that cannot make use of

10         each other, and then the second opinion

11         paragraph 88, that combination does not

12         teach those particular claim elements.

13      BY MR. SHI:

14         Q.    Right.  That actually was my next

15      question.  I want to clarify what exactly you

16      say with respect to claim 9.  So in

17      paragraph 87 of Exhibit 5, this paragraph

18      contains your opinions related to the

19      motivation to combine Diacakis and Loveland;

20      correct?

21             MR. RISLEY:  Object to form.

22             THE WITNESS:  Correct.

23      BY MR. SHI:

24         Q.    So elsewhere in your declaration,

25      you don't have specific opinions related to the

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04205

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 380

1    motivation to combine these two references;

2    right?

3              MR. RISLEY:  Object to form.

4              THE WITNESS:  I do not believe so,

5         no.

6    BY MR. SHI:

7         Q.    In paragraph 88 you opine that the

8    combination of Diacakis and Loveland does not

9    meet Claim 9; right?

10             MR. RISLEY:  Object to form.

11             THE WITNESS:  Right.

12   BY MR. SHI:

13        Q.    But other than stating that the

14   combination does not meet the limitation, you

15   don't provide any other opinions related to

16   Claim 9 of the '727 Patent; correct?

17             MR. RISLEY:  Object to form.

18             THE WITNESS:  Correct.

19   BY MR. SHI:

20        Q.    Let's look at paragraph 89 next.

21   This is on page 41 of Exhibit 5.

22        A.    Yes.

23        Q.    Paragraph 89 discusses Claim 17 of

24   the '727 Patent; correct?

25        A.    Yes.

1          Q.    In your opinion, Claim 17 is not met

2     by Diacakis because in your opinion Diacakis

3     does not enable a plurality of communication

4     modes that includes at least text communication

5     using a mobile phone and voice communication

6     using a mobile phone; right?

7          A.    Right.

8          Q.    You don't have further opinions

9     listed in your declaration relating to Claim

10    17; right?

11              MR. RISLEY:  Object to form.

12              THE WITNESS:  Right.

13    BY MR. SHI:

14         Q.    Let's look next at paragraph 90 of

15    Exhibit 5.  In this paragraph you discuss

16    ground 2 of the '727 petition; right?

17         A.    Yes.

18         Q.    And in this paragraph you opine that

19    Claims 7 to 9 are not taught by Diacakis?

20              MR. RISLEY:  Object to form.

21    BY MR. SHI:

22         Q.    Correct?

23              MR. RISLEY:  Object to form.

24              THE WITNESS:  By Diacakis and

25         Loveland combination -- okay.  Yes.  So

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04207

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 382

1          yes, correct.

2     BY MR. SHI:

3          Q.     And the reason that you believe

4     that -- strike that.

5               Your opinions with respect to ground

6     2 as you say in paragraph 90 are set forth

7     regarding your opinions in Claim 1; correct?

8          A.     Correct.

9          Q.     And beyond your opinions in Claim 1,

10    you don't offer specific opinions related to

11    Claims 7 to 9 in this section ground 2;

12    correct?

13         A.     Correct.

14         Q.     Looking now at paragraph 91?

15         A.     Yes.

16         Q.     Paragraph 91 discusses ground 3 of

17    the '727 petition; right?

18         A.     Yes.

19         Q.     And this ground challenges Claim 16

20    of the '727 Patent; correct?

21         A.     Correct.

22         Q.     In paragraph 91 you opine that the

23    combination of Diacakis and Takahashi do not --

24    excuse me strike that.

25               In paragraph 91 you opine that the

Page 384

1        combination of Diacakis and Takahashi does not

2        teach Claim 16; right?

3                    MR. RISLEY:  Object to form.

4                    THE WITNESS:  Correct.

5        BY MR. SHI:

6            Q.    And your opinions with respect to

7        ground 3 are contained within your opinions

8        with respect to Claim 1; correct?

9            A.    Correct.

10            Q.    Beyond your opinions in Claim 1, you

11        don't offer specific opinions related to Claim

12        16 in this section ground 3; correct?

13            A.    That's right.

14            Q.    You don't offer any opinions

15        regarding a motivation to combine Diacakis and

16        Takahashi; correct?

17                    MR. RISLEY:  Object to form.

18                    THE WITNESS:  That's correct.

19        BY MR. SHI:

20            Q.    So let's move now to the Tanigawa

21        sections of the '727 declaration.  I would like

22        to direct your attention to paragraph 138 on

23        page 62.

24            A.    Yes.

25            Q.    In this paragraph you opine that the

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04209

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 384

1    combination of Tanigawa and Hullfish does not

2    render obvious element 1.3; correct?

3          A.    Correct.

4          Q.    And for the same reasons you opine

5    that the combination of Tanigawa and Hullfish

6    does not render obvious Claims 2, 3, 6, 15, and

7    17 with respect to what's required by element

8    1.3; right?

9          A.    Correct.

10          Q.    You don't offer any specific

11    opinions related to those claims and what's

12    required by element 1.3; correct?

13              MR. RISLEY:  Object to form.

14              THE WITNESS:  Correct.

15    BY MR. SHI:

16          Q.    Let's move now to paragraph 144 on

17    page 64.  In this paragraph you opine that the

18    combination of Tanigawa and Hullfish does not

19    teach element 1.4 of the '727 Patent; correct?

20          A.    Correct.

21              MR. RISLEY:  Object to form.

22    BY MR. SHI:

23          Q.    Element 1.4 of the '727 Patent

24    relates to blocking; correct?

25              MR. RISLEY:  Object to form.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 385

1          THE WITNESS:  Correct.

2     BY MR. SHI:

3          Q.    You also state that in your opinion

4     Claims 2, 3, 6, 15, and 17 are not rendered

5     obvious by the combination of Tanigawa and

6     Hullfish with respect to the blocking

7     limitations for the same reasons; right?

8          A.    Right.

9          Q.    You don't offer specific opinions

10    related to those claims with respect to

11    blocking; correct?

12         A.    Correct.

13         Q.    I'd like to direct you to

14    paragraph 170 on page 74.  In this paragraph

15    you opine that the combination of Tanigawa and

16    Hullfish does not teach or suggest element 1.8

17    of the '727 Patent; correct?

18         A.    Correct.

19         Q.    Element 1.8 refers to the negative

20    limitation; correct?

21         A.    Correct.

22         Q.    You also opine that Claims 2, 3, 4,

23    15, and 17 are not rendered obvious by this

24    combination of Tanigawa and Hullfish for the

25    same reasons; right?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04211

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 386

Page 387

1         A.    Right.

2         Q.    You don't offer any specific

3    opinions related to these claims with respect

4    to the negative limitation; right?

5         A.    Right.

6         Q.    Let's turn now to the next

7    paragraph 171.  In your opinion here, Tanigawa

8    and Hullfish together do not render obvious

9    Claim 3 of the '727 Patent; right?

10        A.    Right.

11        Q.    And the basis for that opinion is

12   that this combination does not enable the

13   message to be provided to the second user from

14   the first user or that the different mode

15   includes an image in communication in an audio

16   manner; right?

17        A.    Right.

18        Q.    You don't offer any additional

19   opinions related to Claim 3; right?

20             MR. RISLEY:  Object to form.

21             THE WITNESS:  Correct.

22   BY MR. SHI:

23        Q.    Let's look at the next

24   paragraph 172.

25        A.    Yes.

TransPerfect Legal Solutions
212-400-8845 – Depo@TransPerfect.com
Appx04212

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 387

1          Q.    In this paragraph you opine that

2     Tanigawa and Hullfish together do not render

3     obvious Claim 6; right?

4          A.    Yes.

5          Q.    And the basis for your opinion is

6     that this combination does not support a user

7     to use an electronic device with computer

8     keyboard to communicate with another user using

9     an electronic device without a computer

10    keyboard; right?

11         A.    Yes.

12         Q.    You don't offer any additional

13    opinions related to Claim 6; right?

14              MR. RISLEY:  Object to form.

15              THE WITNESS:  That's correct.

16    BY MR. SHI:

17         Q.    Let's turn to the next paragraph 173

18    of Exhibit 5.

19         A.    Yes.

20         Q.    In this paragraph you opine that the

21    combination of Tanigawa and Hullfish does not

22    render obvious Claim 17; right?

23         A.    Yes.

24         Q.    And the basis for your opinion is

25    that the combination does not enable a

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04213

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 388

Page 389

1      plurality of communication modes that includes

2      at least text communication using a mobile

3      phone and voice communication using a mobile

4      phone; right?

5          A.    Right.

6          Q.    You don't offer any additional

7      opinions with respect to Claim 17 of the '727

8      Patent; right?

9              MR. RISLEY:  Object to form.

10             THE WITNESS:  Correct.

11     BY MR. SHI:

12         Q.    I want to turn now to paragraph 174

13     of Exhibit 5.  From paragraphs 174 through 176

14     you discuss ground 5 of the '727 petition;

15     right?

16         A.    Right.

17         Q.    And is it your understanding that

18     ground 5 challenges Claims 7 through 9 using a

19     combination of Tanigawa and Hullfish and

20     Loveland; right?

21         A.    Right.

22         Q.    In your opinion this combination

23     does not render obvious Claims 7 through 9;

24     right?

25         A.    Yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04214
Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 389

1          Q.    Is that what you have written in

2     paragraph 176?

3               MR. RISLEY:  Object to form.

4               THE WITNESS:  I'm sorry, what was

5          your question?

6     BY MR. SHI:

7          Q.    I'll ask my question more directly.

8     In paragraph 176 your opinion is that the

9     combination of Tanigawa, Hullfish, and Loveland

10    does not teach or suggest the requirements of

11    Claim 9; correct?

12              MR. RISLEY:  Object to form.

13              THE WITNESS:  In paragraph 176 you

14         say, yes.

15    BY MR. SHI:

16         Q.    In paragraph 176, other than the

17    opinion of yours I just recited, you don't

18    offer any additional opinions; correct?

19              MR. RISLEY:  Object to form.

20              THE WITNESS:  So other than what is

21         in this section, I do not offer any other

22         opinions.

23    BY MR. SHI:

24         Q.    Understood.

25               Looking at paragraph 175.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04215

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 390

1          A.     Yes.

2          Q.     Here you opine that a POSITA would

3    not be motivated to combine Tanigawa and

4    Loveland; right?

5          A.     Yes.

6          Q.     And the basis for your opinion is

7    that Loveland simply duplicates functionality

8    already disclosed in Tanigawa; right?

9                 MR. RISLEY:  Object to form.

10                THE WITNESS:  Correct.

11   BY MR. SHI:

12         Q.     And more specifically in your

13   opinion, this duplication is that Loveland and

14   Tanigawa both provide methods for notifying

15   users; right?

16                MR. RISLEY:  Object to form.

17                THE WITNESS:  Correct.

18   BY MR. SHI:

19         Q.     In this paragraph you don't offer

20   any specific opinions with respect to Hullfish;

21   right?

22         A.     Not in this paragraph 175.

23         Q.     Let's turn now to paragraph 177.

24         A.     Okay.

25         Q.     This paragraph discusses ground 6 of

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 391

1    the '727 petition; right?

2         A.    Yes.

3         Q.    And in ground 6 of the '727 petition

4    the petition challenges claim 16 using a

5    combination of Tanigawa, Hullfish, and

6    Takahashi; right?

7         A.    Right.

8         Q.    In your opinion, this combination

9    does not teach or render obvious Claim 16;

10   right?

11        A.    Right.

12        Q.    The basis for this opinion is what

13   you have written with respect to Claim 1 and

14   ground 4?

15             MR. RISLEY:  Object to form.

16   BY MR. SHI:

17        Q.    Correct?

18             MR. RISLEY:  Object to form.

19             THE WITNESS:  Correct.

20   BY MR. SHI:

21        Q.    Other than what you've written with

22   respect to Claim 1 in ground 4, you don't offer

23   any specific opinions related to Claim 16 in

24   this paragraph; right?

25        A.    Right.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04217

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 392

1          Q.    You don't offer any opinions related

2    to motivation to combine Takahashi with

3    Tanigawa or with Hullfish; right?

4              MR. RISLEY:  Object to form.

5              THE WITNESS:  That's correct, yes.

6    BY MR. SHI:

7          Q.    Okay.  You can put Exhibit 5 to the

8    side for now.  Do you have Exhibit 6 in front

9    of you, Dr. Rouskas?

10         A.    I do.

11         Q.    Exhibit 6 is your declaration with

12   respect to the '038 Patent with further respect

13   to the Diacakis reference; right?

14         A.    Correct.

15         Q.    I want to direct your attention

16   first to page 30, paragraph 67.

17         A.    Yes.

18         Q.    In your opinion, Diacakis does not

19   render obvious Claim 7 -- excuse me.

20              In your opinion, Diacakis does not

21   render obvious element 7.0 of '038 Patent;

22   correct?

23         A.    Correct.

24         Q.    And for the same reasons you state

25   with respect to 7.0, in your opinion, Diacakis

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04218

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 393

Page 394

1        does not render obvious elements 7.1, 7.3, 7.4,

2        7.5, 7.7, and 7.8, and Claims 38 and 46 with

3        respect to the network-based portal; right?

4              A.    Yes.

5              Q.    With respect to those elements and

6        those claims, you don't offer any specific

7        opinions with respect to network-based portal;

8        right?

9                    MR. RISLEY:  Object to form.

10                   THE WITNESS:  Right.

11       BY MR. SHI:

12             Q.    Let's look at paragraph 70 on

13       page 31 of Exhibit 6.  In this paragraph, you

14       opine that Diacakis does not render obvious

15       element 7.1; correct?

16             A.    Correct.

17             Q.    For the same reasons you opine that

18       Diacakis similarly does not render obvious

19       independent claim 38 and specifically element

20       38.1 with respect to the prior registration

21       process of element 7.1; correct?

22             A.    Correct.

23             Q.    You don't offer any specific

24       opinions with respect to Claim 38 and the prior

25       registration process; correct?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04219

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 394

Page 395

1                    MR. RISLEY:  Object to form.

2                    THE WITNESS:  Correct.

3      BY MR. SHI:

4           Q.    Turning now to paragraph 75 on

5      page 33 of Exhibit 6.  In your opinion,

6      Diacakis does not render obvious element 7.3 of

7      the '038 Patent; right?

8           A.    Correct.

9           Q.    In your opinion, for the same

10     reasons, Diacakis does not render obvious

11     Claims 38 and 46 with respect to what's

12     required by element 7.3; right?

13          A.    Yes.

14          Q.    You don't offer any specific

15     opinions with respect to Claims 38 and 46 with

16     respect to what's required by element 7.3;

17     right?

18                    MR. RISLEY:  Object to form.

19                    THE WITNESS:  Correct.

20     BY MR. SHI:

21          Q.    Turning now to paragraph 80 on

22     page 35.  In your opinion, element 7.5 is not

23     rendered obvious by Diacakis; right?

24          A.    Yes.

25          Q.    For the same reasons you believe

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04220

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 395

1      that Claims 38 and 46 are not met by Diacakis

2      with respect to what's required by element 7.5;

3      right?

4                  MR. RISLEY:  Object to form.

5                  THE WITNESS:  Yes.

6      BY MR. SHI:

7          Q.    You don't offer specific opinions

8      with respect to what's required by element 7.5

9      for Claims 38 and 46; right?

10                 MR. RISLEY:  Object to form.

11                 THE WITNESS:  Right.

12     BY MR. SHI:

13         Q.    Turning now to element -- excuse me.

14     Turning now to element 33 and page 36.  In your

15     opinion element 7.7 is not met by Diacakis;

16     right?

17                 MR. RISLEY:  Object to form.

18                 THE WITNESS:  Right.

19     BY MR. SHI:

20         Q.    You similarly opine that Claims 38

21     and 46 are not met by Diacakis with respect to

22     what's required by element 7.7; right?

23                 MR. RISLEY:  Object to form.

24                 THE WITNESS:  Right.

25     BY MR. SHI:

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 396

1          Q.    You don't offer specific opinions

2     with respect to 7.7 -- strike that.

3               You don't offer specific opinions

4     with what's -- strike that.

5               You don't offer specific opinions

6     with respect to what's required by element 7.7

7     for Claims 38 and 46; right?

8               MR. RISLEY:  Object to form.

9               THE WITNESS:  Correct.

10    BY MR. SHI:

11         Q.    Let's turn now to paragraph 97 on

12    page 44.  In your opinion Diacakis does not

13    teach or suggest element 7.8 of the '038

14    Patent; correct?

15         A.    Correct.

16         Q.    And element 7.8 contains the

17    negative limitation of the '038 Patent;

18    correct?

19         A.    Correct.

20         Q.    And so this is a similar limitation

21    to 1.9 of the '810 Patent and 1.8 of the '727

22    Patent; correct?

23              MR. RISLEY:  Object to form.

24              THE WITNESS:  Correct.

25    BY MR. SHI:

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 397

1          Q.    In your opinion, Claims 38 and 46

2    are not met with respect to the negative

3    limitation for the same reasons as you state

4    with respect to element 7.8; correct?

5                MR. RISLEY:  Object to form.

6                THE WITNESS:  Correct.

7    BY MR. SHI:

8          Q.    You don't offer specific opinions on

9    the negative limitation with respect to Claims

10   38 and 46; right?

11               MR. RISLEY:  Object to form.

12               THE WITNESS:  Right.

13   BY MR. SHI:

14         Q.    Turning now to paragraph 98.

15   Starting in this paragraph you discuss ground 2

16   of the '038 petition based on Diacakis;

17   correct?

18         A.    Correct.

19         Q.    In your opinion, Claims 8, 9, 43,

20   44, 47, 48, 50, and 54 are not rendered obvious

21   by a combination of Diacakis and Loveland;

22   right?

23         A.    That's correct.

24         Q.    With respect to this opinion, you

25   cite the reasons you indicate with respect to

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04223

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 398

1    ground 1; right?

2         A.    Right.

3         Q.    In addition, you opine that a POSITA

4    would not be motivated to combine Diacakis and

5    Loveland; right?

6         A.    Correct.

7         Q.    And the reasons you provide to opine

8    that a POSITA would not be motivated to make

9    this combination are the same reasons that we

10   discussed with respect to the '727 Patent;

11   right?

12              MR. RISLEY:  Object to form.

13              THE WITNESS:  Yes.

14   BY MR. SHI:

15        Q.    Now, other than your opinion

16   regarding the motivation to combine and what

17   you've set forth in ground 1, you don't have

18   specific opinions related to ground 2; correct?

19              MR. RISLEY:  Object to form.

20              THE WITNESS:  Correct.

21   BY MR. SHI:

22        Q.    Let's turn to paragraph 100 on

23   page 45 of Exhibit 6.  You understand that this

24   section discusses ground 3 of the '038 petition

25   based on Diacakis; right?

TransPerfect Legal Solutions
212-400-8845 – Depo@TransPerfect.com
Appx04224
Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 399

1              MR. RISLEY:  Object to form.

2              THE WITNESS:  In combination with

3         Takahashi, yes.

4    BY MR. SHI:

5         Q.    Right.  So ground 3 of the '038

6    petition based on Diacakis challenges Claims

7    37, 42, 56, 59 through 63, and 67 based on a

8    combination of Diacakis and Takahashi; right?

9         A.    Yes.

10         Q.    Now, in paragraph 100 you state that

11    in your opinion those claims are not rendered

12    obvious by this combination due to what you set

13    forth regarding ground 1; right?

14         A.    Yes.

15         Q.    In paragraph 101 you opine that a

16    POSITA would not be motivated to combine

17    Diacakis and Takahashi; right?

18         A.    Yes.

19         Q.    In your opinion, a POSITA would not

20    be motivated to make that combination because

21    on the one hand you opine that Diacakis is

22    specifically for publishing contact

23    information, while on the other hand

24    Takahashi's concern with user to user

25    communication; right?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04225

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 400

1            MR. RISLEY:  Object to form.

2            THE WITNESS:  Correct.

3    BY MR. SHI:

4        Q.    In fact, that difference that you've

5    identified is the only basis for your argument

6    that there would be no motivation to combine

7    Diacakis and Takahashi; right?

8            MR. RISLEY:  Object to form.

9            THE WITNESS:  I do offer another

10           opinion later in that paragraph.  So this

11           is the one opinion against the motivation

12           to combine, but later in that paragraph I

13           offer a second one.

14   BY MR. SHI:

15       Q.    Can you explain what that second

16   opinion is?

17       A.    So the -- that opinion is just

18   reading from my declaration, the -- that the --

19   unlike Takahashi that's concerned with direct

20   user to user information, the PA system is

21   expressed designs so that users do not have to

22   communicate directly with each other.  So it's

23   not just a PA -- P&A information, but it's

24   also that the design of the system is to

25   prevent this direct communication in the first

1    place.

2          Q.    So let me make sure I have this

3    right.  In your opinion, there are two reasons

4    that a POSITA would not be motivated to combine

5    Diacakis and Takahashi; right?

6              MR. RISLEY:  Object to form.

7              THE WITNESS:  Right.  Right.  I

8          explained those in that paragraph, yes.

9    BY MR. SHI:

10         Q.    The first reason you identified is

11   that Diacakis pertains to a publisher

12   subscriber system, whereas Takahashi is

13   concerned with direct user to user

14   communication; right?

15         A.    Right.

16         Q.    And the second reason you identified

17   is that Diacakis is designed so that users do

18   not have to communicate directly with each

19   other; right?

20             MR. RISLEY:  Object to form.

21             THE WITNESS:  Correct.

22   BY MR. SHI:

23         Q.    Other than these two opinions, you

24   don't have other opinions related to a

25   motivation to combine Diacakis and Takahashi,

TransPerfect Legal Solutions
212-400-8845 – Depo@TransPerfect.com
Appx04227

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 402

1    right, with respect to the '038 Patent?

2          A.    That -- that's correct, yes.

3          Q.    Let's move now to paragraph 102 and

4    103 of Exhibit 6.  In these paragraphs you

5    address ground 4 of the '038 petition based on

6    Diacakis; right?

7                MR. RISLEY:  Object to form.

8                THE WITNESS:  Right.

9    BY MR. SHI:

10         Q.    You understand that this ground 4 of

11   the petition challenges claim 45 based on a

12   combination of Diacakis, Loveland, and

13   Takahashi; right?

14         A.    Yes.

15         Q.    The basis for this opinion -- sorry,

16   strike that.

17               In your opinion, Claim 45 is not met

18   by this combination; right?

19               MR. RISLEY:  Object to form.

20               THE WITNESS:  Correct.

21   BY MR. SHI:

22         Q.    And the basis for your opinion as

23   you've stated in paragraph 1062 is contained

24   within your opinions regarding ground 1; right?

25         A.    Correct.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04228

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 403

Page 404

1          Q.    You also opine that a POSITA would

2    not have been motivated to combine Diacakis

3    with Loveland; right?

4          A.    Yes.

5          Q.    I don't see a citation here, but I'm

6    assuming that you mean to refer to your earlier

7    discussion with Diacakis and Loveland; is that

8    right?

9          A.    Yes, that is correct.

10          Q.    You also opine that POSITA would not

11    be motivated to combine Diacakis with

12    Takahashi; right?

13          A.    Yes.

14          Q.    Again, you see that there's no

15    citation there?

16          A.    I do.

17          Q.    Do you mean to refer to your

18    discussion between Diacakis and Takahashi?

19          A.    Yes.

20          Q.    Other than what's written in

21    paragraph 103, you don't have other opinions

22    related to motivation to combine with respect

23    to this specific combination; right?

24                MR. RISLEY:  Object to form.

25                THE WITNESS:  That's correct, yes.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 404

1    BY MR. SHI:

2        Q.    Right.  For instance, you don't

3    specifically analyze Loveland and Takahashi

4    together; right?

5        A.    Correct.

6        Q.    Okay.  You can set that aside for

7    now.  Do you have Exhibit 7 in front of you?

8        A.    I do.

9        Q.    Exhibit 7 is your declaration with

10   respect to the '038 Patent based on Tanigawa;

11   correct?

12       A.    That is correct.

13       Q.    Now this is going to be a bit

14   similar, so please bear with me.

15       A.    Yes.

16       Q.    I'd like to direct your attention to

17   paragraph 85 on page 36.

18            MR. RISLEY:  I'm sorry, what did you

19       say?

20   BY MR. SHI:

21       Q.    Paragraph 85 on page 36 of

22   Exhibit 7.  In this paragraph you opine that

23   the combination of Tanigawa and Hullfish does

24   not render obvious element 7.0; right?

25       A.    Yes.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04230

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 405

Page 406

1        Q.    Specifically, your criticism is that

2    it does not -- this combination does not teach

3    the network-based portal; right?

4        A.    Right.

5        Q.    For the same reasons you opine that

6    elements 7.1, 7.3, 7.4, 7.5, 7.7, and 7.8, and

7    Claims 38 and 46 are not met with respect to

8    network-based portal; right?

9              MR. RISLEY:  Object to form.

10             THE WITNESS:  Yes.

11   BY MR. SHI:

12       Q.    You don't have specific opinions

13   related to those elements and claims with

14   respect to network-based portal; right?

15       A.    Right.

16       Q.    Let's look now at paragraph 89 on

17   page 37.  Here you opine that the combination

18   of Tanigawa and Hullfish does not teach element

19   7.2 of the '038 Patent -- excuse me, element

20   7.1 of the '038 Patent; right?

21             MR. RISLEY:  Object to form.

22             THE WITNESS:  Right.

23   BY MR. SHI:

24       Q.    Element 7.1 describes a prior

25   registration process; correct?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04231

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 406

Page 407

1              MR. RISLEY:  Object to form.

2              THE WITNESS:  Correct.

3       BY MR. SHI:

4              Q.    Now, for the same reasons you opine

5       that Claim 38 is unmet with respect to the

6       prior registration process; right?

7              A.    Right.

8              Q.    You don't offer any specific

9       opinions with respect to Claim 38 and the prior

10      registration process; right?

11             A.    Right.

12             Q.    Let's look now at paragraph 94 on

13      page 39 of Exhibit 7.  In this section you

14      opine that the combination of Tanigawa and

15      Hullfish does not render obvious element 7.3 of

16      the '038 Patent; right?

17             A.    Yes.

18             Q.    Element 7.3 relates to the

19      identifier limitation of the '038 Patent;

20      right?

21             MR. RISLEY:  Object to form.

22             THE WITNESS:  Correct.

23      BY MR. SHI:

24             Q.    Now for the same reasons you cite

25      with respect to element 7.3 you opine that

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 407

1      Claims 38 and 46 are not met by the combination

2      of Tanigawa and Hullfish with respect to the

3      identifier limitation; right?

4              MR. RISLEY:  Object to form.

5              THE WITNESS:  Right.

6      BY MR. SHI:

7          Q.    You don't offer any specific

8      opinions with respect to Claims 38 and 46 for

9      the identifier limitation; right?

10             MR. RISLEY:  Object to form.

11             THE WITNESS:  Right.

12     BY MR. SHI:

13         Q.    Let's look at paragraph 100 which

14     spans pages 41 and 42 of Exhibit 7.

15             In your opinion, the combination of

16     Tanigawa and Hullfish does not render obvious

17     element 7.4; right?

18         A.    Yes.

19         Q.    Element 7.4 of the '038 Patent

20     relates to blocking; correct?

21             MR. RISLEY:  Object to form.

22             THE WITNESS:  Yes.

23     BY MR. SHI:

24         Q.    In your opinion, for the same

25     reasons, the combination of Tanigawa and

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04233

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202 p. 408

1     Hullfish does not render obvious Claims 38 and

2     46 with respect to the blocking limitation;

3     right?

4          A.    Yes.

5          Q.    You don't offer specific opinions

6     with respect to Claims 38 and 46 with respect

7     to blocking; right?

8          A.    Right.

9          Q.    Let's now turn to paragraph 130

10    which is on page 53 of Exhibit 7.  In your

11    opinion, the combination of Tanigawa and

12    Hullfish does not teach or suggest element 7.8;

13    correct?

14         A.    Correct.

15         Q.    And as we said before, this element

16    refers to the negative limitation of the '038

17    Patent; correct?

18              MR. RISLEY:  Object to form.

19              THE WITNESS:  Correct.

20    BY MR. SHI:

21         Q.    In your opinion, for the same

22    reasons Claims 38 and 46 are unmet with respect

23    to the negative limitation; right?

24              MR. RISLEY:  Object to form.

25              THE WITNESS:  Right.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04234
Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 409

1    BY MR. SHI:

2        Q.    You don't offer specific opinions

3    with respect to Claims 38 and 46 for the

4    negative limitation; right?

5        A.    I do not.

6        Q.    Let's look now at paragraph 131, and

7    in this section you discuss ground 2 of the

8    '038 petition with respect to Tanigawa; right?

9        A.    Right.

10        Q.    You understand that ground 2 of this

11    petition challenges Claims 8, 9, 43, 44, 47,

12    48, 50, and 54 of the '038 Patent with a

13    combination of Tanigawa, Hullfish, and

14    Loveland; right?

15        A.    Yes.

16        Q.    In your opinion, those claims are

17    unmet by this combination in light of your

18    opinions with respect to ground 1; right?

19            MR. RISLEY:  Object to form.

20            THE WITNESS:  Correct.

21    BY MR. SHI:

22        Q.    You additionally in paragraph 132

23    opine that a POSITA would not be motivated to

24    combine Tanigawa and Loveland; right?

25        A.    Right.

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 410

1          Q.    And this opinion is the same as your

2     opinion regarding Tanigawa and Loveland with

3     respect to the '727 Patent; right?

4               MR. RISLEY:  Object to form.

5               THE WITNESS:  Right.

6     BY MR. SHI:

7          Q.    In paragraph 133 you opine that the

8     challenge claims of ground 2 are not rendered

9     obvious by this combination because the

10    combination does not teach or suggest an

11    urgency indication and/or urgent notification

12    to be provided to the second user from the

13    first user, even though the second user has

14    blocked the first user from using the selected

15    mode of communication to communicate with the

16    second user; right?

17         A.    Right.

18         Q.    Other than what you've listed in

19    paragraphs 131 through 133, you don't have

20    additional opinions related to the elements of

21    Claims 8, 9, 43 and 44, 47, 48, 50, and 54;

22    right?

23              MR. RISLEY:  Object to form.

24              THE WITNESS:  Right.

25    BY MR. SHI:

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04236

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 411

Page 412

1          Q.    Let's turn now to paragraph 134 on

2    page 54 of Exhibit 7.  In this paragraph you

3    discuss ground 3 of the '038 petition based on

4    Tanigawa; right?

5          A.    Right.

6          Q.    Specifically ground 3 challenges

7    Claims 37, 42, 56, 59 through 63, and 67 with

8    the combination of Tanigawa, Hullfish, and

9    Takahashi; right?

10         A.    Right.

11         Q.    In your opinion, those claims are

12   not met by that combination; right?

13              MR. RISLEY:  Object to form.

14              THE WITNESS:  Correct.

15   BY MR. SHI:

16         Q.    In your -- strike that.

17              The basis for your opinion here is

18   set forth in your opinions regarding Claim 7 in

19   ground 1; correct?

20         A.    Correct.

21         Q.    Other than those two sources you

22   don't provide another basis for your opinions

23   with respect to ground 3; right?

24              MR. RISLEY:  Object to form.

25              THE WITNESS:  Right.

1    BY MR. SHI:

2         Q.    So you don't have any specific

3    opinions related to the requirements of the

4    claims challenged by ground 3; right?

5         A.    Right.

6         Q.    Let's take a look at the next

7    paragraph which is 135.  In this paragraph, you

8    address ground 4 of the '038 petition based on

9    Tanigawa; right?

10        A.    Right.

11        Q.    And in this ground the petition

12   challenges Claim 45 with a combination of

13   Tanigawa, Hullfish, Loveland, and Takahashi;

14   right?

15        A.    Right.

16        Q.    In your opinion, Claim 45 is not met

17   by this combination; right?

18             MR. RISLEY:  Object to form.

19             THE WITNESS:  Correct.

20   BY MR. SHI:

21        Q.    You don't appear to provide a basis

22   for this opinion in paragraph 135; right?

23             MR. RISLEY:  Object to form.

24             THE WITNESS:  That is correct.  It

25        does not appear that I provide a basis.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04238

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 413

1    BY MR. SHI:

2        Q.    Okay.  Let's take a short break, and

3    then I'll regroup and see if there's anything

4    else that I have left to ask.

5            THE VIDEOGRAPHER:  Off record at

6        1:24 p.m.

7     (Recess taken from 1:24 p.m. until 1:29 p.m.)

8            THE VIDEOGRAPHER:  On record at

9        1:29 p.m.

10           MR. SHI:  Dr. Rouskas, thank you for

11       your time and attention these past two

12       days.  At this point I have no further

13       questions for you.  So your counsel may ask

14       you some questions if he wishes.

15           MR. RISLEY:  I do, Dr. Rouskas.

16               EXAMINATION

17    BY MR. RISLEY:

18       Q.    Based on the discussion today and

19    yesterday, do you want to change any of the

20    opinions that you've set forth in your four

21    declarations?

22       A.    No.  I do not plan to change any of

23    the opinions in the declarations.

24       Q.    I'd like to ask you a couple of

25    questions that you may or may not want to refer

Page 415

1    to your '810 declaration, Exhibit 4, and

2    Diacakis which is Exhibit 9.

3         A.    Yes.

4         Q.    Ready?  Okay.  First, in Diacakis,

5    does the user interface provide worldwide

6    access?

7         A.    Right.  And so I address these in my

8    declaration regarding the '810 Patent and

9    specifically in paragraph 51 we had the

10   opportunity to discuss yesterday and there I

11   quote, you know, the first two passages labeled

12   1 and items 1 and 2 in that paragraph that

13   states from the specification of the '810

14   Patent.  The first item says the portal allows

15   worldwide access to user.  And the second one

16   says the portal or gateway approach could

17   provide general Internet access to one or more

18   embodiments of the communication management

19   system.

20        Q.    Okay.  I think you need to slow down

21   a little bit please for the court reporter.

22        A.    You want me to go back?

23              And so I remember I was asked the

24   question whether -- I think you directly asked

25   me if my phone provides worldwide access to me.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04240

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 415

Page 416

1    And so I would like to represent that response

2    and basically say that, you know, the answer to

3    that question is rather irrelevant because, you

4    know, the petition does not point to -- does

5    not discuss the client device or a phone as

6    being network-based portal.

7              Instead the petition points -- so if

8    we open Exhibit 9, Figure 9.  So the petition

9    points to user interface 112 in Figure 9 as

10   being the user interface, not the device

11   itself, but that particular user interface 112.

12   And using the language of the '810 claims, the

13   petition says that the user interface in the

14   first users defies is the claims network-based

15   portal.

16             And so the question then is, is the

17   user interface 112 provide worldwide access to

18   the user and related to that, so that the --

19   from the specification of the '810 Patent that

20   I have quoted in my paragraph 51, I'm going to

21   read it again.  It says, "The portal allows

22   worldwide access to the user."  And so in the

23   language of Claim 1 of the '810 Patent, this

24   means worldwide access to the second user who

25   is the recipients of the message.  And so

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04241

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 416

Page 417

1          looking at Figure 9, this is the user interface

2          which also is on -- an example of which is on

3          in Figure 8 that allows the first user to find

4          their contacts, select their contacts, get

5          their contact information, and communicate with

6          the contacts.

7                    So as I explained yesterday in a

8          related discussion, this is the sending part of

9          the device, this user interface is part of the

10         sending part of the device.  And this is

11         clearly indicated also from the arrow that

12         points from the management server, P&A

13         management server to this, you know, device 22.

14         And it's also you can see that in Figure 11 of

15         that same patent, as you pointed out earlier,

16         there are bidirectional arrows to indicate

17         bidirectional communication.  And, therefore,

18         the unidirectional arrow in Figure 9 implies

19         unidirectional information from the management

20         server to, you know, this device 22 and not the

21         other way around.

22                   So the user interface allows the

23         first user, who is the sender, to select the

24         contacts and communicates -- and, you know, get

25         their contact information and communicates with

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 417

1    his or her contacts.  But it does not allow

2    worldwide access to the recipient user.

3            Let me give you an example.  Let's

4    say that I am the first user and I am trying --

5    and I am trying to reach my contact Jonathan in

6    Figure 8 who is the second user in the terminal

7    of this -- of Claim 1.  Then I can certainly

8    click on Jonathan, as Diacakis suggests, get

9    the contact information, the left-hand side of

10   Figure 8 and then place a call to Jonathan.

11   However, that user interface certainly does not

12   provide worldwide access to Jonathan, which is

13   the intention here, what is meant in the

14   specification.  Other users, other than myself,

15   cannot access my device and -- and, you know,

16   contact Jonathan the way that I described as

17   before.

18           In fact, this user interface does

19   not even provide worldwide access to me and,

20   remember, this is user interface 112 in

21   Figure 9.  My phone certainly provides

22   worldwide access to me.  Anyone who has my

23   phone number can reach me by calling that

24   number.  However, this particular user

25   interface is for me to provide -- you know, to

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04243

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 418

1    get access to my contacts.  It doesn't provide

2    anyone around the world -- what is world --

3    worldwide access, to me, means to access this

4    particular interface and, you know, contact me

5    through that.

6            So this particular user interface is

7    only for the sender part of the Diacakis

8    communication and also in terms of the claim of

9    the '810 Patent, and it does not provide any

10    worldwide access.  Actually not even access to

11    any particular user -- to a user, okay.  So, in

12    particular, the second user which is the

13    important thing here.

14            So that -- so I wanted to just

15    clarify that answer that it's not the device

16    that provides the worldwide access.  It should

17    be the user interface and, of course, the user

18    interface that's not support worldwide access.

19        Q.    And is it still your opinion that

20    the user interface in Diacakis is not a

21    network-based portal?

22        A.    The user interface that is shown

23    here in Figure 9 element 112 is not

24    network-based portal, no.

25        Q.    Let me please refer you to

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04244

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 419

1      Figure 11.  And yesterday there was some Q and

2      A about Figure 11 in paragraph 72 about

3      Diacakis.

4          A.    Yes.

5          Q.    Let me know when you're ready.

6          A.    Yeah, one second.  Yeah.

7                Yes, I'm ready.

8          Q.    What do Figure 11 and paragraph 72

9      of Diacakis, Exhibit 9, teach to a person of

10     ordinary skill in the art?

11         A.    I'm sorry, I have to take some more

12     time.

13               All right.  So I was asked

14     yesterday -- I was pointed to paragraph 72 of

15     Diacakis and specifically to the sentence that

16     says, "For example, a subscriber at client

17     terminal 22 may first attempt to communicate

18     with an individual at client terminal 140 via

19     one or more intermediate relay hosts 142.  One

20     of the hosts 142 may be, for example, an

21     instant messaging host or a presence and

22     availability host."

23               So there are two things I would like

24     to clarify.  I think what I said is that I

25     agree that this statement is present in the

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04245

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 420

1      72 -- in paragraph 72 of Diacakis, but I just

2      want to clarify two things.  First, to the best

3      of my knowledge, the petition or Dr. Almeroth's

4      declarations did not cite paragraph 72 or that

5      particular sentence.  And, therefore, all the

6      opinions that I rendered in my declarations

7      still stand and addressed all the citations

8      that the petitioner and Dr. Almeroth, you know,

9      the information that was included in

10     Dr. Almeroth's and the petitioner's documents.

11     So that's the first clarification.

12             The second clarification I want to

13     make is that -- is explained in this particular

14     paragraph a subscriber at client terminal 22

15     may first attempt to communicate with

16     individual at client terminal 140.  And then it

17     says via one or more intermediate relay hosts

18     142.  Now, the important thing here is to

19     understand that whenever I communicate with

20     someone, there is no physical wire that

21     connects my device to the other user's device.

22             And so, for instance, if I make -- I

23     use my iPhone to make a phone call, the signal

24     will be picked up by either the access points,

25     you know, the wireless access point, and then

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04246

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 421

1    will be relayed, forwarded to a router, and

2    then it may take actually multiple hops.

3             So in Figure 11 to reach the other

4    party, the called party.  And so any

5    communication message is typically relayed

6    multiple times in the way from the sender to

7    the recipient.  And, therefore, when, you

8    know -- when this sentence says that the

9    subscriber at client terminal 22 may first

10   attempt to communicate with individual at

11   client terminal 140, you know, the implication

12   here is that this is a direct communication

13   from 22 to 142.  And, furthermore, this is

14   indicated by, for instance, saying that --

15   because as that's the second -- sorry, the

16   second sentence says, "One of the hosts 142 may

17   be, for example, an instant messaging host or a

18   presence and availability host.

19             In other words, this communication

20   may take place, it doesn't have to have an

21   instant messaging host or a presence and

22   availability host.  The communication may take

23   place without a presence and availability host

24   because there's no requirement that that was --

25   is there.  It could be there, but it's not

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04247

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 422

1    there.  And, therefore, the Diacakis

2    communication system is not involved in the

3    initiation and -- it's not involved in the

4    initiation and the routing of the -- this

5    communication because it can take place without

6    the presence and availability host.

7              And so the fact that, you know, it

8    says that one of the hosts there are a presence

9    and availability host does not indicate to a

10   POSITA that the Diacakis P&A system is involved

11   in any way other than the generic and common

12   relaying or forwarding messages from, you know,

13   along the path of the communication, you know,

14   from the sender terminal 22 to the receiver

15   which is terminal 140.

16        Q.   Do Figure 11 and paragraph 72 of

17   Diacakis, Exhibit 9, teach or render obvious a

18   network-based portal to a person of ordinary

19   skill in the art?

20        A.   They do not.

21        MR. RISLEY:  I don't have any more

22   questions.

23        MR. SHI:  I do have just one thing

24   to ask.

25                  FURTHER EXAMINATION

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04248

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 423

1    BY MR. SHI:

2         Q.    I'll keep it very short.

3    Dr. Rouskas, I want to confirm something,

4    because earlier you said that you were going to

5    revisit testimony, and I just want to get a

6    clear answer either one way or the other.  That

7    based on your counsel's questions, are you

8    offering testimony that changes any answers you

9    provided yesterday?

10        A.    My testimony does not change in the

11   answers that I provided yesterday.  To the best

12   of my knowledge, the -- you know, my testimony

13   clarifies some of the answers that I provided

14   yesterday.

15             MR. SHI:  Thank you.

16             THE VIDEOGRAPHER:  This concludes

17        the deposition.  The time is 1:48 p.m.

18                  - - -

19        (Deposition concluded at 1:48 p.m.)

20                  - - -

21             (Signature reserved.)

22                  - - -

23

24

25

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com
Appx04249

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 424

Page 425

1                    CERTIFICATE OF REPORTER

2

3         I, Christine A. Taylor, Registered
     Professional Reporter and Notary Public for the
     State of North Carolina at Large, do hereby
4    certify:

5         That the foregoing deposition was taken
     before me on the date and at the time and
6    location stated on Page 1 of this transcript;
     that the deponent was duly sworn to testify to
7    the truth, the whole truth and nothing but the
     truth; that the testimony of the deponent and
8    all objections made at the time of the
     examination were recorded stenographically by
9    me and were thereafter transcribed; that the
     foregoing deposition as typed is a true,
10   accurate and complete record of the testimony
     of the deponent and of all objections made at
11   the time of the examination to the best of my
     ability.

12

13        I further certify that I am neither
     related to nor counsel for any party to the
     cause pending or interested in the events
14   thereof.  Witness my hand, this 3rd of
     November, 2022.

15

16

17

18   _____

19        Christine A. Taylor,
          Registered Professional Reporter
          Notary Public 19960530077

20

21

22

23

24

25

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 425

1          ERRATA SHEET FOR THE TRANSCRIPT OF:

2     Case Name:  Epic Games, Inc. v. IngenioShare, LLC
      Deposition Date:  September 27 and 28, 2022
3     Deponent:  George N. Rouskas, Ph.D.
                 (Volumes I & II)
4
                      CORRECTIONS:
5
      Pg. Ln.  Now Reads        Should Read        Reason
6     ___ ___  _____    _____      _____

7     ___ ___  _____    _____      _____

8     ___ ___  _____    _____      _____

9     ___ ___  _____    _____      _____

10    ___ ___  _____    _____      _____

11    ___ ___  _____    _____      _____

12    ___ ___  _____    _____      _____

13    ___ ___  _____    _____      _____

14    ___ ___  _____    _____      _____

15    ___ ___  _____    _____      _____

16    ___ ___  _____    _____      _____

17

18                             _____

19                             Signature of Deponent

20    SUBSCRIBED AND SWORN BEFORE ME

21    THIS____DAY OF_____, 2022.

22

23    _____

24    (Notary Public)

25    MY COMMISSION EXPIRES:_____

Epic Games Ex. 1042
Epic Games v. IngenioShare
IPR2022-00202  p. 426

## I.    <u>INTRODUCTION</u>

### A.    <u>No Rebuttal Testimony</u>

Petitioner's Reply does not include any rebuttal testimony from an expert even though it could have. Practice Guide at 73.  As a result, Petitioner's Reply is based on attorney argument and the original Petition Declaration.  More importantly, Dr. Rouskas's POR Declaration and his deposition testimony stand unrebutted.

### B.    <u>Petitioner's Attacks On Dr. Rouskas Are Baseless</u>

First, Petitioner cross-examined (deposed) Dr. Rouskas for two days. Exhibit 1042.  Dr. Rouskas testified at length regarding his opinions to the point that Petitioner's counsel interrupted Dr. Rouskas because Petitioner believed that Dr. Rouskas's testimony was *too* detailed. *Id*. at 265-66.  Tellingly, Petitioner does not cite to *any* cross-examination question that Dr. Rouskas was *not* able to answer. Dr. Rouskas testified that the opinions expressed in his Declaration (Exhibit 2001) are his own and that he spent "anywhere between 80 and 100 hours" preparing his Declaration. *Id*. at 24-25.

Second, Petitioner's reliance on *Hulu* and *Juniper Networks* is inapplicable. Petitioner failed to provide a single example of how Dr. Rouskas's testimony is "cursory or unsupported".  That the POR relies upon and incorporates Dr. Rouskas's testimony is the norm in IPR practice.  Doing otherwise risks exclusion.

1

Practice Guide at 35-36 ("§ 42.6(a)(3) prohibits incorporating arguments by reference from one document into another. Thus, parties that incorporate expert testimony by reference … risk having the testimony not considered by the Board.").

Finally, the rule of completeness shows that Dr. Rouskas did not contradict his Declaration testimony. Fed. R. Evid. 106.  Indeed, Petitioner had four attorneys and its expert, Dr. Almeroth, attend in person Dr. Rouskas's deposition. Exhibit 1042 at 3-4.  Petitioner's five-person team huddled during breaks to review the real-time transcript in an effort to create out of context "sound bites" that Petitioner could use to distort Dr. Rouskas's testimony by asking, re-asking, and asking again the same question in a manner that would never be allowed in a "live" trial.  Of course, Petitioner's Reply never addresses any one of PO's objections to Petitioner's "asked and answered" questioning scheme.

Rather than trying to tarnish the reputation of a Distinguished Graduate Professor at N.C. State University, a better approach would have been to submit a rebuttal declaration from Dr. Almeroth who theoretically could have rebutted Dr. Rouskas's testimony *if* it truly is so baseless. Exhibit 2008 at 1; Exhibit 1042 at 4.

2

## II.   GROUND I

### A.    [1.0] Diacakis Does Not Teach A NBP

The Reply "*first*" argues that there is nothing to limit the claimed portal to a server or a website. Reply at 7.  The POR shows that in the '810 patent a "portal" and a "gateway" are used synonymously; and a "gateway" is a "networked server". POR at 11.  Petitioner's Reply is incorrect and is not supported by *any* rebuttal expert testimony.

Petitioner's unsupported arguments are contradicted by Petitioner's Reply Exhibit 1041, which states "[a] mobile *portal is an Internet gateway* that enables mobile devices *to connect* remotely ... typically *via a Web browser interface*." Thus, Exhibit 1041 defines a "portal" as an Internet "gateway" and differentiates it from a web browser interface, which is only used to connect a device to the portal. The definition of a portal in Exhibit 1041 is consistent with Dr. Rouskas's testimony. Exhibit 1042 at 90:4-9, 91:10-15.  As explained, when a user wishes to connect to a portal, they type the URL of the portal in the browser interface of their device and establish a connection to the portal which is a computer/server distinct from the user's device. *Id*. at 80:7-81:22. Reply Exhibit 1040 also contradicts Petitioner's attorney-only arguments as it defines a "portal" as a "platform," *not* a user interface. Exhibit 1040.

3

Moreover, that a definition includes the term "interface" does not mean a "portal" is an interface. The term "interface" is used to indicate *how a user accesses the portal* (i.e., via a web browser interface)**,** *not what a portal is*. A web browser (as in Petitioner's definition) is an interface found on *all* client devices (computers, laptops, phones, etc.) whether those devices access a portal or not.

Regarding "hosting" a web page, the Petitioner's exhibit expressly states that devices access the portal by "connect[ing] remotely ... typically via a Web browser interface." Exhibit 1041. Since the devices use a "*Web browser* interface" they must necessarily connect to *a website hosted at the portal*. *Id.*

**Second**, the Reply argues that PO incorrectly argues the '810 Patent defines "portal" as a "gateway" and that a gateway is always a "networked server." Reply at 7-8. As shown above, however, Petitioner's Exhibit 1041 also defines "portal" as a "gateway". Indeed, Dr. Rouskas's testimony that to a POSITA the word "or" in the specification means that "portal" and "gateway" are used synonymously is unrebutted. POR at 11; Exhibit 1042 at 90:4-9, 91:10-15.

**Third**, the Reply argues that it is a "distinction without a difference" that the NBP and client devices have different functionalities because the NBP allows worldwide access to the user, whereas a client communication device is associated with a user. Reply at 8-9.

4

Petitioner claims that "Diacakis's client terminal connects a user to a network via the NBP." This statement is wrong because (1) Diacakis only describes messages related to the management of P&A information, not direct communication between users, and (2) interface 112 (i.e., the Petitioner's claimed NBP) cannot be used to send user messages. Exhibit 1042 at 134:3-135:4 and 417:17-21. Petitioner conflates messages related to management of P&A information with direct messages between users. As Dr. Rouskas explained, and as Diacakis teaches, the Diacakis P&A system operates in a publisher-subscriber model. Exhibit 1042 at 141:5-142:12. When the profile of an individual changes, these changes are sent to the P&A server; the server then forwards the updated contact information to the subscribers. *Id.* However, the Diacakis system cannot be used by one user to call or send communication messages directly to another user. *Id.*

Interface 112 cannot be used to send *any user messages* and may only receive contact information from the P&A server. Hence it does not provide "worldwide access to the user." As Dr. Rouskas explained, whether a user's mobile phone allows worldwide access to that user is irrelevant, as the Petition does *not* point to the "mobile phone" as the claimed NBP, but rather argues that interface 112 of Diacakis is the claimed NBP. Exhibit 1042 at 415:23-416:6 and 417:17-21. To communicate with other users (i.e., make or receive calls, emails,

5

or IMs), a user must interact with *specific application interfaces* (i.e., the Phone, Email, or IM interface, respectively) that allow for the sending or receipt of messages.  Just because a phone allows worldwide access to a user does not imply that the interface 112 of Diacakis also provides worldwide access to the user because the interface 112 cannot be used for user-to-user communication.

Further, as Dr. Rouskas explained, whereas Diacakis uses double-headed arrows in Fig. 11 to denote bidirectional communication, Diacakis expressly uses a single-headed arrow in Fig. 9 to denote communication only in the direction *from* the P&A server *to* the client device 22; since Diacakis understood that double-headed arrows correspond to "bidirectional movement of communication" (Exhibit 1042 at 212:8-10), if Diacakis wanted to also indicate communication to the P&A server Diacakis would have used a double-headed, not single-headed arrow.  This is consistent with the teachings of Diacakis (Ex. 1007 at [0064]) that "the indicator module 110 may *receive* availability information from one or more P&A management servers 12 … *for display by the user interface 112*".  Nothing in Diacakis indicates that a user may use interface 112 to either receive or send communication messages to other users.  Figure 9 expressly shows that interface 112 is only connected to the Indicator module 110, and only for displaying information that module 110 receives from the P&A server.  Interface 112 is not connected to any module that can be used for user-to-user communication.  Due to

6

Third, Petitioner mischaracterizes PO's argument.  Interface 112,

Petitioner's claimed NBP, can only receive information from the P&A server (*see*

above).  Every device in Diacakis's system including interface 112 is only for a

user to *receive* contact information of individuals they wish to contact. Exhibit

1042 at 419:6-13.  A device in Diacakis's system will also have an interface (not

shown in Diacakis) that allows the user to connect to the P&A server to provide

their contact information to the server and configure their profile and access

groups.  But that interface is separate from interface 112.  The Diacakis system

must implement different interfaces, one for configuring the contact information,

profiles, and access groups, and one for receiving contact information: the former

is a configuration function while the latter is a digital phonebook (i.e., a Contacts

app). Exhibit 1007 at Fig. 9, [0031], [0036], and [0063]-[0064],.

Finally, Petitioner is wrong in claiming that "PO misreads element 1.8."

Reply at 9.  Indeed, the Reply ignores all the examples PO provided in the POR of

Diacakis teachings that the contact information is displayed to the user, including

Figs. 2, 3, and 8. POR at 6-7 and 27-30.

*Fifth*, regarding whether PO's construction excludes a preferred

embodiment (Fig. 7-12), the Reply argues that "because the patent's figures are

embodiments of the patent, they must include an NBP." Reply at 14.  Petitioner

completely fails to address the POR's *evidence* explaining why Figs. 7-12 are not

8

directed to the use of a NBP. Petitioner's position that every issued claim must encompass every figure/embodiment of a patent is wrong as a matter of law. The fact is that PO's evidence submitted after the Institution Decision shows that a POSITA would understand that the embodiments of Figs. 7-12 are not directed to NBP operations but are instead directed to client-side operations at a client device; and this post-institution evidence stands unrebutted. POR at 16-17.

**B.**    [1.1] Diacakis Does Not Teach A "Prior Registration Process"

The POR proves that Diacakis does not teach a POSITA the claimed registration process because a user in Diacakis does not go through a registration process with their contacts app. POR at 19-20. Petitioner's Reply is incorrect and is not supported by *any* evidence from the perspective of a POSITA. Reply at 14.

Petitioner argues that Diacakis teaches a "prior registration process" "regarding the use of the network-based portal" because a subscriber subscribes to the second user. Reply at 14 citing Petition at 37-38. However, Diacakis teaches that clients are "subscribers of the *individual's information*." Exhibit 1007 at [0029]. Even assuming that a subscription process is equivalent to a registration process, the subscription is not "regarding the use of" the interface 112 (the alleged NBP) on the subscriber's (the first user's) device, but regarding a different individual's (the second user's) contact information. As the POR states, interface 112 is an application on the subscriber's device and "they simply open it and use

9

'810 Patent: Specification

FIG. 6 is a communication system 100 according to one embodiment of the invention. The communication system 100 can support different communication devices, including mobile telephones 102, computers 104 (e.g., personal computers) and/or wireless personal digital assistants (PDAs) 106. Users of the communication devices 102-106 can communicate with like or different communication devices. Each communication device 102-106 offers one or both of audio or textual communication capabilities. These communication devices 102-106 can inter-communicate with one another through a network 108. The network 108 can include one or more of voice networks and data networks. For example, one network is a data network providing a slow speed data channel for transmission of Short Message Service (SMS) messages (which are typically limited to 160 text characters) to a Short Message Service Center (SMSC) and then forwarded on to the destination. Besides short messages (e.g., SMS messages), the network 108 can also support other messaging protocols for sending and receiving enhanced messages (EMS), multimedia messages (MMS), email and fax messages. Other networks support faster data channels and voice channels, such as GPRS, UMTS, G4, GSM, CDMA and various protocols, such as UDP, TCP, WAP, PDP other protocols.

'810 Patent at 8:24-47



'810 Patent at Fig. 6

Appx04404

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE



# Element 1.0: Network-Based Portal

▶ **Network-Based Portal**

▶ Sending Messages

▶ Not Providing Contact Information

DEMONSTRATIVE EXHIBIT · NOT EVIDENCE

# Element 1.0: Network-Based Portal

**1.** A computer-implemented method for managing electronic communications using at least a **network-based portal** at least based on Internet protocol, the method comprising:

Ex. 1001 ('810 Patent), cl. 1



Petitioner's Expert, Dr. Almeroth

"Diacakis further discloses an interface that users employ to connect to the server through an Internet Protocol-based connection, which a POSITA would have understood to be a "network-based portal.""

Ex. 1003 (Almeroth Decl.), ¶ 89; *also id.*, ¶ 192

Under its ordinary and customary meaning, a NBP is a **web page or interface that connects clients to a network**

'810 Pet. at 34–35

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

15

# Element 1.0: Network-Based Portal



Fig. 8

Fig. 9

Availability information from
P&A management server 12

Indicator Module 110

User Interface 112

22

Ex. 1007 at Figs. 8, 9

Diacakis' client terminal 22 contains a NBP, which is a **web page or interface** that connects clients to a network

'810 Pet. at 34–35
Ex. 1007 at Figs. 8, 9, [0056]

Appx04412

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE



# Element 1.0: Network-Based Portal

**Petitioner**: under its ordinary and customary meaning, a NBP is a **web page or interface that connects clients to a network**

'810 Pet. at 34–35



**PO**: NBP resides **only "at the server-side of a network"** and excludes "client-side functionality"

'810 POPR at 15–16; '810 POR at 16–19

## Panel's Preliminary Finding

Based on the current record, we disagree with Patent Owner that a "network-based portal" resides only "at the server-side of a network" and excludes "client-side functionality."

'810 Inst. Dec. at 17

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

EPIC GAMES

18

# Element 1.0: Network-Based Portal



FIG. 7

Ex. 1001 at Fig. 7

Figures 7–11 show claimed functionality (*e.g.*, providing plurality of communication options to a first user) <u>in a client device</u>

'810 Reply at 12–14

As the panel found, PO's construction "would exclude preferred embodiments from claim scope" which is "rarely, if ever correct"

'810 Inst. Dec. at 18–19

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

Appx04414

# Element 1.0: Network-Based Portal



FIG. 7

Ex. 1001 at Fig. 7

1. A computer-implemented method for managing electronic communications using at least a network-based portal at least based on Internet protocol, the method comprising: providing a plurality of communication options to a first user to be selected as a selected option of communication for a message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal, and with the plurality of communication options provided to the first user to send messages to the electronic device associated with the second user,

wherein the plurality of communication options include text messaging and voice communication, and

wherein all of the communication options use one identifier associated with the second user for the second user to receive messages, at least in view of the network-based portal being based on the Internet protocol;

receiving an indication regarding one of the plurality of communication options, via the network-based portal, from an electronic device associated with the first user, the indication indicating the selected option of communication for the message from the plurality of communication options provided;

permitting the second user to block the first user from reaching the second user via the network-based portal; and

Ex. 1001, cl. 1

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE



# Element 1.0: Network-Based Portal



**PO**: the term "portal" means "networked server" and does not include user interfaces

'810 POPR at 15–16; '810 POR at 10–11, 16–19



Yet PO's own expert admitted the term is not limited in that way

'810 Reply at 7

PO's Expert Dr. Rouskas

Q.   Are there other examples of what a portal could be other than a website or a server that hosts a website?

A.   There could be. . . . [T]here's nothing to limit the portal to just a server or a website that is accessed by the HTTP protocol.

Ex. 1042 at 60:16–61:8; see also 57:7–11; 58:3:9



Appx04416

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

# Element 1.0: Network-Based Portal

**PO**: the '810 Patent **defines "portal"** as **"gateway"** and defines "gateway" as "networked server"

'810 POR at 49



But the '810 Patent uses the terms differently, and the word "or" does not redefine "portal" as "gateway"

*Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)

'810 Reply at 7–8;

---

In one embodiment, the <mark>portal or gateway</mark> also includes a database to keep track of the user's different contacts or acquaintances, and the access priorities of each contact. The user can modify information in the database, such as assigning and/or changing the priorities of the contacts. Based on the information (or lack of information) in the database of the contact trying to access the user, and based on the status of the user, <mark>the gateway</mark> can automatically select an intelligent mode of communication for the user. This selection can be done dynamically.

'810 Patent at 4:53-57

---

Thus, in one embodiment, <mark>the portal</mark> can be used to control the selection and setting of different intelligent communication modes for the user.

'810 Patent at 4:39-41

---

In one embodiment, <mark>the portal</mark> can dynamically change the access priorities of a caller trying to reach the user

'810 Patent at 4:63-64

---

Appx04417

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

EPIC GAMES



# Element 1.0: Network-Based Portal

**PO**: the '810 Patent defines "portal" as "gateway" and **defines "gateway" as "networked server"**

'810 POR at 49



But the '810 Patent merely says that one example of a networked server is a "gateway computer"

'810 Reply at 8

Accordingly, in one embodiment, text-to-speech conversion can be off-loaded from the mobile device. For example, a remote server computer can be provided the text message and produce the resulting audio message, and then supply the audio message to the mobile device. The remote server computer can be a networked server coupled to the network 108. **One example of a networked server is a gateway computer for a wireless electronic device, such as a mobile telephone.**

'810 Patent at 16:2-10

Appx04418

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE



# Element 1.0: Network-Based Portal

**PO:** NBP and client devices have different uses:

— NBP "allows worldwide access to the user"

— But a "client communication device is 'associated with a user'"

'810 POR at 11–13

➤ But PO's expert admitted a user's mobile phone does allow worldwide access to that user

'810 Reply at 8–9

## PO's Expert, Dr. Rouskas

Q. Is it your opinion that people around the world cannot contact my phone?

A. The people -- they can call your number. Absolutely, they can.

\*\*\*

Q. [D]on't you quote from the '810 Patent where it says the portal allows worldwide access to the user?

A. ...One is worldwide access to the user. A phone provides that. There's no question about that.

Ex. 1042 at 110:20–24; 114:2–5



Appx04419

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

23



# Element 1.0: Network-Based Portal

▲ PO does not offer new evidence beyond Dr. Rouskas's cursory declaration, which merely cites two definitions pulled from a web search





## PO's Expert, Dr. Rouskas

Q. How did you find this website?

A. I was looking for -- I searched for definitions of a portal, and this is one of the websites that came up.

Q. How many websites came up that you reviewed?

A. I can -- I can't remember. I didn't look at all of them.

Ex. 1042 at 62:24–63:10

49. "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." *See, e.g.*, https://www.techopedia.com/definition/13077/portal-internet . "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals." *See, e.g.*, https://www.techtarget.com/whatis/definition/portal . Websites are hosted on web servers, not on client communication devices such as Diacakis's client terminal 22.

Ex. 2005 at 21

Appx04420

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

# Rouskas Declaration Is Entitled to No Weight

▲ Rouskas Declaration repeats POR nearly verbatim

▲ Dr. Rouskas retained *after* Petitions were instituted

— Rouskas Declaration repeats several POPR passages verbatim

— Rouskas claimed he conceived of PO's argument re "network-based portal"

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

Case No. IPR2022-00291
Patent No. 10,708,727

DECLARATION OF PROFESSOR
GEORGE N. ROUSKAS, PH.D.

Exhibit 2005

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE



# Rouskas Declaration Is Entitled to No Weight

*Hulu, LLC v. Sito Mobile R&D IP, LLC*, IPR2021-00304, Paper 30 at 68

Declarant's "cursory and unsupported testimony entitled to little weight" where it "repeat[ed] verbatim without any additional clarification Patent Owner's contentions from the Patent Owner Response."

*Juniper Networks, Inc. v. Brixham Solutions, Ltd.*, IPR2014-00425, Paper 38 at 13

Rouskas declaration afforded "little weight because his testimony is conclusory and unsupported by evidentiary explanations"

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

# Element 1.0: Network-Based Portal

**PO:** according to Petitioner, only the sender's device contains the NBP

'810 POR, 13–14, 18–19

But **all** users of Diacakis's system 10 access it via client terminal 22, which contains user interface 112 (i.e., the NBP):

'810 Reply at 10
Ex. 1007 at Figs. 1, 9



Fig. 9

Indicator Module — 110

User Interface — 112

22

Availability information from P&A management server 12

Ex. 1007 at Fig. 9



10

22

CLIENT TERMINAL

16

NETWORK

18
PRESENCE DETECTION ENGINE

20
AVAILABILITY MANAGEMENT ENGINE

12

24
Profile Database

Ex. 1007 at Fig. 1

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE



Case: 23-2177    Document: 23-3    Page: 213    Filed: 03/18/2024

# Elements 1.3, 1.4, 1.6, and 1.8:  Sending Messages

▶ Network-Based Portal

▶ **Sending Messages**

▶ Not Providing Contact Information

DEMONSTRATIVE EXHIBIT - NOT EVIDENCE

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    explained with respect to Loveland and the Takahashi

2    references.  However, if the Board would like me to address

3    anything specifically with respect to the '727 patent and

4    petition, I'm happy to do so as well.

5         Now, if we could turn to Slide 8, please.  So

6    before we begin with the disputed limitations, I'd like to

7    provide a brief overview of the '810 patent and the

8    specification using Figure 6 on the left side of Slide 8 as

9    an illustrative example.  So with respect to the '810 patent,

10    it discloses various devices that can communicate using a

11    network.  And as the '810 patent -- which, for the record, is

12    Exhibit 1001.  As the '810 patent indicates, as we've shown

13    on the right side of the slide, the various individuals using

14    the network to communicate may do so with some combination of

15    text and voice and perhaps other communication means.

16         So now let's please jump to Slide 11.  Slide 11

17    presents an overview of the Diacakis reference with respect

18    to a few figures from Diacakis.  Now, Diacakis, in general,

19    describes a presence and availability management system

20    within a larger communications network.

21         And at this point, I think it's important to

22    describe what exactly Diacakis means when it refers to

23    presence and availability.  And as Dr. Almeroth, who is

24    petitioner's expert -- as Dr. Almeroth explained, presence,

25    as used by Diacakis, refers to an individual's physical

8

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    expert, Dr. Almeroth, explained, before the '810 patent,

2    going back to as early as the 1990s, users of the internet

3    would have been -- and a person of ordinary skill in the art,

4    for that matter, would have been familiar with programs like

5    ICQ, AIM, which is AOL Instant Messenger, and a person of

6    ordinary skill in the art would have understood that these

7    programs allow users to communicate with one another simply

8    by screen name.

9         So if I recall the days where I was using AIM to

10   communicate, I could communicate with my friends from school

11   or my family simply by using screen names and clicking on a

12   screen name, rather than having to know or keep track of

13   their phone numbers or email addresses.  The buddy list just

14   provided that basis for communication.

15        And so a person of ordinary skill in the time of

16   the '810 patent would have been aware of these programs and

17   would have been looking at the '810 patent and at Diacakis

18   through this lens.

19        So if we could go to the next slide, Slide 14.  As

20   I previewed earlier for the Board, these are the particular

21   disputed limitations that I believe will be the most

22   important things to focus on today.  However, if the Board

23   has any questions related to other limitations, I'm happy to

24   address those.

25        So first, with respect to the network-based portal,

11

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    if we could turn, please to Slide 15.  As the petition laid

2    out, the network-based portal, with respect to Diacakis, is a

3    web page or interface that connects clients to a network.

4    Now, as Dr. Almeroth explained in his declaration, a person

5    of ordinary skill in the art would have understood

6    network-based portal to refer to an interface that a user

7    might use or employ to connect to a server through an

8    Internet protocol-based connection.  And so for that reason,

9    that interface that allows a user to connect to that network

10   should be understood by a person of ordinary skill in the art

11   to be the network-based portal.

12          If we could turn to Slide 16, please.  Again, with

13   respect to Figure 9, that user interface is the -- is the

14   network-based portal that connects a client to the network

15   and allows that client to communicate with other individuals

16   using client devices on the network.

17          All right.  So let's turn to Slide 17, please.  So

18   patent owner has argued that the network-based portal,

19   properly construed, would exclude client-side functionality

20   and that the network-based portal refers only to things at

21   the server side of the network.  And so I'll get into a few

22   of the specific arguments that patent owner makes, but before

23   I do that, I'd just like to remind the Board that in its

24   preliminary findings in the institution decision disagreed

25   with the patent owner that a network-based portal only

12

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1   includes server-side functionality and excludes client-side

2   functionality.

3       So let's please look at Slide 18.  Now, with

4   respect to the Board's preliminary findings in the

5   institution decision, the Board specifically referred to

6   Figures 7 through 11 of the '810 patent and noted that in

7   these figures -- which are all flowcharts, and Figure 7 is

8   representative -- that in these flowcharts, there are

9   disclosures of particular claim functionality that is carried

10  out by a client device.  As the Board noted, an

11  interpretation or construction of the term, network-based

12  portal, that excludes these preferred embodiments, such a

13  situation would rarely be correct, if ever.

14      If we could turn to Slide 19.  Now, on this slide,

15  we've mapped -- using the yellow and green colors, we've

16  mapped the particular functionality within a client device

17  that the Board noted in the institution decision.  For

18  instance, in yellow, on the right-hand side, on Figure 7,

19  we've highlighted the three communication options that are

20  disclosed by the '810 patent in the example.  For instance,

21  in block 212, a first user may send an audio message, 216

22  indicates a text message, and 220 indicates a voicemail.

23  Now, over on the left, highlighted in the same yellow color

24  is the claim language that corresponds to these options.  A

25  first user is provided a plurality of communication options,

13

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    wherein all of these communication options are in view of the

2    network-based portal being based on the Internet protocol.

3        Now, in green, similarly, when one of these

4    communication options is selected by a first user, a second

5    user receives an indication of that communication option.  So

6    as we see on the right in Figure 7, highlighted in green, no

7    matter what communication option is chosen by the first user,

8    the second user receives a notification of that message and

9    receives the message.  And as we see in green on the left

10   side, that corresponds to the claim language, wherein a

11   second user, via the network-based portal, receives an

12   indication regarding the message.

13       So turning, please, to Slide 20.  One of the

14   arguments that patent owner makes with respect to

15   network-based portal is that the term portal by itself refers

16   to a network server and thereby does not include user

17   interfaces.  However, at his deposition, the patent owner's

18   expert, Dr. Rouskas, did admit that the definition of the

19   term portal could not be limited to a website or a server

20   that hosts a website.  And, in fact, he said specifically

21   that there's nothing to limit the portal to just the server

22   or a website that is accessed by the HTTP protocol.  So at

23   the bottom, Dr. Rouskas, patent owner's expert, admitted that

24   the term, portal, cannot be limited just to servers.

25       So turning now to Slide 21, patent owner makes

14

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1  another argument in two parts.  First, patent owner argues

2  that the '810 patent itself defines a portal as a gateway,

3  and then the second piece is that the '810 patent, as patent

4  owner argues, defines gateway as a network server.  And we

5  believe that both pieces of this argument are incorrect.

6      So first, with respect to the argument that a

7  portal is defined as a gateway, patent owner points to

8  certain language in the specification of the '810 patent that

9  says, certain embodiments can use a portal or gateway.  And

10  so patent owner takes that "or" to mean that portal is

11  defined as gateway.  As the Federal Circuit has found in the

12  past, the word "or" cannot be used in this way to redefine

13  one term as another.

14      But more importantly, taking a look at the

15  specification and the cites that we've shown on Slide 21, the

16  '810 patent itself uses the terms portal and gateway

17  differently.  So in some places in the specification, the

18  patent itself refers to a portal or a gateway performing a

19  task or having a function, but in other places in the

20  specification, the '810 patent refers to a portal by itself

21  performing a function or a gateway by itself performing a

22  function or doing a task.  So in this way, the '810 patent

23  does treat those terms differently.

24      JUDGE AMUNDSON:  This is Judge Amundson.

25      So if I understand your position here with regard

15

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    to the excerpts you have on Slide 21 from the '810 patent,

2    Column 4, lines 39 to 41, and Column 4, lines 63 and 64,

3    where lines 39 to 41 say the portal can be used to control

4    the selection and setting of different intelligent

5    communication modes for the user, and lines 63 and 64 say the

6    portal can dynamically change the access priorities of a

7    caller trying to reach the user.  As I understand your

8    position, it's the portal that can do that, but a gateway would

9    not be doing that?

10    MR. SHI:  Yes, Your Honor.  Our position is that

11    the patent is very specific when it uses the term portal and

12    when it uses the term gateway.  And in those excerpts that

13    Your Honor just mentioned, the term gateway is not described

14    as performing those specific functions.

15    JUDGE AMUNDSON:  All right.  Thank you.

16    MR. SHI:  Thank you, Your Honor.

17    Turning now to Slide 22.  So this is the second

18    piece of the argument I was describing, in which patent owner

19    is redefining portal as gateway and redefining gateway as a

20    network server.  Patent owner points to a single disclosure

21    from the '810 patent, and that's the '810 patent at Column

22    16, lines 2 through 10, which I've highlighted here on

23    Slide 22, to argue that gateway is defined as a network

24    server.

25    But looking at the -- looking at the disclosure on

16

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    the slide, it's clear that the '810 patent is not making that

2    definition and is, in fact, saying that an example of a

3    network server is a gateway computer for a wireless

4    electronic device, and this is specifically in the context of

5    the embodiment where text-to-speech conversion is offloaded

6    from a mobile device onto a gateway computer.  But under no

7    circumstances is the '810 patent actually redefining the term

8    gateway to say all gateways are network servers.

9           If we could turn to Slide 23, please.  Now, patent

10   owner raises an additional argument.

11          JUDGE BOUCHER:  This is Patrick Boucher.  Could you

12   go back to Slide 22, 21, where you were talking about the

13   gateway?

14          MR. SHI:  Yes, Your Honor.

15          JUDGE BOUCHER:  I guess my question is, do you have

16   any other examples of a gateway that's not a network server?

17          MR. SHI:  Your Honor, are you referring to

18   Slide 22?

19          JUDGE BOUCHER:  22, I guess, yes.  But my question

20   is, I mean, you make the point that the patent is simply

21   referring to one example of a network server being a gateway

22   computer.  Do you have any counterexamples?

23          MR. SHI:  Your Honor, the petition does not point

24   to other counterexamples of a gateway being used -- or of a

25   gateway other than a network server.  But I think the -- I

17

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    would say the proper way to view this example is that this is

2    providing an example of a network server and not providing an

3    example of a gateway as a network server.  So in this way,

4    the way that the patent owner is thinking about the sentence

5    is flipping it on its head, if you will, because this is

6    providing an example of a server, of a network server as a

7    gateway computer, and not defining a gateway computer as a

8    network server.

9        So although to answer the question directly, that

10    the petition does not point to different examples or

11    counterexamples of what a gateway computer -- or what a

12    gateway might be than a network server, we believe that the

13    interpretation is incorrect because it's reversed.

14        MR. BOUCHER:  Okay.  Thank you.

15        MR. SHI:  Thank you, Your Honor.

16        MR. TOROSSIAN:  This is Charles -- I apologize.

17    This is Charles from the BTC.  The petitioner video, the

18    focus is off, so just want to see if they want to adjust it

19    or not.  I apologize.

20        MR. SHI:  Oh.  We'll have someone from IT come in

21    and try to resolve the issue.

22        But if it's all right with the Board, if it doesn't

23    affect the majority of the presentation, we can keep going.

24    Or I'll defer to the Board if we should take a pause to sort

25    out the issue.

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    JUDGE AMUNDSON:  Well, this is Judge Amundson.
2    Your slides -- your slides are coming in fine; it's just the
3    focus on you.  So I think -- I think we can carry on, and
4    then your technical people can fix it when they can.
5    MR. SHI:  Okay.  Thank you, Your Honor.  We'll keep
6    going, in that case.
7    So with respect to Slide 23, patent owner raises an
8    argument that the claimed network-based portal and a client
9    device have different uses.  And specifically, patent owner
10    argues that on the one hand, a network-based portal allows
11    worldwide access to the user, whereas a client communication
12    device is, quote, associated with a user.
13    But Dr. Rouskas, patent owner's expert, did admit
14    that a client communication device, such as a mobile phone,
15    does allow worldwide access to the user.  For instance, with
16    my personal mobile phone, people all around the world can
17    contact me, can have access to me through that mobile phone.
18    Similarly, Dr. Rouskas said, with respect to worldwide access
19    to the user, a phone provides that.  There's no question
20    about that.
21    So the network-based portal and the client
22    communication device have similar functionality, not
23    different functionality.
24    Turning to Slide 24.  Petitioner -- or, excuse me,
25    patent owner's expert, Dr. Rouskas, brings two definitions

19

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    taken from an internet web search for the meaning of portal.

2    And so as we see from Exhibit 2005, which is Dr. Rouskas's

3    declaration, at paragraph 49, Dr. Rouskas points to two

4    online definitions to suggest that a portal refers to a

5    website serving as an entry point to the Internet, and then

6    with respect to the second definition, to argue that a portal

7    is a term generally synonymous with gateway for a website

8    that aims or proposes to be a major starting site for users.

9    And so from these definitions, Dr. Rouskas comes to the

10   conclusion that a portal must refer to a server.

11        At his deposition, however, Dr. Rouskas admitted

12   that the way he found these two websites was from doing a web

13   search and that although more search results than these came

14   up, he picked two that he believed supported his definition

15   and that he didn't look at all of the possible -- at all of

16   the hits from his search.

17        And at this point, I'd like to raise something

18   regarding Dr. Rouskas's declaration, if you can turn to

19   Slide 25.  The two definitions that we just discussed that

20   Dr. Rouskas points to are the only things that distinguish

21   his declaration from the patent owner response.  Other than

22   those two declarations, in substance, the Rouskas declaration

23   repeats verbatim the patent owner response.  And for that

24   reason, we believe that the Rouskas declaration is entitled

25   to very little weight, if at all.

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1        Something else I'd like to point out is that

2    Dr. Rouskas admitted at his deposition that he was retained

3    after the petitions were instituted, which normally would not

4    be a problem.  There's nothing wrong with that.  But

5    Dr. Rouskas did also claim that he conceived of patent

6    owner's argument with respect to the network-based portal,

7    yet he also admitted that he had not reviewed or ever seen

8    patent owner's preliminary response, which does contain that

9    same network-based portal argument.

10        So in summary, although he claims to have

11   originated the argument, he did not explain how he did so

12   when the patent owner preliminary response, which was issued

13   before he was retained, has that same argument.

14        JUDGE AMUNDSON:  This is Judge Amundson.

15        On the weight issue, the weight of the testimony

16   from Dr. Almeroth and Dr. Rouskas, IngenioShare makes a point

17   of saying that Dr. Almeroth didn't submit a reply declaration

18   and that Dr. Rouskas's declaration, Exhibit 2005, is

19   unrebutted.  Can you explain why Epic Games decided not to

20   submit a reply declaration from Dr. Almeroth?

21        MR. SHI:  Yes, Your Honor.  And I have three

22   responses to your question.  The first, as I've explained

23   with respect to this Slide 25, is that we believe that

24   Dr. Rouskas's declaration is not entitled to weight and

25   should not be considered as evidence.

21

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1      Second, the petitioner, Epic Games, did

2   cross-examine Dr. Rouskas at his deposition and incorporated

3   Dr. Rouskas's testimony into the reply brief, which addressed

4   the points that Dr. Rouskas made.  So in that way, the

5   testimony is not unrebutted.  And I would also point out that

6   Dr. Almeroth was present at the deposition.

7      And third, it's that Dr. Almeroth's declaration, in

8   addition to the original petition and the reply, all of these

9   documents put forward by the petitioner do address

10  Dr. Rouskas's points, either before he makes them or after.

11     So for those reasons, we decided that there was no

12  need for Dr. Almeroth to submit a supplemental declaration

13  when his original declaration did address all the points that

14  the petition needed to address.

15     JUDGE AMUNDSON:  All right.  Thank you.

16     MR. SHI:  Thank you, Your Honor.

17     JUDGE BOUCHER:  This is Patrick Boucher.  I have a

18  slightly different question on this issue.

19     Earlier this week, the Board designated as

20  precedential the Xerox v. Bytemark decision.  And my

21  understanding of -- and it is not uncommon for briefs

22  submitted by parties to be fairly close, nearly verbatim to

23  expert declarations.  My understanding of the Xerox case is

24  essentially that the concern is whether or not the expert's

25  conclusory statements are supported by evidence, and I'm not

22

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    sure that you've made an allegation that that's the case

2    here.  And I just wonder if you could clarify that, because

3    it doesn't seem to me that it being verbatim by itself is

4    problematic.  The problem is whether the expert has failed to

5    provide supporting evidence for his conclusory statements.

6        MR. SHI:  Yes, Your Honor.  The Xerox v. Bytemark

7    precedential opinion, as you pointed out, was very recent.

8    It was last Friday, I believe.  So the points made in that

9    precedential opinion were not directly addressed in the

10   petition or in the reply.

11       But to get to the heart of the matter, yes, we

12   agree that the issue is whether Dr. Rouskas's opinions are

13   supported by facts, and I think the answer to that is no.

14   And the only -- the only things that Dr. Rouskas points to in

15   terms of facts beyond what's in the patent owner response are

16   simply those two websites that I alluded to earlier.  And

17   beyond those things, Dr. Rouskas's declaration doesn't point

18   to anything else to support the opinions.

19       JUDGE BOUCHER:  Okay.  Thank you.  That answers my

20   question.

21       MR. SHI:  Thank you.

22       So unless the Board has any additional questions

23   with respect to the network-based portal, we can move on to

24   the next disputed limitation, which is the sending messages

25   limitation.

23

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1  that basically, hey, the institution decision says that

2  Claim 1 essentially covers these embodiments shown in Figures

3  7 through 11 or 12, but that was before, obviously,

4  Dr. Rouskas testified.  That wasn't based on any testimony at

5  all on behalf of the patent owner.

6       And now Dr. Rouskas has testified, and I think it's

7  clear, just reading, the first box on Figure 7 is that

8  incoming voice call 7.  And as Dr. Rouskas testified, to a

9  person of ordinary skill in the art, these figures are not

10  related to the network-based portal, and so they are not

11  excluded by preferred embodiment.  And for whatever reason,

12  the petitioner -- or, I'm sorry -- yeah, the petitioner chose

13  not to respond to that.  If there is an evidentiary

14  counterargument with some evidence or positions, it wasn't

15  made.  So again, this is unrebutted.

16       JUDGE AMUNDSON:  This is Judge Amundson.

17       I had a question, though.  Is there anywhere in the

18  figures in, well, either of the patents at issue here that --

19  where the figures show a network-based portal?

20       MR. RISLEY:  You know, that is a great question.

21  And I think Mr. Shi and I have -- I think the answer, just to

22  be direct, is no.  I suppose Figure 6 is kind of a figure

23  that shows the system, and we both have it in our slides.

24  But I think the answer is no.

25       JUDGE AMUNDSON:  Well, I thought there was a

48

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1    regulation that required the features in the claims be shown

2    in the drawings.  Or am I misremembering that?

3        MR. RISLEY:  Well, to the extent -- I mean, it's

4    shown in Figure 6, Your Honor.  I think that's where it is.

5        JUDGE AMUNDSON:  All right.  Thank you.

6        MR. RISLEY:  So next, continuing on, I'd like to

7    address, again, even though they didn't submit any rebuttal

8    testimony from Dr. Almeroth, or anyone, really, responding to

9    Dr. Rouskas's declaration regarding network-based portal,

10   they did submit Exhibit 1041 and Exhibit -- well, let me

11   clarify this.  It's actually 1040 and 1041 in the '810 IPR,

12   but they're Exhibits 1041 and 1042 in the '727 IPR, but

13   they're the same substance.

14       So in Exhibit 1041, which is shown in patent

15   owner's Slide 12 -- and again, this is the petitioner's own

16   reply exhibit, right?  Instead of a declaration, they submit

17   this exhibit, in part, and it flat out says, quote, a mobile

18   portal is an internet gateway.  And that's not -- they don't

19   show this slide anywhere in their slides -- or this

20   reference, and they certainly didn't mention this exhibit at

21   all today because it completely aligns with the patent

22   owner's construction.  I mean, it flat out says, a mobile

23   portal is an internet gateway.

24       And then when you turn to the next exhibit, again,

25   which is Exhibit 1040 in '810 and Exhibit 1041 in '727, and

49

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1   we show this in Slide 13, you have a picture of kind of the

2   three screens, and it says, your portal, and, you know,

3   www.company.com.  And again, and then at the top -- and this

4   is, I think, coming back to me, at least Dr. Rouskas's

5   opinion that everybody knows what a portal is.

6          At the very top -- and I apologize, this is not

7   shown in the slide, but it's on page 2 of Exhibit 1040 in the

8   '810 IPR.  It says, examples of portals, particularly those

9   that use a login experience, abound in most industries.  And

10  then it lists out a couple, and the first one is a patient

11  portal.  And I've recently gone to the doctor and now almost

12  -- apart from the in-person visits, 100 percent of the

13  communication with my doctor is now through this portal.

14  That's where he puts in his notes, and that's where I respond

15  to any questions he has or vice versa.  That's where the

16  medication is.  Everything.  And just because I access my

17  patient portal through a phone, a mobile phone, or my laptop,

18  doesn't mean that that phone or my laptop is part of the

19  portal.

20         And another great example, the next bullet item

21  underneath patient portals in Exhibit 1040 at page 2, is

22  government portals.  And what better example of a government

23  portal is the portal that we use or that the PTAB uses and

24  the P-TACTS portal that was recently revamped and rolled out.

25  Just because we file documents and can access that portal

50

IPR2022-00202 (U.S. Patent 10,142,810 B2)
IPR2022-00291 (U.S. Patent 10,708,727 B2)

1   through our phones, our handhelds, or through a laptop or

2   desktop, it doesn't make those devices part of the portal.

3   The portal is the server, and it's -- I mean, who knows where

4   it is, but we have no -- the users have no control over it.

5   We just access the portal. And again, petitioner has no

6   rebuttal evidence.

7       I did want to -- before I move on, I wanted to

8   reference two of petitioner's slides. The first one is

9   petitioner's Slide 20. And I just -- again, this is what I

10  was referring to earlier that I said I would read into the

11  record. And I think it's a distortion, to be polite, of his

12  testimony. You have a Q and A at the bottom of Slide 20, and

13  then the A has, there could be, but of course there's four

14  dots, and then it continues on. But the point of

15  Dr. Rouskas's testimony that's being cited here by petitioner

16  of what a portal is, the whole testimony is about how you

17  access a portal. And I'd like to just read that into the

18  record. I hope I'm not going too fast, but this is from

19  Exhibit 1042, so it's the '810 exhibit of the deposition

20  transcript.

21      And at line 7 of page 60, it starts, question --

22  this is by Mr. Shi -- so one example of the meaning of the

23  word portal in your opinion is a website, right?

24      Answer, yes.

25      Question, and one example of what a portal is, in

51

# IEEE 100
# The Authoritative Dictionary of IEEE Standards Terms

## Seventh Edition





**Published by**
**Standards Information Network**
**IEEE Press**

Trademarks and disclaimers

*IEEE believes the information in this publication is accurate as of its publication date; such information is subject to change without notice. IEEE is not responsible for any inadvertent errors.*

*Other tradenames and trademarks in this document are those of their respective owners.*

*The Institute of Electrical and Electronics Engineering, Inc.*
*3 Park Avenue, New York, NY, 10016-5997, USA*

*Copyright © 2000 by the Institute of Electrical and Electronics Engineers, Inc. All rights reserved. Published December 2000. Printed in the United States of America.*

*No part of this publication may be reproduced in any form, in an electronic retrieval system or otherwise, without the prior written permission of the publisher.*

*To order IEEE Press publications, call 1-800-678-IEEE.*

*Print: ISBN 0-7381-2601-2*          *SP1122*          *PDF ON CD-ROM*
*ISBN: 0-7381-3926-2   SE127*

See other standards and standards-related product listings at: http://standards.ieee.org/

*The publisher believes that the information and guidance given in this work serve as an enhancement to users, all parties must rely upon their own skill and judgement when making use of it. The publisher does not assume any liability to anyone for any loss or damage caused by any error or omission in the work, whether such error or omission is the result of negligence or any other cause. Any and all such liability is disclaimed.*

*This work is published with the understanding that the IEEE is supplying information through this publication, not attempting to render engineering or other professional services. If such services are required, the assistance of an appropriate professional should be sought. The IEEE is not responsible for the statements and opinions advanced in this publication.*

**gate electric contact** *See:* car-door contact.

**gate limit (speed governing system, hydraulic turbines)** A device which acts on the governor system to prevent the turbine-control servomotor from opening beyond the position for which the device is set.                    (PE/EDPG) [5]

**gate nontrigger current (thyristor)** The maximum gate current that will not cause the thyristor to switch from the OFF state to the ON state. *See also:* principal current; gate trigger current.                    (IA/ED/CEM) 223-1966w, [62], [58], [46]

**gate nontrigger voltage (thyristor)** The maximum gate voltage that will not cause the thyristor to switch from the OFF state to the ON state. *See also:* gate trigger voltage; principal voltage-current characteristic.
(IA/ED/CEM) 223-1966w, [46], [58], [62]

**gate power closer** *See:* car-door closer.

**gate protective action (thyristor converter)** Protective action that takes advantage of the switching property in the converter protection network.                    (IA/IPC) 444-1973w

**gate suppression (thyristor power converter)** Removal of gating pulses.                    (IA/IPC) 444-1973w

**gate terminal (thyristor)** A terminal that is connected to a gate. *See also:* anode.        (IA/ED/CEM) 223-1966w, [58]

**gate trigger current (thyristor)** The minimum gate current required to switch a thyristor from the OFF state to the ON state. *See also:* principal current.
(IA/ED/CEM) 223-1966w, [62], [58], [46]

**gate trigger voltage (thyristor)** The gate voltage required to produce the gate-trigger current. *See also:* principal voltage-current characteristic.
(IA/ED/CEM) 223-1966w, [58], [46], [62]

**gate turn-off current (gate turn-off thyristor)** The minimum gate current required to switch a thyristor from the ON state to the OFF state. *See also:* principal current.
(IA/ED/CEM) 223-1966w, [46], [58], [62]

**gate turn-off voltage (gate turn-off thyristor)** The gate voltage required to produce the gate turn-off current. *See also:* principal voltage-current characteristic.
(IA/ED/CEM) 223-1966w, [58], [46], [62]

**gate voltage (thyristor)** The voltage between a gate terminal and a specified main terminal. *See also:* principal voltage-current characteristic.
(IA/ED/CEM) 223-1966w, [62], [46], [58]

**gateway** A functional unit that interconnects a local area network (LAN) with another network having different higher layer protocols.                    (LM/C) 8802-6-1994
**(2) (A)** A dedicated computer that attaches to two or more networks and that routes packets from one to the other. **(B)** In networking, a device that connects two systems that use different protocols. *Contrast:* bridge. *See also:* router; mail gateway.                    (C) 610.7-1995

**gather write** A write operation in which information from non-adjacent storage areas is placed into a single physical record. *Contrast:* scatter read.            (C) 610.10-1994w

**gating** The process of selecting those portions of a wave that exist during one or more selected time intervals or that have magnitudes between selected limits. *See also:* waveform; modulation.                    (AP/ANT) 145-1983s
**(2)** The application of enabling or inhibiting pulses during part of a cycle of equipment operation.        (AES) 686-1997

**gating signal (keying signal)** A signal that activates or deactivates a circuit during selected time intervals.
(PE/EEC) [119]

**gating techniques (thyristor)** Those techniques employed to provide controller (thyristor) gating signals.
(IA/IPC) 428-1981w

**gauss (centimeter-gram-second electromagnetic-unit system)** The gauss is $10^{-4}$ webers per square meter or one maxwell per square centimeter.            (Std100) 270-1966w

**Gaussian beam (1) (fiber optics)** A beam of light whose electric field amplitude distribution is gaussian. When such a beam is circular in cross section, the amplitude is $E(r) = E$

(0) exp $[-(r/w)^2]$ where $r$ is the distance from beam center and $w$ is the radius at which the amplitude is $1/e$ of its value on the axis; $w$ is called the beamwidth. *See also:* beam diameter.                    (Std100) 812-1984w
**(2) (laser maser)** A beam of radiation having an approximately spherical wave front at any point along the beam and having transverse field intensity over any wave front that is a Gaussian function of the distance from the axis of the beam.
(LEO) 586-1980w

**Gaussian density function (radar)** Sometimes referred to as normal probability distribution, the Gaussian probability-density function is given by

$$f(X) = \frac{1}{\sigma\sqrt{2\pi}} \exp\left(-\frac{x^2}{2\sigma^2}\right)$$

Often used to describe statistical nature of random noise, where $\sigma$ = standard deviation.        (AES/RS) 686-1982s

**Gaussian distribution** A probability distribution characterized by the probability density function

$$f(x) = \frac{1}{\sqrt{2\pi}\,\sigma} \exp\left[-\frac{(x-m)^2}{2\sigma^2}\right]$$

where
  $x$ = the random variable
  $m$ = the mean
  $\sigma$ = the standard deviation

The Gaussian distribution is often used for analytical modeling of radar noise and various measurement errors. *Synonym:* normal distribution.                    (AES) 686-1997

**Gaussian filter** A polynomial filter whose magnitude-frequency response approximates the ideal Gaussian response, the degree of approximation depending on the complexity of the filter. The ideal Gaussian response is given by

$$\left| H(j\omega) \right| = \exp\left[-0.3466(\omega/\omega_c)^2\right]$$

where $\omega_c$ 3 dB frequency. Gaussian filters, because of their good transient characteristics (small overshoot and ringing), find applications in pulse systems.            (CAS) [13]

**Gaussian frequency shift keying (GFSK)** A modulation scheme in which the data is first filtered by a Gaussian filter in the baseband and then modulated with a simple frequency modulation.                    (C/LM) 8802-11-1999

**Gaussian noise** Noise characterized by a wide frequency range with regard to the desired signal of communication channel, statistical randomness, and other stochastic properties.
(C) 610.7-1995

**Gaussian pulse (1) (fiber optics)** A pulse that has the waveform of a gaussian distribution. In the time domain, the waveform is

$$f(t) = A \exp\left[-(t/a)^2\right]$$

where $A$ is a constant, and $a$ is the pulse half duration at the $1/e$ points. *See also:* full width (duration) half maximum.
(Std100) 812-1984w
**(2)** A pulse shape tending to follow the Gaussian curve corresponding to $A(t) = e^{-a(b-t)^2}$. *See also:* pulse.
(IM/HFIM) [40]

**Gaussian random noise** *See:* random noise.

**Gaussian response (1) (amplifiers)** A particular frequency-response characteristic following the curve $y(f) = e^{-af^2}$. *Note:* Typically, the frequency response approached by an amplifier having good transient response characteristics. *See also:* amplifier.                    (IM/HFIM) [40]
**(2) (oscilloscopes) (amplifiers)** A particular frequency response characteristic following the curve

$$y(f) = e^{-af^2}$$

Typically, the frequency response approached by an amplifier having good transient response characteristics.
(IM) 311-1970w

**Gaussian system (units)** A system in which centimeter-gram-second electrostatic units are used for electric quantities and



**Microsoft**

OVER
**10,000**
ENTRIES

# Microsoft®

# Computer
# Dictionary

## Fifth Edition

- *Fully updated with the latest technologies, terms, and acronyms*
- *Easy to read, expertly illustrated*
- *Definitive coverage of hardware, software, the Internet, and more!*

Appx04557

**PUBLISHED BY**
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 2002 by Microsoft Corporation

All rights reserved. No part of the contents of this book may be reproduced or transmitted in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data
Microsoft Computer Dictionary.--5th ed.
      p. cm.
   ISBN 0-7356-1495-4
   1. Computers--Dictionaries.   2. Microcomputers--Dictionaries.

   AQ76.5. M52267   2002
   004'.03--dc21                                    200219714

Printed and bound in the United States of America.

2 3 4 5 6 7 8 9    QWT    7 6 5 4 3 2

Distributed in Canada by H.B. Fenn and Company Ltd.

A CIP catalogue record for this book is available from the British Library.

Microsoft Press books are available through booksellers and distributors worldwide. For further informa-tion about international editions, contact your local Microsoft Corporation office or contact Microsoft Press International directly at fax (425) 936-7329. Visit our Web site at www.microsoft.com/mspress. Send comments to *mspinput@microsoft.com.*

Active Desktop, Active Directory, ActiveMovie, ActiveStore, ActiveSync, ActiveX, Authenticode, BackOffice, BizTalk, ClearType, Direct3D, DirectAnimation, DirectDraw, DirectInput, DirectMusic, DirectPlay, DirectShow, DirectSound, DirectX, Entourage, FoxPro, FrontPage, Hotmail, IntelliEye, IntelliMouse, IntelliSense, JScript, MapPoint, Microsoft, Microsoft Press, Mobile Explorer, MS-DOS, MSN, Music Central, NetMeeting, Outlook, PhotoDraw, PowerPoint, SharePoint, UltimateTV, Visio, Visual Basic, Visual C++, Visual FoxPro, Visual InterDev, Visual J++, Visual SourceSafe, Visual Studio, Win32, Win32s, Windows, Windows Media, Windows NT, Xbox are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries. Other product and company names mentioned herein may be the trademarks of their respective owners.

The example companies, organizations, products, domain names, e-mail addresses, logos, people, places, and events depicted herein are fictitious. No association with any real company, organization, product, domain name, e-mail address, logo, person, place, or event is intended or should be inferred.

**Acquisitions Editor:** Alex Blanton
**Project Editor:** Sandra Haynes


Body Part No. X08-41929

**G**

**game tree** *n.* A tree structure representing contingencies in a game and used by game developers for design purposes. Each node in a game tree represents a possible position (for example, the configuration of pieces on a chessboard) in the game, and each branching represents a possible move. *See also* computer game.

**gamut** *n.* The complete range of colors a display or printer is capable of producing. If a color falls outside the gamut of a device, it cannot be accurately displayed or printed from that device.

**gamut alarm** *n.* A feature in graphics programs that alerts the user if a chosen color will fall outside the currently selected gamut. *See also* gamut.

**Gantt chart** *n.* A bar chart that shows individual parts of a project as bars against a horizontal time scale. Gantt charts are used as a project-planning tool for developing schedules. Most project-planning software can produce Gantt charts.

**gap** *n. See* inter-record gap.

**garbage** *n.* **1.** Incorrect or corrupted data. **2.** Gibberish displayed on screen, either due to faulty hardware or software or because a program is unable to display a file's content. For example, an executable file is not meant to be displayed by a text editor and so is indecipherable on screen.

**garbage collection** *n.* A process for automatic recovery of heap memory. Blocks of memory that had been allocated but are no longer in use are freed, and blocks of memory still in use may be moved to consolidate the free memory into larger blocks. Some programming languages require the programmer to handle garbage collection. Others, such as Java, perform this task for the programmer. *See also* heap (definition 1).

**garbage in, garbage out** *n.* A computing axiom meaning that if the data put into a process is incorrect, the data output by the process will also be incorrect. *Acronym:* GIGO.

**gas-discharge display** *n.* A type of flat-panel display, used on some portable computers, containing neon between a horizontal and a vertical set of electrodes. When one electrode in each set is charged, the neon glows (as in a neon lamp) where the two electrodes intersect, representing a pixel. *Also called:* gas-plasma display. *See also* flat-panel display, pixel.

**gas-plasma display** *n. See* gas-discharge display.

**gate** *n.* **1.** An electronic switch that is the elementary component of a digital circuit. It produces an electrical output signal that represents a binary 1 or 0 and is related to the states of one or more input signals by an operation of Boolean logic, such as AND, OR, or NOT. *Also called:* logic gate. *See also* gate array. **2.** The input terminal of a field-effect transistor (FET). *Also called:* gate electrode. *See also* drain (definition 1), FET, MOSFET, source (definition 2). **3.** A data structure used by 80386 and higher microprocessors to control access to privileged functions, to change data segments, or to switch tasks.

**gate array** *n.* A special type of chip that starts out as a nonspecific collection of logic gates. Late in the manufacturing process, a layer is added to connect the gates for a specific function. By changing the pattern of connections, the manufacturer can make the chip suitable for many needs. This process is very popular because it saves both design and manufacturing time. The drawback is that much of the chip goes unused. *Also called:* application-specific integrated circuit, logic array.

**gated** *adj.* **1.** Transmitted through a gate to a subsequent electronic logic element. **2.** Transmitted through a gateway to a subsequent network or service. For example, a mailing list on BITNET may be gated to a newsgroup on the Internet.

**gate electrode** *n. See* gate (definition 2).

**gateway** *n.* A device that connects networks using different communications protocols so that information can be passed from one to the other. A gateway both transfers information and converts it to a form compatible with the protocols used by the receiving network. *Compare* bridge.

**gateway page** *n. See* doorway page.

**gating circuit** *n.* An electronic switch whose output is either on or off, depending on the state of two or more inputs. For example, a gating circuit may be used to pass or not pass an input signal, depending on the states of one or more control signals. A gating circuit can be constructed from one or more logic gates. *See also* gate (definition 1).

**gatored** *vb.* To have been the victim of a hijackware program that seized control of an Internet shopping or surfing experience and caused the victim's browser to display ads and Web sites chosen by the program. Users may be



Microsoft

Over 3000 Entries!

Microsoft

Internet & Networking

**Dictionary**

- Covers key networking and Internet terms you need to know
- Includes current technologies and acronyms from ACK to Zope
- Lists common file extensions, Instant Messaging emoticons, and Internet domains

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v
Order of Presentation . . . . . . . . . . . . . . . . . . . . . . . . . . v
Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v
Future Printings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

# Dictionary of Computer Terms . . . . 1

**Appendix A:**
Instant Messaging Emoticons and Acronyms . . . . . . . . . . 309
    *Emotags* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *309*
    *Smileys* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *309*
    *Alternate (Japanese) Smileys* . . . . . . . . . . . . . . . . . *311*
    *Acronyms and Shorthand* . . . . . . . . . . . . . . . . . . . . *312*

**Appendix B:**
Internet Domains . . . . . . . . . . . . . . . . . . . . . . . . . . . 316
    *Top-Level Domains: Organizational* . . . . . . . . . . . . . *316*
    *Top-Level Domains: Geographic* . . . . . . . . . . . . . . . *316*

**Appendix C:**
Common File Extensions . . . . . . . . . . . . . . . . . . . . . 320
    *Common File Extensions* . . . . . . . . . . . . . . . . . . . . *320*

iii

PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 2003 by Microsoft Corporation

All rights reserved. No part of the contents of this book may be reproduced or transmitted in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data
Microsoft Internet & Networking Dictionary / Microsoft Press.
    p. cm.
    ISBN 0-7356-1813-5
    1. Computer networks--Dictionaries. 2. Internet--Dictionaries. I. Microsoft
Press.

TK5105.5 .M5474 2002
004.678--dc21                                                2002075312

Printed and bound in the United States of America.

1 2 3 4 5 6 7 8 9   QWE   7 6 5 4 3 2

Distributed in Canada by H.B. Fenn and Company Ltd.

A CIP catalogue record for this book is available from the British Library.

Microsoft Press books are available through booksellers and distributors worldwide. For further information about international editions, contact your local Microsoft Corporation office or contact Microsoft Press International directly at fax (425) 936-7329. Visit our Web site at www.microsoft.com/mspress. Send comments to *mspinput@microsoft.com*.

Active Desktop, Active Directory, ActiveX, Authenticode, BackOffice, BizTalk, Entourage, FoxPro, FrontPage, Hotmail, JScript, Microsoft, Microsoft Press, Mobile Explorer, MS-DOS, MSN, NetMeeting, Outlook, PowerPoint, SharePoint, UltimateTV, Visio, Visual Basic, Visual C++, Visual FoxPro, Visual InterDev, Visual J++, Visual SourceSafe, Visual Studio, Win32, Win32s, Windows, Windows Media, Windows NT, and Xbox are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries. Other product and company names mentioned herein may be the trademarks of their respective owners.

The example companies, organizations, products, domain names, e-mail addresses, logos, people, places, and events depicted herein are fictitious. No association with any real company, organization, product, domain name, e-mail address, logo, person, place, or event is intended or should be inferred.

**Acquisitions Editor:** Alex Blanton
**Project Editor:** Sandra Haynes

Body Part No. X08-92505

**G**

**Game Boy** *n.* Nintendo Corporation's popular battery-powered, portable handheld gaming system first introduced in 1990 and updated frequently. Games are supplied on cartridges. The latest Game Boy, Game Boy Advance, features a 32-bit ARM CPU with embedded memory and a 2.9-inch TFT reflective screen with 240x160 resolution. *See also* computer game.

**GameCube** *n.* Nintendo Corporation's console gaming system. It features a developer-friendly format and introduces 1T-RAM technology, which reduces delays to the main memory and introduces LSI mixed memory. The microprocessor is a custom IBM Power PC "Gekko" featuring a secondary cache (Level One: Instruction 32 KB, Data 32 KB (8-way); Level Two: 256 KB (2-way)). Games are supplied on a GameCube game disc. *See also* computer game, console game. *Compare* Dreamcast, PlayStation, Xbox.

**gamer** *n.* Refers to a person who plays games, sometimes role-playing games or trading card games; often a person who plays computer, console, arcade, or online games as a primary hobby or avocation.

**gated** *adj.* Transmitted through a gateway to a subsequent network or service. For example, a mailing list on BITNET may be gated to a newsgroup on the Internet.

**gateway** *n.* A device that connects networks using different communications protocols so that information can be passed from one to the other. A gateway both transfers information and converts it to a form compatible with the protocols used by the receiving network. *Compare* bridge.

**gateway page** *n. See* doorway page.

**gatored** *vb.* To have been the victim of a hijackware program that seized control of an Internet shopping or surfing experience and caused the victim's browser to display ads and Web sites chosen by the program. Users may be gatored when they have unknowingly installed a program or plug-in with a hidden marketing agenda, which intrudes on the user's Web shopping to display ads or Web sites promoting competing products. The term gatored comes from the name of a plug-in that was one of the first hijackware products to be used by Web marketers. *See also* hijackware.

**Gecko** *n.* A cross-platform Web browsing engine introduced by Netscape in 1998, distributed and developed as open-source software through Mozilla.org. Designed to be small, fast, and modular, the Gecko engine supports Internet standards including HTML, cascading style sheets (CSS), XML, and the Document Object Model (DOM). Gecko is the layout engine in Netscape's Communicator software.

**GENA** *n.* Acronym for General Event Notification Architecture. An extension to HTTP defined by an Internet Engineering Task Force (IETF) Internet-Draft and used to communicate events over the Internet between HTTP resources. Universal Plug and Play (UPnP) services use GENA to send XML event messages to control points.

**General Event Notification Architecture** *n. See* GENA.

**General Inter-ORB Protocol** *n. See* IIOP.

**General Packet Radio Service** *n. See* GPRS.

**General Public License** *n.* The agreement under which software, such as the GNU (GNU's Not UNIX) utilities, is distributed by the Free Software Foundation. Anyone who has a copy of such a program may redistribute it to another party and may charge for distribution and support services, but may not restrict the other party from doing the same. A user may modify the program, but if the modified version is distributed, it must be clearly identified as such and is also covered under the General Public License. A distributor must also either provide source code or indicate where source code can be obtained. *Acronym:* GPL. *Also called:* copyleft. *See also* free software, Free Software Foundation, GNU.

**Genie** *n.* An online information service originally developed by General Electric (GE) Information Services as GEnie (General Electric network for information exchange); currently owned and provided by IDT Corporation as Genie (lowercase *e*). Genie provides business information, forums, home shopping, and news and can exchange e-mail with the Internet.

**GEO** *n. See* geostationary orbit satellite.

**GEOS** *n.* An operating system developed by Geoworks Corporation, used in some handheld devices. GEOS is designed to provide broad functionality in resource-constrained environments that have limited storage or memory capability, such as enhanced phones, some Internet access devices, and PDAs and other handheld computers.

**geostationary orbit satellite** *n.* A communications satellite that rotates with the earth and thus appears to remain fixed, or stationary, over a particular location. This travels in orbit 22,282 miles above the equator, where its period of rotation matches the earth's rotation. The service area, or *footprint*, of the satellite is approximately one-third of the earth's surface, so global satellite coverage can be achieved with three satellites in orbit. In a voice communication system, a round-trip to and from this satellite takes approximately 250 milliseconds. Satellite-based data communications are necessary for delivering high bandwidth options to rural areas. *Acronym:* GEO.

**GGA** *n.* Acronym for Good Game All. GGA is often used in online and chat games at the conclusion of play. *See also* role-playing game.

**ghost** *n.* An abandoned or no-longer-maintained Web site that remains accessible to visitors.

**.gif** *n.* The file extension that identifies GIF bit map images. *See also* GIF.

**GIF** *n.* **1.** Acronym for Graphics Interchange Format. A graphics file format developed by CompuServe and used for transmitting raster images on the Internet. An image may contain up to 256 colors, including a transparent color. The size of the file depends on the number of colors actually used. The LZW compression method is used to reduce the file size still further. **2.** A graphic stored as a file in the GIF format.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

EPIC GAMES, INC.,
Petitioner

v.

INGENIOSHARE, LLC,
Patent Owner

**U.S. PATENT NO. 10,708,727**

Case IPR2022-TBD

**PETITION FOR *INTER PARTES* REVIEW
UNDER 35 U.S.C. §312 AND 37 C.F.R. §42.104**

Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727

| Ground | Claim(s) | Proposed Statutory Rejection |
|--------|----------|------------------------------|
| I | 1–6, 15, 17 | Obvious under §103 in view of Diacakis |
| II | 7–9 | Obvious under §103 in view of Diacakis in combination with Loveland |
| III | 16 | Obvious under §103 in view of Diacakis in combination with Takahashi |
| IV | 1–3, 6, 15,17 | Obvious under §103 in view of Tanigawa in combination with Hullfish |
| V | 7–9 | Obvious under §103 in view of Tanigawa in combination with Hullfish and Loveland |
| VI | 16 | Obvious under §103 in view of Tanigawa in combination with Hullfish and Takahashi |

## VI.  DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE

### A.  <u>The '727 Patent Has Not Been Subject to a Prior Petition</u>

The '727 has not been subject to any prior IPR or PGR petitions.  Thus, this is not a "follow-on" petition and there is no basis for the Board to exercise its discretion under 35 U.S.C. § 314(a) and 37 C.F.R. § 42.108(a).  *Gen. Plastic Indus. Co. v. Canon Kubushiki Kaisha*, IPR2016-01357, Paper 19 (P.T.A.B. Sept. 6, 2017).

Further, Epic Games has filed only a single petition challenging the claims of the '727, avoiding any suggestion that Epic Games has placed a substantial and unnecessary burden on the Board.  *See* Trial Practice Guide Update (July 2019).

Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727

he failed to consider the grounds described herein, which render all claims of the '727 patent obvious.

### D.    Person of Ordinary Skill in the Art

For the reasons described in Dr. Almeroth's declaration, a POSITA at the time of the '727 Patent would have had a Bachelor's degree in Computer Science, or an equivalent field, and three to five years of experience working with Internet communication systems.    Additional education might compensate for less experience, and vice-versa.  Ex. 1003, ¶¶92-97.

## IX.    CLAIM CONSTRUCTION

Claim terms in an IPR should be construed in accordance with the principles set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. §42.104(b)(3).  "[W]ords of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Phillips*, 415 F.3d at 1312–13. Petitioner does not believe that any terms need to be construed to assess the arguments presented herein.

## X.    OVERVIEW OF THE PRIOR ART

### A.    Overview of Diacakis

Diacakis teaches a "presence and availability management system," and related methods, including a communication network with several users

Appx04596

Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727

## XI.    SPECIFIC GROUNDS FOR PETITION

### A.    <u>Ground I: Claims 1–6, 15, and 17 Are Rendered Obvious by Diacakis</u>

#### 1.    **Independent Claim 1**

##### a.    **Element 1.0[4]**

To the extent the preamble is limiting, Diacakis discloses a computer-implemented method to facilitate electronic communication of a plurality of users using at least a network-based portal at least based on Internet protocol. Diacakis teaches a "presence and availability [P&A] management" server within a communication system. Ex. 1007, [0003], [0009]. This P&A management server is a "computer" implementing a "computer-implemented method." Ex. 1003, ¶293. Moreover, Diacakis teaches a "P&A management server 12 in communication with a client terminal 22 via a network 16," where "network 16 may include, for example, the Internet[.]" Ex. 1007, [0024]–[0025]. These components are shown below in Figure 1:

---

[4]    Ex. 1032 is a claim listing that enumerates each claim element.

35

Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727



*Id.*, Fig. 1.  As shown below in Figures 8 and 9, Diacakis' client terminal 22 also contains a "network-based portal," which is a web page or interface that connects multiple users to a network.



36

Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727



**Fig. 8**

*Id.*, Figs. 8, 9, [0056]; Ex. 1003, ¶115-16.

b.     **Element 1.1**

Diacakis discloses this element.  ***First***, Diacakis discloses a message from the first user to a second user: a first user (or "subscriber") may wish to communicate with a second user (or "individual").  *See* Ex. 1007, [0008], [0029], [0062].

***Second***, Diacakis discloses providing a plurality of modes of communication to a first user to allow the first user to use one of the plurality of modes of communication as a selected mode of communication for a first message to be sent

37

Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727

Title, Abstract, [0036].  As shown below, Tanigawa's communications system is

based on the Internet protocol (*i.e.*, "IP Network"):



*Id.*, Fig. 1; *see also id.*, [0003], [0009], [0014], [0034], [0035], [0040], [0041],

[0057], [0103], [0104].

Moreover, Tanigawa's terminals (user devices) contain a "network-based

portal,"—a user interface connecting users to a network (shown below):

Petition for *Inter Partes* Review of U.S. Patent No. 10,708,727



Ex. 1010, Fig. 12, [0162].

### b. **Element 1.1**

Tanigawa discloses this element. **First**, Tanigawa discloses a message from

the first user to a second user: various users use client devices as shown below in

Figure 3 (a presence information management table used to manage client devices):

UNITED STATES PATENT AND TRADEMARK OFFICE

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner

---

**U.S. PATENT NO. 10,708,727**
**U.S. PATENT NO. 10,492,038**

Case IPR2022-TBD
Case IPR2022-TBD

---

**DECLARATION OF DR. KEVIN ALMEROTH**
**IN SUPPORT OF PETITION FOR *INTER PARTES* REVIEW OF U.S.**
**PATENT NOS. 10,708,727 AND 10,492,038**

Epic Games Ex. 1003
Page 1

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

## III.    MATERIALS AND OTHER INFORMATION CONSIDERED

33.    In forming the opinions expressed in this Declaration, I relied upon my education and many years of experience in the relevant field of the art and have considered the viewpoint of a person having ordinary skill in the art (a POSITA) as of the Priority Date of the Challenged Patents.

34.    I have considered the materials referenced in this Declaration, including the Challenged Patents, the file histories, and other documents listed in the Exhibit List to the '727 and '038 Petition, reproduced above.  In particular, I have considered the prior art references listed below.

35.    U.S. Patent Application 2002/0116461 ("Diacakis") (Ex. 1007) was filed on February 5, 2002 and published on August 22, 2002—before the Priority Date—and is therefore prior art under pre-AIA 35 U.S.C. §§102(a) and 102(b).

36.    U.S. Patent No. 7,287,056 ("Loveland") (Ex. 1008), was filed on September 28, 2001—before the Priority Date—and is therefore prior art under pre-AIA 35 U.S.C. §§102(a) and 102(b).

37.    U.S. Patent Application 2002/0183114 ("Takahashi") (Ex. 1009), was filed on May 29, 2002, and published on December 5, 2002—before the Priority Date—and is therefore prior art under pre-AIA 35 U.S.C. §§102(a) and 102(b).

Epic Games Ex. 1003
Page 28

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

38.    U.S. Patent Application 2004/0001480 ("Tanigawa") (Ex. 1010) was filed on August 30, 2002 and published on January 1, 2004—before the Priority Date—and is therefore prior art under pre-AIA 35 U.S.C. §§102(a) and 102(b).

39.    U.S. Patent No. 7,428,580 ("Hullfish") (Ex. 1011), was filed on November 26, 2003—before the Priority Date—and is therefore prior art under pre-AIA 35 U.S.C. §102(e).

## IV.    UNDERSTANDING OF PATENT LAW

40.    I understand that prior art to the Challenged Patents includes patents and printed publications in the relevant art that predate the Priority Date of the Challenged Patents.

41.    I understand that claims in an IPR are given their plain and ordinary meaning as understood by a person of ordinary skill in the art in view of the specification and prosecution history, unless those sources show an intent to depart from such meaning.

42.    I understand that a patent claim is invalid if it is anticipated or obvious. Anticipation of a claim requires that every element of a claim be disclosed expressly or inherently in a single prior art reference, arranged in the prior art reference as arranged in the claim.  Obviousness of a claim requires that the claim be obvious from the perspective of a POSITA at the time of the alleged invention.  I understand

Epic Games Ex. 1003
Page 29

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

similarly identified by screen name.  *See* Ex. 1028, 4:7–26, 5:11–13; Ex. 1025 at 1 (describing IM and audio communicating through the "buddies list").  By using screen names and communicating with others on that basis, users could communicate with one another while keeping their personal contact information private.  *See* Ex. 1028, 23:27–26:6 (describing "enabl[ing] the anonymity of watched parties to be managed," including where "the watching party does not find out what the connection address for the watched party is"); Ex. 1025 at 1–2 (describing "privacy of groups" and "chat privacy" in AIM and Yahoo Messenger).  Moreover, these IM services featured tools allowing users to "mute" and "block[]" chat participants.  *See* Ex. 1025 at 1–2; Ex. 1029 at 27 ("Access permission settings explicitly permit ('allow') or restrict ('block') messages from certain people.").

71.     In summary, by the early 2000s, computer users had access to a broad range of chatting applications and features, including the ability to communicate beyond text, the ability to represent themselves with screen names, the ability to manage their availability, and the ability to keep their personal information private.

### B.     Overview of the '727 Patent

72.     I understand that the '727 Patent issued on July 7, 2020, from U.S. Application No. 16/556,205, filed on August 29, 2019.  For purposes of this declaration, I have been asked to assume that the '727 Patent is entitled to a Priority Date of April 27, 2005.

Epic Games Ex. 1003
Page 41

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

### 1.    Claims

73.    The '727 Patent has 17 claims, including independent claim 1. Independent claim 1 claims a "computer-implemented method to facilitate electronic communication of a plurality of users."  The remaining 16 dependent claims each recite a "computer-implemented method."   Claims 1–9 and 15–17 are the Challenged Claims of the '727 patent.

### 2.    Summary of the Specification

74.    The specification of the '727 Patent describes similarly technological features that I describe above in Section VI, indicating that a POSITA would have known the claimed limitations of the purported invention before the Priority Date. In its "Summary of the Invention" section, the '727 Patent describes sending messages electronically "based on Internet protocol through a website."  Ex. 1001, 2:29–39.  This section further describes two users: a person (first user) and a user (second user) (although the roles of the first and second user are fungible and reversible).  *See id.*, 2:12–21.  The '727 Patent states that the second user can define the "access priority" of the first user, while the first user can determine whether the second user is available to receive messages.  *See id.*, 2:12–28.  Moreover, the second user may be required to provide the system with contact information (*e.g.*, a telephone number or email address), but this contact information would remain unknown to the first user.  *See id.*, 2:40–47.  The '727 patent states that, when the

Epic Games Ex. 1003
Page 42

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

first user attempts to conveys a message to the second user, several variables are identified to determine the resolution of this attempt, including the identity of the recipient and sender, the urgency of the message, the "access priority" of the sender, and a process (consisting of rules) to manage priority. *See id.*, 2:12–21.

75.    The specification of the '727 Patent describes several variations on the known principles described above. For example, the specification explains that the users are not aware of each other's contact information (*e.g.*, a telephone number or email address). *See id.*, 2:40–47; *see also id.*, 7:19–28. The specification also describes how the recipient can receive a direct communication (*e.g.*, direct call) or an indirect communication (*e.g.*, a voice mail) from the sender based on variables such as the status of the recipient, urgency of the message, and the access priority of the sender. *See id.*, 6:35–50. In other variations, the recipient can categorize communication requests into "different degrees of undesirability" and block undesired communications. *See id.*, 4:37–40. Relatedly, the '727 Patent describes several methods in which a recipient can manage the priority hierarchy of senders trying to communicate with the recipient. *See id.*, 4:43–47; *see also id.*, 5:64–6:10. The specification further describes a first user and second user communicating using text and audio messages. *See id.*, 2:53–55; *see also id.*, 8:41–58.

76.    The '727 Patent describes these features against the backdrop of "automated actions or decisions" (akin to an "intelligent secretary") used to

Epic Games Ex. 1003
Page 43

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

automate a user's message management. *See id.*, 7:48–61. This automated process is handled by "predetermined audio messages." *See id.*, 10:35–12:67. The specification describes similar procedures for deferring and automating responses to incoming text messages. *See id.*, 7:37–47.

77.    In my opinion, much of the disclosure of the '727 specification would have been known to a POSITA simply by virtue of certain prior-art references publicly available at the time. Further, in my opinion, the alleged novelty of the '727 patent described by the specification is "manag[ing] the numerous modes of communication" allowing one user to block another user in a computer-based communications system. *See, e.g.*, *id.*, 2:7–8. Accordingly, as I explain in further detail below, my opinion is that the Challenged Claims of the '727 patent are all rendered at least obvious by Diacakis and further rendered obvious by Tanigawa in view of Hullfish.

### 3.    Summary of the Prosecution History

78.    I have reviewed the prosecution history of the '727 Patent. During prosecution of the '727 Patent, the Examiner issued a Notice of Allowance—finding the pending claims patentable—a mere five months after the application was filed. Ex. 1002, 124. The examiner found that "Claims 1-17 are allowance [sic] according [sic] the history [sic] rejection of Application 12/798,995 now US Patent 8,744,407. Application 14/922,344 now US patent 9,736,664." *See id.*

Epic Games Ex. 1003
Page 44

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

79.     My understanding of the Examiner's actions is that, because the Examiner had examined patent applications related to the '727 Patent, and issued rejections thereupon, he decided it was appropriate to allow the then-pending claims of the '7270 Patent within five months.

80.     I have reviewed the prosecution history of the two prior examinations on which the '727 Examiner based his allowance.    Across the two prior examinations, only two office actions were entered.  *See* Exs. 1030–1031 ('407 and '664 FHs).  First, with respect to the '407 examination, the Examiner issued a single §102/§103 rejection based on Pepper as a primary reference (Ex. 1030 ('407 FH)), but withdrew the rejection after a telephonic inventor interview.

81.     With respect to the '664 examination, the Examiner's only §102/§103 rejection applied Pepper as a primary reference (Ex. 1031 ('664 FH), 66–70)—again, the Examiner withdrew the rejection after the Applicant traversed.  *See id.* 130–33, 187.

### C.     Overview of the '038 Patent

#### 1.     Claims

82.     The '038 Patent has 70 claims, including independent claims 1, 7, 38, and 46.   Independent claim 1 claims an "article for managing messaging of a plurality of users."  Independent claim 7 claims a "non-transitory computer readable medium . . . for managing electronic communications."    Independent claim 38

Epic Games Ex. 1003
Page 45

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

claims    "A    computer-implemented    method    for    managing    electronic

communications."    Independent    claim    46    claims    a    "non-transitory    computer

readable medium . . . that facilitates electronic communication."  Claims 7–12, 22–

24, 33–67 are the Challenged Claims of the '038 Patent.

## 2.    Summary of the Specification

83.    The specification of the '038 Patent describes similarly technological

features that I describe above in Section VI, indicating that a POSITA would have

known the claimed limitations of the purported invention before the Priority Date.

For example, the '038 Patent describes a "network-based portal based on Internet

portal" with different modes of communication, including "text messaging and voice

communication."  Ex. 1001, 2:9–31.  The "Summary of the Invention" section

further describes two users: a sender (first user) and a recipient (second user)

(although the roles for the first and second user are fungible and reversible).  *See id.*

The second user can block the first user from sending messages to the second user,

and the first user can determine whether the second user is available to receive

messages.  *See id.*, 2:19–21.  The second user may be required to provide the system

with contact information (*e.g.*, a telephone number or email address), but this contact

information would remain unknown to the first user.  *See id.*, 2:21–31.  When the

first user conveys a message to the second user, several variables are identified,

Epic Games Ex. 1003
Page 46

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

including the users, the urgency of the message, the "access priority" of the sender, and a process (consisting of rules) to manage priority. *See id.*, 2:31–39.

84.    The specification of the '038 Patent specification describes several variations on the known principles described above.  For example, it describes a recipient postponing non-urgent communications from a relative. *See id.*, 3:60–67. It also describes the second user receiving information indicating the urgency of the communication. *See id.*, 4:1–4.  In other variations, several of a recipient's devices (including home or office phone, mobile phone, computer with email address, etc.) are associated with a single name, allowing the sender to communicate "efficiently" over different modes. *See id.*, 4:5–19, 7:18–21.  It describes a recipient managing the priority hierarchy of senders trying to send messages. *See id.*, 6:17–23.  The specification further describes a sender and recipient communicating using text and audio messages. *See id.*, 7:57–67.

85.    The '038 Patent describes these features against the backdrop of automated actions or decisions (akin to an "intelligent secretary") used to automate message management. *See id.*, 8:1–14.  For example, the specification describes a second user providing "limited information" in response to a first user, but that a "personal call response process" (*e.g.*, answering machine) would provide certain information (such as "health" or "mood" status) to a caller, or set particular rules for when calls can be answered (*e.g.*, no calls at nighttime). *See id.*, 9:10–10:33.  This

Epic Games Ex. 1003
Page 47

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

automated process is handled by "predetermined . . . messages." *See id.*, 10:52–14:68.  The specification describes similar procedures for deferring and automating responses to incoming text messages.  *See id.*, 15:1–18:46.

86.     In my opinion, much of the disclosure of the '038 specification would have been known to a POSITA simply by virtue of certain prior-art references publicly available at the time.  Further, in my opinion, the alleged novelty of the '038 patent described by the specification is "manag[ing] the numerous modes of communication" allowing one user to block another user in a computer-based communications system.  *Id.*, 2:1–3.  Accordingly, as I explain in further detail below, my opinion is that the Challenged Claims of the '038 patent are all rendered at least obvious by Diacakis and further rendered obvious by Tanigawa in view of Hullfish.

### 3.     Summary of the Prosecution History

87.     I have reviewed the prosecution history of the '038 Patent.  During prosecution of the '038 Patent, the Examiner issued a Notice of Allowance—finding the pending claims patentable—barely seven months after the application was filed.  Ex. 1002, 104.  The Examiner found that the claims were "allowance [sic] according to history of rejection of parent case and Terminal Disclaimer filed and approved."  *See id.*  Subsequently, the Applicant of the '038 Patent filed five Requests for Continued Examination, amending the claims and specification.  *See id.*, 137, 197,

Epic Games Ex. 1003
Page 48

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

286, 484, 537.  The Examiner allowed these amendments.  *See id.*, 164, 242, 337, 517, 682.

88.     My understanding of the Examiner's actions is that, because the Examiner had examined patent applications related to the '038 Patent, and issued rejections thereupon, he decided it was appropriate to allow the then-pending claims of the '038 Patent within barely seven months.

89.     I have reviewed the prosecution history of the three prior examinations on which the '038 Examiner based his allowance.   Across the three prior examinations, only two office actions were entered.  *See* Exs. 1030, 1036, 1031 (file histories of '407, '268, and '664 patents).  First, with respect to the '268 patent, the Examiner issued zero office actions.  *See* Ex. 1036.

90.     With respect to the '407 patent, the Examiner issued a single §102/§103 rejection based on Pepper as a primary reference (Ex. 1030 ('407 FH)), but withdrew the rejection after a telephonic inventor interview.  *See id.*, 111–14, 129–30.

91.     With respect to the '664 patent, the Examiner's only §102/§103 rejection applied Pepper as a primary reference (Ex. 1031 ('664 FH), 66–70)—again, the Examiner withdrew the rejection after the Applicant traversed.  *See id.* 130–33, 187.

Epic Games Ex. 1003
Page 49

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

*Id.*, Fig. 1.

116.    Diacakis further discloses an interface that users employ to connect to the server through an Internet Protocol-based connection, which a POSITA would have understood to be a "network-based portal." *See id.*, [0056].  This interface is shown below in Figure 9:



*Id.*, Fig. 9 (showing user interface in yellow within client terminal 22).  The interface is shown in further detail below in Figure 8:

Epic Games Ex. 1003
Page 64

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.



**Fig. 8**

*Id.*, Fig. 8.

> b.    Element [1.1]: providing a plurality of modes of
> communication to a first user to allow the first user to use
> one of the plurality of modes of communication as a
> selected mode of communication for a first message to be
> sent from the first user to a second user, based on an
> identifier associated with the first user previously set by
> the first user via the network-based portal.

117.    In my opinion, Diacakis discloses this element. Diacakis discloses that

a "subscriber" (*i.e.*, the claimed "first user") may wish to communicate with an

"individual" (*i.e.*, the claimed "a second user"). *See* Ex. 1007, [0029]. Specifically,

Diacakis discloses that individuals on a network may "may want to communicate

with other individuals on the communications network." *Id.*, [0008].    To

Epic Games Ex. 1003
Page 65

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

follow the below steps—are stored in a conventional storage device coupled to the server.

242.    Diacakis further discloses managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol.  In Diacakis, multiple users connect to a "presence and availability [P&A] management" over a network.  Ex. 1007, [0003], [0009].  This P&A management server is a computer that detects when any one user is present on any network connected to the P&A management server.  Diacakis explains that "P&A management server 12 in communication with a client terminal 22 via a network 16," where "network 16 may include, for example, the Internet[.]" *Id.*, [0024]– [0025].  Although Diacakis' system refers to the Internet as a network, it is not limited to the Internet. *See id.*  Diacakis' P&A management server 12 is connected to client terminal 22 as shown below in Figure 1:



Fig. 1

Epic Games Ex. 1003
Page 152

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

*Id.*, Fig. 1.  Diacakis further discloses an interface that users employ to connect to the server through an Internet Protocol-based connection, which a POSITA would have understood to be a "network-based portal."  *See id.*, [0056].  This interface is shown below in Figure 9:



*Id.*, Fig. 9 (showing user interface in yellow within client terminal 22).  The interface is shown in further detail below in Figure 8:

Epic Games Ex. 1003
Page 153

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.



**Fig. 8**

*Id.*, Fig. 8.

243.    Diacakis further discloses allowing different communication modes. Diacakis discloses that when an individual is connected to the network, the subscriber may send "text files, audio files, streaming audio files, video files, streaming video files, graphics files and streaming graphics files" to the second user. *See id.*, [0059], [0062]. A POSITA would have recognized that these different forms of communication constitute different communication modes.

244.    Diacakis also teaches a "Contacts Program" window as a component of the user interface (*i.e.*, the network-based portal) which allows a subscriber to

Epic Games Ex. 1003
Page 154

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

determine which modes of communication are available for an individual on the network:



*Id.*, Fig. 8. This Contacts Program window provides a subscriber with information about what communication methods are available to contact an individual on the subscriber's contact list. *Id.* The individual (*i.e.*, the "second user") sets up a profile indicating what communication methods are available for a subscriber to contact them. For example, as shown above, Tom's profile indicates that he can be contacted via voice, but not Instant Messaging ("IM," which refers to an internet-based text

146

Epic Games Ex. 1003
Page 155

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

messaging system). Similarly, Pete may only be contacted by IM, while Corby and Cyndi can be contacted via both voice and IM. *Id.*

245. Diacakis further teaches that the availability of any one method of communication can depend on an access level coding. For example, as shown below in Figure 2, a subscriber with a "Restricted" access level would only be able to communicate with the individual via voicemail, while a subscriber with a "Normal" access level would be able to communicate with the individual via an office telephone, voicemail, and work e-mail:

## OFFICE PROFILE

| Communication Media | Address | Important | Normal | Restricted | Blocked |
|---|---|---|---|---|---|
| Home telephone | (412) 555-1234 | No | No | No | No |
| Office telephone | (412) 555-0101 | Yes (preferred) | Yes | No | No |
| Mobile telephone | (412) 555-4567 | Yes | No | No | No |
| Voicemail | (800) 555-mail | Yes | Yes (preferred) | Yes | No |
| Personal e-mail | user@domain.com | Yes | No | No | No |
| Work e-mail | user@company.com | Yes (preferred) | Yes (preferred) | No | No |
| Instant messaging | user@someplace.com | Yes | No | No | No |

## Fig. 2

*Id.*, Fig. 2.

246. Diacakis teaches that each user (both subscribers and individuals) are associated with a unique identifier. Specifically, with respect to a subscriber, Diacakis teaches an "indicator" (the claimed "one identifier")—which is listed

Epic Games Ex. 1003
Page 156

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

"chat[] using images," and engage in "video chatting." *Id.*, [0221]. Tanigawa's

communication system uses an IP network (reproduced below in Figure 1) that

connects various servers 4, 5, 6, and 10 and various client terminals, including IP

terminals 7, radio terminal 9, and fixed telephone 11:



*Id.*, Fig. 1; *see also id.*, [0035], [0040], [0041], [0057], [0103], [0104].

398.    Tanigawa makes clear that its communications system is based on the

Internet Protocol.  As shown above in Figure 1, Tanigawa's "IP Network" refers to

an "Internet Protocol Network."  *See id.*, [0003], [0009], [0014], [0034].

Epic Games Ex. 1003
Page 225

Ex. 1003 – Declaration of Kevin C. Almeroth, Ph.D.

Additionally, Tanigawa's IP terminals 7 contain a user interface (*i.e.*, the claimed "network-based portal") connecting clients devices to a network. *See id.*, [0162]. This user interface is shown below in Figure 12:



*Id.*, Fig. 12, [0162].

399. Tanigawa further discloses that users are identified to one another via nickname, such as Taro, Jiro, Ichiro, Hanako, and Yoshi (*see id.*, [0050], [0141]–[0143]):

Epic Games Ex. 1003
Page 226

In an IPR claim terms are construed using the standard used in civil actions under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b). The standard used in federal courts is set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Under *Phillips*, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning they would have to a person of ordinary skill in the art at the time of the invention, in light of the specification and prosecution history. *See Phillips*, 415 F.3d at 1312–13.

**B.    The Specification Of The '727 Patent Teaches That The "Network-Based Portal" Is At The Server-Side Of A Network**

The specification of the '727 Patent uses the term "network-based portal" consistently as being at the server-side of a network. In particular, the specification states:

> As explained above, based on an embodiment, a message is electronically conveyed by *a central network server*, *such as a web server* based on [an] Internet protocol. A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems so that users can configure the system behavior they desire. *The portal or gateway can then facilitate download* of a database *or update* thereto *to a communication device, such as a phone*.

Exhibit 1001, '727 Patent at 6:55-63 (emphasis added).

The specification of the '727 Patent further provides that (i) "*a mobile phone*" "*calls a portal*" (*Id*. Col. 6, lines 12-13) (emphasis added)); (ii) the "portal

15

accesses the personal communication device" (*Id*. Col. 6, lines 32-33); and (iii)

"[o]ne example of a networked server is *a gateway computer for a wireless device*,

such as a mobile telephone." (*Id*. at Col. 16, lines 1-3 (emphasis added)).

As shown above, the specification teaches that the claimed "network-based

portal" is at the server-side of a network. The specification does not teach that the

"network-based portal" is at the client-side of a network. The specification

certainly does not support the interpretation that a user interface at a client

constitutes a network-based portal.

### C.     Diacakis's Client Terminal And User Interface Are Not A "Network-Based Portal"

In Grounds I-III, Petitioner relies on Diacakis as disclosing the recited

network-based portal. Petitioner incorrectly contends that the claimed "network-

based portal" is at the client-side of a network. Indeed, Petitioner contends

"Diacakis' client terminal 22" "contains a 'network-based portal,' which is a web

page or interface that connects multiple users to a network." *See* Petition at 36.

Similarly, Petitioner's expert also testified that the claimed "network-based portal"

acts as a client, not as a server: "Diacakis further discloses an *interface* [which

Petitioner contends constitutes the claimed network-based portal] that users

employ *to connect to the server* through an Internet Protocol-based connection,

which a POSITA would have understood to be a 'network-based portal.'" *See*

Exhibit 1003 at ¶ 116 (Declaration of Almeroth) (emphasis added). Thus,

16

Trials@uspto.gov                                                        Paper 10
571-272-7822                                                  Date: May 24, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

———————

IPR2022-00291
Patent 10,708,727 B2

———————

Before JONI Y. CHANG, PATRICK M. BOUCHER, and
STEVEN M. AMUNDSON, *Administrative Patent Judges*.

BOUCHER, Administrative Patent Judge.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314(a)*

Epic Games, Inc. ("Petitioner") filed a Petition pursuant to 35 U.S.C.
§§ 311–319 to institute an *inter partes* review of claims 1–9 and 15–17 of
U.S. Patent No. 10,708,727 B2 (Ex. 1001, "the '727 patent"). Paper 1
("Pet."). IngenioShare, LLC ("Patent Owner") filed a Preliminary

IPR2022-00291
Patent 10,708,727 B2

Response.  Paper 7 ("Prelim. Resp.").  With our authorization, Petitioner filed a Reply.[1]  Paper 9; *see* Paper 8.

We have jurisdiction under 35 U.S.C. § 314 and 37 C.F.R. § 42.4. Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we grant the Petition and institute an *inter partes* review.  The Board has not made a final determination regarding the patentability of any claim.

## I.  BACKGROUND

### A.  The '727 Patent

The '727 patent relates to "automatically remov[ing] unwanted communications."  Ex. 1001, 3:33–34.  Figure 6 of the '727 patent is reproduced below.

---

[1] We also authorized Patent Owner to file a Sur-reply, but Patent Owner did not do so.  *See* Paper 8.

systems." Pet. 25. According to Petitioner, "[a]dditional education might compensate for less experience, and vice-versa." *Id.* Dr. Almeroth supports this articulation, and Patent Owner does not, at this time, propose any different articulation. *See* Ex. 1003 ¶¶ 92–97.

Because we find Petitioner's proposal reasonable, consistent with the level of skill reflected by the prior art, and supported by the testimony of Dr. Almeroth, we adopt it for purposes of this Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art may reflect an appropriate level of skill in the art).

## *C. Claim Construction*

The Board uses "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2021); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Although "Petitioner does not believe that any terms need to be construed to assess the arguments presented" in its Petition, Patent Owner raises an issue with respect to the challenged claims' recitation of a "network-based portal." *See* Pet. 25; Prelim. Resp. 15–16. In particular, Patent Owner contends that "[t]he specification of the '727 Patent uses the term 'network-based portal' consistently as being at the server-side of a network." Prelim. Resp. 15.

Patent Owner supports its contention by identifying examples where the specification of the '727 patent describes a "portal" as separate from a

"mobile phone" or from a person's "wireless device." *Id.* at 15–16 (citing Ex. 1001, 6:12–13, 6:32–33, 6:55–63, 16:1–3). But the specification also includes numerous examples where the portal functionality is implemented in a "mobile phone," i.e., a client-side device. *See* Ex. 1001, 3:10–19, 9:3–10:2, 10:17–13:27, 14:64–15:54, Figs. 7–11. For example, the specification explains that a "mobile communication device," such as a "mobile telephone," may perform steps depicted in Figures 7 through 11. *See id.* at 9:4–8, 10:17–28, 11:60–12:5, 13:1–9, 14:7–13, 14:66–67, 15:44–46; *see also id.* at 14:36–38 (identifying a "mobile telephone" as an example of a "mobile communication device), 17:53–55 (same). And Patent Owner categorizes a "mobile phone" as a client-side device. *See* Prelim. Resp. 16–22. To adopt Patent Owner's exclusion of client-side functionality from the scope of the recited "network-based portal" would thus exclude preferred embodiments. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016). Accordingly, for purposes of this Decision, we decline to adopt such an exclusion. The parties will have an opportunity to elaborate on their positions for proper construction of "network-based portal" during the trial.

On the record before us, we do not find it necessary to construe any other term for purposes of this Decision. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

With respect to the "user interface 112," Diacakis teaches that the "user interface 112" is provided by the client device and that it "may include, for example, a GUI (Graphical User Interface) or a CUI (Character-based user interface)." Exhibit 1007, Diacakis at [0063]; Exhibit 2005, Rouskas Declaration at 20-21, ¶48.

### 1.    A "Portal" Is *Not* A User Terminal Or A Client Communication Device

"In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." Exhibit 2005, Rouskas Declaration at 21, ¶49. "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals." *Id*. Websites are hosted on web servers, not on client communication devices such as Diacakis's client terminal 22. *Id*.

### 2.    The '727 Specification Defines "Portal" As A "Gateway" And Defines A "Gateway" As A "Networked Server"

Consistent with its common meaning, the specification of the '727 patent defines a "portal" as a "communication gateway". Exhibit 1001, '727 Patent at Col. 4, line 3 and lines 43-44, Col. 6, lines 57-58 and line 61; Exhibit 2005,

11

Rouskas Declaration at 21, ¶50.  The specification also defines a "gateway" as a "networked server":

> The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 electronic device, such as a mobile telephone.

Exhibit 1001, '727 Patent at Col. 15, line 67-Col. 16, line 3.  Importantly, the '727 specification does not define "portal" or network-based portal" as an end-user device or client communication device. Exhibit 2005, Rouskas Declaration at 22, ¶50.

### 3.     The Functionality Of A "Portal" Is Different Than That Of A Client Communication Device

Based on the '727 specification's use of the term "portal", a POSITA would understand that the functionality of the claimed "portal" is different than that of a client communication device. Exhibit 2005, Rouskas Declaration at 22, ¶51. Specifically, a POSITA would understand that a portal allows "worldwide access", whereas a client communication device is "associated with a user". *Id*.  This is consistent with the teachings of the '727 specification:

> (1)     "The portal allows worldwide access to the user"

Exhibit 1001, '727 Patent at Col. 4, lines 33-34;

> (2)     "A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems"

12

*Id*. at Col. 6, lines 57-60 (indicating that a portal can be accessed by multiple users

through the Internet); and

> (3)    "Peter wants to make a mobile phone call to the user. In one embodiment, Peter calls a portal…. In another example, Peter is also a registered user of the portal."

*Id*. at Col. 6, lines 12-19 (indicating again that multiple users may access the

portal); Exhibit 2005, Rouskas Declaration at 22-23, ¶51.

In light of the common meaning of "portal," and the specification's use of

the term "portal", a POSITA would understand that the functionality of a "portal"

is different than that of a client communication device because a "portal" allows

"worldwide access", whereas a client communication device is "associated with a

user". Exhibit 2005, Rouskas Declaration at 23, ¶52.  They are two distinct things.

*Id*.

### 4.    <u>Requiring The "Portal" To Be On The Sender's Client Communication Device Leads To A Contradiction</u>

In addition to the specification, the claim language also clearly differentiates

between a "portal" and a client communication device. Exhibit 2005, Rouskas

Declaration at 23, ¶53.  For example, claim element [1.8] states:

> "*contact information associated with the second user* and provided by the second user to *the network-based portal*"

Exhibit 1001, '727 Patent at Claim 1 (emphasis added).

13

Petitioner argues that the user interface on the sender's (first user's) client communication device is the claimed network-based portal ("NBP"). Petition at 35-37. But if that were the case, then the method of claim 1 could not possibly be carried out because [1.8] requires the recipient's (second user's) contact information for messages to be "provided by the second user to the network-based portal", and since Petitioner claims the NBP is on the sender's client communication device, the recipient's contact information necessarily must also be provided to the sender's client communication device. Exhibit 2005, Rouskas Declaration at 23-24, ¶54. However, [1.8] specifically further requires that the second user's "contact information" "is not be provided via the network-based portal to the first user", i.e. the sender's client communication device. *Id*.

Thus, adopting Petitioner's argument leads to a contradiction, making the method useless. Exhibit 2005, Rouskas Declaration at 24, ¶55. This contradiction, however, is resolved by following the '727 specification's and the claims' teaching that the NBP is *distinct* from the sender's client communication device. *Id*.

## 5.    The User Interface Of Diacakis Is Not A "Portal"

The user interface of Diacakis is just that, the user interface of a sender's client communication device. It is not a "portal". Exhibit 2005, Rouskas Declaration at 24, ¶56. A POSITA would understand this based on Diacakis's teachings that:

14

("The portal allows worldwide access to the user").  But a user

terminal/communication device allows access to its user only, and by definition is

not accessible "worldwide". Exhibit 2005, Rouskas Declaration at 26, ¶59.

### 7.    Patent Owner's Construction Of A NBP Does Not Exclude A Preferred Embodiment

The Institution Decision rejected Patent Owner's Preliminary Response

argument that a "network-based portal" resides only "at the server-side of a

network" and excludes "client-side functionality" because the "'727 patent's

specification discloses embodiments where claimed functionality resides in a

'mobile phone,' i.e., a client-side device." Institution Decision at 11.  In doing so,

the Board relied on the notion that the '727 patent's specification discloses

embodiments "where the portal functionality is implemented in a 'mobile phone,'

i.e., a client-side device." *Id*. citing Ex. 1001, 3:10-19, 9:3-10:2, 10:17-13:27,

14:64-15:54, Figs. 7–11.  However, as explained below, the embodiment in Figs.

7-11 are not embodiments concerning use of a NBP. Exhibit 2005, Rouskas

Declaration at 26-27, ¶60.  Indeed, the Board noted that the "parties will have an

opportunity to elaborate on their positions for a proper construction of 'network-

based portal' during trial."  Institution Decision at 11.

Respectfully, construing the NBP as distinct from a client communication

device, such as Diacakis's client communication device, does *not* exclude a

preferred embodiment. Exhibit 2005, Rouskas Declaration at 27, ¶61.

17

Indeed, for Fig. 7, the '727 specification states:

> "Fig. 7 is a flow diagram of a *personal call response process* 200 according to one embodiment of the invention. The personal call response process 200 is *performed by an electronic device*, such as a mobile communication device (e.g., *mobile telephone*).

Exhibit 1001, '727 Patent at Col. 9, lines 4-8; Exhibit 2005, Rouskas Declaration at 27, ¶61.  Similar language is used in describing Figures 8-11. Exhibit 1001, '727 Patent at Figures 8-11; Exhibit 2005, Rouskas Declaration at 27, ¶61.

The method of claim 1 concerns "managing electronic communications using at least a network-based portal" and requires "*enabling*, via the network-based portal, *the message to be received* by the second user"; whereas the embodiments of Figs. 7-11 are methods performed by the second user's device *upon receiving a message*. Exhibit 1001, '727 Patent at Figures 7-11; Exhibit 2005, Rouskas Declaration at 27-28, ¶62.  In other words, Figures 7-11 are not embodiments for "managing electronic communications using at least a network-based portal" as are the claims of the '727 patent.  Instead, Figures 7-11 concern how a recipient user interacting with their client device can respond to an incoming call or message.  As a result, a construction that has the NBP at a server distinct from the second user's communication device *does not exclude a preferred embodiment, if anything, it enables them*. Exhibit 2005, Rouskas Declaration at 27-28, ¶62.

18

Moreover, with respect to Diacakis, Petitioners argue that the claimed NBP is the user interface at *the first user's device* (sender) – not the second user's device. Petition at 35-37.  Petitioner's construction therefore is the one that excludes the embodiments shown in Figs. 7-11 because the methods of Figs. 7-11 cannot be performed by the sender's device. Exhibit 2005, Rouskas Declaration at 28, ¶63.  Furthermore, since Diacakis does not teach making or receiving calls, it necessarily excludes the embodiments shown in Figs. 7-11. *Id*.  In other words, Figs. 7-11 of the '727 patent are not embodiments using a NBP as the claims of the '727 patent require. *Id*.  Instead, Figs. 7-11 concern different embodiments operating at a client communication device that occur after a recipient receives a message/call, and thus are not concerned with managing electronic communication at an NBP. *Id*.

## 8.  [1.0] Summary

Diacakis's P&A system does not render [1.0] obvious to a POSITA. *Id*. at 29, ¶64.  The claim term "network-based portal" also appears in claim elements [1.1], [1.2], [1.3], [1.4], [1.5], and [1.8].  The preamble therefore breaths life and meaning into claim 1.  Claims 2-6, 15, and 17 are not rendered obvious to a POSITA for the same reasons. *Id*.

example, a GUI (Graphical User Interface) or a CUI (Character-based user interface)." Exhibit 1007, Diacakis at [0063].

### 1.    A "Portal" Is *Not* A User Terminal Or A Client Communication Device

49.    "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." *See, e.g.*,

https://www.techopedia.com/definition/13077/portal-internet.  "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals." *See, e.g.*,

https://www.techtarget.com/whatis/definition/portal.  Websites are hosted on web servers, not on client communication devices such as Diacakis's client terminal 22.

### 2.    The '727 Specification Defines "Portal" As A "Gateway" And Defines A "Gateway" As A "Networked Server"

50.    Consistent with its common meaning, the specification of the '727 patent defines a "portal" as a "communication gateway". Exhibit 1001, '727 Patent at Col. 4, line 3 and lines 43-44, Col. 6, lines 57-58 and line 61.  The specification also defines a "gateway" as a "networked server":

> The remote server computer can be a networked server coupled to the
> network 108. One example of a networked server is a gateway

21

computer for a wireless 10 electronic device, such as a mobile telephone.

Exhibit 1001, '727 Patent at Col. 15, line 67-Col. 16, line 3. Importantly, the '727 specification does not define "portal" or network-based portal" as an end-user device or client communication device. *Id.*

### 3.    The Functionality Of A "Portal" Is Different Than That Of A Client Communication Device

51.    Based on the '727 specification's use of the term "portal", a POSITA would understand that the functionality of the claimed "portal" is different than that of a client communication device.   Specifically, a POSITA would understand that a portal allows "worldwide access", whereas a client communication device is "associated with a user".  This is consistent with the teachings of the '727 specification:

(1)    "The portal allows worldwide access to the user"

Exhibit 1001, '727 Patent at Col. 4, lines 33-34;

(2)    "A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems"

*Id*. at Col. 6, lines 57-60 (indicating that a portal can be accessed by multiple users through the Internet); and

(3)    "Peter wants to make a mobile phone call to the user. In one embodiment, Peter calls a portal…. In another example, Peter is also a registered user of the portal."

22

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)

"client communication devices such as Diacakis's client terminal 22." POR, 11.

PO's argument is wrong for several reasons.

*First*, PO relies on the Rouskas Declaration's offering of extrinsic definitions to show that "portals" are websites, but Dr. Rouskas admitted "[t]here's nothing to limit the portal to just a server or a website." *Compare* POR, 11, *with* Ex. 1043, 60:7–61:8; *see also id.*, 57:7–11 (declining to equate "portals" to websites), 58:5–9 (same). Moreover, Dr. Rouskas admitted the two definitions in the Rouskas Declaration were cherry-picked from search results for "portal" rather than from any nuanced inquiry or analysis. *Id.*, 62:24–63:10. This method selectively disregarded definitions that include the word "interface." *See* Exs. 1041 ("A portal is a web-based platform that collects information from different sources into a single ***user interface***[.]"), 1042 ("A mobile portal is an Internet gateway that enables mobile devices to connect remotely . . . typically via a Web browser ***interface***."). In any event, PO's argument limiting "portals" to websites is based on a fundamental misunderstanding of the claim, which Dr. Rouskas yielded in deposition: the Rouskas Declaration claims the NBP cannot be in a client device because it must be "***hosted*** on [a] web server[]," but Dr. Rouskas acknowledged no claim limitation requires the NBP to be "hosted." *Compare* Ex. 2005, ¶ 49 *and* Ex. 1043, 84:11–14, *with id.*, 84:16–85:11.

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)

**Second**, PO incorrectly argues the '727 Patent defines "portal" as a "gateway" and that a gateway is always a "networked server." POR, 11–12. But the specification states that "[a] communication gateway *or* a portal is formed"—not that the portal *is* a communication gateway. Ex. 1001, 4:3–5. Indeed, the specification treats the phrase "portal or gateway" differently from the singular "portal," using these phrases to describe different embodiments, indicating that portals and gateways are two alternative means to establish communication. *See id.*, 4:29–43; 4:43–53, 5:44–64. The specification further states that "[o]ne example of a networked server is a gateway computer"—not that all gateways are servers. Ex. 1001, 16:1–3. Dr. Rouskas admits as much. Ex. 1043, 96:20–97:1 ("It doesn't say that [gateway] means network[ed] server, yes."); *see also id.*, 94:18–95:1; Ex. 1003, ¶¶ 115–16. Dr. Rouskas nevertheless opines that the word "or" defines "portal" as "gateway." *Id.*, 90:17–24. But the '727 Patent's recitation of "portal or gateway" means the two are alternatives, not that one redefines the other. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012) (holding that the phrase "embedded within *or* attached to" did not redefine "embedded" as "attached" or vice versa).

**Third**, PO argues the NBP and client devices have different functionalities because the NBP "allows worldwide access to the user," whereas a "client communication device is 'associated with a user.'" POR, 12–13. This is a

8

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)

distinction without a difference.  As the Petition explains, Diacakis's client terminal (1) connects a user to a network via the NBP **and** (2) is associated with that user. Pet., 35–37.  For instance, as Dr. Rouskas admitted, a user's mobile phone allows worldwide access to that user by allowing others to communicate with the user. Ex. 1043, 110:20–24, 114:2–5 ("One is worldwide access to the user.  A phone provides that, there's no question about that.").  PO offers no explanation why such a device "is not accessible 'worldwide.'"  POR, 17.

**_Fourth_**, PO counters a strawman argument (that only the **_sender's_** device contains the NBP) that Petitioner did not advance.  POR, 13–14, 19.  Relying on this mischaracterization, PO concludes Diacakis cannot meet both the NBP and the negative limitation (_i.e._, communicating without providing contact information) because senders' devices would have access to others' contact information.  _Id_.  This is incorrect.

As the Petition explained, **all** users (including senders and recipients) use Diacakis's NBP to connect to Diacakis's network—_i.e._, the NBP does not solely exist in a sender's device.  Pet., 35–37; Ex. 1003, ¶¶ 115–16.  As Diacakis explains, senders **and recipients** access the NBP via their respective devices.  _See_ Ex. 1007, [0031].  Accordingly, as shown below in Diacakis's Figures 1 and 9, **all** users of communications system 10 access it via client terminals 22, which contain user

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)

interface 112 (*i.e.*, the NBP), indicating that both senders and recipients use this

interface:



Fig. 1

Appx05483

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)



Ex. 1007, Figs. 1, 9.  PO's argument that Diacakis's interface only allows sending (not receiving) messages fails for the same reasons.  POR, 14–15.

**Fifth**, although the Board found PO's argument excluded a preferred embodiment of the '727 Patent (specifically Figures 7–11), PO insists its argument did not because the figures allegedly describe methods performed after receiving a message, rather than enabling receipt of a message.  POR, 17–19.  That is incorrect. The '727 Patent's claims that "messages are eligible **to be received** by the second user via the network-based portal."  Ex. 1001, cl. 1.  In fact, as the Board understood, key "recipient" functionality (*i.e.*, allowing users to specify who may contact them and see their contact information), takes place "all in the phone," since these phones "automatically manage the communication."  *Id.*, 7:6–15; ID, 10–11.  Thus, the NBP

11

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)

not only enables receipt of messages but also manages them.  *See* Ex. 1003, ¶¶ 131–

32.

Moreover, contrary to PO's argument, the client devices described by the '727

Patent enable messages to be received, as annotated in Figure 7 below:

12

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)



FIG. 7

Ex. 1001, Fig. 7; *see also id.*, Figs. 8–11, 3:12–19, 9:4–10:3, 10:17–13:27, 14:64–

15:54.

13

Petitioner's Reply to Patent Owner's Response
IPR2022-00291 (U.S. Pat. No. 10,708,727)

Faced with this fact, PO argues these disclosures are "not embodiments for 'managing electronic communications using at least a network-based portal' as are the claims of the '727 Patent." POR, 18. This is not correct. The '727 Patent's sole independent claim recites an NBP—thus, because the patent's figures are embodiments of the patent, they must include an NBP. PO remains silent as to the purpose of these disclosures, if not related to the claims. As the Board recognized, a construction "which excludes the preferred embodiment is rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) (internal quotation marks omitted). PO's argument thus fails.

## B.    Diacakis Teaches "Messages"

With respect to Elements 1.3 and 1.5, PO argues Diacakis "does not teach a system that actually allows a user to make a communication." POR, 20; *see id.*, 8, 21–23, 31–32. That is wrong. As the Board concluded, Diacakis discloses a first user sending a message to a second user. ID, 23; Pet., 37–38; Ex. 1003, ¶¶ 117–21. Indeed, Diacakis expressly teaches two client devices communicating with each other: "a subscriber at client terminal 22 may first attempt to communicate with an individual at client terminal 140 via one or more intermediate relay hosts 142." Ex. 1007, [0072]. Relay host 142 can be "a presence and availability host" such as Diacakis's P&A server. *See id.* This client-to-client messaging is shown below in Figure 11, which Dr. Rouskas acknowledged in deposition:

14

the Board should agree with Judge Chang's opinion and deny Ground I. Indeed, the POR's evidence is unrebutted.

*Third*, without any citation, or evidence from a POSITA, the Reply posits "the Diacakis system does not provide contact information simply because one user contacts another; rather, it determines whether or not to provide information subject to the recipient's preferences." Reply at 18. In contrast, the POR sets forth many *unrebutted* examples of Diacakis teaching that the contact information not only is provided, but is displayed to the user, including Figs. 2, 3, and 8. POR at 26-29.

That the server "takes into account [the recipient's] preference setting for the subscriber's access group" does not imply that the server "determines whether or not to provide information subject to the recipient's preferences," as Petitioner argues. Reply at 18. Rather, consistent with Diacakis's teachings on "access groups", the quoted sentence simply recognizes that if, say, the "Normal" access group does not have access to, e.g., the IM address, then the server will not provide it; but will provide the telephone, voicemail, and email addresses to which the "Normal" group has access. Exhibit 1007 at [0032]-[0037] and Figs. 2, 3.

Diacakis *does not include any embodiment in which an access group is not provided any contact information but still can communicate with a recipient*. All embodiments differentiate among access groups only in that each has access to

12

*different pieces* of a recipient's contact information. Exhibit 1007 at [0032]. In fact, Diacakis expressly defines a "Blocked access level" as "persons" who "receive not [sic] contact information at all." *Id.* But persons in the "Blocked" level cannot contact the recipient. Therefore, Petitioner's attorney argument that the Diacakis system allows a user who receives no contact information to communicate with a recipient is baseless and not supported by any POSITA evidence.

**Fourth**, PO does not conflate two techniques that allow Diacakis's users to control their interactions. Reply at 18. PO never claimed that Petitioner relies on the blocking feature of Diacakis. PO simply pointed out that Diacakis clearly teaches that only "blocked" persons receive no contact information and that "blocked" persons cannot communicate with the recipient who blocked them. POR at 31.

Moreover, the Reply (and Petition) cites Diacakis's teaching that users can "control *what* contact information observers are allowed to view" and argues that this implies that Diacakis teaches the negative limitation. Reply at 18 (emphasis added). It does not. This citation from Diacakis is consistent with its other teachings (Figures 2, 3, 8, and [0032]-[0037]) which, as discussed above, differentiate among access groups in that each has access to *different pieces* ("what") of contact information. For instance, as Fig. 3 shows, the recipient can

13

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

EPIC GAMES, INC.,
Petitioner

v.

INGENIOSHARE, LLC,
Patent Owner

**U.S. PATENT NO. 10,492,038**

Case IPR2022-TBD

**PETITION FOR *INTER PARTES* REVIEW
UNDER 35 U.S.C. §312 AND 37 C.F.R. §42.104**

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038

| Ground | Claims | Proposed Statutory Rejection |
|--------|--------|------------------------------|
| I | 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57–58, 64–66 | Obvious under §103 in view of Diacakis |
| II | 8, 9, 43, 44, 47, 48, 50, 54 | Obvious under §103 in view of Diacakis in combination with Loveland |
| III | 37, 42, 56, 59–63, 67 | Obvious under §103 in view of Diacakis in combination with Takahashi |
| IV | 45 | Obvious under §103 in view of Diacakis in combination with Loveland and Takahashi |

## VI.    DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE

### A.    The '038 Patent Has Not Been Subject to a Prior Petition

The '038 Patent has not been subject to any prior IPR or PGR petitions.  Thus, this is not a "follow-on" petition and there is no basis for the Board to exercise its discretion under 35 U.S.C. §314(a) and 37 C.F.R. §42.108(a).  *Gen. Plastic Indus. Co. v. Canon Kubushiki Kaisha*, IPR2016-01357, Paper 19 (P.T.A.B. Sept. 6, 2017).

### B.    The Presented Grounds and Argument Are Dissimilar to the Art and Arguments Previously Presented to the Office

#### 1.    *Becton Dickinson* Factors

All factors considered by the Board under 35 U.S.C. §325(d) weigh in favor of institution.  *Becton, Dickinson, & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 (P.T.A.B. Dec. 15, 2017); *see also Advanced Bionics, LLC v. Med-El Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (P.T.A.B. Feb.

6

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038

C.F.R. §42.104(b)(3). "[W]ords of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13. Petitioner does not believe that any terms need to be construed to assess the arguments presented herein.

## X.    OVERVIEW OF THE PRIOR ART

### A.    Overview of Diacakis

Diacakis teaches a "presence and availability management system," and related methods. Ex. 1007, Title, Abstract. Diacakis describes a communication network with several users communicating with one another. *See id.*, [0008]. Individual users use client terminals (*e.g.*, computers or mobile telephones) connected to a presence and availability ("P&A") management server through a network (such as the Internet). *See id.*, [0024]–[0025]. The main functions of the P&A server are to: (1) determine whether a user is ***present*** on the network (*i.e.*, whether the user's device is powered on); (2) determine whether a user is ***available*** on the network (whether the user is willing to receive communications from others); and (3) communicate P&A information to others, depending on the user's preferences. *See id.*, [0026]–[0027]. Figure 1 shows client terminal 22 connected to P&A server 12 via network 16:

26

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038

during the game (*e.g.*, at the start of the game) or when the user operates a function key that corresponds to the stored predetermined message. *Id.*, [0062], [0077]. "As a result, messages which the user can present to the opponent can be limited in advance, so an exchange of unfavorable messages, such as slander, can be prevented, and a net game can progress smoothly." *Id.*, [0138]–[0139].

## XI.    SPECIFIC GROUNDS FOR PETITION

### A.    <u>Ground I</u>: Claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57–58, And 64–66 Are Rendered Obvious by Diacakis

#### 1.    **Independent Claim 7**[5]

##### a.    **Element 7.0**

To the extent the preamble is limiting, Diacakis discloses it. ***First***, Diacakis discloses a non-transitory computer readable medium including at least executable computer program code stored therein: Diacakis teaches a server that includes "software code [that] may be stored as a series of instructions or commands on a computer readable medium, such as a random access memory (RAM), a read only memory (ROM), a magnetic medium such as a hard-drive or a floppy disk, or an optical medium such as a CD-ROM." Ex. 1007, [0038]–[0039].

***Second***, Diacakis discloses managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet

---

[5]    Ex. 1032 is a claim listing that enumerates each claim element.

33

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038

protocol: Diacakis teaches a "presence and availability [P&A] management" server within a communication system. Ex. 1007, [0003], [0009]. Moreover, Diacakis teaches a "P&A management server 12 in communication with a client terminal 22 via a network 16," where "network 16 may include, for example, the Internet[.]" Ex. 1007, [0024]–[0025]. These components are shown below in Figure 1:



*Id.*, Fig. 1. As shown below in Figures 8 and 9, Diacakis' client terminal 22 also contains a "network-based portal," which is a web page or interface that connects clients to a network:

34

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038





*Id.*, Figs. 8, 9, [0056]; Ex. 1003, ¶242.

**F.   The sixth factor the PTAB considers is whether other circumstances impact the PTAB's exercise of discretion, including the merits**

*Fintiv* factor 6 favors denial of institution. Patentee does not presently believe that there is any other circumstance that would impact the Board's exercise of discretion. To the extent there is any merit in Petitioner's arguments raised in the Petition, Petitioner can present them in district court along with the remainder of Petitioner's invalidity arguments, resulting in a more efficient resolution of all of Petitioner's invalidity arguments.

As the *Fintiv* factors favor denial of the Petition, institution should be denied.

## V.    THE PETITION SHOULD BE DENIED BASED ON THE MERITS

### A.    Claim Construction

In an IPR claim terms are construed using the standard used in civil actions under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b). The standard used in federal courts is set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Under *Phillips*, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning they would have to a person of ordinary skill in the art at the time of the invention, in light of the specification and prosecution history. *See Phillips*, 415 F.3d at 1312–13.

### B.    The Specification Of The '038 Patent Teaches That The "Network-Based Portal" Is At The Server-Side Of A Network

12

The specification of the '038 Patent uses the term "network-based portal" consistently as being at the server-side of a network. In particular, the specification states:

> As explained above, based on an embodiment, a message is electronically conveyed by *a central network server*, *such as a web server* based on [an] Internet protocol. A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems so that users can configure the system behavior they desire. *The portal or gateway can then facilitate download* of a database *or update* thereto *to a communication device, such as a phone*.

Exhibit 1001, '038 Patent at 7:9-17 (emphasis added).

The specification of the '038 Patent further provides that (i) "a network-based portal based on Internet protocol, *receives* a message" "*from* a person's wireless device" (*Id.* at Abstract) (emphasis added)); (ii) "*a mobile phone*" "*calls a portal*" (*Id.* Col. 6, lines 33-34) (emphasis added)); (iii) the "portal accesses the personal communication device" (*Id.* Col. 6, lines 53-55); and (iv) "[o]ne example of a networked server is *a gateway computer for a wireless device*, such as a mobile telephone." (*Id.* at Col. 16, lines 17-19 (emphasis added)).

As shown above, the specification teaches that the claimed "network-based portal" is at the server-side of a network. The specification does not teach that the "network-based portal" is at the client-side of a network. The specification

13

## 2. "Network-Based Portal"

Each challenged independent claim requires a "network-based portal." Ex. 1001, 21:50–22:43, 26:1–57, 27:37–28:39. Although Patent Owner does not propose a construction for a "network-based portal," Patent Owner proposes restrictions on that term. *See* Prelim. Resp. 1–2, 4–5, 12–14. In particular, Patent Owner contends that a "network-based portal" resides only "at the server-side of a network" and excludes "client-side functionality." *Id.* at 1–2, 4, 12–14. According to Patent Owner, the '038 patent's specification "universally indicates that the network-based portal is at the server-side." *Id.* at 1. Patent Owner identifies places where the specification describes a "portal" as separate from a "mobile telephone" and a "person's wireless device." *Id.* at 4–5, 13 (citing Ex. 1001, 6:33–34, 6:53–54, 7:9–17, 16:17–19, code (57)). Further, Patent Owner asserts that the specification "certainly does not support the interpretation that a user interface at a client constitutes a network-based portal." *Id.* at 13–14.

Based on the current record, we disagree with Patent Owner that a "network-based portal" resides only "at the server-side of a network" and excludes "client-side functionality." *See* Prelim. Resp. 1–2, 4, 12–14. The '038 patent's specification discloses embodiments where claimed functionality resides in a "mobile phone," i.e., a client-side device. *See* Ex. 1001, 3:29–38, 9:22–10:19, 10:34–13:43, 15:12–16:2, Figs. 7–11.

As an example, Figures 7 through 11 depict steps in processes that include:

- providing a first user with a voice communication mode and a text communication mode, e.g., as recited in limitations [7.1] and [7.2];

23

- enabling a second user to receive a voice message or a text message using a selected communication mode in view of the second user not blocking the first user, e.g., as recited in limitations [7.4] and [7.5]; and

- allowing the second user to receive messages through an electronic device associated with the second user, e.g., as recited in limitation [7.8].

Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2, Figs. 7–11; *see id.* at 3:29–38, 10:6–19.  The specification explains that a "mobile communication device," e.g., a "mobile telephone" or a "mobile phone," may perform the steps depicted in Figures 7 through 11.  *Id.* at 9:22–26, 10:34–45, 12:9–21, 13:16–25, 14:23–28, 14:52–53, 15:14–15, 15:59–61, 18:4–5.

Because the '038 patent's specification discloses embodiments where claimed functionality resides in a "mobile telephone," i.e., a client-side device, construing "network-based portal" to exclude "client-side functionality," such as mobile-phone functionality, would exclude preferred embodiments from claim scope.  *See* Ex. 1001, 3:29–38, 9:22–10:19, 10:34–13:43, 14:52–53, 15:12–16:2, 18:4–5, Figs. 7–11.  A construction excluding a preferred embodiment is "rarely, if ever correct."  *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016).  Consistent with a broader rather than a narrower interpretation, the '038 patent's specification explains that "the invention extends beyond these limited embodiments" described in the specification.  Ex. 1001, 8:29–34; *see id.* at 3:43–47, 20:4–7.

We invite the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of "network-based portal" in the '038 patent's claims.

With respect to the "user interface 112," Diacakis teaches that the "user interface 112" is provided by the client device and that it "may include, for example, a GUI (Graphical User Interface) or a CUI (Character-based user interface)." Exhibit 1007, Diacakis at [0063]; Exhibit 2005, Rouskas Declaration at 20-21, ¶48.

### 1.     A "Portal" Is *Not* A User Terminal Or A Client Communication Device

"In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." Exhibit 2005, Rouskas Declaration at 21, ¶49. "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals." *Id.* Websites are hosted on web servers, not on client communication devices such as Diacakis's client terminal 22. *Id.*

### 2.     The '038 Specification Defines "Portal" As A "Gateway" And Defines A "Gateway" As A "Networked Server"

Consistent with its common meaning, the specification of the '038 patent defines a "portal" as a "communication gateway". Exhibit 1001, '038 Patent at Col. 4, line 22, Col. 4, lines 62-63, Col. 7, lines 11-12, and Col. 7, line 15; Exhibit

Appx06678

2005, Rouskas Declaration at 21, ¶50.  The specification also defines a "gateway"

as a "networked server":

> The remote server computer can be a networked server coupled to the
> network 108. One example of a networked server is a gateway
> computer for a wireless 10 electronic device, such as a mobile
> telephone.

Exhibit 1001, '038 Patent at Col. 16, lines 15-18; Exhibit 2005, Rouskas

Declaration at 21-22, ¶50.  Importantly, the '038 specification does not define

"portal" or "network-based portal" as an end-user device or client communication

device. *Id.*

### 3.     The Functionality Of A "Portal" Is Different Than That Of A Client Communication Device

Based on the '038 specification's use of the term "portal", a POSITA would

understand that the functionality of the claimed "portal" is different than that of a

client communication device.   Specifically, a POSITA would understand that a

portal allows "worldwide access", whereas a client communication device is

"associated with a user".  This is consistent with the teachings of the '038

specification:

> (1)    "The portal allows worldwide access to the user"

Exhibit 1001, '038 Patent at Col. 4, lines 52-53;

> (2)    "A portal or gateway approach could provide general Internet
> access to one or more embodiments of the communication management
> systems"

12

*Id*. at Col. 7, lines 11-14 (indicating that a portal can be accessed by multiple users

through the Internet);

> (3)    "Peter wants to make a mobile phone call to the user. In one
> embodiment, Peter calls a portal…. In another example, Peter is also a
> registered user of the portal."

*Id*. at Col. 6, lines 33-39 (indicating again that multiple users may access the

portal);

> (4)    "not provided to the first user via the electronic device
> associated with the first user, … the message is received by the second user
> via the electronic device associated with the second user,"

*Id*. at Col. 2, lines 25-29; Exhibit 2005, Rouskas Declaration at 22-23, ¶51.

In light of the common meaning of "portal," and the specification's use of

the term "portal", a POSITA would understand that the functionality of a "portal"

is different than that of a client communication device because a "portal" allows

"worldwide access", whereas a client communication device is "associated with a

user".  They are two distinct things. Exhibit 2005, Rouskas Declaration at 23, ¶52.

### 4.    The Claims Also Distinguish A "Portal" From A Client Communication Device

In addition to the specification, the claim language also clearly differentiates

between a "portal" and a client communication device.  For example, claim

elements [7.7] and [7.8] state, respectively:

> "computer program code for *receiving, from the second user, contact
> information associated with the second user* to allow the second user

13

to participate and at least *receive messages via the network-based portal*;

and

"wherein … the contact information associated with the second user is not provided *via the network-based portal* to the first user *via an electronic device associated with the first user*"

Exhibit 1001, '038 Patent at Claim 7 (emphasis added); Exhibit 2005, Rouskas Declaration at 23-24, ¶53; *see also* Exhibit 1001, '038 Patent at Claim 38 ([38.7] and [38.8] and Claim 46 ([46.7] and [46.8]); Exhibit 2005, Rouskas Declaration at 23-24, ¶53.

Petitioner argues that the user interface on the sender's (first user's) client communication device is the claimed network-based portal ("NBP"). Petition at 33-35.  But if that were the case, claim 7 (and claims 38 and 46) could not possibly be carried out because [7.7] (and [38.7] and [46.7]) requires the recipient's (second user's) contact information for messages to be received via the NBP, and since Petitioner claims the NBP is on the sender's client communication device, the recipient's contact information necessarily must also be provided to the sender's client communication device. Exhibit 2005, Rouskas Declaration at 24, ¶54. However, [7.8] (and [38.8] and [46.8]) specifically requires that the contact information not be provided to the sender's client communication device. *Id*.

Thus, adopting Petitioner's argument leads to a contradiction, making the method useless.  This contradiction, however, is resolved by following the '038

14

Case: 23-2177    Document: 23-3    Page: 309    Filed: 03/18/2024

specification's and the claims' teaching that the NBP is *distinct* from the sender's client communication device. Exhibit 2005, Rouskas Declaration at 24, ¶55.

### 5. The User Interface Of Diacakis Is Not A "Portal"

The user interface of Diacakis is just that, the user interface of a sender's client communication device. It is not a "portal". A POSITA would understand this based on Diacakis's teachings that:

> the subscriber may navigate the list of names in the right hand window ("Contacts Program") to access the P&A information regarding the highlighted individual in the left hand window ("Contacts Properties").

Exhibit 1007, Diacakis at [0056]. Based on this teaching, a POSITA would understand that the Diacakis user interface is the interface of the Contacts application on the sender's client communication device; it is not a "portal". Exhibit 2005, Rouskas Declaration at 25, ¶56.

The Diacakis user interface merely provides contact and availability information to a *sender* who wants to send messages *to* his/her contacts using their contact information. Exhibit 2005, Rouskas Declaration at 25, ¶57. In contrast, the '038 "portal" or NBP allows a *recipient* to receive messages *from* multiple senders:

(1)    "The portal allows worldwide access *to* the user",

Exhibit 1001, '038 Patent at Col 4, 52-53.

(2)    "Peter wants to make a mobile phone call to the user. In one

15

8.   **Patent Owner's Construction Of A NBP Does Not Exclude A Preferred Embodiment**

The Institution Decision rejected Patent Owner's Preliminary Response argument that a "network-based portal" resides only "at the server-side of a network" and excludes "client-side functionality" because the "'038 patent's specification discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Institution Decision at 23.  In doing so, the Board relied on the notion that "[t]he '038 patent's specification discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device. *See* Ex. 1001, 3:20–27, 9:11–10:8, 10:24–13:35, 15:4–61, Figs. 7–11." Institution Decision at 23.  However, as explained below, the embodiment in Figs. 7-11 are not embodiments concerning use of a NBP. Exhibit 2005, Rouskas Declaration at 28-29, ¶63.  Nonetheless, the Board "invite[d] the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '038 patent's claims."  Institution Decision at 24; Exhibit 2005, Rouskas Declaration at 29, ¶63.

Respectfully, construing the NBP as distinct from a communication device, such as Diacakis's communication device, does *not* exclude a preferred embodiment. Exhibit 2005, Rouskas Declaration at 29, ¶64.

Indeed, for Fig. 7, the '038 specification states:

"Fig. 7 is a flow diagram of a *personal call response process* 200 according to one embodiment of the invention. The personal call response process 200 is *performed by an electronic device*, such as a mobile communication device (e.g., *mobile telephone*).

Exhibit 1001, '038 Patent at Col. 9, lines 22-26; Exhibit 2005, Rouskas Declaration at 29, ¶64.  Similar language is used in describing Figures 8-11.

Exhibit 1001, '038 Patent at Figures 8-11; Exhibit 2005, Rouskas Declaration at 29, ¶64.

Claim 7 concerns "managing electronic communications of a plurality of users using at least a network-based portal" and requires "*enabling*, via the network-based portal, *the first message to be received* by the second user"; whereas the embodiments of Figs. 7-11 are methods performed by the second user's device *upon receiving a message*. Exhibit 1001, '038 Patent at Figures 7-11; Exhibit 2005, Rouskas Declaration at 29, ¶65.  In other words, Figures 7-11 are not embodiments for "managing electronic communications using at least a network-based portal" as are the claims of the '038 Patent.  Instead, Figures 7-11 concern how a recipient user interacting with their client device can respond to an incoming call or message.  As a result, a construction that has the NBP at a server distinct from the second user's communication device *does not exclude a preferred embodiment, if anything, it enables them*. *Id*. at 29-30, ¶65.

Moreover, with respect to Diacakis, Petitioner argues that the claimed NBP is the user interface at *the first user's device* (sender) – not the second user's

device. Petition at 33-35. Petitioner's construction therefore is the one that excludes the embodiments shown in Figs. 7-11 because the methods of Figs. 7-11 cannot be performed by the sender's device. Exhibit 2005, Rouskas Declaration at 30, ¶66. In other words, Figs. 7-11 of the '038 patent are not embodiments using a NBP as the claims of the '038 patent require. Instead, Figs. 7-11 concern different embodiments operating at a client communication device that occur after a recipient receives a message/call, and thus are not concerned with managing electronic communication at an NBP. *Id*.

### 9.      [7.0] Summary

Diacakis's P&A system does not render [7.0] obvious to a POSITA. *Id*. at 30, ¶67. The claim term "network-based portal" also exists in [7.1], [7.3], [7.4], [7.5], [7.7], and [7.8]. Independent claims 38 and 46 are not rendered obvious to a POSITA for the same reasons. *Id*. As a result, no claim challenged in the Petition is rendered obvious such that the patentability of all challenged claims should be confirmed. *Id*.

### C.      [7.1] Is Not Obviated By Diacakis

[7.1] requires "the first user being identified at least depending on *a prior registration process by the first user* regarding the use of the network-based portal". Exhibit 1001, '038 Patent at Claim 7 (emphasis added); Exhibit 2005, Rouskas Declaration at 31, ¶68.

example, a GUI (Graphical User Interface) or a CUI (Character-based user interface)." Exhibit 1007, Diacakis at [0063].

### 1.    A "Portal" Is *Not* A User Terminal Or A Client Communication Device

49.    "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." *See, e.g.*,

https://www.techopedia.com/definition/13077/portal-internet.  "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. There are general portals and specialized or niche portals." *See, e.g.*,

https://www.techtarget.com/whatis/definition/portal.  Websites are hosted on web servers, not on client communication devices such as Diacakis's client terminal 22. *Id*.

### 2.    The '038 Specification Defines "Portal" As A "Gateway" And Defines A "Gateway" As A "Networked Server"

50.    Consistent with its common meaning, the specification of the '038 patent defines a "portal" as a "communication gateway". Exhibit 1001, '038 Patent at Col. 4, line 22, Col. 4, lines 62-63, Col. 7, lines 11-12, and Col. 7, line 15.  The specification also defines a "gateway" as a "networked server":

> The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 electronic device, such as a mobile telephone.

Exhibit 1001, '038 Patent at Col. 16, lines 15-18.  Importantly, the '038

specification does not define "portal" or "network-based portal" as an end-user

device or client communication device. *Id*.

### 3.    The Functionality Of A "Portal" Is Different Than That Of A Client Communication Device

51.    Based on the '038 specification's use of the term "portal", a POSITA

would understand that the functionality of the claimed "portal" is different than

that of a client communication device.   Specifically, a POSITA would understand

that a portal allows "worldwide access", whereas a client communication device is

"associated with a user".  This is consistent with the teachings of the '038

specification:

> (1)    "The portal allows worldwide access to the user"

Exhibit 1001, '038 Patent at Col. 4, lines 52-53;

> (2)    "A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems"

*Id*. at Col. 7, lines 11-14 (indicating that a portal can be accessed by multiple users

through the Internet);

22

Petitioner's Reply to Patent Owner's Response
IPR2022-00294 (U.S. Pat. No. 10,492,038)

the elements of Claim 7.  As to the few limitations PO does address, they are

obvious.[2]

## A.     Diacakis Teaches A "Network-Based Portal"

As the Board recognized with respect to Element 7.0, giving the term

"network-based portal" its "ordinary and customary meaning," Diacakis discloses

an NBP because it references a ***user interface in a client terminal*** connected to a

P&A management server via a network.  *See* ID, 22–24; Pet., 33–35; Ex. 1003,

¶ 242.  In both the '038 Patent and Diacakis, the claimed functionality appears in

mobile phones—which PO admits are client devices.  POR, 19.

In the POR, PO revives the same argument the Board already rejected: that

the NBP resides only at the server-side of a network and excludes user interfaces of

"client communication devices such as Diacakis's client terminal 22."  POR, 11.

PO's argument is wrong for several reasons.

***First***, PO relies on the Rouskas Declaration's offering of extrinsic definitions

to show that "portals" are websites, but Dr. Rouskas admitted "[t]here's nothing to

limit the portal to just a server or a website."  *Compare* POR, 11, *with* Ex. 1043,

---

[2] PO addresses Independent Claims 38 and 46 only with reference to Claim 7.  POR,

21–35.

Petitioner's Reply to Patent Owner's Response
IPR2022-00294 (U.S. Pat. No. 10,492,038)

60:7–61:8; *see also id.*, 57:7–11 (declining to equate "portals" to websites), 58:5–9

(same).    Moreover, Dr. Rouskas admitted the two definitions in the Rouskas

Declaration were cherry-picked from search results for "portal" rather than from any

nuanced inquiry or analysis.  *Id.*, 62:24–63:10.  This method selectively disregarded

definitions that include the word "interface."  *See* Exs. 1041 ("A portal is a web-

based platform that collects information from different sources into a single ***user

interface***[.]"), 1042 ("A mobile portal is an Internet gateway that enables mobile

devices to connect remotely . . . typically via a Web browser ***interface***.").   In any

event, PO's argument limiting "portals" to websites is based on a fundamental

misunderstanding of the claim, which Dr. Rouskas yielded in deposition:   the

Rouskas Declaration claims the NBP cannot be in a client device because it must be

"***hosted*** on [a] web server[]," but Dr. Rouskas acknowledged no claim limitation

requires the NBP to be "hosted."  *Compare* Ex. 2005, ¶ 49 *and* Ex. 1043, 84:11–14,

*with id.*, 84:16–85:11.

　　　　***Second***, PO incorrectly argues the '038 Patent defines "portal" as a "gateway"

and that a gateway is always a "networked server."   POR, 11–12.   But the

specification states that "[a] communication gateway ***or*** a portal is formed"—not

that the portal ***is*** a communication gateway.  Ex. 1001, 4:23–24.  Indeed, the

specification treats the phrase "portal or gateway" differently from the singular

"portal," using these phrases to describe different embodiments, indicating that

6

Petitioner's Reply to Patent Owner's Response
IPR2022-00294 (U.S. Pat. No. 10,492,038)

portals and gateways are two alternative means to establish communication. *See id.*, 4:33–47; 4:48–62, 4:62–5:4. The specification further states that "[o]ne example of a networked server is a gateway computer"—not that all gateways are servers. Ex. 1001, 16:17–19. Dr. Rouskas admits as much. Ex. 1043, 96:20–97:1 ("It doesn't say that [gateway] means network[ed] server, yes."); *see also id.*, 94:18–95:1; Ex. 1003, ¶¶ 242. Dr. Rouskas nevertheless opines that the word "or" defines "portal" as "gateway." *Id.*, 90:17–24. But the '038 Patent's recitation of "portal or gateway" means the two are alternatives, not that one redefines the other. *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1367-68 (Fed. Cir. 2012) (holding that the phrase "embedded within *or* attached to" did not redefine "embedded" as "attached" or vice versa).

**Third**, PO argues the NBP and client devices have different functionalities because the NBP "allows worldwide access to the user," whereas a "client communication device is 'associated with a user.'" POR, 12–13. This is a distinction without a difference. As the Petition explains, Diacakis's client terminal (1) connects a user to a network via the NBP **and** (2) is associated with that user. Pet., 33–35. For instance, as Dr. Rouskas admitted, a user's mobile phone allows worldwide access to that user by allowing others to communicate with the user. Ex. 1043, 110:20–24, 114:2–5 ("One is worldwide access to the user. A phone

7

Petitioner's Reply to Patent Owner's Response
IPR2022-00294 (U.S. Pat. No. 10,492,038)

provides that, there's no question about that.").  PO offers no explanation why such

a device "is not accessible 'worldwide.'"  POR, 13, 15–16.

**Fourth**, PO counters a strawman argument (that only the **sender's** device

contains the NBP) that Petitioner did not advance.  POR, 14, 16–17, 27–28.  Relying

on this mischaracterization, PO concludes Diacakis cannot meet the NBP limitation,

the identifier limitation (*i.e.*, a user's "corresponding identifier" is "set via the

network-based portal") because a recipient cannot use the sender's device to set the

recipient's identifier, and the negative limitation (*i.e.*, communicating without

providing contact information) because senders' devices would have access to

others' contact information.  *Id*.  This is incorrect.

As the Petition explained, **all** users (including senders and recipients) use

Diacakis's NBP to connect to Diacakis's network—*i.e.*, the NBP does not solely

exist in a sender's device.  Pet., 33–35; Ex. 1003, ¶ 242.  As Diacakis explains,

senders **and recipients** access the NBP via their respective devices.  *See* Ex. 1007,

[0031] (explaining that users of Diacakis's system 10 instruct the system how, when,

and from whom they prefer to receive communications).  Accordingly, as shown

below in Diacakis's Figures 1 and 9, **all** users of communications system 10 access

it via client terminals 22, which contain user interface 112 (*i.e.*, the NBP), indicating

that both senders and recipients use this interface:

8



**Fig. 1**



**Fig. 9**

Petitioner's Reply to Patent Owner's Response
IPR2022-00294 (U.S. Pat. No. 10,492,038)

Ex. 1007, Figs. 1, 9.  PO's argument that Diacakis's interface only allows sending

(not receiving) messages fails for the same reasons.  POR, 8, 22–25.

*Fifth*, although the Board found PO's argument excluded a preferred

embodiment of the '038 Patent (specifically Figures 7–11), PO insists its argument

did not because the figures allegedly describe methods performed after receiving a

message, rather than enabling receipt of a message.  POR, 19–21.  That is incorrect.

The '038 Patent's claims state "the first message is received by the second user."

Ex. 1001, cls. 7, 38, 46.  In fact, as the Board understood, key "recipient"

functionality (*i.e.*, allowing users to specify who may contact them and see their

contact information), takes place "all in the phone," since these phones

"automatically manage the communication."  *Id.*, 7:32–36; ID, 23–24.  Thus, the

NBP not only enables receipt of messages but also manages them.  *See* Ex. 1003,

¶ 263.

Moreover, contrary to PO's argument, the client devices described by the '038

Patent enable messages to be received, as annotated in Figure 7 below:

10

Petitioner's Reply to Patent Owner's Response
IPR2022-00294 (U.S. Pat. No. 10,492,038)



Ex. 1001, Fig. 7; *see also id.*, Figs. 8–11, 3:29–33, 9:22–10:5, 10:34–13:43, 15:12–16:19.

Faced with this fact, PO argues these disclosures are "not embodiments for 'managing electronic communications using at least a network-based portal' as are the claims of the '038 Patent." POR, 20. This is not correct. All of the '038 Patent's

11

Petitioner's Reply to Patent Owner's Response
IPR2022-00294 (U.S. Pat. No. 10,492,038)

independent claims recite an NBP—thus, because the patent's figures are embodiments of the patent, they must include an NBP.  PO remains silent as to the purpose of these disclosures, if not related to the claims.  As the Board recognized, a construction "which excludes the preferred embodiment is rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) (internal quotation marks omitted).  PO's argument thus fails.

### B.    Diacakis Teaches A "Prior Registration Process"

With respect to Element 7.1, PO does not dispute that Diacakis's users must undergo a prior registration process. Pet., 41–42.  Rather, PO argues that "a user does not go through a registration process with their Contact app before they can use [Diacakis]; they simply open it and use it." POR, 22.  Yet, the claim merely requires a "prior registration process by the first user regarding the use of the network-based portal." Ex. 1001, cl. 7.  It does not require a user to register "with their Contact app"—which PO improperly attempts to inject.  PO cites nothing suggesting a user could "simply open [] and use" Diacakis's system without any registration. POR, 22.

### C.    Diacakis Teaches "Messages"

With respect to Elements 7.3, 7.5, 7.7, and 7.8, PO argues Diacakis "does not teach a system that actually allows a user to make a communication."  POR, 22; *see id.*, 8, 21–27, 35.  That is wrong.  As the Board concluded, Diacakis discloses a first

12

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**
_____

EPIC GAMES, INC.,
Petitioner

v.

INGENIOSHARE, LLC,
Patent Owner

**U.S. PATENT NO. 10,492,038**

Case IPR2022-TBD

**PETITION FOR *INTER PARTES* REVIEW
UNDER 35 U.S.C. §312 AND 37 C.F.R. §42.104**

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038

| Ground | Claims | Proposed Statutory Rejection |
|--------|--------|------------------------------|
| I | 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57–58, 64–66 | Obvious under §103 in view of Tanigawa in combination with Hullfish |
| II | 8, 9, 43, 44, 47, 48, 50, 54 | Obvious under §103 in view of Tanigawa in combination with Hullfish and Loveland |
| III | 37, 42, 56, 59–63, 67 | Obvious under §103 in view Tanigawa in combination with Hullfish and Takahashi |
| IV | 45 | Obvious under §103 in view of Tanigawa in combination with Hullfish, Loveland, and Takahashi |

## VI.   DISCRETIONARY DENIAL IS NOT APPROPRIATE HERE

### A.   The '038 Patent Has Not Been Subject to a Prior Petition

The '038 Patent has not been subject to any prior IPR or PGR petitions.  Thus, this is not a "follow-on" petition and there is no basis for the Board to exercise its discretion under 35 U.S.C. §314(a) and 37 C.F.R. §42.108(a).  *Gen. Plastic Indus. Co. v. Canon Kubushiki Kaisha*, IPR2016-01357, Paper 19 (P.T.A.B. Sept. 6, 2017).

---

Aug. 5, 2019) (allowing separate petitions challenging a large number of claims); *Microsoft Corp. v. IPA Techs. Inc.*, IPR2019-00814, Paper 12, 14 (P.T.A.B., Nov. 6, 2019) (similar).

6

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038

C.F.R. §42.104(b)(3). "[W]ords of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13. Petitioner does not believe that any terms need to be construed to assess the arguments presented herein.

## X.    OVERVIEW OF THE PRIOR ART

### A.    Overview of Tanigawa

Tanigawa describes a communication system with several users employing text- and voice-based communications over the Internet, allowing users to transition between text and voice chat, even in a multi-party chat environment. Ex. 1010, [0006], [0035]. As illustrated below, Tanigawa's users can use several client terminal devices, including personal computers (with or without telephones), fixed telephones, and mobile telephones:

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038

2.     **Independent Claim 7**[5]

a.     **Element 7.0**

To the extent the preamble is limiting, Tanigawa discloses it.  ***First***, Tanigawa discloses a non-transitory computer readable medium including at least executable computer program code stored therein: Tanigawa teaches that a "program for configuring" IM server 4 "may be directly loaded from a storage medium (not shown) such as a CD-ROM . . . . Alternatively, the program may be stored in the external memory device 43 and then may be loaded to the memory 42."  Ex. 1010, [0040].  Thus, a POSITA would have understood that Tanigawa's apparatus contains storage devices coupled to the IM server 4 with executable instructions (*i.e.*, a predetermined program).  *See also id.*, [0057] (AP server 5), [0068] (IP terminals 7), [0090] (MD server 6), [0104] (VR server 10); Ex. 1003, ¶395-96.

***Second***, Tanigawa discloses managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol: Tanigawa teaches a "communication system and communication method" wherein servers facilitate "text chatting" and "voice chatting" among client devices. *See* Ex. 1010, Title, Abstract, [0036].  As shown below in Figure 1, Tanigawa's communications system is based on the Internet protocol (*i.e.*, "IP Network"), which connects various servers and client terminals:

---

[5]  Ex. 1032 is a claim listing that enumerates each claim element.

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038



*Id.*, Fig. 1; *see also id.*, [0003], [0009], [0014], [0034], [0035], [0040], [0041], [0057], [0103], [0104].

Moreover, Tanigawa's IP terminal contains a "network-based portal," which is a user interface that connects clients to a network (shown below in Figure 12):

38

Petition for *Inter Partes* Review of U.S. Patent No. 10,492,038



Ex. 1010, Fig. 12, [0162]; Ex. 1003, ¶¶397-98.

**Third**, Tanigawa discloses allowing different communication modes: Tanigawa teaches that users may engage in "text chat," "voice chat," "chatting using images," and "video chatting." Ex. 1010, [0036], [0221].

**Fourth,** Tanigawa discloses depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal: IM server 4 uses a presence information management table (as shown in Figure 3) to manage presence

39

courts is set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Under *Phillips*, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning they would have to a person of ordinary skill in the art at the time of the invention, in light of the specification and prosecution history. *See Phillips*, 415 F.3d at 1312–13.

**B.      The Specification Of The '038 Patent Teaches That The "Network-Based Portal" Is At The Server-Side Of A Network**

The specification of the '038 Patent uses the term "network-based portal" consistently as being at the server-side of a network. In particular, the specification states:

> As explained above, based on an embodiment, a message is electronically conveyed by *a central network server*, *such as a web server* based on [an] Internet protocol. A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems so that users can configure the system behavior they desire. *The portal or gateway can then facilitate download* of a database *or update* thereto *to a communication device, such as a phone*.

Exhibit 1001, '038 Patent at 7:9-17 (emphasis added).

The specification of the '038 Patent further provides that (i) "a network-based portal based on Internet protocol, *receives* a message" "*from* a person's wireless device" (*Id*. at Abstract) (emphasis added)); (ii) "*a mobile phone*" "*calls a*

*portal*" (*Id*. Col. 6, lines 33-34) (emphasis added)); (iii) the "portal accesses the personal communication device" (*Id*. Col. 6, lines 53-55); and (iv) "[o]ne example of a networked server is *a gateway computer for a wireless device*, such as a mobile telephone." (*Id*. at Col. 16, lines 17-19 (emphasis added)).

As shown above, the specification teaches that the claimed "network-based portal" is at the server-side of a network. The specification does not teach that the "network-based portal" is at the client-side of a network. The specification certainly does not support the interpretation that a user interface at a client constitutes a network-based portal.

### C.   <u>Tanigawa's User Interface Does Not Teach A "Network-Based Portal"</u>

Petitioner incorrectly contends (with respect to Tanigawa) that the claimed "network-based portal" is a "a user interface that connects clients to a network," *i.e.*, the network-based portal is at the client-side of the network, not the server-side. The portion of Tanigawa that Petitioner relies upon merely teaches a user interface provided by a client device; it does not teach anything that is at the server-side of a network.

Figure 12 of Tanigawa shows a "user interface of" a "client, which is displayed in an IP terminal 7":

14



*Id.* at [0025].

As shown in Figure 1 of Tanigawa, the user interface provided by an IP

terminal (such as 7-1, 7-2, 7-3) is at the client-side of the network:



15

In summary, Tanigawa's user interface provided by a client device (IP Terminal) is at the client-side of the network. Tanigawa's user interface is not at the server-side of the network. Thus, Tanigawa's user interface cannot be a "network-based portal," which is at the server-side of a network.

Petitioner points to nothing in Hullfish curing this defect in its allegations based on Tanigawa. As a result, the combination of Tanigawa and Hullfish fails to obviate the claims of the '038 patent challenged in Ground I because the combination fails to teach or suggest the claimed "network-based portal." The Board should therefore deny institution on Ground I of the Petition. Likewise, Petitioner fails to point to anything in Loveland or Takahashi curing this deficiency. Thus, the Board should also deny institution on Grounds II-IV.

16

## VI.    CONCLUSION

For the above stated reasons, the Petition should be denied.

Respectfully submitted this 13th day of March, 2022.


/Stephen R. Risley/

Stephen R. Risley
Email: steverisley@kentrisley.com
Telephone: (404) 585-2101
Cortney S. Alexander
Email: cortneyalexander@kentrisley.com
Telephone: (404) 855-3867

KENT & RISLEY LLC
5755 North Point Parkway, Suite 57
Alpharetta, GA 30022

Attorneys for Patent Owner,
IngenioShare, LLC

17

## **CERTIFICATE OF COMPLIANCE**

This Preliminary Response complies with the type-volume limitation as mandated in 37 C.F.R. § 42.24, totaling 3,006 words. Counsel has relied upon the word count feature provided by Microsoft Word.

/*Stephen R. Risley*/
Stephen R. Risley
Registration No. 35,659

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **Patent Owner's Preliminary Response Under 37 C.F.R. § 42.107** was served on March 13, 2022, via email on the following counsel for Petitioners:

W. Todd Baker (No. 45,265)
todd.baker@kirkland.com
Postal and Hand-Delivery Address:
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Yimeng Dou (No. 69,770)
yimeng.dou@kirkland.com
Postal and Hand-Delivery Address:
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

KENT & RISLEY LLC

*/Stephen R. Risley/*

19

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____


EPIC GAMES, INC.,
Petitioner,


v.


INGENIOSHARE, LLC,
Patent Owner


**U.S. PATENT NO. 10,492,038**

Case IPR2022-00295


**PETITIONER'S REPLY TO PATENT OWNER'S PRELIMINARY
RESPONSE UNDER 37 C.F.R. §§ 42.23, 42.24(c), AND 42.108(c)**

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Fintiv, Inc.*,
    IPR2020-00019, Paper 11 (P.T.A.B. Mar. 20, 2020) ................................. *passim*

*Beckman Coulter, Inc. v. Sysmex Corp.*,
    IPR2020-01503, Paper 10 (P.T.A.B. Feb. 23, 2021) ........................................... 3

*Facebook, Inc. v. Express Mobile, Inc.*,
    IPR2021-01456 Paper 10 (P.T.A.B. Mar. 3, 2022) ............................................. 3

**Other Authorities**

35 U.S.C. §314(a) ..................................................................................................... 1

ii

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

## LIST OF PETITIONER'S EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 10,492,038 |
| 1002 | File History of U.S. Patent No. 10,492,038 |
| 1003 | Declaration of Dr. Kevin Almeroth in Support of *Inter Partes Review* of U.S. Patent No. 10,492,038 |
| 1004 | *Curriculum Vitae* of Dr. Kevin Almeroth |
| 1005 | U.S. Provisional Patent Application No. 60/527,565 |
| 1006 | U.S. Provisional Patent Application No. 60/689,686 |
| 1008 | U.S. Patent No. 7,287,056 ("Loveland") |
| 1009 | U.S. Patent Application 2002/0183114 ("Takahashi") |
| 1010 | U.S. Patent Application 2004/0001480 ("Tanigawa") |
| 1011 | U.S. Patent No. 7,428,580 ("Hullfish") |
| 1012 | IngenioShare's Infringement Contentions in Texas Litigation |
| 1013 | Texas Litigation Proposed Scheduling Order |
| 1014 | Fourteenth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic |
| 1015 | Judge Albright's Standing Order re Inter-District Transfer |
| 1016 | Kurose, J. and Ross, K., Computer Networking: A Top-Down Approach Feature the Internet (2000) |
| 1017 | Kuehn, S., A Play Theory Analysis of Computer-Mediated Telecommunication (Apr. 20, 1990) |
| 1018 | Telecomputing in Japan |
| 1019 | Hernandez, R., ECPA and Online Computer Privacy (1988) |

iii

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

| Exhibit No. | Description |
|---|---|
| 1020 | Miller, A., Applications of Computer Conferencing to Teacher Education and Human Resource Development (1991) |
| 1021 | Benimoff, N. and Burns, M., Multimedia User Interfaces for Telecommunications Products and Services (1993) |
| 1022 | Falconer, W. and Hooke, J., Telecommunications Services in the Next Decade (1986) |
| 1023 | Hine, N.A., et al., An Adaptable User Interface to a Multimedia Telecommunications Conversation Service for People with Disabilities (1995) |
| 1024 | Bazaios, A., et al., Multimedia Architecture Offering Open Distance Learning Services over Internet |
| 1025 | Stein, J., et al., Chat and Instant Messaging Systems (2002) |
| 1026 | U.S. Patent No. 6,241,612 ("Heredia") |
| 1027 | U.S. Patent Application 2003/0216178 ("Danieli") |
| 1028 | International Patent Application WO 01/45343 ("Davies") |
| 1029 | Grinter, R. and Palen, L., Instant Messaging in Teen Life (2002) |
| 1030 | File History of U.S. Patent No. 8,744,407 |
| 1031 | File History of U.S. Patent No. 9,736,664 |
| 1032 | U.S. Patent No. 10,492,038 Claim Listing |
| 1033 | U.S. Patent No. 6,828,924 ("Gustavsson") |
| 1034 | Patil, S. and Kobsa, A., The Challenges in Preserving Privacy in Awareness Systems (2003) |
| 1035 | Internet Engineering Task Force RFC 2779 (Instant Messaging/Presence Protocol Requirements) (2000) |
| 1036 | File History of U.S. Patent No. 9,204,268 |

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

On March 31, 2022, the Board issued an Order authorizing Petitioner Epic Games, Inc. ("Epic Games" or "Petitioner") to file a four-page Reply to address Patent Owner's Preliminary Response ("POPR").  Paper 9.  In the POPR, Patent Owner repeatedly cites the parallel district court proceeding (the "Texas Litigation") to urge the Board to exercise its discretionary power under 35 U.S.C. § 314(a) and *Fintiv*.  *See Apple v. Fintiv*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020).

On March 18, 2022, District Judge Alan Albright granted Petitioner's Motion to Dismiss the Texas Litigation, thereby terminating it.  As explained in further detail below, this dismissal moots Patent Owner's arguments based on *Fintiv*. Because there is no longer any parallel proceeding, there is no basis for a discretionary denial under § 314(a).

**Factor 1 (Stay Pending IPR Institution):**  Patent Owner argues that "[t]he district court has not issued a stay in the parallel district court proceeding" and that "Petitioner has not filed a motion to stay with the district court."  POPR at 8.  The Texas Litigation has been terminated; thus, there is no parallel proceeding to stay.

**Factor 2 (Proximity of Trial to Final Written Decision):**  Patent Owner's arguments should be disregarded as there is no parallel proceeding.

**Factor 3 (Investment in Parallel Proceeding):**  Patent Owner alleges that "voluminous and overlapping invalidity arguments" exist for the District Court and the Board to resolve favor denial of institution.  POPR at 10.  Not only is this

1

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

argument irrelevant to Factor 3—which contemplates the "amount and type of work

***already completed*** in the parallel litigation" (*Fintiv* at 9)—it is moot, as the Texas

Litigation has been terminated.

Patent Owner further argues that, "given Petitioner's/Defendant's inconsistent

positions with respect to four claim terms of the '038 Patent . . . it is possible that a

claim term could be construed inconsistently." POPR at 9–10. This argument is

irrelevant and moot. The District Court did not issue a *Markman* order before

terminating the Texas Litigation, so Patent Owner's argument does not reflect "work

already completed in the parallel litigation." *Fintiv* at 9. This argument is further

irrelevant in light of the fact that here, Patent Owner does not offer any constructions

of its own.

Moreover, Petitioner's positions were not inconsistent. Petitioner explained

that it "does not believe that any terms need to be construed to assess the arguments

presented herein." Petition at 26. The Board has found that a petitioner is not

inconsistent when it "states no express construction of any terms is needed" in an

IPR petition while advocating affirmative claim construction positions in a different

forum. *E.g.*, *Facebook, Inc. v. Express Mobile, Inc.*, IPR2021-01456, Paper 10 at

19 (granting institution without construing terms because "it is not clear that

Petitioner is, in fact, advocating a position before us that is ***inconsistent*** with its

previous position in district court") (italics in original); *see also Beckman Coulter,*

2

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

*Inc. v. Sysmex Corp.*, IPR2020-01503, Paper 10 at 28 ("Our rules do not require that, for every term for which Petitioner has proposed an express construction in a related proceeding, Petitioner must propose the same construction in the Petition."). Even if Petitioner had taken inconsistent positions (it has not), the Board has held that "petitioners may advocate in different fora for seemingly inconsistent positions." *Facebook* at 19.

**Factor 4 (Overlap of Petition and Parallel Proceeding Issues):** Patent Owner repeats its arguments based on "voluminous invalidity contentions in the district court litigation" and Petitioner's allegedly "inconsistent claim construction positions." These arguments should be disregarded for the same reasons discussed above with respect to Factor 3.

Additionally, Patent Owner argues that the Petition "advocates for an interpretation of 'network-based portal' (i.e., a client terminal providing 'a user interface that connects clients to a network') that deviates from its ordinary meaning." POPR at 11–12. This is incorrect—Petitioner does not advance any claim construction positions for any terms. Petition at 26. Moreover, Patent Owner does not explain the basis for its statement that the Petition deviates from the ordinary meaning of "network-based portal." Nor does Patent Owner articulate what it believes the ordinary meaning is.

3

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

**Factor 5 (Identity of the Parties)**: Patent Owner's argument is moot, as the Texas Litigation has been terminated.

**Factor 6 (Other Relevant Circumstances, Including the Merits)**: As set forth in the Petition, Petitioner has demonstrated a likelihood of success on the merits. Patent Owner advances no other other argument (and identifies no other circumstance) that weighs in favor of discretionary denial.

For the above reasons, and in light of the termination of the Texas Litigation, Petitioner respectfully requests that the Board grant institution of the Petition.

Date: April 7, 2022                    Respectfully submitted,

*/s/ W. Todd Baker*
W. Todd Baker (No. 45,265)
todd.baker@kirkland.com
Postal and Hand-Delivery Address:
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Yimeng Dou (No. 69,770)
yimeng.dou@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*Attorneys for Petitioner Epic Games, Inc.*

4

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

## <u>CERTIFICATE OF COMPLIANCE</u>

This Petition complies with the type-volume limitations as mandated in 37

C.F.R. §42.24, totaling 769 words. Counsel has relied upon the word count feature

provided by Microsoft Word.

*/s/ W. Todd Baker*
W. Todd Baker (No. 45,265)

Petitioner's Reply to Patent Owner's Preliminary Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was

served on April 7, 2022 by electronic mail on the attorneys of record below:

> Cortney Alexander
> cortneyalexander@kentrisley.com
> Stephen R. Risley
> steverisley@kentrisley.com

A courtesy copy was also served by via overnight delivery directed to the

attorney/agent of record for the patent as identified on USPTO PAIR and associated

with USPTO Customer No. 34,071 at the following address:

> C. Thomas (No. 32,947)
> Peter Tong (No. 35,757)
> 4010 Moorpark Ave., Ste. 211
> San Jose, CA 95117

<u>/s/ W. Todd Baker</u>
W. Todd Baker (No. 45,265)

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

————————————

IPR2022-00295
Patent 10,492,038 B2

————————————

Before JONI Y. CHANG, PATRICK M. BOUCHER, and
STEVEN M. AMUNDSON, *Administrative Patent Judges*.

AMUNDSON, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

## I. INTRODUCTION

Epic Games, Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 7–12, 22–24, and 33–67 in U.S. Patent No. 10,492,038 B2 (Exhibit 1001, "the '038 patent") under 35 U.S.C. §§ 311–319.  Paper 1 ("Pet.").  IngenioShare, LLC ("Patent Owner") filed a Preliminary Response.  Paper 8 ("Prelim. Resp.").

Under 37 C.F.R. § 42.4(a), we have authority to determine whether to institute an *inter partes* review.  We may institute an *inter partes* review only if "the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a) (2018).  The "reasonable likelihood" standard is "a higher standard than mere notice pleading" but "lower than the 'preponderance' standard to prevail in a final written decision."  *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 13 (PTAB Dec. 20, 2019) (precedential).

Based on the current record and for the reasons explained below, Petitioner has shown that there is a reasonable likelihood that it would prevail with respect to at least one of the challenged claims.  Thus, we institute an *inter partes* review of claims 7–12, 22–24, and 33–67 in the '038 patent on all challenges included in the Petition.

## II. BACKGROUND

### A. Real Parties in Interest

Petitioner identifies itself as the real party in interest.  Pet. 2.  Patent Owner identifies itself as the real party in interest.  Paper 6, 2.  The parties do not raise any issue about real parties in interest.

2

IPR2022-00295
Patent 10,492,038 B2

## B. Related Matters

Petitioner and Patent Owner identify the following civil action where Patent Owner has asserted the '038 patent and other patents against Petitioner: *IngenioShare, LLC v. Epic Games, Inc.*, No. 6:21-cv-00663-ADA (W.D. Tex. filed June 25, 2021) ("the Texas case").  Pet. 2; Prelim. Resp. 2; Paper 6, 2.

Patent Owner identifies the following Board proceedings as related matters:

- *Epic Games, Inc. v. IngenioShare, LLC*, IPR2022-00202 (U.S. Patent No. 10,142,810 B2);

- *Epic Games, Inc. v. IngenioShare, LLC*, IPR2022-00291 (U.S. Patent No. 10,708,727 B2);

- *Epic Games, Inc. v. IngenioShare, LLC*, IPR2022-00294 (U.S. Patent No. 10,492,038 B2); and

- *Epic Games, Inc. v. IngenioShare, LLC*, IPR2022-00297 (U.S. Patent No. 8,744,407 B2).

Paper 6, 2–3.

## C. The '038 Patent (Exhibit 1001)

The '038 patent, titled "Method and Apparatus to Manage Messaging Providing Different Communication Modes Depending on One Identifier and Not Requiring to Disclose Contact Information," issued on November 26, 2019, from an application filed on September 14, 2017. Ex. 1001, codes (22), (45), (54).  The patent identifies that application as the last in a series of continuation and continuation-in-part applications that started with an application filed on December 7, 2004. *Id.* at 1:10–41, code (63).

The '038 patent explains that an individual may (1) employ numerous modes of communication, such as desk phone, cell phone, email, and instant messaging, and (2) "have more than one phone number and multiple electronic mail addresses." Ex. 1001, 1:59–64. The patent states that "there is still a need to help manage the numerous modes of communication." *Id.* at 2:1–3. The patent discloses "systems and methods to manage electronic communications." *Id.* at code (57); *see id.* at 3:52–5:63.

For example, the '038 patent discloses a communications apparatus that:

(1)  "provides different communication modes to a first user, with messages eligible to be received by a second user based on any of the modes, depending on an identifier associated with the second user";

(2)  "receives an indication from the first user to select a communication mode for a message for the second user"; and

(3)  "receive[s] contact information associated with the second user to allow the second user to participate, with the contact information not provided to the first user even when the message is received by the second user, and with the contact information being distinct from the identifier."

Ex. 1001, code (57).

The '038 patent explains that a "user receives the message through a handheld device, such as a cellular phone," or the "message is electronically conveyed" to the user "based on Internet protocol through a website." Ex. 1001, 2:54–57. If the "message is electronically conveyed" to the user through a "central network server, such as a web server based on Internet protocol," a "portal or gateway" may "provide general Internet access." *Id.*

IPR2022-00295
Patent 10,492,038 B2

at 7:9–15.  For instance, the portal or gateway may "allow[] the user to receive communications from numerous sources through different modes." *Id.* at 4:22–24.

Figure 7 in the '038 patent (reproduced below) depicts steps in a process for responding to an incoming call:



FIG. 7

Appx07032

IPR2022-00295
Patent 10,492,038 B2

Figure 7 "is a flow diagram of a personal call response process 200"

performed "by an electronic device, such as a mobile communication device

(e.g., mobile telephone)."  Ex. 1001, 9:22–26, Fig. 7; *see id.* at 3:29–30.  The

personal call response process permits a user to, among other things, answer

an incoming call, respond to a caller with an audio message, and respond to

a caller with a text message.  *Id.* at 9:26–10:5, Fig. 7.

Figure 8 in the '038 patent (reproduced below) depicts steps in a

process for responding to a caller with an audio message:



FIG. 8

Appx07033

IPR2022-00295
Patent 10,492,038 B2

Figure 8 "is a flow diagram of an audio message response process 300"
suitable for the processing performed by block 214 in Figure 7.  Ex. 1001,
10:34–38, Fig. 8; *see id.* at 3:31–32.  The audio message response process
permits a user to respond to a caller with a predetermined audio message or
a custom audio message.  *Id.* at 10:39–11:41, Fig. 8.  A "mobile
communication device (e.g., mobile telephone)" may perform the audio
message response process.  *Id.* at 10:42–45.

IPR2022-00295
Patent 10,492,038 B2

Figure 9 in the '038 patent (reproduced below) depicts steps in a process for responding to a caller with a text message:



FIG. 9

Figure 9 "is a flow diagram of a text message response process 400" suitable for the processing performed by block 218 in Figure 7. Ex. 1001, 12:9–12, Fig. 9; *see id.* at 3:33–34. The text message response process permits a user to respond to a caller with a predetermined text message or a custom text message. *Id.* at 12:13–45, Fig. 9. A "mobile communication device" may perform the text message response process. *Id.* at 12:18–21.

8

IPR2022-00295
Patent 10,492,038 B2

Figure 10 in the '038 patent (reproduced below) depicts steps in a process for responding to an incoming call:



FIG. 10

Figure 10 "is a flow diagram of an automated call response process 500." Ex. 1001, 13:17–18, Fig. 10; *see id.* at 3:35–36. Figure 10's process "is substantially similar in many ways to" Figure 7's process. *Id.* at 13:19–21. But Figure 10's process "operates to reduce user input at the mobile communication device by making use of stored data pertaining to its hardware components, configuration or preferences." *Id.* at 13:21–25.

9

IPR2022-00295
Patent 10,492,038 B2

Figure 11 in the '038 patent (reproduced below) depicts steps in a process for message presentation to a user:



FIG. 11

Figure 11 "is a flow diagram of a message presentation process 600" performed "by an electronic device, such as a mobile communication device." Ex. 1001, 15:12–15, Fig. 11; *see id.* at 3:37–38. The message presentation process permits a user to receive a text message and play the text message as an audio message. *Id.* at 15:16–16:2, Fig. 11. For example, "the audio message can be output to a speaker of the mobile communication device or a headset used therewith." *Id.* at 15:59–61.

10

IPR2022-00295
Patent 10,492,038 B2

*D.  The Challenged Claims*

Petitioner challenges independent computer-readable-medium claim 7, claims 8–12, 22–24, and 33–37 that depend directly or indirectly from claim 7, independent method claim 38, claims 39–45 that depend directly or indirectly from claim 38, independent computer-readable-medium claim 46, and claims 47–67 that depend directly from claim 46. Pet. 6, 33–86.  Claims 7 and 46 exemplify the challenged claims and read as follows (with numbers added for reference purposes)[1]:

> 7.  [7.0] A non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol, with different communication modes allowed, depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal, and without requiring the plurality of users to disclose their contact information to each other, said computer readable medium comprising:

> [7.1] computer program code for providing a plurality of communication modes to a first user to allow the first user to use one of the plurality of communication modes as a selected communication mode for a first message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal,

> [7.2] wherein the plurality of communication modes include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone, voice communication

---

[1] We use the same numbers that Petitioner uses to identify the claim limitations.  *See* Ex. 1032 (claim listing).

11

using a mobile phone, and communication with at least an image, and

[7.3] wherein messages are eligible to be received by the electronic device associated with the second user based on any of the plurality of communication modes, all depending on an identifier associated with the second user being set by the second user via the network-based portal, at least in view of the network-based portal based on the Internet protocol;

[7.4] computer program code for permitting the second user to block the first user from using at least the selected communication mode to reach the second user via the network-based portal;

[7.5] computer program code for enabling, via the network-based portal, the first message to be received by the second user via the electronic device associated with the second user, using the selected communication mode, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected communication mode to reach the second user, via the network-based portal;

[7.6] computer program code for determining availability of the second user; and

[7.7] computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal,

[7.8] wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user via an electronic device associated with the first user, and

[7.9] wherein the identifier associated with the second user is distinct from the contact information associated with the second user.

46. [46.0] A non-transitory computer readable medium including at least executable computer program code stored therein that facilitates electronic communication of a plurality of users using at least a network-based portal at least based on Internet protocol, with a plurality of modes of communication available for the plurality of users to communicate, with each of the plurality of users having an identifier for use with the plurality of modes of communication, and without requiring the plurality of users to disclose their contact information to each other, the computer readable medium comprising:

[46.1] computer program code for providing a plurality of modes of communication to a first user to allow the first user to use one of the plurality of modes of communication as a selected mode of communication for a first message to be sent from the first user to a second user, based on an identifier associated with the first user previously set by the first user via the network-based portal,

[46.2] wherein the plurality of modes of communication supported by the network-based portal include at least text communication using a personal computer, voice communication using a personal computer, text communication using a mobile phone voice communication using a mobile phone, and communication with at least an image, and

[46.3] wherein messages are eligible to be received electronically by the second user via the network-based portal, based on any of the plurality of modes of communication, all depending on an identifier associated with the second user previously set by the second user via the network-based portal, which allows the second user to efficiently maintain the second user's communication using the plurality of modes of communication;

[46.4] computer program code for permitting the second user to block the first user from using at least the selected mode of communication to communicate with the second user via the network-based portal, based on the identifier associated with the first user;

[46.5] computer program code for enabling the first message to be electronically provided to the second user, using the selected mode of communication, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected mode of communication to communicate with the second user, via the network-based portal;

[46.6] computer program code for determining availability of the second user related to receiving messages; and

[46.7] computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal,

[46.8] wherein even when the first message is received by the second user via the selected mode of communication, the contact information associated with the second user is not provided via the network-based portal to the first user, and contact information associated with the first user is not provided via the network-based portal to the second user, so as to provide an option to the second user to keep the contact information associated with the second user confidential from the first user, and to provide an option to the first user to keep the contact information associated with the first user confidential from the second user, and

[46.9] wherein the identifier associated with the second user is distinct from the contact information associated with the second user, and the identifier associated with the first user is distinct from the contact information associated with the first user.

Ex. 1001, 21:50–22:43, 27:37–28:39.

IPR2022-00295
Patent 10,492,038 B2

### E. The Asserted References

For its challenges, Petitioner relies on the following references:

| Name | Reference | Exhibit |
|------|-----------|---------|
| Loveland | US 7,287,056 B2, issued Oct. 23, 2007 (based on an application filed Sept. 28, 2001) | 1008 |
| Takahashi | US 2002/0183114 A1, published Dec. 5, 2002 (based on an application filed May 29, 2002) | 1009 |
| Tanigawa | US 2004/0001480 A1, published Jan. 1, 2004 (based on an application filed Aug. 30, 2002) | 1010 |
| Hullfish | US 7,428,580 B2, issued Sept. 23, 2008 (based on an application filed Nov. 26, 2003) | 1011 |

Pet. 6. Petitioner asserts that Loveland, Takahashi, and Tanigawa qualify as prior art under § 102(a) and § 102(b) and that Hullfish qualifies as prior art under § 102(e). *Id.* at 4–5; *see* 35 U.S.C. § 102(a), (b), (e) (2006).[2]

At this stage of the proceeding, Patent Owner does not dispute that each reference qualifies as prior art. *See, e.g.*, Prelim. Resp. 12–16.

### F. The Asserted Challenges to Patentability

Petitioner asserts the following challenges to patentability:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---------------------|-------------|---------------------|
| 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, 64–66 | 103(a) | Tanigawa, Hullfish |
| 8, 9, 43, 44, 47, 48, 50, 54 | 103(a) | Tanigawa, Hullfish, Loveland |

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. § 102 and § 103 effective March 16, 2013. Because the effective filing date of the challenged claims predates the AIA's amendments to § 102 and § 103, this decision refers to the pre-AIA versions of § 102 and § 103.

15

IPR2022-00295
Patent 10,492,038 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 37, 42, 56, 59–63, 67 | 103(a) | Tanigawa, Hullfish, Takahashi |
| 45 | 103(a) | Tanigawa, Hullfish, Loveland, Takahashi |

Pet. 6, 33–86.

### G. Testimonial Evidence

To support its challenges, Petitioner relies on the declaration of Kevin C. Almeroth, Ph.D. (Exhibit 1003, "Almeroth Decl."). Dr. Almeroth states, "I have been retained as an expert witness on behalf of Epic Games, Inc. ('Epic Games' or 'Petitioner') to offer technical opinions in connection with" the '038 patent. Ex. 1003 ¶ 1.

### III. DISCRETIONARY DENIAL

#### A. Parallel Proceeding

Under § 314(a), the Director possesses "broad discretion" in deciding whether to institute an *inter partes* review. *See* 35 U.S.C. § 314(a); *Saint Regis Mohawk Tribe v. Mylan Pharm. Inc.*, 896 F.3d 1322, 1327 (Fed. Cir. 2018). The Board decides whether to institute an *inter partes* review on the Director's behalf. 37 C.F.R. § 42.4(a) (2021).

Citing *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("*Fintiv*"), Patent Owner argues that we should exercise our discretion under § 314(a) to deny institution in light of the Texas case where Patent Owner has asserted the '038 patent and other patents against Petitioner. *See* Prelim. Resp. 7–12; *supra* § II.B.

On March 18, 2022, the district court in the Texas case granted Petitioner's motion to dismiss for improper venue, thus ending that case. Ex. 3001, 9.

16

IPR2022-00295
Patent 10,492,038 B2

On March 31, 2022, we issued an Order authorizing Petitioner to file a Preliminary Reply addressing discretionary denial under § 314(a) and authorizing Patent Owner to file a Preliminary Sur-reply responding to the Preliminary Reply.  Paper 9, 3.

On April 7, 2022, Petitioner filed a Preliminary Reply addressing discretionary denial under § 314(a).  Paper 10 ("Prelim. Reply").  Patent Owner did not file a Preliminary Sur-reply.

In the Preliminary Reply, Petitioner argues that the district court's dismissal of the Texas case "moots Patent Owner's arguments based on *Fintiv*."  Prelim. Reply 1.  Petitioner also argues that "there is no basis for a discretionary denial under § 314(a)" based on *Fintiv* because "there is no longer any parallel proceeding."  *Id.*

We agree with Petitioner that "there is no basis for a discretionary denial under § 314(a)" based on *Fintiv* because "there is no longer any parallel proceeding."  *See* Prelim. Reply 1; Ex. 3001, 9.  Hence, we decline to exercise our discretion under § 314(a) to deny institution due to a parallel proceeding.

### B.  Multiple Petitions

Petitioner filed another petition challenging claims 7–12, 22–24, and 33–67 of the '038 patent, i.e., in IPR2022-00294.  *See Epic Games, Inc. v. IngenioShare, LLC*, IPR2022-00294, Paper 1 at 6, 33–83 (PTAB Dec. 7, 2021); *supra* § II.B.  Petitioner explains that the challenges in this proceeding rest on Tanigawa in combination with Hullfish "as primary

IPR2022-00295
Patent 10,492,038 B2

references" and that the challenges in the 00294 proceeding rest on Diacakis[3] "as a primary reference."  Paper 3, 1.

Petitioner contends that the Board should institute a trial in both proceedings for the following reasons:

(i) "the length and large number (44) of challenged claims";

(ii) "given common issues across the Petitions, the burden to consider all Petitions is not substantially greater than considering just one"; and

(iii) "Petitioner has filed . . . petitions for inter partes review of two patents in the same family as the '038 Patent (U.S. Patent Nos. 10,142,810 and 10,708,727), and those petitions similarly present grounds based on Diacakis and on Tanigawa in combination with Hullfish."

Paper 3, 1; *see supra* § II.B.

Petitioner also contends that the "combination of Tanigawa and Hullfish is not cumulative over Diacakis."  Paper 3, 3.  Specifically, Petitioner asserts that "Diacakis is directed to a commun[ic]ations system with a 'presence and availability management system,' used to detect when a user is available to communicate and to notify another of the user's availability information."  *Id.*  According to Petitioner, "Diacakis teaches that users can block others (thereby preventing them from communicating with them) across specific modes of communication by defining 'access levels' to give different people different levels of access at different times."  *Id.*  Petitioner asserts that "Tanigawa (as modified by Hullfish) teaches a server directed towards a communications system specifically facilitating

---

[3] U.S. Patent Application Publication US 2002/0116461 A1 to Diacakis et al., titled "Presence and Availability Management System," filed on February 5, 2002, and published on August 22, 2002 ("Diacakis").

transitions between text chat and voice chat in both a group setting and a one-on-one setting." *Id.* Petitioner also asserts that in the Tanigawa-Hullfish combination "users can block others—not through defined access levels, as in Diacakis—by identifying a user to be blocked by a 'pre-determined telephone number,' a process that prevents the blocked user from further communicating with the blocking user." *Id.*

Patent Owner does not argue that we should exercise our discretion under § 314(a) to deny institution due to multiple petitions. *See, e.g.*, Prelim. Resp. 7–12.

Under the circumstances here, two petitions challenging claims in the '038 patent will not place a substantial and unnecessary burden on the Board or Patent Owner. In IPR2022-00202, the Board will consider challenges to related U.S. Patent No. 10,142,810 B2 based on Diacakis and alternatively the Tanigawa-Hullfish combination. *See Epic Games, Inc. v. IngenioShare, LLC*, IPR2022-00202, Paper 9 (PTAB May 23, 2022) (granting institution of *inter partes* review); *supra* § II.B. In IPR2022-00291, the Board will similarly consider challenges to related U.S. Patent No. 10,708,727 B2 based on Diacakis and alternatively the Tanigawa-Hullfish combination. *See Epic Games, Inc. v. IngenioShare, LLC*, IPR2022-00291, Paper 10 (PTAB May 24, 2022) (granting institution of *inter partes* review); *supra* § II.B. Thus, in other proceedings the Board will consider and become familiar with Diacakis, Tanigawa, and Hullfish and the relevance of those references to claims in related patents.

Additionally, Patent Owner has asserted a large number of claims in the '038 patent against Petitioner in the Texas case, and Petitioner challenges a large number of claims in the '038 patent. *See* Pet. 33–83;

19

IPR2022-00295
Patent 10,492,038 B2

Ex. 1012, 1–2.  The PTAB Consolidated Trial Practice Guide ("CTPG")
notes that "more than one petition may be necessary" when "the patent
owner has asserted a large number of claims in litigation."  CTPG 59.[4]

Moreover, for the reasons stated by Petitioner, there are material
differences between Diacakis and the Tanigawa-Hullfish combination.  *See*
Paper 3, 3.

Hence, we decline to exercise our discretion under § 314(a) to deny
institution due to multiple petitions.  *See Weber, Inc. v. Provisur Techs.,
Inc.*, IPR2019-01465, Paper 10 at 10–11 (PTAB Feb. 20, 2020) (declining
to exercise discretion under § 314(a) to deny institution because "material
differences exist between the challenges in the two petitions and both
petitions present meritorious challenges").

## IV.  PATENTABILITY ANALYSIS

### A.  Legal Principles: Obviousness

A patent may not be obtained "if the differences between the subject
matter sought to be patented and the prior art are such that the subject matter
as a whole would have been obvious at the time the invention was made to a
person having ordinary skill in the art to which said subject matter pertains."
35 U.S.C. § 103(a) (2006).  An obviousness analysis involves underlying
factual inquiries including (1) the scope and content of the prior art;
(2) differences between the claimed invention and the prior art; (3) the level
of ordinary skill in the art; and (4) where in evidence, objective indicia of
nonobviousness, such as commercial success, long-felt but unsolved needs,

---

[4] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

and failure of others.[5] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 35–36 (1966); *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48 (Fed. Cir. 2016) (en banc). When evaluating a combination of references, an obviousness analysis should address "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

We analyze the obviousness issues according to these principles.

### B. Level of Ordinary Skill in the Art

Factors pertinent to determining the level of ordinary skill in the art include (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior-art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the technology; and (6) the educational level of workers active in the field. *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983). Not all factors may exist in every case, and one or more of these or other factors may predominate in a particular case. *Id.* These factors are not exhaustive, but merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). Moreover, the prior art itself may reflect an appropriate skill level. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Petitioner asserts that a person of ordinary skill in the art "would have had a Bachelor's degree in Computer Science, or an equivalent field, and three to five years of experience working with Internet communication systems." Pet. 25. Petitioner also asserts that "[a]dditional education might

---

[5] The record does not include evidence concerning objective indicia of nonobviousness.

compensate for less experience, and vice-versa." *Id.* Dr. Almeroth's testimony supports Petitioner's assertions. *See* Ex. 1003 ¶¶ 92–97.

At this stage of the proceeding, Patent Owner does not address the educational level or work experience of a person of ordinary skill in the art. *See, e.g.*, Prelim. Resp. 1–7, 12–16.

Based on the current record and for purposes of institution, we accept Petitioner's description of an ordinarily skilled artisan as consistent with the '038 patent and the asserted prior art.

## C. *Claim Construction*

### 1. GENERALLY

We construe claim terms "using the same claim construction standard" that district courts use to construe claim terms in civil actions under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b). Under that standard, claim terms "are given their ordinary and customary meaning, which is the meaning the term would have to a person of ordinary skill in the art at the time of the invention." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 971 (Fed. Cir. 2018) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)). The meaning of claim terms may be determined by "look[ing] principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Petitioner "does not believe that any terms need to be construed to assess the arguments presented" in the Petition and does not propose a construction for any claim language. Pet. 26.

IPR2022-00295
Patent 10,492,038 B2

Patent Owner does not propose a construction for any claim language. *See* Prelim. Resp. 4–5, 12–13.

### 2. "NETWORK-BASED PORTAL"

Each challenged independent claim requires a "network-based portal." Ex. 1001, 21:50–22:43, 26:1–57, 27:37–28:39. Although Patent Owner does not propose a construction for a "network-based portal," Patent Owner proposes restrictions on that term. *See* Prelim. Resp. 1–2, 4–5, 12–14. In particular, Patent Owner contends that a "network-based portal" resides only "at the server-side of a network" and excludes "client-side functionality." *Id.* at 1–2, 4, 13–14. According to Patent Owner, the '038 patent's specification "universally indicates that the network-based portal is at the server-side." *Id.* at 1. Patent Owner identifies places where the specification describes a "portal" as separate from a "mobile telephone" and a "person's wireless device." *Id.* at 4–5, 13–14 (citing Ex. 1001, 6:33–34, 6:53–54, 7:9–17, 16:17–19, code (57)). Further, Patent Owner asserts that the specification "certainly does not support the interpretation that a user interface at a client constitutes a network-based portal." *Id.* at 14.

Based on the current record, we disagree with Patent Owner that a "network-based portal" resides only "at the server-side of a network" and excludes "client-side functionality." *See* Prelim. Resp. 1–2, 4, 13–14. The '038 patent's specification discloses embodiments where claimed functionality resides in a "mobile phone," i.e., a client-side device. *See* Ex. 1001, 3:29–38, 9:22–10:19, 10:34–13:43, 15:12–16:2, Figs. 7–11.

As an example, Figures 7 through 11 depict steps in processes that include:

- providing a first user with a voice communication mode and a text communication mode, e.g., as recited in limitations [7.1] and [7.2];

- enabling a second user to receive a voice message or a text message using a selected communication mode in view of the second user not blocking the first user, e.g., as recited in limitations [7.4] and [7.5]; and

- allowing the second user to receive messages through an electronic device associated with the second user, e.g., as recited in limitation [7.8].

Ex. 1001, 9:22–10:5, 10:34–14:57, 15:12–16:2, Figs. 7–11; *see id.* at 3:29–38, 10:6–19. The specification explains that a "mobile communication device," e.g., a "mobile telephone" or a "mobile phone," may perform the steps depicted in Figures 7 through 11. *Id.* at 9:22–26, 10:34–45, 12:9–21, 13:16–25, 14:23–28, 14:52–53, 15:14–15, 15:59–61, 18:4–5.

Because the '038 patent's specification discloses embodiments where claimed functionality resides in a "mobile telephone," i.e., a client-side device, construing "network-based portal" to exclude "client-side functionality," such as mobile-phone functionality, would exclude preferred embodiments from claim scope. *See* Ex. 1001, 3:29–38, 9:22–10:19, 10:34–13:43, 14:52–53, 15:12–16:2, 18:4–5, Figs. 7–11. A construction excluding a preferred embodiment is "rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016). Consistent with a broader rather than a narrower interpretation, the '038 patent's specification explains that "the invention extends beyond these limited embodiments" described in the specification. Ex. 1001, 8:29–34; *see id.* at 3:43–47, 20:4–7.

24

IPR2022-00295
Patent 10,492,038 B2

We invite the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of "network-based portal" in the '038 patent's claims.

### 3. OTHER TERMS

Based on the current record, we determine that no other claim terms require explicit constructions to decide whether Petitioner satisfies the "reasonable likelihood" standard for instituting trial. "[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### D. *Alleged Obviousness over Tanigawa and Hullfish: Claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, and 64–66*

Petitioner contends that claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, and 64–66 are unpatentable under § 103(a) as obvious over Tanigawa and Hullfish. *See* Pet. 6, 33–73. Below, we provide overviews of Tanigawa and Hullfish, and then we consider the obviousness issues. As explained below, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa and Hullfish teach the subject matter of claims 7, 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, and 64–66.

### 1. OVERVIEW OF TANIGAWA (EXHIBIT 1010)

Tanigawa is a U.S. patent application publication titled "Communication System and Communication Method," filed on August 30, 2002, and published on January 1, 2004. Ex. 1010, codes (22), (43), (54). Tanigawa states that the invention relates to "a communication technology

25

IPR2022-00295
Patent 10,492,038 B2

such as Instant Messaging (IM)" and endeavors to "achieve group chat using multimedia." *Id.* ¶¶ 1, 8. The invention implements text chat, voice chat, and video chat by employing various servers to handle various tasks. *Id.* ¶¶ 9–13, 221, code (57).

Tanigawa's Figure 1 (reproduced below) depicts a communication system that implements text chat, voice chat, and video chat by employing various servers to handle various tasks:



## FIG.1

Figure 1 illustrates "an IM-Voice over Internet Protocol (VoIP) interconnecting system" including IP network 1, IM server 4, AP server 5, MD server 6, IP terminal 7-1, IP terminal 7-2, IP terminal 7-3, VoIP telephone 8, and VR server 10. Ex. 1010 ¶¶ 14, 34–36, Fig. 1; *see id.* ¶ 221.

IPR2022-00295
Patent 10,492,038 B2

Tanigawa describes each server's role as follows:

(1)    IM server 4 "manages presence information of an IM client";

(2)    AP server 5 "manages connection for a voice chat using VoIP";

(3)    MD server 6 "implements multi-party voice speech by mixing voice data"; and

(4)    VR server 10 "performs voice relay among" IP network 1, radio communication network (RCN) 2, and publicly switched telephone network (PSTN) 3.

Ex. 1010 ¶¶ 35–36, 214, code (57).  Further, VR server 10 communicates with radio terminal 9 (e.g., a mobile telephone) via RCN 2 and with fixed telephone 11 via PSTN 3.  *Id.* ¶ 35, Fig. 1.

Tanigawa describes an IM client as "application software."  Ex. 1010 ¶ 3.  An IM client resides in each of IP terminal 7-1, IP terminal 7-2, IP terminal 7-3, VoIP telephone 8, radio terminal 9, and fixed telephone 11. *Id.* ¶¶ 35, 54.

IM server 4 contains a presence information management table. Ex. 1010 ¶ 49, Fig. 3.  Tanigawa's Figure 3 (reproduced below) depicts an example presence information management table:

27

IPR2022-00295
Patent 10,492,038 B2

## FIG.3

| | 431 | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ACCOUNT NAMES | CLIENT ADDRESSES | CLIENT NICKNAMES | AUTHENTI-CATION KEYS | PRESENCE | USABLE MEDIA | CONFERENCE ADDRESSES | CONFERENCE NICKNAMES | BUDDY LIST | 440 |
| | Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... | |
| | Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... | |
| | Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client G | ***(***)*** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... | |

PRESENCE INFORMATION MANAGEMENT TABLE 488

Figure 3 illustrates "an example of a presence information management table" comprising multiple records (rows) with the following fields in each record (row):

(1)   "a field 431 for registering an account name of a user of an IM client";

(2)   "a field 432 for registering an address of the IM client";

(3)   "a field 433 for registering a nickname of the user of the IM client";

(4)   "a field 434 for registering an authentication key for using the IM-VoIP interconnecting system";

(5)   "a field 435 for registering presence information of the IM client";

(6)   "a field 436 for registering a medium (text chat and voice chat), which can be used by IM client for a chat";

28

IPR2022-00295
Patent 10,492,038 B2

> (7)  "a field 437 for registering an address (IP address or
>      DNS and a port number) of a conference room in which
>      the IM client participates";
>
> (8)  "a field 438 for registering a nickname of the conference
>      room"; and
>
> (9)  "a field 439 for registering account names of the other
>      IM clients with whom the IM client can chat."

*Id.* ¶¶ 16, 49–50, Fig. 3.  For instance, field 433 includes the following nicknames in various records: Taro, Jiro, Ichiro, Hanako, and Yoshi.  *Id.* ¶ 116, Fig. 3.

Tanigawa discloses examples where (a) the user nicknamed Taro registers IP terminal 7-2 as an account named client A, (b) the user nicknamed Hanako registers (i) IP terminal 7-1 as an account named client D and (ii) VoIP telephone 8 as an account named client E, and (c) the user nicknamed Yoshi registers (i) IP terminal 7-3 as an account named client F and (ii) radio terminal 9 as an account named client G.  Ex. 1010 ¶¶ 115–116, 177–179, 193–194, 207–209, Figs. 3, 10–11, 15–19.

After registering with the system, a user may communicate with one or more other users by text chat, voice chat, and video chat.  Ex. 1010 ¶¶ 11–12, 23–24, 28–29, 36, 221, code (57), Figs. 10–11, 15–16.  Moreover, a user may engage in a one-to-one chat or a multi-party chat.  *Id.* ¶¶ 8, 115–164, 176–212, 216–218, Figs. 10–12, 15–19.

IPR2022-00295
Patent 10,492,038 B2

Tanigawa's Figure 12 (reproduced below) depicts a user interface for an IM client in an IP terminal:



FIG.12

Figure 12 illustrates a user interface for an IM client having various display areas and a main menu bar. Ex. 1010 ¶¶ 25, 162, Fig. 12.

As Figure 12 shows, main menu bar 130 includes the following icons:

(1)    "an icon 131 indicating an operation relating to presence information";

(2)    "an icon 132 indicating voice chatting in one-to-one (Peer-to-Peer)";

(3)    "an icon 133 indicating voice chatting in multi-party communication"; and

(4)    "an icon 134 indicating text chatting."

Ex. 1010 ¶ 163, Fig. 12.

30

IPR2022-00295
Patent 10,492,038 B2

As Figure 12 also shows, the user interface may display the following information:

(1)    a buddy list in display area 135;

(2)    the content of a text chat in display area 136;

(3)    a text message in display area 137; and

(4)    the content of a file transferred by a buddy
in display area 138.

Ex. 1010 ¶¶ 164–166, Fig. 12.

2. OVERVIEW OF HULLFISH (EXHIBIT 1011)

Hullfish is a U.S. patent titled "Electronic Message Forwarding," filed on November 26, 2003, and issued on September 23, 2008. Ex. 1011, codes (22), (45), (54). Hullfish states that the invention relates to "the delivery of an electronic message addressed to a telephone number." *Id.* at 1:8–10. In particular, the invention provides systems and methods "for forwarding electronic messages addressed to telephone numbers as instant messages for the instant message identifiers associated with the corresponding telephone numbers." *Id.* at 3:35–39.

IPR2022-00295
Patent 10,492,038 B2

Hullfish's Figure 2 (reproduced below) depicts a system for forwarding a Short Message Services (SMS) text message to a destination device:



**FIG. 2**

Figure 2 illustrates a system including "an SMS text message originator 202, an SMS server 204 that includes a routing logic 206, a dynamic message control server 208, an IM server 210, and one or more destination devices 212, 214, 216." Ex. 1011, 3:9–11, 4:30–40, Fig. 2.

The SMS text message originator 202 "generates an SMS text message addressed to a telephone number of the recipient mobile devices 212, 214 or an email address of a desktop computer 216." Ex. 1011, 4:42–45. "[T]he SMS server 204 receives the SMS text message" and "then forwards it to the dynamic message control server 208." *Id.* at 4:52–54.

32

IPR2022-00295
Patent 10,492,038 B2

"The dynamic message control server 208 makes decisions with regard to various actions that can be taken with the SMS text message, such as whether to forward the SMS message as an instant message, or whether or not to forward the SMS message in its original content." *Id.* at 4:55–59.

If "the dynamic message control server 208 decides that the SMS message should be forwarded as an instant message, the dynamic message control server 208 forwards the SMS message to the IM server 210 to be transmitted further as an instant message" to "one or more instant message receivers 214, 216." Ex. 1011, 4:61–67. If "the dynamic message control server 208 decides that the SMS message should be forwarded as an SMS message through the SMS server 204, the routing logic 206 then forwards the SMS message to the mobile phone number with the addressed telephone number." *Id.* at 5:5–9.

Hullfish discloses a privacy feature for blocking "messages originating from a specified telephone number to the telephone number of a user, or the instant message identifier associated with that user's telephone number." Ex. 1011, 8:59–61, 8:64–65, 9:34–38. Specifically, if User A "wants to stop receiving messages from User B," User A "may send a text message containing User B's telephone number" to "a pre-determined telephone number that is available to all SMS forwarding subscribers who want to use the privacy feature" and thereby "discontinue receiving SMS text messages from User B's telephone number." *Id.* at 8:63–9:4.

33

IPR2022-00295
Patent 10,492,038 B2

Hullfish's Figure 5 (reproduced below) depicts steps in a method for implementing a privacy feature for blocking messages:



**FIG. 5**

Figure 5 illustrates steps 502 through 508 in "a method of discontinuing receiving SMS text messages from an undesired source." Ex. 1011, 8:59–61, 8:64–65, Fig. 5; *see id.* at 3:18–20.

As Figure 5 shows, "an SMS server receives an SMS text message originated from User A addressed to a pre-determined telephone number 502." Ex. 1011, 9:5–7, Fig. 5. Then, the SMS server "determine[s] whether the SMS text message originated from User A contains a telephone number 504, e.g. User B's telephone number." *Id.* at 9:7–9, Fig. 5. If the SMS server "determine[s] that the SMS text message originated from User A contains User B's telephone number, any future SMS text message

34

IPR2022-00295
Patent 10,492,038 B2

from User B's telephone number to User A's telephone number, will not be forwarded to the User A's telephone number or the instant message identifier associated with User A's telephone number 506," thus blocking User B. *Id.* at 9:9–16, Fig. 5. If, however, the SMS server "determine[s] that the SMS text message originated from User A does not contain User B's telephone number 504, the SMS text message is forwarded according to user preference 508." *Id.* at 9:30–33, Fig. 5.

Additionally, Hullfish discloses that a user may condition message delivery based on times and dates. Ex. 1011, 11:38–45, Fig. 7; *see id.* at 7:25–27, 13:40–42, 14:63–65, 16:44–46. For example, a user may specify "a pre-determined rule stating that within a certain time period, e.g. 12:00 am-6:00 am, and/or within a date range, e.g. Dec. 25, 2003-Jan. 1, 2004, messages would not be forwarded either to the instant message receiver and/or the mobile device." *Id.* at 11:40–45.

### 3. INDEPENDENT CLAIM 7

(a)    Preamble [7.0]

Claim 7's preamble recites as follows:

[a] non-transitory computer readable medium including at least executable computer program code stored therein for managing electronic communications of a plurality of users using at least a network-based portal at least based on Internet protocol, with different communication modes allowed, depending on each of the plurality of users having an identifier for use with the different communication modes, with the corresponding identifier being set via the network-based portal, and without requiring the plurality of users to disclose their contact information to each other.

Ex. 1001, 21:50–59.

Petitioner contends that Tanigawa teaches claim 7's preamble for five related reasons. *See* Pet. 37–43. First, Petitioner asserts that Tanigawa discloses that a "program for configuring" IM server 4 "may be directly loaded from a storage medium (not shown) such as a CD-ROM" or alternatively "may be stored in the external memory device 43 and then may be loaded to the memory 42." *Id.* at 37 (quoting Ex. 1010 ¶ 40). According to Petitioner, an ordinarily skilled artisan "would have understood that Tanigawa's apparatus contains storage devices coupled to the IM server 4 with executable instructions (*i.e.*, a predetermined program)." *Id.* (citing Ex. 1003 ¶¶ 395–396; Ex. 1010 ¶¶ 57, 68, 90, 104).

Second, Petitioner asserts that Tanigawa discloses a "communication system and communication method" where servers facilitate text chatting and voice chatting among client devices. Pet. 37 (citing Ex. 1010 ¶ 36, codes (54), (57)). According to Petitioner, "Tanigawa's communications system is based on the Internet protocol (*i.e.*, 'IP Network')" and includes IP terminals as client devices. *Id.* at 37–38 (citing Ex. 1010 ¶¶ 3, 9, 14, 34–35, 40–41, 57, 103–104, Fig. 1). Petitioner asserts that an IP terminal includes "a user interface that connects clients to a network" and functions as a "network-based portal." *Id.* at 38–39 (citing Ex. 1003 ¶¶ 397–398; Ex. 1010 ¶ 162, Fig. 12).

Third, Petitioner asserts that Tanigawa discloses "allowing different communication modes" such that "users may engage in 'text chat,' 'voice chat,' 'chatting using images,' and 'video chatting.'" Pet. 39 (citing Ex. 1010 ¶¶ 36, 221).

Fourth, Petitioner asserts that Tanigawa discloses that IM server 4 uses a "presence information management table" to "manage presence

36

IPR2022-00295
Patent 10,492,038 B2

information" among client devices.  Pet. 39–40 (citing Ex. 1010 ¶¶ 40, 49).

According to Petitioner, (1) a user provides a nickname when registering to

use the system, (2) the presence information management table contains the

nicknames, and (3) "these nicknames are identifiers (for both first and

second users) that are previously registered to client devices participating in"

text, voice, or video chat.  *Id.* at 40 (citing Ex. 1003 ¶¶ 399–402; Ex. 1010

¶¶ 50, 65, 85, 116, 119, 126, 129–136, 141–143, Fig. 3).  Petitioner asserts

that "even where a user has multiple client devices, these devices are all

identified by the same nickname."  *Id.* at 41 (citing Ex. 1003 ¶¶ 399–402;

Ex. 1010, Figs. 3, 10).

To support its assertions, Petitioner provides the highlighted version

of Tanigawa's Figure 3 reproduced below (Pet. 41):

## FIG.3

| | 431 | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ACCOUNT NAMES | CLIENT ADDRESSES | CLIENT NICKNAMES | AUTHENTI- CATION KEYS | PRESENCE | USABLE MEDIA | CONFERENCE ADDRESSES | CONFERENCE NICKNAMES | BUDDY LIST | 440 |
| | Client A | ***.***.***.*** | taro | **** | text/voice | text/voice | ***.***.***/ ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client B | ***.***.***.*** | jiro | **** | off | text/voice | ***.***.*** | | A,B,C,D,E,F,G... | |
| | Client C | ***.***.***.*** | ichiro | **** | idle | text | ***.***.*** | | A,B,C,D,E,F,G... | |
| | Client D | ***.***.***.*** | hanako | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client E | ***.***.***.*** | hanako | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client F | ***.***.***.*** | yoshi | **** | text | text | ***.***.*** | room1 | A,B,C,D,E,F,G... | |
| | Client G | ***.***.***.*** ***.***.***.*** | yoshi | **** | voice | voice | ***.***.*** | room1 | A,B,C,D,E,F,G... | |

PRESENCE INFORMATION MANAGEMENT TABLE 488

Figure 3 illustrates "an example of a presence information management

table."  Ex. 1010 ¶¶ 16, 49, Fig. 3.  The above highlighted version of

37

IPR2022-00295
Patent 10,492,038 B2

Figure 3 has yellow highlighting in field 433 for the user nicknamed Hanako, yellow highlighting in field 431 for Hanako's two electronic devices identified as client D and client E, yellow highlighting in field 433 for the user nicknamed Yoshi, and yellow highlighting in field 431 for Yoshi's two electronic devices identified as client F and client G. *See* Pet. 41; Ex. 1003 ¶ 401.

Fifth, Petitioner asserts that Tanigawa discloses that "when a first user invites a second user to chat, the second user's contact information is not shown to the first user" and that the first user instead receives "only pieces" of information about the second user, such as a nickname and presence information. Pet. 42 (citing Ex. 1010 ¶¶ 124, 130, 134, 144). According to Petitioner, contact information "is provided only to the IM server—not to the users themselves." *Id.* (citing Ex. 1010 ¶¶ 135, 137).

To support its assertions, Petitioner provides the highlighted version of Tanigawa's Figure 12 reproduced below (Pet. 43):



Figure 12 illustrates a user interface for an IM client having various display areas and a main menu bar. Ex. 1010 ¶¶ 25, 162, Fig. 12. The above highlighted version of Figure 12 has yellow highlighting over the display area for text chatting identified by reference numeral 140. *See* Pet. 43; Ex. 1003 ¶ 405; Ex. 1010 ¶ 166. The highlighted display area for text chatting does not provide contact information for the chat participants. *See* Pet. 42–43; Ex. 1003 ¶ 405.

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to claim 7's preamble. *See* Prelim. Resp. 1–2, 13–16. Specifically, Patent Owner asserts that a "network-based portal" resides only "at the server-side of a network" and that Petitioner identifies no server-side

portal in Tanigawa. *Id.* at 1–2, 4, 13–16. At this stage of the proceeding, Patent Owner does not dispute that Tanigawa discloses the other aspects of claim 7's preamble. *Id.* at 14–16.

Generally, a preamble does not limit a claim. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). We need not decide whether claim 7's preamble limits the claim because, based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches claim 7's preamble. *See* Pet. 33–39; Ex. 1003 ¶¶ 109–111, 395–405.

For instance, Tanigawa's Figure 1 illustrates "an IM-Voice over Internet Protocol (VoIP) interconnecting system" including IP network 1, IM server 4, AP server 5, MD server 6, IP terminal 7-1, IP terminal 7-2, IP terminal 7-3, VoIP telephone 8, and VR server 10. Ex. 1010 ¶¶ 34–36, Fig. 1; *see* Ex. 1003 ¶¶ 109, 395. Tanigawa explains that an IM client is "application software" and that each IP terminal contains an IM client. Ex. 1010 ¶¶ 3, 35; *see* Ex. 1003 ¶ 424.

In Tanigawa's communications system, each IP terminal includes a user interface for the IM client. Ex. 1010 ¶¶ 25, 162, Fig. 12; *see* Ex. 1003 ¶¶ 110, 398. The user interface enables a user to communicate with others via IP network 1, radio communication network (RCN) 2, and publicly switched telephone network (PSTN) 3. Ex. 1010 ¶¶ 35–36, 162–166; *see* Ex. 1003 ¶¶ 110, 397–398. With the user interface, a user may initiate any of the following: (1) a one-to-one text chat; (2) a one-to-one voice chat; (3) a multi-party text chat; and (4) a multi-party voice chat. Ex. 1010 ¶¶ 8, 115–164, 176–212, 216–218, Figs. 10–12, 15–19; *see* Ex. 1003 ¶¶ 110, 398.

IPR2022-00295
Patent 10,492,038 B2

Hence, based on the current record, Petitioner establishes sufficiently for purposes of institution that Tanigawa's user interface for an IM client residing in an IP terminal functions as a "network-based portal."

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

(b)    Limitation [7.1]

Claim 7 recites as follows:

> computer program code for providing a plurality of communication modes to a first user to allow the first user to use one of the plurality of communication modes as a selected communication mode for a first message from the first user to a second user via an electronic device associated with the second user, with the first user being identified at least depending on a prior registration process by the first user regarding the use of the network-based portal.

Ex. 1001, 21:61–22:2.

Petitioner contends that Tanigawa teaches this limitation for four related reasons. *See* Pet. 43–46.  First, Petitioner asserts that Tanigawa discloses users communicating with one another "on a one-to-one or multi-party basis using client devices." *Id.* at 43–44 (citing Ex. 1010 ¶¶ 116, 179, 194, Fig. 3).

Second, Petitioner asserts that Tanigawa discloses a plurality of communication modes for users to communicate with one another, including "text chat," "voice chat," "chatting using images," and "video chatting." Pet. 44 (citing Ex. 1010 ¶¶ 36, 221).

Third, Petitioner asserts that Tanigawa discloses that a "message from the first user to a second user is via an electronic device associated with the

41

second user," such as an IP terminal, a radio terminal (mobile telephone), or a fixed (stationary) telephone.  Pet. 45 (citing Ex. 1010 ¶¶ 35, 68, 157, Fig. 1).

Fourth, Petitioner asserts that Tanigawa discloses that a user provides a nickname when registering to use the system and that "these nicknames are identifiers (for both first and second users) that are previously registered to client devices participating in" text, voice, or video chat.  Pet. 46 (citing Ex. 1003 ¶¶ 409–410; Ex. 1010 ¶¶ 50, 65, 85, 116, 119, 126, 129–136, 141–143, Fig. 3).

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to limitation [7.1], i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa.  *See* Prelim. Resp. 1–2, 4, 13–16.  At this stage of the proceeding, Patent Owner does not dispute that Tanigawa discloses the other aspects of limitation [7.1].  *Id.* at 14–16.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches limitation [7.1].  *See* Pet. 39–42; Ex. 1003 ¶¶ 109, 395–410.  Specifically, Tanigawa discloses "an IM-Voice over Internet Protocol (VoIP) interconnecting system" including IP network 1, IM server 4, AP server 5, MD server 6, IP terminal 7-1, IP terminal 7-2, IP terminal 7-3, VoIP telephone 8, and VR server 10. Ex. 1010 ¶¶ 14, 34–36, Fig. 1; *see* Ex. 1003 ¶¶ 109, 397.

IM server 4 "manages presence information of an IM client"; AP server 5 "manages connection for a voice chat using VoIP"; and MD server 6 "implements multi-party voice speech by mixing voice data." Ex. 1010 ¶¶ 35–36, 214, code (57); *see* Ex. 1003 ¶ 109.  Further, VR

server 10 "performs voice relay among" IP network 1, RCN 2, and PSTN 3. Ex. 1010 ¶ 35; *see* Ex. 1003 ¶ 109. VR server 10 communicates with radio terminal 9 (e.g., a mobile telephone) via RCN 2 and with fixed telephone 11 via PSTN 3. Ex. 1010 ¶ 35, Fig. 1; *see* Ex. 1003 ¶¶ 109, 397. An IM client resides in each of IP terminal 7-1, IP terminal 7-2, IP terminal 7-3, VoIP telephone 8, radio terminal 9, and fixed telephone 11. Ex. 1010 ¶¶ 35, 54; *see* Ex. 1003 ¶ 424.

IM server 4 contains a presence information management table. Ex. 1010 ¶ 49, Fig. 3; *see* Ex. 1003 ¶¶ 111, 400, 406. The example presence information management table depicted in Tanigawa's Figure 3 includes the following fields in each record (row):

(1)  "a field 431 for registering an account name of a user of an IM client";

(2)  "a field 432 for registering an address of the IM client";

(3)  "a field 433 for registering a nickname of the user of the IM client";

(4)  "a field 434 for registering an authentication key for using the IM-VoIP interconnecting system";

(5)  "a field 435 for registering presence information of the IM client";

(6)  "a field 436 for registering a medium (text chat and voice chat), which can be used by IM client for a chat";

(7)  "a field 437 for registering an address (IP address or DNS and a port number) of a conference room in which the IM client participates";

(8)  "a field 438 for registering a nickname of the conference room"; and

(9)  "a field 439 for registering account names of the other IM clients with whom the IM client can chat."

43

IPR2022-00295
Patent 10,492,038 B2

Ex. 1010 ¶ 50, Fig. 3; *see* Ex. 1003 ¶¶ 111, 400, 406.  For instance, field 433 includes the following nicknames in various records: Taro, Jiro, Ichiro, Hanako, and Yoshi.  Ex. 1010 ¶ 116, Fig. 3; *see* Ex. 1003 ¶¶ 399, 406.

Tanigawa discloses examples where (a) the user nicknamed Taro registers IP terminal 7-2 as an account named client A, (b) the user nicknamed Hanako registers (i) IP terminal 7-1 as an account named client D and (ii) VoIP telephone 8 as an account named client E, and (c) the user nicknamed Yoshi registers (i) IP terminal 7-3 as an account named client F and (ii) radio terminal 9 as an account named client G.  Ex. 1010 ¶¶ 115–116, 177–179, 193–194, 207–209, Figs. 3, 10–11, 15–19; *see* Ex. 1003 ¶¶ 399, 406, 409.

After registering with the system, a user may communicate with one or more other users by text chat, voice chat, and video chat.  Ex. 1010 ¶¶ 11–12, 23–24, 28–29, 36, 221, code (57), Figs. 10–11, 15–16; *see* Ex. 1003 ¶¶ 110, 397, 407.  Moreover, a user may engage in a one-to-one chat or a multi-party chat.  Ex. 1010 ¶¶ 8, 115–164, 176–212, 216–218, Figs. 10–12, 15–19; *see* Ex. 1003 ¶¶ 110, 406.  Thus, a user may select from among a plurality of communication modes when sending a message to an electronic device associated with another user.

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network."  *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

(c)    Limitation [7.2]

Claim 7 recites "wherein the plurality of communication modes include at least text communication using a personal computer, voice communication using a personal computer, text communication using

44

a mobile phone, voice communication using a mobile phone, and communication with at least an image." Ex. 1001, 22:3–8.

Petitioner contends that Tanigawa teaches this limitation because Tanigawa discloses text chatting and voice chatting and that "text or voice communication can be performed using a variety of client terminal devices, including personal computers (with or without telephones), fixed telephones, and mobile telephones." Pet. 47–48 (citing Ex. 1003 ¶¶ 411–412; Ex. 1010 ¶¶ 5–9, 36, 50–52, 114–163, 176–220, Figs. 1, 12).

Patent Owner makes no arguments specific to limitation [7.2]. *See, e.g.*, Prelim. Resp. 1–2, 12–16. Nonetheless, Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches limitation [7.2]. *See* Pet. 47–48; Ex. 1003 ¶¶ 411–412.

(d)    Limitation [7.3]

Claim 7 recites as follows:

> wherein messages are eligible to be received by the electronic device associated with the second user based on any of the plurality of communication modes, all depending on an identifier associated with the second user being set by the second user via the network-based portal, at least in view of the network-based portal based on the Internet protocol.

Ex. 1001, 22:9–15.

Petitioner contends that Tanigawa teaches this limitation for the reasons that Tanigawa teaches claim 7's preamble and limitation [7.1]. Pet. 48–49.

45

IPR2022-00295
Patent 10,492,038 B2

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to limitation [7.3], i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa. *See* Prelim. Resp. 1–2, 4, 13–16. At this stage of the proceeding, Patent Owner does not dispute that Tanigawa discloses the other aspects of limitation [7.3]. *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches limitation [7.3]. *See* Pet. 37–46, 48–49; Ex. 1003 ¶¶ 395–410, 413–415; *supra* §§ IV.D.3(a)–(b).

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

(e)    Limitation [7.4]

Claim 7 recites "computer program code for permitting the second user to block the first user from using at least the selected communication mode to reach the second user via the network-based portal." Ex. 1001, 22:16–19.

Petitioner contends that the combined disclosures in Tanigawa and Hullfish teach this limitation. *See* Pet. 38–39, 49–50. Specifically, Petitioner asserts that Tanigawa discloses a "network-based portal" and that Hullfish discloses "a 'privacy feature' comprising 'a method of discontinuing receiving . . . messages from an undesired source.'" *Id.* at 38–39, 49 (alteration by Petitioner) (quoting Ex. 1011, 8:64–65). According to Petitioner, Hullfish discloses that "when 'User A [i.e., second user] wants

46

to stop receiving messages from User B [i.e., first user],'" User A "sends a text message to a 'predetermined telephone number' containing" User B's telephone number, and "any 'future . . . message from User B to User A will be blocked.'" *Id.* at 49 (alterations by Petitioner) (emphases omitted) (quoting Ex. 1011, 8:63–64, 9:15–16, 9:41–42).

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to limitation [7.4], i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa. *See* Prelim. Resp. 1–2, 4, 13–16.  At this stage of the proceeding, Patent Owner does not dispute that Tanigawa and Hullfish disclose the other aspects of limitation [7.4]. *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa and Hullfish teach limitation [7.4]. *See* Pet. 38–39, 49–50; Ex. 1003 ¶¶ 398, 416–417.

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

(f)    Limitation [7.5]

Claim 7 recites as follows:

computer program code for enabling, via the network-based portal, the first message to be received by the second user via the electronic device associated with the second user, using the selected communication mode, depending on the identifier associated with the second user, in view of the second user not blocking the first user from using the selected communication mode to reach the second user, via the network-based portal.

47

IPR2022-00295
Patent 10,492,038 B2

Ex. 1001, 22:20–27.

Petitioner contends that the combined disclosures in Tanigawa and Hullfish teach this limitation for the reasons that the combined disclosures teach limitations [7.3] and [7.4]. *See* Pet. 50–51. Further, Petitioner asserts that Hullfish discloses that a user "registers a screen name representing her identity in an IM service system, e.g. JaneSmith1." *Id.* at 51 (emphasis omitted) (quoting Ex. 1011, 6:12–13). Petitioner also asserts that "a message from the first user is enabled to be received based on the second user's screen name (the claimed 'one identifier')" when "the first user is not blocked" by the second user. *Id.* (citing Ex. 1011, 8:59–9:42, 10:1–8, Fig. 5).

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to limitation [7.5], i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa. *See* Prelim. Resp. 1–2, 4, 13–16. At this stage of the proceeding, Patent Owner does not dispute that Tanigawa and Hullfish disclose the other aspects of limitation [7.5]. *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa and Hullfish teach limitation [7.5]. *See* Pet. 38–39, 50–51; Ex. 1003 ¶¶ 398, 418–421; *supra* §§ IV.D.3(d)–(e).

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

48

(g)    <u>Limitation [7.6]</u>

Claim 7 recites "computer program code for determining availability of the second user." Ex. 1001, 22:28–29.

Petitioner contends that Tanigawa teaches this limitation because Tanigawa discloses that IM server 4 "causes 'presence information' to be created, such as 'information indicating the user can chat: "available" and information indicating that the user is busy and cannot chat.'" Pet. 52 (quoting Ex. 1010 ¶ 120). Petitioner also contends that IM server 4 contains a presence information management table with each user's availability information. *Id.* at 52–53 (citing Ex. 1003 ¶¶ 422–423; Ex. 1010 ¶¶ 49–54, 120–125, 164, Fig. 3).

Patent Owner makes no arguments specific to limitation [7.6]. *See, e.g.*, Prelim. Resp. 1–2, 12–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches limitation [7.6]. *See* Pet. 52–53; Ex. 1003 ¶¶ 422–423.

(h)    <u>Limitation [7.7]</u>

Claim 7 recites "computer program code for receiving, from the second user, contact information associated with the second user to allow the second user to participate and at least receive messages via the network-based portal." Ex. 1001, 22:30–33.

Petitioner contends that Tanigawa teaches this limitation because Tanigawa discloses that "telephone users must register a telephone number, which is 'required for an IM client to participate in IM.'" Pet. 53 (emphasis omitted) (quoting Ex. 1010 ¶ 84). Petitioner also contends that an ordinarily

skilled artisan would have known in 2000 that the Internet Engineering Task Force (IETF) recommended "a common base format" for instant messages as well as "standard forms of addresses or contact means" for media other than instant messages, such as "telephone numbers or email addresses." *Id.* at 54 (citing Ex. 1003 ¶¶ 424–427).

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to limitation [7.7], i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa. *See* Prelim. Resp. 1–2, 4, 13–16. At this stage of the proceeding, Patent Owner does not dispute that Tanigawa discloses the other aspects of limitation [7.7]. *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches limitation [7.7]. *See* Pet. 53–54; Ex. 1003 ¶¶ 424–427.

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

(i)    Limitation [7.8]

Claim 7 recites as follows:

wherein even when the first message is received by the second user via the electronic device associated with the second user depending on the identifier associated with the second user, the contact information associated with the second user is not provided via the network-based portal to the first user via an electronic device associated with the first user.

Ex. 1001, 22:34–40.

IPR2022-00295
Patent 10,492,038 B2

Petitioner contends that Tanigawa teaches this limitation because
Tanigawa discloses that "when a first user invites a second user to chat, the
second user's contact information is not shown to the first user" and that the
first user instead receives "only pieces" of information about the second
user, such as a nickname and presence information. Pet. 54 (citing Ex. 1010
¶¶ 124, 130, 134, 144). Petitioner also contends that contact information
"is provided only to the IM server—not to the users themselves." *Id.* (citing
Ex. 1010 ¶¶ 135, 137).

To support its contentions, Petitioner provides the highlighted version
of Tanigawa's Figure 12 reproduced below (Pet. 55):



Figure 12 illustrates a user interface for an IM client having various display
areas and a main menu bar. Ex. 1010 ¶¶ 25, 162, Fig. 12. The above
highlighted version of Figure 12 has yellow highlighting over the display

IPR2022-00295
Patent 10,492,038 B2

area for text chatting identified by reference numeral 140. *See* Pet. 55; Ex. 1003 ¶ 430; Ex. 1010 ¶ 166. The highlighted display area for text chatting does not provide contact information for the chat participants. *See* Pet. 55; Ex. 1003 ¶ 430.

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to limitation [7.8], i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa. *See* Prelim. Resp. 1–2, 4, 13–16. At this stage of the proceeding, Patent Owner does not dispute that Tanigawa discloses the other aspects of limitation [7.8]. *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches limitation [7.8]. *See* Pet. 54–55; Ex. 1003 ¶¶ 404–405, 428–430; *supra* § IV.D.3(a).

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

(j)     Limitation [7.9]

Claim 7 recites "wherein the identifier associated with the second user is distinct from the contact information associated with the second user." Ex. 1001, 22:41–43.

Petitioner contends that Tanigawa teaches this limitation because Tanigawa discloses that a user has a nickname or screen name that (1) is distinct from the user's telephone number and email address and (2) serves as an "indicator." Pet. 55–56 (citing Ex. 1003 ¶ 431).

52

IPR2022-00295
Patent 10,492,038 B2

Patent Owner makes no arguments specific to limitation [7.9].  *See, e.g.*, Prelim. Resp. 1–2, 12–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that Tanigawa teaches limitation [7.9]. *See* Pet. 55–56; Ex. 1003 ¶¶ 395–410, 431; *supra* §§ IV.D.3(a)–(b).

(k)     Alleged Reasons for Combining the Teachings of the References

Petitioner identifies reasons that would have prompted an ordinarily skilled artisan to combine Hullfish's blocking features with Tanigawa's communications system.  *See* Pet. 33–36, 49–50.  Further, Petitioner asserts that an ordinarily skilled artisan "would have had a reasonable expectation of success in combining Hullfish's blocking features with Tanigawa's communications system." *Id.* at 36.  Dr. Almeroth's testimony supports Petitioner's positions.  *See* Ex. 1003 ¶¶ 178–185, 394, 420.

For instance, Dr. Almeroth testifies that an ordinarily skilled artisan would have been motivated to combine Hullfish's blocking features with Tanigawa's communications system for several reasons.  Ex. 1003 ¶¶ 179–184, 420.  According to Dr. Almeroth, combining the teachings of the references in the way Petitioner proposes would have improved Tanigawa's communications system by:

(1)     giving a user "greater control" over who can reach the user;

(2)     allowing a user to avoid "conversations with annoying, abusive, or unpleasant" people;

(3)     providing "a method of parental control to allow parents to supervise a minor's use" of the system; and

(4)     permitting a user "to block messages at certain times,
        including while they are asleep, while they are busy,
        or while they are traveling."

*Id.* ¶¶ 179–181, 183–184, 420.

Patent Owner makes no arguments against combining the teachings
of Tanigawa and Hullfish. *See, e.g.*, Prelim. 1–2, 12–16.

Based on the current record, Petitioner establishes sufficiently for
purposes of institution that an ordinarily skilled artisan would have had
reasons, e.g., as articulated by Dr. Almeroth, to combine the teachings of
Tanigawa and Hullfish in the way Petitioner proposes.  *See* Ex. 1003
¶¶ 178–184, 394, 420.  Petitioner also establishes sufficiently for purposes
of institution that an ordinarily skilled artisan would have had a reasonable
expectation of success in combining the teachings of Tanigawa and Hullfish.
*Id.* ¶ 185.

(l)     Conclusion About Obviousness/Nonobviousness for Claim 7

As discussed above, Petitioner's analysis addresses how the combined
disclosures in Tanigawa and Hullfish teach each limitation in claim 7.  *See
supra* §§ IV.D.3(b)–(j).  Additionally, Petitioner provides a reason with
rational underpinning as to why an ordinarily skilled artisan would have
been motivated to combine Hullfish's blocking features with Tanigawa's
communications system and would have had a reasonable expectation
of success.  *See supra* § IV.E.3(k).  Thus, based on the current record,
Petitioner establishes sufficiently for purposes of institution that the
combined disclosures in Tanigawa and Hullfish teach claim 7's subject
matter.  Hence, Petitioner demonstrates a reasonable likelihood of prevailing
in proving claim 7 unpatentable under § 103(a) as obvious over Tanigawa
and Hullfish.

4. INDEPENDENT CLAIMS 38 AND 46 AND DEPENDENT CLAIMS
10–12, 22–24, 33–36, 39–41, 49, 51–53, 55, 57, 58, AND 64–66

Independent claims 38 and 46 recite subject matter similar to claim 7. *Compare* Ex. 1001, 21:50–22:43, *with id.* at 26:1–57, *and id.* at 27:37–28:39. We recognize that the challenged independent claims differ at least somewhat in scope. As an example, limitation [46.1] requires "an identifier associated with the first user previously set by the first user via the network-based portal," while limitations [7.1] and [38.1] lack a similar requirement. *Id.* at 21:61–22:2, 26:10–18, 27:48–55. As another example, limitations [7.2] and [46.2] each require "a personal computer" and "a mobile phone," while limitation [38.2] requires only "a mobile phone." *Id.* at 22:3–8, 26:19–22, 27:56–62. At this stage of the proceeding, however, Patent Owner does not advance patentability arguments based on differences in claim scope. *See, e.g.*, Prelim. Resp. 1–2, 12–16.

Claims 10–12, 22–24, and 33–36 depend directly or indirectly from claim 7. Ex. 1001, 22:56–23:4, 24:5–22, 25:14–61. Claims 39–41 depend directly or indirectly from claim 38. *Id.* at 26:58–27:14. Claims 49, 51–53, 55, 57, 58, and 64–66 depend directly or indirectly from claim 46. *Id.* at 28:53–29:3, 29:7–48, 29:52–57, 29:64–30:11, 30:47–31:3.

For claims 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, and 64–66, Petitioner provides a detailed analysis supported by Dr. Almeroth's testimony about how the combined disclosures in Tanigawa and Hullfish teach all the limitations in the claims. *See* Pet. 56–73; Ex. 1003 ¶¶ 432–511.

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to independent claims 38 and 46 and certain dependent

55

claims, i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa. *See* Prelim. Resp. 1–2, 4, 13–16. At this stage of the proceeding, Patent Owner does not dispute that Tanigawa and Hullfish disclose the other aspects of claims 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, and 64–66. *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa and Hullfish teach the subject matter of claims 10–12, 22–24, 33–36, 38–41, 46, 49, 51–53, 55, 57, 58, and 64–66. *See* Pet. 56–73; Ex. 1003 ¶¶ 432–511.

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

### E. Alleged Obviousness over Tanigawa, Hullfish, and Loveland: Claims 8, 9, 43, 44, 47, 48, 50, and 54

Petitioner contends that claims 8, 9, 43, 44, 47, 48, 50, and 54 are unpatentable under § 103(a) as obvious over Tanigawa, Hullfish, and Loveland. *See* Pet. 6, 74–78. Above, we provided overviews of Tanigawa and Hullfish. *See supra* §§ IV.D.1–IV.D.2. Below, we provide an overview of Loveland, and then we consider the obviousness issues. As explained below, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, and Loveland teach the subject matter of claims 8, 9, 43, 44, 47, 48, 50, and 54.

IPR2022-00295
Patent 10,492,038 B2

### 1. Overview of Loveland (Exhibit 1008)

Loveland is a U.S. patent titled "Dispatching Notification to a Device Based on the Current Context of a User with the Device," filed on September 28, 2001, and issued on October 23, 2007. Ex. 1008, codes (22), (45), (54). Loveland states that the invention "relates to methods, systems and computer program products for notifying a user of an event via voice notifications or other notification methods depending on the user's dynamic circumstances." *Id.* at 1:8–11; *see id.* at 1:61–64, 3:4–7. As an example, Loveland explains that an urgent notification sent by text message to a user driving a car may distract the user, whereas a "notification spoken to the user via a voice notification" may be "far more appropriate." *Id.* at 1:65–2:11.

Loveland's Figure 2 (reproduced below) depicts an example environment for a method for notifying a user of an event in a context-sensitive manner that takes into consideration the user's current state:



FIG. 2

57

IPR2022-00295
Patent 10,492,038 B2

Figure 2 illustrates example environment 200 including the following:

(1)   "several devices that are capable of receiving notifications such as telephonic devices 241 and 242";

(2)   "a notification source 210 that generates the notification either in response to having directly detected an event, or in response to having indirectly detected an event via another notification that may be received by the notification source 210"; and

(3)   "a delivery component 220 that delivers the notification using the correct notification method to the user of the corresponding telephonic device 241 or 242."

Ex. 1008, 2:63–64, 5:25–26, 5:32–43, Fig. 2.

IPR2022-00295
Patent 10,492,038 B2

Loveland's Figure 3 (reproduced below) depicts steps in a method for notifying a user of an event in a context-sensitive manner that takes into consideration the user's current state:



**FIG. 3**

Figure 3 "illustrates a flowchart of a method for notifying a user of an event" in a context-sensitive manner that takes into consideration the user's current state. Ex. 1008, 2:65–67, 5:26–28, Fig. 3. The method "may be performed by the notification source 210" shown in Figure 2. *Id.* at 6:24–25.

In step 301, a notification service "detect[s] an event to which a user has previously subscribed," e.g., "that a new e-mail from an important individual has been received in the user's in-box" or "that a stock price has

59

reached a predetermined value." Ex. 1008, 6:27–34, Fig. 3.  In step 302, the notification service "send[s] a notification to the user that is appropriate for the user's circumstances." *Id.* at 6:36–38, Fig. 3.

To determine whether a notification is appropriate for the user's circumstances, in step 303 the notification service "access[es] a current context of the user." Ex. 1008, 6:40–42, Fig. 3.  "The current context may include, for example, whether or not the user's telephone is on, busy, in hands-free mode, out of range, in meeting mode or the like for each of the user's telephones." *Id.* at 6:44–47.

Then, in step 304 the notification service "identif[ies] one of a plurality of possible notification methods to use in order to dispatch the notification based on the current context of the user," e.g., by accessing rules that "relate the current user circumstances with how and whether notification should occur given the current circumstances." Ex. 1008, 6:51–59, Fig. 3. The rules may "define which telephonic devices to notify given the current time, and what notification methods to use if the current device is on or off, in hands-free mode or not, and busy or not." *Id.* at 6:60–64.  For instance, "the user may specify that if an e-mail is received from a certain important person, that a voice notification interrupt the current conversation even if the user is currently on the telephone." *Id.* at 2:28–31; *see id.* at 6:64–7:3.

Next, in step 305 the notification service "cause[s] the notification to be dispatched to the user using the identified notification method." Ex. 1008, 7:4–6, Fig. 3.

IPR2022-00295
Patent 10,492,038 B2

2. DIFFERENCES BETWEEN THE CLAIMED
INVENTION AND THE PRIOR ART

Claims 8 and 9 read as follows:

> 8.  A non-transitory computer readable medium as recited in claim 7, wherein said computer readable medium comprises computer program code for:
>
> > receiving an urgency indication from the first user to the second user via the electronic device associated with the first user; and
> >
> > enabling an urgent notification to be generated to notify the second user at least in view of receiving the urgency indication.
>
> 9.  A non-transitory computer readable medium as recited in claim 8, wherein the urgent notification is enabled to be generated at least in an audio manner.

Ex. 1001, 22:44–55.  Claims 43, 44, 47, 48, 50, and 54 include limitations similar to the limitations in claims 8 and 9.  *Id.* at 27:20–27, 28:40–52, 29:4–6, 29:49–51.

Petitioner contends that Loveland teaches claim 8's limitations because Loveland discloses a notification service that (1) "determines the appropriate notification method to notify the recipient of receipt of the message" and (2) "generate[s] an urgent notification," e.g., if the sender "is an important person trying to communicate with" the recipient.  Pet. 76–77 (citing Ex. 1008, 2:13–33, 6:30–7:3).  Petitioner contends that Loveland teaches claim 9's limitation because Loveland discloses that "the user may state that she wants to be notified by audible voice message if she receives an e-mail from a certain individual."  *Id.* at 77 (emphasis omitted) (quoting Ex. 1008, 6:64–67).  Petitioner contends that Loveland teaches the

61

limitations in claims 43, 44, 47, 48, 50, and 54 for the reasons that Loveland teaches the limitations in claims 8 and 9. *Id.* at 77–78.

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to claim 47, i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa. *See* Prelim. Resp. 1–2, 4, 13–16. At this stage of the proceeding, Patent Owner does not dispute that Tanigawa, Hullfish, and Loveland disclose the other aspects of claims 8, 9, 43, 44, 47, 48, 50, and 54. *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, and Loveland teach all the limitations in claims 8, 9, 43, 44, 47, 48, 50, and 54. *See* Pet. 76–78; Ex. 1003 ¶¶ 513–528.

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network." *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

### 3. ALLEGED REASONS FOR COMBINING THE TEACHINGS OF THE REFERENCES

Petitioner identifies reasons that would have prompted an ordinarily skilled artisan to combine Loveland's urgent-message-notification features with Tanigawa's communications system (as modified by Hullfish). *See* Pet. 74–76. Further, Petitioner asserts that an ordinarily skilled artisan "would have had a reasonable expectation of success in combining" Loveland's features with Tanigawa's system. *Id.* at 76. Dr. Almeroth's testimony supports Petitioner's positions. *See* Ex. 1003 ¶¶ 218–224, 512.

For instance, Dr. Almeroth testifies that an ordinarily skilled artisan would have been motivated to combine Loveland's urgent-message-notification features with Tanigawa's communications system to improve Tanigawa's system by (1) "prevent[ing] inadvertent blocking of important communications" and (2) "provid[ing] users more control over blocked communications." Ex. 1003 ¶¶ 219–220. Dr. Almeroth explains that with the teachings of Loveland and Hullfish "users of Tanigawa's system would be better equipped to receive notifications of urgent messages from important individuals and to block unwanted communications." *Id.* ¶ 222.

Patent Owner makes no arguments against combining the teachings of Tanigawa, Hullfish, and Loveland. *See, e.g.*, Prelim. Resp. 1–2, 12–16.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that an ordinarily skilled artisan would have had reasons, e.g., as articulated by Dr. Almeroth, to combine the teachings of Tanigawa, Hullfish, and Loveland in the way Petitioner proposes. *See* Ex. 1003 ¶¶ 218–223. Petitioner also establishes sufficiently for purposes of institution that an ordinarily skilled artisan would have had a reasonable expectation of success in combining the teachings of Tanigawa, Hullfish, and Loveland. *Id.* ¶ 224.

### 4. CONCLUSION ABOUT OBVIOUSNESS/NONOBVIOUSNESS

As discussed above, Petitioner's analysis addresses how the combined disclosures in Tanigawa, Hullfish, and Loveland teach all the limitations in claims 8, 9, 43, 44, 47, 48, 50, and 54. *See supra* § IV.E.2. Additionally, Petitioner provides a reason with rational underpinning as to why an ordinarily skilled artisan would have been motivated to combine Loveland's urgent-message-notification features with Tanigawa's communications

system (as modified by Hullfish) and would have had a reasonable expectation of success. *See supra* § IV.E.3. Thus, based on the current record, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, and Loveland teach the subject matter of claims 8, 9, 43, 44, 47, 48, 50, and 54. Hence, Petitioner demonstrates a reasonable likelihood of prevailing in proving these claims unpatentable under § 103(a) as obvious over Tanigawa, Hullfish, and Loveland.

### F. *Alleged Obviousness over Tanigawa, Hullfish, and Takahashi: Claims 37, 42, 56, 59–63, and 67*

Petitioner contends that claims 37, 42, 56, 59–63, and 67 are unpatentable under § 103(a) as obvious over Tanigawa, Hullfish, and Takahashi. *See* Pet. 6, 79–85. Above, we provided overviews of Tanigawa and Hullfish. *See supra* §§ IV.D.1–IV.D.2. Below, we provide an overview of Takahashi, and then we consider the obviousness issues. As explained below, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, and Takahashi teach the subject matter of claims 37, 42, 56, 59–63, and 67.

### 1. OVERVIEW OF TAKAHASHI (EXHIBIT 1009)

Takahashi is a U.S. patent application publication titled "Server Device for Net Game, Net Game Management Method, Net Game Management Program and Recording Medium Which Stores Net Game Management Program," filed on May 29, 2002, and published on December 5, 2002. Ex. 1009, codes (22), (43), (54). Takahashi states that the invention "relates to a server device" for network games "communicably connected to a plurality of terminal devices used by users via a network for

managing a game played in a game space by the users using the terminal devices." *Id.* ¶ 2; *see id.* ¶¶ 8–9.

Takahashi describes the invention using a baseball game as an illustrative network game. Ex. 1009 ¶¶ 27, 72–76, 82–83, 109. Takahashi explains that by limiting messages among users to a plurality of predetermined messages, "an exchange of unfavorable messages, such as slander, can be prevented, and the baseball game can progress smoothly." *Id.* ¶ 76; *see id.* ¶¶ 138–139. A server stores the plurality of predetermined messages. *Id.* ¶¶ 62, 70, 80, 87, code (57).

Takahashi's Figure 7 (reproduced below) depicts an example set of predetermined messages:



Figure 7 illustrates "an example of the messages at game start/during game setup screen." Ex. 1009 ¶ 72, Fig. 7; *see id.* ¶ 19. During game setup, a user may select various predetermined messages for a server to send automatically to another user at predetermined times during game play. *Id.* ¶¶ 72–80; *see id.* ¶¶ 8–9, 38–39, 61, 136–138.

IPR2022-00295
Patent 10,492,038 B2

As an example, a user may select any of the following messages for automatic transmission at game start: "How do you do" (shown in Figure 7), "Hi," "Take it easy please," "I'm a beginner," or "Good evening." Ex. 1009 ¶¶ 72, 74–75, Fig. 7. As another example, a user may select any of the following messages for automatic transmission when a tie occurs: "I'm getting warmed up" (shown in Figure 7), "I'm just getting serious," "Revenge," "You are strong," or "Take it easy will you." *Id.* ¶¶ 72, 75, Fig. 7.

Takahashi's Figure 8 (reproduced below) depicts another example set of predetermined messages:

**FIG.8**



Figure 8 illustrates "an example of the messages during pitching setup screen." Ex. 1009 ¶ 82, Fig. 8; *see id.* ¶ 20. During game setup, a user may select various predetermined messages the user may desire to send to another user at various points during game play, e.g., when pitching to the batting side. *Id.* ¶¶ 81–87; *see id.* ¶ 60. Then, during game play, a user may send a particular predetermined message by pressing an assigned function key, e.g., one of the function keys F1 through F6. *Id.* ¶¶ 82–83; *see id.*

66

IPR2022-00295
Patent 10,492,038 B2

¶¶ 38–39.  In the Figure 8 example set of predetermined messages, a user may send the message "Here comes a curve" by pressing the F1 function key or send the message "Here comes a screwball" by pressing the F2 function key.  *Id.* ¶¶ 82–83, Fig. 8.

### 2. DIFFERENCES BETWEEN THE CLAIMED INVENTION AND THE PRIOR ART

Claim 37 depends from claim 36 and specifies that "said computer readable medium comprises computer program code to enable the second user to select a predetermined message to send to the first user, the predetermined message being selected from a set of predetermined messages provided to the second user."  Ex. 1001, 25:62–67.  Claims 42, 56, 59, and 67 include limitations similar to claim 37's limitations.  *Id.* at 27:15–19, 29:58–63, 30:12–18, 31:4–10.  Claims 60, 61, 62, and 63 depend directly or indirectly from claim 59 and include limitations similar to the limitations in claims 64, 65, 36, and 66, respectively.  *Id.* at 30:19–31:3.

Petitioner contends that Takahashi teaches claim 37's limitations because Takahashi discloses that "a user preselects predetermined messages" and a server stores the predetermined messages "in the user's message storing section."  Pet. 82 (citing Ex. 1009 ¶¶ 59, 74, 137, Figs. 7–8).  Petitioner asserts that a user may assign function keys (e.g., F1, F2, etc.) to the predetermined messages.  *Id.* (citing Ex. 1009 ¶ 60).  Petitioner also asserts the server presents a predetermined message at a predetermined time during game play or "when the user operates a function key corresponding to" a predetermined message.  *Id.* (citing Ex. 1009 ¶¶ 59–60, 62, 70–71, 77, 136–139, Fig. 6).

67

IPR2022-00295
Patent 10,492,038 B2

Petitioner contends that Takahashi teaches the limitations in claims 42, 56, 59, and 67 for the reasons that Takahashi teaches claim 37's limitations.  Pet. 83–85.  Petitioner contends that Tanigawa teaches the limitations in claims 60, 61, 62, and 63 for the reasons that Tanigawa teaches the limitations in claims 64, 65, 36, and 66, respectively.  *Id.* at 84–85.

Patent Owner disputes that Tanigawa discloses a "network-based portal" according to claim 63, i.e., because a "network-based portal" resides only "at the server-side of a network" and Petitioner identifies no server-side portal in Tanigawa.  *See* Prelim. Resp. 1–2, 4, 13–16.  At this stage of the proceeding, Patent Owner does not dispute that Tanigawa, Hullfish, and Takahashi disclose the other aspects of claims 37, 42, 56, 59–63, and 67.  *Id.* at 14–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, and Takahashi teach all the limitations in claims 37, 42, 56, 59–63, and 67.  *See* Pet. 82–85; Ex. 1003 ¶¶ 530–547.

For the reasons discussed above, we disagree with Patent Owner's assertion that a "network-based portal" resides only "at the server-side of a network."  *See* Prelim. Resp. 1–2, 4, 13–14; *supra* § IV.C.2.

### 3. ALLEGED REASONS FOR COMBINING THE TEACHINGS OF THE REFERENCES

Petitioner identifies reasons that would have prompted an ordinarily skilled artisan to combine Takahashi's predetermined-messaging features with Tanigawa's communications system (as modified by Hullfish).  *See*

Pet. 79–81.  Further, Petitioner asserts that an ordinarily skilled artisan "would have had a reasonable expectation of success in combining" Takahashi's features with Tanigawa's system.  *Id.* at 81.  Dr. Almeroth's testimony supports Petitioner's positions.  *See* Ex. 1003 ¶¶ 231–238, 529.

For instance, Dr. Almeroth testifies that an ordinarily skilled artisan would have been motivated to combine Takahashi's predetermined-messaging features with Tanigawa's communications system to improve Tanigawa's system by (1) "minimiz[ing] disruptions while communicating with other users" and (2) "prevent[ing] unwanted communications." Ex. 1003 ¶¶ 232–236.  Dr. Almeroth explains that with the teachings of Takahashi and Hullfish "users of Tanigawa's system would be better equipped to limit or block unwanted communications, with the predictable result of improving their online chatting experience."  *Id.* ¶ 236.

Patent Owner makes no arguments against combining the teachings of Tanigawa, Hullfish, and Takahashi.  *See, e.g.*, Prelim. Resp. 1–2, 12–16.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that an ordinarily skilled artisan would have had reasons, e.g., as articulated by Dr. Almeroth, to combine the teachings of Tanigawa, Hullfish, and Takahashi in the way Petitioner proposes.  *See* Ex. 1003 ¶¶ 231–237.  Petitioner also establishes sufficiently for purposes of institution that an ordinarily skilled artisan would have had a reasonable expectation of success in combining the teachings of Tanigawa, Hullfish, and Takahashi.  *Id.* ¶ 238.

### 4. Conclusion About Obviousness/Nonobviousness

As discussed above, Petitioner's analysis addresses how the combined disclosures in Tanigawa, Hullfish, and Takahashi teach all the limitations in

69

claims 37, 42, 56, 59–63, and 67. *See supra* § IV.F.2. Additionally, Petitioner provides a reason with rational underpinning as to why an ordinarily skilled artisan would have been motivated to combine Takahashi's predetermined-messaging features with Tanigawa's communications system (as modified by Hullfish) and would have had a reasonable expectation of success. *See supra* § IV.F.3. Thus, based on the current record, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, and Takahashi teach the subject matter of claims 37, 42, 56, 59–63, and 67. Hence, Petitioner demonstrates a reasonable likelihood of prevailing in proving these claims unpatentable under § 103(a) as obvious over Tanigawa, Hullfish, and Takahashi.

### G. Alleged Obviousness over Tanigawa, Hullfish, Loveland, and Takahashi: Claim 45

Petitioner contends that claim 45 is unpatentable under § 103(a) as obvious over Tanigawa, Hullfish, Loveland, and Takahashi. *See* Pet. 6, 85–86. Above, we provided overviews of Tanigawa, Hullfish, Loveland, and Takahashi. *See supra* §§ IV.D.1–IV.D.2, IV.E.1, IV.F.1. Below, we consider the obviousness issues. As explained below, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, Loveland, and Takahashi teach claim 45's subject matter.

#### 1. DIFFERENCES BETWEEN THE CLAIMED INVENTION AND THE PRIOR ART

Claim 45 reads as follows (with formatting added for clarity):

45. A computer-implemented method as recited in claim 41 comprising

IPR2022-00295
Patent 10,492,038 B2

> enabling the second user to select a predetermined
> message to send to the first user, the predetermined message
> being selected from a set of predetermined messages provided
> to the second user,

> wherein an urgency indication is received from the
> second user to the first user via the electronic device associated
> with the second user to generate an urgent notification to notify
> the first user.

Ex. 1001, 27:28–36.

Petitioner contends that Takahashi teaches claim 45's "enabling" limitation for the reasons that Takahashi teaches claim 37's limitations. Pet. 82–83, 86. Petitioner contends that Loveland teaches claim 45's "wherein" clause for the reasons that Loveland teaches claim 8's limitations. *Id.* at 76–77, 86.

Patent Owner makes no arguments specific to claim 45. *See, e.g.*, Prelim. Resp. 1–2, 12–16.

Based on the current record and for the reasons advanced by Petitioner and supported by Dr. Almeroth's testimony, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, Loveland, and Takahashi teach claim 45's limitations. *See* Pet. 76–77, 82–83, 86; Ex. 1003 ¶¶ 513–514, 530–531, 548–551.

### 2. ALLEGED REASONS FOR COMBINING THE TEACHINGS OF THE REFERENCES

For the reasons discussed above for the challenge based on Tanigawa, Hullfish, and Loveland, Petitioner asserts that an ordinarily skilled artisan would have been motivated to combine Loveland's urgent-message-notification features with Tanigawa's communications system. Pet. 86; *see supra* § IV.E.3. For the reasons discussed above for the challenge based on

Tanigawa, Hullfish, and Takahashi, Petitioner asserts that an ordinarily skilled artisan would have been motivated to combine Takahashi's predetermined-messaging features with Tanigawa's communications system. Pet. 86; *see supra* § IV.F.3.

Patent Owner makes no arguments against combining the teachings of Tanigawa, Hullfish, Loveland, and Takahashi. *See, e.g.*, Prelim. Resp. 1–2, 12–16.

Based on the current record, Petitioner establishes sufficiently for purposes of institution that an ordinarily skilled artisan would have had reasons, e.g., as articulated by Dr. Almeroth, to combine the teachings of Tanigawa, Hullfish, Loveland, and Takahashi in the way Petitioner proposes. *See* Ex. 1003 ¶¶ 178–185, 218–224, 231–238, 394, 420, 512, 529; *supra* §§ IV.D.3(k), IV.E.3, IV.F.3.

### 3. Conclusion About Obviousness/Nonobviousness

As discussed above, Petitioner's analysis addresses how the combined disclosures in Tanigawa, Hullfish, Loveland, and Takahashi teach claim 45's limitations. *See supra* §§ IV.E.2, IV.F.2, IV.G.1. Additionally, Petitioner provides a reason with rational underpinning as to why an ordinarily skilled artisan would have been motivated to combine the teachings of Tanigawa, Hullfish, Loveland, and Takahashi in the way Petitioner proposes. *See supra* §§ IV.E.3, IV.F.3, IV.G.2. Thus, based on the current record, Petitioner establishes sufficiently for purposes of institution that the combined disclosures in Tanigawa, Hullfish, Loveland, and Takahashi teach claim 45's subject matter. Hence, Petitioner demonstrates a reasonable likelihood of prevailing in proving claim 45 unpatentable under § 103(a) as obvious over Tanigawa, Hullfish, Loveland, and Takahashi.

## V.  CONCLUSION

Based on the arguments and evidence presented in the Petition, the Preliminary Response, and the Preliminary Reply along with the accompanying exhibits, we determine that there is a reasonable likelihood Petitioner would prevail with respect to at least one claim challenged in the Petition.  Hence, we institute an *inter partes* review of all challenged claims on all challenges included in the Petition.  *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (noting that the language of 35 U.S.C. § 314(b) "indicates a binary choice—either institute review or don't"); *see also PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018) (interpreting the statute as requiring "a simple yes-or-no institution choice respecting a petition, embracing all challenges included in the petition").  Additionally, we decline to exercise our discretion under § 314(a) to deny institution.

At this preliminary stage, we have not made a final determination about the patentability of any challenged claim, the construction of any claim term, phrase, or limitation, or any other legal or factual issue.

## VI.  ORDER

Accordingly, it is

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 7–12, 22–24, and 33–67 in the '038 patent is instituted on all challenges included in the Petition; and

FURTHER ORDERED that, according to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial that commences on the entry date of this Decision.

IPR2022-00295
Patent 10,492,038 B2


PETITIONER:

W. Todd Baker
Yimeng Dou
KIRKLAND & ELLIS LLP
todd.baker@kirkland.com
yimeng.dou@kirkland.com
Epic_IngenioShare@kirkland.com


PATENT OWNER:

Stephen R. Risley
Cortney S. Alexander
KENT & RISLEY LLC
steverisley@kentrisley.com
cortneyalexander@kentrisley.com

74

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

———————————————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner

———————————————

**U.S. PATENT NO. 10,492,038**

Case IPR2022-00295

———————————————

**SUPPLEMENTAL DECLARATION OF DR. KEVIN ALMEROTH
PURSUANT TO 37 C.F.R. 42.64(b)(2)**

Epic Games Ex. 1039
Epic Games v. IngenioShare
IPR2022-00295  p. 1

# LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 10,492,038 |
| 1002 | File History of U.S. Patent No. 10,492,038 |
| 1003 | Declaration of Dr. Kevin Almeroth in Support of *Inter Partes Review* of U.S. Patent No. 10,492,038 |
| 1004 | *Curriculum Vitae* of Dr. Kevin Almeroth |
| 1005 | U.S. Provisional Patent Application No. 60/527,565 |
| 1006 | U.S. Provisional Patent Application No. 60/689,686 |
| 1007 | Unused |
| 1008 | U.S. Patent No. 7,287,056 ("Loveland") |
| 1009 | U.S. Patent Application 2002/0183114 ("Takahashi") |
| 1010 | U.S. Patent Application 2004/0001480 ("Tanigawa") |
| 1011 | U.S. Patent No. 7,428,580 ("Hullfish") |
| 1012 | IngenioShare's Infringement Contentions in Texas Litigation |
| 1013 | Texas Litigation Proposed Scheduling Order |
| 1014 | Fourteenth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic |
| 1015 | Judge Albright's Standing Order re Inter-District Transfer |
| 1016 | Kurose, J. and Ross, K., Computer Networking: A Top-Down Approach Feature the Internet (2000) |
| 1017 | Kuehn, S., A Play Theory Analysis of Computer-Mediated Telecommunication (Apr. 20, 1990) |
| 1018 | Telecomputing in Japan |
| 1019 | Hernandez, R., ECPA and Online Computer Privacy (1988) |

Epic Games Ex. 1039
Epic Games v. IngenioShare
IPR2022-00295  p. 2

| Exhibit No. | Description |
|---|---|
| 1020 | Miller, A., Applications of Computer Conferencing to Teacher Education and Human Resource Development (1991) |
| 1021 | Benimoff, N. and Burns, M., Multimedia User Interfaces for Telecommunications Products and Services (1993) |
| 1022 | Falconer, W. and Hooke, J., Telecommunications Services in the Next Decade (1986) |
| 1023 | Hine, N.A., et al., An Adaptable User Interface to a Multimedia Telecommunications Conversation Service for People with Disabilities (1995) |
| 1024 | Bazaios, A., et al., Multimedia Architecture Offering Open Distance Learning Services over Internet |
| 1025 | Stein, J., et al., Chat and Instant Messaging Systems (2002) |
| 1026 | U.S. Patent No. 6,241,612 ("Heredia") |
| 1027 | U.S. Patent Application 2003/0216178 ("Danieli") |
| 1028 | International Patent Application WO 01/45343 ("Davies") |
| 1029 | Grinter, R. and Palen, L., Instant Messaging in Teen Life (2002) |
| 1030 | File History of U.S. Patent No. 8,744,407 |
| 1031 | File History of U.S. Patent No. 9,736,664 |
| 1032 | U.S. Patent No. 10,492,038 Claim Listing |
| 1033 | U.S. Patent No. 6,828,924 ("Gustavsson") |
| 1034 | Patil, S. and Kobsa, A., The Challenges in Preserving Privacy in Awareness Systems (2003) |
| 1035 | Internet Engineering Task Force RFC 2779 (Instant Messaging/Presence Protocol Requirements) (2000) |
| 1036 | File History of U.S. Patent No. 9,204,268 |
| 1037 | Declaration of Yimeng Dou Pursuant to 37 C.F.R. 42.64(b)(2) |
| 1038 | Declaration of Jennifer A. Babbitt Pursuant to 37 C.F.R. 42.64(b)(2) |

Epic Games Ex. 1039
Epic Games v. IngenioShare
IPR2022-00295  p. 3

| Exhibit No. | Description |
|---|---|
| 1039 | Supplemental Declaration of Dr. Kevin Almeroth Pursuant to 37 C.F.R. 42.64(b)(2) |

Epic Games Ex. 1039
Epic Games v. IngenioShare
IPR2022-00295  p. 4

I, Dr. Kevin C. Almeroth, hereby declare as follows:

1.      I have been retained as an expert witness on behalf of Epic Games, Inc. ("Epic Games" or "Petitioner") to offer technical opinions in connection with the above-captioned Petition for *Inter Partes* Review ("IPR") of U.S. Patent No. 10,492,038 ("the '038 Patent"). I previously submitted a declaration containing my technical opinions, which I incorporate by reference here, including my discussion of the technological background of the '038 Patent. Ex. 1003, ¶¶ 61–71; *see generally id*.

2.      I understand that Patent Owner has objected to the authenticity of certain exhibits that I cited in my initial declaration. Specifically, I understand that, among other objections, Patent Owner has objected to the authenticity of Exhibits 1016–1025, 1029, and 1034–1035. I submit this declaration as supplemental evidence under 37 C.F.R. § 42.64(b)(2).

3.      Exhibits 1016 (Kurose and Ross) and 1023 (Hine) are chapters of books covering technical subject matter. In my initial declaration, I used these exhibits to show what a POSITA would have known at the time of the '038 Patent. *See* Ex. 1003, ¶¶ 61–71. As an expert, I routinely rely on these types of books in rendering my opinions, including opinions related to patent invalidity.

4.      Exhibits 1017 (Kuehn), 1020 (Cruz), 1024 (Bazaios), and 1029 (Grinter) are papers presented at technical conferences. In my initial declaration, I

Epic Games Ex. 1039
Epic Games v. IngenioShare
IPR2022-00295  p. 5

used them to show what a POSITA would have known at the time of the '038 Patent. *See* Ex. 1003, ¶¶ 61–71.  As an expert, I routinely rely on these types of conference papers in rendering my opinions, including opinions related to patent invalidity.

5.    Exhibits 1018 (Telecomputing in Japan), 1019 (Hernandez), 1021 (Benimoff), 1022 (Falconer), 1025 (Stein), and 1034 (Patil) are scholarly articles published in journals.  In my initial declaration, I used them to show what a POSITA would have known at the time of the '038 Patent.  *See* Ex. 1003, ¶¶ 61–71.  As an expert, I routinely rely on these types of articles in rendering my opinions, including opinions related to patent invalidity.

6.    As I previously explained, Exhibit 1035 is an RFC (or "request for comments") authored by the Internet Engineering Task Force (IETF).  *See* Ex. 1003, ¶ 63.  The IETF develops standards documents that define protocols governing the Internet, including TCP, IP, HTTP, and SMTP.  *See id.*  In my initial declaration, I used the RFC to show what a POSITA would have known at the time of the '810 Patent.  *See* Ex. 1003, ¶¶ 61–71, 425–27.  As an expert, I routinely rely on these types of standards documents in rendering my opinions, including opinions related to patent invalidity—especially in cases involving communications standards or protocols.

Epic Games Ex. 1039
Epic Games v. IngenioShare
IPR2022-00295  p. 6

Date:  July 5, 2022

Respectfully submitted,

_Kevin C Almeroth_

_____

Kevin C. Almeroth, Ph.D.

Epic Games Ex. 1039
Epic Games v. IngenioShare
IPR2022-00295  p. 7

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

EPIC GAMES, INC.,
Petitioner,

v.

INGENIOSHARE, LLC,
Patent Owner.

————————————

Case No. IPR2022-00295
Patent No. 10,492,038

————————————

**PATENT OWNER'S RESPONSE
UNDER 37 C.F.R. § 42.120**

—————————————————————————————————

Mail Stop PATENT BOARD, PTAB
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ……………………………………………    1

II.  TERMINOLOGY ……………………………………………    1

III. GROUND I – CLAIMS 7, 10–12, 22–24, 33–36, 38–41, 46,
     49, 51–53, 55, 57–58, AND 64–66 ARE NOT RENDERED
     OBVIOUS BY TANIGAWA IN VIEW OF HULLFISH  ………    1

     A.   Tanigawa (Exhibit 1010) …………………………………    2

     B.   Hullfish (Exhibit 1011)   …………………………………    7

     C.   A POSITA Would Not Be Motivated To Combine
          Tanigawa And Hullfish To Implement The Claimed
          Invention Of The '038 Patent   …………………………..    8

          1.   Tanigawa And Hullfish Are Incompatible   ………    8

          2.   Petitioner's Alleged Motivation To Combine
               Is Nonsense …………………………………………..   12

     D.   [7.0] "Network-Based Portal"   …………………………..   14

          1.   A "Portal" Is *Not* A User Terminal Or A
               Client Communication Device  ……………………   16

          2.   The '038 Specification Defines "Portal" As
               A "Gateway" And Defines A "Gateway" As
               A "Networked Server"    …………………………..   17

          3.   The Functionality Of A "Portal" Is Different
               Than That Of A Client Communication Device …..   17

          4.   The Claims Also Distinguish A "Portal"
               From A Client Communication Device ……………   19

i

5. Petitioner's Construction Is Contradictory ……... 19

6. Tanigawa's User Interface Is Not A "Network-Based Portal" ………………………….. 21

7. Patent Owner's Construction Of NBP Does Not Exclude A Preferred Embodiment ……… 22

8. Petitioner's Construction Is Contradictory ……… 24

9. Tanigawa's User Interface Is Not A "Network-Based Portal" ………………………… 25

10. [7.0] Summary ………………………… 28

E. [7.1] "A Prior Registration Process" Is Not Obviated By The Combination Of Tanigawa And Hullfish ……… 28

F. [7.3] "Messages Are Eligible To Be Received … All Depending On An Identifier" Is Not Rendered Obvious By The Alleged Combination …………………..……… 30

G. [7.4] "Block" Is Not Rendered Obvious By The Alleged Combination ………………………… 32

H. [7.5] The Alleged Combination Does Not Render Obvious "Enabling, Via The Network-Based Portal, The First Message To Be Received" "Depending On *The Identifier*" "In View Of The Second User *Not Blocking* The First User" ………………………….. 34

I. [7.8] "Even When The Message Is Received" "The Contact Information" "Is *Not* Provided" Is Not Rendered Obvious By The Alleged Combination ……………. 35

1. The Petitioner's Positions On "NBP" And "Contact Information *Not* Provided" Are Incompatible ……... 35

ii

2.    The Combination Teaches That The Recipient's
      Contact Information Is Sent To The Sender's Client
      Communication Device  ………………………..    36

      i.    Tanigawa Teaches A POSITA That Contact
            Information *Is* Provided  ……………………    36

      ii.   Tanigawa Teaches A POSITA That IM
            Clients Receive Presence Information ………    39

      iii.  Tanigawa Teaches A POSITA That IM
            Clients Use Client Addresses To Initiate
            Communication  …………………………..    40

3.    Tanigawa Does Not Teach Or Suggest Hiding
      Contact Information  …………………………..    41

4.    Petitioner's Reliance On Dr. Almeroth Is
      Misplaced  ………………………..………………    41

5.    Petitioner's Argument Is Wrong And Is
      Outweighed By Patent Owner's Evidence  ……..    44

6.    The Institution Decision  …………………………..    46

7.    [7.8] Summary  …………………………………    46

IV.    GROUND II – CLAIMS 8, 9, 43, 44, 47, 48, 50, AND 54
       ARE NOT RENDERED OBVIOUS BY TANIGAWA
       IN VIEW OF HULLFISH AND LOVELAND  …………….    46

V.     GROUND III – CLAIMS 37, 42, 56, 59–63, AND 67
       ARE NOT RENDERED OBVIOUS BY TANIGAWA IN
       VIEW OF HULLFISH AND TAKAHASHI ……………………    47

VI.    GROUND IV – CLAIM 45 IS NOT RENDERED OBVIOUS
       BY TANIGAWA IN VIEW OF HULLFISH, LOVELAND,
       AND TAKAHASHI  …………………………………..    48

VII.   CONCLUSION  …………………………………………    49

iii



Exhibit 1010, Tanigawa at Fig. 12 and [0025]; Exhibit 2005, Rouskas Declaration at 25, ¶62.

As a result, Tanigawa's user interface is provided by and displayed in an IP terminal on the client-side of the network. Petition at 38-39; Exhibit 2005, Rouskas Declaration at 26, ¶63. Tanigawa's IP terminals are client communication devices. Exhibit 1010, Tanigawa at [0162]-[0166]; Exhibit 2005, Rouskas Declaration at 26, ¶63.

### 1.  A "Portal" Is *Not* A User Terminal Or A Client Communication Device

"In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." Exhibit 2005, Rouskas Declaration at 26, ¶64. "Portal is a term, generally synonymous with gateway, for a World Wide

16

Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. *Id*. There are general portals and specialized or niche portals." *Id*. Websites are hosted on web servers, not on communication devices such as Tanigawa's client terminals 7-1, 7-2, 7-3. *Id*.

### 2.      The '038 Specification Defines "Portal" As A "Gateway" And Defines A "Gateway" As A "Networked Server"

Consistent with its common meaning, the specification of the '038 patent defines a "portal" as a "communication gateway". Exhibit 1001, '038 Patent at Col. 4, line 22, Col. 4, lines 62-63, Col. 7, lines 11-12, and Col. 7, line 15; Exhibit 2005, Rouskas Declaration at 26-27, ¶65. The specification also defines a "gateway" as a "networked server":

> The remote server computer can be a networked server coupled to the network 108. One example of a networked server is a gateway computer for a wireless 10 electronic device, such as a mobile telephone.

Exhibit 1001, '038 Patent at Col. 16, lines 15-18; Exhibit 2005, Rouskas Declaration at 27, ¶65. Importantly, the '038 specification does not define "portal" or "network-based portal" as a client communication device. Exhibit 2005, Rouskas Declaration at 27, ¶65.

17

### 3.     The Functionality Of A "Portal" Is Different Than That Of A Client Communication Device

Based on the '038 specification's use of the term "portal", a POSITA would understand that the functionality of the claimed "portal" is different than that of a client communication device. Exhibit 2005, Rouskas Declaration at 27, ¶66. Specifically, a POSITA would understand that a portal allows "worldwide access", whereas a client device is "associated with a user". *Id*.  This is consistent with the teachings of the '038 specification:

> (1)     "The portal allows worldwide access to the user"

Exhibit 1001, '038 Patent at Col. 4, lines 52-53;

> (2)     "A portal or gateway approach could provide general Internet access to one or more embodiments of the communication management systems"

*Id*. at Col. 7, lines 11-14 (indicating that a portal can be accessed by multiple users through the Internet);

> (3)     "Peter wants to make a mobile phone call to the user. In one embodiment, Peter calls a portal…. In another example, Peter is also a registered user of the portal."

*Id*. at Col. 6, lines 33-39 (indicating again that multiple users may access the portal from their communication device); and

> (4)     "for the second user to receive messages via an electronic device associated with the second user"

*Id*. at Col. 2, lines 25-29; Exhibit 2005, Rouskas Declaration at 27-28, ¶66.

18

In light of the common meaning of "portal," and specification's use of the term "portal", a POSITA would understand that the functionality of a "portal" is different than that of a client communication device because a "portal" allows "worldwide access", whereas a client communication device is "associated with a user". Exhibit 2005, Rouskas Declaration at 28, ¶67.  They are two distinct things. *Id*.

### 4.    The Claims Also Distinguish A "Portal" From A Client Communication Device

In addition to the specification, the claim language also clearly differentiates between a "portal" and a "communication device".  For example, claim elements [7.7] and [7.8] state, respectively:

> "computer program code for *receiving, from the second user, contact information associated with the second user* to allow the second user to participate and at least *receive messages via the network-based portal*;

> and

> "wherein … the contact information associated with the second user is not provided *via the network-based portal* to the first user *via an electronic device associated with the first user*"

Exhibit 1001, '038 Patent at Claim 7 (emphasis added); Exhibit 2005, Rouskas Declaration at 28-29, ¶68; *see also* Exhibit 1001, '038 Patent at Claim 38 ([38.7] and [38.8] and Claim 46 ([46.7] and [46.8]).

19

(3)    "The portal or gateway can then facilitate download of a
database or update thereto to a communication device, such as a phone."

Exhibit 1001, '038 Patent at Col. 7, 15-17; Exhibit 2005, Rouskas Declaration at

30-31, ¶72.

As shown above, it was well known to a POSITA that a "portal" or gateway

connects distinct networks, whereas a user terminal device does not. Exhibit 2005,

Rouskas Declaration at 31, ¶73.  There can be no more clear distinction in the

Internet community than between a "portal" or a gateway and a user

terminal/communication device. *Id.*  The '038 specification and claims are clear

that multiple users may access the "portal". *See, e.g.*, Exhibit 1001, '038 Patent at

Col. 4, lines 52-53 ("The portal allows worldwide access to the user") and Claim 7

at [7.0] ("each of the plurality of users having an identifier for use with the

different communication modes, with the corresponding identifier being set via the

network-based portal"); Exhibit 2005, Rouskas Declaration at 31, ¶73.  But a user

terminal/communication device allows access to its user only, and by definition is

not accessible "worldwide". Exhibit 2005, Rouskas Declaration at 31, ¶73.

**7.    Patent Owner's Construction Of A NBP Does Not Exclude
A Preferred Embodiment**

The Institution Decision rejected Patent Owner's Preliminary Response

argument that a "network-based portal" resides only "at the server-side of a

network" and excludes "client-side functionality" because the "'038 patent's

22

specification discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device." Institution Decision at 23.  In doing so, the Board relied on the notion that "[t]he '038 patent's specification discloses embodiments where claimed functionality resides in a 'mobile phone,' i.e., a client-side device. *See* Ex. 1001, 3:29–38, 9:22–10:19, 10:34–13:43, 15:12–16:2, Figs. 7–11." Institution Decision at 23.  However, as explained below, the embodiment in Figs. 7-11 are not embodiments concerning use of a NBP. Exhibit 2005, Rouskas Declaration at 32, ¶74.  Nonetheless, the Board "invite[d] the parties to provide additional briefing in the Response, Reply, and Sur-reply about the meaning of 'network-based portal' in the '038 patent's claims."  Institution Decision at 25; Exhibit 2005, Rouskas Declaration at 32, ¶74.

Respectfully, construing the NBP as distinct from a communication device, such as Tanigawa's communication device, does *not* exclude a preferred embodiment. Exhibit 2005, Rouskas Declaration at 32, ¶75.

Indeed, for Fig. 7, the '038 specification states:

"Fig. 7 is a flow diagram of a *personal call response process* 200 according to one embodiment of the invention. The personal call response process 200 is *performed by an electronic device*, such as a mobile communication device (e.g., *mobile telephone*).

Exhibit 1001, '038 Patent at Col. 9, lines 22-26; Exhibit 2005, Rouskas Declaration at 32, ¶76.  Similar language is used in describing Figures 8-11.

23

Exhibit 1001, '038 Patent at Figures 8-11; Exhibit 2005, Rouskas Declaration at 32, ¶76.

Claim 7 concerns "managing electronic communications of a plurality of users using at least a network-based portal" and requires "*enabling*, via the network-based portal, *the first message to be received* by the second user"; whereas the embodiments of Figs. 7-11 are methods performed by the second user's device *upon receiving a message*. Exhibit 1001, '038 Patent at Figures 7-11; Exhibit 2005, Rouskas Declaration at 32-33, ¶77.  In other words, Figures 7-11 are not embodiments for "managing electronic communications using at least a network-based portal" as are the claims of the '038 Patent. *Id*. at 33, ¶77.  Instead, Figures 7-11 concern how a recipient user interacting with their client device can respond to an incoming call or message. *Id*.  As a result, a construction that has the NBP at a server distinct from the second user's communication device *does not exclude a preferred embodiment, if anything, it enables them*. *Id*.

### 8.    <u>Petitioner's Construction Is Contradictory</u>

Petitioner's construction of NBP should also be rejected because it is contradictory and inconsistent. Exhibit 2005, Rouskas Declaration at 33, ¶78. Petitioner argues that the user interface on an IP terminal is the claimed network-based portal (NBP). Petition at 38-39.  According to Tanigawa, "Fig. 12 is a diagram showing an example of an IM client, which is displayed in an IP terminal

63.     As a result, Tanigawa's user interface is provided by and displayed in an IP terminal on the client-side of the network. Petition at 38-39.  Tanigawa's IP terminals are client communication devices. Exhibit 1010, Tanigawa at [0162]-[0166].

### 1.     A "Portal" Is *Not* A User Terminal Or A Client Communication Device

64.     "In the context of the Internet, a portal refers to any commonly used website serving as an entry point to the Internet, usually with many links to a wide variety of information, data, resources and services." *See, e.g.*, https://www.techopedia.com/definition/13077/portal-internet.  "Portal is a term, generally synonymous with gateway, for a World Wide Web site that is or proposes to be a major starting site for users when they get connected to the Web or that users tend to visit as an anchor site. *Id*. There are general portals and specialized or niche portals." *See, e.g.*, https://www.techtarget.com/whatis/definition/portal.  Websites are hosted on web servers, not on communication devices such as Tanigawa's client terminals 7-1, 7-2, 7-3.

### 2.     The '038 Specification Defines "Portal" As A "Gateway" And Defines A "Gateway" As A "Networked Server"

65.     Consistent with its common meaning, the specification of the '038 patent defines a "portal" as a "communication gateway". Exhibit 1001, '038 Patent

26

at Col. 4, line 22, Col. 4, lines 62-63, Col. 7, lines 11-12, and Col. 7, line 15.  The

specification also defines a "gateway" as a "networked server":

> The remote server computer can be a networked server coupled to the
> network 108. One example of a networked server is a gateway
> computer for a wireless 10 electronic device, such as a mobile
> telephone.

Exhibit 1001, '038 Patent at Col. 16, lines 15-18.  Importantly, the '038

specification does not define "portal" or "network-based portal" as a client

communication device.

### 3.    The Functionality Of A "Portal" Is Different Than That Of A Client Communication Device

66.    Based on the '038 specification's use of the term "portal", a POSITA

would understand that the functionality of the claimed "portal" is different than

that of a client communication device.  Specifically, a POSITA would understand

that a portal allows "worldwide access", whereas a client device is "associated with

a user".  This is consistent with the teachings of the '038 specification:

> (1)    "The portal allows worldwide access to the user"

Exhibit 1001, '038 Patent at Col. 4, lines 52-53;

> (2)    "A portal or gateway approach could provide general Internet
> access to one or more embodiments of the communication management
> systems"

Id. at Col. 7, lines 11-14 (indicating that a portal can be accessed by multiple users

through the Internet);

27

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

As explained above (and recognized by the Board), the teachings of Tanigawa and Hullfish as a whole render the challenged claims obvious.[3]

### B.    Tanigawa Teaches A "Network-Based Portal"

As the Board recognized with respect to Element 7.0, giving the term "network-based portal" its "ordinary and customary meaning," Tanigawa teaches the claimed NBP—namely, a user interface that connects clients to a network.  *See* ID, 23–25; Pet., 37–39; Ex. 1003, ¶¶ 397–398.  In both the '038 Patent and Tanigawa, the claimed functionality appears in mobile phones—which PO admits are client devices.  POR, 23.

In the POR, PO revives the same argument the Board already rejected: that the NBP resides only at the server-side of a network and excludes user interfaces of client communication devices such as Tanigawa's user interface.  POR, 15–16.  PO's argument is wrong for several reasons.

---

[3] Dr. Rouskas further opined that a POSITA would not be motivated to combine Hullfish's blocking features in Tanigawa because the costs of modifying Tanigawa would outweigh the benefits such that a POSITA would not "make a profit to implement that feature."  Ex. 1043, 318:12–21.  These opinions are not based on the motivation-to-combine standard and should be disregarded.

9

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

***First***, PO relies on the Rouskas Declaration's offering of extrinsic definitions to show that "portals" are websites, but Dr. Rouskas admitted "[t]here's nothing to limit the portal to just a server or a website." *Compare* POR, 16–17, *with* Ex. 1043, 60:7–61:8; *see also id.*, 57:7–11 (declining to equate "portals" to websites), 58:5–9 (same). Moreover, Dr. Rouskas admitted the two definitions in the Rouskas Declaration were cherry-picked from search results for "portal" rather than from any nuanced inquiry or analysis. *Id.*, 62:24–63:10. This method selectively disregarded definitions that include the word "interface." *See* Exs. 1041 ("A portal is a web-based platform that collects information from different sources into a single ***user interface***[.]"), 1042 ("A mobile portal is an Internet gateway that enables mobile devices to connect remotely . . . typically via a Web browser ***interface***."). In any event, PO's argument limiting "portals" to websites is based on a fundamental misunderstanding of the claim, which Dr. Rouskas yielded in deposition: the Rouskas Declaration claims the NBP cannot be in a client device because it must be "***hosted*** on [a] web server[]," but Dr. Rouskas acknowledged no claim limitation requires the NBP to be "hosted." *Compare* Ex. 2005, ¶ 64 *and* Ex. 1043, 84:11–14, *with id.*, 84:16–85:11.

***Second***, PO incorrectly argues the '038 Patent defines "portal" as a "gateway" and that a gateway is always a "networked server." POR, 17. But the specification states that "[a] communication gateway ***or*** a portal is formed"—not that the portal ***is***

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

a communication gateway. Ex. 1001, 4:23–24. Indeed, the specification treats the phrase "portal or gateway" differently from the singular "portal," using these phrases to describe different embodiments, indicating that portals and gateways are two alternative means to establish communication. *See id.*, 4:33–47; 4:48–62, 4:62–5:4. The specification further states that "[o]ne example of a networked server is a gateway computer"—not that all gateways are servers. Ex. 1001, 16:17–19. Dr. Rouskas admits as much. Ex. 1043, 96:20–97:1 ("It doesn't say that [gateway] means network[ed] server, yes."); *see also id.*, 94:18–95:1. Dr. Rouskas nevertheless opines that the word "or" defines "portal" as "gateway." Ex. 1043, 90:17–24. But the '038 Patent's recitation of "portal or gateway" means the two are alternatives, not that one redefines the other. *See Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1367-68 (Fed. Cir. 2012) (holding that the phrase "embedded within *or* attached to" did not redefine "embedded" as "attached" or vice versa).

**Third**, PO argues the NBP and client devices have different functionalities because the NBP "allows worldwide access to the user," whereas a "client communication device is 'associated with a user.'" POR, 18–19. This is a distinction without a difference. As the Petition explains, Tanigawa's client terminal (1) connects a user to a network via the NBP **and** (2) is associated with that user. Pet., 37–39. For instance, as Dr. Rouskas admitted, a user's mobile phone allows worldwide access to that user by allowing others to communicate with the user.

11

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

Ex. 1043, 110:20–24, 114:2–5 ("One is worldwide access to the user. A phone provides that. There's no question about that."). PO offers no explanation why such a device "is not accessible 'worldwide.'" POR, 22.

**Fourth**, PO counters a strawman argument (that only the **sender's** device contains the NBP) that Petitioner did not advance. POR, 20–21, 24–25, 35–36. Relying on this mischaracterization, PO concludes Tanigawa cannot meet the NBP limitation, the identifier limitation (*i.e.*, a user's "corresponding identifier" is "set via the network-based portal") because a recipient cannot use the sender's device to set the recipient's identifier, and the negative limitation (*i.e.*, communicating without providing contact information) because senders' devices would have access to others' contact information. *Id*. This is incorrect.

As the Petition explained, **all** users (including senders and recipients) use Tanigawa's NBP to connect to Tanigawa's network—*i.e.*, the NBP does not solely exist in a sender's device. Pet., 37–39; Ex. 1003, ¶ 398. As Tanigawa explains, senders **and recipients** access the NBP via their respective devices. *See* Ex. 1010, [0162], Fig. 12. Accordingly, as shown below in Tanigawa's Figures 1 and 12, **all** users of Tanigawa's system access it via client terminals (7-1, 7-2, 7-3), which contain a user interface that connects clients to a network (*i.e.*, the NBP), indicating that both senders and recipients use this interface:

12

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

FIG.1



13

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)



Ex. 1010, Figs. 1, 12.

*Fifth*, although the Board found PO's argument excluded a preferred embodiment of the '038 Patent (specifically Figures 7–11), PO insists its argument did not because the figures allegedly describe methods performed after receiving a message, rather than enabling receipt of a message.  POR, 22–24.  That is incorrect. The '038 Patent's claims state "the first message is received by the second user." Ex. 1001, cls. 7, 38, 46.  In fact, as the Board understood, key "recipient" functionality (*i.e.*, allowing users to specify who may contact them and see their contact information), takes place "all in the phone," since these phones

14

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

"automatically manage the communication." *Id.*, 7:32–36; ID, 23–24. Thus, the

NBP not only enables receipt of messages but also manages them. *See* Ex. 1003,

¶¶ 397–98.

Moreover, contrary to PO's argument, the client devices described by the '038

Patent enable messages to be received, as annotated in Figure 7 below:



FIG. 7

Petitioner's Reply to Patent Owner's Response
IPR2022-00295 (U.S. Pat. No. 10,492,038)

Ex. 1001, Fig. 7; *see also id.*, Figs. 8–11, 3:29–33, 9:22–10:5, 10:34–13:43, 15:12–16:19.

Faced with this fact, PO argues these disclosures are "not embodiments for 'managing electronic communications using at least a network-based portal' as are the claims of the '038 Patent." POR, 24. This is not correct. All of the '038 Patent's independent claims recite an NBP—thus, because the patent's figures are embodiments of the patent, they must include an NBP. PO remains silent as to the purpose of these disclosures, if not related to the claims. As the Board recognized, a construction "which excludes the preferred embodiment is rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) (internal quotation marks omitted). PO's argument thus fails.

### C.     Tanigawa Teaches A "Prior Registration Process"

With respect to Element 7.1, PO concedes both Tanigawa and Hullfish teach users registering with a server. POR, 28. The Board also acknowledged this point. ID, 41–44. Indeed, Tanigawa teaches that users register nicknames, account names, authentication keys, and addresses. Ex. 1010, [0085]. Further, Tanigawa discloses a log-in process where users' credentials are compared to pre-existing (*i.e.*, pre-registered) entries in the presence information management table. *See id.*, [0118]–[0119]; Pet., 45–46; Ex. 1003, ¶¶ 409–10.

16

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that on March 18, 2024, I electronically filed the foregoing using the Court's CM/ECF filing system. All counsel of record who are deemed to have consented to electronic service, including counsel for appellant, were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).


Dated: March 18, 2024               Respectfully submitted,


                                    */s/ Carolyn Chang*
                                    Carolyn Chang
                                    MARTON RIBERA SCHUMANN
                                        & CHANG LLP
                                    548 Market Street, Suite 36117
                                    San Francisco, CA 94104
                                    Telephone: (415) 360-2514

                                    *Counsel for Appellant Epic Games, Inc.*